FILED

2003 DEC -9 A 11: 10

US DISTRICT COURT
HARTFORD CT

UNITED STATES DISTRICT COURT
for the
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| LISA K. BLUMENSCHINE, | : | CIVIL ACTION NO. 302CV2244 DJS |
| Plaintiff, | : | |
| vs. | : | |
| PROFESSIONAL MEDIA GROUP LLC | : | DECEMBER 8, 2003 |
| Defendant. | : | |

### DEFENDANT'S LOCAL RULE 9(c)1 STATEMENT

Pursuant to the provisions of Local Rule 9(c)1, defendant Professional Media Group, LLC ("the Company") submits the following undisputed facts in support of its Motion for Summary Judgment:

1. Plaintiff Lisa K. Blumenschine ("Blumenschine") was 50 years old when her employment was terminated by the Company, having been born June 27, 1951.  Complaint, para. 7.

2. Defendant Professional Media Group LLC ("the Company") publishes two magazines: "District Administration" and

"University Business incorporating Matrix," the latter of which is addressed to college and university administrators. Deposition of William Ziperman ("Ziperman dep."), pp. 10-11, and Ex. "I" at para. 1.

3. The Company has 32 employees. Ziperman dep., Ex. "I" at para. 2.

4. Since 1998, the Company has employed 26 women and 24 men, and currently employs at least 14 women and 18 persons over the age of 40, including Joe Hanson, Bill Ziperman, Dan Kinnaman and Dan Shannon. Shannon Dep., Ex. "P".

5. There is no formal corporate heirarchy in place at the Company, nor was there ever one in place during Blumenschine's employment. Deposition of Joseph Hanson ("Hanson dep."), p. 15; Deposition of Daniel Kinnaman ("Kinnaman dep."), pp. 39, 51-52.

6. The Company has an "open door" policy. Kinnaman dep., p. 51; Deposition of Daniel Shannon ("Shannon dep."), p. 50.

7. Joseph J. Hanson ("Hanson") is managing member and co-owner of the Company. Hanson dep., p. 4; Ziperman dep., p. 19.

8.  Hanson makes all executive decisions for the Company. Hanson dep., p. 15; Kinnaman dep., pp. 21-22; Ziperman dep., p. 19.

9.  Shortly after Blumenschine joined the Company, she recognized that there were employees older than plaintiff, including Fran Cassone, Joanna Melfi, and Ms. Terry Nelson, a female salesperson who worked with plaintiff on "Matrix" magazine. Blumenschine dep., pp. 79-81.

10. Blumenschine began her employment with the Company that is the subject of this litigation in January 2000. Complaint, para. 6.

11. Blumenschine's initial title with the Company was "National Sales Manager." Complaint, para. 6.

12. Blumenschine's primary responsibility was the sale of advertising space for "Matrix" magazine. Kinnaman dep., pp. 37-38; Shannon dep., p. 46; Ziperman dep., pp. 22-23.

13. In January 2000, when Blumenschine was hired, "Matrix" was a start-up publication aimed at college and university administrators. Ziperman dep., Ex. "A."

14. Revenue from "Matrix" was derived almost exclusively from the sale of advertising space, since the publication was largely given away for free. Ziperman dep., p. 10, Ex. "H" para. 1, Ex. "I" para. 3.

15. Blumenschine understood that she would be responsible for generating advertising sales. Blumenschine dep., pp. 46-47, 117.

16. For the first year (2000), Blumenschine's compensation consisted of base pay of $80,000 (Blumenschine dep., p. 52) and a "nonrecoverable draw against commissions" of $60,000. Blumenschine dep. p. 52; Ziperman dep., pp. 21-22.

17. Blumenschine's draw was "nonrecoverable" during 2000 because the Company knew that in the first year, "Matrix" would not generate sufficient revenues to pay sales commissions. Ziperman dep., pp. 20-21.

18. At all times during Blumenschine's employment with the Company, sales territory for "Matrix" magazine was divided by the Company in the following manner: Terry Nelson, Midwest; George Saroyan, West Coast; and Lisa Blumenschine, East Coast. Blumenschine dep., pp. 47, 81; Hanson dep., pp. 32-33; Ziperman dep. Ex. "F."

19. Advertisement space in the inaugural issue of "Matrix" was offered for free as an enticement for continued ad sales from initial customers. Hanson dep., pp. 32-33.

