

UNITED STATES DISTRICT COURT
for the
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| LISA K. BLUMENSCHINE, | : | CIVIL ACTION NO. 302CV2244 DJS |
| Plaintiff, | : | |
| vs. | : | |
| PROFESSIONAL MEDIA GROUP LLC | : | DECEMBER 8, 2003 |
| Defendant. | : | |

**AFFIRMATION OF MICHAEL L. FERCH IN SUPPORT
OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

MICHAEL L. FERCH, an attorney duly admitted to practice before this Court, hereby affirms under penalty of perjury:

1. I am counsel to Minogue Birnbaum LLP, attorneys for defendant Professional Media Group LLC ("the Company" or "ProMedia") in this matter. I make this affirmation in support of defendant's motion for summary judgment dismissing plaintiff's Complaint on the various grounds set forth herein and as supported by the accompanying Memorandum of Law.

Introduction

2.  The salient facts on this motion, as detailed in Defendant's Local Rule 9(c)1 Statement, have been adduced through documents filed with the Court in this matter or exchanged between parties, and deposition testimony and relevant exhibits attached thereto, which are submitted herewith in a separate binder as follows:  Complaint of Plaintiff Blumenschine (Exhibit "A"); Deposition of Plaintiff Blumenschine (Exhibit "B"); Deposition of Joseph J. Hanson ("Hanson dep.") (Exhibit "C"); Deposition of William Ziperman ("Ziperman dep.") (Exhibit "D"); Deposition of Daniel Shannon ("Shannon dep.") (Exhibit "E"); Deposition of Daniel Kinnaman ("Kinnaman dep.") (Exhibit "F"); Deposition of Daniel Boucher ("Boucher dep.") (Exhibit "G"); Plaintiff's First Set of Interrogatories and Defendant's Answers and Objections thereto ("Answer to Interrogs.") (Exhibit "H").  For ease of reference, citations to deposition testimony will refer to the deponent, then the number of the transcript page or relevant exhibit number.

3.  Plaintiff Lisa K. Blumenschine ("Blumenschine") is angry and disappointed over having been dismissed by the Company because the Company's co-owner and managing member, Joseph J. Hanson ("Hanson") made the determination that Blumenschine's

2

declining sales performance on "Matrix" magazine was so poor that her employment should not continue.

4. Anger and disappointment, however, cannot support a claim of Federal employment discrimination in the absence of any objective facts tending to prove that the relevant decision-maker -- here, Mr. Hanson -- was motivated by discriminatory intent.

5. The context of the employment situation at bar is relevant: ProMedia is a very small company -- at no pertinent time did it have more than 32 employees -- with its main office on one-half of one floor of a Norwalk, Connecticut office building. The Company employs at least 14 women and 18 persons over the age of 40 (Shannon dep., Ex. "P"). The Company publishes two magazines for distribution to the educational market -- District Administration (formerly Curriculum Administrator), aimed at high school administrators and University Business (formerly Matrix, and referred to herein as "Matrix"), directed at the purchasing authorities of colleges and universities.

6. Blumenschine was hired in January 2000 to sell advertising for "Matrix," which was a "start-up." Blumenschine knew that such sales of advertising were crucial to any financial success of Matrix because almost all copies of

"Matrix" are distributed <u>free of charge</u> to university administrators, so any meaningful revenue must come from advertising sales. Blumenschine admits she understood that the Company was a "start-up" where "Matrix" was concerned: at no time during the two years Blumenschine worked for the Company did "Matrix" show a profit, nor has it still shown a profit two years later. The Company, as Blumenschine well knew, was supported only by infusions of cash by its co-owners, and <u>all meaningful decisions</u>, including the decision to hire and fire, were made by Joseph Hanson, the co-owner who was the managing member of the Company.[1]

7. Hanson's only interest was sales performance, as Blumenschine well knew, not age or gender; Hanson is 73 years old himself and two of the Company's top five employees in terms of salary, both at the time Blumenschine was terminated and continuing to date, are women, both of whom are over forty and one of whom is older than Blumenschine (see Ziperman, Ex. "I" at paras. 4 and 6; see also, Rule 9(c)1 Statement, para. 4).

