forth in paragraph 21, <u>supra</u>, each can be analyzed in turn to show Blumenschine has proffered <u>no evidence</u> sufficient to sustain these Counts.

"Exclusions" from Meetings

28. Blumenschine claims she was excluded from "important and strategic" meetings by Shannon. However, at her deposition, Blumenschine could only offer a bare surmise: she saw meetings of management personnel occurring in the Company's conference room to which she was not invited (Blumenschine dep., p. 185); this happened two to three times (Id., p. 186); she admits that Shannon advised her of relevant portions of what transpired at the meetings (Id., p. 185).

29. Blumenschine is unable to adduce any proof, however, that Hanson, the Company's managing member and decision-maker, ever viewed Blumenschine's change in title as vesting her with management responsibilities necessitating her participation in "important and strategic" meetings (Hanson dep., pp. 34, 41-43; Ziperman dep., pp. 59-60, 87-88; see also, Rule 9(c)1 Statement, paras. 31 through 40). Blumenschine's subjective feeling that, after her title change, she was "not met with an attitude that would ... allow me to be part of any kind of management team" (Blumenschine dep., p. 151), in contrast to her admission that "[m]y function was to do what I was told" (Blumenschine dep., p.

14

84), only confirms that what the Company repeatedly asked of her was to focus on her primary responsibility, which was securing advertising sales for "Matrix" magazine (Hanson dep., p. 42; Rule 9(c)1 Statement, paras. 30-34.

Shannon's "Sexist" Jokes

30. Blumenschine's claim that Shannon told sexist jokes remains unsubstantiated by any testimony other than her own and, even accepting her own testimony, Blumenschine only recalls a single instance, perhaps as many as two, of such joking, in which Shannon made Viagra jokes in mixed company at a business convention or two (Blumenschine dep., pp. 246-247). Further, Blumenschine admits that that any purported joking was not made toward her personally (Id., p. 247). Blumenschine never complained to anyone at the Company about Shannon's purported joke-telling (Id., p. 197). At deposition, all other officers and employees of the Company flatly denied ever hearing, from anyone, that Shannon ever told objectionable jokes (Hanson dep., p. 46; Ziperman dep., p. 83; Kinnaman dep., p. 56; Boucher dep., p. 53). As the accompanying Memorandum of Law demonstrates (Point II ("Sexist Jokes") at p. 14), such an isolated incident

cannot, even if it were true, rise to the level of discrimination by the Company.[3]

Shannon Fostered a
"Disrespectful Atmosphere"
Toward Blumenschine

31.  As "evidence" of a disrespectful atmosphere, Blumenschine offers nothing more than the following insubstantial "proof" of her own feelings:  that Hanson, on one single occasion, did not meet her ideas for a change in "Matrix" with "any kind of positive reception or acceptance" (Blumenschine dep., p. 133) (i.e., "he didn't think I had a good idea" (Id.)); that she felt Shannon was "extremely sarcastic," was "very negative," was "very uninterested" toward her potential contributions to "Matrix" (Blumenschine dep., p. 179); and that she perceived Shannon as "condescending or negative" toward her sales work (Id., pp. 212-213).[4]  When Shannon was unreceptive to Blumenschine's suggestions, she was "not happy with that kind of response" (Id., p. 199).

32.  These are subjective feelings.  The only evidence of a

---

[3] If every Company who had an employee who told an isolated Viagra joke was guilty of sex discrimination in employment, every company in the country would be a defendant.

[4] Which would not have been surprising given Blumenschine's dramatically declining sales figures.

disrespectful atmosphere Blumenschine can offer is a <u>single instance</u> when Shannon allegedly talked over or interrupted Blumenschine during a meeting with Hanson! (Blumenschine dep., pp. 208-209). Blumenschine offers <u>no</u> evidence that there is <u>any</u> connection whatsoever between a purportedly brash management style (even if true) and any discriminatory intent against Blumenschine based on her age or gender. By contrast, Blumenschine <u>admits</u> that she was <u>not</u> <u>unhappy</u> working with Shannon until December 2001 (Id., p. 213), which presumably she would have been if he had manifested any gender or age bias. By this time, the Company (<u>i.e.</u>, Hanson) had already made its decision to terminate her (Hanson dep., pp. 49-51, 62, and Ex. "R"; Ziperman dep., p. 81; Rule 9(c)1 Statement, paras. 46, 58, 66-67).

33. Of course, overriding all of Blumenschine's "evidence" is the irrefutable fact that Hanson, who was the sole decision-maker when it came to Blumenschine's termination, admittedly knew <u>nothing</u> of Blumenschine's purported complaint (Blumenschine dep., p. 130; Hanson dep., pp. 54-55).

