UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| LISA K. BLUMENSCHINE, | : | CIVIL ACTION NO. |
| | : | 302 CV 2244 (DJS) |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| PROFESSIONAL MEDIA GROUP, | : | |
| LLC, | : | DECEMBER 8, 2003 |
| | : | |
| Defendant. | : | |

MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR SUMMARY JUDGEMENT
AS TO COUNTS 4 THROUGH 9

*PRELIMINARY STATEMENT*

Pursuant to Rule 56 of the Rules of Federal Procedure and Local Rule 9(c), plaintiff Lisa K. Blumenschine moves for summary judgment as to liability on counts 4 through 9 in plaintiff's Complaint. Together with this Memorandum of Law, plaintiff relies upon the Statement of Material Facts about which there is no genuine issue of material fact and the exhibits submitted herewith, which collectively demonstrate a lack of any genuine dispute and plaintiff's entitlement to judgment on said counts as matter of law (leaving only the issue of appropriate damages on the retaliation claim).

## STATEMENT OF FACTS

Plaintiff, a 51-year-old female, brings this action alleging she was the victim sex and age discrimination while employed by defendant Professional Media Group, LLC,[1] and that once she complained of this discrimination, she was terminated. In addition, upon her termination, defendant failed to pay all wages due her, in violation of Connecticut's wage statute, in further retaliation for her complaints. This failure to pay also supports her claims of promissory estoppel and negligent misrepresentation.

Defendant is a company located in Norwalk, Connecticut engaged in the publication industry. Its products consist of two trade magazines in the educational field, one entitled "District Administration," which primarily addresses district administrators of high schools, and the other entitled "University Business" (formerly "Matrix"), which addresses college and university administrators. (Defendant's Statement of Facts to the Connecticut Commission on Human Rights and Opportunities ("CHRO"), P1 ¶1 (App.Ex. A).) For a brief time, defendant published a magazine called "eMarketing Magazine" directed to technology in the education industry, but this magazine folded in September 2001, just after 9/11. (Ziperman Depo. P57 L5-13 (App.Ex. B); Deposition of Daniel Kinnaman taken September 26, 2003 (hereinafter "Kinnaman Depo.") P48 L6-10 (App.Ex. C); Deposition of Joseph Hanson taken September 30, 2003 (hereinafter "Hanson Depo.") P39 L18–P40 L21 (App.Ex. D); Deposition of Daniel Shannon taken September 24, 2003 (hereinafter "Shannon Depo.") P26 L19-20 (App.Ex. E).)

---

[1] Defendant changed its name from Educational Media to Professional Media prior to plaintiff's hiring, yet this change was only a change in name. (Deposition of William Ziperman taken September 16, 2003 (hereinafter "Ziperman Depo.") Page 8 Lines 13-19 (hereinafter the designation "P___ L___" refers to page number and line number), attached to plaintiff's Appendix filed herewith as Exhibit B (hereinafter "App.Ex.___").)

2

The members of the executive and management team of defendant during plaintiff's employment were: (1) Joseph J. Hanson, the 50% managing owner of defendant[2]; (2) William Ziperman, defendant's General Manager; (3) Daniel Kinnaman, Vice President and Publisher; and (4) Daniel Shannon, Vice President and Publisher. (Ziperman Depo. P19 L22-25 (App.Ex. B); Shannon Depo. P14 L21-24, P16 L1-14 (App.Ex. E); Kinnaman Depo. P17 L10--P21 L17 (App.Ex. C); Hanson Depo. P4 L14-15, P56 L25--P57 L4 (App.Ex. D).) This management team had the authority to make all major decisions, including all decisions concerning employees' salaries, terminations and promotions. (Ziperman Depo. P19 L18-25 (App.Ex. B); Shannon Depo. P14 L21-24, P16 L1-14 (App.Ex. E); Kinnaman Depo. P17 L16--P21 L17 (App.Ex. C); Hanson Depo. P13 L16--P15 L17 (App.Ex. D).) Historically, and throughout plaintiff's tenure, all of the members of defendant's senior management team have been men. (Kinnaman Depo. P38 L11-19 (App.Ex. C); Shannon Depo. P62 L18-23 (App.Ex. E); Ziperman Depo. P82 L1-5 (App.Ex. B).) Together and individually, these managers guarded this male inner circle to the strict exclusion of women, including plaintiff.[3] (Shannon Depo. P62 L18-23 (App.Ex. E); Kinnaman Depo. P38 L23--P39 L2 (App.Ex. C).)

