55

1  A     Yes.

2  Q     Did he ask to have Lisa report to him?

3  A     No.

4  Q     Did he protest having Lisa report to him?

5  A     No.

6  Q     Did he make any comments one way or the
7  other about being happy or unhappy that Lisa was
8  reporting to him?

9  A     I don't recall any.

10 Q     Do you recall any conversations with him
11 about that topic, namely, Lisa being shifted and
12 reporting to him?

13 A     Not at that time, no.

14       Ask the question again. I'm sorry.

15 Q     Do you recall any conversations with
16 Mr. Shannon -- I'm saying at this time in September
17 of --

18 A     Right.

19 Q     -- of 2001, regarding shifting Lisa to him?

20 A     I'm sure there were conversations, but I
21 don't remember any negative responses.

22 Q     Okay. Do you remember -- is it safe to say
23 you don't specifically remember any of the
24 conversations around that topic?

25 A     Yeah. No, I don't. Everybody was looking

1　　Q　　Then that failed?

2　　A　　Yes.

3　　Q　　I take it you didn't blame him for its
4　failure?

5　　A　　Oh, no. The Internet market -- I mean, when
6　we started *eMarketing Magazine*, we had a customer
7　potential somewhere on the order of 350. When we
8　closed it, it was down to under a hundred.

9　　Q　　You closed it right after 9/11, correct?

10　　A　　Yes. We had met on September 10th and had
11　decided to try to continue it for two more issues and
12　see if it improved. And once 9/11 occurred, we
13　realized that those events would just be calamitous.

14　　Q　　"Those events," being 9/11 generally, based
15　on your observation, had a negative impact on the
16　magazine business, did it not?

17　　A　　On our magazine business. The magazine
18　business prior to 9/11, in general, had suffered
19　significant advertising sales declines. *Curriculum*
20　*Administrator*, which was our primary magazine, at that
21　time I think it was *District Administration*, had
22　actually continued to do -- to be -- have an
23　extraordinary year up until 9/11. We published our
24　October magazine with 53 ad pages, which was extremely
25　profitable.

1    For November of that year -- on 9/11, we had
2    28 pages. That made us think we were going to have
3    something on the order of 56 pages in our November
4    issue. We wound up with something in the 30s. So for
5    us it marked a change.
6        Q    A change for the worse?
7        A    Yes.
8        Q    And obviously it impacted *Matrix* sales as
9    well, correct?
10       A    It didn't seem to impact Terry Nelson's
11   sales. Hers actually increased.
12       Q    How about Melanie's sales? Did it impact
13   hers on *Curriculum Administration*?
14       A    I don't remember specifically, but I don't
15   believe so.
16       Q    It had to impact somebody's because it went
17   down.
18            MR. MINOGUE: Object to the form.
19       A    It did. I think -- yeah. But you asked
20   specifically about Melanie. I think in her case it was
21   not the case.
22       Q    Did you have a discussion with Lisa about
23   making her associate publisher?
24       A    I don't remember.
25       Q    Someone had to tell her, right?

                                                                    59

1        A    The person who told her was Joe Hansen.  I
2   was there.
3        Q    You were present?
4        A    Yes.
5        Q    What do you recall being said?
6        A    I remember him saying to Lisa that -- I had
7   strongly recommended that Lisa be given the job,
8   associate publisher.  It was something that she wanted
9   very, very much, and I thought it would relieve some of
10  the tension within her, to be made an associate
11  publisher.
12            There's not really, from our perspective,
13  very much difference in the job of associate publisher
14  and national sales manager when you have a publisher on
15  the magazine.  What Joe said to Lisa was -- Dan's
16  primary background is editorial, although he was the
17  publisher of *eMarketing Magazine*.  And he had owned his
18  own company where he had done selling as well.  But
19  Joe's comment was that Lisa would be advising Dan on --
20  giving him advice and counsel on selling.
21       Q    How about on publishing as opposed to
22  editorial?
23       A    I don't think that question makes -- it
24  doesn't make any sense to me, that question.  I'm
25  sorry.

```
 1  sales were growing?
 2       A    Her subordinates' sales were growing quite
 3  independently, we thought.
 4       Q    When did you make that decision to terminate
 5  Lisa?
 6       A    Towards the end of December.
 7       Q    Had you already committed to Darren Sikorski
 8  by then?
 9       A    No.
10       Q    When did you give Darren Sikorski an offer?
11       A    It was later in December.
12       Q    Before or after the decision to terminate
13  Lisa?
14       A    It was after the decision to terminate Lisa.
15       Q    They were both at the end of December,
16  correct?
17       A    Yes.
18       Q    How much after?
19       A    It was days or a week.
20       Q    How about Thomas Terry?
21       A    Yes?
22       Q    When was he first contacted about coming on
23  board?
24       A    They were, as I understood, initially talked
25  to at the same time.  So all the dates were the same.
```

