1    A.   Not that I can specifically recall.
2    Q.   And just so we're clear, you don't
3    recall ever having seen one for Ms. Blumenschine?
4    A.   I don't recall having seen it.
5    Q.   Let me show you a document. This is a
6    group of documents for Terry Nelson that I have
7    marked as Exhibit C for identification. And the
8    first question is whether you have seen any of
9    those documents before?
10   A.   I don't recall having seen these
11   specific documents.
12   Q.   Terry Nelson was a salesperson on MATRIX
13   Magazine; is that right?
14   A.   Yes.
15   Q.   Did you have any involvement in
16   administering her compensation?
17   A.   No. It was the same. We functioned the
18   same way for all of the employees.
19   Q.   So Mr. Ziperman took care of this end of
20   the business?
21   A.   That's correct. He certainly discussed
22   it with me but he was the one who administered all
23   of this.
24   Q.   Looking at the first page of Exhibit C,
25   have you ever seen a similar document such as this

1  Q. Having read that document, is this your
2  first knowledge that Ms. Blumenschine was in fact
3  promoted in September 2001?
4     MR. MINOGUE: Objection to the
5  form. You can answer.
6  A. It's my first knowledge of this document.
7  Q. Up to this deposition had anyone ever
8  told you that Ms. Blumenschine had been promoted
9  in September 2001?
10 A. No one ever told me she was promoted. I
11 heard -- I'm still involved with the company. I
12 heard and knew generally her title had changed to
13 associate publisher is my understanding.
14 Q. Were you told that her title had changed
15 but her position had not?
16 A. I wasn't told anything specific.
17 Remember I was Lisa's supervisor for a year and
18 eight or nine months so I was well aware of what
19 her goals were, and I was well aware of what our
20 relationship was in terms of her achieving those.
21 Q. Were you told anything incident to this
22 title change other than the fact it was going to
23 be a title change?
24 A. Lisa had sought that title for as long
25 as I can remember and her primary function with us

1  was to sell ad space. As her direct supervisor, I
2  emphasized to her many, many times in her
3  employment with us that her job number one was
4  sell ad space and national sales director had a
5  territory and our K-12 magazine, which is now
6  District Administration, East Coast Sales Manager
7  also carries the title National Sales Director.
8  His primary function is to sell ad space and
9  that's what he does and Lisa's primary function
10 was to sell ad space.
11         On numerous occasions she would ask when
12 can I become associate publisher. My response was
13 pretty much always the same. I understand and
14 applaud your desire to grow professionally and to
15 take on management responsibilities and over the
16 course of her employment when I was her
17 supervisor, we looked for many ways for her to be
18 involved in different kind of creation of sales
19 material and managing travel schedules and
20 managing trade shows but always her number one job
21 was to sell ad space. The future of the magazine
22 depended on getting to subsequent level of total
23 sales and she understood that clearly, and when I
24 was asked directly, would I give her the title or
25 would I support her in becoming associate

1   publisher, my answer was not yet.  My answer was
2   always not yet.  Let's wait until we succeed, then
3   my goal was to support her toward that end.  Up
4   until the time I had left neither her territory
5   nor the magazine as a whole was producing the kind
6   of sales that would justify having anyone be
7   associate publisher or any individual that was
8   seeking it.
9       Q.   So her becoming associate publisher was
10  something that happened after you left?
11      A.   My reaction when I heard it was
12  certainly not she had been promoted but she had
13  received something she asked for.  Our management
14  structure and style is relatively flat and we're
15  certainly not a title-focused company.  It's
16  really about performance, not about title.  We
17  don't get hung up on it.  If we hire an editor
18  that wants to be called features editor, we're
19  flexible with that.  I held the line on associate
20  publisher.  I wanted Lisa to say focused on sales
21  and not to think that all the sudden she would be
22  focused on management.  She had opportunities to
23  learn about management.  When I heard she had
24  become associate publisher, my reaction was very
25  simply that's something she was seeking very

```
 1   aggressively and so it probably was something that
 2   was granted in terms of inspiring her and helping
 3   her and letting her have something that she wanted
 4   that would be an incentive to her going out and
 5   getting sales.
 6        Q.   That's a surmise on your part?
 7        A.   That was my general impression, yes.
 8        Q.   From what source did you get that
 9   impression?
10        A.   Primarily from my own experience and
11   interaction with Lisa.
12        Q.   You don't know what she was told
13   incident to receiving this promotion?
14        A.   I was not involved in any discussions
15   nor did I seek to know anything about it.  That's
16   what I gathered from it.  When I left, my
17   assumption was simply she had pressed hard for the
18   title and received it.
19        Q.   One of the reasons you didn't want to
20   see her receive that title or promotion was
21   because you were afraid that she would then focus
22   more on management or too much on management?
23             MR. MINOGUE:  Objection to the
24   form.
25        A.   I wasn't afraid of anything.  I was
```

```
 1    this is what you should, do that type of thing?
 2         A.   We had numerous meetings over the course
 3    of time.
 4         Q.   Had you had any discussions with Mr.
 5    Shannon about Ms. Blumenschine that you can
 6    recall?
 7         A.   I don't recall any specific discussions.
 8         Q.   Did you ever tell Ms. Blumenschine her
 9    job was in danger of being eliminated?
10         A.   No.  I didn't have to ever think about
11    saying anything about that.  Lisa asked me on a
12    very regular basis if she was going to be fired
13    and I always told her no, why would you ask that,
14    I think we're working on trying to build a
15    magazine so let's just work at that.
16         Q.   On how many occasions did she ask you
17    that?
18         A.   I have no idea what the number was.
19    Probably more than four times over the course of
20    the --
21         Q.   When was the last time you recall her
22    saying that to you?
23         A.   I don't recall.
24         Q.   When was the first time?
25         A.   I don't know.
```

```
 1    magazines that we were deciding whether to fold
 2    them or keep them going and what to do with the
 3    structure of the sales team. Mostly we talked in
 4    terms of numbers, not in terms of specific
 5    individuals.
 6         Q.   And the magazine that Mr. Shannon was in
 7    charge of did in fact fold, right?
 8         A.   You are referring to E-Marketing?
 9         Q.   Yes.
10         A.   E-marketing was folded.
11         Q.   And that was for lack of sales, lack of
12    revenue, correct?
13         A.   Yes.
14         Q.   And he was not terminated, right?
15         A.   No. He became the publisher of MATRIX.
16         Q.   How did you become aware of the claims
17    that Ms. Blumenschine was asserting in this
18    lawsuit?
19         A.   I don't know what specific claim she's
20    asserting.
21         Q.   When did you become aware that she filed
22    a claim with the Commission on Human Rights and
23    Opportunities?
24         A.   I don't know.
25         Q.   You never became aware of it?
```

