**<u>EXHIBIT D</u>**

1              UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF CONNECTICUT

3      * * * * * * * * * * * *

4  LISA K. BLUMENSCHINE,        *        COPY

5            Plaintiff          *

6      VS.                      *        3:02 CV 2244(DJS)

7  PROFESSIONAL MEDIA           *

8  GROUP, LLC,                  *

9            Defendant
       * * * * * * * * * * * *

10                                       Stamford, CT

11                                       September 30, 2003

12                                       10:00 A.M.

13

14                        - - -
              DEPOSITION OF JOSEPH HANSON
15                        - - -

16

17  APPEARANCES:

18        FOR THE PLAINTIFF:

19            MARTIN, LUCAS & CHIOFFI
              BY:  SCOTT LUCAS, ESQ.
20                177 Broad Street
                  Stamford, CT  06904

21        FOR THE DEFENDANT:

22            MINOGUE BIRNBAUM LLP
              BY:  THOMAS E. MINOGUE, JR., ESQ.
23                237 Elm Street
                  New Canaan, CT  06840

24

25

                    CAMPANO & ASSOCIATES
                 COURT REPORTING SERVICES

1          A.    A year ago.

2          Q.    Was Professional Media Group involved in

3     that at all?

4          A.    Not at all.

5          Q.    You were deposed as a witness to some

6     fact?

7          A.    I was a good friend of Jay Walker's for

8     many years.

9          Q.    What was the time before that?

10         A.    I was involved in shareholders suit

11    regarding a company that I sold back in 1976 or

12    1977.

13         Q.    Are you a majority shareholder?

14         A.    I own 50 percent.

15         Q.    Who is the other shareholder?

16         A.    William Pattis.

17         Q.    When was Professional Media Group formed?

18         A.    The founding company was Educational

19    Media and that was formed probably in 1984 or

20    1985.

21         Q.    Was the ownership the same back then?

22         A.    Yes.

23         Q.    So it's always been 50 percent you and

24    50 percent William Pattis?

25         A.    Right.

1    vacations.

2         Q.   What percentage of your time do you say

3    is devoted to Educational Media during the period

4    March to January -- during the time you are not

5    skiing?

6         A.   I would say I spend four or five hours a

7    day every day.

8         Q.   At some point Mr. Reed leaves

9    Educational Media; is that correct?

10        A.   He retired.

11        Q.   When was that?

12        A.   About five and a half years ago.

13        Q.   And did you hire a replacement for

14   Mr. Reed?

15        A.   No.

16        Q.   At some point you hired Mr. Zipperman as

17   general manager, correct?

18        A.   Yes.

19        Q.   Was there a general manager under

20   Mr. Reed's tenure?

21        A.   No.

22        Q.   And when did you hire Mr. Zipperman?

23        A.   I don't know the date.

24        Q.   Were you acting as a general manager

25   before Mr. Zipperman was hired?

1          A.     I would say yes.

2          Q.     Do you recall the year that you hired

3    Mr. Zipperman?

4          A.     My guess is it was not a long time after

5    Mr. Reed left.

6          Q.     More than a year?

7          A.     I would guess less than a year.

8          Q.     And in the --

9                 THE WITNESS: How come you didn't

10   tell me not to guess?

11                MR. MINOGUE:  You know better.

12         Q.     The four to five hours a day that you

13   are involved in professional media -- by the way,

14   it is still that amount of time today when you

15   were not skiing, four to five hours a day?

16         A.     Yes.

17         Q.     During those four to five hours, what

18   activities are you involved in?

19         A.     I meet with the editors, I meet with the

20   publishers.  I walk around the office and talk to

21   people and find out what they were doing.  If they

22   have any problems.  I read competitive magazines,

23   discuss them with publishers and with Bill

24   Zipperman.  I review management travel

25   itineraries, discuss strategy and tactics.

CAMPANO & ASSOCIATES
COURT REPORTING SERVICES

1    Q.   Do you get involved in personnel matters?

2    A.   Yes.

3    Q.   Hiring and firing of individuals?

4    A.   Yes.

5    Q.   In all instances?

6    A.   No.

7    Q.   How do you decide what hiring and firing

8    decisions you are involved in and which ones you

9    are not?

10   A.   It would be a function of the level of

11   the individual involved.

