1　　negotiations probably.
2　　　　Q.　Eventually she was sent an offer
3　　letter. Let me show you Exhibit A. Is that the
4　　offer letter that you are referring to?
5　　　　A.　Yes.
6　　　　Q.　Did you look at this before it went out?
7　　　　A.　I don't know.
8　　　　Q.　There's a list of bullet points. Were
9　　those the responsibilities you expected her to
10　　perform?
11　　　　A.　Yes.
12　　　　Q.　And then there's -- below that it
13　　indicates her monthly salary would be what factors
14　　out to $80,000 per year. Do you see that?
15　　　　A.　Yes.
16　　　　Q.　Plus a commission/bonus. Are you
17　　familiar with what she was being offered with
18　　regard to the commission/bonus?
19　　　　A.　No.
20　　　　Q.　Whose job was it to determine that?
21　　　　A.　Mr. Zipperman's.
22　　　　Q.　He indicates -- this letter is
23　　Mr. Zipperman, correct?
24　　　　A.　Yes.
25　　　　Q.　He indicates he will write up in detail

1    and send to Ms. Blumenschine details about the
2    commission/bonus plan. Do you see that?
3        A.   Yes.
4        Q.   Did you have any involvement in that?
5        A.   I'm sure I had, but I don't recall what
6    it was.
7        Q.   Have you ever seen that writing that's
8    referred to by Mr. Zipperman?
9        A.   I don't know.
10       Q.   Did this letter have an attachment to
11   it, do you know?
12       A.   I don't know.
13       Q.   Do you know what Ms. Blumenschine was
14   actually paid when she started working in January
15   of 2000?
16       A.   What's the question?
17       Q.   Do you know what Ms. Blumenschine was
18   actually paid when she began work at Professional
19   Media Group?
20       A.   No.
21       Q.   Do you know whether she got a
22   non-recoverable draw?
23       A.   I believe that's correct.
24       Q.   Do you know how much?
25       A.   No.

1    Q.   You have in your Exhibit R 1-8-2000 date
2  of hiring LB letter. Where did you get that
3  information from?
4    A.   Bill Zipperman.
5    Q.   If you look at the letter, it is
6  actually dated January 7. Is this a reference to
7  the date of the letter, 1-8-00?
8    A.   I guess so.
9    Q.   Do you know if there's another letter
10 other than the one that's marked Exhibit A?
11   A.   I would be surprised.
12   Q.   Do you know why there's a date
13 discrepancy?
14   A.   I was trying to get an overall picture
15 of what was going on. I didn't ask anybody to dig
16 up documents.
17   Q.   This is information you got from
18 Mr. Kinnaman?
19   A.   Or Mr. Zipperman. I'm not sure. I just
20 didn't want to mention the wrong year.
21   Q.   And do you know whether Ms. Blumenschine
22 was given commission sales goals? Sales goals
23 upon her commission would be based?
24   A.   I would certainly think so.
25   Q.   Have you ever seen a document that sets

```
 1      forth sales goals for Ms. Blumenschine?
 2           A.   Not that I recall.
 3           Q.   Have you ever seen a document that sets
 4      forth the amount of commission she will earn
 5      vis-a-vis certain sales attainments?
 6           A.   No.
 7           Q.   Ms. Blumenschine was the only one being
 8      given the title national sales manager; isn't that
 9      correct?
10           A.   Not in our company, no.  We have another
11      national sales manager in the company.
12           Q.   At that time?
13           A.   Yes.
14           Q.   For a different magazine?
15           A.   Yes.
16           Q.   She was the only one on this particular
17      magazine?
18           A.   Yes.
19           Q.   Were there other salespeople working on
20      the magazine at the time Ms. Blumenschine was
21      hired?
22           A.   I don't think so.
23           Q.   Eventually two more were hired, correct?
24           A.   Yes.
25           Q.   Was she responsible for them as sales
```

1  manager?
2      A.  I believe that the commission plan was
3  structured so it compensated her to some degree on
4  their sales, but I'm not sure of that.
5      Q.  Now, you recall there being a structure
6  that measured her compensation based on certain
7  sales goals?
8      A.  I think so. I don't know.
9      Q.  Let me show you Exhibit B. That's
10 several documents for Ms. Melanie Jenkins as well
11 as Exhibit C. Look at them both, which are
12 several documents for Terry Nelson, both of whom
13 were salespeople for Professional Media or were at
14 one time, correct?
15     A.  Yes.
16     Q.  If you look first at Exhibit B, there
17 are annual agreements, one for 1999, one for 2001,
18 and one for 2002. Setting forth sales goals,
19 commissions and other items. Do you see that?
20     A.  Yes.
21     Q.  Have you ever seen a document of this
22 nature for Ms. Blumenschine?
23     A.  I don't think so.
24     Q.  Do you know why that would be?
25     A.  I haven't seen these documents.

