1       A.    Two more issues were published and her
2  forecast for two more issues were published. We
3  were now coming into a new fiscal year and a new
4  calendar year for publishing and I had no business
5  in her territory.
6       Q.    Where are those forecasts? Have you
7  seen them?
8       A.    Those were forecasts she submitted.
9       Q.    Where are they?
10      A.    I have no idea.
11      Q.    Have you ever seen them?
12      A.    I don't think so.
13      Q.    And wasn't it about November of '01 that
14 there were discussions about bringing on the two
15 young salesmen from University Business?
16      A.    What dates are you talking about?
17      Q.    November of '01.
18      A.    No.
19      Q.    No?
20      A.    I don't think -- well, we had no
21 discussions about hiring salespeople from UB until
22 we learned that UB was going out of business and
23 that was late November, early December.
24      Q.    When was the decision to terminate
25 Ms. Blumenschine communicated to

1　　Ms. Blumenschine?
2　　　　A.　After New Year's.
3　　　　Q.　Is that because you wanted to see if the
4　　University Business acquisition was consummated?
5　　　　A.　No. Because it was I didn't want to
6　　fire her before Christmas.
7　　　　Q.　Because the two young people from
8　　University Business weren't coming on until the
9　　first week of January, right?
10　　　　A.　I think we have a couple questions mixed
11　　here. I don't know -- I don't believe that we had
12　　finalized an agreement with Mr. Sikorsky or
13　　Mr. Terry prior to Christmas. I suspect it was
14　　after Christmas, but I don't know.
15　　　　Q.　In fact, they came on a day or two after
16　　Ms. Blumenschine was terminated, right?
17　　　　A.　It looks to me like they were hired on
18　　January 8 and she was dismissed on January 3.
19　　　　Q.　Where did you get those dates from?
20　　　　A.　I got the dismissal date from Bill
21　　Zipperman. I got the hiring date from our
22　　financial executive. It may have been both from
23　　the financial executive. I'm not sure.
24　　　　Q.　You don't have any personal knowledge of
25　　this, correct?

1     A.   No.  But I will tell you that we were
2  negotiating with Mr. Terry and Mr. Sikorsky for
3  some time and I'm not sure that it was resolved.
4  That the negotiations were actually resolved
5  before January 8 or January 7.
6     Q.   How long were the negotiations going on?
7     A.   I believe the notice that we received in
8  early December was an e-mail from either
9  Mr. Sikorsky or Mr. Terry indicating that the
10 University Business magazine was going to cease
11 publishing and at that point I suggested, I
12 believe, to Mr. Shannon that he contact them and
13 see what he could do about -- whether or not they
14 would be available.
15    Q.   That's the notice you referred to as
16 late November or early December in Exhibit R?
17    A.   Yes.
18    Q.   Were you aware Ms. Blumenschine
19 complained to Mr. Shannon about the management
20 team at Professional Media Group being a boys
21 club?
22    A.   I was not aware of it at the time.
23    Q.   Mr. Shannon never brought to your
24 attention?
25    A.   No.  I still don't think that the word

```
 1   complaint applies here at all.
 2        Q.   That's because you performed an
 3   investigation?
 4        A.   No.  It's because if somebody says, oh,
 5   the boys club is going to lunch, I don't think
 6   that's a complaint.
 7        Q.   You think that's a -- how would you
 8   describe it?
 9        A.   I would describe it as being very much
10   in keeping with a lot of sarcasm that I heard from
11   Ms. Blumenschine at the time I met her and the
12   time I dealt with her.  Maybe she was annoyed she
13   wasn't invited to lunch with us.  But I didn't see
14   that as a complaint at all even afterward.  I
15   didn't hear it when it happened.
16        Q.   Why didn't you invite her to lunch with
17   you?
18        A.   I have 25 other employees.  Why didn't I
19   invite them to lunch.  We discuss business matters
20   at lunch and the matters may not have been
21   relevant to what she was doing.
22        Q.   And Ms. Blumenschine made complaints she
23   was excluded from other management meetings by Mr.
24   Shannon?
25        A.   Not to me.
```

