**EXHIBIT E**

```
                                                                        1

 1                UNITED STATES DISTRICT COURT

 2                  DISTRICT OF CONNECTICUT

 3      * * * * * * * * * * * * * * * *            COPY

 4      LISA K. BLUMENSCHINE,           *

 5              Plaintiff,              *

 6        vs.                           *    Civil Action No.
                                              302 CV 2244(DJS)
 7      PROFESSIONAL MEDIA GROUP, LLC,  *

 8              Defendant.              *

 9      * * * * * * * * * * * * * * * *

10                                       Stamford, CT

11                                       September 24, 2003

12                                       11:37 a.m.

13                          - - -

14             DEPOSITION OF DANIEL SHANNON
                            - - -
15

16      APPEARANCES:

17         FOR THE PLAINTIFF:

18              MARTIN, LUCAS & CHIOFFI
                BY:  SCOTT LUCAS, ESQ.
19                   MICHAEL BAYONNE, ESQ.
                     177 Broad Street, 16th Floor
20                   Stamford, CT 06904

21         FOR THE DEFENDANT:

22              MINOGUE BIRNBAUM, LLP
                BY:  THOMAS E. MINOGUE, JR.
23                   237 Elm Street
                     New Canaan, CT 06840
24

25
                     CAMPANO & ASSOCIATES
                   COURT REPORTING SERVICES
```

```
 1      A     Yeah.
 2      Q     So going into the spring of 2000, what was
 3  your opinion of Lisa Blumenschine, if any?
 4      A     None of any -- none.
 5      Q     How about on a personal level; nice person,
 6  bad person?  Had you made any sort of assessment at
 7  that point?
 8      A     I made no assessment.
 9      Q     Professional or personal?
10      A     Really none.
11      Q     Okay.  When you were hired in the spring of
12  2000, was Ms. Blumenschine already there?
13      A     I believe so.
14      Q     Had you worked with her at all or had any
15  contact with her as an independent contractor?
16      A     Not to my memory, no.
17      Q     You were hired, you testified earlier, into
18  the publisher [slash] vice president position?
19      A     And editor-in-chief.
20      Q     Was that of eMarketing Magazine?
21      A     Yes.  Maybe I wasn't a vice president.  I
22  was certainly the vice president and publisher and
23  editor-in-chief of eMarketing Magazine.  I don't
24  remember.
25      Q     EMarketing was a new magazine?
```

```
 1      Q     Did you consider yourself Bill Ziperman's
 2   peer on the sale level?
 3      A     Colleague.  Is that fair enough?
 4      Q     At this point --
 5      A     He --
 6      Q     Go ahead.
 7      A     His responsibilities complemented mine in
 8   that he ran the business in which I was working and I
 9   looked to him for support and all sorts of help
10   and . . . .
11      Q     If you were to draw a corporate tree at this
12   point in your career, when you were publishing and
13   editor of eMarketing, Joe Hansen would be on top?
14      A     Yes.
15      Q     Would you put yourself on the next level,
16   for example, alongside Bill Ziperman?
17      A     I never really knew how to do a corporate
18   chart.  That would be as descriptive of my day-to-day
19   duties.  My whole focus was in creating the magazine.
20   There was almost, if you will, a hub in that everybody
21   in the different departments helped support the
22   publication.  So that doesn't lend itself to what
23   you're asking.
24      Q     For the whole time you've been at
25   Professional Media, have you ever see a corporate tree
```

Dec. 9. 2003 12:37PM    MARTINLUCASCHIOFFI                          No.1672   P. 5
Case 3:02-cv-02244-HBF   Document 27-11   Filed 12/09/2003   Page 5 of 14

