1   Mr. Hansen and Mr. Ziperman, possibly Mr. Kinnaman.
2   But with Mr. Ziperman and Mr. Hansen I recall
3   specifically, to the best of my memory.  That was the
4   context.  And, the best I can recall, she asked me
5   something, as we had a constant give and take between
6   us, constant open door, never a knock, she could come
7   to my office, I would go to her cubicle, constant.  My
8   memory is that I said, "I can't talk now," or words to
9   that effect, as best I can recall.  She then
10  scoffingly -- "Oh, the boys' club," referring to our
11  lunch, which was the context and, as best I can
12  remember, the words or words to that effect.
13       Q    Had she wanted to go along on the lunch?
14       A    No.  Definitely not.
15       Q    Why do you say that?
16       A    I would have recalled her asking to come.
17       Q    And it's your testimony that she never,
18  either directly or indirectly, indicated to you that
19  she felt she was being excluded from the boys' club
20  management or the management, male management team?
21       A    No.
22       Q    She never indicated that to you?
23       A    No.
24       Q    What did you take that phrase to mean when
25  she said "boys' club"?

Dec. 9. 2003 12:40PM    MARTINLUCASCHIOFFI                    No.1672   P. 16
Case 3:02-cv-02244-HBF   Document 27-12   Filed 12/09/2003   Page 2 of 14

51

1    A    I can't recall. I certainly gave it no
2  weight.
3    Q    And you didn't have any follow-up
4  conversation with her about that?
5    A    Not to my -- no.
6    Q    Did you ever tell any off-colored jokes?
7    A    Not that I can recall.
8    Q    Ever had Viagra jokes, things like that?
9    A    Not that I can recall.
10        Can you be specific?
11   Q    I don't know the jokes. But there's been
12 testimony that at at least one client dinner you made
13 off-color jokes that was a Viagra joke or other joke.
14 Do you have any recollection of that?
15   A    I would be surprised if that occurred. I
16 have no memory of that. Can you be specific about the
17 comment?
18   Q    That's as specific as I can be right now.
19   A    No, I have no memory of it.
20   Q    So is it your testimony you never told an
21 off-color joke at work, or you may have and you just
22 can't recall?
23   A    In what context are you asking?
24   Q    Any context.
25   A    If I ever told an off-color joke in my life?

52

1          MR. MINOGUE:  Objection to the form.
2  If he ever told an off-color joke at any time in his
3  life?
4       Q     At work.
5       A     Not to my memory.
6       Q     So you've never told an off-color joke to
7  anyone at Professional Media, ever?
8       A     I don't recall it.  It's -- you know, yeah.
9  I just don't recall ever telling -- it's not something
10 I'd do in an office.
11             If you could be specific, I'd be glad to
12 tell you if I know that joke or if I recall making it.
13      Q     Have you read Ms. Blumenschine's deposition
14 transcript?
15      A     No.
16      Q     When you recommended that Ms. Blumenschine
17 be terminated -- I think you indicated you recommended
18 it to Mr. Ziperman; is that correct?  I don't want to
19 put words in your mouth.
20      A     I don't think I --
21      Q     Let me back up then.
22             To whom did you recommend it?
23      A     As I recall, Mr. Hansen and Mr. Ziperman.
24      Q     Together?
25      A     As I recall, yes.

Dec. 9. 2003 12:41PM    MARTINLUCASCHIOFFI                              No.1672   P. 18
Case 3:02-cv-02244-HBF   Document 27-12   Filed 12/09/2003   Page 4 of 14

53

1   Q    What was their reaction?
2   A    What ensued was a discussion. I can't
3   characterize their reaction. What ensued was -- I'm
4   sure, although I have no memory of the specific
5   conversation, the basis of my recommendation.
6   Q    Which was?
7   A    Which would include poor sales
8   performance -- which would encompass poor sales
9   performance.
10  Q    What else?
11  A    Nothing.
12  Q    So it would encompass it and nothing else?
13  A    Correct. There was no other -- there was no
14  other reason.
15  Q    That was the sole reason?
16  A    That was the sole reason.
17  Q    Did you share any documents with either
18  Mr. Hansen or Mr. Ziperman?
19  A    I don't recall. But we were all very well
20  aware of the sales performance and projections.
21  Q    Is it your testimony she was responsible for
22  the other two salespeople?
23  A    No.
24  Q    No?
25  A    That's not my testimony.

1  two other individuals from *University Business* incident
2  to getting that business, correct?
3              MR. MINOGUE: Object to the form.
4  That's not the testimony.
5              MR. LUCAS: I'm asking him a question.
6      A    Honestly, I don't understand what you're
7  asking.
8      Q    Ms. Blumenschine was fired January 3rd, I
9  think it was, right?
10     A    Correct.
11     Q    Those two individuals that we've talked
12 about, they were hired January 7th, a couple days
13 later, right?
14     A    Correct.
15     Q    So they're pretty much coterminous, right?
16 One goes out, two come in. Right?
17     A    The dates are as you said.
18     Q    Okay. Did you ever refer to those two
19 individuals as "the boys"?
20     A    To whom?
21     Q    To anyone.
22             MR. MINOGUE: Ever?
23     Q    Ever.
24     A    Yes.
25     Q    To whom?

