Dec. 9. 2003 12:48PM    MARTINLUCASCHIOFFI                          No.1672   P. 39
Case 3:02-cv-02244-HBF    Document 27-14    Filed 12/09/2003    Page 1 of 8

Page 73

```
 1   back in 2000?
 2        A.    It was a Primedia publication, and it was
 3   called Cable News.
 4        Q.    And did you submit a resume in the course of
 5   that interview?
 6        A.    Yes, I did.
 7        Q.    And what prompted the interview, how did
 8   you --
 9        A.    How did I get the interview?
10        Q.    Yeah.
11        A.    A friend of mine worked in the same office
12   and knew they were looking for someone.
13        Q.    Okay.  So your friend contacted you?
14        A.    Right.
15        Q.    And you went off and had this interview with
16   that company?
17        A.    With the publisher, correct.
18        Q.    And were you offered a job?
19        A.    I was.
20        Q.    And you declined?
21        A.    I did.
22        Q.    And what was the compensation that you were
23   offered?
24        A.    About -- it was a package of somewhere
25   between 150 and 175 thousand to start.
```

Dec. 9. 2003 12:48PM    MARTINLUCASCHIOFFI                    No.1672   P. 40
Case 3:02-cv-02244-HBF   Document 27-14   Filed 12/09/2003   Page 2 of 8

Page 74

1    Q.    And what were the nature -- what was the
2  nature of the job?
3    A.    It was selling advertising space in a cable
4  magazine, so to suppliers for the cable industry.
5    Q.    And what was the person's name with whom you
6  interviewed?
7    A.    I honestly, I don't remember.
8    Q.    And what was the -- and was the -- have you
9  finished?  I am sorry.
10   A.    Yes, I don't remember his name.
11   Q.    Who offered you the job, the same person?
12   A.    Yes.
13   Q.    Was it in writing?
14   A.    No.
15   Q.    And was anybody present during this
16  interview besides you and this person who's --
17   A.    No.
18   Q.    And did you have more than one interview?
19   A.    No.  I had one interview.  I had one
20  face-to-face interview.
21   Q.    And what was the name of the company again?
22   A.    It was a Primedia publication and called
23  Cable News.
24   Q.    And where was it located?
25   A.    New York.

Dec. 9. 2003 12:49PM    MARTINLUCASCHIOFFI                    No.1672   P. 41
Case 3:02-cv-02244-HBF   Document 27-14   Filed 12/09/2003   Page 3 of 8

Page 75

| | | |
|---|---|---|
| 1 | Q. | Whereabouts? |
| 2 | A. | Seventh Avenue and 34th Street by the Hotel |

3  New Yorker.

| 4 | Q. | Do you recall the date that you met the |

5  person there?

| 6  | A. | April or May of 2000. |
| 7  | Q. | Were you offered a job on the spot? |
| 8  | A. | No. |
| 9  | Q. | How long after the interview were you |

10 offered a job?

| 11 | A. | A week to ten days. |
| 12 | Q. | How were you offered the job? |
| 13 | A. | On the phone. |
| 14 | Q. | Did you call them, or did they call you? |
| 15 | A. | I called them to follow up, I had submitted |

16 a follow-up letter to the interview. We had -- I had some
17 issues. I don't remember exactly. I had some issues with
18 salary, and they were willing to work with me, and we had
19 to get those ironed out, and then I had to give an answer,
20 and I decided after talking to Bill that I would stay at
21 Matrix.

| 22 | Q. | So you disclosed to Bill that you had this |

23 interview and offer?

| 24 | A. | I told him my inclination was I wanted to |

25 stay, I wanted it to work, I had an investment, did he

Dec. 9. 2003 12:49PM    MARTINLUCASCHIOFFI                    No.1672   P. 42
Case 3:02-cv-02244-HBF   Document 27-14   Filed 12/09/2003   Page 4 of 8

Page 76

1    feel that we could make it work.
2         Q.    Did you memorialize that conversation at
3    all?
4         A.    No.
5         Q.    Did you, you say you had a follow-up letter
6    to the prospective new employer?
7         A.    Yes.
8         Q.    That letter was sent over your signature?
9         A.    Yes.
10        Q.    Do you have a copy of that?
11        A.    I would believe so.
12        Q.    You didn't throw that out?
13        A.    I wouldn't think so.  It's a good letter.
14        Q.    Was it met with a follow-up?
15        A.    I'm sorry?
16        Q.    Was it met with a follow-up response?
17        A.    By him?
18        Q.    Yes.
19        A.    By phone.
20        Q.    When Mr. Ziperman communicated to you the
21   fact that the commission portion of your compensation was
22   going to be altered, where did that leave you in terms of
23   your fixed salary on an annual basis, in terms of amount?
24        A.    I believe I had been receiving the amount
25   that was originally stipulated in my letter of employment.

