**EXHIBIT K**

LISA K. BLUMENSCHINE       :   CHRO Case No. 0220357

V.                         :

PROFESSIONAL MEDIA GROUP LLC : MAY 16, 2002


### AFFIDAVIT OF DANIEL SHANNON

Daniel Shannon, being duly sworn, hereby deposes and says:

1. I am over the age of 18 and believe in the obligation of an oath to tell the truth; I know that I am subject to penalties for perjury if I do not do so.

2. I make the following statements, based upon my personal knowledge, in response to Lisa Blumenschine's wholly unsupported complaint of age and sex discrimination against me and my employer, Professional Media Group LLC ("Promedia").

3. Ms. Blumenschine's claims that her dismissal was a result of age or sex discrimination (or retaliation for having made a discrimination complaint) are absolutely false.

4. At first, I simply could not imagine the motivation behind her untrue and scurrilous allegation that I made sexist comments or jokes or that there was a sexist environment at work. My superiors and colleagues know how

improbable these charges are, since I take great pride in following a high standard of appropriate and professional behavior at the office.

5. However, there were moments working with Blumenschine (hereinafter, "LB") which were personally embarrassing or awkward. I can only wonder if LB is motivated, in whole or part, by anger at my unwillingness to engage in inappropriate and innuendo-laden banter, as well as her desire to extract maximum financial consideration from the Company. In fact, I early on established clear boundaries between LB and myself because of actions on her part which I perceived as, at the very least, unprofessional.

6. On four or five occasions during the period from September, 2001 through December, 2001, LB told me that she had "had a crush on" me or wanted "to go out with" me when we worked for the same company a number of years ago. On each occasion, I ignored the flirtatious comments and changed the subject or simply failed to respond.

7. On at least two occasions, LB mentioned that her live-in companion was probably "jealous" of LB's and my "relationship." Both times I expressed surprise, and said that, of course, was silly because we had no relationship other than a professional relationship at work. I changed the topic immediately.

8. After a sales lunch in Norwalk in October or November, 2001, LB suggested we drop by her house (she was driving) so she could show me work that had been done on the house. I said that I'd like to take the opportunity to say hello to Peter (her live-in companion who, she said, was there at the time). When we arrived at her house, there was no one home. I became mildly uncomfortable and asked where Peter was. The essence of her response was that it was good that he wasn't there or he would be angry at my presence. A car then pulled up in the driveway and I quickly went outside to get out of the house. It was a realtor and, after LB spoke with her, I said, "Let's get back to the office." We did.

9. LB once told me in my office that she recently had been criticized for dressing provocatively but, she then laughingly said, "A girl's got to use what she's got." She thereupon proceeded to raise her breasts with her hands and giggle. I was quite embarrassed and said something along the lines of, "Not really." I quickly began to talk about something else.

10. This is the context in which, incredibly, LB charges me with sexist jokes and comments. I believe that LB's anger that I did not respond to her inappropriate and provocative behavior accounts for the fact that she now

3

blames *me* for her dismissal. I here deny *all* of her allegations of improper behavior.

11. Furthermore, the notion of her dismissal as "retaliation" for her complaints of discrimination is equally far-fetched, since no one at the Company, including myself, knew of any such complaints. LB never made a complaint in writing, and she is not telling the truth when she says she repeatedly made such complaints orally. Indeed, she had known my superior in a prior business and yet he says she *never* complained to him. LB *did* once say that the senior management was a "boys club" because it was made up of men. I pointed out that the highest paid employee in the Company was a woman (paid more than myself or my male superiors) because she was the best salesperson. LB knew this to be true. There was no other discussion on this subject, nor did she make any complaint that she was discriminated against; LB was, in fact, a highly paid employee so long as she was doing her job.

12. The simple truth of this matter is that LB's performance became so poor that she could not be retained as an employee.

13. At several meetings with LB in the fall of 2001, I told her -- explicitly -- that unless her sales increased she would be out of a job. I asked her on numerous occasions why she wasn't able to sell more ads. Was it a

4

market problem, a problem with the publication, a problem with our pricing? Each time she declined to respond with more than a shrug and the comment "It's a tough market."

14. Because LB's performance did not improve, it was decided in late fall or early December to sever her employment as a result of her poor sales. We waited until after the holidays to do this. The decision was approved by my superiors, including William Ziperman, Vice President and General Manager of Promedia.

15. Finally, I never said that I was "looking to recruit" two "bright, young and energetic guys." When our competitor suspended publication in December, 2001, we were contacted by two successful salespeople from that publication in search of employment; as detailed in Respondents' Statement of Facts, soon thereafter Promedia acquired the assets of their former employer. These two salespeople had sold $1 million in ads in 2001, compared to LB's total of $127,000; and they were hired by the Company.

16. Incidentally, when we met with the two salespersons, they presented us with a proposition: If we hired them, we would double or triple our ad sales based on their past performance in our market. Subsequently, they did so. Each salesperson has increased sales each month by more than 100% over LB's performance in the same territory.

17. I respectfully request that LB's complaint be dismissed.

*[signature]*
DANIEL SHANNON

Sworn to before me on this 15th day of May, 2002

*[signature]*
Notary Public ~~on Commission of the Supreme Court~~

**LYNN D. KEELER**
*NOTARY PUBLIC*
MY COMMISSION EXPIRES SEP 30, 2006

6