**EXHIBIT L**

STATE OF CONNECTICUT
COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES

| | | |
|---|---|---|
| LISA K. BLUMENSCHINE, | : | |
| | : | CHRO CASE NO.: 0220359 |
| Complainant, | : | EEOC CASE NO.: [unknown] |
| | : | |
| PROFESSIONAL MEDIA GROUP, LLC And DANIEL SHANNON, | : | |
| | : | MAY 30, 2002 |
| Respondents. | : | |

### *COMPLAINANT'S REPLY TO RESPONDENTS' ANSWER*

Complainant Lisa K. Blumenschine submits this reply to the May 16, 2002 Answer of respondents Professional Media Group, LLC ("PMG") and Mr. Daniel Shannon. Respondents' Answer raises numerous issues of fact regarding the discriminatory treatment of Ms. Blumenschine. Attached hereto as Exhibit A is a detailed response of Ms. Blumenschine to the Answer submitted by respondents. This affidavit demonstrates:

➢ The sole basis asserted for the termination of Ms. Blumenschine is demonstrably false. The purported failure "to be a productive employee" is premised upon a decline in sales figures for the months September, October and November. Due to the nature of publishing, these figures were set and available to management *prior to her promotion* in late September.

➢ At the time of Ms. Blumenschine's promotion in late September, just 90 days prior to her termination, she was given a letter which is in her personnel file which clearly states:

> "I'm pleased to announce that Lisa Blumenschine has been promoted to associate Publisher for Matrix.
>
> *This is good news for Matrix.* Lisa has been with Matrix since its launch and *has done a terrific job helping the book get established* in the higher education market. She has *contributed greatly to Matrix' steady growth* and this new position *will allow her to use more of her skills* as we move the magazine to the next level. Lisa will, in addition to continue growing her own territory, *support and manage the sales effort.* She will also continue to *play a key role in positioning the magazine and developing collateral sales material.*

> *Lisa has enjoyed great success in the past* working for a number of magazines including Operations and Fulfillment, DM News, Catalog Age and Direct. I look forward to her leveraging this experience for a more successful Matrix.

(September 26, 2001 memo attached as Exhibit A(1) (emphasis supplied).)

➤ Ms. Blumenschine was also told by Bill Ziperman at the time of her promotion that she had a bright future.

➤ Daniel Shannon became Ms. Blumenschine's boss at the time of her promotion, and he terminated her 90 days later.

➤ Mr. Shannon's explanation about declining sales by Ms. Blumenschine and the comparison by respondent to other female salespersons fails to compare equals, as:
  o The figures of Ms. Blumenschine were known at the time of promotion as stated above;
  o The two saleswomen to which she is compared were not in management, and their sole function was to sell. Ms. Blumenschine's job included many administrative tasks. (See Job Description, Ex. A(2).) These administrative tasks were broadened when she was promoted to the management team.
  o The other two saleswomen are not even located in Connecticut – one is in California and one is in Illinois.

➤ Mr. Shannon's attitude toward Ms. Blumenschine as a member of management is best characterized as "strange." His affidavit stating Ms. Blumenschine had some sort of lust for him is, at best, pure fantasy and evidences a male stereotyping of a female employee.

➤ Mr. Shannon's admission that Ms. Blumenschine complained of a "boys club" is but the tip of the iceberg regarding her complaints. Mr. Shannon excluded her from meetings and dismissed her complaints. Indeed, respondent admits it performed no investigation of the complaints and viewed them as false. (Respondent states "[a]ny true complaint would have been promptly investigated and dealt with.") Federal law required respondent to investigate any such complaints. See Malik v. Carrier Corp., 202 F.3d 97, 104 (2000) (employer has duty to investigate claims of discrimination). Respondent admits it did nothing.

➤ Respondent PMG has no written discrimination policy and no Human Resources representative. Ms. Blumenschine's complaints to her supervisor were ignored, and when she complained of discrimination, she was fired.

➤ Mr. Shannon admits that two young male salespersons were hired coterminously with Ms. Blumenschine's firing and assumed Ms. Blumenschine's sales activities. Mr. Shannon confronted Ms. Blumenschine with his desire to hire these two people and showed a clear preference for them.

2

> Mr. Shannon was not supportive of Ms. Blumenschine.

> Ms. Blumenschine's personnel file, supplied by respondent, is devoid of *any* negative comments whatsoever. No warnings were given nor notice of any performance issues. The termination by her new supervisor 90 days after performance accolades and her promotion destroys any claim of termination for poor performance. It is clear her complaints of discrimination, and Mr. Shannon's sexist views, were the cause of her discharge.

