9

1997 WL 718976  
(Cite as: 1997 WL 718976 (D.Conn.))

Page 1

C  
Only the Westlaw citation is currently available.

United States District Court, D. Connecticut.

Zoraida SERRANO, Plaintiff,  
v.  
Marvin T. RUNYON, et al., Defendants.

No. 3:95-469(DJS).

Aug. 22, 1997.

W. Martyn Philpot, Jr., New Haven, CT, for Zoraida Serrano, plaintiff.

Lauren M. Nash, New Haven, CT, Anne M. Gallaudet, Windsor, CT, for Martin T. Runyon, Postmaster General, Official Capacity, defendant.

Lauren M. Nash, Anne M. Gallaudet, (See above), for Buford White, Area Manager, Official & Individual Capacities, defendant.

Lauren M. Nash, Anne M. Gallaudet, (See above), for William Galligan, Manager, Processing and Distribution, Official & Individual Capacities, defendant.

Lauren M. Nash, (See above), Judy Duncan Rintoul, Rintoul & Rintoul, West Hartford, CT, for Clifford Aivaz, Mail Carrier, Individual & Official Capacities, defendant.

**MEMORANDUM OPINION AND ORDER**

SQUATRITO, J.

*1 The plaintiff brings this action under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e, *et seq.*, and the Connecticut Fair Employment Practices Act ("CFEPA"), 46 Conn.Gen.Stat. § 46a-60, alleging sexual discrimination in the workplace and intentional infliction of emotional distress. The case arises out of the plaintiff's employment as a supervisor for the United States Postal Service, and is currently before this court on the defendants' motion for summary judgment. For the reasons set forth below, the motion is granted in part and denied in part.

I. *Facts*

A. *Background*

Based on the complaint, the depositions, the Local Rule 9 statements, and the memoranda of the parties, the court finds the following to be undisputed. [FN1] This suit arises out of a series of interactions between the plaintiff, an Hispanic female, and the defendant Clifford Aivaz. Also at issue are the subsequent actions of supervisory personnel, namely defendants Buford White and William Galligan.

> FN1. The plaintiff's and the defendants' summary of events contains slight, non-material differences as to the dates of several of the events. These differences in no way impact this decision.

Since July 1984, the plaintiff has been employed by the United States Postal Service at the Bradley Airmail Facility ("AMF") in Windsor Locks, Connecticut. Aivaz was a postal union steward at the same facility. [FN2] Galligan was plant manager of the Hartford General Processing and Distribution Facility, [FN3] and was responsible for the employees at AMF. White was the Northeast Postal Area Manager, and had supervisory authority over Galligan.

> FN2. Aivaz assumed the duties of a union steward in 1989.

> FN3. The Hartford Processing and Distribution Center is comprised of the Bradley Airport Mail Facility in Windsor Locks, Connecticut (where the plaintiff was employed); the Hartford Distribution and Processing Plant, in Hartford, Connecticut; and the Waterbury Postal facility, in Waterbury, Connecticut.

Between 1987-1989, Aivaz asked the plaintiff for a date on several occasions, and she repeatedly declined his invitations. In her deposition, she stated that she did not feel threatened by these advances, and "never took it seriously." (Plaintiff's

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

1997 WL 718976
(Cite as: 1997 WL 718976 (D.Conn.))

Page 2

Deposition at 54.) In 1990, the plaintiff became involved in a relationship with another postal worker, Scott Clayton. She alleges that Aivaz followed her after work on several occasions to discover if she was going to see Clayton. The plaintiff did not report any of these incidents to her supervisor. Aivaz did not ask her out during the period of 1989 to 1993.

On October 15, 1993, the plaintiff allegedly disciplined a union employee for arriving late to work. Aivaz, as union steward, confronted the plaintiff concerning her actions. According to the plaintiff, Aivaz's actions were aggressive, and included yelling obscenities and threatening to complain about her performance as a supervisor. Although the conversation became heated, the plaintiff concedes that Aivaz neither raised issues nor made comments relating to her gender, her national origin, or her refusal to date him some years ago.

