UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| LISA K. BLUMENSCHINE, | : | CIVIL ACTION NO. |
| | : | 302 CV 2244 (DJS) |
| Plaintiff, | : | |
| | : | |
| V. | : | |
| | : | |
| PROFESSIONAL MEDIA GROUP, LLC, | : | |
| | : | JANUARY 27, 2003 |
| Defendant. | : | |

PLAINTIFF'S OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

*PRELIMINARY STATEMENT*

Plaintiff Lisa K. Blumenschine submits this brief in opposition to defendant's Motion for Summary Judgment dated December 8, 2003 (hereinafter "defendant's Motion"). As more fully set forth below, defendant has misstated and skewed both the facts and, in many instances, the applicable law in an effort to wrongly deprive plaintiff of her day in court. For example, in its memorandum in support of its Motion for Summary Judgment, defendant first intimates that plaintiff did not complain of discrimination, then concedes that she did, however it was not "formal." Defendant further seeks to insulate itself from liability by asserting that plaintiff did not route her complaints in a formal fashion despite defendant's admission that it had no human resources department nor established guidelines for employees to lodge and/or remedy grievances of any kind. Defendant then further contends that an impartial disinterested member

of management terminated plaintiff when plaintiff's manager readily admitted in his deposition that the decision was his alone.

The foregoing examples are but a sample of the numerous issues of fact which make the granting of summary judgment inappropriate. As demonstrated below, there exist numerous additional disputed issues of material fact, any one of which provides an adequate basis to deny defendant's Motion for Summary Judgment.

## *FACTS*

Plaintiff, hereby incorporates by reference the "Facts" section of her Memorandum of Law in Support of Motion for Summary Judgment dated December 8, 2003. However, the following facts should be reiterated and/or added, as they clearly defeat defendant's claim that there exists no issue of material fact.

Plaintiff was told by William Ziperman that she was highly valued and *not* "just a salesperson." (Deposition of Lisa K. Blumenschine taken May 28, 2003 (hereinafter "Blumenschine Depo.") Page 124 Lines 3-11[1], attached as Exhibit B to Defendant's Exhibits to Affirmation of Michael L. Ferch dated December 8, 2003 (hereafter "Def.Ex.").) In fact, on September 26, 2001, incident to plaintiff's *promotion* to Assistant Publisher, an e-mail was circulated to the entire company stating:

> I'm please to announce that Lisa Blumenschine has been promoted to Associate Publisher for Matrix.
>
> This is good news for Matrix. Lisa has been with Matrix since its launch and has done a terrific job helping the book get established in the higher education market. She has contributed greatly to Matrix's steady growth and this new position will allow her to use more of her skills as we move the magazine to the next level.

---

[1] Hereinafter, the designation "P___ L___" shall refer to page number and line number.

> Lisa will, in addition to continue growing her own territory, support and manage the sales effort. She will also continue to play a key role in positioning the magazine and developing collateral sales material.
>
> Lisa has enjoyed great success in the past working for a number of magazines including, Operations & Fulfillment, DM New, Catalog Age and Direct. I look forward to her leveraging this experience for a more successful Matrix.

(See E-mail, Exhibit J to Plaintiff's Appendix of Exhibits in Support of Motion for Summary Judgment dated December 8, 2003 (hereinafter "Pl. Ex.").)

The decision to promote plaintiff was determined by defendant's co-owner, Joseph Hanson, and general manager, William Ziperman. (Deposition of Daniel Shannon taken September 24, 2003 (hereinafter "Shannon Depo.") P25 L20--L25 & P28 L24--P30 L12 (Def.Ex. E).) In addition, at the time of plaintiff's promotion, Daniel Shannon, became plaintiff's new supervisor and new head of Matrix Magazine[2]. (Deposition of William Ziperman taken September 16, 2003 (hereinafter "Ziperman Depo.") P53 L20--P55 L1 (Def.Ex. D).) More importantly, Mr. Shannon stated that he had never worked with plaintiff prior to her promotion and had nothing to do with her promotion. (Shannon Depo. P25 L20--L25 & P28 L24--P30 L12 (Def.Ex. E).) In fact, plaintiff's promotion, as Mr. Shannon put it, was a "done deal" when he was informed of the decision. (Shannon Depo. P25 L20--L25 & P28 L24--P30 L12 (Def.Ex. E); Ziperman Depo. P53 L20--P55 L1 (Def.Ex. D).)

