**UNITED STATES DISTRICT COURT**
**for the**
**DISTRICT OF CONNECTICUT**


LISA K. BLUMENSCHINE,          : CIVIL ACTION NO. 302CV2244 DJS
                               :
          Plaintiff,           :
                               :
vs.                            :
                               :
PROFESSIONAL MEDIA GROUP LLC,  : JANUARY 29, 2004
                               :
          Defendant.           :


**PROFESSIONAL MEDIA GROUP LLC'S**
**MEMORANDUM IN OPPOSITION TO**
**BLUMENSCHINE'S MOTION FOR**
**PARTIAL SUMMARY JUDGMENT_____**


Defendant Professional Media Group LLC ("ProMedia")
submits this memorandum in opposition to the motion of
plaintiff Lisa Blumenschine ("Blumenschine") for partial
summary judgment on the fourth through ninth counts in her
complaint.

<u>Overview</u>

Blumenschine's motion is based on egregious
misrepresentations of the testimony in this matter.  A few
examples will suffice:

-- Blumenschine's memory of a single Viagra
   joke told publicly in mixed company becomes
   "incessant sexual laden joking";

-- Blumenschine asserts that ProMedia
   "received" and understood her single
   reference to a "boys' club" as a complaint
   of discrimination, yet the only two
   deposition references cited in support of
   this astounding assertion are (a) Dan
   Kinnaman's explicit testimony that he <u>never</u>
   <u>even heard</u> Blumenschine's off-hand, hallway
   remark before this litigation and (b) Dan
   Shannon, the only executive who did hear the
   remark, explaining, in detail, the
   circumstances of her utterance and <u>why it</u>
   <u>did not</u> rise to the status of such a
   complaint in anyone's mind;

-- this lone "boys' club" remark is turned into
   "repeated internal complaints"
   (Blumenschine's Memorandum of Law in Support
   (hereinafter "Blumenschine Memo."), p. 17)
   without the slightest bit of evidentiary
   support;

-- although Blumenschine asserts that "at no

time during her employment had [she] been
told that her position was in jeopardy,
[and] in fact she was assured that her
position was safe," (Blumenschine's Rule
56(a)1 Statement (hereinafter, "Rule 56
Statement"), para. 43), she totally fails to
reference testimony which demonstrates <u>the</u>
<u>exact opposite</u>, namely, that she was
repeatedly warned that her sales had to
improve and that she herself recognized that
her sales were inadequate.  (Hanson depo. p.
42; Shannon depo. pp. 66-67; Blumenschine
depo. pp. 121-123, 188-189);

-- Blumenschine asserts that she learned in May
2001 that her non-recoverable draw was being
"withheld" (implying it would be restored to
her).  The actual deposition testimony says,
<u>in two different places</u>, that she was told
that the portion of her compensation which
had been a "non-recoverable draw" would be
"discontinued," not merely "withheld."[1]

---

[1] It is little wonder that Blumenschine mischaracterizes this testimony, since the difference in the two words alone defeats her motion for partial summary judgment on her state law compensation claims (Counts 7, 8 and 9).

Is Blumenschine hoping that if she asserts these "facts" confidently enough, no one will check the actual citations?[2]

Moreover, even a brief examination of Blumenschine's presentation demonstrates that her grievance is based not on any real proof of discrimination, but on her own subjective belief that she deserved to be an executive, not a "salesperson." The uncontradicted testimony (including Blumenschine's own), however, shows that:

- ProMedia initially <u>refused</u> to hire Blumenschine as an executive;

- didn't need executives as much as it needed sales personnel;

- never <u>ever</u> promised her that she was assured of being an executive;

- gave her the title she requested (without a pay increase) but <u>repeatedly</u> made it clear that her responsibilities were <u>sales, sales and sales</u> on a magazine which had yet to turn a profit.

