UNITED STATES DISTRICT COURT
for the
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| LISA K. BLUMENSCHINE, | : | CIVIL ACTION NO. 302CV2244 DJS |
| | : | |
| Plaintiff, | : | |
| | : | |
| vs. | : | |
| | : | |
| PROFESSIONAL MEDIA GROUP LLC | : | JANUARY 29, 2004 |
| | : | |
| Defendant. | : | |

**PROFESSIONAL MEDIA GROUP LLC'S**
**RESPONSIVE LOCAL RULE 56(a)2 STATEMENT**

Pursuant to the provisions of Local Rule 56(a)2, defendant Professional Media Group, LLC ("the Company") states there are no issues of <u>material</u> fact for which there is a genuine issue to be tried; that the Company should be granted summary judgment, and submits the following statement of disputed and undisputed facts, together with references to the evidence relating to those facts, in opposition to the motion for summary judgment filed by Lisa K. Blumenschine ("Blumenschine"), as follows:

***1.   Defendant is a company located in Norwalk, Connecticut engaged in the publication industry.  Its products consist of two trade magazines in the educational field, one entitled***

*"District Administration," which primarily addresses district administrators of high schools, and the other entitled "University Business" (formerly "Matrix"), which addresses college and university administrators. (Defendant's Statement of Facts to the Connecticut Commission on Human Rights and Opportunities ("CHRO"), P1 ¶1 (App.Ex. A[1]).)*

*[1]The designation "App.Ex. ___" refers to exhibits contained in Plaintiff's Appendix of Materials in Support of Summary Judgment filed herewith.*

**Response:** Admits the facts asserted in Blumenschine's paragraph "1."

*2. For a brief time, defendant published a magazine called "eMarketing Magazine" directed to technology in the education industry, but this magazine folded in September 2001, just after 9/11. (Ziperman Depo. P57 L5-13[2] (App.Ex. B); Deposition of Daniel Kinnaman taken September 26, 2003 (hereinafter "Kinnaman Depo." ) P48 L6-10 (App.Ex. C); Deposition of Joseph Hanson taken September 30, 2003 (hereinafter "Hanson Depo." ) P39 L18--P40 L21 (App.Ex. D); Deposition of Daniel Shannon taken September 24, 2003 (hereinafter "Shannon Depo." ) P26 L19-20 (App.Ex. E).)*

*[2] The designation "P__ L__" refers to page number and line number.*

**Response**: Admits the facts asserted in Blumenschine's paragraph "2," except denies the characterization therein.

*3. The members of the executive and management team of defendant during plaintiff's employment were: (1) Joseph J. Hanson, the 50% managing owner of defendant[3]; (2) William Ziperman, defendant's General Manager; (3) Daniel Kinnaman, Vice President and Publisher; and (4) Daniel Shannon, Vice President and Publisher. (Ziperman Depo. P19 L22-25 (App.Ex. B); Shannon Depo. P14 L21-24, P16 L1-14 (App.Ex. E); Kinnaman Depo. P17 L10--P21 L17 (App.Ex. C); Hanson Depo. P4 L14-16, P56 L25--P57 L4 (App.Ex. D).)*

*[3] Mr. William Pattis, a non-managing owner of defendant, owns the remaining 50% of defendant. (Hanson Depo. P4 L13-25 (App.Ex. D).)*

**Response**: Admits the facts asserted in Blumenschine's paragraph "3," except that in addition to being "50% managing owner" of the Company, Joseph J. Hanson ("Hanson") is also its

President.  The Company further disagrees with Blumenschine's characterization in said paragraph of the principal executives of the Company as a "team," as such characterization is wholly inaccurate and unfounded in the deposition testimony cited by Blumenschine therein or otherwise adduced from admissible evidence in this matter to date.

**4.  *This management team had the authority to make all major decisions, including all decisions concerning employees' salaries, terminations and promotions. (Ziperman Depo. P19 L18-25 (App.Ex. B); Shannon Depo. P14 L21-24, P16 L1-14 (App.Ex. E); Kinnaman Depo. P17 L10--P21 L17 (App.Ex. C); Hanson Depo. P13 L16--P15 L17 (App.Ex. D).)***

**Response**: Denies the facts asserted in Blumenschine's paragraph "4."  The deposition citations offered by Blumenschine do not support these "facts."  Blumenschine cites the deposition of William Ziperman, page 19, but his salient testimony cited is as follows:

> Q      Did you have the authority to make the decision whether to hire Ms. Blumenschine?
>
> A      No.
>
> Q      Who did?
>
> A      Well, Joe Hansen is the managing owner of the company, so I never have done anything without consulting with Joe.  And also the publisher of the two magazines was Dan Kinnaman.

The citations to Dan Shannon's testimony merely state his job title and function with the Company, that he was Ziperman's colleague, and that Hanson would be at the top of any perceived

3

corporate structure.  Kinnaman testified that "Mr. Hanson always

has veto power" (Kinnaman depo., p. 21, line 17), and that the

decision to offer Blumenschine employment with the Company was a

collective one between Hanson, Ziperman and Kinnaman.  Hanson

testified that he was involved with the hiring (or firing) of

"any sales manager candidate and anybody above that level."

Hanson depo., p. 15.

**5.  *Historically, and throughout plaintiff's tenure, all
of the members of defendant's senior management team have been
men. (Kinnaman Depo. P38 L11-19 (App.Ex. C); Shannon Depo. P62
L18-23 (App.Ex. E); Ziperman Depo. P82 L1-5 (App.Ex. B);
Kinnaman Depo. P38 L23--P39 L2 (App.Ex. C).)***

**Response**: Denies the facts asserted in Blumenschine's

paragraph "5." The depositions citations offered by Blumenschine

do not support these "facts."  Moreover, Ziperman recalled at

his deposition three (3) women that are or were in upper

management positions with the Company.  Ziperman depo., p. 81.

