UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| LISA K. BLUMENSCHINE, : | CIVIL ACTION NO. |
| : | 302 CV 2244 (DJS) |
| Plaintiff, : | |
| V. : | |
| : | |
| PROFESSIONAL MEDIA GROUP, : | |
| LLC, : | FEBRUARY 10, 2004 |
| Defendant. : | |

**PLAINTIFF'S REPLY TO DEFENDANT'S
OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

*PRELIMINARY STATEMENT*

Plaintiff Lisa K. Blumenschine submits this reply to address certain salient points missed by defendant in its Opposition to Plaintiff's Motion for Summary Judgment dated January 29, 2004 (hereinafter "Defendant's Opposition"). As demonstrated below, there continues to be no material issues of fact, and summary judgment should be granted to plaintiff as a matter of law.

*FACTS*

Plaintiff, hereby incorporates by reference the "Facts" section of her Memorandum of Law in Support of Motion for Summary Judgment dated December 8, 2003 (hereinafter "Plaintiff's Memo").

*ARGUMENT*

I. *SUMMARY JUDGMENT IS APPROPRIATE ON PLAINTIFF'S CLAIM OF RETALIATION PURSUANT TO TITLE VII AND ADEA.*

Defendant attacks the propriety of awarding summary judgment as to plaintiff's retaliation claim, not by contesting the facts regarding retaliation itself, but rather by attacking the existence of a protected activity sufficient to protect plaintiff from the retaliation she experienced. As set forth below, defendant's assertions that plaintiff's complaints are not cognizable protected activity must fail.

### A. DEFENDANT KNEW OR SHOULD HAVE KNOWN THAT PLAINTIFF WAS ENGAGED IN PROTECTED ACTIVITY UNDER TITLE VII.

#### 1. *Plaintiff Was Engaged In Protected Activity.*

The defendant disputes whether plaintiff established the first element of the *prima facie* case, that she was engaged in protected activity.[1] Specifically, defendant claims that plaintiff's "single" complaint to Dan Shannon (defendant's executive and plaintiff's supervisor), that the small management group of defendant's company was a "boys club," did not amount to a "genuine" complaint triggering the protection of Title VII.[2] However, the Second Circuit in Sumner v. United States Postal Serv., 899 F.2d 203, 209 (2d Cir.1990), held that "In addition to protecting the filing of formal charges of discrimination, [Title VII] protects as well informal protests of discriminatory employment practices, including making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges." Stordeur v. Computer Assocs. Int'l, Inc., 995 F.Supp. 94, 105 (S.D.N.Y.1998); Barcher v. New York Univ. Sch. of Law, 993 F.Supp. 177, 184 (S.D.N.Y.1998) ("A 'protected activity' includes the registering of a complaint of a Title VII violation, which 'need not take the form of a formal claim filed with a court or administrative agency ... [but] may simply be an objection voiced to the employer.'") (quoting Iannone v. Frederic R. Harris, Inc., 941 F.Supp. 403, 410 (S.D.N.Y.1996), aff'd, 172 F.3d 37 (1999)); Del Castillo v. Pathmark Stores, Inc., 941 F.Supp.

---

[1] In order for plaintiff to establish the first element, that she was engaged in protected activity, she need only show that she was acting under a good faith belief that the activity was covered by the statute. Cosgrove v. Sears, Roebuck and Co., 9 F.3d 1033, 1040 (2d Cir. 1993) (citing Sumner v United States Postal Service, 899 F.2d 203, 209 (2d. Cir. 1990)). While the protected activity usually takes the form of filing a formal complaint or a lawsuit, making an internal complaint regarding sexual discrimination is also covered by the statute. Id. at 1040.

[2] It should be noted that plaintiff made other complaints of discrimination (e.g., being shut out of management meetings).

2

437, 438-39 (S.D.N.Y. 1996); see also Doria v. Cramer Rosenthal McGlynn, Inc., 942 F.Supp. 937 (S.D.N.Y. 1996) (court identified a "general boy's club attitude" in plaintiff's EEOC complaint alleging gender-based discrimination and retaliatory discrimination); Briamonte v. Liberty Brokerage, Inc., 2000 WL 351399 (S.D.N.Y.) (plaintiffs testimony that male dominated employer "just liked having their boys club" was proper evidence in upholding her sex discrimination decision) (attached hereto as Exhibit A).

