```
                    UNITED STATES DISTRICT COURT
                      DISTRICT OF CONNECTICUT

  LISA K. BLUMENSCHINE,           :
                                  :
       Plaintiff,                 :
                                  :
    v.                            :   No. 3:02CV2244(DJS)
                                  :
  PROFESSIONAL MEDIA GROUP LLC,   :
                                  :
       Defendant.                 :
                                  :
```

## MEMORANDUM OF DECISION

On December 17, 2002, plaintiff Lisa Blumenschine filed this action alleging that defendant, Professional Media Group LLC ("ProMedia"), her employer, discriminated against her on the basis of her sex and age in violation of Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e et seq.; the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 et seq.; and the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. §§ 46a-60 et seq.  Blumenschine also brings claims alleging promissory estoppel, negligent misrepresentation, and failure to pay wages in violation of Section 31-72 of the Connecticut General Statutes.  On December 8, 2003, pursuant to Rule 56(b) of the Federal Rules of Civil Procedure, ProMedia (dkt. # 21) and Blumenschine (dkt. # 25) filed a motions for summary judgment.  For the reasons set forth herein, both motions are **DENIED**.

**I. FACTS**

Plaintiff, Lisa K. Blumenschine, was 49 years old when she began her employment with ProMedia on January 31, 2000. ProMedia's principal place of business is located in Norwalk, Connecticut, and it publishes two magazines intended for use by persons who work in the higher education field: "District Administration" and "University Business," which was formerly known as "Matrix." During the time of the events pertinent to Blumenschine's claims, Joseph Hanson was managing partner and co-owner of ProMedia, and William Ziperman was General Manager. Daniel Kinnaman was Publisher of "Matrix" at the time Blumenschine was hired, and Daniel Shannon took over the position of Publisher and Vice President of "Matrix" when Kinnaman relinquished his position and became a part-time employee of ProMedia in September of 2001. ProMedia consisted of thirty-two employees, fourteen of whom were women and eighteen persons over the age of forty. At the time of Blumenschine's employment, ProMedia did not have a Human Resources Department.

Based upon the record, Blumenschine and ProMedia had different views about Blumenschine's position. Blumenschine's job title at the time she was hired was National Sales Manager, and one of her responsibilities was to sell advertising space in "Matrix." At the time Blumenschine began working at ProMedia, "Matrix" was a start-up magazine that was distributed free of

charge to persons working in the higher education field.  Because copies of "Matrix" were largely given away for free, the revenue ProMedia received from "Matrix" was derived almost exclusively from the sale of advertising space.  ProMedia's management has indicated that they wanted Blumenschine to focus on generating greater sales.  Blumenschine considered her move to ProMedia as a lateral move from her sales position at her former company.

While ProMedia's management maintains that Blumenschine's focus should have been almost exclusively on sales, Blumenschine did have additional responsibilities, and she expressed her wish to attain more managerial responsibility.  In an offer of employment letter dated January 7, 2000, ProMedia outlined Blumenschine's job description as follows: being in charge of selling advertising space for "Matrix"; developing overall sales and marketing strategy for "Matrix"; participating in the hiring of additional sales people; participating in the development of sales support materials; participating in the development of business show participation; and supervising the overall sales efforts with respect to "Matrix."  Blumenschine's sales territory consisted of the East Coast and certain selected key accounts.  ProMedia's offer letter also stated that Blumenschine's monthly salary would be $6,666.66 for the year 2000 in addition to money earned pursuant to the terms of a compensation and bonus plan.  In September of 2001, Blumenschine was promoted to Associate

Publisher.

Prior to New Year's Day of 2002 and on January 3, 2002, when Blumenschine arrived to work she was told by Shannon that she should just sit at her desk, not make any telephone calls, not make any appointments or do anything. ProMedia terminated Blumenschine's employment on January 3, 2002.

ProMedia claims that Blumenschine was terminated because she failed to generate sufficient advertising sales for "Matrix." Joseph Hanson claims that he had numerous casual conversations with Blumenschine regarding her poor advertising sales and that she asked him on several occasions if her job was in jeopardy. Hanson claims that he told Blumenschine that he needed to see more growth in her sales. Hanson also claims that Blumenschine's being named Associate Publisher was not an actual promotion because Blumenschine did not receive more responsibility and she received no increase in her compensation.