20. For the remaining issues of "Matrix," total advertising sales can be broken down between the sales territories and salespersons as follows:

|  | East Coast Blumenschine | Midwest Nelson | Southwest Saroyan |
|---|---|---|---|
| 9/00 | 44,478.38 | 49,254.65 |  |
| 10/00 | 28,812.88 | 31,193.30 |  |
| 11/00 | 34,031.20 | 37,830.95 |  |
| 2/01 | 24,762.38 | 38,188.38 |  |
| 4/01 | 21,658.00 | 24,730.75 | 9,201.25 |
| 6/01 | 31,219.13 | 35,078.65 | 4,840.75 |
| 9/01 | 27,429.08 | 21,230.03 | 9,681.50 |
| 10/01 | **13,115.50** | 57,926.03 | 16,889.50 |
| 11/01 | **5,504.17** | 35,236.75 | 4,840.75 |
| Total | 231,010.71 | 330,669.48 | 45,453.75 |

Ziperman dep. Ex. "F" (emphasis added).

5

21. In or around the end of September 2001, Blumenschine told Kinnaman her sales figures were not where she would like them to be. Blumenschine dep., p. 121.

22. Hanson and Blumenschine had several conversations during the course of Blumenschine's employment in which Hanson directly expressed to Blumenschine the Company's concern with her poor sales performance. Hanson dep., p. 42.

23. Blumenschine stated to Daniel Shannon that she expected to be fired because of her lack of sales volume (Shannon dep., pp. 66-67) and, in December 2001, asked him when the Company would terminate her to put her out of her misery. Blumenschine dep., pp. 122, 126, 188-189; Answer to Interrogs. 8.

24. In May 2001, Blumenschine's nonrecoverable draw against commissions was terminated by the Company. Answer to Interrogs. 8; Blumenschine dep., p. 58; Hanson dep., pp. 47-48; Ziperman dep., pp. 49-50.

25. Blumenschine's sales figures for 2001 could not justify any nonrecoverable draw or commission plan. Ziperman dep., pp. 28, 51; Answer to Interrogs. 4.

26. Blumenschine understood that her nonrecoverable draw against commissions was discontinued because of poor actual and projected sales. Blumenschine dep., p. 123; Ziperman dep., pp. 49-50.

27. Blumenschine admits her sales figures were not meeting even her own goals. Blumenschine dep., p. 123.

28. After her nonrecoverable draw was terminated in May 2001, Blumenschine continued to work for the Company. Blumenschine dep., pp. 69-70, 78; Hanson dep., p. 48; Answer to Interrogs. 4.

29. At Blumenschine's request, on or about September 15, 2001, Blumenschine's job title was changed by the Company to "Associate Publisher." Complaint, para. 14; Kinnaman dep., pp. 37-40, 42; Ziperman dep., pp. 59, 86-87, Ex. "G."

30. The Company's purpose was to provide Blumenschine with a title <u>she had explicitly requested</u> in an effort to assist her to increase her advertising sales for "Matrix" and to provide her with additional status in the marketplace to "open doors" to new business. Kinnaman dep., pp. 37-40; Shannon dep., pp. 29-30; Ziperman dep., pp. 59, 85-86, Ex. "I" para. 4.

31. The Company did not view this change as a promotion of any sort, merely a change in title. Deposition of Daniel Boucher ("Boucher dep."), pp. 34-35, 51; Hanson dep., p. 43; Kinnaman dep., pp. 37-42; Ziperman dep., pp. 59, 87-88.

32. This change in job title was not accompanied by any increase in Blumenschine's pay; the Company did not hire any additional salesperson because of the change in Blumenschine's title. Hanson dep., p. 43.

33. Blumenschine retained her full sales responsibility after the title change. Blumenschine dep., pp. 82, 151; Kinnaman dep., pp. 38, 41-42; Ziperman dep., pp. 60-61.

34. Blumenschine's management responsibilities were extremely limited, both prior to and after the title change. Blumenschine dep., pp. 84-86; Boucher dep., Ex. "O"; Hanson dep., pp. 34, 42; Kinnaman dep., pp. 40-41; Shannon dep., pp. 46, 62-65; Ziperman dep., pp. 60, 87-88.

35. Blumenschine gave no sales goals to any Company employee. Blumenschine dep., p. 203.

36. All sales goals were determined by or otherwise came from the Publisher of "Matrix," not Blumenschine. Blumenschine dep., pp. 85, 203.

37. Blumenschine claims she was not privy to, and had no input regarding, the Company's decision to terminate George Saroyan, a younger, male salesperson. Blumenschine dep., pp. 87, 188.

38. Blumenschine's "management responsibility" for George Saroyan consisted of nothing more than relaying information received from the Publisher of "Matrix" to Saroyan. Blumenschine dep., pp. 84-85.

39. Blumenschine claims she was not privy to and had no input regarding the Company's decision to place Ms. Terry Nelson on temporary probation. Blumenschine dep., pp. 164-167.

40. Hanson regularly reviewed sales figures and projected sales for the Company's two magazines. Hanson dep., p. 32; Kinnaman dep., p. 51; Shannon dep., pp. 21-22.