---

[1] Hanson worked in the same offices as Blumenschine, and Blumenschine had previously worked for another company Hanson had owned (Blumenschine dep., pp. 22-25, 32; Hanson dep., pp. 8-9); she knew Hanson well enough personally to invite Hanson and his wife to her "commitment ceremony" (equivalent to a wedding), which the Hansons did attend (Blumenschine dep., p. 174). With this background, Blumenschine's admitted failure to say <u>anything</u> about purported discrimination to Hanson (Blumenschine dep., p. 130; Hanson dep., pp. 54-55) -- who had hired her twice and was the ultimate decision-maker who terminated her -- shows what a sham this case is.

4

8. Blumenschine was repeatedly advised during her time with the Company to focus her energies on the area for which she was hired: generating advertising sales for "Matrix." Officers of the Company repeatedly discussed with Blumenschine their dissatisfaction with her sales job performance, and she admits she knew full well her sales performance was poor (Blumenschine dep., pp. 121-123, 126; Hanson dep., p. 42; Kinnaman dep., p. 46; Shannon dep., pp. 66-67, 188; Ziperman dep., pp. 49-52).

9. Initially hired with the title of "National Sales Manager," Blumenschine lobbied for, and was ultimately granted on September 13, 2001, a change in title to "Associate Publisher." Blumenschine makes much of a memorandum which she herself requested be sent out praising her and heralding her new job, but will not deny that the change in title was <u>not</u> accompanied by any increase in pay. She will also admit that she requested the new title by arguing that it would assist her in increasing her sales volume by making it easier to approach and inspire confidence in potential advertisers (Kinnaman dep., pp. 37-40, 42; Ziperman dep., pp. 59, 85-86, Ex. "I" para. 4).

10. The new title did not help. Instead of achieving increased sales after the change in title, Blumenschine's sales continued to decline precipitously in the following three months (Blumenschine dep., p. 15; Hanson dep., pp. 32, 34-35, 49-51;

Shannon dep., pp. 39-41, 53, 60, 85; Ziperman dep., pp. 68-69, Ex. "F").

11. Blumenschine cannot attempt to portray herself, after her change in title, as having other duties than sales, since at her deposition she was forced to admit that she was given no additional responsibilities other than advertising sales (Blumenschine dep., p. 82; see also Rule 9(c)1 Statement, paras. 33-39). She admits that all sales goals for the two persons she allegedly "supervised" were decided and given out by the Publisher without her input (Blumenschine dep., pp. 85, 203); that a decision as to Terry Nelson (an older) saleswoman Blumenschine supposedly oversaw on "Matrix," was made without her knowledge or input (Blumenschine dep., pp. 164-167); that the Company's decision to terminate part-time "Matrix" salesperson George Saroyan ("Saroyan"), again on the basis of performance, was made without her knowledge or input (Blumenschine dep., pp. 87, 188); that any criticism of Saroyan was levied by the Publisher (Blumenschine dep., pp. 84-85); and that she acted basically as a conduit of information between the Company's managers and these two other salespeople (Blumenschine dep., pp. 84-85, 166-167). Clearly, the change in title, made at Blumenschine's request, involved no different responsibility

6

than she had before: she had to sell advertising and if she didn't, there was no job.[2]