<u>The Company's Recruitment of Two "Bright, Young and Energetic Guys"</u>

34. Blumenschine's allegation that Shannon stated he wanted to recruit two "bright, young and energetic guys," even

17

if true, arguendo, does not constitute sufficient evidence of discrimination. The only "two guys" with whom the Company had contact during the relevant period were two salesmen on the staff of "University Business," a magazine in competition with "Matrix" which was admittedly going out of business at the end of 2001. (See, Rule 9(c)1 Statement, paras. 68-72).

35. Furthermore, the two events -- Blumenschine's termination for poor sales performance and the hiring of the salesmen -- were unrelated. The Company was approached by the two "University Business" salespeople in December, 2001 -- well after Joe Hanson had decided to terminate Blumenschine for her poor sales performance -- because they would soon be out of a job (Hanson dep., p. 53; Rule 9(c)1 Statement, paras. 68-72). In December 2001, the Company was actively seeking to purchase the assets of "University Business,"[5] and the opportunity to acquire its sales force -- with their existing customers and a track record of sales revenue far greater than that of "Matrix" (Ziperman dep., Ex. "I", para. 8; Shannon dep., Ex. "Q", paras. 15-16) -- made sound business sense. Discrimination had nothing to do with it.

---

[5] The acquisition of the assets of University Business took place in the first quarter of 2002, following which the magazine changed its name from "Matrix" to "University Business."

18

36. The fact the Company was looking to buy a competing magazine and bring aboard part of its sales force is not evidence of discrimination against Blumenschine, particularly since Blumenschine admits that the Company had discussed her poor sales with her (Blumenschine dep., pp. 188-189; Hanson dep., p. 42; Kinnaman dep., p. 46) and the Company's decision to terminate her had already been made.

Blumenschine's "Boys' Club"
Comment and Its Alleged
Aftermath

37. Blumenschine claims that on a single occasion she complained to Dan Shannon of the Company having a "boys' club" atmosphere (Blumenschine dep., pp. 127-128). Not only did <u>no one</u> at the Company besides Dan Shannon ever receive wind of this "complaint" from Blumenschine, but she specifically <u>admits</u>, as she must, that she never voiced this comment to Joe Hanson, the ultimate decision-maker with respect to her employment (as well as every other major decision at the Company):

> Q. Did you speak at all to Mr. Hanson about the fact that Mr. Shannon was creating a boys' club or any other -- any other form of dissatisfaction that you had with Mr. Shannon?
>
> * * *

>    Q.    That's right, that's my question, you never spoke to Mr. Hanson about any of these displeasures?
>
>    A.    Larger issues, <u>no</u>, <u>I</u> <u>never</u> <u>did</u>.

Blumenschine dep., p. 130 (emphasis added).

38.    Joe Hanson admittedly made the Company's decision to terminate Blumenschine by himself (Hanson dep., pp. 49-51; Hanson dep., Ex. "R"; Rule 9(c)1 Statement, paras. 45-47). Having <u>never</u> been apprised by Blumenschine of her "boys' club" comment[6] until instigation of these proceedings, there can be no legitimate argument that the Company decided to terminate Blumenschine as a result of that comment.

39.    At deposition, Blumenschine could not offer <u>any</u> specific example of discrimination based exclusively on her age. Instead, Blumenschine continually stated her conclusion that the reason for her termination was her "age and sex," intertwined (Blumenschine dep., pp. 93, 147-148, 150). As the accompanying Memorandum of Law, Point III at p. 19, points out, such

---

[6] This comment by Blumenschine, again, was nothing more than her subjective perception, a perception which ignored that fact that two of the Company's highest paid employees were women over forty (Rule 9(c)1 Statement, para. 76). Dan Shannon remembers Blumenschine's comment as an off-handed reference to the fact he was going to lunch with some other men -- a lunch to which she did not ask to be invited (Shannon dep., pp. 49-50). This off-handed remark, <u>to which no one else at the Company was ever made privy by Blumenschine</u>, was not sufficient to apprise the Company that she was making a claim of gender discrimination. See, Rule 9(c)1 Statement, paras. 54-58; Memorandum of Law, Point I, p. 15.

conclusory allegations cannot serve as evidence in support of discrimination claims. As the accompanying Memorandum of Law also explains (see Point III, p. 19), Blumenschine cannot show a causal connection between her purported complaints and the Company's decision to terminate her, a failure that is fatal to all of her discrimination Counts.

40. Further, Blumenschine offered no evidence at her deposition that she ever followed up with anyone else at the Company, <u>or even Shannon himself</u>, regarding any purported gender (or age) discrimination. As the accompanying Memorandum of Law shows (at Point II, p. 15), the single instance of Blumenschine's "boys' club" remark, unsupported by any other complaint to the Company or follow-up with respect thereto, cannot raise a genuine issue of material fact in support of her allegations of discrimination. And how could she be retaliated against when Hanson, who decided to terminate her employment, knew nothing about any claim of discrimination (Hanson dep., pp. 54-55).