Plaintiff, prior to being recruited by defendant, was a successful saleswoman in the publishing industry. She was gainfully employed with another publisher, Primedia, as a sales manager at the time she was first approached by defendant in November 1999. (Ziperman Depo. P13 L17-25, P16 L1-5 (App.Ex. B).) Plaintiff was recruited by defendant for the position of

---

[2] Mr. William Parks, a non-managing owner of defendant, owns the remaining 50% of defendant. (Hanson Depo. P4 L13-25 (App.Ex. D).)

[3] Mr. Kinnaman illustrates this when stating "...when I was asked directly, would I give her the title of or would I support her in becoming associate publisher, my answer was not yet. My answer was always not yet." (Kinnaman Depo. P38 L23--P39 L2 (App. Ex. C).)

3

sales manager of its Matrix magazine effort. Plaintiff made it clear she was looking to earn $150,000 and obtain a position of senior management, namely Associate Publisher.[4] (Ziperman Depo. P16 L8-20 (App.Ex. B).) It was known at the time of plaintiff's hire that plaintiff was historically a top producer, highly competent and sought-after in the publishing industry. (Deposition of Lisa Blumenschine taken May 28, 2003 (hereinafter "Blumenschine Depo.") P26 L17–P27 L3 (App.Ex. F); Hanson Depo. P21 L11–P22 L13 (App.Ex. D).) In fact, her competency and goodwill had earned her promotions from salesperson to National Sales Manager in other organizations, long before being recruited by defendant. (Blumenschine Depo. P29 L19–P30 L12 (App.Ex. F); Ziperman Depo. P13 L22-25, P16 L21–P17 L7 (App.Ex. B).) As sales manager for a major publishing house, plaintiff was not only in charge of overseeing staff, but was also responsible for strategic planning and directing the sales effort. (Blumenschine Depo. P29 L19–P30 L12 (App.Ex. F).)

Toward the end of December 1999, Mr. Ziperman, knowing plaintiff's desires, history and position with Primedia (Ziperman Depo. P13 L22-25, P16 L21–P17 L7 (App.Ex. B); Hanson Depo. P21 L23–P24 L15 (App.Ex. D)) approached plaintiff requesting that they meet

---

[4] When deposing Dan Boucher, a male member of defendant's management team hired soon after plaintiff's termination to perform functions she was aspiring to (Deposition of Daniel Boucher taken September 24, 2003 (hereinafter "Boucher Depo.") P32 L12–P35 L15 (App.Ex. G)), about plaintiff's position, he stated that an Associate Publisher is "usually" a managerial position (Boucher Depo. P34 L13–P35 L10 (App.Ex. G)). In addition, Dan Kinnaman also stated that plaintiff had a strong desire to be in senior management when he stated in his deposition:

> "On numerous occasions she would ask when can I [plaintiff] become associate publisher. My response was pretty much the same. I understand and applaud your desire to grow professionally and to take on management responsibilities...."

(Kinnaman Depo. P38 L11-15 (App.Ex. C).)

4

(Ziperman Depo. P14 L20-22 (App.Ex. B); Blumenschine Depo. P43 L6-13 (App.Ex. F)). In order for one to be given a position within defendant's management team, they must interview with and be approved by other members of management, including Mr. Hanson, defendant's 50% owner. (Hanson Depo. P15 L13 (App.Ex. D).) Therefore, after a series of meetings with Mr. Ziperman, Mr. Hanson and defendant's managerial inner circle, plaintiff was not offered the title of Associate Publisher, but instead offered a lateral move with the title of National Sales Manager, the same position she held with Primedia. (Hanson P21 L23–P24 L15 (App.Ex. D); Ziperman Depo. P17 L1-L7, P19 L4-8 (App.Ex. B).) Plaintiff nevertheless was led to believe she would take on significant managerial duties. Her offer letter in pertinent part reads:

> It is our pleasure to offer you the position of National Sales Manager on our new higher education magazine, Matrix. Our goal is to create the leading magazine for college and university leaders covering the latest in technology and administrative trends and directions. We feel you would be the ideal person to help us meet this goal.
>
> You will have responsibility for the overall sales effort on this magazine including the following specifics:
> - Develop overall sales/marketing strategy for Matrix.
> - Sales responsibility for the Eastern Territory and certain selected key accounts
> - Participate in the selection and hiring of the additional members of the sales team.
> - Participate in the development of sales support materials, i.e. media kit, editorial calendar, promotional materials, etc.
> - Participate in the development of business show participation/attendance approach.
> - Supervision of overall sales effort.

(See Offer Letter (App.Ex. E).)