1   Q   Sometime in November?
2   A   Yes.
3   Q   You said Dan Shannon was involved in that?
4   A   Yes.
5   Q   And Mr. Hansen?
6   A   Yes.
7   Q   Anyone else?
8   A   I don't believe so.
9   Q   And Mr. Terry was hired, wasn't he?
10  A   Yes.
11  Q   And they both started the same day, correct?
12  A   Yes.
13  Q   And combined, their salaries, let alone
14  commissions, were higher than what you were paying Lisa
15  at that point, correct?
16  A   Yes.
17  Q   Then you also acquired the magazine?
18  A   Yes.
19  Q   What was paid for the magazine, do you know?
20  A   I don't know the exact terms of the deal.
21  Q   Was it an asset purchase or stock purchase,
22  do you know?
23  A   I believe it was just the right to publish
24  the magazine. We did not certainly get any of their
25  receivables or payables.

1   A   He recommended that they be hired.

2   Q   And he also recommended that Lisa be
3   terminated, correct?

4   A   Yes.

5   Q   Who else was involved in the termination
6   decision?

7   A   Joe Hansen and myself.

8   Q   You made a decision to terminate her,
9   correct?

10  A   Eventually, yes.

11  Q   Was that based at least in part on
12  Mr. Shannon's recommendation?

13  A   Small part. The real -- my basis for -- her
14  performance in the last three months was clearly, you
15  know, declining past the point of almost being visible.

16  Q   Did you talk to her about that?

17  A   No.

18  Q   Why not?

19  A   Because she worked directly for Dan.

20  Q   You didn't think it would be appropriate,
21  since you had just promoted her and given her a memo of
22  accolades, that perhaps you ought to talk to her that
23  her job from September, mid September, through the next
24  90 days dropped so dramatically she was in danger of
25  being fired?

76

1   A   I was really unaware of it until, you know,
2   events kind of overtook it.
3   Q   Sales are done in the months preceding the
4   actual issue of the monthly magazine, correct?
5   A   True.
6   Q   So November sales would have been known, at
7   least in part, by September, correct?
8   A   In part.
9   Q   What about December's sales, when do you
10  know about those? How early?
11  A   Say again which month?
12  Q   December.
13  A   You would know about them in November.
14  Q   When are they finalized?
15  A   When the magazine hits the printing press.
16  Q   Which is when in the month?
17  A   For Matrix, it was after the -- just at the
18  end of the first week in the month.
19  Q   So for December it would be December 7th?
20  A   That -- yes. I mean, if a two-page spread
21  came in on December 6th, we would probably try and find
22  a way of getting it into the magazine.
23  Q   But 90 percent or so is known by mid month
24  of the prior month?
25  A   Oh, no.

1  Q  How about the headquarters building itself,
2  going publisher level and above. Any females?
3  A  No. Although my wife acted as a consultant
4  and was privy to many -- you know, was party to
5  significant upper-management meetings.
6  Q  Is she part-time?
7  A  She was.
8  Q  She's a consultant?
9  A  Yes.
10 Q  You and her have been in business, as we
11 saw, for years, right?
12 A  She worked for Mr. Hansen before as a vice
13 president.
14 Q  But she was not a full-time employee?
15 A  She was not.
16 Q  This document, going back to the document,
17 indicates that, toward the end of that first
18 paragraph -- in paragraph 3, "any true complaint would
19 have been properly investigated and dealt with."
20 A  Yes.
21 Q  Is it your opinion that Mr. Shannon did not
22 believe that was a true complaint?
23        MR. MINOGUE: Object to the form. His
24 opinion is irrelevant.
25 A  I don't really have any knowledge of that.

```
 1                         C E R T I F I C A T E

 2     STATE OF CONNECTICUT

 3     JUDICIAL DISTRICT OF ANSONIA/MILFORD

 4

 5             I, LYNNE STEIN, Notary Public within and for
       the State of Connecticut, duly commissioned and
 6     qualified, do hereby certify that pursuant to Notice,
       WILLIAM ZIPERMAN, the deponent herein, was by me first
 7     duly sworn to testify the truth, the whole truth and
       nothing but the truth of his knowledge touching and
 8     concerning the matters in controversy in this case;
       that he was thereupon carefully examined upon his oath
 9     and his testimony reduced to writing by me; and that
       the deposition is a true record, to the best of my
10     ability, of the testimony given by the witness.

11             I further certify that I am neither attorney
       or counsel for, nor related to or employed by, any of
12     the parties to the action in which this deposition is
       taken, and further that I am not a relative or employee
13     of any attorney or counsel employed by the parties
       thereto, or financially interested in the action.
14
               IN WITNESS WHEREOF, I have hereunto set my
15     hand this 4th day of October, 2003, at Milford,
       Connecticut.
16

17

18

19

20

21

22
       My Commission Expires:    LYNNE STEIN, Lic. No. 00110
23     January 31, 2004          Notary Public
                                 State of Connecticut
24

25
```

CAMPANO & ASSOCIATES
COURT REPORTING SERVICES