1  Q. And in September of 2001, what data
2  would have been available to you what month's data
3  would have been available to you?
4  A. Probably we were looking at October,
5  parts of November. I don't know that November
6  sales cycle was completed. Everyone got a weekly
7  ledger report.
8  Q. At the time you left shortly after 9-11,
9  you had September's figures, right?
10  A. Um-hum.
11  Q. October's figures and a good part of
12  November's figures?
13  A. I don't know that it was a good part. I
14  don't remember exactly when the cycles began and
15  ended but I probably had seen one initial report.
16  Q. For November?
17  A. Yes.
18  Q. You had made a comment earlier that the
19  management was fairly flat, what did you mean by
20  that?
21  A. In terms of a structure of management it
22  is not -- it's pretty free flowing. There's not a
23  specific Lisa didn't have to talk to me to talk to
24  Joe and/or anything like that. It's flat in terms
25  of it's a relatively horizontal structure. If you

1   Shannon about the accusations levelled against him?
2       A.   Nothing other than general we're being
3   sued.
4       Q.   Are you aware that there's a claim of --
5   Ms. Blumenschine complained to him that the
6   management structure was a boys club?
7       A.   Am I aware of that complaint?
8       Q.   Right.
9       A.   I am.  I don't know when I became aware
10  of it.  Just within the last few days I think.
11      Q.   Did you have any discussion with Mr.
12  Shannon about that?
13      A.   No specific discussions.  I believe he
14  may have asked me if anything was ever said to
15  me.
16      Q.   Did he tell you it was said to him?
17      A.   That Lisa said it to him?
18      Q.   Yes.
19      A.   I believe he told me that.
20      Q.   What did he tell you about that?
21      A.   If I remember the conversation, it was
22  did anything like that ever get said to me.  The
23  answer was no.  I said it got said to you.  He
24  said yeah.  I believe he said it was a hallway
25  conversation.

```
 1                    C E R T I F I C A T E

 2    STATE OF CONNECTICUT

 3    JUDICIAL DISTRICT OF WATERBURY

 4
            I, TERRI FIDANZA, Notary Public within and
 5    for the State of Connecticut, duly Commissioned
      and qualified, do hereby certify that pursuant to
 6    Notice, DANIEL KINNAMAN, the deponent herein, was
      by me first duly sworn to tell the truth, the
 7    whole truth and nothing but the truth of his
      knowledge touching and concerning the matters in
 8    controversy in this case; that he was thereupon
      carefully examined upon his oath and his testimony
 9    reduced to writing by me; and that the deposition
      is a true record of the testimony given by the
10    witness.

11          I further certify that I am neither attorney
      or counsel for, nor related to or employed by, any
12    of the parties to the action in which this
      deposition is taken, and further that I am not a
13    relative or employee of any attorney or counsel
      employed by the parties thereto or financially
14    interested in the action.

15          IN WITNESS WHEREOF, I have hereunto set my
      hand and affixed my notarial seal this 10th day of
16    _____Oct_____, 2003 at Prospect, Connecticut.

17
                           /s/ Terri Fidanza
18                         Terri Fidanza, LSR
                           Notary Public
19                         State of Connecticut

20    My Commission Expires:
      October 31, 2003
21

22

23

24

25
```

CAMPANO & ASSOCIATES
COURT REPORTING SERVICES