12   Q.   At what level do you get involved?

13   A.   Well, for example, we just hired an

14   assistant editor.  I haven't met her yet.  If we

15   were hiring an editor, I would meet them, I would

16   unequivocally meet any sales manager candidate and

17   anybody above that level.

18   Q.   Have you ever created or seen any sort

19   of corporate hierarchy chart at Professional Media

20   Group?

21   A.   No.

22   Q.   Has one ever been created to your

23   knowledge?

24   A.   No, I don't think so.

25   Q.   Do you get involved in human resource

```
 1        Q.   Is she the chief financial officer.

 2        A.   Yes, but I don't have that title in my

 3   company.

 4        Q.   She's just your financial person?

 5        A.   Yes.

 6        Q.   Do you recall interviewing Lisa

 7   Blumenschine?

 8        A.   Yes.

 9        Q.   And do you know who contacted who with

10   regard to setting up that interview?

11        A.   It may have been Bill or Ellen

12   Zipperman, one of them.

13        Q.   Did they recommend Ms. Blumenschine to

14   you?

15        A.   Yes.

16        Q.   And it is your belief they contacted

17   Ms. Blumenschine, not the other way around?

18        A.   That's my impression, yes.

19        Q.   Ms. Blumenschine was employed full time

20   at this point, was she not, in November, December

21   1999?

22        A.   Yes.

23        Q.   Do you know where she was employed?

24        A.   Prime Media.

25        Q.   Do you know what she was doing there?
```

CAMPANO & ASSOCIATES
COURT REPORTING SERVICES

1          A.    I'm not sure.

2          Q.    Do you know what her salary was?

3          A.    No.

4          Q.    What do you recall about the interview?

5          A.    She came with, I think, high

6     recommendation from Ellen Zipperman, who had

7     worked with her.  I know she was unhappy in her

8     position at Prime Media as are most employees of

9     Prime Media, I think.  We were in the process of

10    launching a new magazine.  I was told that she's

11    an aggressive, effective salesperson.  And we

12    needed a lot of sales strength.  She seemed to be

13    the right person.

14         Q.    What person were you interviewing her

15    for?

16         A.    We called it, I think, national sales

17    manager, but whereas we don't have titles

18    internally.  We have a lot of external titles.

19         Q.    But she was in fact offered the position

20    of national sales manager, was she not?

21         A.    Yes.

22         Q.    And the initial interview you have in

23    your notes, Kinnaman, Zipperman, and me, are those

24    the individuals you recall being present at the

25    initial interview?

CAMPANO & ASSOCIATES
COURT REPORTING SERVICES

1      A.    Ellen may have been there also.  It may

2  be one or both Zippermans.

3      Q.    You have interview process.  You have it

4  covering a two-month span.  Is that something you

5  recall or is that information you got from one of

6  the three sources for this document?

7      A.    I don't remember the exact date.  It was

8  sometime within that time period.

9      Q.    Are you referring to more than one

10 meeting?

11     A.    I think there were a couple meetings.

12     Q.    Do you recall you being present at more

13 than one meeting?

14     A.    I don't think so.

15     Q.    You were only present at one?

16     A.    I think so.  I could not say for sure.

17     Q.    Is it safe to say you only recall one

18 specifically?

19     A.    It's safe to say that I recall being at

20 one meeting.

21     Q.    There may have been more?

22     A.    There may have been more, yes.

23     Q.    The one that you do recall, what do you

24 recall saying to her and her to you?

25     A.    We were talking about what our plans

CAMPANO & ASSOCIATES
COURT REPORTING SERVICES

1    were for the launch, what our strategy was for the

2    launch and what her present compensation was.

3    What she was looking for in her future.  Fairly

4    standard interview.

5        Q.    What do you recall her saying about what

6    her present compensation was?

7        A.    I don't recall at all.

8        Q.    What do you recall her saying about what

9    she was looking for?

10       A.    I can't say that I recall.

11       Q.    Do you recall generally the range?

12       A.    She gave the right answers.  She was

13    looking for a future in management.  If she didn't

14    say that, I would have real questions about her,

15    but I don't remember what she said.

16       Q.    Do you recall what the compensation was

17    that you budgeted for the position of national

18    sales manager?

19       A.    We don't budget for positions.  We find

20    out what we need to pay.

21       Q.    What were you willing to pay a national

22    sales manager?

23       A.    I think we put down in her employment

24    letter was what we were willing to pay.  I don't

25    remember what that was.