1   craze ended and we launched at a terrible time.
2       Q.   It was right after 9-11, correct?
3       A.   Yes.
4       Q.   Did that have a negative impact on the
5   publishing world, that event, 9-11?
6       A.   Yes.
7       Q.   You have 9-15 Kinnaman part-time role
8   reduced to DA publisher. Dan Shannon named
9   publisher?
10      A.   LB named associate publisher.
11      Q.   Tell me about any meetings or
12  discussions you had leading to those issues.
13      A.   Dan Kinnaman had been involved on a
14  consulting basis with a company in Connecticut.
15  Mystic, Connecticut. They had persuaded him to
16  take on a part-time position with them half time.
17      Q.   Who is they? Professional Media Group?
18      A.   No. The company in Mystic. A company
19  called USA Video. And he came in and told me that
20  he wanted to cut back, and that he felt that he
21  could continue doing his job on both magazines and
22  still do half time with this other company, and I
23  told him I don't think that was possible. That I
24  might consider a situation where he limited his
25  role in our company to DA magazine, and from a

1   timing point of view, I thought there might be an
2   opportunity to put Dan Shannon in as publisher of
3   MATRIX magazine.
4       Q.   Had that been something you were
5   contemplating for awhile?
6       A.   No.  It would not have happened if
7   Mr. Kinnaman hadn't taken on this additional
8   responsibility.
9       Q.   Were you done with your prior answer?
10  Let me continue on then.  Mr. Shannon had been
11  unsuccessful with his magazine he was publisher
12  for, correct?
13      A.   Yes.
14      Q.   Why would you take him and put him in
15  charge of MATRIX?
16      A.   Because I don't believe that the failure
17  of E Marketing magazine could be attributed to his
18  either lack of effort or lack of abilities.  I
19  think it was forced upon us by the market.  And I
20  take more responsibility for that failure than I
21  apply to him.
22      Q.   Had anyone complained to you at that
23  point about Mr. Shannon's management style?
24      A.   No.
25      Q.   Anyone complained to you about telling

1   incident to that discontinuance?
2       A.  No, I don't.
3       Q.  Do you know whether she consented to it?
4       A.  She continued working. She never
5   complained to anybody that I know of about it.
6       Q.  Are you aware that Mr. Zipperman
7   testified that she made inquiries, numerous
8   inquiries, to him about that?
9       A.  I'm aware that she made inquiries
10  requesting, as I understand it, a letter from him
11  resolving her future compensation, yes.
12      Q.  Did he tell you why he was receiving
13  those inquiries?
14      A.  I don't think so.
15      Q.  He didn't indicate to you that he had
16  promised her anything?
17      A.  Absolutely not.
18      Q.  Didn't indicate to you that he had told
19  her he was going to come up with a different
20  compensation scheme?
21      A.  No.
22      Q.  The next entry in Exhibit R is a late
23  September '01 e-mail to staff re: LB to associate
24  publisher. Is that Exhibit G you are referring
25  to? Looking at the next entry. Associate

49

1    publisher. Is that a reference to Exhibit G?
2        A.   I believe so, yes.
3        Q.   And is that information you got from
4    someone else?
5        A.   I believe I got that from
6    Mr. Zipperman.
7        Q.   You have mid November '01 decision to
8    terminate LB. Where did you get that information
9    from?
10       A.   I'm pretty sure I had conversation with
11   Bill Zipperman about that.
12       Q.   Incident to creating Exhibit R or at the
13   time?
14       A.   Incident to creating this exhibit.
15       Q.   So you think Mr. Zipperman gave you that
16   date?
17       A.   No. We discussed it and looked at
18   calendars and that's what he came up with. I
19   don't know that it is exactly right. But it is
20   approximately right.
21       Q.   Mr. Shannon testified that terminating
22   Ms. Blumenschine was something he initiated. Do
23   you concur with that?
24       A.   No.
25       Q.   You think it was your decision?

1     A.    I'm sure it was my decision.
2           MR. MINOGUE:  Objection to the
3     form.  You mean initiated or finalized?
4           MR. LUCAS:  Initiated.
5           MR. MINOGUE:  I didn't understand
6     your question that way.
7     Q.    Did you understand my question?
8     A.    Why don't you rephrase it.
9     Q.    Who first mentioned the topic of
10    terminating Lisa Blumenschine in mid November '01?
11    A.    I think I spoke to Dan Shannon and Bill
12    Zipperman and said this can't go on.  We have to
13    replace her.
14    Q.    If Mr. Shannon recalls it differently,
15    he's mistaken?
16    A.    Either he's mistaken or I'm mistaken.
17    That's my impression.  I think I was much more in
18    the forefront on this than he was.
19    Q.    Now, mid November would have been about
20    five weeks after her promotion was announced,
21    correct?
22    A.    Mid November, mid September would be
23    about eight weeks.
24    Q.    What happened in those eight weeks to
25    precipitate a decision to terminate?