1　　　　Q.　When did Mr. Shannon go part time?
2　　　　A.　I don't know the date.
3　　　　Q.　When did he move to North Carolina?
4　　　　A.　I don't know the date.
5　　　　Q.　Was it shortly after the CHRO filing by
6　Ms. Blumenschine?
7　　　　A.　I'm not hearing you.
8　　　　Q.　The CHRO, the Commission on Human Rights
9　and Opportunity complaint filed by
10　Ms. Blumenschine?
11　　　　A.　It has nothing to do with that. It had
12　nothing to do with that. I don't know what the
13　timing is.
14　　　　Q.　Did Professional Media Group have any
15　set procedure for dealing with complaints of
16　chauvinism or discrimination or exclusion on the
17　basis of gender?
18　　　　A.　We never had any such complaint.
19　　　　Q.　So, hence, you never had any set
20　procedure?
21　　　　A.　The procedures were, I guess, outlined
22　on the wall by federal laws and state laws, but I
23　have never had any such complaint in the 40 years
24　I have been in business.
25　　　　Q.　In the fall of 2001, who were the

```
 1   primary managers?  You had yourself, correct?
 2        A.   Yes.
 3        Q.   Mr. Shannon?
 4        A.   Mr. Zipperman.  Mr. Kinnaman.
 5        Q.   Kinnaman had gone part time at that
 6   point?
 7        A.   I believe that's right, yes.  And the
 8   editor of MATRIX magazine.  The financial manager
 9   of the company.  I don't know how you want to
10   define managers, but the sales manager would be
11   Melanie Jenkins, and Terry Nelson, I guess, and
12   Lisa Blumenschine.
13        Q.   The business lunch that you are going
14   out to discuss business, who was going that day
15   that Ms. Blumenschine made that comment?
16        A.   I have no idea.  I don't know when it
17   happened.
18        Q.   Did you have set lunch days with
19   Ms. Shannon or Mr. Zipperman?
20        A.   No.  I walk around and say free for
21   lunch today, and sometimes we invite an editor and
22   sometimes we invite an art director.
23        Q.   Have you ever invited Ms. Blumenschine?
24        A.   Yeah.
25        Q.   Has she ever gone out with you to lunch?
```

1   money that was not paid.
2   　　A.　　Never been such a complaint.
3   　　Q.　　Let me show you Exhibit F. Have you
4   ever seen that document before?
5   　　A.　　No.
6   　　Q.　　Did you look at any documents incident
7   to the ultimate decision to terminate
8   Ms. Blumenschine?
9   　　A.　　I discussed with Bill Zipperman a
10  severance package that probably was put into a
11  document, but I don't know that I have ever seen
12  it.
13  　　Q.　　Anything else, any other documents?
14  　　A.　　Not that I am aware of. Not that I can
15  think of.
16  　　　　(Whereupon, a recess was taken.)
17  　　Q.　　Just a couple more questions. The boys
18  club comment, Mr. Hanson, when did you first learn
19  that Ms. Blumenschine had made that statement to
20  Mr. Shannon?
21  　　A.　　It was after the case was filed.
22  　　Q.　　When we discussed that comment earlier,
23  you had indicated you thought it was typical of a
24  sarcastic or remarks that Ms. Blumenschine would
25  make in your experience. What other type of

1  remarks have you heard Ms. Blumenschine make?
2      A.   Well, if you look at the original letter
3  indicating her responsibility, she was supposed to
4  participate in the development of sales material.
5  My gut feeling she spent more time complaining
6  about the material she didn't have than she did
7  developing material.  I didn't complain about that
8  because her job was to sell space, but I felt that
9  she was using her complaints as an excuse as
10 opposed to solving the issue.
11     Q.   Anything else?
12     A.   I don't know.  She might not have liked
13 the coffee machine.  I don't really remember.
14     Q.   Nothing else specific that you can
15 recall as you sit here?
16     A.   No.
17     Q.   Was Professional Media Group in poor
18 financial condition in November, December 2001?
19     A.   Yes.
20     Q.   And what did it pay to acquire the
21 University Business assets that it did acquire?
22     A.   I believe that it was $350,000 plus some
23 percentage of revenue increases over the following
24 three years.
25     Q.   Where did the 350,000 come from?