26

1   Q   Do you know who did that, either of those
2   tasks?
3   A   Without certain knowledge but with an
4   understanding of how our business works, that would
5   include Bill Ziperman, Mr. Hansen, and the publisher,
6   Dan Kinnaman. That's my belief.
7   Q   In September, Mr. Kinnaman's position
8   changed, did it not?
9           MR. MINOGUE:  September?
10          MR. LUCAS:  September '01.
11  A   Yes, it did.
12  Q   How did his position change, to your
13  knowledge?
14  A   To my knowledge, he became a part-time
15  employee of Professional Media Group and relinquished
16  his position as publisher of *Matrix Magazine*.
17  Q   Was that a voluntary decision, do you know?
18  A   Yes, it was.
19  Q   You took over for *Matrix*, was that correct?
20  A   Correct.
21  Q   Was it Mr. Kinnaman's exact position that
22  you took over or was it a hybrid?
23  A   It was the position of publisher.
24  Q   At that point you still didn't have the
25  title of VP, did you?

```
 1      A      No, no.
 2      Q      Was that a promotion that's being announced
 3   in Exhibit K?
 4      A      For whom?
 5      Q      For you.
 6      A      I wouldn't characterize it as such.
 7      Q      How would you characterize it?
 8      A      As an announcement of additional and
 9   different responsibilities.
10      Q      Greater responsibilities than you had prior
11   to that?
12      A      I wouldn't characterize it that way.  I
13   would --
14      Q      Just different duties?
15      A      Really different.  It looks like I will be
16   spending time trying to build our supplement business.
17      Q      We'll get to that in a minute.
18      A      Okay.
19      Q      That involved your physically relocating as
20   well, did it not?
21      A      Did not.
22      Q      That was later on.  Sorry.
23      A      Getting ahead of myself.
24      Q      Let's go back to September of '01.  You took
25   over Mr. Kinnaman's duties starting when in September?
```

```
 1    Was it immediate on 9/13 or was there a transition
 2    period?
 3         A     There was a transition period of days.
 4         Q     Less than a week?
 5         A     I don't know that.
 6         Q     Ms. Blumenschine began reporting to you?
 7         A     Yes.
 8         Q     She was promoted in this time frame as well,
 9    correct?
10         A     Yes.
11         Q     Did you have any hand in her promotion?
12         A     No.
13         Q     Who promoted her, do you know?
14         A     Mr. Ziperman and Mr. Hansen.
15         Q     Did you object to her promotion?
16         A     No.
17         Q     Did you agree with her promotion?
18         A     I understood the rationale for it and
19    supported it.
20         Q     In what way did you support it?
21         A     It was presented as a remedy for an employee
22    who wanted the title change, virtually insisted,
23    according to reports, but not to me because I wasn't in
24    that loop.  I didn't have that job at the time.  It was
25    argued it would help that employee get in to see
```

Dec. 9. 2003 12:38PM    MARTINLUCASCHIOFFI                    No.1672   P. 8
Case 3:02-cv-02244-HBF   Document 27-11   Filed 12/09/2003   Page 8 of 14

32

```
 1      A    Two different events, to my understanding.
 2      Q    When did you learn of your reassignment to
 3   Mr. Kinnaman's duties?
 4      A    Mid September.
 5      Q    Was that before or after you learned of
 6   Ms. Blumenschine's promotion?
 7      A    After.
 8      Q    Okay.
 9      A    Simultaneous, to be specific.  I went in to
10   a meeting.  She was -- had been promoted and I was
11   then, at that meeting, named publisher.
12      Q    Who was in the meeting?
13      A    Mr. Hansen and Mr. Ziperman.
14      Q    Was Ms. Blumenschine there?
15      A    No.
16      Q    Showing you Exhibit G, have you seen that
17   document before?
18      A    Yes.
19      Q    Do you know who drafted that?
20      A    I drafted this.
21      Q    At whose request, if anyone's?
22      A    Lisa Blumenschine's request.
23      Q    What did she say to you in making that
24   request?
25      A    She requested that a company-wide
```

Dec. 9. 2003 12:38PM    MARTINLUCASCHIOFFI    No.1672    P. 9
Case 3:02-cv-02244-HBF   Document 27-11   Filed 12/09/2003   Page 9 of 14

39

1   A    I don't know if it's 90 percent, but you
2   would have a good idea of what the magazine's going to
3   do, yes.
4   Q    Now, you recommended Ms. Blumenschine's
5   termination, correct?
6   A    Correct.
7   Q    Was it your decision?
8   A    No.
9   Q    But you -- it was your idea initially,
10  correct?
11  A    Yes, as best I can recall.
12  Q    What documents did you look at in making
13  that decision, if any, the decision to recommend her
14  termination?
15  A    I can't specify the documents. The
16  knowledge that I went on was based on the numbers of
17  ads and dollar volume. They would in be a number of
18  documents.
19  Q    For which months?
20  A    For the three or for months in which she and
21  I worked together.
22  Q    When did you make your decision to recommend
23  her termination?
24  A    It must have been -- I would guess early
25  December, just best I can recall. Possibly late

40

1   November.
2       Q       So it would be the three months' prior sales
3   figures?
4       A       Prior to what?
5       Q       Prior to November, were what you used in
6   making your decision?
7       A       No.  It was -- projections is as important
8   as actuals.  So I would combine the actuals with what
9   we were expecting to get for the next few issues.  So
10  it was a combination of information.
11      Q       Where are those projection figures
12  maintained?
13      A       I don't know.
14      Q       Were there any maintained for Lisa
15  Blumenschine?
16      A       Yes.
17      Q       Have you looked for those?
18      A       I have looked for all documents.
19      Q       The same answer; I'm representing to you I
20  haven't seen them, is because you can't locate them?
21      A       That's not all together accurate.  I would
22  assume your client has them.  I'm not aware that --
23  until right now I wasn't aware that they were
24  missing -- or not missing, but not available.  They
25  were in electronic form.  I'll -- does that answer?