1   A   To them. It's . . . .

2   Q   It's a phrase you used with them?

3   A   Not regularly, but certainly I've used it
4   with them.

5   Q   How would you use it? Give me an example.
6   "You boys come here"?

7   A   I want to go on sales calls with the boys;
8   I'm going to go out and we're going to see clients;
9   We're going to sell some ads, boys. A friendly term.
10  I don't think they were offended by it, certainly.

11  Q   Would you use that term with others at
12  Professional Media?

13  A   Perhaps in conversations with perhaps
14  Mr. Ziperman.

15  Q   And Mr. Boucher?

16  A   Possibly.

17  Q   And others as well?

18  A   Possibly.

19  Q   When you became Ms. Blumenschine's superior,
20  supervisor, did you then become involved in her
21  compensation arrangement?

22  A   No.

23  Q   Were you aware that she had at one point
24  been on a nonrecoverable draw?

25  A   No.

Dec. 9. 2003 12:42PM    MARTINLUCASCHIOFFI                    No.1672   P. 21
Case 3:02-cv-02244-HBF   Document 27-12   Filed 12/09/2003   Page 7 of 14

57

1    Q    I take it you were not aware in 2001 that
2  that had been taken away from her?
3    A    I was not aware of any aspect of her
4  compensation, nor am I to this day.
5    Q    Okay. Let me show you what was marked
6  earlier as Exhibit F. Is that a document that you
7  referred to in making your decision to terminate
8  Ms. Blumenschine?
9    A    This is the weekly report that you indicated
10  you did not have. This is the one I was referring to.
11    Q    That's a monthly summary.
12    A    The weekly report resembles it.
13    Q    Resembles it?
14    A    Yes. I thought it was the same thing.
15    Q    That's a month-by-month summary?
16    A    It comes out on a weekly basis and it's
17  subtotaled as you go. So this is the weekly.
18    Q    That's the document you relied upon?
19    A    This one per se, I assume. I don't --
20    Q    That data is what you relied on?
21    A    Yeah, right. As I say, this is the weekly
22  report. You may have one that is a comprehensive
23  month, cumulative.
24    Q    That's all I have.
25    A    This is what I was referring to. What you

```
 1   said you did not have, what I was referring to, you do
 2   have.
 3        Q    I apologize.
 4        A    I just want you to know for your
 5   information.
 6             Yes, this is the -- if this is not the exact
 7   month or whatnot -- but this is exactly the kind of
 8   information that I would rely upon.
 9        Q    Look through the whole document and tell me
10   if there's anything missing that you did rely upon that
11   you recall.
12        A    No, there's nothing missing that would jump
13   out at me at all.
14             I'm trying to read -- acquaint myself with
15   this, trying to see whose territories is whose.
16        Q    You're aware, are you not, that
17   Ms. Blumenschine filed a claim with the Commission on
18   Human Rights and Opportunities against the company and
19   you?
20        A    I'm aware that she filed a Complaint, but I
21   wasn't aware it was against me.  I thought it was just
22   a corporate complaint.  Is there a distinction there?
23   You tell me.
24        Q    In any event, the federal suit is not
25   against you per se.  I thought you were named -- yes,
```

```
1    you were, at the CHRO.
2         A    Okay.  But I'm aware of that action.
3         Q    Let me show you Exhibit H, a document
4    prepared by George Birnbaum, and ask you if you've seen
5    that document before.
6         A    I didn't see this.  Let me refresh myself
7    here.
8              (Perusing document.)
9              MR. LUCAS:  Off the record.
10             (Discussion held off the record.)
11        A    I don't believe I saw this summary.
12   Obviously I would have contributed to -- you know,
13   created the affidavit, whatnot.  But I don't recall
14   this specific summary by Mr. Birnbaum.
15        Q    Let me turn your attention to page 3 of
16   Exhibit H.
17        A    I see it.
18        Q    The paragraph starts, "Blumenschine was
19   named associate publisher."  You see that?
20        A    Um-hum.
21        Q    Sentence says, "Blumenschine was named
22   associate publisher of Matrix in September of 2001, but
23   after the promotion in title her performance rapidly
24   worsened."  Do you agree with that?
25        A    I can really only talk to her performance
```

60

1  when we worked together. I wasn't on the magazine and
2  I'm not really -- I wasn't aware of what she did. I
3  didn't do a check on it.
4       Q    You didn't? So you just know what you know.
5  But you didn't check her history to see whether it had
6  gotten better or worse?
7       A    I don't recall. I certainly didn't do a
8  micro. I may have done an overview check. I certainly
9  must have, because I would have looked over the last
10 year's revenues and how things were going.
11      Q    So do you agree with the statement that
12 after her promotion her performance rapidly worsened?
13      A    I agree with that.
14      Q    And was that the basis for your decision to
15 terminate her?
16      A    The basis was she was not contributing
17 anything close to acceptable in terms of sales revenue.
18 That was the sole basis for her termination.
19      Q    Do you know of any reason why her
20 compensation and duties would be different than any
21 other salespeople at *Matrix*?
22      A    I don't know that her compensation was
23 different.
24      Q    Are you aware that Ms. Blumenschine was
25 never given any sales goals?