Dec. 9. 2003 12:50PM    MARTINLUCASCHIOFFI                          No.1672   P. 43
Case 3:02-cv-02244-HBF   Document 27-14   Filed 12/09/2003   Page 5 of 8

Page 124

1   jeopardy by virtue of that lack of performance, did you
2   not?
3          A.    I did not know that. When I did mention it
4   to Mr. Ziperman, Mr. Ziperman said: We value you here,
5   and you're not just a salesperson. There are industry
6   fluxes, and we want to keep you, and we want to assess
7   this and work with it and see what we can do to generate
8   more sales. We were working on an editorial calendar.
9   There were problems with Matrix, there were a lot of
10  problems with Matrix. And if we could overcome those,
11  perhaps the sales would have been better.
12         Q.    Is it part of your job to contribute to the
13  editorial content of the magazine?
14         A.    Part of my job?
15         Q.    Yeah.
16         A.    I wasn't an editor. I was an associate
17  publisher.
18         Q.    Is the answer no?
19         A.    The answer is yes. I worked with Wayne
20  D'Orio to put together an editorial calendar.
21         Q.    And what is an editorial calendar?
22         A.    It's the framework of what the content of
23  the magazine would be.
24         Q.    And give me an example.
25         A.    There was an article on wireless

Dec. 9. 2003 12:50PM    MARTINLUCASCHIOFFI                           No.1672   P. 44
Case 3:02-cv-02244-HBF   Document 27-14   Filed 12/09/2003   Page 6 of 8

Page 196

1    Q.    In addition to excluding you from management
2  meetings, what else did -- what else, if anything, did Pro
3  Media do to create the discriminatory environment of which
4  you complain?
5              MR. LUCAS:    I'm going to object
6         because she answered that earlier.
7              MR. MINOGUE:    I think we got into the
8         exclusion from the meetings.
9    Q.    Didn't you tell me that there were --
10 Mr. Shannon told off-color jokes?
11   A.    Yes, I did.
12   Q.    Was that part of -- is that part of the
13 basis for your statement that this discriminatory
14 atmosphere was created and fostered by him?
15   A.    Yes.
16   Q.    How often did he do that?
17   A.    When we were with clients or when we were at
18 trade shows, he would, depending on the audience, tell
19 dirty jokes.
20   Q.    And in terms of the audience, what did you
21 mean by that, depending on the audience?
22   A.    Well, he would when we were with colleagues,
23 especially from Professional Media.  I can recall one
24 instance where we were at a dinner with a number of people
25 from the company, and he was telling Viagra jokes.  It was

Dec. 9. 2003 12:50PM    MARTINLUCASCHIOFFI                    No.1672   P. 45
Case 3:02-cv-02244-HBF   Document 27-14   Filed 12/09/2003   Page 7 of 8

Page 197

1    inappropriate.  It's just not --
2         Q.    You were at the table?
3         A.    Yes, I was.
4         Q.    And you heard the jokes?
5         A.    Yes.
6         Q.    Along with other employees?
7         A.    Yes.
8         Q.    Did you object to them in any way?
9         A.    I didn't participate in them.  I didn't -- I
10   didn't say, "You be quiet, that's disgusting," but I said
11   I didn't think it was necessary.
12        Q.    Did you make any complaints to anybody about
13   them?
14        A.    Again, I had no one to go to.
15        Q.    So the answer to that again is no?
16        A.    I made complaint to him that I didn't feel
17   that it was appropriate.
18        Q.    He was the only person?
19        A.    He would be my only recourse.
20        Q.    You didn't complain to Mr. Hanson?
21        A.    I would never -- I did not go to Mr. Hanson.
22        Q.    You didn't complain to Mr. Ziperman?
23        A.    I may have complained to Mr. Ziperman.  I
24   can't recall.
25        Q.    About the dirty jokes?

Dec. 9. 2003 12:51PM    MARTINLUCASCHIOFFI                    No.1672   P. 46
Case 3:02-cv-02244-HBF    Document 27-14    Filed 12/09/2003    Page 8 of 8

Page 256

```
 1   STATE OF CONNECTICUT    )
                             ) ss:  NEW CANAAN
 2   COUNTY OF FAIRFIELD     )
 3
 4          I, Melodie Ajello, a Registered Professional
 5   Reporter and Notary Public within and for the State of
 6   Connecticut, do hereby certify that the within deposition
 7   of LISA K. BLUMENSCHINE was held before me on the 28th day
 8   of May, 2003.
 9          I further certify that the witness was first sworn
10   by me to tell the truth, the whole truth and nothing but
11   the truth, and was examined by counsel, and his testimony
12   was recorded stenographically by me, it was reduced to
13   typewriting under my supervision, and I hereby submit that
14   the within contents of said deposition are true and
15   accurate to the best of my ability.
16          I further certify that I am not a relative of nor
17   an attorney for any of the parties connected with the
18   aforesaid examination, nor otherwise interested in the
19   testimony of the witness.
20          Dated at New Canaan, Connecticut, the 13th day of
21   June, 2003.
22
23
                              _____
                              Melodie Ajello  License#SHR.20
24                            Certified Court Reporter
25   (My Commission expires October 31, 2003.)
```