In order to prove a *prima facie* case of unlawful discrimination, a plaintiff must establish that (1) she is a member of a protected class; (2) she was qualified for the position; (3) she was discharged or not offered the position; and (4) the circumstances exist which give rise to an inference of discrimination. Rose v. James River Paper Co., 2 F.Supp.2d 245, 250 (D.Conn. 1998); see also McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); Shumway v. United Parcel Service, Inc., 118 F.3d 60, 63 (2d Cir. 1997); Gallo v. Prudential Residential Services, Ltd. Partnership, 22 F.3d 1219, 1224 (2d Cir. 1994).

"The burden of establishing a prima facie case...is not onerous." Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981). In fact, a plaintiff's burden of establishing a *prima facie* case has been frequently described as "minimal." St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506 (1993); Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994) (quoting Dister v. Continental Group, Inc., 859 F.2d 1108, 1114 (2d Cir. 1988)); Fisher v. Vassar College, 114 F.3d 1332, 1335, cert. denied 522 U.S. 1075 (1998).

Similarly, the burden to prove a *prima facie* case of retaliation is slight and may be established "with *de minimus* evidence." Wanamaker v. Columbian Rope Co., 108 F.3d 462, 465 (2d Cir. 1997). Ms. Blumenschine need only show:

> (1) the plaintiff was engaged in an activity protected under the ADEA [and Title VII]; (2) the employer was aware of the plaintiff's participation in the protected activity; (3) the plaintiff was subject to an adverse employment action; and (4) there is a nexus between the protected activity and the adverse action taken.

3

Id. Complaining of discrimination is protected activity. Id. ("[Plaintiff's] opposing discriminatory treatment is protected activity."). Respondent will be deemed responsible for the knowledge of its agent, Mr. Shannon, and the termination is clearly adverse activity. Faragher v. City of Boca Raton, 524 U.S. 775 (1998) (employer is vicariously liable for actionable discrimination by supervisor). Moreover, the temporal connection between the complaint and the discharge is more than adequate to establish a retaliatory nexus for the jury. Slattery v. Swiss Reinsurance America Corp., 248 F.3d 87, 95, cert. denied, 122 S.Ct. 348 (2001) ("temporal proximity can demonstrate a causal nexus"); Manoharan v. Columbia University College of Physicians & Surgeons, 842 F.2d 590, 593 (2d Cir. 1988) ("Proof of the causal connection can be established indirectly by showing that the protected activity was closely followed in time by the adverse action.").

Accordingly, Ms. Blumenschine has clearly satisfied the elements of proving a *prima facie* case of age and sex discrimination and retaliation.

COMPLAINANT
LISA K. BLUMENSCHINE

By _____
Scott R. Lucas, Esq. (#303944)
Mary Alice S. Canaday, Esq. (#409576)
Martin Lucas & Chioffi, LLP (#418373)
1177 Summer Street
Stamford, CT 06905
Phone: (203)324-4200
Fax: (203) 324-8649

4

# EXHIBIT A

STATE OF CONNECTICUT
COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES

| | |
|---|---|
| LISA K. BLUMENSCHINE, | : |
| | : CHRO CASE NO.: 0220359 |
| Complainant, | : EEOC CASE NO.: [unknown] |
| | : |
| | : |
| PROFESSIONAL MEDIA GROUP, | : |
| LLC And DANIEL SHANNON, | : |
| | : MAY 30, 2002 |
| Respondents. | : |

## *COMPLAINANT'S VERIFIED REPLY*

1. I am submitting this affidavit in supplement to my complaint and to clarify some points raised by respondents Professional Media Group, LLC ("PMG") and Daniel Shannon in their opposition papers.

2. Respondents' allegation that my performance had deteriorated since the time of my promotion, which is the time Mr. Shannon was appointed as my manager, and the date of my termination is false. The sales figures detailed by respondents appear incorrect to me, although I have no way of verifying this as all records remain with respondents. In any event, the sales figures cited as a basis for my termination, those for September, October and November, were known *prior to* my promotion. Due to the nature of the business, sales are made and locked approximately two months prior to the month the sales are credited. Moreover, by the time of my promotion, three quarters of the sales year was complete, and yet I was promoted and given accolades in the announcement of my promotion (attached as Exhibit 1).