On October 27, 1993, the plaintiff related the incident to Galligan, and indicated that she believed her previous refusal to date Aivaz was a factor in his aggressive behavior. Two days later, Galligan met with the plaintiff and her immediate supervisor, Rocio Pinto. He informed them of his decision to transfer the plaintiff to the Hartford Distribution and Processing facility. The plaintiff indicated that she did not want to accept the transfer because she would be working more frequently with Aivaz and the Hartford facility was farther away from her home. On November 12, 1993, the plaintiff wrote a letter to White expressing concern over the transfer, indicating that she had "no desire to be placed in a hostile environment." When Galligan learned of the plaintiff's refusal to accept the transfer, he indicated to Pinto that he was prepared to "play hardball." On November 15, 1993, White affirmed the transfer order. The following day the plaintiff filed a Notice of Occupational Disease and Claim for Compensation with the Department of Labor, claiming depression resulting from the transfer order. [FN4]

> FN4. The plaintiff is currently employed by the U.S. Postal Service in Springfield, Massachusetts.

B. *Procedural History*

*2 On November 5, 1993, the plaintiff contacted an EEOC investigator in relation to the above incidents. On March 15, 1995, she filed this action naming Runyon, [FN5] Aivaz, Galligan, and White as defendants. In response to the defendants' motion for partial dismissal, [FN6] the plaintiff voluntarily amended the complaint on October 7, 1996. The amended complaint ("complaint") contains four counts. Count one is a Title VII claim against defendant Runyon. Count two is based on CFEPA and names Runyon, White, Galligan, and Aivaz as defendants. Counts three and four are based on state tort law. Count three alleges intentional and/or negligent infliction of emotional distress against Aivaz while count four makes the same claim against Galligan. Defendants Runyon, White, and Galligan have moved for summary judgment on counts one, two, and four, claiming that the plaintiff has failed to state a *prima facie* case under Title VII, that her state law claims are preempted by Title VII, and that this court lacks subject matter jurisdiction to hear her state tort claims. No motion for summary judgment was filed by Aivaz.

> FN5. Runyon is the Postmaster General.

> FN6. Two separate motions for dismissal were filed, one by defendants Runyon, White, and Galligan, and one by defendant Aivaz.

II. *Discussion*

A. *Standard of Review*

A motion for summary judgment will be granted if the court determines that the case presents no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). It is the substantive law governing the case which identifies those facts which are material on motions for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 258, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The burden of showing that no genuine issue of material fact exists rests on the moving party. *See Adickes v. S.H. Kress and Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598,

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

1997 WL 718976
**(Cite as: 1997 WL 718976 (D.Conn.))**

Page 3

26 L.Ed.2d 142 (1970).

To determine whether there is a genuine issue of material fact, the court is required to resolve ambiguities and draw factual inferences in favor of the party against whom summary judgment is sought. *Anderson,* 477 U.S. at 255; *Ramseur v. Chase Manhattan Bank,* 865 F.2d 460, 465 (2d Cir.1989); *Donahue v. Windsor Locks Bd. of Fire Comm'rs,* 834 F.2d 54, 57 (2d Cir.1987). The conclusions drawn must be viewed in the light most favorable to the opposing party. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962) (per curiam).

**B.** *Title VII Claims Against Runyon*

The plaintiff alleges that the defendant Runyon violated Title VII through various actions, including (1) fostering a hostile work environment; (2) engaging in quid pro quo sexual harassment; and (3) by retaliating against her when she complained of sexual harassment. As each of these claims present different issues to the court, they will be discussed in turn.

*1. Hostile Work Environment*

Hostile work environment harassment occurs when the employer's conduct "has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive work environment." *Tomka v. Seiler,* 66 F.3d 1295, 1305 (2d Cir.1995) (quoting *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). An employee can advance a successful claim under a hostile work theory only upon showing that the workplace environment was permeated with discriminatory intimidation, ridicule, and insult. *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 65-67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). There is no precise test for what constitutes a hostile work environment, so courts must focus on the totality of the circumstances. Factors which should be considered include the Frequency of the discriminatory conduct, its severity, whether it is physically threatening, or whether it interfered with the employee's work performance. *Harris v. Forklift Systems Inc.,* 510 U.S. 17, 114 S.Ct. 367, 371, 126 L.Ed.2d 295 (1993). Isolated acts or occasional episodes are not sufficient to establish the existence of a hostile work environment.