At the outset, Mr. Shannon made clear his sexist and ageist views. (Shannon Depo. P55 L18--P56 L10 (Def.Ex. E).) Mr. Shannon did not want any input from plaintiff on the magazine

---

[2] Defendant had to shut down one of its major magazines, eMarketing Magazine, which was headed by Mr. Shannon, due to a lack of sales under his direction. Despite eMarketing Magazine's failure under Mr. Shannon's direction and control, Mr. Shannon was placed as the new head of Matrix magazine and placed directly over plaintiff. Plaintiff had no role in the sales or management of E Magazine. (Ziperman Depo. P53 L20--P55 L1 (Def.Ex. D).)

3

nor would he answer questions regarding the direction of the magazine when posed by plaintiff in an attempt to perform her duties as an Associate Publisher. (Shannon Depo. P49 L12--P51 L2, P62 L18-23 (Def.Ex. E).) It became painfully obvious to plaintiff that although she was promoted to Associate Publisher, she was being excluded from participating as a manager.

> Q. Is it your testimony that the position of Associate Publisher was a sales position?
>
> A. Yes.
>
> Q. And she was looked upon by you the same as the other salespeople for Matrix, no different?
>
> A. That is correct.

(Shannon Depo. P62 L18-23 (Def.Ex. E).)

Plaintiff's protests over being shut out from management and its meetings fell on deaf ears. (Deposition of Joseph Hanson taken September 30, 2003 (hereinafter "Hanson Depo.") P53 L18--P54 L14 (Def.Ex. C); Shannon Depo. P49 L12--P51 L2 (Def.Ex. E).) Defendant readily admits that plaintiff "scoffingly[3]" told Mr. Shannon that "the small management group of the company was a boys' club." (Deposition of Daniel Kinnaman taken September 26, 2003 (hereinafter "Kinnaman Depo.") P55 L4-25 (Def.Ex. F); Shannon Depo. P49 L12--P51 L2 (Def.Ex. E).) While defendant admits that it registered plaintiff's protests as complaints of discrimination (Kinnaman Depo. P55 L4--25 (Def.Ex. F); Shannon Depo. P49 L12--P51 L2 (Def.Ex. E)), Mr. Shannon decided to give them "no weight" (Shannon Depo. P49 L12--P51 L2 (Def.Ex. E); Hanson Depo. P53 L18--P54 L14 (Def.Ex. C)). Moreover, Mr. Shannon created a

---

[3] Merriam-Webster Dictionary defines the verb "scoff" as "to show contempt by derisive acts or language; to treat or address with derision."

4

hostile environment with his incessant sexual laden jokes and comments. (Blumenschine Depo. P196 L1--P197 L14 (Def.Ex. B).) In fact, despite the known complaints of discrimination, Mr. Shannon proceeded with a plan implemented just weeks after her promotion, and shortly after her first complaint, to hire two young men, Darren Sikorsky (age 27) and Tom Terry (age 31) to replace plaintiff. (Ziperman Depo. P69 L10--P69 L11, P75 L5-7 (Def.Ex. D); Shannon Depo. P44 L8-17, P55 L8-L17 (Def.Ex. E).) At the time Ms. Blumenschine was advised of the potential of hiring these two young male salespeople, plaintiff had been Associate Publisher for only two months.

> Q. At the time you approached Lisa about the fact you had been contacted by these individuals, as you just described, had you already made up your mind to recommend Lisa's termination?
>
> A. I had already recommended Lisa's termination.
>
> Q. When did you first recommend Lisa's termination?
>
> A. Late November or early December. To the best of my knowledge it had to be in that area.

(Shannon Depo. P44 L8-17 (Def.Ex. E).)

To add insult to injury, faced with plaintiff's complaints, Mr. Shannon in his typical sexist fashion states he had issues with plaintiff due to his perception that she was sexually attracted to him, and that "on four or five occasions during the period from September, 2001 through December, 2001, [plaintiff] told me that she had 'had a crush on' me or wanted 'to go out with' me when we worked for the same company a number of years ago. On each occasion, I ignored the flirtatious comments and changed the subject or simply failed to respond." (Affidavit of Daniel Shannon dated May 16, 2002 ("Shannon Aff.") ¶6 (Pl. Ex. K).) He testified

in his deposition that plaintiff repeatedly made advances and inappropriate flirtatious gestures. (Shannon Depo. P69 L8-17 (Def.Ex. E).)