---

[2] It initially appeared that the erroneous caption on Blumenschine's motion was a word processor error. Given the extraordinary dissonance between Blumenschine's statement of facts and the actual testimony in this matter, it soon became evident that more than the caption came off the word processor without examination. Neither Blumenschine's citation of fact or law can be relied on without examination. ProMedia will resist the temptation to correct, in this memorandum, every error or mis-cited case, much of which is simply irrelevant to the legal issues raised by her motion for partial summary judgment. The Court is respectfully referred to ProMedia's response to Blumenschine's Rule 56 statement for further examples.

Blumenschine's failure to obtain the duties and the status she wanted -- which were different from those for which she was hired -- does not constitute discrimination, and none of her authorities hold to the contrary.

### Summary of Argument

1.  "Retaliation":  Blumenschine moves for summary judgment on liability only with respect to her "retaliation" claims under Federal and Connecticut law (Counts 4, 5 and 6).  Her motion must fail because:

(a)  she cannot establish, as a matter of fact or law, that ProMedia received her single off-hand hallway comment about the "boys' club" as a complaint of sexual discrimination; and

(b)  the uncontested facts demonstrate that the person who had the sole power to terminate Blumenschine and made the final decision to do so -- Joseph J. Hanson, the co-owner of ProMedia -- never heard of any complaint of discrimination by Blumenschine.  As a result, his decision could not, a priori, constitute retaliation.

For these reasons, and as discussed in detail at pages 22 to 25 of its memorandum in support of its own motion for summary judgment dated December 8, 2003, ProMedia, not Blumenschine, is entitled to summary judgment on the "retaliation" claims.

2.   <u>State law compensation claims</u>:   The remaining
three causes of action (Counts 7 through 9) on which
Blumenschine seeks summary judgment are all premised on her
claim that ProMedia promised or was obligated to pay
Blumenschine $140,000 per annum ($80,000 in "base pay" and
$60,000 in "nonrecoverable draw"), but then only paid her
$100,000 for year 2001, thereby owing her $40,000 in wages
for that year.   These claims, too, are based on an
untenable distortion of the factual record:

(a)   It is plain that ProMedia's only obligation to
pay Blumenschine $140,000 was for a single year -- 2000 --
the year she was hired; indeed, her offer letter (which she
accepted) specified her salary <u>for that one year only</u>.

(b)   In May of 2001, because Blumenschine's sales were
not even good enough to support her base pay of $80,000 per
annum, much less any additional compensation, Blumenschine
was explicitly informed that her "nonrecoverable draw"
would be <u>discontinued</u> and that she would earn commissions
over her $80,000 base only if her sales warranted it.   In
point of fact, Blumenschine's sales never thereafter rose
to a level which warranted any commission, and, as a
result, William Ziperman was unable to construct a relevant
commission plan.   Blumenschine continued to take her salary
knowing that her sales did not warrant any commissions.

The testimony shows that she never _ever_ stated that she would resign unless her "non-recoverable draw" was restored, nor did anyone at ProMedia _ever_ promise her that she would continue to receive anything other than real commissions if she earned them (which she did not).

Without a factual showing that Blumenschine was promised a "non-recoverable draw" after May 2001, her State law wage claims -- no matter how they are constructed -- cannot succeed.

**I.**

**PROMEDIA, NOT BLUMENSCHINE, IS ENTITLED TO SUMMARY JUDGMENT ON THE "RETALIATION" CLAIMS (FOURTH, FIFTH AND SIXTH COUNTS) BECAUSE BLUMENSCHINE LACKS ESSENTIAL ELEMENTS OF PROOF OF THOSE CLAIMS.**

In her fourth, fifth and sixth "counts," Blumenschine claims she was fired in "retaliation" for her complaints of sex and age discrimination.[3]

ProMedia will not burden this Court with a repetition of all of the factual and legal reasons why Blumenschine cannot succeed on her "retaliation" claims, and respectfully refers the Court to the following sections of ProMedia's Motion for Summary Judgment dated December 8, 2003, which address these claims:

---

[3] The record is totally silent as to any incident which Blumenschine can even fantasize was a complaint of age discrimination on her part.

1.   Moving affirmation of Michael L. Ferch, pp. 3-5, paras. 6-8 and footnote 1; pp. 19-21, paras. 37-40; pp. 23-24, paras. 44-46.