**6.  *Plaintiff, prior to being recruited by defendant, was
a successful saleswoman in the publishing industry. She was
gainfully employed with another publisher, Primedia, as a sales
manager at the time she was first approached by defendant in
November 1999. (Ziperman Depo. P13 L17-25, P16 L1-5 (App.Ex.
B).)***

**Response**:  Will not contest, for the purpose of this

motion, the facts asserted in the first sentence of

Blumenschine's paragraph "6," and admits the facts asserted in

the second sentence therein.

7.   *Plaintiff was recruited by defendant for the position of sales manager of its Matrix magazine effort. Plaintiff made it clear she was looking to earn $150,000 and obtain a position of senior management, namely Associate Publisher.[4]   (Ziperman Depo. P16 L8-20 (App.Ex. B).)*

[4]*When deposing Dan Boucher, a male member of defendant's management team hired soon after plaintiff's termination to perform functions she was aspiring to (Deposition of Daniel Boucher taken September 24, 2003 (hereinafter "Boucher Depo.") P32 L12--P35 L15 (App.Ex. G)), about plaintiff's position, he stated than an Associate Publisher is "usually" a managerial position (Boucher Depo. P34 L13--P35 L10 (App.Ex. G)). In addition, Dan Kinnaman also stated that plaintiff had a strong desire to be in senior management when he stated in his deposition:*

*"On numerous occasions she would ask when can I [plaintiff] become associate publisher.  My response was pretty much the same.   I understand and applaud your desire to grow professionally and to take on management responsibilities.…"*
*(Kinnaman Depo. P38 L11-15 (App.Ex. C).)*

**Response**: Admits the facts asserted in the first sentence of  Blumenschine's paragraph "7," except that the position offered by the Company was as "National Sales Manager."  Denies the facts asserted in the second sentence therein.  The Ziperman testimony cited does not support Blumenschine's statement; Ziperman testified instead that:

> A    She asked if she would have the opportunity to earn $150,000, and she also asked if there was the potential for being -- eventually becoming associate publisher. The job we were discussing was national sales manager.
>
> Q    How did you respond to those inquiries?
>
> A    I told her that we had salespeople who earned in excess of $150,000, you know, based on their ability to sell advertising in our magazines. And that, yes, you know, we look to promote from within whenever possible.

Ziperman depo., p. 16 (emphasis added).

With respect to Footnote 4, denies that Dan Boucher was

5

questioned "about plaintiff's position" as Associate Publisher
with the Company when he stated that the position is "usually" a
managerial one.  The Boucher testimony cited by Blumenschine
makes clear that he was being questioned about his <u>general</u>
knowledge of the industry, not with respect to Blumenschine's
job title specifically.  Further, the Kinnaman deposition
testimony quoted by Blumenschine is also taken out of context;
Kinnaman admitted that Blumenschine approached him repeatedly
about becoming an "Associate Publisher," but the continuation of
Blumenschine's citation is that Kinnaman advised her that:

> "always her number one job was to sell ad space.
> The future of the magazine depended on getting to
> subsequent level of total sales and she
> understood that clearly, and when I was asked
> directly, would I give her the title or would I
> support her in becoming associate publisher, my
> answer was not yet.  My answer was always not
> yet.  Let's wait until we succeed, then
> my goal was to support her toward that end.  Up
> until the time I had left neither her territory
> nor the magazine as a whole was producing the
> kind of sales that would justify having anyone be
> associate publisher or any individual that was
> seeking it."

Kinnaman depo., pp. 38-39 (emphasis added).

   **8.  *It was known at the time of plaintiff's hire that
plaintiff was historically a top producer, highly competent and
sought-after in the publishing industry.  (Deposition of Lisa
Blumenschine taken May 28, 2003 (hereinafter "Blumenschine
Depo.") P26 L17--P27 L3 (App.Ex. F); Hanson Depo. P21 L11--P22
L13 (App.Ex. D).)***

   **Response:**  Denies the facts asserted in Blumenschine's

paragraph "8," except admits that Blumenschine was known to be
good at selling advertising space.  The testimony Blumenschine
cites from her own deposition merely states that she had once
been "recruited to work for a competitor."  (Blumenschine depo.,
p. 27, line 3.)  Hanson testified only that "I was told that
she's an aggressive, effective salesperson. And we needed a lot
of sales strength." Hanson depo, p. 22.

**9.  *Plaintiff's competency and goodwill had earned her
promotions from salesperson to National Sales Manager in other
organizations, long before being recruited by defendant.
(Blumenschine Depo. P29 L19--P30 L12 (App.Ex. F); Ziperman Depo.
P13 L22-25, P16 L21--P17 L7 (App.Ex. B).)***

**Response:**  Will not contest, for the purposes of this
motion, the facts asserted in Blumenschine's paragraph "9."

**10.  *As sales manager for a major publishing house,
plaintiff was not only in charge of overseeing staff, but was
also responsible for strategic planning and directing the sales
effort.  (Blumenschine Depo. P29 L19--P30 L12 (App.Ex. F).)***

**Response:**  Denies having knowledge or information
sufficient to form a belief as to the facts asserted in
Blumenschine's paragraph "10," except Blumenschine's own
testimony does not support that she was "responsible for
strategic planning."  Instead, Blumenschine testified that she
had "responsibility for sales reports." Blumenschine depo., p.
30.

**11.  *Toward the end of December 1999, Mr. Ziperman, knowing
plaintiff's desires, history and position with Primedia
(Ziperman Depo. P13 L22-25, P16 L21--P 17 L7 (App.Ex. B); Hanson***

7

*Depo. P21 L23--P24 L15 (App.Ex. D)) approached plaintiff requesting that they meet (Ziperman Depo. P14 L20-22 (App.Ex. B); Blumenschine Depo. P43 L6-13 (App.Ex. F)).*

**Response:** Admits that, in December 1999, Ziperman

approached Blumenschine aware she held the title of "National

Sales Manager" at Primedia, but denies the remaining facts

asserted in Blumenschine's paragraph "11."