In the instant case, plaintiff clearly made complaints of discrimination.

> Q. So when you got promoted to associate publisher, you felt there was an effort to exclude you from management function, is that a fair statement.
> A. That's fair.
> Q. All right. What did you do about that?
> A. I brought that up to Mr. Shannon.
> Q. And you brought it up to no one else, as I understand?
> A. Mr. Shannon was my supervisor, there was no other structure in place or no other recourse in place for me to go. I had been told not to talk to Bill Ziperman, I had been warned that I would report to him and that he was in charge.

(Deposition of Lisa Blumenschine taken May 28, 2003 (hereinafter "Blumenschine Depo.") Page 181 Line 16 to Page 182 Line 3[3] (attached as Exhibit B to Defendant's Exhibits to Affirmation of Michael L. Ferch dated December 8, 2003 (hereafter "Def.Ex.").)

> Q. Is there anything else he said to you about being excluded from those meetings?
> A. He told me they were management meetings and that I wasn't included.
> Q. Did you say: I'm part of management and I should be included?
> A. I did.
> Q. What did he say?
> A. He said: You'll learn about it through me.[4]
> Q. And how many times did you have that kind of a conversation with Mr. Shannon.
> A. At least two or three.

(Blumenschine Depo. P186 L14—L25.)

---

[3] Hereinafter, the designation "P___ L___" shall refer to page number and line number.
[4] Dan Shannon also testified that he excluded plaintiff from a "presentation" presented by two young males being interviewed by defendant in which plaintiff "requested" to be part of. (Deposition of Daniel Shannon taken September 24, 2003 (hereinafter "Shannon Depo.") P45 L2—L12 (Def.Ex.E).)

3

> Q. Let's talk about that. You've made a complaint that Mr. Shannon created an atmosphere that discriminated against you, correct?
> A. He created an atmosphere of tremendous disrespect.
> Q. In what ways?
> A. He told male chauvinist jokes, he was extremely sarcastic, he was very negative about things that I did and totally uninterested in any contribution that I had, not totally uninterested but very uninterested.
> Q. And I think you told us earlier in response to my question a couple seconds ago that you made the statement to him that he had created a boys' club, correct.
> A. I don't know that I said that he created, I thought I did say that one existed.
> Q. In the management of Pro Media?
> A. That's correct.

(Blumenschine Depo. P178 L22—P179 L15.)

More importantly, defendant admits that it received plaintiff's complaints of discrimination.

> Q. At some point she told you she felt it was a boy's club right? Management was a boys' club?
> A. I remember the phrase that she used, and I remember the context.
> Q. Why don't you tell me the context and the phrase.
> A. As best –
> MR. MINOGUE: That's really two questions.
> Whatever.
> Q. Start with the context. Tell me the context.
> MR. MINOGUE: Good. Start someplace.
> A. I was in the hallway leaving for lunch with Mr. Hansen and Mr. Ziperman, possibly Mr. Kinnaman. But with Mr. Ziperman and Mr. Hansen I recall specifically, to the best of my memory. That was the context. And, the best I can recall, she asked me something, as we had a constant give and take between us, constant open door, never a knock, she could come to my office, I would go to her cubicle, constant. My memory is that I said, "I can't talk now," or words to that effect, as best I can recall. She then *scoffingly*[5] – *"Oh, the boys' club,"* referring to our lunch, which was the context and, as best I can remember, the words or words to that effect.

(Shannon Depo. P49 L12—P50 L12 (Def.Ex. E) (emphasis added).)

Therefore, not only does plaintiff testify that she made various complaints of discrimination, but Dan Shannon **himself** admits that a complaint of discrimination was made

---

[5] Merriam-Webster Dictionary defines the verb "scoff" as "to show contempt by derisive acts or language; to treat or address with derision."

4

directly to him. Accordingly, defendant's own assertions clearly show that plaintiff complained of discrimination.