Shannon, who was Blumenschine's direct supervisor, stated the following about the decision to terminate her employment: "[b]ecause [Blumenschine's] performance did not improve, it was decided in late fall or early December to sever her employment as a result of her poor sales. We waited until after the holidays to do this. The decision was approved by my superiors, including William Ziperman." (Dkt. # 27, Ex. K (Shannon Aff.) ¶ 14). Shannon also states that he hired two men in December of 2001 who

previously sold advertising for "University Business," which competed with "Matrix." Shannon claims that he hired these men because ProMedia was acquiring "University Business" and these men had been extremely successful in generating sales. (See id. ¶ 15). ProMedia eventually did acquire "University Business," which replaced ProMedia's "Matrix" publication. Shannon claims that Blumenschine questioned him as to whether she was going to be fired and when was the company going to "put her out of her misery."

ProMedia also claims that its treatment of other employees does not permit the inference that it unlawfully discriminated against Blumenschine. ProMedia stated that George Saroyan, another salesperson, was terminated for poor sales performance. Another employee, Melanie Jenkins, who is 46 years old and handled the Midwest advertising sales territory for "Matrix," was employed by ProMedia and had higher advertising sales during the same period of time that Blumenschine worked for the company. ProMedia also points out that Jenkins has, at times, been amongst the most highly compensated ProMedia employees.

Blumenschine claims that her employment was terminated because of her sex, age, and in retaliation for her protesting ProMedia's discriminatory conduct. Blumenschine admits that her sales for September through November of 2001 were below her expectations, and that she discussed her view in general with

Kinnaman, but she claims that she did not fail to meet any specific sales requirements. Blumenschine also points out that she was promoted to Associate Publisher on September 15, 2001, less than four months before her termination. Although ProMedia claims that the change in title was not a promotion and was done merely to appease Blumenschine's requests for more responsibility, Ziperman stated the following in an e-mail sent to all ProMedia employees:

> I'm pleased to announce that Lisa Blumenschine has been promoted to Associate Publisher for Matrix.
>
> This is good news for Matrix. Lisa has been with Matrix since its launch and has done a terrific job helping the book get established in the higher education market. She has contributed greatly to Matrix' steady growth and this new position will allow her to use more of her skills as we move the magazine to the next level.

(Dkt. # 27 Ex. J). ProMedia, according to Blumenschine, knew, to some degree, about her sales performance through November of 2001 when they promoted her. Blumenschine claims that she did not suspect that her job was in jeopardy until ProMedia took an interest in acquiring "University Business" and hiring the two younger men in December of 2001.

Blumenschine claims that Shannon, who ceased working on another ProMedia publication to become her supervisor in September of 2001, treated her poorly for unlawfully discriminatory reasons. While attending conferences and conventions, Blumenschine claims Shannon would "let his hair down

and say things that were inappropriate" (dkt. # 24 at 246:20-21), including what Blumenschine considered to be sexist comments. Blumenschine also claims that after Shannon became her supervisor she was excluded from strategic meetings and important lunches with the other members of management. When Blumenschine asked to be included in these meetings or lunches, Shannon told her that he would fill her in with what she needed to know.  Blumenschine claims that she complained to Shannon about this and told him he was creating a "boys' club."[1]  Blumenschine further claims that after she complained to Mr. Shannon about the "boys' club," he treated her disrespectfully and disregarded any ideas that she had regarding "Matrix."  Even though Blumenschine made these complaints to Shannon, she felt she had no other recourse because ProMedia did not have a Human Resources Department and she was told to report to Shannon only.  Finally, Blumenschine contends that Shannon indicated to her that he was going to hire "two bright young energetic guys" (dkt. # 24 Ex. B at 213:10) in December of 2001.[2]  Blumenschine believes the two men that were hired took her place.