41. The tragic events in New York City on September 11, 2001, caused the advertising industry to suffer. Blumenschine dep., pp. 161-162; Hanson dep., p. 39. These events affected

sales volume for "Matrix" magazine in fall 2001. Blumenschine dep., pp. 114-115; Hanson dep., p. 63.

42. However, despite the struggling technology and advertising markets, Ms. Terry Nelson, a female employee older than Blumenschine, continued to have strong sales. Hanson dep., pp. 34-35; Ziperman dep., p. 58, Ex. "H" para. 2; see also, para. 20, supra.

43. Blumenschine's sales volume decreased significantly throughout the latter part of 2001 (Blumenschine dep., p. 115; see also, para. 20, supra), and was projected to continue in an appreciable decline. Hanson dep., pp. 32, 34-35; Ziperman dep. Ex. "F".

44. Blumenschine asked the Company's managers if she would be fired or if her job was in jeopardy because of her poor sales. Hanson dep., p. 42; Kinnaman dep., p. 46; Ziperman dep., Ex. "I" para. 5. Blumenschine admits she asked Shannon this. Blumenschine dep., pp. 188-189; Answer to Interrogs. 8.

45. The Company's managers specifically assessed Blumenschine's dramatically-declining sales revenues, actual and projected, for the last few months of 2001 and projected into

early 2002.  Hanson dep., pp. 49-51; Shannon dep., pp. 39-41, 53, 60, 85; Ziperman dep., pp. 68-69; Answer to Interrogs. 13.

46.  Based solely on her failure to generate advertising sales for "Matrix" magazine, in or about mid-November 2001, Joe Hanson made a business decision that the Company must terminate Blumenschine.  Hanson dep., pp. 49-51; Hanson dep., Ex. "R"; Shannon dep., p. 39; Answer to Interrogs. 1.

47.  As a courtesy, the Company waited until after the holiday season 2001 to inform Blumenschine of its decision. Hanson dep., pp. 51-52; Shannon dep., Ex. "Q", para. 14.

48.  Blumenschine was terminated as of January 2 or 3, 2002. Complaint, para. 20; Hanson dep., Ex. "R"; Shannon dep., Ex. "P".

49.  Although Blumenschine complains that a "similarly situated young male" was not similarly treated, despite low sales figures (Complaint, para. 22), she admits that the person referred to was George Saroyan ("Saroyan").  Blumenschine dep., p. 175.

50.  In fact, on or about November 27, 2001, Saroyan, a part-time salesman for "Matrix", was dismissed by the Company for his poor sales performance.  Hanson dep., Ex. "R".

11

51. Blumenschine now admits Saroyan was terminated a few weeks prior to her own termination because the Company was dissatisfied with Saroyan's performance, as well as his sales volume. Blumenschine dep., pp. 83-84.

52. In or around September of 2001, Dan Shannon replaced Kinnaman as Publisher of "Matrix" magazine, and consequently became Blumenschine's direct supervisor. Complaint, para. 16; Blumenschine dep., p. 84; Shannon dep., p. 26; Ziperman dep., pp. 54-55.

53. Blumenschine had no problems working with Shannon until December 2001. Blumenschine dep., p. 213.

54. The only direct evidence Blumenschine claims to have of sex discrimination is one occasion in late October or November 2001, when Blumenschine herself made a comment referring to management personnel at the Company as a "boys' club." Complaint, para. 18; Blumenschine dep., pp. 127, 128, 179; Shannon dep., pp. 49-51.

55. Blumenschine did not make any complaints about Dan Shannon, the "boys' club" -- or <u>any</u> other alleged act of sex discrimination -- to <u>any</u> other management personnel or employee at the Company. Blumenschine dep., pp. 134-135; Hanson dep., pp.

54-55; Kinnaman dep., pp. 35-36, 55; Shannon dep., p. 106; Ziperman dep., p. 88, Ex. "H" para. 3.

56. Blumenschine never made any purported complaint of any kind of discrimination to Hanson. Blumenschine dep., p. 130; Hanson dep., pp. 54-55.

57. No one at the Company was aware that Blumenschine's comment about a "boys' club" was intended to be a complaint of sex discrimination until Blumenschine started these legal proceedings against the Company. Hanson dep., pp. 53-55; Kinnaman dep., p. 55; Shannon dep., p. 106; Ziperman dep., pp. 80-81.

58. Blumenschine's "boys' club" comment was not known and never mentioned during the Company's discussion(s) about terminating, and decision to terminate, Blumenschine. Hanson dep., p. 62; Ziperman dep., p. 81.

59. The only time in its history the Company actually did receive a complaint of inappropriate behavior and/or discrimination concerning an employee (Dan Boucher), the Company immediately investigated and took remedial action, eventually terminating the employee involved (an incident which had nothing

to do with Blumenschine). Boucher dep., pp. 57-59; Hanson dep., pp. 18-19; Shannon dep., pp. 101-104.