12. When Blumenschine was hired in early 2000, "Matrix" was a "start-up" whose sales in the first year were not projected to be high enough to justify Blumenschine's agreed-on compensation for that year, so a $60,000 "non-recoverable draw" was added to her $80,000 base salary (Ziperman dep., pp. 20-22). In May 2001, plaintiff's nonrecoverable draw against commissions was terminated by the Company because the time had come when she should have been able to sell sufficient advertising to earn commissions (Blumenschine dep., p. 123; Ziperman dep., pp. 49-52). As it turned out, Blumenschine's sales never reached the point where she would be commissionable under any viable plan; in fact, Blumenschine's actual sales figures did not even justify her base salary of $80,000 per annum (Hanson dep., pp. 47-48; Ziperman dep., pp. 49-52). Blumenschine was well aware of the Company's decision to discontinue her nonrecoverable draw against commissions but nonetheless, Blumenschine continued to work for the Company (Blumenschine dep., pp. 69-70, 78; Hanson

---

[2] In her complaint, Blumenschine erroneously claims that the Company's retention of a "younger, male employee" shows discrimination; at her deposition, she had to admit that she was referring to Saroyan, who, in fact, was fired before Blumenschine was (Blumenschine dep., pp. 83-84, 175; Hanson dep., Ex. "R").

7

dep., p. 48; Answer to Interrogs. 4).

13. By mid-November 2001, Hanson had seen enough. Blumenschine's claim that the new title would help her realize the growth potential in her territory had not materialized (Hanson dep., pp. 34-35). In fact, it appears she nearly stopped selling altogether after the title change (Ziperman dep., p. 75). After having reviewed Blumenschine's sales figures, which had plummeted to a total of only $18,619.67 for October and November 2001 (compared to $93,162.78 sold by Terry Nelson (a woman <u>older</u> than Blumenschine) for the same period, and $21,730.25 sold by Saroyan, a <u>part-time</u> salesperson <u>whom the Company terminated before it terminated Blumenschine</u>) Hanson made the decision -- which was his alone (see Hanson dep., p. 15; Kinnaman dep., pp. 21-22; Ziperman dep., p. 19) -- to terminate Blumenschine (Hanson dep., pp. 49-51, Ex. "R"; Shannon dep., p. 39; Ziperman dep., p. 75). In consideration of the holidays, he waited until January 2002 to have her informed of his decision (Hanson dep., pp. 51-52; Shannon dep., Ex. "Q", para. 14).

14. Unable to accept responsibility for her woeful sales performance, which cost her a lucrative position with the Company, Blumenschine resorted to the instant lawsuit. Her claims of employment discrimination against the Company, based

8

on the actual evidence adduced in this matter, are wholly without foundation.

Procedural History of This Matter

15. Blumenschine first filed a complaint with the Connecticut Commission on Human Rights and Opportunities ("CHRO") and the Equal Employment Opportunity Commission ("EEOC") on April 12, 2002.

16. Blumenschine did not wait for an administrative determination, but on November 18, 2002, requested and received a Release to Sue from the CHRO. On November 25, 2002 the EEOC issued Blumenschine a Right to Sue letter, prompting the instant lawsuit before this Court (Complaint, para. 4).

17. Plaintiff's Complaint, filed on December 20, 2002 and served on or about January 14, 2003, contains nine purported Counts against the Company. Based on the evidence in this matter, including Blumenschine's own deposition testimony, the testimonies given under oath by key Company personnel, and admissions (and now admitted errors) in the Complaint itself, it is respectfully submitted that this Court should grant summary judgment in favor of the Company.

Analysis of the Complaint
In Contrast to the Evidence
Adduced at Depositions

18.  Paragraphs 1 through 15 of the Complaint portray Blumenschine as an exemplary employee as to whom no complaint was ever made; in fact, Blumenschine's deposition shows her awareness of her poor (and diminishing) sales, the basis upon which she was terminated (Blumenschine dep., pp. 59-60, 114-115, 121-123, 126, 188-189).

19.  The Complaint (paras. 16 through 25) then details a laundry list of supposedly "tyrannical" behavior exhibited toward Blumenschine after September 13, 2001, when Dan Shannon took over as Publisher of "Matrix" magazine and as Blumenschine's direct supervisor.  Brusque management style, even if true, is not discrimination.  When it comes to hard evidence, Blumenschine offers nothing other than her own subjective feelings and sheer conjecture to support any of the attenuated strands of purported discrimination.  As demonstrated below, it becomes clear by reviewing each of Blumenschine's purported Counts that none constitutes a viable legal claim.