Blumenschine's Purported
"Dissimilar Treatment"

41. Blumenschine's only claim that she was treated differently from any younger or male employee now fails by her own admission. The complaint alleges that George Saroyan

("Saroyan"), a part-time salesman, was treated more favorably than Blumenschine based on his age and/or gender. She is now forced to admit that she was in error: in fact, Saroyan was terminated by the Company -- shortly after the decision to terminate Blumenschine was made, and for exactly the same reason Blumenschine was terminated: poor sales performance.

42. Moreover, Blumenschine now admits she knew Saroyan was terminated for poor performance (Blumenschine dep., pp. 84-85), although to date she has not amended her complaint to remove this erroneous allegation. The only difference is that Saroyan was given notice immediately and the Company, as a courtesy, waited until after the holiday season 2001 to communicate its decision to Blumenschine (Hanson dep., pp. 51-52). Accordingly, if anything, Blumenschine received more favorable treatment than this younger, male employee.

43. Blumenschine was well aware that older women receive no less favorable treatment than other employees of the Company. Ms. Terry Nelson, a female salesperson on "Matrix" magazine who is older than Blumenschine, was (and still is) highly compensated based on her success at securing advertising sales for the magazine. Also, Ms. Melanie Jenkins, an older, female salesperson for the Company's other publication, "District Administrator," was the Company's highest paid employee in year

2001 (Ziperman dep., Ex. "I", para. 6). These two older women were and are in the top five of the Company's employees in terms of salary (Rule 9(c)1 Statement, para. 76).

Lacking Any Evidence of Age
or Sex Discrimination, Or That
the Company's Decision-Maker
Knew of any Complaints by
Blumenschine, Summary Judgment
on the Fourth Through Sixth
Counts for Retaliation Must
Be Granted As Well

44.  The purported Fourth through Sixth Counts claim that the Company retaliated against Blumenschine by dismissing her as a result of her "specific complaint[s]" to Shannon about his discriminatory conduct.

45.  As shown above, Blumenschine's single off-hand comment about a "boys' club" -- the only allegation of any "complaint" -- is not sufficient evidence to support a claim for either age or sex discrimination under Federal or Connecticut state law. On this basis alone, Blumenschine has no basis for her retaliation Counts.

46.  Moreover, Blumenschine cannot show that Hanson -- the decision-maker who terminated her employment -- had any knowledge of any complaint of discrimination by her. On that basis alone, as the accompanying Memorandum of Law sets forth (at Point IV), Blumenschine fails to make a prima facie case of

23

retaliation. Accordingly, summary judgment for the Company is warranted on those Counts as well.

Summary Judgment Must Also Be Granted
On the Seventh (Promissory Estoppel),
Eighth (Negligent Misrepresentation),
And Ninth (Conn. Wage Statute) Counts

47. Blumenschine's Seventh, Eighth and Ninth Counts allege Connecticut State and common law theories of recovery for Blumenschine's nonrecoverable draw against commissions that was terminated in May 2001. Even though Blumenschine admits, as she must, that she knew that this nonrecoverable draw was terminated as of May 2001 (Blumenschine dep., p. 58) and she continued to work for the Company thereafter (Blumenschine dep., pp. 69-70), Blumenschine alleges she is owed her nonrecoverable draw from June through December 2001, or $40,000. The evidence, as discussed above, does not support these claims (see, Rule 9(c)1 Statement, paras. 20-28).

48. Moreover, as the accompanying Memorandum of Law sets forth at Point VI, this Court should decline to exercise supplementary jurisdiction over Blumenschine's alleged State or common law claims since summary judgment in favor of the Company should be granted as to all of Blumenschine's Federal claims, therefore reducing the amount in controversy to $40,000 -- an amount well below the $75,000 threshold under 28 U.S.C. Sect.

24

1332 (there is no diversity since both the Company and Blumenschine are Connecticut citizens) (Complaint, para. 5).

49. I respectfully submit that the "evidence" of discrimination or retaliation proffered by Blumenschine is simply not sufficient to raise a question of fact as to whether Blumenschine's termination was the product of conduct prohibited by Federal law. An employment discrimination plaintiff has to offer something substantially greater than Blumenschine can muster in order to provoke a trial and take the valuable time of a Federal judge and jury.

50. I respectfully request that summary judgment be granted dismissing Blumenschine's complaint in its entirety.

Dated:  New Canaan, Connecticut
        December 8, 2003

_____
MICHAEL L. FERCH (CT24764)

**CERTIFICATION**

    This is to certify that a copy of the foregoing was sent by Federal Express to the following counsel of record on December 8, 2003:

        Scott R. Lucas, Esq.
        Martin, Lucas & Chioffi, LLP
        177 Broad Street
        Stamford, CT  06901

                          MICHAEL L. FERCH