In addition, plaintiff was promised that she would be paid at the rate of $140,000 per year, divided between a base salary of $80,000 and a non-recoverable draw of $60,000.

5

(Defendant's Answer ¶10 (App.Ex. I); Ziperman Depo. P22 L1-3 (App.Ex. B); Kinnaman Depo. P27 L18-21 (App.Ex. C), Hanson Depo. P27 L21-23 (App.Ex. D).) Relying on these promises, plaintiff terminated her employment with Primedia and accepted defendant's offer. Plaintiff hit the ground running and immediately attempted to undertake the tasks she was told she was hired to do. (Blumenschine Depo. P46 L4-13 (App.Ex. F).) In reliance on the assurances made to her by defendant and her desire to continue in her role in management, plaintiff declined an offer from another employer as a salesperson, despite being offered almost $35,000 more than her salary with defendant. (Blumenschine Depo. P73 L18--P75 L1 (App.Ex. F).)

Nevertheless, after over a year of faithful service under Dan Kinnaman, defendant was viewed primarily as a "salesperson" and not a manager. (Kinnaman Depo. P37 L24--P38 L1 (App.Ex. C).) Then, in May 2001, defendant unilaterally withheld the non-recoverable portion of plaintiff's compensation. (Ziperman Depo. P49 L5--P53 L17 (App.Ex. B).) Defendant asserts this was because her sales figures did not warrant this "commission," despite the fact that defendant readily admits that at the time that plaintiff's non-recoverable draw was suspended, no "commission plan" existed for plaintiff and the pay withheld was admitted to have been "nonrecoverable" (Kinnaman Depo. P29 L23--P30 L4 (App.Ex. C).) Mr. Ziperman also admitted under oath that no commission plan existed for plaintiff:

> Q. So you're saying, we're stopping the commission plan you're under, which is $5,000 nonrecoverable draw?
>
> A. That was not a commission plan. I had allowed the draw to continue while I was trying to put together a commission plan.
>
> Q. What's the definition of a commission plan, as you're using it? I just want to understand.

6

> A. Basically a revenue objective or set of objectives that would result in a payment, you know, for meeting those objectives.

(Ziperman Depo. P50 L9-19 (App.Ex. B).) Plaintiff did not agree to have her pay reduced. She protested the unilateral reduction of her compensation. (Eanson Depo. P48 L6-11 (App.Ex. D); Ziperman Depo. P49 L5–P53 L17 (App.Ex. B).) In response, she was repeatedly assured that her total compensation would be reinstated retroactively in some fashion. (Ziperman Depo. P49 L5–P53 L17 (App.Ex. B).) This never occurred despite continuous inquiries from May 2001 to the date of her termination a few months later. (Blumenschine P60 L21–P61 L1 (App.Ex. F); Ziperman Depo. P49 L5–P53 L17 (App.Ex. B).)

A lull in the publishing industry followed the terrorist attacks of September 11, 2001. (Ziperman Depo. P57 L9-13 (App.Ex. B).) This led to a restructuring of defendant's management team. First, Dan Kinnaman relinquished his position as publisher of Matrix magazine and became a part-time publisher for defendant. (Ziperman Depo. P53 L20–P55 L1 (App.Ex. B).) In doing so, Mr. Kinnaman was no longer the supervisor of plaintiff. (Ziperman Depo. P53 L20–P55 L1 (App.Ex. B).) Next, defendant had to shut down eMarketing Magazine, which was headed by Mr. Shannon, due to a lack of sales under his direction.[5] Despite eMarketing Magazine's failure under Mr. Shannon's direction and control, Mr. Shannon was transferred to replace Mr. Kinnaman as the new head of Matrix magazine and placed directly over plaintiff. In addition, at this time, without any input from Mr. Kinnaman or Mr. Shannon, plaintiff was given the position of Associate Publisher by Mr. Ziperman in what he testified was an effort to appease her. (Ziperman P58 L22–P59 L15 (App.Ex. B).)

---

[5] Plaintiff had no role in the sales or management of E Magazine.