CAMPANO & ASSOCIATES
COURT REPORTING SERVICES

1  A. Mr. Pattis and myself.
2  Q. And do you know what the two salesmen
3 from University Business were paid when they came
4 on board?
5  A. Not specifically, no.
6  Q. Do you know whether they were paid more
7 than Ms. Blumenschine was being paid?
8  A. In combination.
9  Q. Either individually or in combination?
10  A. I'm pretty sure that in combination,
11 they were paid more than she was paid.
12  Q. How about individually?
13  A. I have to tell you I don't know what she
14 was paid at this point. I don't know.
15  Q. And then Mr. Boucher was hired shortly
16 after that, correct?
17  A. Um-hum.
18  Q. Do you know what he was paid?
19  A. 110 or 120,000.
20  Q. Was there some sort of cash infusion
21 into the company at this time to pay for all these
22 salaries?
23  A. Cash infusion. Mr. Pattis and I lend
24 money to the company on a regular basis.
25  Q. And incident to these events, the

1  acquisition of the University Business assets and
2  the hiring of Mr. Sikorsky and Mr. Terry and
3  Mr. Boucher, did you and Mr. Pattis put in more
4  capital into the company to accomplish those
5  things?
6      A.  No.  We lent money to the company.  We
7  didn't increase the capital of the company.
8      Q.  You lent money to accomplish those
9  things?
10     A.  Yes.
11     Q.  Do you know what the gross revenue of
12 Professional Media Group was in 2001?
13     A.  No.
14     Q.  Is that on a calendar year or fiscal
15 year?
16     A.  Calendar.  However, it is confused by
17 the fact we publish a January issue in December,
18 so the revenue from the issue is in the month.
19 The revenue from the January issue is in the
20 preceding December.
21     Q.  And you have no idea what the gross
22 revenue was?
23     A.  No.  I really don't.
24     Q.  How about the year after, 2002?
25     A.  I don't know.

```
 1                    C E R T I F I C A T E

 2     STATE OF CONNECTICUT

 3     JUDICIAL DISTRICT OF WATERBURY

 4
              I, TERRI FIDANZA, Notary Public within and
 5     for the State of Connecticut, duly Commissioned
       and qualified, do hereby certify that pursuant to
 6     Notice, JOSEPH HANSON, the deponent herein, was by
       me first duly sworn to tell the truth, the whole
 7     truth and nothing but the truth of his knowledge
       touching and concerning the matters in controversy
 8     in this case; that he was thereupon carefully
       examined upon his oath and his testimony reduced
 9     to writing by me; and that the deposition is a
       true record of the testimony given by the witness.
10
              I further certify that I am neither attorney
11     or counsel for, nor related to or employed by, any
       of the parties to the action in which this
12     deposition is taken, and further that I am not a
       relative or employee of any attorney or counsel
13     employed by the parties thereto or financially
       interested in the action.
14
              IN WITNESS WHEREOF, I have hereunto set my
15     hand and affixed my notarial seal this 10th day of
                  Oct        , 2003 at Prospect, Connecticut.
16
                                 _____
17                               Terri Fidanza, LSR
                                 Notary Public
18                               State of Connecticut

19
       My Commission Expires:
20     October 31, 2003

21

22

23

24

25
```

CAMPANO & ASSOCIATES
COURT REPORTING SERVICES