CAMPANO & ASSOCIATES
COURT REPORTING SERVICES

41

1    Q    Is that something you looked at in making
2  your decision? Is that right?
3    A    Which?
4    Q    Your decision -- the projections are
5  something you looked at?
6    A    Yes.
7    Q    So you looked at the -- you looked at
8  September, October, November sales, correct?
9    A    Yes.
10   Q    And projections?
11   A    Yes.
12   Q    And you made your decision?
13   A    Yes.
14   Q    Did you look at anything else?
15   A    No.
16   Q    When did --
17   A    Not that I recall.
18   Q    Were you involved in the discussions to
19  acquire *University Business*?
20   A    Yes.
21   Q    When did you become involved in that?
22   A    I think it started -- I think the whole
23  process started in December. It's fuzzy. It was
24  around that time. But I was there at the beginning.
25   Q    When did you first learn that *University*

CAMPANO & ASSOCIATES
COURT REPORTING SERVICES

44

1    Q    Was it more than a week?
2    A    I don't know.
3    Q    Could it have been more than two weeks?
4    A    Could have been.
5    Q    At the time you approached Lisa, had you
6  made up your mind to recommend her termination?
7    A    I beg your pardon?
8    Q    At the time you approached Lisa about the
9  fact you had been contacted by these individuals, as
10 you just described, had you already made up your mind
11 to recommend Lisa's termination?
12   A    I had already recommended Lisa's
13 termination.
14   Q    When did you first recommend Lisa's
15 termination?
16   A    Late November or early December. To the
17 best of my knowledge, it had to be in that area.
18   Q    I thought you testified that you learned
19 *University Business* was for sale sometime in December.
20 You couldn't pinpoint when.
21   A    Correct.
22   Q    And you were approached by these two
23 individuals, the salespeople, could be as much as two
24 weeks prior to when you learned *University Business* was
25 for sale. Correct?

Dec. 9. 2003 12:39PM    MARTINLUCASCHIOFFI                    No.1672   P. 13
Case 3:02-cv-02244-HBF   Document 27-11   Filed 12/09/2003   Page 13 of 14

45

1   A    Correct.

2   Q    What do you recall about that conversation
3   with Ms. Blumenschine? What did she say to you and you
4   to her?

5   A    I don't recall other than she, in my memory,
6   requested to be part of the conversation when the two
7   salespeople made their presentation.

8   Q    How did you respond to that request?

9   A    I said no.

10  Q    Did you explain to her why?

11  A    I don't remember there being extended
12  conversation.

13  Q    She had made several requests while working
14  for you to be more involved in management meetings, had
15  she not?

16  A    No.

17  Q    Had she made any requests other than this
18  one you're talking about?

19  A    Not to my memory.

20  Q    What were your duties as publisher of
21  *Matrix*?

22  A    When you asked a question a moment ago about
23  did she ask to participate in management conversations
24  and I said no, she and I had many conversations, daily
25  conversations, and I was management, so there was no

1  spent on Lisa's sales activities. That included Lisa,
2  but were not just relegated to Lisa. But the majority
3  of my time was sales.
4     Q    Did Lisa ever complain to you that she was
5  excluded from meetings in which you were participating
6  in *Matrix* decision making?
7     A    Not to my memory.
8     Q    Did you ever feel she was not involved
9  enough as associate publisher in your duties as
10 publisher?
11    A    Not to my memory.
12    Q    At some point she told you she felt it was a
13 boys' club, right? Management was a boys' club?
14    A    I remember the phrase that she used, and I
15 remember the context.
16    Q    Why don't you tell me the context and the
17 phrase.
18    A    As best --
19         MR. MINOGUE: That's really two
20 questions.
21         Whatever.
22    Q    Start with the context. Tell me the
23 context.
24         MR. MINOGUE: Good. Start someplace.
25    A    I was in the hallway leaving for lunch with