1                MR. MINOGUE: I'm sorry? I didn't
2   hear you.
3                MR. LUCAS: Was never given any sales
4   goals.
5        A    She was by me in collaboration with her.
6   Every issue, she would provide me, as would every other
7   salesperson, a projection of anticipated sales for her
8   territory and their respective territories. That was
9   an account-by-account projection in terms of what she
10  expected to get, what she might get, and what possibly
11  she might get. We call it a 90, 50, 10. 90 percent,
12  50 percent, and 10 percent likelihood of these ads
13  coming in. At that basis, that was a very real
14  day-to-day projection and sales goals, objectives.
15  Concurrent with that, I had asked her to prepare a
16  projection for the following year's sales in which I
17  could base a budget upon which to, you know, build a
18  business.
19       Q    When did you ask her to do that?
20       A    I don't know when.
21       Q    Was that done?
22       A    It was the fourth quarter of the year.
23            I don't recall. I believe it was. I don't
24  recall, though. I got it from a couple of -- I got it
25  from Terry Nelson. I can't recall specifically if I

62

1    got it from Lisa.

2        Q    There's no projections in Exhibit K, right?

3    I'm sorry.  Exhibit F, the one with the data.  There's

4    no projections in there.

5        A    Let me see.

6             (Perusing document.)

7             These are actuals.  These reflect actual

8    business that we've booked.

9        Q    Back to my question:  Ms. Blumenschine's --

10   unlike the other salespeople, her compensation didn't

11   have specific sales and targets.  You're not aware of

12   that, right?

13       A    I'm not aware of that.

14       Q    And you don't know why that would be, then,

15   right?

16       A    I'm not aware of it, so I don't know how to

17   answer your second question, why isn't it.

18       Q    Is it your testimony that the position of

19   associate publisher was a sales position?

20       A    Yes.

21       Q    And she was looked upon by you the same as

22   the other salespeople for *Matrix*, no different?

23       A    That is correct.

24       Q    Did she have any additional managerial

25   duties, in your mind, that the other salespeople didn't

CAMPANO & ASSOCIATES
COURT REPORTING SERVICES

69

1  guard in terms of being very, very specifically formal,
2  professional.  Whether or not that's what motivated her
3  is speculation on my part.  But that's the basis for my
4  thoughts.
5       Q    So are you saying that she had an attraction
6  to you that was not reciprocated?
7       A    I'm not saying that.
8       Q    Are you saying she tried to flirt with you
9  in some way?
10      A    Her manner was flirtatious, but that was her
11 manner.  Not -- I didn't take a whole lot of stock.
12 Certainly, when you asked was she attracted to me,
13 that's not what I drew from it.  What I drew from it, I
14 was sometimes uncomfortable.
15      Q    And she would make comments to you that were
16 sexual in nature?
17      A    Flirtatious as opposed to sexual.
18      Q    What do you mean by "innuendo-laden"?
19      A    On numerous business trips, recalling that
20 we worked in the same company many years before, when I
21 was a single fellow, she would state either at a dinner
22 or -- I can remember dinners -- that she had a crush on
23 me before I was married.  In and of itself, that
24 doesn't rise to anything.  But I was not necessarily
25 comfortable with that remark, and I either changed the

CAMPANO & ASSOCIATES
COURT REPORTING SERVICES

109

```
 1                    C E R T I F I C A T E

 2     STATE OF CONNECTICUT

 3     JUDICIAL DISTRICT OF ANSONIA/MILFORD

 4

 5              I, LYNNE STEIN, Notary Public within and for
       the State of Connecticut, duly commissioned and
 6     qualified, do hereby certify that pursuant to Notice,
       DANIEL SHANNON, the deponent herein, was by me first
 7     duly sworn to testify the truth, the whole truth and
       nothing but the truth of his knowledge touching and
 8     concerning the matters in controversy in this case;
       that he was thereupon carefully examined upon his oath
 9     and his testimony reduced to writing by me; and that
       the deposition is a true record, to the best of my
10     ability, of the testimony given by the witness.

11              I further certify that I am neither attorney
       or counsel for, nor related to or employed by, any of
12     the parties to the action in which this deposition is
       taken, and further that I am not a relative or employee
13     of any attorney or counsel employed by the parties
       thereto, or financially interested in the action.
14
                IN WITNESS WHEREOF, I have hereunto set my
15     hand this 7th day of October, 2003, at Milford,
       Connecticut.
16

17

18

19

20

21
                                        [signature: Lynne Stein]
22
       My Commission Expires:    LYNNE STEIN, Lic. No. 00110
23     January 31, 2004          Notary Public
                                 State of Connecticut
24

25
```

CAMPANO & ASSOCIATES
COURT REPORTING SERVICES