3. Attached hereto as Exhibit 2 is a description of my duties. Unlike the two female salespersons to whom I am compared in respondents' reply, my job was much broader. As you can

see, my responsibilities included many administrative duties and other tasks. These duties increased as a result of my promotion, and the idea was for me to become more involved in management. Unfortunately, Mr. Shannon would not allow me to do this and he would not support my efforts, either in management or in sales.

4. After my promotion, I was the first woman in management on the publishing side of the business. Terry Nelson, my subordinate, did not report directly to Mr. Shannon and did not have to deal with him. Moreover, she is stationed in Illinois, not in Connecticut. The other saleswoman cited by respondents, Melanie Jenkins, works in California. Neither of these women have managerial duties.

5. At no time was I given any warning of poor performance nor was I told I was likely to be terminated. In fact, as indicated by the attached memorandum (Exhibit 1), I was assured just the opposite, that I had done well and had an excellent future.

6. I made numerous complaints to Mr. Shannon. Although the only one he admits to is my complaint about management being a "boys club," even this was a result of my being excluded from meetings and other sexist conduct by Mr. Shannon. I made numerous complaints to Mr. Shannon, including a direct claim of discrimination. The reason I complained directly to Mr. Shannon is that he insisted that all issues in my job flow through him. I was hopeful he would correct his attitude and do the right thing. There is no Human Resources Department at PMG and no employee manual other than what I have attached as Exhibit 3. Accordingly, there are no procedures for complaining about discrimination or harassment. I had no idea Mr. Shannon would react so negatively to my complaints.

7. Mr. Shannon's assertions that I indicated I had a "crush" on him or was otherwise sexually attracted to him are ridiculous and demonstrate his distorted view of male/female

relationships. I can only presume he was referring to a discussion I had with him in which I acknowledged that his wife, Ellen Shannon, had been my boss at a prior employer for the years 1995 through 2000. I simply told him (immediately after my promotion) that it would be nice to work with him. This, of course, was before he began acting in a blatantly discriminatory manner. Moreover, I never said that my boyfriend Peter was jealous of Mr. Shannon. What I stated was that Peter was "jealous of the time away from him" because I was working extremely long hours, including weekends and nights at home. In other words, I was indicating Peter, who was retired, was jealous of the fact I had to devote so much time to working. This had *nothing* to do with Mr. Shannon -- the thought that Peter would be jealous of him, or that I was somehow attracted to him, is utter nonsense.

8. Mr. Shannon's imagination about me somehow seducing him in my house is equally ludicrous. We were returning from a sales lunch in Norwalk involving MicroWarehouse. We were discussing my home, which is a 120-year-old renovated farmhouse. He expressed an interest in seeing it, and we stopped by the house. I never said I was glad that Peter was not there, nor did I act in any way in an unbusinesslike fashion. Moreover, Mr. Shannon was driving that day, and it was he who expressed his interest in viewing the house and drove there. Incidentally, Mr. Shannon had insisted on several occasions that I pick him up at *his* house in Westport, Connecticut on the way to business events.

9. The discussion about my clothing referred to by Mr. Shannon in his affidavit was a result of him telling me one day that the clothes I was wearing were unusual for me. I was wearing conservative clothes that day, and I responded that I did not like dressing provocatively as it can often be misconstrued in the workplace. I believe the quote that he attributes to me is actually attributable to another female employee at the company, and I in no way grabbed my breasts or otherwise acted suggestively.

3

10. The male management at PMG would frequently exchange jokes with other male managerial employees. These were inappropriate, off-color jokes, often of a sexual nature involving items such as Viagra, etc.

11. I never shrugged off the declining sales figures for Matrix magazine. Indeed, I prepared extensive market analyses detailing market trends and reasons for the sales decline nationwide.

12. Mr. Shannon directly informed me that he was looking to hire two young male sales employees. He stated it was his desire to get these "young and aggressive" salespeople in, and he clearly expressed a preference for working with such salespeople.

13. The comment Mr. Shannon attributes to me about "when are you firing me" is a result of my being told by Mr. Shannon not to use the phone, not to make travel plans, not to arrange any appointments, not to use the e-mails, and to do nothing. This was the day I was fired. It was the culmination of his mistreatment. I asked him if he thought I was stupid and when was he going to fire me. This was in direct response to his removal of all my duties, as well as my knowledge PMG was acquiring University business and the two new male sales employees, despite the fact Mr. Shannon had tried to keep the PMG acquisition a secret from me.

14. All told, I find Mr. Shannon's affidavit, and the "attack the victim" tactic of PMG, to be reprehensible. I stand by my complaint that respondents engaged in discriminatory and retaliatory conduct.