*Kotcher v. Rosa and Sullivan Appliance Center, Inc.,* 957 F.2d 59, 62 (2d Cir.1992).

**\*3** The facts of the present case are legally insufficient to establish the presence of a pervasive hostile work environment. [FN7] In essence, the plaintiff has alleged that a hostile work environment existed based on two sets of occurrences. First, she alleges that during the period of 1987-1989 Aivaz asked her for a date on several occasions. However, at that time, she did not perceive these acts to be threatening or harassing. She did not report Aivaz's actions to anyone at work because she "never took it seriously." (Plaintiff's Deposition at 54.) The second occurrence is the altercation which took place on October 15, 1993. This incident apparently involved a heated discussion between the plaintiff and Aivaz regarding the disciplining of another employee. However, the plaintiff does not allege that Aivaz ever mentioned her race, national origin, or her refusal to date him four years ago. In fact, the plaintiff concedes that the subject of the debate never strayed from those which a union steward would normally discuss with a supervisor. Considering all the evidence in a light most favorable to the plaintiff, a reasonable jury could not find that these two incidents, separated by several years, constitute a hostile work environment under Title VII.

> FN7. The defendants also assert that events which occurred more than 45 days prior to the time the plaintiff contacted the EEOC investigator should not be considered. The plaintiff counters that these events fall under the continuing violation exception to the statutory period. Since this court finds that the conduct does not rise to the level of harassment, we need not determine whether the plaintiff has successfully demonstrated a continuing course of conduct.

*2. Quid Pro Quo Sexual Harassment*

In order to establish a claim of quid pro quo sexual harassment against an employer, a plaintiff must show: (1) the employee belongs to a protected class; (2) the employee was subject to unwelcome sexual harassment; [FN8] (3) the harassment complained of was based on sex; and (4) the

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

1997 WL 718976
**(Cite as: 1997 WL 718976 (D.Conn.))**

Page 4

employer's reaction to the harassment affected tangible aspects of the employee's compensation, terms, conditions, or privileges of employment. *Hodges v. Gellerstedt,* 833 F.Supp. 898 (M.D.Fla.1993); *Lane v. Ground Round Inc.,* 775 F.Supp. 1219 (E.D.Mo.1991).

> FN8. The EEOC guidelines define the type of conduct which may constitute sexual harassment as "unwelcome sexual advances, request for sexual favors, and other verbal or physical conduct of a sexual nature..." 29 C.F.R. § 1604.11(a) (1991).

"The gravaman of a quid pro quo sexual harassment claim is that the employer conditions an employment benefit or job status on the employee's submission to conduct of a sexual nature." *Splunge v. Shoney's Inc.,* 874 F.Supp. 1258, 1269 (M.D.Ala.1994). The acceptance or rejection of the harassment must be an express or implied condition of receipt of job benefits or the cause of the job detriments. *Id.* at 1270. In determining whether claims exist for implicit quid pro quo sexual harassment, the fact that an employer discusses potential job benefits or detriments during the same time period that sexual advances are made is considered. *Fowler v. Sunrise Carpet Industries Inc.,* 911 F.Supp. 1560 (N.D.Ga.1996). At least three factors are relevant in determining implicit quid pro quo sexual harassment: (1) the frequency of the employer's sexual advances; (2) the length of time over which those advances occur; and (3) the nexus between the sexual advances and the discussion of job benefits or detriments. *Id.*

In the case at bar, the plaintiff has failed to present sufficient evidence from which a reasonable trier of fact could find quid pro quo sexual harassment. She has not set forth any evidence tending to show that she was subjected to unwanted harassment. She concedes that when she declined to date Aivaz in 1987-89, he never threatened to do anything. She never took the advances seriously and never reported any of them to her management. Additionally, she admits that Aivaz never made any derogatory references concerning her nationality or gender at any time from 1987 to 1993. There is no evidence that her encounter with Aivaz in October of 1993 had anything to do with matters other than legitimate union business. There appears to be no relationship between Aivaz's request for dates in the late 1980's and the 1993 argument. In essence, the plaintiff describes a confrontation between a postal supervisor and a union steward which, although unpleasant, does not by itself support a charge of quid pro quo sexual harassment. Discord based on personality conflicts between co-workers or between a supervisor and an employee is not actionable under Title VII. *Vore v. Indiana Bell Telephone Co. Inc.,* 32 F.3d 1161 (7th Cir.1994); *Risinger v. Ohio Bureau of Workers' Comp.,* 883 F.2d 475, 478 (6th Cir.1989); *Valdez v. Mercy Hosp.,* 961 F.2d 1401, 1402-03 (8th Cir.1992); *Man-of-Jerusalem v. Hill,* 769 F.Supp. 97, 101 (E.D.N.Y.1991). Considering all the evidence in a light most favorable to the plaintiff, a reasonable jury could not find that the plaintiff's allegations support a claim of quid pro quo harassment under Title VII.