Plaintiff adamantly denies all of Mr. Shannon's sexist allegations. (Complainant's Reply To Respondents' Answer Exhibit A ("Plaintiff's CHRO Reply") P2 ¶¶7 and 8 (Pl. Ex. L).) Moreover, despite Mr. Shannon's purported problems with plaintiff's alleged sexuality, defendant readily admits the sole and exclusive reason for plaintiff's termination was her "poor sales." (Shannon Depo. P52 L16--P53 L16 (Def.Ex. E); Ziperman Depo. P48 L17--P49 L2 (Def.Ex. D).) The irony of Mr. Shannon's termination of plaintiff for "poor sales" given his failed effort with the sales of eMarketing Magazine which folded incident to his assuming control of Matrix magazine just weeks earlier is readily apparent[4]. Moreover, Mr. Shannon's references to the future employment of the two young males he referred to as "the boys," and his creation of a hostile workplace, demonstrate his sexist, as well as ageist, views. (Shannon Depo. P55 L18--P56 L18 (Def.Ex. E).)

On January 2, 2002,[5] after two months of complaints of sex discrimination and being shut out from management, Mr. Shannon informed plaintiff of his decision to terminate her. (Shannon Depo P39 L4--P40 L1, P49 L12--P51 L25 (Def.Ex. E); Hanson Depo. P49 L10-L20, P53 L18--P54 L14 (Def.Ex. C); Ziperman Depo. P75 L2-3 (Def.Ex. D).) At no time during her employment had plaintiff been told that her position was in jeopardy. In fact, she was assured

---

[4] As discussed further, George Sorayan, a former salesperson of defendant, was also given far greater opportunities than plaintiff to succeed despite his poor sales performance. (Blumenschine Depo. P84 L20—P86 L2 (Def.Ex. B).)

[5] This termination was not communicated to plaintiff until January 2002. (Hanson Depo. P51 L24--P52 L2 (Def.Ex. C).)

6

that her position was safe. (See promotion email (Pl. Ex. J); Kinnaman Depo. P46 L8-15 (Def.Ex. F).)

Defendant's purported reason for plaintiff's termination (i.e., "poor sales") is demonstrably false. (Shannon Depo. P52 L16--P53 L16 (Def.Ex. E); Ziperman Depo. P48 L17--P49 L2 (Def.Ex. D); Documents produced by defendant alleged to exhibit plaintiff's "Poor Sales" (Pl. Ex. M).) Defendant cannot and has not produced any evidence that plaintiff's sales were so poor relative to defendant's other salespeople that they placed her job in jeopardy. (Shannon Depo. P40 L7-L13 (Def.Ex. E); Hanson Depo. P50 L22--P51 L12, P62 L3-5 (Def.Ex. C); Ziperman P48 L17--P49 L2 (Def.Ex. D).) Moreover, plaintiff had just been promoted to Associate Publisher on September 26, 2001 based upon her performance through the month of November (in the industry sales are known for coming months in advance[6]). (Ziperman Depo. P75 L20--P76 L8 (Def.Ex. D); Shannon Depo. P39 L1--P40 L1, P41 L7-15 (Def.Ex. E); Kinnaman Depo. P51 L8-17 (Def.Ex. F).) Specifically, defendant states that it fired plaintiff due to her "poor sales" for the *three months* spanning September, October and November of 2001. (Ziperman Depo. P75 L20--P76 L8 (Def.Ex. D); Shannon Depo. P41 L7-L15 (Def.Ex. E).) However, defendant was and readily admits that it was well aware of plaintiff's so-called sales for at least two of those three months prior to her promotion and yet still promoted her on September 26, 2001. (Shannon Depo. P39 L1--P40 L1 (Def.Ex. E); Kinnaman Depo. P51 L8-17

---

[6] "Q. Sales are done in the months preceding the actual issue of the monthly magazine, correct?
A. True.
Q. So November sales would have been known, at least in part, by September, correct?
A. In part."

(Ziperman Depo. P75 L8-25, P76 L1-L8 (Def.Ex. D).)

7

(Def.Ex. F).) In addition, Mr. Shannon states that he made his decision to terminate plaintiff around "possibly late November," which is the third month of the three-month time span. (Shannon Depo P39 L24--P40 L1 (Def.Ex. E).)

Therefore, within 60 days after her promotion to Associate Publisher and within weeks of her first complaint of discrimination, plaintiff was selected by Mr. Shannon for termination for alleged "poor sales" based upon sales figures it knew at the time of her promotion. (Shannon Depo. P39 L1--P40 L1, P49 L12--P51 L25, P56 L10 (Def.Ex. E); Hanson Depo. P53 L18--P54 L14 (Def.Ex. C); Ziperman Depo. P76 L1-8 (Def.Ex. D); promotion e-mail (Pl. Ex. J); (Kinnaman Depo. P55 L4-25 (Def.Ex. F).)