2.   ProMedia's Memorandum of Law in Support of Defendant's Motion for Summary Judgment (hereinafter, "Moving Memorandum of Law"), Points IV and V, pages 22-25.

In particular, proof of <u>two</u> essential elements of Blumenschine's "retaliation" claims is wholly absent:  (a) a genuine complaint of discrimination; and (b) any evidence that the decision-maker who actually terminated Blumenschine -- ProMedia's co-owner Joseph J. Hanson -- had notice of any such complaint on Blumenschine's part.

No Sufficient Complaint
of Discrimination

As demonstrated in ProMedia's Motion for Summary Judgment, there can be no "retaliation" for a complaint of discrimination if no one at the employer understands that such a complaint has been made.

Blumenschine is forced to concede that she made no specific oral or written complaint of discrimination (of any type) to ProMedia other than her off-hand sarcastic remark that a group of male managers leaving for lunch was the "boys' club."  She admits that she never followed up this remark with any further or other complaint

(Blumenschine depo., pp. 134-135).  Thus, her "retaliation" claims initially turn on the question of whether that one casual remark was sufficient to have triggered ProMedia's understanding that Blumenschine was actually making a claim of discrimination.

We have found no case where such a one-time off-hand remark in passing was deemed to be a sufficient claim of discrimination, nor do any of the cases relied on by Blumenschine say otherwise.

This makes perfect sense:  an employee who makes a claim as serious as that of discrimination, which has severe legal repercussions for small businesses such as ProMedia, is required, at the very least, to make her claim sufficiently clear and definite to be understood as such. Without this requirement, anyone who makes a passing comment at the watercooler can later contend that they were actually making a claim of discriminatory treatment and that any employment action which follows, however unrelated, must be retaliatory in nature.

Blumenschine's misrepresentation of the actual testimony in this case shows that she is aware that her single, off-hand remark falls short.  Blumenschine asserts, in her Rule 56 Statement at para. 34, that "Defendant registered plaintiff's protests as complaints of

9

discrimination." She cites to deposition testimony of both Dan Kinnaman, p. 55, lines 4-25, and Dan Shannon at pp. 49, line 12 - 51, line 2. But what do those references really say?

-- Kinnaman's testimony makes it clear that (a) Blumenschine never made any complaint to him (Kinnaman) and (b) that he never even heard about the remark to Shannon until Shannon told him about it long after the instant lawsuit was started!

-- Shannon's testimony is that the comment was nothing more than part of the usual "give and take"; that Blumenschine was not excluded from the lunch at issue; that Blumenschine never indicated that she felt she was being excluded from a "male management team"; that Shannon did not perceive the hallway "boys' club" comment to have the weight of a complaint of discrimination; and that it was never repeated or followed up by Blumenschine. (In her deposition, Blumenschine confirms that she never at any time followed up her so-called "complaint.")

Thus, the actual testimony cited by Blumenschine as "proof" that ProMedia "registered" this single comment as "protests of complaints of discrimination" shows that Kinnaman never even knew about the lone comment and Shannon most certainly did not understand that Blumenschine had

10

made such a complaint or felt she was being excluded.[4]

This is the only "proof" which Blumenschine offers on the key element of whether ProMedia understood she was making a complaint of discrimination.  It is patently insufficient.

Plainly Blumenschine, who knew her sales performance was deficient, is trying only to convert her single off-hand remark into the necessary legal leg for her "retaliation" claim.  She cannot succeed on the facts at bar.

No Proof That the Person Who
Terminated Blumenschine's
Employment Ever Heard of Any
Complaint of Discrimination.

Furthermore, Blumenschine cannot refute the uncontested fact that the person who had the authority to terminate her, and made the ultimate decision to do so -- ProMedia's co-owner Joseph J. Hanson -- made his decision without having learned of any complaint of discrimination, including the "boys' club" remark.  After testifying that it was his decision, as the final authority, to terminate Blumenschine (he was one of two people personally funding

---

[4] Furthermore, of course, no matter what Blumenschine now claims she believed, there is absolutely no proof in the record that she was ever excluded because she was a woman (as opposed to instances where she was not invited into meetings which had nothing to do with her job function) or that a similarly situated male was accorded preferential treatment (see ProMedia's Moving Memorandum of Law at Point II, pp. 6-19).