*12. In order for one to be given a position within defendant's management team, they must interview with and be approved by other members of management, including Mr. Hanson, defendant's 50% owner. (Hanson Depo. P15 L13 (App.Ex. D).)*

**Response:** Denies the facts asserted in Blumenschine's

paragraph "12." Blumenschine cites Hanson's deposition, page 15,

line 13 in support, but the entire exchange is as follows:

Q.   At what level do you get involved?

A.   Well, for example, we just hired an assistant editor.  I haven't met her yet.  If we were hiring an editor, I would meet them, I would unequivocally meet any sales manager candidate and anybody above that level.

Hanson depo., p. 15, lines 12-17.

*13. After a series of meetings with Mr. Ziperman, Mr. Hanson and defendant's managerial inner circle, plaintiff was not offered the title of Associate Publisher, but instead offered a lateral move with the title of National Sales Manager, the same position she held with Primedia. (Hanson P21 L23--P24 L15 (App.Ex. D); Ziperman Depo. P17 L1-L7, P19 L4-8 (App.Ex. B).)*

**Response:** Admits the facts asserted in Blumenschine's

paragraph "13," except denies the characterization that

Blumenschine met with some "managerial inner circle."

8

14. *Plaintiff was led to believe she would take on significant managerial duties. Her offer letter in pertinent part reads:*

> *It is our pleasure to offer you the position of National Sales Manager on our new higher education magazine, Matrix. Our goal is to create the leading magazine for college and university leaders covering the latest in technology and administrative trends and directions. We feel you would be the ideal person to help us meet this goal.*
>
> *You will have responsibility for the overall sales effort on this magazine including the following specifics:*
> * *Develop overall sales/marketing strategy for Matrix.*
> * *Sales responsibility for the Eastern Territory and certain selected key accounts.*
> * *Participate in the selection and hiring of the additional members of the sales team.*
> * *Participate in the development of sales support materials, i.e. media kit, editorial calendar, promotional materials, etc.*
> * *Participate in the development of business show participation/attendance approach.*
> * *Supervision of overall sales effort.*

(*See* *Offer Letter (App.Ex. H).*)

**Response:** Denies the first sentence of Blumenschine's paragraph "14." Admits that a portion of her Offer Letter only is stated accurately therein.

15. *Plaintiff was promised that she would be paid at the rate of $140,000 per year, divided between a base salary of $80,000 and a non-recoverable draw of $60,000. (Defendant's Answer ¶10 (App.Ex. I); Ziperman Depo. P22 L1-3 (App.Ex. B); Kinnaman Depo. P27 L18-21 (App.Ex. C); Hanson Depo. P27 L21-23 (App.Ex. D).)*

**Response:** Denies that Blumenschine was "promised" "$140,000 per year," but admits that, when hired, her compensation for the year 2000 was as alleged in the remainder of Blumenschine's paragraph "15." Further, the deposition

9

testimony cited by Blumenschine does not support her statements therein: Ziperman stated $140,000 was for the <u>first year</u> of Blumenschine's employment; Kinnaman understood Blumenschine received a $60,000 non-recoverable draw, but did not know her total compensation; and Hanson did not know her salary.

**16. *Plaintiff terminated her employment with Primedia and accepted defendant's offer.  Plaintiff hit the ground running and immediately attempted to undertake the tasks she was told she was hired to do.  (Blumenschine Depo. P46 L4-13 (App.Ex. F).)***

**Response:**  Admits Blumenschine accepted the Company's employment offer, and further admits, with respect to the second sentence of Blumenschine's paragraph "16," that Blumenschine began to work for the Company and began to perform her duties assigned as "National Sales Manager."  Denies the characterization that she "hit the ground running" (as if that meant anything).

**17. *Plaintiff declined an offer from another employer as a salesperson, despite being offered almost $35,000 more than her salary with defendant. (Blumenschine Depo. P73 L18--P76 L1 (App.Ex. F).)***

**Response:**  Denies knowledge or information regarding the details of any other job offer Blumenschine may have had in the year 2000, as asserted in Blumenschine's paragraph "17," but avers that, even if true, it is irrelevant to anything that happened well over a year later.

**18. *After over a year of faithful service under Dan***

10

*Kinnaman, defendant was viewed primarily as a "salesperson" and not a manager. (Kinnaman Depo. P37 L24--P38 L1 (App.Ex. C).)*

**Response:** Admits the facts asserted in Blumenschine's paragraph "18" in that at all times Blumenschine was employed by the Company she was repeatedly told, and she understood, that her primary job responsibility was to sell advertising space in "Matrix" magazine. The deposition testimony cited by Blumenschine confirms this: "Lisa had sought that title [Associate Publisher] for as long as I can remember and her primary function with us was to sell ad space." Kinnaman depo., pp. 37-38.

*19. In May 2001, defendant unilaterally withheld the non-recoverable portion of plaintiff's compensation. (Ziperman Depo. P49 L5--P53 L17 (App.Ex. B).) Defendant asserts this was because her sales figures did not warrant this "commission," despite the fact that defendant readily admits that at the time that plaintiff's non-recoverable draw was suspended, no "commission plan" existed for plaintiff and the pay withheld was admitted to have been "nonrecoverable" (Kinnaman Depo. P29 L23--P30 L4 (App.Ex. C).)*

**Response:** Denies the facts asserted in Blumenschine's paragraph "19." The cited deposition testimony is not that Ziperman "unilaterally withheld the non-recoverable portion of plaintiff's compensation" but that "I told her we were discontinuing the draw against commission because I did not see how she could earn commission in excess of the draw without improved performance of the magazine" and, on the next page:

Q.    Okay.  And did you ever come up with such a

11

commission plan?

     A.   I did not.  The sales of the magazine kept declining.

(Ziperman depo., p. 49-52).

With respect to the second sentence therein, admits that

Blumenschine's poor sales figures precipitated the discon-

tinuance (not the "withholding," as Blumenschine claims) of any

"nonrecoverable draw" portion of her compensation in May 2001.