### 2. *Defendant Knew That Plaintiff Was Engaged In Protected Activity.*

Defendant cannot insulate itself from liability by claiming that Mr. Shannon blissfully did not "understand" plaintiff's comments, namely that management was a "boy's club," to be a complaint of discriminatory conduct. Iannone v. Frederic R. Harris, Inc., 941 F.Supp. 403, 410 (S.D.N.Y.1996), aff'd, 172 F.3d 37 (1999) ("there is no question that the employer was aware of [plaintiff's] complaint, since she registered it directly with employer's president."). More importantly, defendant's Statement of Facts and Answer to the Connecticut Commission on Human Rights and Opportunities each state respectively that: (1) "Mr. Shannon remembers that Blumenschine on one occasion did use the term *'boys' club' to refer to the fact that the senior management of the Company was male*"; and (2) "...[Plaintiff's] comment to Daniel Shannon, *to the effect that the small management group of the company was a "boys club"* was answered by him and never repeated." These admissions by defendant illustrate its full awareness not only of plaintiff's complaints, but also of the meaning attached to it. (Defendant's Statement of Facts to the Connecticut Commission on Human Rights and Opportunities ("CHRO"), P5 ¶9 (attached hereto as Exhibit B); defendant's Answer to the CHRO, P5 ¶3 (attached hereto as Exhibit C).) In fact, Mr. Shannon's own affidavit underscores the fact that he heard and understood plaintiff's complaint when he again testified, "LB [plaintiff, Lisa Blumenschine] did once say that the senior management was a 'boys club' because it was made up of men." (Defendant's Affidavit of Daniel Shannon to the CHRO, P4 ¶11 (attached hereto as Exhibit D) (emphasis in the original).)

Accordingly, there are no genuine issues of fact as to whether defendant knew that plaintiff was engaged in protected activity.

5

### B. DEFENDANT KNEW OR SHOULD HAVE KNOWN THAT PLAINTIFF WAS ENGAGED IN PROTECTED ACTIVITY UNDER ADEA.

The Second Circuit analysis for determining retaliation claims brought under ADEA is identical to claims brought under Title VII. Wanamaker v. Columbian Rope Company, 108 F.3d 462 (2nd Cir. 1997). Plaintiff hereby incorporates in its entirety §A, supra, and adds the following facts as they clearly show plaintiff is entitled to summary judgment. Plaintiff complained of being excluded from meetings in which two "bright, young and energetic guys" were being interviewed for positions within defendant's company. (Blumenschine Depo. P186 L14—L25; Plaintiff's Complaint ¶17.) In fact, Dan Shannon admits he referred to these two young men as the "boys," that plaintiff demanded to participate in these meetings, and that he flatly denied her request. (Shannon Depo. P45 L2—L12, P55 L18--P56 L18 (Def.Ex. E).) Soon after plaintiff's complaints, she was terminated and, according to defendant, "replaced" by these two young men. (Shannon Depo. P49 L12--P51 L25, P56 L10 (Def.Ex. E); Deposition of Joseph Hanson taken September 30, 2003 (hereinafter "Hanson Depo.") P50 L9--L13 (Def.Ex. C).) Accordingly, defendant's own assertions clearly show that plaintiff complained of discrimination.

### II. DEFENDANT KNEW OR SHOULD HAVE KNOWN THAT PLAINTIFF WAS ENGAGED IN A PROTECTED ACTIVITY UNDER CFEPA.

Plaintiff also brings a retaliation claim under the Connecticut Fair Employment Practices Act. Connecticut General Statutes §46a-60(a)(4) makes it a discriminatory employment practice:

> For any person, employer, labor organization or employment agency to discharge, expel or otherwise discriminate against any person because he has opposed any discriminatory employment practice ...

We look to federal law for guidance on interpreting state employment discrimination law, and the analysis is the same under both. Board of Education of the City of Norwalk v.

6

Commission On Human Rights and Opportunities, 266 Conn. 492, 832 A.2d 660 (2003); Craine v. Trinity College, 259 Conn. 625 (2002). Accordingly, because plaintiff has satisfied the elements necessary to establish a claim of retaliation under Title VII, she has also satisfied the requirements of retaliation under CFEPA.