Blumenschine also claims that ProMedia has not paid her

---

[1] Shannon admits that Blumenschine referred to ProMedia's all-male management team as a "boys' club."  (Dkt. # 27, Ex. K ¶ 11).

[2] Shannon denies making this statement.  (See Dkt. # 27, Ex. K ¶ 15).

wages she earned pursuant to the compensation and bonus plan. ProMedia agreed to compensate Blumenschine at the rate of $6,666.66 per month, or $80,000 per year, plus a non-recoverable draw against commissions earned of $60,000. In May of 2001, ProMedia discontinued the non-recoverable draw portion of Blumenschine's compensation because, according to ProMedia, the revenues earned from "Matrix" had not met ProMedia's projections and Blumenschine would not earn enough in commissions to justify the non-recoverable draw. Despite Blumenschine's requests for a new commission program, one was never implemented prior to her termination, and she did not receive the remainder of the $60,000 non-recoverable draw she alleges was due to her for the year 2001.

## II.  DISCUSSION

Blumenschine complains that ProMedia terminated her employment in violation of Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act ("ADEA"), and the Connecticut Fair Employment Practices Act ("CFEPA"). Blumenschine claims that ProMedia's termination of her employment was based upon three illegal forms of discrimination: sex discrimination (First and Third Counts); age discrimination (Second and Third Counts); and retaliation (Fourth, Fifth, and Sixth Counts). Blumenschine also alleges promissory estoppel (Seventh Count), negligent misrepresentation (Eighth Count), and

failure to pay wages in violation of Section 31-72 of the Connecticut General Statutes (Ninth Count).  Because neither party has demonstrated that it is entitled to judgment as a matter of law, both motions for summary judgment are denied.

### A.  STANDARD

A motion for summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Summary judgment is appropriate if, after discovery, the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "The burden is on the moving party 'to demonstrate the absence of any material factual issue genuinely in dispute.'"  American Int'l Group, Inc. v. London Am. Int'l Corp., 664 F.2d 348, 351 (2d Cir. 1981) (quoting Heyman v. Commerce & Indus. Ins. Co., 524 F.2d 1317, 1319-20 (2d Cir. 1975)).  A dispute concerning a material fact is genuine "'if evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 523 (2d Cir. 1992) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  The court must view all

inferences and ambiguities in a light most favorable to the nonmoving party.  See Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991).  "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper."  Id.

### B.  DISCRIMINATION CLAIMS

The court applies the same framework for each of Blumenschine's discrimination claims, which are discussed collectively herein.  In McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973), the Supreme Court established an "allocation of the burden of production and an order for the presentation of proof in Title VII cases."  Under that framework, a plaintiff alleging a violation of the anti-discrimination statutes establishes a prima facie case by showing she:  (1) was a member of a protected class; (2) was qualified for the position she held; (3) suffered an adverse employment action; (4) in circumstances giving rise to an inference of discrimination.  See Schnabel v. Abrahmson, 232 F.3d 83, 87 (2d Cir. 2000); see also Texas Dept. Of Community Affairs v. Burdine, 450 U.S. 248, 253 (1985) ("Plaintiff must prove by a preponderance of the evidence that she applied for an available position for which she was qualified, but was rejected under circumstances which give rise to an inference of unlawful discrimination."); Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001) ("To establish a prima facie case of age discrimination, a plaintiff

-10-

must show four things: (1) he is a member of the protected class; (2) he is qualified for his position; (3) he has suffered an adverse employment action; and (4) the circumstances surrounding that action give rise to an inference of age discrimination.") (footnote omitted); Quinn v. Green Tree Credit Corp., 159 F.3d 759, 769 (2d Cir. 1998) ("To establish a prima facie case of retaliation, an employee must show [1] participation in a protected activity known to the defendant; [2] an employment action disadvantaging the plaintiff; and [3] a causal connection between the protected activity and the adverse employment action.").  If the plaintiff establishes a prima facie case, the employer has the burden of articulating a "legitimate, nondiscriminatory reason" for the adverse employment action. Stern v. Trustees of Columbia University, 131 F.3d 305, 312 (2d Cir. 1997).  If the employer does so, the plaintiff must prove by a preponderance of the evidence that the employer's proffered explanation is unworthy of credence, and that the true reason for the employer's action was discrimination.  See id.