60. Blumenschine's only evidence of her claim that Shannon told off-color, sexist, or otherwise inappropriate jokes (Complaint, para. 17), is a single occasion, or perhaps two, where Shannon was purportedly telling Viagra jokes. Blumenschine dep., pp. 196-197, 247.

61. Even this alleged joking was done in the presence of others and was not directed toward Blumenschine personally. Blumenschine dep., pp. 196-197, 246-247.

62. Any alleged inappropriate joke-telling was done in mixed company at business conventions. Blumenschine dep., p. 246.

63. No one at the Company has otherwise known Shannon to tell, or ever complained of his telling, any inappropriate joke. Boucher dep., p. 53; Hanson dep., p. 46; Kinnaman dep., p. 56; Ziperman dep., p. 83.

64. Blumenschine can only recall one specific meeting from which she was ever allegedly excluded. Blumenschine dep., pp. 185-186.

65. The Company did not give Blumenschine additional duties after September 2001 which required her to attend such a management meeting. See paras. 33-39, supra.

66. The alleged exclusionary meeting occurred in December 2001, at a time after the Company had made its decision to terminate Blumenschine. Shannon dep., pp. 44-45; see para. 46, supra.

67. Blumenschine <u>did not complain</u> about her perceived exclusion to anyone <u>except</u> Dan Shannon in December 2001, by which time Hanson had already decided to terminate Blumenschine's employment for poor sales performance. Blumenschine dep., pp. 130, 152-153; Hanson dep., Ex. "R".

68. In or about <u>December</u> 2001, the Company received notice that its principal competitor, "University Business," was going out of business and would publish its last issue in January 2002. Hanson dep., pp. 51, 53 and Ex. "R"; Shannon dep., pp. 41-42.

69. Shortly thereafter, Hanson initiated discussions with the owners of "University Business" as to the possibility of the Company acquiring some of its assets. Hanson dep., p. 8.

70. The owners of University Business ultimately agreed to sell certain assets to the Company, including the right to continue publication of "University Business," and the acquisition was consummated in early 2002. Hanson dep., p. 7; Ziperman dep., Ex. "I", para. 8.

71. In or about December 2001, <u>after</u> the Company had made its decision to terminate Blumenschine, two sales personnel from "University Business," Tom Terry and Darren Sikorsky, approached the Company to discuss employment possibilities with the Company. Hanson dep., p. 53; Shannon dep., Ex. "Q", paras. 15, 16.

72. The Company had decided to terminate Blumenschine before ever being approached by these two salespersons. Shannon dep., p. 44; see paras. 45-47, supra.

73. Although hired by the Company when it acquired the assets of University Business in early 2002, Mr. Sikorsky was terminated by the Company in or about December 2002, and Mr. Terry was terminated by the Company in or about April 2003, both for poor sales performance. Hanson dep., Ex. "R."

74. Terry Nelson is a highly-compensated female employee of the Company <u>older than Blumenschine</u>, who consistently sold more advertising space than Blumenschine during Blumenschine's tenure

with the Company, and Ms. Nelson continues to be employed by the Company. Blumenschine dep., pp. 80-81, 92; Ziperman dep., Ex. "F" and Ex. "I", para. 4.

75. Ms. Melanie Jenkins, a 46-year-old female, was the Company's most highly compensated employee in 2001. Shannon dep., Ex. "Q", para. 11; Ziperman dep., Ex. "I", para. 6.

76. Ms. Nelson and Ms. Jenkins, both females over forty, were and remain among the Company's top five (5) most highly compensated employees. Ziperman Ex. "I", paras. 4 and 6.

77. Blumenschine admits she was not terminated exclusively because of her age. Blumenschine dep., pp. 90, 93, 147-148, 150.

78. Hanson repeatedly discussed Blumenschine's poor sales performance with her before her termination. See para. 22, supra.

Respectfully submitted,

DEFENDANT PROFESSIONAL MEDIA
GROUP LLC

By: _____
Thomas E. Minogue (CT06845)
Michael L. Ferch (CT24764)
Minogue Birnbaum LLP
Attorneys for Defendant
237 Elm Street
New Canaan, CT 06840
(203) 966-6916

TO:  Scott R. Lucas, Esq.
     Martin, Lucas & Chioffi, LLP
     Attorneys for Plaintiff
     177 Broad Street
     Stamford, CT  06901
     (203) 973-5200

## CERTIFICATION

This is to certify that a copy of the foregoing was sent by Federal Express to the following counsel of record on December 8, 2003:

>Scott R. Lucas, Esq.
>Martin, Lucas & Chioffi, LLP
>177 Broad Street
>Stamford, CT  06901

_____
MICHAEL L. FERCH