20.  Finally, Blumenschine complains that her nonrecoverable draw against commissions was terminated, yet she admits that she understood the Company ended it in May of 2001

(Blumenschine dep., p. 58) and could not justify it on the grounds of her poor sales performance (Blumenschine dep., pp. 59-60, 123). She continued to work for the Company after May of 2001 for her base pay of $80,000 (Blumenschine dep., pp. 69-70). At no time thereafter did her sales justify even her base salary (Hanson dep., pp. 45-47; Ziperman dep., p. 28). Blumenschine admitted that she was sufficiently aware of her own poor sales figures to the point where she questioned the Company as to whether she would be terminated or not, based on her poor sales performance (Blumenschine dep., pp. 59-60, 121-123, 126, 188-189).

Blumenschine's Claims of Discrimination Are Unsupported by Evidence of Any Specific Discriminatory Acts

21. Blumenschine claims that the following evidence the Company's age and/or sex discrimination against her: after Daniel Shannon became her supervisor in September 2001, he (1) excluded her from "important and strategic meetings"; (2) made "sexist jokes"; (3) fostered a "disrespectful" atmosphere against her; (4) told her he wanted to recruit two "bright, young and energetic guys"; (5) did not "respond to plaintiff's complaints in a constructive manner" when she told Shannon that he was creating a "boys' club"; (6) she was "further ostracized"

11

as a result of her "boys' club" comment; and (7) that "another young male salesperson was not similarly treated despite his low sales figures" (Complaint, paras. 17, 18, 20-22).

22. As discussed below, the actual evidence adduced from Blumenschine herself, as well as from the Company's managers, does not support these claims. Nothing that the Company did constitutes any legally cognizable claim of discrimination, and there is no "genuine issue of material fact" allowing Blumenschine's concocted claims to proceed beyond this motion.

The First, Second, and Third Counts Alleging Purported Age and Sex Discrimination Must Be Dismissed.

23. Since the same evidentiary bases are relied upon by Blumenschine in support of her claims of sex and age discrimination under both Federal and Connecticut state law, and since, as the accompanying Memorandum of Law demonstrates, such claims must be analyzed under the same basic framework to determine whether Blumenschine has made a prima facie case of sex and/or gender discrimination and/or retaliation, these Counts are analyzed together to show that they have no basis in evidentiary fact.

24. In the First Count of Blumenschine's Complaint, she alleges that the Company discriminated against her on the basis

12

of <u>gender</u> by (1) "treating [her] in [sic] the manner unequal to other employees" (Complaint, para. 29); (2) having knowledge of discriminatory conduct (Id., para 30); (3) failing to "adequately investigate and remedy" the purported discriminatory treatment (Id., para. 30); (4) Shannon's "unreasonabl[e] interfere[ence] with [her] work performance" (Id., para 31); and (5) using Blumenschine's "complaints of discrimination" as the basis for her termination (Id., para. 31).

25.  Plaintiff's Third Count, alleging violation of Connecticut General Statutes, Sect. 46a-60(a) repeats these same allegations (Complaint, paras. 44-47).

26.  The Second Count of Blumenschine's Complaint alleges that the Company discriminated against her on the basis of <u>age</u> by: (1) Shannon's "unreasonabl[e] interfere[ence] with [her] work performance" (Id., para 38); and (2) using Blumenschine's "complaints of discrimination" as the basis for her termination (Id., para. 38). These allegations of discrimination and retaliation are precisely the same as are alleged as the basis for <u>gender</u> discrimination (see above).

27.  Blumenschine's claims are patently unsubstantiated by facts which would create any genuine issue for a jury to resolve. Since the first three Counts of Blumenschine's Complaint rely on the specific, alleged discriminatory acts set