7

Plaintiff was not informed of the view that her promotion was simply a change in title, a view directly contrary to what she and others within the organization were told. (Kinnaman Depo. P40 L12-18, P51 L8-19 (App.Ex. C); Hanser Depo. P39 L15--P40 L21 (App.Ex. D); Shannon Depo. P26 L19-20, P28 L24--P29 L12, P32 L2-13 (App.Ex. E).) In fact, plaintiff was told by Mr. Ziperman that she was highly valued and not "just a salesperson." (Blumenschine Depo. P124 L3-11 (App.Ex. F).) Even more importantly, on September 26, 2001, incident to plaintiff's promotion to Assistant Publisher, an e-mail was circulated to the entire company stating:

> I'm please to announce that Lisa Blumenschine has been promoted to Associate Publisher for Matrix.
>
> This is good news for Matrix. Lisa has been with Matrix since its launch and has done a terrific job helping the book get established in the higher education market. She has contributed greatly to Matrix's steady growth and this new position will allow her to use more of her skills as we move the magazine to the next level. Lisa will, in addition to continue growing her own territory, support and manage the sales effort. She will also continue to play a key role in positioning the magazine and developing collateral sales material.
>
> Lisa has enjoyed great success in the past working for a number of magazines including, Operations & Fulfillment, DM New, Catalog Age and Direct. I look forward to her leveraging this experience for a more successful Matrix.

(See e-mail, App.Ex. I.)

At the outset, Mr. Shannon, plaintiff's new supervisor, made clear his sexist and ageist views. (Shannon Depo. P55 L18--P56 L10 (App.Ex. E).) Mr. Shannon did not want any input from plaintiff on the magazine nor would he answer questions regarding the direction of the magazine when posed by plaintiff in an attempt to perform her duties as an Associate Publisher. (Shannon Depo. P49 L12--P51 L2, P62 L18-23 (App.Ex. E).) It became painfully obvious to

8

plaintiff that although she was promoted to Associate Publisher, she was being excluded from participating as a manager.

> Q. Is it your testimony that the position of Associate Publisher was a sales position?
>
> A. Yes.
>
> Q. And she was looked upon by you the same as the other salespeople for Matrix, no different?
>
> A. That is correct.

(Shannon Depo. P62 L18-23 (App.Ex. E).)

Plaintiff's protests over being shut out from management and its meetings fell on deaf ears. (Hanson Depo. P53 L18--P54 L14 (App.Ex. D); Shannon Depo. P49 L12--P51 L2 (App.Ex. E).) Defendant readily admits that plaintiff "scoffingly"[6] told Mr. Shannon that "the small management group of the company was a boys' club" (Kinnaman Depo. P55 L4-25 (App.Ex. C); Shannon Depo. P49 L12--P51 L2 (App.Ex. E).) While defendant admits that it registered plaintiff's protests as complaints of discrimination (Kinnaman Depo. P55 L4-25 (App.Ex. C); Shannon Depo. P49 L12--P51 L2 (App.Ex. E)), Mr. Shannon decided to give them "no weight" (Shannon Depo. P49 L12--P51 L2 (App.Ex. E); Hanson Depo. P53 L18--P54 L14 (App.Ex. D).) Moreover, Mr. Shannon created a hostile environment with his incessant sexual laden jokes and comments. (Blumenschine Depo. P196 L1--P197 L14 (App.Ex. F).) In fact, despite the known complaints of discrimination, Mr. Shannon proceeded with a plan implemented just weeks after her promotion, and shortly after her first complaint, to hire two young men, Darren Sikorsky (age 27) and Tom Terry (age 31) to replace plaintiff. (Zipperman Depo. P69 L10--P69 L11, P75 L5-7

---

[6] Merriam-Webster Dictionary defines the verb "scoff" as "to show contempt by derisive acts or language; to treat or address with derision."

9

(App.Ex. B); Shannon Depo. P44 L5-17, P55 L8-L17 (App.Ex. E).) At the time Ms. Blumenschine was advised of the potential of hiring these two young male salespeople, plaintiff had been Associate Publisher for only two months.

> Q. At the time you approached Lisa about the fact you had been contacted by these individuals, as you just described, had you already made up your mind to recommend Lisa's termination?
>
> A. I had already recommended Lisa's termination.
>
> Q. When did you first recommend Lisa's termination?
>
> A. Late November or early December. To the best of my knowledge it had to be in that area.

(Shannon Depo. P44 L8-17 (App.Ex. E).)

To add insult to injury, faced with plaintiff's complaints, Mr. Shannon in his typical sexist fashion states he had issues with plaintiff due to his perception that she was sexually attracted to him, and that "on four or five occasions during the period from September, 2001 through December, 2001, [plaintiff] told me that she had 'had a crush on' me or wanted 'to go out with' me when we worked for the same company a number of years ago. On each occasion, I ignored the flirtatious comments and changed the subject or simply failed to respond." (Affidavit of Daniel Shannon dated May 16, 2002 ("Shannon Aff.") ¶6 (App.Ex. K).) He testified in his deposition that plaintiff repeatedly made advances and inappropriate flirtatious gestures. (Shannon Depo. P69 L8-17 (App.Ex. E).)