*3. Retaliation*

*4 Title VII prohibits an employer from subjecting an employee to an adverse employment action in retaliation for that employee's opposition to allegedly discriminatory conduct. 42 U.S.C. § 2000e-3(a). To establish a *prima facie* case of retaliation under Title VII, the plaintiff must show that: (1) she was engaged in an activity protected by Title VII; (2) the employer was aware that the plaintiff engaged in the protected activity; (3) the plaintiff suffered a disadvantageous employment action; and (4) a causal relation exists between the protected activity and the employment action. *Dortz v. City of New York,* 904 F.Supp. 127, 156 (S.D.N.Y.1995) (*citing Cosgrove v. Sears, Roebuck and Co.,* 9 F.3d 1033, 1040 (2d Cir.1993). Once a *prima facie* case has been established, the burden shifts to the defendant to provide a legitimate, nondiscriminatory reason for the action. *See Cronin v. Aetna Life Insurance Co.* 46 F.3d 196, 199 (2d Cir.1995).

In order for the plaintiff to establish the first element, that she was engaged in a protected activity, she need only show that she was acting under a good faith belief that the activity was covered by the statute. *Cosgrove,* 9 F.3d at 1039 ( citing *Sumner v. United States Postal Service,* 899 F.2d 203, 209 (2d Cir.1990). While the protected activity usually takes the form of filing a formal complaint or a lawsuit, making an internal

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

1997 WL 718976
(Cite as: 1997 WL 718976 (D.Conn.))

Page 5

complaint regarding sexual harassment is also covered by the statute. *Id.* at 1040. Establishing that the employer knew or should have known about the incident satisfies the second element. *Id.* at 1039. The third element is satisfied if the claimant can show that the employer's conduct "affected terms, privileges, duration, or conditions of employment." *Dortz,* 904 F.Supp. at 156 (*quoting Vergara v. Bentsen,* 868 F.Supp. 581, 591 (S.D.N.Y.1994)). While the result is often the employee's discharge, less severe events can also be sufficient. *Id.* Finally, the fourth element can be established "by showing that the protected activity was closely followed by adverse treatment." *Id.* at 157.

In the case at bar, the plaintiff's complaint satisfies all of the required elements. She alleges that within three weeks of bringing a complaint of what she perceived to be sexual harassment to the attention of her management, she was involuntarily transferred to a facility where she would have greater contact with the alleged harasser. The defendant contends that a legitimate, non-discriminatory reason for this transfer was to remove the plaintiff from a work situation about which she complained to a different environment. However, Galligan knew that the plaintiff did not want to accept the transfer because it would increase her interactions with Aivaz. He told the plaintiff's supervisor that he intended to "play hardball" in order to convince the plaintiff to accept the transfer. The actions of Galligan in ordering the transfer after receiving the complaint, and his subsequent desire to enforce it, raise issues of triable fact as to the legitimacy of the offered non-discriminatory reason. A reasonable jury could find that the plaintiff has a valid retaliation claim under Title VII. Therefore the motion for summary judgment against count one of the complaint is denied.

C. *State Anti-Discrimination Claims Based on CFEPA*

*5 Title VII embodies a comprehensive remedial scheme for handling employment discrimination in the federal government. *Brown v. General Services Administration,* 425 U.S. 820, 829, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976). "The congressional intent in 1972 was to create a preemptive administrative and judicial scheme for the redress of employment discrimination." *Id.* at 828. *See also Pierce v. Casey,* 1988 WL 832 (E.D.Pa.1988) (court dismisses claims brought under state law holding that Title VII provides the exclusive remedy for federal employment discrimination).