To highlight defendant's pretextual reason for plaintiff's termination, defendant admits that the sole document it relied upon to terminate plaintiff does not even contain the data of the type it claimed it used in forming its conclusion of "poor sales." (Shannon Depo. P39 L1--P40 L1, P49 L12--P51 L25, P56 L10, P57 L5--P62 L23 (Def.Ex. E).) Stated otherwise, when defendant was confronted with the fact the sales figures on which it claims to have relied were already known, defendant shifted to a claim that plaintiff's alleged lack of sales included "projections which [are] as important as actuals." (Shannon Depo. P39 L1--P40 L1, P49 L12--P51 L25, P56 L10, P57 L5--P62 L23 (Def.Ex. E).) Incredibly, however, the document defendant admits it solely and exclusively relied upon in making its determination to terminate plaintiff does not even contain "projections" within it. (Shannon P39 L1--P40 L1, P49 L12--P51 L25, P56 L10, P57 L5--P62 L23 (Def.Ex. E).) No documents containing any such "projections" have been produced in this litigation.

8

Moreover, implicit within defendant's pretextual reason for plaintiff's termination is its disingenuous indication that it was its poor financial condition arising out of alleged poor sales revenues which necessitated plaintiff's termination. Incredibly, however, in the same time frame as plaintiff's termination, defendant proceeded to acquire: (1) assets of University Business, a competing magazine which was brought in to merge with Matrix for a price of $350,000, (2) Darren Sikorsky, a sales manager paid approximately $60,000 per year plus additional commission (Offer Letter to Darren Sikorsky dated December 28, 2001 (Pl. Ex. N)), (3) Tom Terry, a sales manager paid $60,000 per year plus additional commission (Offer Letter to Tom Terry dated December 28, 2001 (Pl. Ex. O)); and (4) Dan Boucher, a Publisher who was compensated well over $100,000 in base salary and guaranteed commissions (Offer Letter to Daniel Boucher dated February 21, 2002 (Pl. Ex. P)). (Hanson Depo. P63 L20--P65 L25 (Def.Ex. C).)

Finally, upon the filing of plaintiff's complaint with the Connecticut Commission on Human Rights and Opportunities ("CHRO"), documents which defendant allegedly maintained plaintiff was merely a salesperson like all other salespersons in defendant's employment (Ziperman Depo. P26 L3--P28 L15 (Pl. Ex. D)) setting forth sales data and commissions analysis were supposedly "lost" (Ziperman Depo. P24 L14--P25 L11 (Pl. Ex. D)). Defendant claims under oath it realized it had "lost" the documents detailing the structure of plaintiff's compensation and what it now characterizes as a "commission plan" at the time plaintiff filed her CHRO complaint. (Ziperman Depo. P24 L14--P25 L16 (Def.Ex. D); Hanson Depo. P26 L12--P27 L12, P28 L25--P29 L2, P30 L16-23 (Def.Ex. C).) Even more incredible is defendant's admission that despite claiming these documents are now "lost," defendant admits it never even

9

saw such documents at any time, prior to or subsequent to this litigation. (Ziperman Depo. P39 L5-10 (Def.Ex. D); Hanson Depo P26 L12--P27 L12, P28 L25--P29 L23, P30 L16-23 (Def.Ex. C).) Yet, all other true "salespersons" within its employment had folders containing these quarterly commission reports analyzing sales numbers, goals and commission payments. (Ziperman Depo. P40 L8--P41 L4 (Def.Ex. D); Hanson Depo. P26 L12--P27 L12, P28 L25--P29 L23, P30 L16-23 (Def.Ex. C).)

> Q. I noticed in production there are other salespeople that have folders, commission folders, if you will.
> A. Um-hum.
> Q. I don't know what the term is. But folders with the commission calculations and reconciliations in them; is that correct?
> A. Yes.
> Q. Is it the practice of Professional Media to maintain that type of folder for salespeople?
> A. Yes.
> Q. Did you maintain that type of folder for Ms. Blumenschine?
> A. Yes, I thought.
> Q. No one can find it?
> A. We had a change of financial people and so the — somewhere in that change — I also kept copies on my computer, but I must have overwritten it because I don't have a copy.
> Q. You've done a computer search and can't find any documents?
> A. Right.
> Q. And you've done a physical search and you can't find the folder that may or may not have been kept of Ms. Blumenschine's commissions?
> A. Right.
> Q. Do you recall ever seeing a folder with Ms. Blumenschine's name on it containing commissions calculations for her?
> A. No. But I don't see them for other — unless there are commission payments, I don't see them.