ProMedia, a small company with a start-up magazine) (Hanson depo., pp. 49-50), Hanson made it clear that he never heard about even the "boys' club" comment until <u>after</u> Blumenschine was terminated and filed her complaint with the CHRO (Hanson depo., pp. 53-55):[5]

> Q.   Were you aware Ms. Blumenschine complained to Mr. Shannon about the management team at Professional Media Group being a boys club?
>
> A.  I was not aware of it at the time.
>
> Q.  Mr. Shannon never brought to your attention?
>
> A.  No.  I still don't think that the word complaint applies here at all.
>
> Q.  That's because you performed an investigation?
>
> A.   No.  It's because if somebody says, oh, the boys club is going to lunch, I don't think that a complaint.
>
> Q.   You think that a -- how would you describe it?

---

[5] Contrast ProMedia's swift response to information that Dan Boucher engaged in sexually inappropriate behavior, which ultimately led to his termination.  Understandably, Blumenschine would prefer to overlook this entirely (see, Defendant's Local Rule 9(c) Statement at para. 59 and the references therein cited).

A.    I would describe it as being very much in keeping with a lot of sarcasm that I heard from Ms. Blumenschine at the time I met her and the time I dealt with her.  Maybe she was annoyed she wasn't invited to lunch with us.  But I didn't see that as a complaint at all even afterward.  I didn't hear it when it happened.

Q.    Why didn't you invite her to lunch with you?

A.    I have 25 other employees.  Why didn't I invite them to lunch.  We discuss business matters at lunch and the matters may not have been relevant to what she was doing.

Q.    And Ms. Blumenschine made complaints she was excluded from other management meetings by Mr. Shannon?

A.    Not to me.

Q.    To other people?

A.    I think in retrospect, I have heard she's made that complaint in her complaint, but I don't know that she complained to anybody.

Blumenschine is obliged to admit that she knew Hanson owned ProMedia; that she had worked for Hanson in a previous company; and that she had a close enough

13

relationship with Hanson to invite him and his wife to her "commitment" ceremony (in lieu of a wedding), which Hanson and his wife in fact did attend (see Blumenschine depo., pp. 22, 32, 174).  Nonetheless, she <u>never uttered a word of complaint to Hanson</u>, and now accuses him of "retaliating" by firing her for a complaint of discrimination which he was unaware of!

Blumenschine's retaliation claim fails for lack of proof of at least two essential elements of such claims: there was no cognizable complaint of discrimination, and there could be no "retaliation" for a complaint no one knew existed.

Blumenschine's "Retaliation"
Case Citations Are So
Inapposite That They
Support ProMedia._____

As demonstrated above, Blumenschine cannot transform her single off-hand hallway comment about a "boys' club" into a cognizable complaint of discrimination.  Her case citations do not show otherwise.

In her supporting memorandum of law, Blumenschine "string cites" cases for various abstract propositions. When examined, however, these cases are so distinguishable from the facts at bar that they support ProMedia's own motion for summary judgment on Blumenschine's "retaliation"

claims.

In the cases cited by Blumenschine, there is no
contest that <u>an actual (and almost always repeated)
complaint of discrimination</u> had occurred <u>before</u>, and was
the basis for, the alleged retaliatory action.  In <u>Serrano</u>
(1997 WL 718976, Squatrito, J.), the complaint took the
form of two formal meetings and a letter to the employer
describing a "hostile work environment"; in <u>Quinn</u> (159 F.3rd
759), there was a formal letter complaining of sexual
harassment, and the letter went on to state that Quinn
intended to file her complaint with the company's human
resources department (which she subsequently did); in
<u>Pascal</u> (152 F. Supp.2d 191), it was uncontested that the
employee had complained to human resources about
"discriminatory treatment and hostile environment."  The
defendant in <u>Kotcher</u> (957 F.2d 59) <u>admitted</u> that it had
received a formal complaint of discrimination from the
plaintiff.  <u>Dortz</u> (904 F. Supp. 127) is premised on the
undisputed fact that "Dortz brought <u>continuing</u> complaints
to Cuzzi <u>many</u> times" (emphasis supplied).