    *20.  Mr.  Ziperman  also  admitted  under  oath  that  no commission plan existed for plaintiff:*

    *Q.   So you're saying, we're stopping the commission plan you're under, which is $5,000 nonrecoverable draw?*

    *A.   That was not a commission plan.  I had allowed the draw to continue while I was trying to put together a commission plan.*

    *Q.   What's the definition of a commission plan, as you're using it?  I just want to understand.*

    *A.   Basically a revenue objective or set of objectives that would result in a payment, you know, for meeting those objectives.*

**(Ziperman Depo. P50 L9-19 (App.Ex. B).)**

    **Response:**  Admits the fact that, as asserted in

Blumenschine's paragraph "20," no commission plan for

Blumenschine was ever completed, since her declining sales did

not justify replacement compensation.  Blumenschine quotes the

deposition of Ziperman, but the salient testimony is as follows:

    A    Well, what I explained to her was that, you
know, that sales on Matrix were very, very
disappointing and not improving, and I was having

difficulty getting together a commission plan for her
with the sales so poor.  I -- I don't remember if it
was that particular conversation or later
conversations, but I asked for her recommendations as
to what she thought could go into a commission plan.
But I told her that we were discontinuing the draw
against commission because I did not see how she
could earn commission in excess of the draw without
improved performance of the magazine.  And I did tell
her I was trying to put together a commission plan,
but I was struggling with it.

Ziperman depo., pp. 49-50.  Ziperman further testified:

    Q    But as far as you understood, Lisa came away
    from your meeting in April with an understanding that
    you were discontinuing the nonrecoverable draw, but
    she would wait to hear from you as to the basis her
    compensation would be going forward?

    A    Yes.  Commission going forward.

Id., p. 53.

   **21.  Plaintiff did not agree to have her pay reduced. She
protested the unilateral reduction of her compensation. (Hanson
Depo. P48 L6-11 (App.Ex. D); Ziperman Depo. P49 L5--P53 L17
(App.Ex. B).)**

   **Response:**  Denies the assertion that Blumenschine "did not

agree" with and "protested" having her nonrecoverable draw

withdrawn.  The testimony cited notes that Blumenschine

"continued working. She never complained to anybody that I know

of about it" (Hanson, p. 48, lines 4-5), and that simply "she

made inquiry" of a new commission plan. (Ziperman depo., p. 51.)

   **22.  Plaintiff was repeatedly assured that her total
compensation would be reinstated retroactively in some fashion.
(Ziperman Depo. P49 L5--P53 L17 (App.Ex. B).) This never
occurred despite continuous inquiries from May 2001 to the date
of her termination a few months later. (Blumenschine P60 L21--**

13

*P61 L1 (App.Ex. F); Ziperman Depo. P49 L5--P53 L17 (App.Ex. B).)*

22. Denies the facts stated in Blumenschine's paragraph "22" and refers to its responses to paragraphs "20" and "21" as set forth above.

*23. A lull in the publishing industry followed the terrorist attacks of September 11, 2001. (Ziperman Depo. P57 L9-13 (App.Ex. B).) This led to a restructuring of defendant's management team.*

**Response:** Admits the facts asserted in the first sentence of Blumenschine's paragraph "23," but denies the second sentence of said paragraph.

*24. At that time, Dan Kinnaman relinquished his position as publisher of Matrix magazine and became a part-time publisher for defendant. (Ziperman Depo. P53 L20--P55 L1 (App.Ex. B).) In doing so, Mr. Kinnaman was no longer the supervisor of plaintiff. (Ziperman Depo. P53 L20--P55 L1 (App.Ex. B).)*

**Response:** Admits the facts asserted in Blumenschine's paragraph "24."

*25. At that time, defendant also had to shut down eMarketing Magazine, which was headed by Mr. Shannon, due to a lack of sales under his direction. Despite eMarketing Magazine's failure under Mr. Shannon's direction and control, Mr. Shannon was transferred to replace Mr. Kinnaman as the new head of Matrix magazine and placed directly over plaintiff. In addition, at this time, without any input from Mr. Kinnaman or Mr. Shannon, plaintiff was given the position of Associate Publisher by Mr. Ziperman in what he testified was an effort to appease her. (Ziperman P58 L22--P59 L15 (App.Ex. B).)*

**Response:** Admits the facts asserted in Blumenschine's paragraph "25," except denies that the failure of "eMarketing Magazine" was due to the "direction and control" of Shannon.

14

Blumenschine cites no evidence to support this theory, whereas

the deposition testimony of Hanson is directly inapposite:

> "I don't believe that the failure of E Marketing
> magazine could be attributed to [Shannon's]
> either lack of effort or lack of abilities.  I
> think it was forced upon us by the market.  And I
> take more responsibility for that failure than I
> apply to him."

Hanson depo., p. 40.

**26.  Plaintiff had no role in the sales or management of
eMarketing Magazine.**

**Response:**  Admits the facts asserted in Blumenschine's

paragraph "26."

**27.  Plaintiff was not informed of the view that her
promotion was simply a change in title, a view directly contrary
to what she and others within the organization were told.
(Kinnaman Depo. P40 L12-18, P51 L8-10 (App.Ex. C); Hanson Depo.
P39 L18--P40 L21 (App.Ex. D); Shannon Depo. P26 L19-20, P28 L24-
-P29 L12, P32 L2-13 (App.Ex. E).)**

**Response:**  Denies the facts asserted in Blumenschine's

paragraph "27."  The deposition citations <u>all</u> address Shannon's

move to Publisher of "Matrix Magazine;" Shannon testified he had

no role in Blumenschine's change in title, and Kinnaman

testified:

> Q.   You don't know what she was told incident to
> receiving this promotion?
>
> A.   I was not involved in any discussions nor
> did I seek to know anything about it.  That's what I
> gathered from it.  When I left, my assumption was
> simply she had pressed hard for the title and
> received it.