### III. DEFENDANT MADE REPRESENTATIONS TO PLAINTIFF IT KNEW OR SHOULD HAVE KNOWN TO BE UNTRUE SUFFICIENT FOR SUMMARY JUDGMENT ON PLAINTIFF'S NEGLIGENT MISREPRESENTATION CLAIM.

Defendant's argument that it did not represent to plaintiff that her compensation would be reinstated is untrue and was actually made when defendant should have known it to be false. Moreover, "[E]ven an innocent misrepresentation of fact may be actionable if the declarant has the means of knowing, ought to know or has the duty of knowing the truth." Williams Ford, Inc. v. Hartford Courant Co., 232 Conn. 559, 575 (1995). The plaintiff need not prove that the representation made by the defendant was promissory, but only that it contained false information. Daley v. Aetna Life & Casualty Co., 249 Conn. 766, 793 (1999).

In the instant case plaintiff testified as follows:

Q. What do you mean by unrecoverable draw, or what did you understand that term to mean?
A. My understanding is that it doesn't have to be – that it was not applied against sales, that it is just another way of say this is a salary.
Q. In other words, the company couldn't get it back?
A. Well, they wouldn't –my understanding was, it sounds so harsh to say it that way. My understanding was that it was paid to me, not to be applied against future sales, but as an incentive to continue work.
Q. And that changed at some point, and your recollection is when, again, May 2001.
A. I believe May 2001.
Q. Um-hum. And how did it change?
A. It was discontinued. Again, I was told that there would be a new plan put into place.

(Blumenschine Depo P58 L7—L23.)

Furthermore, defendant admits plaintiff did not acquiesce to this change and relied upon defendant's promise to make good on her full compensation package by continuing to work:

7

Q. Did she make inquiry of you from time to time as to whether the commission plan you were working on was completed.
A. Yes.
Q. What did you tell her?
A. I told her I was struggling with it because the sales of the magazine were already paying our salespeople, in salary, approximately 50 percent of the revenue of the magazine. Typically, you try to have all sales expenses under 20 percent. With Curriculum Administrator those numbers are in the teens. So this magazine was underperforming for the number of salespeople we had and how much revenue they were bringing in.
Q. But it wasn't your intent to drop Ms. Blumenschine's total compensation package down to $80,000 was it?
A. She had already gotten the additional 20.
Q. Down to a hundred?
A. Right
Q. It wasn't your intent for the year to drop it down to a hundred, was it?
A. No, if sales had increased and given me something to hang my hat on. In retrospect I'm sorry I hadn't come up with a commission plan like I had for eMarketing. I had given them a two-year plan because of different timing. None of them made commission, but they had plans. We wouldn't be having this conversation if I had estimated it earlier. I was chasing a second target.
Q. But as far as you understood, Lisa came away from your meeting in April with an understanding that you were discontinuing the nonrecoverable draw, but she would wait to hear from you as to the basis her compensation would be going forward?
A. Yes. Commission going forward.
Q. Her total compensation package is what I was referring to. Yes?
A. Yes.

(Deposition of William Ziperman taken September 16, 2003 (hereinafter "Ziperman Depo.") P51 L22-- P53 L12 (Def.Ex. D).)

Q. And was it your intent to make this commission, when you came up with it, retroactive to that April date?
A. Retroactive to the beginning of the year.

(Ziperman Depo. P51 L7—L10 (Def.Ex. D).)

Accordingly, plaintiff's testimony held in juxtaposition with defendant's clearly shows that defendant told plaintiff that her compensation would be reinstated under a new "plan" despite that fact that it ought to have known this was not to be the case.

8

## IV. DEFENDANT'S APPLICATION OF LAW IN RELATION TO PLAINTIFF'S CLAIM OF PROMISSORY ESTOPPEL IS INCORRECT.

Defendant argues that only a promise sufficient to form an offer to a contract, can be the basis for promissory estoppel, citing D'Ulisse Cupo v. Board of Directors of Notre Dame High School, 202 Conn. 206 (1987). The Connecticut Supreme Court in Stewart v. Cendant Mobility Services Corp., 267 Conn. 96 (2003), recently flatly rejected this argument, confirming instead that at the heart of applying the doctrine of promissory estoppel is the recognition of a promise not an offer to contract.