     The parties have both met their respective preliminary burdens with respect to each discrimination claim.  Blumenschine has adequately demonstrated a prima facie case of sex discrimination, age discrimination, and retaliation.[3]  ProMedia

---

[3] ProMedia's persistent arguments that Hanson, who was not aware of Blumenschine's comments to Shannon that are the basis of her retaliations claims, took sole responsibility for the

has met its obligation by stating that it terminated Blumenschine's employment because of her poor sales.  This offer of proof is sufficient to meet ProMedia's burden at this stage in the analysis.  See Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 142 (2000) ("the burden is one of production, not persuasion").

The ultimate question in an employment discrimination case is whether the evidence offered can reasonably and logically give rise to an inference of discrimination under all of the circumstances.  See Reeves, 530 U.S. at 148; Bickerstaff v. Vassar College, 196 F.3d 435, 448 (2d Cir. 1999).  That is, "the final burden rests on the plaintiff to prove not only that the proffered nondiscriminatory reason was pretextual but also that the defendant discriminated against the plaintiff."  Slattery v. Swiss Reinsurance America Corp., 248 F.3d 87, 91 (2d Cir. 2001); see also Reeves, 530 U.S. at 143.  Blumenschine may be able to meet her ultimate burden.  A jury could find in Blumenschine's favor on each of her discrimination claims because, based upon the evidence submitted, she may be able to prove the following.  Blumenschine could show that, despite her recent promotion, Shannon decided to terminate her employment because she

---

decision to terminate Blumenschine's employment ignores contrary evidence, in particular testimony from Shannon.  Although ProMedia may be able to persuade a jury to adopt this position, the court cannot do so at this stage.

complained about ProMedia being a "boys' club" and not because of her sales performance.  Further, the evidence could show that, when "University Business" and two of its younger male salespersons became available, Shannon decided to remove Blumenschine in favor of the two younger men.  If the factual dispute regarding the timing of the events preceding Blumenschine's termination is resolved in her favor, (see dkt. # 32 ¶¶ 67-27 and responses thereto), despite the apparent contemporaneous decline in her sales, the trier of fact could infer that ProMedia terminated Blumenschine and replaced her with two younger men for each of the unlawfully discriminatory reasons alleged in the complaint.

Neither party has demonstrated that there is no genuine issue of material fact for trial with respect to each of Blumenschine's discrimination claims.  Therefore, both motions for summary judgment are denied.

### C. COMPENSATION CLAIMS

The parties' motions are denied with respect to Blumenschine's promissory estoppel, negligent misrepresentation, and Section 31-72 claims.  Each of these claims is based upon ProMedia's alleged promise in its offer letter to Blumenschine to pay her an $80,000 base salary and $60,000 as a non-recoverable draw against commissions earned pursuant to a program that ProMedia discontinued in May of 2001.  Blumenschine seeks to

enforce both ProMedia's alleged promise to pay her a total of $140,000 per year and ProMedia's promise to implement a substitute commission compensation plan.  She also claims that the unpaid balance of the $140,000 owed to her is being withheld in violation of Section 31-72, which prohibits unlawfully withholding payment of wages.

The state of the record is such that there is more than one reasonable conclusion to be drawn regarding why Blumenschine was entitled to the full $60,000 non-recoverable draw in 2001 and what was said to her when she first accepted the position.  Because the record does not permit only one reasonable conclusion, judgment as a matter of law in favor of either party is not appropriate.

### III. CONCLUSION

For the foregoing reasons, ProMedia's (dkt. # 21) and Blumenschine's (dkt. # 25) motions for summary judgment are **DENIED**.  The parties shall file a joint trial memorandum on or before **January 13, 2006** and shall contact the undersigned's chambers during the week of **November 14, 2005** in order to schedule a settlement conference with this court's parajudicial officer.  So ordered this 9th day of November, 2005.

/s/DJS
_____
            **DOMINIC J. SQUATRITO**
         **UNITED STATES DISTRICT JUDGE**