Plaintiff adamantly denies all of Mr. Shannon's sexist allegations. (Complainant's Reply To Respondents' Answer Exhibit A ("Plaintiff's CHRO Reply") P2 ¶7 & ¶8 (App.Ex. L).) Moreover, despite Mr. Shannon's purported problems with plaintiff's alleged sexuality, defendant readily admits the sole and exclusive reason for plaintiff's termination was her "poor

10

sales." (Shannon Depo. P52 L16--P53 L16 (App.Ex. E); Ziperman Depo. P48 L17--P49 L2 (App. Ex. B).) The irony of Mr. Shannon's termination of plaintiff for "poor sales" given his failed effort with the sales of eMarketing Magazine which folded incident to his assuming control of Matrix magazine just weeks earlier is readily apparent. Moreover, Mr. Shannon's references to the future employment of the two young males he referred to as "the boys," and his creation of a hostile workplace, demonstrate his sexist as well as ageist views. (Shannon Depo. P55 L18--P56 L18 (App.Ex. E).)

On January 2, 2002,[7] after two months of complaints of sex discrimination and being shut out from management, Mr. Shannon informed plaintiff of his decision to terminate her. (Shannon Depo P39 L4--P40 L1, P49 L12--P51 L25 (App.Ex. E); Hanson Depo. P49 L10-L20, P53 L18--P54 L14 (App.Ex D); Ziperman Depo. P75 L2-3 (App.Ex. B).) At no time during her employment had plaintiff been told that her position was in jeopardy, in fact she was assured that her position was safe. (See promotion email (App Ex. C); Kinnaman Depo. P46 L8-15 (App.Ex. C).)

Defendant's purported reason for plaintiff's termination (i.e., "poor sales") is demonstrably false. (Shannon Depo. P52 L16--P53 L16 (App.Ex. E); Ziperman Depo. P48 L17--P49 L2 (App.Ex. B); Documents produced by defendant alleged to exhibit plaintiff's "Poor Sales" (App. Ex. M).) Defendant cannot and has not produced any evidence that plaintiff's sales were so poor relative to defendant's other salespeople that they placed her job in jeopardy. (Shannon Depo. P40 L7-L13 (App.Ex. E); Hanson Depo. P50 L22--P51 L13, P62 L3-5 (App.Ex. D); Ziperman P48 L17--P49 L2 (App.Ex. B).) Moreover, plaintiff had just been promoted to

---

[7] This termination was not communicated to plaintiff until January 2002. (Hanson Depo. P51 L24--P52 L2 (App.Ex. D).)

11

Associate Publisher on September 26, 2001 based upon her sales performance through the month of November (in the industry sales are known for coming months in advance[3]). (Ziperman Depo. P75 L20-P76 L8 (App.Ex. B); Shannon Depo. P39 L1-P40 L1, P41 L7-15 (App.Ex. E); Kinnaman Depo. P51 L8-17 (App.Ex. C).) Specifically, defendant states that it fired plaintiff due to her "poor sales" for the *three months* spanning September, October and November of 2001. (Ziperman Depo. P75 L20-P76 L8 (App.Ex. B); Shannon Depo. P41 L7-L15 (App.Ex. E).) However, defendant was and readily admits that it was well aware of plaintiff's so-called sales for at least two of those three months prior to her promotion and yet still promoted her on September 26, 2001. (Shannon Depo. P39 L1-P40 L1 (App.Ex. E); Kinnaman Depo. P51 L8-17 (App.Ex. C).) In addition, Mr. Shannon states that he made his decision to terminate plaintiff around "possibly late November," which is the third month of the three-month time span. (Shannon Depo P39 L24-P40 L1 (App.Ex. E).)

Therefore, within 60 days after her promotion to Associate Publisher and within weeks of her first complaint of discrimination, plaintiff was selected by Mr. Shannon for termination for alleged "poor sales" based upon sales figures it knew at the time of her promotion. (Shannon Depo. P39 L1-P40 L1, P49 L12-P51 L25, P56 L10 (App.Ex. E); Hanson Depo. P53 L18-P54 L14 (App.Ex. D); Ziperman Depo. P76 L1-8 (App.Ex. B), promotion e-mail (App.Ex. J); (Kinnaman Depo. P53 L4-25 (App.Ex. C).)

---

[3] "Q. Sales are done in the months preceding the actual issue of the monthly magazine, correct?
A. True.
Q. So November sales would have been known, at least in part, by September, correct?
A. In part."

(Ziperman Depo. P75 L8-25, P76 L1-L8 (App.Ex. B).)

12