In the case at bar, the plaintiff has charged all four defendants with violations of CFEPA. However, as an employee of the United States Postal Service, her exclusive remedy lies in Title VII. Her attempt to recast her federal charges as state claims is in violation of the scheme Congress embodied in Title VII. In her brief, the plaintiff herself acknowledges that "admittedly, our Supreme Court has stated that Title VII provides the exclusive remedy for claims of discrimination by federal employees." (Plaintiff's Reply Brief at 32.) Accordingly, the plaintiff's allegations based on CFEPA as stated in count two of the complaint are dismissed.

D. *State Law Tort Claims*

1. *State Tort Claims Against Galligan*

The state tort claims alleging intentional and/or negligent infliction of emotional distress against defendant Galligan lack proper subject matter jurisdiction. The Postal Reorganization Act, 39 U.S.C. § 409(c), *et seq.* provides that postal agents acting in their official capacity may only be sued under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671- 2680. *See McCollum v. Tisch,* 479 U.S. 1034, 107 S.Ct. 883, 93 L.Ed.2d 836 (1987). Furthermore, the FTCA provides that the plaintiff must exhaust all administrative remedies before bringing suit. *See Cizek v. United States,* 953 F.2d 1232, 1233 (10th Cir.1992).

In the case at bar, the plaintiff claims that filing her claims with a federal court is proper since Galligan's actions were outside the scope of his employment. However, the facts of case indicate otherwise. The plaintiff claims that Galligan was unresponsive to her complaints regarding the incident with Aivaz and that he subsequently ordered her reassignment to another Connecticut postal facility. Reviewing employment matters and suggesting transfers does not appear to lie outside the normal job functions of a postal service supervisor. The claims for intentional infliction of emotional distress based on count four of the amended complaint are dismissed.

2. *State Tort Claims Against Aivaz*

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

1997 WL 718976
**(Cite as: 1997 WL 718976 (D.Conn.))**

Page 6

The plaintiff brings count three against Aivaz for intentional and/or negligent infliction of emotional distress. As stated above, Aivaz has not moved for summary judgment on this claim. Accordingly, count three remains pending for trial.

III. *Conclusion*

For the foregoing reasons, the defendants' motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART.** Summary judgment is granted against count two (CFEPA charges against all defendants) and count four (state tort claims against Galligan). Summary judgment is granted against the plaintiff's claims of hostile work environment harassment and quid pro quo harassment in violation of Title VII in count one against Runyon.

*6 Count one against defendant Runyon for retaliation in violation of Title VII and count three against defendant Aivaz for negligent and/or intentional infliction of emotional distress remain pending for trial.

**It is so ordered.**

1997 WL 718976, 1997 WL 718976 (D.Conn.)

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works



Not Reported in A.2d
(Cite as: 1998 WL 764465 (Conn.Super.))

Page 1

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Superior Court of Connecticut.

Karen L. MAHONEY,
v.
Michael J. AUGENSTERN.

No. CV 970403122S.

Oct. 21, 1998.

MEMORANDUM OF DECISION ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

PITTMAN.

*1 On April 6, 1997, the plaintiff commenced a suit against the defendant in the Small Claims Session of the Superior Court, G.A. # 6, for $2500 in back wages. [FN1] On June 25, 1997, the defendant appeared by counsel, filed an answer denying the allegations in the complaint, and moved to transfer this matter to the regular docket. The plaintiff, representing herself, filed an objection, to no avail. Since then the plaintiff, proceeding pro se, has had great difficulty navigating our sometimes convoluted rules of practice. She has filed a number of amended complaints, several unsuccessful motions to cite in an additional party, and at least four motions for default for failure to plead which have been denied because of the existence of the defendant's original answer.

> FN1. The amount of wages she actually claimed was $2559 20 for a period from February to October 1995, but she was content abide by the $2,500 jurisdictional limit of the Small Claims Session. Conn. Gen.Stat. § 51-15.