(Ziperman Depo. P25 L20--P26 L25 (Def.Ex. D).)

By the time plaintiff was told on January 2, 2002 that her position was terminated, defendant had already made offers to the two young men who Mr. Shannon repeatedly referred to as "the boys." (Ziperman Depo. P69 L10-11 (Def.Ex. D); Shannon Depo. P49 L12--P51 L25,

10

P56 L10 (Def.Ex. E).) As noted, these two young men had been contacted by defendant as early as November. (Ziperman P69 L22--P70 L2 (Def.Ex. D).) When plaintiff insisted that she be included in management meetings, including hiring decision meetings, Mr. Shannon adamantly denied her from such inclusion. (Shannon Depo. P45 L2-9 (Def.Ex. E).) Moreover, management's awareness of plaintiff's complaint of sex discrimination did not even merit any form of inquiry or investigation by defendant. (Kinnaman Depo. P55 L4-25 (Def.Ex. F).) Instead, defendant highlights its discriminatory conduct by disingenuously claiming that George Saroyan, another one of defendant's salespeople who plaintiff supervised, was somehow treated equally to plaintiff in that he too was terminated for poor sales performance. (See Paragraph 49 Defendant's Local Rule 9(c)1 Statement dated December 8, 2003.) This excuse is demonstrably false where, **unlike** plaintiff, Mr. Saroyan was: (1) an actual salesperson; (2) given notice that his sales performance needed improvement; (3) warned that management was not pleased with his sales performance; and (4) allowed to remain employed for over six months without ever showing improvement. (Blumenschine Depo. P84 L17 to P86 L23 (Def.Ex. B).) Moreover, assuming arguendo that plaintiff was a just a salesperson, equal to that of Mr. Saroyan, her actual sales according to defendant were, at certain points, **8 times** greater than his and yet she was terminated without so much as a hint that her position was in jeopardy. (See Paragraph 20 Defendant's Local Rule 9(c)1 Statement; Blumenschine Depo. P126 L6—P127 L9 & P130 L8—P132 L14 (Def.Ex.B).)

In addition, the only time in defendant's history that defendant actually acted in connection with a complaint of sex discrimination committed by a male member of its management team (Dan Boucher) was **after** it was notified of plaintiff's complaint with the

11

CHRO. Defendant disingenuously in its Local Rule 9(c)1 Statement dated December 8, 2003 at paragraph 59 intimates that while plaintiff was an employee, defendant had in place an active policy regarding discrimination, along with remedial provisions geared toward such unlawful conduct. (See Paragraph 59 of Defendants Local Rule 9(c)1 Statement). On the contrary, defendant concedes that it did not have a human resources department or established guidelines aimed at preventing any form of unlawful discrimination at any time during plaintiff's employment. (Hanson Depo. P17 L14—L16 (Def.Ex. C).) Finally, after receiving notice of this suit, defendant's management team met to coordinate their stories regarding plaintiff and to reach a consensus in areas where they disagreed, such as timing of events and specific facts, thereby attempting to eliminate inconsistent stories. (Hanson Depo. P59 L23 –P61 L6 (Def.Ex. C).)

## ARGUMENT

### I. THE STANDARD FOR GRANTING SUMMARY JUDGMENT.

Summary judgment is proper only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "The burden of demonstrating the absence of a genuine dispute as to a material fact rests with the party seeking summary judgment." Rose v. James River Paper Co., 2 F.Supp.2d 245 (D.Conn. 1998) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). In determining whether summary judgment is appropriate, the court resolves all ambiguities and draws all reasonable inferences against the moving party. Id. (citing McLee

v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997)); see also Cifarelli v. Village of Babylon, 93 F.3d 47, 51 (2d Cir. 1996).

> In determining whether the plaintiff has met the de minimis initial burden of showing "circumstances giving rise to an inference of discrimination," the function of the court on a summary judgment motion is to determine whether the "proffered admissible evidence shows circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory motive. It is not the province of the summary judgment court itself to decide what inferences should be drawn." Chambers v. TRM Copy Centers Corp., 43 F.3d at 38; see also Ramseur v. Chase Manhattan Bank, 865 F.2d at 465; Donahue v. Windsor Locks Board of Fire Commissioners, 834 F.2d at 58.

Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 203-04 (2d Cir. 1995).