The remaining cases cited by Blumenschine are even
more unhelpful to her since they, too, bear no relation to
the facts at bar:  <u>Cosgrove</u> (9 F.3d 1033) (employee
terminated only <u>after</u> actually filing sex discrimination

15

complaint with the EEOC); <u>Treglia</u> (313 F.3d 713)
("retaliation" occurred <u>after</u> charges filed with the New
York State Division of Human Rights); <u>Cifra</u> (252 F.3d 205)
(plaintiff not only complained to employer's human
resources department, but employer received a complaint
letter from plaintiff's lawyer <u>before</u> taking the action
later deemed as retaliation!)  In <u>Craine</u> (259 Conn. 625),
the single case cited by Blumenschine in support of her
State law "retaliation" claim, the Connecticut Supreme
Court actually granted employer's motion for judgment
notwithstanding the verdict on employee's claim of sex
discrimination, and directed the lower court to modify the
judgment and award accordingly (leaving only contract and
negligent misrepresentation claims, since the employee's
age discrimination claims had been previously dismissed).

Here, Blumenschine made one off-hand comment in the
hallway and admits that this is her sole claim of sex
discrimination on which the purported "retaliation" was
based; she can and has produced no authority to support
summary judgment for her on these facts.  Contrary to her
bald, unsupported assertions, no one at ProMedia either
recognized, or was required to recognize, a single
sarcastic remark in the hallway as a complaint of
discrimination.  Furthermore, she offers no evidence to

show that the person who terminated her employment, Joseph
J. Hanson, ProMedia's co-owner and ultimate decision-maker
-- either knew or had reason to know that she was making a
complaint of discrimination.[6]

## II.

**BLUMENSCHINE CANNOT SUCCEED
ON HER STATE LAW COMPENSATION
CLAIMS (COUNTS SEVEN, EIGHT
AND NINE) SINCE THE FACTS
DO NOT SUPPORT ANY PROMISE
THAT SHE WOULD EARN ANYTHING
MORE THAN HER $80,000 BASE
AFTER MAY OF 2001.**

Blumenschine's three State law compensation claims --
failure to pay wages (Count Nine), promissory estoppel
(Count Seven) and Negligent Misrepresentation (Count Eight)
-- all turn on her assertion that (a) she had been promised
$140,000 per year, and (b) ProMedia (by William Ziperman)
had "withheld" (Blumenschine's word) $40,000 of "non-
recoverable draw" starting in May 2001, promising to pay it
back in some fashion at some later point. [7]

That was not the agreement and, moreover, is not what

---

[6] The underlying truth here -- which, of course, this Court need not
reach either to deny summary judgment to Blumenschine or award it to
ProMedia -- is that Blumenschine never thought about discrimination
until after she was fired.

[7] Also see ProMedia's Moving Memorandum of Law at Point VI, p. 25: it is
respectfully submitted that Blumenschine's State law claims should also
be dismissed for lack of continuing jurisdiction after Blumenschine's
Federal claims are dismissed.

the evidence shows.

Blumenschine's "offering letter" (Blumenschine depo., Ex. "1") explicitly states that her $140,000 salary was <u>for the year 2000</u>.  It says nothing about any period of time beyond 2000.

In May 2001, Blumenschine was told that the portion of this $140,000 representing a "non-recoverable draw" would be "<u>discontinued</u>."  She was not told it was being "withheld," and nothing in the testimony even suggests that Blumenschine would get a single dollar more than $80,000 unless she generated sufficient sales to warrant commissions.[8]

Here is the <u>actual</u> testimony of Ziperman, in full, on which Blumenschine relies in support of her assertion that her "non-recoverable draw" was merely being "withheld," so she was promised the same amount of salary she received in 2000.  It is respectfully submitted that it says no such thing:

> Q    Now, at some point in 2001 you had a conversation with Lisa about <u>discontinuing</u> her nonrecoverable draw; is that correct?
>
> A    Yes.