Kinnaman depo., p. 40.   Furthermore, Shannon testified as

follows:

>     Q.   Did you agree with her promotion?
>
>     A.   I understood the rationale for it and
> supported it.
>
>     Q.   In what way did you support it?
>
>     A.   It was presented as a remedy for an employee
> who wanted the title change, virtually insisted,
> according to reports, but not to me because I wasn't
> in that loop.  I didn't have that job at the time.
> It was argued it would help that employee get in to
> see accounts that wouldn't ordinarily be seen by a
> national sales manager.  For example, the title
> publisher was argued that it could carry the weight
> to get in to see the necessary clients.  That made
> sense to me, those reasons.

Shannon depo., pp. 29-30.

**28.   In fact, plaintiff was told by Mr. Ziperman that she was highly valued and not "just a salesperson." (Blumenschine Depo. P124 L3-11 (App.Ex. F).)**

**Response:**   Denies the facts asserted in Blumenschine's

paragraph "28."

**29.   Even more importantly, on September 26, 2001, incident to plaintiff's promotion to Assistant Publisher, an e-mail was circulated to the entire company stating:**

> *I'm please to announce that Lisa Blumenschine has been promoted to Associate Publisher for Matrix.*
>
> *This is good news for Matrix.  Lisa has been with Matrix since its launch and has done a terrific job helping the book get established in the higher education market.  She has contributed greatly to Matrix's steady growth and this new position will allow her to use more of her skills as we move the magazine to the next level.  Lisa will, in addition to continue growing her own territory, support and manage the sales effort.  She will also continue to play a key role in positioning the magazine and developing collateral sales material.*

16

*Lisa has enjoyed great success in the past working for a number of magazines including, Operations & Fulfillment, DM New, Catalog Age and Direct. I look forward to her leveraging this experience for a more successful Matrix.*

**(See e-mail, App.Ex. J.)**

**Response:** Admits the facts asserted in Blumenschine's paragraph "29," but denies the implicit characterization of her promotion.

**30. Mr. Shannon did not want any input from plaintiff on the magazine nor would he answer questions regarding the direction of the magazine when posed by plaintiff in an attempt to perform her duties as an Associate Publisher. (Shannon Depo. P49 L12--P51 L2, P62 L18-23 (App.Ex. E).)**

**Response:** Denies the facts asserted in Blumenschine's paragraph "30." Blumenschine cites the Shannon deposition in support, but the citations refer only to her "boys' club" comment in addition to the following:

> Q   Is it your testimony that the position of associate publisher was a sales position?
>
> A   Yes.
>
> Q   And she was looked upon by you the same as the other salespeople for Matrix, no different?
>
> A   That is correct.
>
> Q   Did she have any additional managerial duties, in your mind, that the other salespeople didn't have?
>
> A   Can you define "managerial"?
>
> Q   You already said she wasn't responsible for the other salespeople, right?

17

A     She wasn't responsible for them in terms of
their day-to-day activities or that sort of thing.
She did help me in securing from them their
projections, for example, which went to me.  So --
and managerial duties -- I would meet with Lisa on a
daily basis on a number of topics.  Were these
managerial?  How -- modifying the media kit, which
every magazine requires, by way of background, I
would ask for her input, for example.  Things that
she might need to help sell ads, we would discuss.

Shannon depo., pp. 62-63.

**31.  Although she was promoted to Associate Publisher,
plaintiff was excluded from participating as a manager.**

*Q.     Is it your testimony that the position of Associate Publisher was a sales
position?*

*A.     Yes.*

*Q.     And she was looked upon by you the same as the other salespeople for
Matrix, no different?*

*A.     That is correct.*

**(Shannon Depo. P62 L18-23 (App.Ex. E).)**

**Response:**  Denies the facts asserted in Blumenschine's

paragraph "31," except admits her title was changed to

"Associate Publisher."  Blumenschine has failed to establish

that her job duties changed in any fashion whatsoever when her

title was changed, and the portion of Shannon's deposition

quoted does not support her assertions stated in the first

sentence therein.

**32.  Plaintiff's protests over being shut out from
management and its meetings fell on deaf ears. (Hanson Depo. P53
L18--P54 L14 (App.Ex. D); Shannon Depo. P49 L12--P51 L2 (App.Ex.
E).)**

**Response:**  Denies the facts asserted in Blumenschine's paragraph "32." The deposition testimony of Shannon cited in support concerns the context of Blumenschine's "boys' club" comment (in a hallway at lunch, with no follow up conversations or weight given to this comment).  Even this off-hand comment was not perceived to be a "complaint of discrimination," and Hanson stated that he wasn't even aware of the "boys' club" comment.

**33.  Defendant admits that plaintiff "scoffingly[5]" told Mr. Shannon that "the small management group of the company was a boys' club" (Kinnaman Depo. P55 L4-25 (App.Ex. C); Shannon Depo. P49 L12--P51 L2 (App.Ex. E).)**
    [5]*Merriam-Webster Dictionary defines the verb "scoff" as "to show contempt by derisive acts or language; to treat or address with derision."*

**Response:**  Denies the facts asserted in Blumenschine's paragraph "33."  Kinnaman states that he wasn't aware of her comment until a few days before his deposition, and Shannon testified that, on his way to lunch with Hanson and Ziperman, Blumenschine approached Shannon with a question, to which he replied: "'I can't talk now,' or words to that effect, as best I can recall.  She then scoffingly -- "Oh, the boys' club," referring to our lunch, which was the context and, as best I can remember, the words or words to that effect."  Shannon depo., p. 50.

**34.  Defendant registered plaintiff's protests as complaints of discrimination (Kinnaman Depo. P55 L4--25 (App.Ex. C); Shannon Depo. P49 L12--P51 L2 (App.Ex. E)), and Mr. Shannon**

*decided to give them "no weight" (Shannon Depo. P49 L12--P51 L2 (App.Ex. E); Hanson Depo. P53 L18--P54 L14 (App.Ex. D).)*

**Response:** Denies the facts asserted in Blumenschine's paragraph "34." None of the deposition testimony cited supports Blumenschine's assertion that her lone comment was a "protest," a "complaint of discrimination," or "registered" by the Company as such, which is precisely why Shannon gave it "no weight."