> Although the promise must be clear and definite, it need not be the equivalent of an offer to enter into a contract because [t]he prerequisite for ... application [of the doctrine of promissory estoppel] is a *promise* and not a bargain and *not* an *offer*.(emphasis in the original)

Id. at 105.

Here, defendant promised plaintiff that she would be paid at an annual rate of $140,000, divided between a base salary of $80,000 and a non-recoverable draw of $60,000. (Defendant's Answer ¶10 (App.Ex. I); Ziperman Depo. P22 L1-3 (Def.Ex. D); Deposition of Daniel Kinnaman taken September 26, 2003 (hereinafter "Kinnaman Depo.") P27 L18-21 (Def.Ex. F); Hanson Depo. P27 L21-L23 (Def.Ex. C).)

Although having promised plaintiff annual compensation at an annual rate of $140,000 and paying plaintiff consistent with this promise for over a year, in May 2001, defendant unilaterally suspended the non-recoverable draw portion of plaintiff's compensation, which consisted of approximately $40,000. Plaintiff immediately told Mr. Ziperman, the General Manager, her concerns over this reduction in her compensation. (Ziperman Depo. P49 L5--P53 L17 (Def.Ex. D).) Mr. Ziperman repeatedly promised plaintiff that this was not a permanent suspension and that defendant would retroactively reinstate plaintiff's full compensation under a

9

new plan. Accordingly, it is the promise of reinstating plaintiff retroactively to her full annual compensation that is the basis for this portion of plaintiff's promissory estoppel claim. As for whether a promise was made, it is undisputed that there was a promise sufficient to satisfy the elements of promissory estoppel. Mr. Ziperman admits that he allayed plaintiff's concerns by assuring her that steps would be taken to retroactively reinstate her level of annual compensation. (Ziperman Depo. P49 L5--P53 L17 (Def.Ex. D).) Accordingly, a promise was made warranting summary judgment with regard to plaintiff's claim of promissory estoppel.

### V. DEFENDANT APPLIES IMPROPER LAW TO PLAINTIFF'S WAGE CLAIM PURUSUANT TO C.G.S. § 31-72.

Defendant's opposition to plaintiff's wage claim is puzzling where it totally ignores the wage statute's mandates. Stated otherwise, rather than address the language of the statute[6], defendant concocts its own prerequisite to establish a wage claim and states that plaintiff failed to meet it. Specifically, defendant states that plaintiff must show that a "promise" was made to pay her the <u>unpaid</u> portion of her wages, a test absent from C.G.S. §31-72 and wholly unsupported by caselaw or otherwise. Plaintiff was told her compensation was $140,000 per year, and defendant failed to pay this compensation, without plaintiff's consent. Accordingly, all elements of a statutory wage claim have been satisfied.

### CONCLUSION

For the foregoing reasons, plaintiff respectfully requests that plaintiff's Motion for Summary Judgment be granted.

---

[6] Connecticut General Statutes § 31-72 provides:

"When any employer fails to pay an employee wages in accordance with the provisions of sections 31-71a to 31-71i, inclusive, or fails to compensate an employee in accordance with section 31-76k ... such employee ... may recover, in a civil action, twice the full amount of such wages, with costs and such reasonable attorneys fees as may be allowed by the court...."

10

By: /s/ _____
Scott R. Lucas (ct00517)
Mary Alice S. Canaday (ct17608)
Michel Bayonne (ct24628)
*Attorneys for Plaintiff*
*Lisa K. Blumenschine*
MARTIN, LUCAS & CHIOFFI, LLP
177 Broad Street
Stamford, CT 06901
Phone: (203) 973-5200
Fax: (203) 973-5250
slucas@mlc-law.com
mcanaday@mlc-law.com
mbayonne@mlc-law.com

## CERTIFICATE OF SERVICE

This is to certify that on this 10th day of February, 2004, a copy of the foregoing was mailed, first class, postage prepaid, to:

George P. Birnbaum, Esq.
Thomas P. Minogue, Esq.
Michael L. Ferch, Esq.
Minogue Birnbaum LLP
237 Elm Street
New Canaan, CT 06840
Phone: (203) 966-6916
Fax: (203) 966-6917

_____
Scott R. Lucas