Finally, on July 13, 1998, the plaintiff filed an application for prejudgment remedy, seeking to secure the sum of $5118.40, which is double the original amount claimed in her small claims writ, pursuant to the provisions of Conn. Gen. Stat § 31-72. The application was originally scheduled for hearing on August 17, 1998. The plaintiff appeared and was ready to proceed. Counsel for the defendant, though duly notified per the printed calendar, did not appear. The court marked the matter over as a courtesy to non-appearing counsel and had the clerk contact the attorney's office to notify him of the new hearing date. On August 19, 1998, counsel for defendant filed a written Objection to Application for Prejudgment Remedy, arguing that there was no real estate of the defendant subject to attachment in the State of Connecticut.

On September 1, 1998, the plaintiff again appeared in court for the scheduled PJR hearing, and counsel for the defendant did not attend. The court allowed the plaintiff to proceed with her evidence. She took the witness stand, swore the oath, and testified credibly that she had worked for the defendant in 1995 and was due back wages in the sum of $2559.20. A co-worker also testified that he was aware that she had worked for the defendant during the period in question.

The court found that the plaintiff had made the required showing under Conn. Gen.Stat. § 52-278d and entered an order for prejudgment remedy in the sum of $5118.40. Notice of the order was duly sent to defendant's counsel on September 1, 1998.

Previously on June 24, 1998, the plaintiff had also filed a Motion for Summary Judgment. In an effort to clean up the loose ends in the file and get the case placed on a list for trial, the court specially assigned the Motion for Summary Judgment for hearing. Both the plaintiff and the attorney for the defendant appeared in court on September 14, 1998, and argued the motion.

In opposing the motion, the defendant relies solely on an Objection to Motion for Summary Judgment filed on July 21, 1998, which argues that summary judgment cannot be granted if the pleadings are not closed. This, of course, is not the law. Conn. Prac. Book § 17-44 states, "[i]n any action ... any party may move for a summary judgment at any time ..." [FN2]

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in A.2d
(Cite as: 1998 WL 764465 (Conn.Super.))

Page 2

FN2. Even if the rule were that the pleadings must be closed, the plaintiff conceded at oral argument that she was relying only on her first count in the April 7, 1998, complaint, and to simplify matters related to the pleadings, was orally withdrawing all other counts. Thus the issues were joined, as they had been back in 1997, by the original answer, which was a general denial to the allegations in the one-count complaint.

*2 The Practice Book also provides that after each side is given the opportunity to file appropriate documentary evidence, such as affidavits, written admissions, and other documentary proof such as testimony under oath, Conn. Prac. Book § 17-45, the judgment sought shall be rendered forthwith if the pleadings, affidavits, and any other proof submitted show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Conn. Prac. Book § 17-49.

On September 15, 1998, this court filed the following interim memorandum, a copy of which was duly sent to the plaintiff and to counsel for the defendant on September 17, 1998:

MEMORANDUM RE SUMMARY JUDGMENT
*The parties argued the plaintiff's Motion for Summary Judgment before the court on September 14, 1998. As part of the submission, the parties are hereby notified that the court intends to take notice of the evidence and sworn testimony offered by the plaintiff in open court on September 1, 1998, when this court heard plaintiff's Application for Prejudgment Remedy. Should either party wish to file further documentation, the court will receive it on or before September 28, 1998, after which the Motion for Summary Judgment will be considered fully submitted and ruled on by the court. Patty Jerkins Pittman, Judge.*

The deadline of September 28, 1998, has come and gone. The court has before it the affidavits in support of summary judgment submitted by the plaintiff, and more importantly the testimony of which the court has taken notice. There exists no sworn statement by the defendant or anyone competent to offer knowledgeable evidence on his behalf. All that exists to oppose summary judgment is the defendant's legal argument and the unsworn assertions of the defendant and his counsel that he does not owe $2559.20 in back wages to the plaintiff. These are not sufficient to defeat summary judgment.

Therefore the court finds that there is no genuine issue of material fact and grants the plaintiff's Motion for Summary Judgment.

Judgment shall enter as follows:
  Compensatory damages: $2559.20
  Double damages per § 31-72: $2559.20
  Interest pursuant to Conn. Gen. Stat. § 52-192a (Offer of Judgment of November 13, 1997, for $1600, retroactive to April 16, 1997): $928.03.

Judgment shall enter for plaintiff in the total of the above sum--$6046.43 plus costs.

1998 WL 764465 (Conn.Super.)

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works