In an employment discrimination context where the employer's intent is at issue, special caution should be employed when deciding a motion for summary judgment. See Gallo v. Prudential Residential Servs., Ltd. Partnership, 22 F.3d 1219, 1224 (2d Cir. 1994).

> Although the Second Circuit has approved the use of summary judgment in employment discrimination cases, Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir.), cert. denied, 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985), it has cautioned against granting summary judgment in an employer's favor because intent is often an issue. Gallo v. Prudential Residential Servs., Ltd., 22 F.3d 1219, 1224 (2d Cir. 1994). The Second Circuit has since reaffirmed its limited approach to summary judgment in discrimination cases. See Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir. 1998); McLee v. Chrysler Corp., 109 F.3d 130, 135-37 (2d Cir. 1997).

Zarzycki v. United Technologies Corp., 30 F.Supp.2d, 283, 286 (D. Conn. 1998).

## II. SUMMARY JUDGMENT IS INAPPROPRIATE WHERE GENUINE ISSUES OF MATERIAL FACT EXIST AS TO PLAINTIFF'S CLAIMS UNDER TITLE VII.

This Court correctly has not hesitated to deny summary judgment where, as here, a discrimination plaintiff's proof rises to the level of a *prima facie* case and where an employer's legitimate business reason for terminating the employee is false. Banks v. Potter, 253 F.Supp.2d 335 (D.Conn. 2003); Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 120 S.Ct.

2097 (2000); McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) (Supreme Court set out "the order and allocation of proof" in Title VII cases).

To establish a *prima facie* case of gender discrimination under Title VII, plaintiff must show that: (1) that she is a member of a protected class; (2) that she was qualified for her job; and (3) that she suffered an adverse employment action (4) under circumstances giving rise to an inference of discrimination. See St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); Holtz v. Rockefeller & Co., Inc., 258 F.3d 62 (2nd Cir. 2001); see also Gregory v. Daly, 243 F.3d 687 (2nd Cir. 2001); Norville v. Staten Island Hosp., 196 F.3d 89, 95 (2d Cir.1999); Pascal v. Storage Technology Corp., 152 F.Supp.2d 191 (D.Conn. 2001).

Proof of the *prima facie* case creates a presumption of discrimination that defendant may rebut by producing evidence of a legitimate nondiscriminatory reason for the adverse employment decision. See St. Mary's Honor Center, 509 U.S. at 507, 113 S.Ct. 2742. This burden is one of production, not persuasion; it can involve no credibility assessment. See Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

Once the employer produces legitimate, nondiscriminatory reasons for its adverse employment action, the plaintiff must prove, by a preponderance of the evidence, that the employer intentionally discriminated against him. Id. at 143, 120 S.Ct. 2097. However, the "factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the *prima facie* case, suffice to show intentional discrimination" Id. at 147, 120 S.Ct. 2097.

### A. *PLAINTIFF'S PROOF ESTABLISHES A PRIMA FACIE CASE FOR DISCRIMINATION PURSUANT TO TITLE VII.*

#### *1. Plaintiff's termination occurred under circumstances giving rise to an inference of sex discrimination.*

The defendant disputes whether plaintiff met her burden of presenting a *prima facie* case sufficient to oblige it to explain its adverse action. See Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). Specifically, defendant contends that plaintiff failed to meet the requirement of showing that its adverse employment action "occurred under circumstances give rise to an inference of discrimination." Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir.2000). This argument is unavailing. The Second Circuit has characterized the evidence necessary to satisfy this initial burden as "minimal" and "*de minimis,*" see Byrnie v. Town of Cromwell, 243 F.3d 93, 101 (2d Cir.2001); Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 467 (2d Cir.2001), and the mere fact that a plaintiff was replaced by someone outside the protected class will suffice for the required inference of discrimination at the *prima facie* stage of the Title VII analysis. See Zimmerman v. Associates First Capital, 251 F.3d 376 (2001); Cook v. Arrowsmith Shelburne, Inc., 69 F.3d 1235, 1239 (2d Cir.1995).

In the case at bar, despite the known complaints of discrimination, Mr. Shannon proceeded with a plan, implemented just weeks after plaintiff's promotion and shortly after her first complaint, to hire two young men, Darren Sikorsky (age 27) and Tom Terry (age 31), to replace plaintiff. At the time plaintiff was advised of the potential hiring of these two young male salespeople, she had been Associate Publisher for only two months. By the time plaintiff was told on January 2, 2002 that her position was terminated, defendant had already made offers