---

[8] Blumenschine admits she received this amount in 2000.

Q    When was that conversation?

A    I believe it was on or about -- in April of 2001.

Q    Who was present during that conversation?

A    Just Lisa and myself.

Q    Where did that conversation occur?

A    In my office.

Q    How long was that conversation?

A    I don't recall.

Q    What do you recall saying to Lisa and she to you?

A    Well, what I explained to her was that, you know, that sales on Matrix were very, very disappointing and not improving, and I was having difficulty getting together a commission plan for her with the sales so poor. I -- I don't remember if it was that particular conversation or later conversations, but I asked for her recommendations as to what she thought could go into a commission plan. But I told her that we were discontinuing the draw against commission because I did not see how she could earn commission in excess of the draw without improved

performance of the magazine.  And I did tell her
I was trying to put together a commission plan,
but I was struggling with it.

Q    So you're saying, We're stopping the
commission plan you're under, which is 5,000
nonrecoverable draw?

A    That was not a commission plan.  I had
allowed the draw to continue while I was trying
to put together a commission plan.

Q    What's the definition of a commission
plan, as you're using it?  I just want to
understand.

A    Basically a revenue objective or set of
objectives that would result in a payment, you
know, for meeting those objectives.

Q    Up to that point, had you set a
correlation between her payment and objectives?

A    Yes.

Q    Where are those located?

A    Well, that's the document that's
missing.

Q    That was on overall magazine sales?

A    I believe it was.

Q    All right.  And what you were telling

her was you had to come up with a different set
of parameters because the magazine wasn't
achieving the sales you had hoped, correct?

    A    Yes.

    Q    And was it your intent to make this
commission, when you came up with it, retroactive
to that April date?

    A    Retroactive to the beginning of the
year.

    Q    Okay.  And did you ever come up with
such a commission plan?

    A    I did not.  The sales of the magazine
kept declining.

    Q    Did she make inquiry of you from time
to time --

    A    Yes.

    Q    -- as to whether the commission plan --

    A    Sorry.

    Q    Let me start again.

    A    Sure.

    Q    Did she make inquiry of you from time
to time as to whether the commission plan you
were working on was completed?

    A    Yes.

Q    What did you tell her?

A    I told her I was struggling with it because the sales of the magazine were declining. I mean, we were already paying our salespeople, in salary, approximately 50 percent of the revenue of the magazine.  Typically, you try to have all sales expenses under 20 percent.  With Curriculum Administrator those numbers are in the teens.  So this magazine was underperforming for the number of salespeople we had and how much revenue they were bringing in.

Q    But it wasn't your intent to drop Ms. Blumenschine's total compensation package down to 80,000, was it?

A    She had already gotten the additional 20.

Q    Down to a hundred?

A    Right.

Q    It wasn't your intent for the year to drop it down to a hundred, was it?

A    No, if sales had increased and given me something to hang my hat on.  In retrospect I'm sorry I hadn't come up with a commission plan like I had for eMarketing.  I had given them a

two-year plan because of different timing.  None
of them made commission, but they had plans.  We
wouldn't be having this conversation if I had
estimated it earlier.  I was chasing a second
target.

      Q    But as far as you understood, Lisa came
away from your meeting in April with an
understanding that you were <u>discontinuing</u> the
nonrecoverable draw, but she would wait to hear
from you as to the basis her compensation would
be going forward?

      A    Yes.  Commission going forward.

      Q    Her total compensation package is what
I was referring to.

        Yes?

      A    Yes.

(Ziperman depo., pp. 49-53) (emphasis added).

    Thus, Blumenschine knew that her non-recoverable draw
was being <u>discontinued</u>, and that unless her sales improved,
she would not receive any commissions.  Given the testimony
here, all of the underpinnings of her State law claims fall
away.