*35. Mr. Shannon told sexual laden jokes and comments. (Blumenschine Depo. P196 L1--P197 L14 (App.Ex. F).)*

**Response:** Denies the facts asserted in Blumenschine's paragraph "35." Blumenschine's own testimony does not support the facts alleged herein: she could recall only "one instance" when Shannon was "telling Viagra jokes" at a convention in mixed company. (Blumenschine depo., pp. 196-197.)

*36. Mr. Shannon implemented a plan just weeks after plaintiff's promotion, and shortly after her first complaint, to hire two young men, Darren Sikorsky (age 27) and Tom Terry (age 31) to replace plaintiff. (Ziperman Depo. P69 L10--P69 L11, P75 L5-7 (App.Ex. B); Shannon Depo. P44 L8-17, P55 L8-L17 (App.Ex. E).)*

**Response:** Denies the facts asserted in Blumenschine's paragraph "36."

*37. At the time Ms. Blumenschine was advised of the potential of hiring these two young male salespeople, plaintiff had been Associate Publisher for only two months.*

*Q.   At the time you approached Lisa about the fact you had been contacted by these individuals, as you just described, had you already made up your mind to recommend Lisa's termination?*

*A.    I had already recommended Lisa's termination.*

*Q.    When did you first recommend Lisa's termination?*

*A.    Late November or early December.  To the best of my knowledge it had to be in that area.*

`(Shannon Depo. P44 L8-17 (App.Ex. E).)`

**Response:** Admits the facts asserted in Blumenschine's paragraph "37."

**38.  Mr. Shannon testified he had issues with plaintiff due to his perception that she was sexually attracted to him, and that "on four or five occasions during the period from September, 2001 through December, 2001, [plaintiff] told me that she had 'had a crush on' me or wanted 'to go out with' me when we worked for the same company a number of years ago.  On each occasion, I ignored the flirtatious comments and changed the subject or simply failed to respond." (Affidavit of Daniel Shannon dated May 16, 2002 ("Shannon Aff.") ¶6 (App.Ex. K).)  He testified in his deposition that plaintiff repeatedly made advances and inappropriate flirtatious gestures.  (Shannon Depo. P69 L8-17 (App.Ex. E).)**

**Response:** Admits the facts (totally irrelevant for the purposes of this motion) asserted in Blumenschine's paragraph "38," except denies that Shannon stated at his deposition that Blumenschine "repeatedly made advances" toward him.

**39.  Plaintiff adamantly denies all of Mr. Shannon's sexist allegations.  (Complainant's Reply To Respondents' Answer Exhibit A ("Plaintiff's CHRO Reply") P2 ¶7 & ¶8 (App.Ex. L)**

**Response:** Admits Blumenschine's paragraph "39" (also irrelevant) and notes that this is not a statement of material fact.

**40.  Despite Mr. Shannon's problems with plaintiff's alleged sexuality, defendant admits the sole and exclusive reason for plaintiff's termination was her "poor sales."**

21

*(Shannon Depo. P52 L16--P53 L16 (App.Ex. E); Ziperman Depo. P48 L17--P49 L2 (App. Ex. B).)*

**Response:**  Admits the facts asserted in Blumenschine's paragraph "40," except denies Shannon had "problems with plaintiff's alleged sexuality."  Shannon depo., pp. 72-74.

*41.  Mr. Shannon's referred to the two young males he was to hire as "the boys." (Shannon Depo. P55 L18--P56 L18 (App.Ex. E).)*

**Response:**  With respect to Blumenschine's paragraph "41," Shannon admits that he referred to Sikorsky and Terry as "the boys," but there is no evidence that this reference had any connection with, or was made <u>prior</u> to, the Company's decision to terminate Blumenschine's employment.

*42.  On January 2, 2002, after two months of complaints of sex discrimination and being shut out from management, Mr. Shannon informed plaintiff of his decision to terminate her. (Shannon Depo P39 L4--P40 L1, P49 L12--P51 L25 (App.Ex. E); Hanson Depo. P49 L10-L20, P53 L18--P54 L14 (App.Ex. D); Ziperman Depo. P75 L2-3 (App.Ex. B).)*

**Response:**  Denies the facts asserted in Blumenschine's paragraph "42," except admits Blumenschine was provided notice of termination on or about January 2, 2002.

*43.  At no time during her employment had plaintiff been told that her position was in jeopardy, in fact she was assured that her position was safe. (<u>See</u> promotion email (App.Ex. J); Kinnaman Depo. P46 L8-15 (App.Ex. C).)*

**Response:**  Denies the facts asserted in Blumenschine's

22

paragraph "43."  To the contrary, Blumenschine was repeatedly

advised by several Company employees to focus on generating

sales revenue; she repeatedly asked if she was going to be fired

and expressed dissatisfaction with her own sales figures.  See,

Blumenschine depo., pp. 121, 122, 123, 126, 188-189; Hanson

depo., p. 42; Shannon depo. pp. 66-67; Kinnaman depo., p. 46;

Ziperman depo., Ex. "I."

**44.  *Defendant cannot and has not produced any evidence that plaintiff's sales were so poor relative to defendant's other salespeople that they placed her job in jeopardy. (Shannon Depo. P40 L7-L13 (App.Ex. E); Hanson Depo. P50 L22--P51 L12, P62 L3-5 (App.Ex. D); Ziperman P48 L17--P49 L2 (App.Ex. B).)***

**Response:**  Denies the facts asserted in Blumenschine's

paragraph "44," and refers this Court to Ziperman deposition

Exhibit "F."  The citation to Shannon's deposition notes only

that it was his assumption Blumenschine would have these

documents, and that Hanson stated the projected sales forecasts

were submitted by her.  (Hanson depo., p. 51.)

**45.  *This termination was not communicated to plaintiff until January 2002.  (Hanson Depo. P51 L24--P52 L2 (App.Ex. D).)***

**Response:**  Admits the facts asserted in Blumenschine's

paragraph "45."