23

Blumenschine's Case Citations
With Respect to Her Claim
for "Unpaid Wages" (Count 9)
Are Inapposite._____

Blumenschine's Ninth Count involves a claim for "unpaid wages" under Connecticut General Statutes §31-72. Based on the foregoing testimony, however, Blumenschine fails to show that there was any promise to pay her any wages other than those she was actually paid. ProMedia's written promise to pay her $140,000 was confined to the year 2000 only; Blumenschine was subsequently advised, in May of 2001, that her "non-recoverable draw" would be henceforth discontinued. These facts are in the sworn record.

Blumenschine's case authority in support of her State law "unpaid wages claims" are again nothing more than general propositions, inapposite to the facts at bar. In Schoonmaker (265 Conn. 210), the unpaid wages at issue were actually set by statute as the prevailing wages, fringe benefits and overtime owed to construction workers; the same is true in Butler (243 Conn. 454), where the statute provided that an employee was not "exempt" from statutory overtime payments.

These cases regarding statutory minimum wage payments have nothing to do with a highly paid employee like

24

Blumenschine, particularly given that she was told her "non-recoverable draw" would be discontinued.[9]  Blumenschine offers no Connecticut case where a highly paid employee, told that part of her compensation package would be discontinued, then continued to work and later sued on a claim for "unpaid wages."

Blumenschine's "Promissory
Estoppel" Cases (Count 7)
Are Similarly Misplaced.

Blumenschine's claim of promissory estoppel (Seventh Count) again depends on a promise which is wholly absent from the facts at bar.  Told that her "non-recoverable draw" was being discontinued, Blumenschine offers nothing to support her bald assertion that it was only being "withheld" and would be restored.

Her case authority here, as elsewhere, is misplaced.

In Finley (202 Conn. 190), the employer not only admitted that there had been a promise, but then prevailed, after trial, on its claim that the promise had been fulfilled.

D'Ulisse-Cupo (202 Conn. 206) actually supports ProMedia's own motion for summary judgment on this "promissory estoppel" claim.  There the employer, despite "having made conciliatory statements" to the employee, was

_____

[9] Mahoney (2998 WL 764465) is meaningless, since the defendant offered nothing except an unsworn assertion that wages were not owed.

found <u>not</u> to have made representations which were
"sufficiently promissory nor sufficiently definite to
support contractual liability ... no more than representa-
tions indicating that the defendants intended to enter into
another employment contract with the plaintiff at some time
in the future" (202 Conn. at 214).  If the Connecticut
Supreme Court declined to find promissory estoppel on these
facts, then, <u>a</u> <u>fortiori</u>, here, where Ziperman <u>told</u>
Blumenschine that he was "discontinuing" her non-
recoverable draw and did nothing more than indicate that
she could earn commissions in the future if her sales
levels warranted them, ProMedia deserves summary judgment
on Blumenschine's "promissory estoppel" claims.

The remainder of Blumenschine's citations on this
point are equally distinguishable:  <u>Kiely</u> (670 P.2d 764,
766), a Colorado case in which "both parties stated that
they had reached an agreement on all major terms of a new
business venture"; <u>Ziotas</u> (2000 WL 1701848) (motion
directed <u>to pleadings only</u>, where the Court was required to
assume, for the purposes of the motion, a "representation
... made in the context of a policy of the firm over
several years"; Superior Court goes on to question the
factual basis of the promissory estoppel claim, but admits
it cannot deal with this issue on a "motion to strike the

pleadings";[10] <u>Jewett</u> (1997 WL 255093) (employee survived summary judgment <u>only</u> -- unlike here -- by reason of a "genuine issue of whether [General Dynamics'] employment manual, policies and rules equate to a promise upon which plaintiff could have reasonably relied"); <u>Bombard</u> (1998 WL 13935) (promissory estoppel claim actually dismissed <u>despite</u> employee's claimed reliance on policies "published in an employee handbook and distributed to all employees" because employee failed to allege "any statement or conduct" sufficient to induce reliance); <u>Rothman</u> (1994 WL 50882) (again, a pleading motion rather than a summary judgment motion, which holds only that the complaint's allegations of a "clear and definite promise" constitute a sufficient pleading to survive a motion to strike).