**46.  *When plaintiff was promoted to Associate Publisher on September 26, 2001, defendant knew her sales performance through at least a part of the month of November. (Ziperman Depo. P75 L20--P76 L8 (App.Ex. B); Shannon Depo. P39 L1--P40 L1, P41 L7-15 (App.Ex. E); Kinnaman Depo. P51 L8-17 (App.Ex. C).)***

*"Q.    Sales are done in the months preceding the actual issue of the monthly magazine, correct?*
*A.    True.*
*Q.    So November sales would have been known, at least in part, by September, correct?*
*A.    In part."*

*(Ziperman Depo. P75 L8-25, P76 L1-L8 (App.Ex. B).)*

**Response:**  Admits the statements asserted in Blumenschine's paragraph "46," but points out that Ziperman was talking about sales for the November issue of the magazine (not all sales through November).

**47.  Defendant claims it fired plaintiff due to her "poor sales" for the three months spanning September, October and November of 2001. (Ziperman Depo. P75 L20--P76 L8 (App.Ex. B; Shannon Depo. P41 L7-L15 (App.Ex. E).)**

**Response:**  Denies the facts asserted in Blumenschine's paragraph "47," since both Ziperman and Shannon, as cited by Blumenschine, note their decision to terminate Blumenschine was also based on her projected (poor) sales.  The Company based its decision on Blumenschine's sales for the October, November, and January issues and projected sales figures.

**48.  Defendant was well aware of plaintiff's sales for at least two of those three months prior to her promotion and yet still promoted her on September 26, 2001. (Shannon Depo. P39 L1--P40 L1 (App.Ex. E); Kinnaman Depo. P51 L8-17 (App.Ex. C).)  In addition, Mr. Shannon states that he made his decision to terminate plaintiff around "possibly late November," which is the third month of the three-month time span. (Shannon Depo P39 L24--P40 L1 (App.Ex. E).)**

**Response:**  Denies the facts asserted in Blumenschine's paragraph "48," (see response to No. 47 above) in that

24

Blumenschine's available sales figures were incomplete for October 2001 at the time of her change in title.  Further, the Shannon deposition citations state that when he became Publisher of "Matrix "Magazine" the decision had already been made to make her "Associate Publisher."  The Company further denies the facts asserted therein in so far as the decision to terminate Blumenschine was not made by Shannon, but was in fact ultimately made by Hanson upon Shannon's recommendation.  Hanson Depo., pp. 49-50 and Ex. "R."

**49.  Therefore, within 60 days after her promotion to Associate Publisher and within weeks of her first complaint of discrimination, plaintiff was selected by Mr. Shannon for termination for alleged "poor sales" based upon sales figures it knew at the time of her promotion.  (Shannon Depo. P39 L1--P40 L1, P49 L12--P51 L25, P56 L10 (App.Ex. E); Hanson Depo. P53 L18--P54 L14 (App.Ex. D); Ziperman Depo. P76 L1-8 (App.Ex. B); promotion e-mail (App.Ex. J); (Kinnaman Depo. P55 L4-25 (App.Ex. C).)**

**Response:**  Denies the facts (and characterizations asserted) in Blumenschine's paragraph "49," which are not supported by the deposition testimony cited.

**50.  Defendant admits that the sole document it relied upon to terminate plaintiff does not even contain the data of the type it claimed it used in forming its conclusion of "poor sales." (Shannon Depo. P39 L1--P40 L1, P49 L12--P51 L25, P56 L10, P57 L5--P62 L23 (App.Ex. E).)**

**Response:**  Denies the facts asserted in Blumenschine's paragraph "50."  Shannon states that the sales figures relied upon in reaching the decision to terminate Blumenschine were "in

25

a number of documents." (Shannon depo., p. 39, lines 17-18.)

*51. The document defendant relied upon in making its determination to terminate plaintiff does not contain sales "projections" within it. (Shannon P39 L1--P40 L1, P49 L12--P51 L25, P56 L10, P57 L5--P62 L23 (App.Ex. E).) No documents containing any such "projections" for plaintiff have been produced in this litigation.*

**Response:**  Denies the facts asserted in Blumenschine's

paragraph "51."  Shannon and Hanson testified that projections

were supplied by Blumenschine.  See Response to No. 44 above.

*52. Defendant claims its poor financial condition arising out of alleged poor sales revenues necessitated plaintiff's termination. In the same general time frame as plaintiff's termination, however, defendant proceeded to acquire: (1) assets of University Business, a competing magazine which was brought in to merge with Matrix for a price of $350,000, (2) Darren Sikorsky, a sales manager paid approximately $60,000 per year plus additional commission (Offer Letter to Darren Sikorsky dated December 28, 2001 ("Sikorsky Offer Letter") (App.Ex. N)), (3) Tom Terry, a sales manager paid $60,000 per year plus additional commission (Offer Letter to Tom Terry dated December 28, 2001 ("Terry Offer Letter") (App.Ex. O)); and (4) Dan Boucher, a Publisher who was compensated well over $100,000 in base salary and guaranteed commissions (Offer Letter to Daniel Boucher dated February 21, 2002 ("Boucher Offer Letter") (App.Ex. P)). (Hanson Depo. P63 L20--P65 L25 (App.Ex. D).)*

**Response:**  Denies the facts asserted in Blumenschine's

paragraph "52," insofar as it was not the Company's "poor

financial condition arising out of alleged poor sales revenues",

but in fact Blumenschine's "poor sales revenues" (and

projections) that resulted in her termination.

*53. Upon the filing of plaintiff's complaint with the CHRO, documents which defendant allegedly maintained plaintiff was merely a salesperson like all other salespersons in defendant's employment (Ziperman Depo. P26 L3--P28 L15 (App.Ex.*

*B)), setting forth sales data and commissions analysis were "lost" by defendant (Ziperman Depo. P24 L14--P25 L11 (App.Ex. B).)*

**Response:**  Denies the facts asserted in Blumenschine's paragraph "53."  Ziperman's cited testimony is that, when a search was done pursuant to Blumenschine's CHRO complaint, it was <u>only</u> <u>then</u> that certain documents, *i.e.*,  the sales plan for Blumenschine, were unable to be located.