Finally, none of the cases support the evidentiary relevance of Blumenschine's assertion that -- approximately a year and a half prior to her termination and long before any of the issues in this case arose -- she passed up an offer to go to another employer at a higher salary.

As demonstrated in ProMedia's Motion for Summary Judgment, Blumenschine's "promissory estoppel" claim must be dismissed for lack of sufficient evidence.

---

[10] <u>Ziotas</u> and its subsequent history (2001 WL 128904) dismissed the employee's "wage" claims.

Blumenschine's Case Authorities
Do Not Support Her Claim for
Negligent Misrepresentation.____

    Finally, Blumenschine offers no legal authority to
show that, given the facts at bar, she can prevail on her
"negligent misrepresentation" claim.  Blumenschine cites
Barry (36 Conn. App. 1), where the employee lost his
negligent misrepresentation claim at trial, because, as
here, he could not present evidence that the employer "made
a representation [to him]" that was untrue or should have
been known to be untrue.  In the case at bar, Ziperman's
representation that Blumenschine's "non-recoverable draw"
would be discontinued was completely true.[11]

    Williams Ford (232 Conn. 559) is not an employment
case and is wildly distinguishable on the facts.  Daley
(249 Conn. 766), again decided after a jury trial, upholds
jury instructions in which "falsity" is an essential
element of the negligent misrepresentation claim.
Blumenschine offers no evidence that anyone at ProMedia
ever made any false statement to her; Ziperman told her
that her "non-recoverable draw" was being discontinued and
that he hoped, as indeed he did, that her sales would

_____

[11] Blumenschine's citation of the Barry case says "cert denied"; in
fact, however, on reconsideration, certiorari to the Supreme Court of
Connecticut was granted (235 Conn. 901), and the matter remanded to the
Appellate Court, which disallowed both the "front pay damage awards"
and "punitive damages" which the jury had initially awarded.
Certiorari from that decision was ultimately denied (237 Conn. 917).

improve to the point where he could justify commissions on them.  Blumenschine's unsupported assertion that she was supplied with "false information regarding her annual compensation, as well as the retroactive reinstatement of her salary" (Blumenschine Memo., p. 31) is another sweeping assertion without any support in the evidentiary record.

Finally, Dacourt (747 F. Supp. 157) actually supports a grant of summary judgment for ProMedia.  There Judge Egington granted summary judgment on the "negligent misrepresentation" claim because, just as here, "plaintiff has failed to submit any credible evidence which would lead the Court to conclude that at the time the representations were made [defendant] knew or had reason to know they were false.  Jewett, supra, is inapposite as discussed above, since Blumenschine's alleged "detriment" in "not seeking alternative employment" happened over a full year before the events at issue; see Blumenschine depo., p. 72.

Based on the foregoing, Blumenschine's State law compensation claims cannot survive summary judgment.[12]

---

[12] Finally, as demonstrated in ProMedia's Moving Memorandum of Law, these claims should be dismissed as having no independent juris- dictional basis in the absence of her Federal claims, on all of which, it is respectfully submitted, ProMedia should be awarded summary judgment.

## Conclusion

Blumenschine's motion for partial summary judgment should be denied.  ProMedia's motion for summary judgment should be granted.

                    Respectfully submitted,

                    DEFENDANT PROFESSIONAL MEDIA
                    GROUP LLC


                    By:_____
                      Thomas E. Minogue (CT06845)
                      George P. Birnbaum (CT04937)
                      Michael L. Ferch (CT24764)
                      MINOGUE BIRNBAUM LLP
                      Attorneys for Defendant
                      237 Elm Street
                      New Canaan, CT 06840
                      (203) 966-6916

## CERTIFICATION

This is to certify that a copy of the foregoing was sent by First Class Mail, postage prepaid, to the following counsel of record on January 28, 2004:

Scott R. Lucas, Esq.
Mary Alice S. Canady, Esq.
Michel Bayonne, Esq.
Martin, Lucas & Chioffi, LLP
177 Broad Street
Stamford, CT  06901

_____
MICHAEL L. FERCH