*54.  Defendant claims under oath it realized it had "lost" the documents detailing the structure of plaintiff's compensation and what it now characterizes as a "commission plan" at the time plaintiff filed her CHRO complaint. (Ziperman Depo. P24 L14--P25 L16 (App.Ex. B); Hanson Depo. P26 L12--P27 L12, P28 L25--P29 L2, P30 L16-23 (App.Ex. D).)*

**Response:**  Denies the facts asserted in Blumenschine's paragraph "54."  See the Company's Response to No. 53 above.

*55.  Defendant admits it never even saw such documents at any time, prior to or subsequent to this litigation. (Ziperman Depo. P39 L5-10 (App.Ex. B); Hanson Depo P26 L12--P27 L12, P28 L25--P29 L23, P30 L16-23 (App.Ex. D)).*

**Response:**  Denies the facts asserted in Blumenschine's paragraph "55."  Ziperman stated that he could not find relevant documents on his computer or in Blumenschine's file; Hanson could not recall whether or not he saw "such documents."

*56.  All "salespersons" within its employment had folders containing these quarterly commission reports analyzing sales numbers, goals, and commission payments. (Ziperman Depo. P40 L8--P41 L4 (App.Ex. B); Hanson Depo. P26 L12--P27 L12, P28 L25--P29 L23, P30 L16-23 (App.Ex. D).)*

**Response:**  Denies the facts asserted in Blumenschine's

27

paragraph "56."  Ziperman testified that he was unsure whether he had seen the types of documents reproduced herein for Ms. Terry Nelson, as well as Blumenschine.  Ziperman also testified that some of the sales reports may have been different from others.  (Ziperman depo., p. 41.)

**57.  By the time plaintiff was told on January 2, 2002 that her position was terminated, defendant had already made offers to the two young men who Mr. Shannon repeatedly referred to as "the boys." (Ziperman Depo. P69 L10-11 (App.Ex. B); Shannon Depo. P49 L12--P51 L25, P56 L10 (App.Ex. E).)**

**Response:**  Admits the facts asserted in Blumenschine's paragraph "57," but denies the allegation that it made its decision to terminate Blumenschine after it had made offers to Sikorsky and Terry.  <u>See</u>, Hanson depo., pp. 51-53 and Ex. "R".

**58.  These two young men had been contacted by defendant as early as November. (Ziperman P69 L22--P70 L2 (App.Ex. B).)**

**Response:**  Admits the facts asserted in Blumenschine's paragraph "58."

**59.  When plaintiff insisted that she be included in management meetings, including hiring decision meetings, Mr. Shannon adamantly denied her from such inclusion. (Shannon Depo. P45 L2-9 (App.Ex. E).)**

**Response:**  Denies the facts asserted in Blumenschine's paragraph "59." Shannon testified, as cited by Blumenschine, as follows:

> A    I don't recall other than she, in my memory, requested to be part of the conversation when the two salespeople made their presentation.

28

Q    How did you respond to that request?

A    I said no.

Q    Did you explain to her why?

A    I don't remember there being extended
conversation.

Q    She had made several requests while working
for you to be more involved in management meetings,
had she not?
A    No.

Q    Had she made any requests other than this
one you're talking about?

A    Not to my memory.

Shannon depo., p. 45.

**60. Despite management's awareness of plaintiff's
complaint of sex discrimination, it did not perform any form of
inquiry or investigation. (Kinnaman Depo. P55 L4-25 (App.Ex.
C).)**

**Response:**  Denies the statements set forth in

Blumenschine's paragraph "60."  Blumenschine's off-hand "boys'

club" comment was not a "complaint of sex discrimination," so

the Company did not have anything to investigate.  See Shannon

depo., pp. 105-106.

**61. Defendant hired a total of three young men shortly
after it terminated plaintiff. (Ziperman Depo. P69 L10-11, P75
L5-7 (App.Ex. B); Shannon Depo. P55 L8-17 (App.Ex. E); Hanson
Depo. P63 L20--P65 L25 (App.Ex. D).)**

**Response:**  Denies the statements set forth in

Blumenschine's paragraph "61."  Admits that two men under 40

were hired (and subsequently fired), but that Dan Boucher was

29

approximately 56 years old when hired by the Company (Boucher depo., pp. 5, 11).

**62. Upon her termination, plaintiff was never paid the portion of her compensation representing her non-recoverable draft from May 2001 to the date of her termination (i.e., $40,000).**

**Response:** Admits the fact of non-payment as set forth in Blumenschine's paragraph "62," but denies that Blumenschine was owed any "non-recoverable draft [sic]," since that part of her compensation was <u>discontinued</u> in May of 2001 (Ziperman depo., pp. 49-53.

<div style="margin-left: 45%;">

Respectfully submitted,

DEFENDANT PROFESSIONAL MEDIA
GROUP LLC

By:_____
    Thomas E. Minogue(CT06845)
    George P. Birnbaum (CT04937)
    Michael L. Ferch (CT24764)
    Minogue Birnbaum LLP
    Attorneys for Defendant
    237 Elm Street
    New Canaan, CT 06840
    (203) 966-6916

</div>

TO:  Scott R. Lucas, Esq.
     Mary Alice S. Canaday, Esq.
     Michel Bayonne, Esq.
     Martin, Lucas & Chioffi, LLP
     Attorneys for Plaintiff
     177 Broad Street
     Stamford, CT  06901
     (203) 973-5200

## CERTIFICATION

This is to certify that a copy of the foregoing was sent by First Class Mail, postage prepaid, to the following counsel of record on January __, 2004:

        Scott R. Lucas, Esq.
        Mary Alice S. Canaday, Esq.
        Michel Bayonne, Esq.
        Martin, Lucas & Chioffi, LLP
        177 Broad Street
        Stamford, CT  06901

                                _____
                                  MICHAEL L. FERCH