**EXHIBIT E**

1  documents that Ms. Blumenschine made a comment to

2  Mr. Shannon about the management of Pro Media being a

3  "boys' club." Are you aware of that?

4      A    I was unaware of it until the litigation

5  started.

6      Q    So Mr. Shannon never brought it to your

7  attention?

8      A    I don't believe so.

9      Q    How did you become aware of it?

10     A    As part of the litigation.

11     Q    But from what source? I don't want it from

12 counsel.

13              MR. MINOGUE:  Excluding --

14     Q    Excluding counsel. If you only learned

15 about it from counsel, just tell me you can't answer.

16     A    I just don't remember.

17     Q    Did Mr. Shannon tell you that

18 Ms. Blumenschine had made this complaint? At any time

19 did he tell you this?

20     A    I believe after it -- I mean, it was

21 certainly discussed with him after -- I don't remember

22 what came first.

23     Q    Mr. Shannon was instrumental in the hiring

24 of those two individuals we just discussed, the

25 salespeople from University Business, correct?

75

1      A      He recommended that they be hired.

2      Q      And he also recommended that Lisa be

3  terminated, correct?

4      A      Yes.

5      Q      Who else was involved in the termination

6  decision?

7      A      Joe Hansen and myself.

8      Q      You made a decision to terminate her,

9  correct?

10     A      Eventually, yes.

11     Q      Was that based at least in part on

12  Mr. Shannon's recommendation?

13     A      Small part.  The real -- my basis for -- her

14  performance in the last three months was clearly, you

15  know, declining past the point of almost being visible.

16     Q      Did you talk to her about that?

17     A      No.

18     Q      Why not?

19     A      Because she worked directly for Dan.

20     Q      You didn't think it would be appropriate,

21  since you had just promoted her and given her a memo of

22  accolades, that perhaps you ought to talk to her that

23  her job from September, mid September, through the next

24  90 days dropped so dramatically she was in danger of

25  being fired?

**EXHIBIT F**

Westlaw.

Not Reported in F.Supp.2d                                    Page 1

Not Reported in F.Supp.2d, 2005 WL 712232 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
   United States District Court,S.D. New York.
   L-3 COMMUNICATIONS CORPORATION,
        Plaintiff and Counterclaim Defendant,
                        v.
OSI SYSTEMS, INC., Defendant and Counterclaim
                    Plaintiff.
               **No. 02 Civ. 9144(DC).**

                 March 28, 2005.

Proskauer Rose LLP, By: Steven M. Kayman,
Michele M. Ovesey, Kevin J. Perra, Joanna Smith,
New York, New York, for Plaintiff and
Counterclaim Defendant.
Sidley Austin Brown & Wood LLP, By: John J.
Kuster, New York, New York, Howard J. Rubinroit
, Los Angeles, California, for Defendant and
Counterclaim Plaintiff.

             *MEMORANDUM DECISION*
CHIN, J.
**\*1** Plaintiff L-3 Communications Corporation ("L-3
") and defendant OSI Systems, Inc. ("OSI")
cross-move for summary judgment on a number of
claims and counterclaims in this diversity suit. The
issues presented include whether L-3 acted
improperly when it purchased and retained the
Detection Systems division (the "Business") of
PerkinElmer, Inc. ("PEI"); whether both parties
negotiated in good faith for OSI to acquire a portion
of the Business; and whether OSI breached the
parties' agreements in its communications with third
parties. In addition, OSI moves to strike two
declarations submitted as part of L-3's opposition to
OSI's motion for summary judgment. For the
reasons stated below, the motion to strike is granted
in part and denied in part and the cross-motions for
summary judgment are denied except as to two
claims. I address first OSI's motion to strike, second
OSI's counterclaims, and third L-3's claims.

              *A. Motion to Strike*

OSI moves to strike the declarations of Ian Newson
and Angus de Villiers on the grounds that: (1) L-3
violated its duty to make the declarants available as
corporate deponents pursuant to Fed.R.Civ.P.
30(b)(6); (2) the declarations create an issue of fact
only by contradicting the Rule 30(b)(6) witness; (3)
the declarations are replete with hearsay; and (4)
L-3 failed to initially disclose Newson's existence,
violating Fed.R.Civ.P. 26 and warranting preclusion
of the declaration pursuant to Fed.R.Civ.P. 37(c)(1)
   L-3 counters that there is no justification for
precluding the declarations and that it will suffer
severe prejudice if the declarations are struck.

OSI's motion to strike is denied as to de Villiers's
declaration. First, under Rule 30(b)(6), a company
has a duty to designate a deponent to testify "as to
matters known or reasonably available to the
organization." During deposition, the 30(b)(6)
deponent presents the corporation's "position" on
the topics. *Twentieth Century Fox Film Corp. v.
Marvel Enters.*, No. 01 Civ. 3016, 2002 U.S. Dist.
LEXIS 14682, \*7 (S.D.N.Y. Aug. 8, 2002) There
is no duty to make all people with knowledge of the
facts available. Moreover, the deponent does not
have to have personal knowledge to be a proper
Rule 30(b)(6) witness, so long as he or she is
prepared to provide information known to the
company. *See id.* at \*6-7 ("the duty to present and
prepare a Rule 30(b)(6) designee goes beyond
matters personally known to that designee or to
matters in which that designee was personally
involved") (quotations and citation omitted). Here,
L-3 designated Stephen Meltz, an employee of L-3
and a former vice president of PEI, the business at
the center of the parties' dispute, as a Rule 30(b)(6)
witness. L-3 did not have a duty to also designate de
Villiers as a Rule 30(b)(6) witness

Second, de Villiers's declaration did not contradict
Meltz's testimony in a way material to these
cross-motions. OSI is correct that a party may not

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 712232 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that contradicts the affiant's previous deposition testimony. *Hayes v. New York City Dep't of Corrections,* 84 F.3d 614, 619 (2d Cir.1996) (citing *Perma Research & Dev. Co. v. The Singer Co.,* 410 F.2d 572, 578 (2d Cir.1969)). It is appropriate to strike a declaration if it "states legal and factual positions that vary materially with those taken by the corporate representative." *See Rainey v. American Forest & Paper Assoc.,* 26 F.Supp.2d 82, 96 (D.C.Cir.1998). Still, contradictory portions of an affidavit may be struck while supplemental portions are considered. *See Newport Elec., Inc. v. Newport Corp.,* 157 F.Supp.2d 202, 220 (D.Conn.2001). Here, the declaration tends to support Meltz's testimony and provide added corroborating detail.

**\*2** Third, it is possible to find portions of the declaration inadmissible as hearsay without striking the declaration in its entirety. *See, e.g., LaSalle Bank Nat'l Ass'n v. Citcorp Real Estate Inc.,* No. 02 Civ. 7868, 2003 U.S. Dist. LEXIS 15069, \*29-33 (S.D.N.Y. Aug. 29, 2003). OSI's objections to the hearsay statements in the declaration and Meltz's testimony are acknowledged, and these hearsay statements have not been relied on in this decision.

OSI's motion to strike is granted as to Newson's declaration because L-3 violated Rule 26 by not disclosing Newson as a potential witness. Under Rule 26, a party is required to name "each individual likely to have discoverable information that the disclosing party may use to support its claims or defenses." Fed.R.Civ.P. 26(a)(1)(A). Parties that fail to disclose evidence in discovery may be precluded from relying on that evidence at trial or in motion practice.

A party that without substantial justification fails to disclose information required by Rule 26(a) ... is not, unless such failure is harmless, permitted to use as evidence at trial, at a hearing, or on a motion any witness or information not so disclosed.

Fed.R.Civ.P. 37(c)(1).

When deciding whether to exclude undisclosed evidence, courts should consider, *inter alia,* the importance of the evidence, the prejudice to the opposing party of allowing the use of the evidence, and any explanation for failure to disclose the evidence. 6 James Wm. Moore et al., *Moore's Federal Practice* § 26.27[2][b] (2004) (citing cases; footnotes omitted).

Here, Newson's declaration provides evidence in support of L-3's claims. L-3 admits, however, that Newson's name was not among those identified in L-3's initial disclosures. Although L-3 claims that Newson was identified in documentary evidence-an e-mail dated April 4, 2002-produced prior to Meltz's deposition, L-3 supplies no evidence of when OSI received a copy of the e-mail or whether OSI actually became aware of Newson, and mere mention of Newson's name in an e-mail did not give OSI sufficient notice that Newson would be called as a witness. If L-3 had wanted to use Newson's testimony to support its claims, it should have identified him previously as an individual who had knowledge of the claims. Accordingly, Newson's declaration is struck pursuant to Rule 37.

### B. *OSI's Counterclaims*

FN1. The choice-of-law issues were decided in my memorandum decision (the "January 2004 Decision") granting in part and denying in part L-3's motion to dismiss OSI's counterclaims. *See L-3 Communications Corp. v. OSI Systems, Inc.,* No. 02 Civ. 9144(DC), 2004 U.S. Dist. LEXIS 165 (S.D.N.Y. Jan. 8, 2004). As I held in that decision, California law applies to OSI's tort counterclaims and New York law applies to OSI's contract counterclaims. *Id.* at \*7-9.

New York law also applies to L-3's claims. L-3's contract claims involve the parties' amended letter of intent ("Amended LOI") and the Confidentiality Agreement, which both provide that they "shall be governed by and construed in accordance with the internal laws of the State of New York." (Smith Decl. Ex. 1, Ex. 55.) As to L-3's tort claims, the parties agree that New

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                            Page 3

Not Reported in F.Supp.2d, 2005 WL 712232 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

York law applies. Although the tortious conduct alleged by L-3 occurred in countries around the world, there are contacts to New York, including the location of L-3's principal place of business in New York, L-3 allegedly suffered damages in New York, and at least some of the alleged tortious conduct occurred in New York.

OSI moves for partial summary judgment on its counterclaim that L-3 breached a fiduciary duty owed to OSI when it purchased and retained the Business. L-3 cross-moves for summary judgment to dismiss that counterclaim as well as OSI's related counterclaims of fraud, negligent misrepresentation, constructive fraud, and breach of contract. I first discuss the tort counterclaims and then discuss OSI's counterclaim that L-3 breached the parties' amended letter of intent (the "Amended LOI").

### 1. OSI's Tort Counterclaims

OSI's counterclaims depend on a determination of the obligations L-3 owed to OSI and whether L-3 met those obligations. OSI argues that L-3 thwarted OSI's opportunity to purchase two components of the Business by promising to protect OSI's interests and instead using L-3's position of relative power to retain the entire Business. L-3 counters that the only possible binding agreement between the parties was their agreement to negotiate in good faith for OSI's potential purchase of the Components (the "Possible Transaction"), and that the parties had no further obligations to each other and the negotiations simply broke down.

FN2. In the parties' original letter of intent (the "Original LOI"), they agreed to jointly purchase the Business for up to $85 million and to distribute to OSI the conventional and industrial imaging portions of the Business, in addition to a detection system product then in development (referred to as "Argus"), and distribute to L-3 the cargo and automated hold baggage scanning portions of the Business. (Kuster Aff. Ex. 27). Those components of the Business that the parties agreed would be acquired by OSI are referred to herein as the "Components."

*3 OSI first claims that L-3 breached a fiduciary duty owed to OSI. This claim presents two issues on the merits: (i) the existence of a fiduciary duty and (ii) the breach of any such duty. See Stanley v. Richmond, 35 Cal.App. 4th 1070, 1086 (Cal.Ct.App.1996). Whether L-3 owed OSI a fiduciary duty "should be resolved by looking to the particular facts and circumstances of the relationship at issue." In re Daisy Sys. Corp., 97 F.3d 1171, 1178 (9th Cir.1996). On the undisputed facts here, a reasonable jury could only find that L-3's commitments to OSI created a fiduciary duty. As L-3's chief executive officer admitted in his deposition testimony, L-3 agreed to submit a bid to PEI to purchase the Business on behalf of both parties, but in L-3's name only. (Lanza Dep. at 205-08). Likewise, L-3's general counsel testified that L-3 had access to information about the Business that OSI did not have and told OSI that L-3 "intended to sell [OSI] the conventional and ARGUS business." (Cambria Dep. at 99-109). OSI agreed to this arrangement and thus L-3 undertook to act in part on OSI's behalf. Thus the record shows as a matter of law that L-3 was in a position superior to OSI in respect to the purchase of the Business, and that OSI and L-3 entered into a confidential relationship, with L-3 accepting OSI's trust and confidence and agreeing to act on both their behalf. See Barbara A. v. John G., 145 Cal.App.3d 369, 382-83 (Cal.Ct.App.1983) ("[A fiduciary] relation ordinarily arises where a confidence is reposed by one person in the integrity of another, and ... the party in whom the confidence is reposed ... voluntarily accepts or assumes to accept the confidence.... The essence of a fiduciary or confidential relationship is that the parties do not deal on equal terms, because the person in whom trust and confidence is reposed and who accepts that trust and confidence is in a superior position to exert unique influence over the dependent party."); GAB Business Servs., Inc. v. Lindsey & Newsom Claim Servs., 83 Cal.App.4th 409, 416 (Cal.Ct.App.2000).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 4

Not Reported in F.Supp.2d, 2005 WL 712232 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Negotiating parties generally do not owe fiduciary duties to each other. *See Worldvision Enters., Inc. v. ABC, Inc.,* 142 Cal.App.3d 589, 594 (Cal.Ct.App.1983) (the relationship between parties negotiating to divest a subsidiary is "wholly inconsistent with the fiduciary relationship advocated by plaintiff"). But here OSI and L-3 went beyond negotiations, as L-3 agreed to act on both their behalf. A fiduciary duty was created.

As to the second inquiry, however, triable issues of fact exist, including whether L-3 breached the alleged duty by: withholding information about the Business and the L-3/PEI deal from OSI, restricting OSI's access to Business personnel, utilizing Business employees for its own tasks, and retaining the Components of the Business that L-3 and OSI agreed would be purchased by OSI. Although the Amended LOI "did not obligate the parties to reach a final agreement on the terms of OSI's acquisition of the Business from L-3," a fiduciary relationship could create obligations beyond the scope of the Amended LOI. *See L-3 Communications Corp.,* 2004 U.S. Dist. LEXIS 165 at *25.

**\*4** More generally, a material issue of fact exists as to whether L-3 actually intended to sell the Components-or the portions of the Components that it believed were valuable-to OSI. This issue is relevant to OSI's other counterclaims, including promissory fraud, negligent misrepresentation, and constructive fraud, all of which L-3 moves to dismiss.

OSI provides some evidence that it was misled by L-3 about OSI's potential purchase of the Components, but it is necessary for a fact-finder to determine from the totality of the evidence whether L-3 intended to sell OSI the Components. For example, in January 2002 the president of L-3's detection systems division told third parties that L-3 would not sell the Components to OSI. (Soshnick Dep. at 57; Ellenbogen Dep. at 201). This is some evidence of fraud and misrepresentation, but a finder of fact must consider L-3's assertions that the official did not speak for L-3 and that it intended to sell OSI the Components. The same official allegedly pressured a company involved in the development of a Business product to object to the

transfer of the product to OSI. (Soshnick Dep. at 117-18 (testifying that "I got so alarmed about the possibility that I might be accused of being involved in a criminal conspiracy that I called [L-3 counsel] Chris Cambria to tell him what [the official] was doing")). Evidence of the conduct of L-3 at the time the promises were made and throughout the negotiation process must be weighed by a fact-finder, along with OSI's alleged reliance on them.

L-3 argues that by entering into the Amended LOI, OSI waived its right to assert fraud claims. As I concluded in the January 2004 Decision, however, " [w]hether OSI was fully aware of the alleged fraud before it entered into the Amended LOI is a question of fact." *L-3 Communications Corp.,* 2004 U.S. Dist. LEXIS 165 at *11. At this stage, the parties have put forward conflicting evidence as to whether OSI knew of the evidence that it is now relying on in asserting its fraud counterclaim, presenting another matter for the finder of fact. A reasonable jury could find that OSI was aware of L-3's alleged fraud and waived its right to assert the claim or, on the other hand, that OSI entered into the Amended LOI in reliance on L-3's fraudulent statements. *See Ingram v. Old Line Ins. Co. of Am.,* No. C98-2422, 1999 U.S. Dist. LEXIS 9346, *8-9 (N.D. Cal. June 21, 1999) ("information that, in retrospect, might make one wonder, is not actual knowledge that distinctly implies" misrepresentation (quotes and citation omitted)).

OSI also claims that L-3 is an involuntary trustee of the Components, holding them in constructive trust for OSI with a duty to convey the Components to OSI. This claim raises additional issues for trial.

### 2. OSI's Contract Counterclaim

L-3 also moves to dismiss OSI's counterclaim for breach of the Amended LOI. The Amended LOI, approved by both parties on August 13, 2002, "set forth the major terms and conditions of a proposed acquisition by OSI from L-3" of the Components. (Smith Decl. Ex. 1). It provided that the parties " shall proceed to prepare and negotiate in good faith definitive agreements reflecting the terms and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                Page 5

Not Reported in F.Supp.2d, 2005 WL 712232 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

conditions contained in this Amended LOI." (*Id* ¶ 5). Although the parties were not bound by all its provisions, the Amended LOI states that the provision to negotiate in good faith is binding. (*Id* ¶ 6).

*5 L-3 claims that the Amended LOI is not enforceable, despite the fact that L-3 also seeks a declaratory judgment that it "fulfilled all of its obligations" under the Amended LOI; claims that the Amended LOI "expressly imposed upon OSI the duty to deal and negotiate in good faith definitive agreements to consummate the Proposed Acquisition " and that OSI breached its duty; and argues that by signing the Amended LOI, OSI waived its claims of fraud (Am. Compl ¶¶ 35-37, 43-45; L-3 Mem. of Law at 30-32). I cannot find as a matter of law that the Amended LOI is so vague or indefinite as to be unenforceable.

A finding that the agreement is enforceable is a separate inquiry from whether the duty to negotiate in good faith was breached. The terms of the agreement help determine whether the parties are complying with the duty. *See Teachers Ins & Annuity Ass'n v. Tribune Co.*, 670 F. Supp 491, 498 (S.D.N.Y 1987) ("the parties can bind themselves to a concededly incomplete agreement in the sense that they accept a mutual commitment to negotiate in good faith in an effort to reach final agreement within the scope that has been settled in the preliminary agreement"). The duty to negotiate in good faith "bar[s] a party from renouncing the deal, abandoning the negotiations, or insisting on conditions that do not conform to the preliminary agreement." (*Id*). Here, L-3 and OSI were not obligated to reach a final agreement, but neither can they rely on the Amended LOI being a preliminary agreement to avoid liability for bad-faith dealing.

Material issues of fact exist as to whether L-3 violated the Amended LOI by failing to negotiate in good faith. For example, the record contains contradictory evidence about L-3's efforts to close the deal. OSI argues that L-3's efforts to sell the Components to OSI were superficial and that L-3 had no intention of consummating the deal. It claims that L-3 negotiated in good faith only when L-3 thought an acquisition by OSI would be

required by the government and otherwise went through the motions of negotiations to avoid liability. L-3, on the other hand, claims it spent enormous time and resources to "get this deal done." (L-3 Mem. of Law at 22; Cambria Decl. ¶ 3).

L-3 argues that it had no interest in retaining the " conventional or Argus business lines," which it claims evidences its intent to negotiate in good faith to sell the Components. Whether statements to this effect contradict other claims by L-3 that a decision regarding how to divide overlapping intellectual property was the critical issue in the negotiations is an issue of fact for trial. The record provides contradictory evidence in respect to the parties' understandings about the definition of the Components and what, if any, products, employees, and intellectual property were considered part of the Components mentioned in the Amended LOI. L-3 claims that the definitions and details about what was included with the Components were subject to negotiations, while OSI claims that the definition of the Components was clear from the language of the Amended LOI. OSI additionally points to a memorandum prepared for the sale of the Business, conversations between the parties, and industry knowledge in making its claim. OSI argues that L-3 violated its duty to negotiate in good faith by attempting to redefine precise terms in the Amended LOI with the purpose of retaining the valuable portions of the Business. L-3 counters that the Amended LOI does not include terms related to these issues.

*6 In sum, material issues of fact exist as to whether L-3 sought to retain portions of the Business that the parties had agreed would be acquired by OSI and whether L-3's negotiations were reasonable or designed to prevent OSI's acquisition of the Components.

### 3 *OSI's Damages*

L-3's motion to limit the potential damages that OSI can recover to reliance damages is premature. In an order dated April 29, 2004, I noted that at the time I set a schedule for the instant cross-motions for summary judgment, "[t]here was some discussion of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 6

Not Reported in F.Supp.2d, 2005 WL 712232 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

experts, and I ruled that expert discovery with respect to damages could be deferred until after I ruled on the summary judgment motions." The legal issues related to damages should also be addressed after this decision is entered.

### C. L-3's Claims

OSI moves to dismiss L-3's claims that OSI breached its duty to negotiate in good faith, tortiously interfered with L-3's business relations, and breached the parties' agreements in communications with third parties.

### 1. Breach of the Duty to Negotiate in Good Faith

The events leading to the breakdown of negotiations between L-3 and OSI are central to this case and, as stated above, ultimately a finder of fact must determine what actually happened. L-3 claims that OSI breached its duty to negotiate in good faith by (a) interfering with L-3's business prospects around the world, (b) failing to meet a deadline to complete a working capital review, and (c) submitting a positions memorandum, received just a week before this case was filed by L-3 in November 2002, that L-3 found to "abdicate[ ] the entire substance of extensive negotiations between the parties." (L-3 Opp'n Mem. of Law at 29-30). I note that this evidence is minor in comparison to that of the alleged breach of the same duty by L-3. Even so, there is conflicting evidence in the record regarding whether OSI interfered with contracts between L-3 and third parties; whether L-3 agreed independently to extend the working capital review deadline and the reasons for OSI's delay in completing its review; and whether OSI's positions memorandum was the straw that broke the camel's back in this deal, or whether an October 2002 document from L-3 to OSI held that distinction. Accordingly, OSI's motion to dismiss this claim is denied.

### 2. Tortious Interference

Triable issues of fact exist regarding whether OSI tortiously interfered with L-3's business relations in

New Zealand and in Oman. A reasonable jury could find that L-3 had business relations with Aviation Security Service of New Zealand ("AVSEC") and that OSI, through its agent, interfered with the relationship by circulating a flier that discussed the sale of the Business to a subsidiary of OSI. (*See, e.g.,* Meltz Dep. at 63-65, 93, 95-97; Kuster Aff. Ex. 85). An issue of fact also exists as to whether OSI used "wrongful means" to interfere with the negotiations between L-3 and AVSEC. *See NBT Bancorp, Inc v. Fleet/Norstar Fin. Group Inc.,* 87 N.Y.2d 614, 624 (1996) (to find interference with prospective contractual relations, "wrongful means" by defendant required). The flier distributed by OSI's agent contained inaccuracies and arguably was improper. Such a flier could have affected AVSEC's decision to purchase replacement machines from L-3.

**\*7** Likewise, a jury could reasonably find that OSI tortiously interfered with the relationship between L-3 and the Oman Royal Air Force (the "RAFO") when Rapiscan Security Products, Inc. ("Rapiscan" ), a subsidiary of OSI, sent Oman's Ministry of Defense a letter about L-3's potential sale of the Business and alleged weaknesses of the Business and its products. There is a triable issue of fact as to whether the letter resulted in L-3 losing the sale.

The claim of tortious interference with business relations in South Africa must be dismissed, however, because L-3 failed to provide sufficient evidence of injury to the business relationship between it and the Airports Company South Africa ( "ACSA"). L-3 had already been awarded an order from ACSA at the time of OSI's alleged interference with the relationship, and it did not lose the product order after the alleged interference. (Meltz Dep at 161-64). To prevail on a claim of tortious interference with prospective business relations, L-3 "would have to show that [OSI] intentionally caused [ACSA] not to enter into a contractual relation with them." *G.K.A. Beverage Corp. v. Honickman,* 55 F.3d 762, 768 (2d Cir.1995). L-3 argues that it incurred "costs relating to spending time with the customer" in retaining the order without specifying an amount (*See* Ovesey Decl. Ex. 18 at 41-42). This is not sufficient to sustain the claim. *See G.K.A. Beverage Corp.,* 55 F.3d at 768.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                              Page 7

Not Reported in F.Supp.2d, 2005 WL 712232 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

Although L-3 claims that OSI tortiously interfered
with its existing and potential business relations in
several countries, it defends the claim from
summary judgment with detailed evidence
regarding only New Zealand, Oman, and South
Africa. The record does not contain "concrete
particulars" that satisfy the elements of tortious
interference with business relations in other
countries, nor does it with respect to South Africa.
For that reason, summary judgment is granted
dismissing the claims for tortious interference with
business relations in countries other than New
Zealand and Oman.

### 3 Breach of Contract

OSI moves to dismiss L-3's claim that OSI breached
the August 13, 2002 Confidentiality Agreement by
disclosing to L-3's customers and potential
customers information regarding the proposed
acquisition of the Components. (See Amended
Compl. ¶¶ 38-41). L-3 argues that this conduct
was also a breach of the Amended LOI. (Id. ¶ 23).
I consider OSI's potential breach of contract for
incidents related to business deals in South Africa,
New Zealand, and Oman only, because L-3 only
provides specific evidence related to those deals.

L-3's breach of contract claim relating to the
AVSEC deal in New Zealand is dismissed because
the agreements did not exist at the time of the
alleged breach. The flier sent by OSI's agent to
AVSEC, a potential purchaser of the Business's
products, discussed the Possible Transaction and
stated that L-3 and Rapiscan had made an
agreement to divide the Business. (Kuster Aff. Ex.
85). Although the flier arguably would have
violated the Confidentiality Agreement and the
Amended LOI had they applied, it was sent in or
before early April 2002, at least four months before
the parties' agreements were signed on August 13,
2002. The Confidentiality Agreement required
OSI's compliance from the date of signing onward.
(Smith Decl. Ex. 55 ¶ 4 (providing that "[w]ithout
the prior written consent of [L-3], from and after the
date hereof, [OSI] agree[s] that [OSI] will not"
disclose information regarding a Possible
Transaction)). Likewise, the Amended LOI came

into effect on the date it was signed.

> FN3. The Original LOI, in effect prior to
> the Amended LOI, did not contain a
> disclosure provision.

*8 In respect to the deal between L-3 and the RAFO
in Oman, a reasonable jury could find that OSI
breached the Confidentiality Agreement and the
Amended LOI resulting in loss to L-3. In September
2002, after both agreements were signed, Rapiscan
sent a letter to Oman's Ministry of Defense stating
that L-3 and OSI were negotiating the sale of the
Components and that L-3 was "in the process of
selling" the unit that handled the product RAFO
was interested in buying. A rational jury could find
that the letter was sent without L-3's consent and in
violation of the Confidentiality Agreement, which
prohibited disclosure by OSI of the "status of
negotiations," and the Amended LOI, which
restricted public announcements about the Possible
Transaction. Moreover, a representative of the
RAFO allegedly reported to L-3 that the bid was
lost because Rapiscan advised the Tender
Committee about the Possible Transaction.

Similarly, issues of material fact exist as to whether
OSI breached the agreements by sending letters
about the Possible Transaction to ACSA in South
Africa, resulting in damages to L-3. After a tender
was awarded to L-3 by ACSA, at least two letters
were sent in September 2002 to ACSA officials by
Rapiscan querying whether they were aware that
PEI "is currently under due diligence and subject to
sale to OSI Rapiscan." OSI acknowledged that the
statement was inaccurate. A jury could find that OSI
breached the Confidentiality Agreement and
Amended LOI by making such statements.

OSI argues that it did not breach the agreements
because L-3 had previously disseminated similar
information publicly. OSI points to a conference
call between L-3's CEO and financial analysts in
July 2002 in which the CEO said, in regard to
selling a portion of the Business to OSI, "[w]e are
obligated ... to do that, assuming they can get
through antitrust." (Kuster Aff. Ex. 52 at L022989).
In addition, in its quarterly filing with the Securities

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 8

Not Reported in F.Supp.2d, 2005 WL 712232 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

and Exchange Commission, L-3 wrote that "the Company intends to sell [Components of the Business] to OSI." (*Id.* Ex. 53 at 12). L-3 counters that the information disclosed by OSI was distinct from L-3's statements and that, in addition, the information was false and misleading.

OSI's obligations under the Confidentiality Agreement did not extend to information that "was or becomes generally available to the public other than as a result of any action or inaction by [OSI] or [OSI's] Agents." Issues of fact exist as to whether all of OSI's disclosures to the RAFO and ACSA were the same or different than those made by L-3 and if they reflected the status of negotiations at the particular time they were made. A reasonable jury could certainly find that the letters to ACSA contained information that had not been made public previously and might find that the letters to the RAFO also contained nondisclosed information. Consequently, a jury could find that OSI breached the Confidentiality Agreement.

*9 The Amended LOI required both parties to obtain the written consent of the other before making any public announcements and did not limit that requirement to statements that were not yet public. As a result, whether L-3 had made statements similar to those made by OSI is irrelevant to a claim that the Amended LOI was breached.

Triable issues of fact exist as to whether L-3 suffered injury as a result of the alleged breaches. The letter to RAFO could have influenced the Tender Committee that shortly thereafter awarded the tender to Rapiscan, and a reasonable jury could surely so find. L-3 was not awarded the tender, which was valued at approximately $13 million. (De Villiers Decl. ¶ 8). In South Africa, L-3 maintained ACSA's order but spent three months " sort[ing] out" its business relations with ACSA. A jury could find that those costs were incurred in an effort to maintain the order as a result of Rapiscan's letters. Accordingly, OSI's motion for summary judgment in respect to the Oman and South African claims is denied.

*CONCLUSION*

The motion to strike is granted in part and denied in part. The parties' cross-motions for summary judgment are denied in part and granted in part. Counsel for the parties shall appear for a pretrial conference on April 15, 2005, at 11 a.m.

SO ORDERED

S.D.N.Y.,2005.
L-3 Communications Corp. v. OSI Systems, Inc.
Not Reported in F.Supp.2d, 2005 WL 712232 (S.D.N.Y.)

Briefs and Other Related Documents (Back to top)

• 1:02cv09144 (Docket) (Nov. 15, 2002)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# **EXHIBIT G**



Not Reported in F.Supp.2d                                                                                                    Page 1

Not Reported in F.Supp.2d, 2004 WL 421984 (N.D.Ill.), 2004 Copr.L.Dec. P 28,768

**(Cite as: 2004 WL 421984 (N.D.Ill.))**

**H**

United States District Court,
N.D. Illinois, Eastern Division.
**TY**, INC., Plaintiff,
v.
**PUBLICATIONS** INTERNATIONAL, LTD., Defendant.
**No. 99 C 5565.**

Feb. 17, 2004.

Avrum Sidney Katz, Joseph Eben Cwik, Michael A. Bondi, Welsh & Katz, Ltd., Chicago, IL, for Plaintiff

Anthony C. Valiulis, Kimberly A. Krugman, Much, Shelist, Freed, Denenberg, Ament & Rubenstein, P.C., Michael John Merrick, Penny, Nathan, Kahan and Associates, Ltd., Chicago, IL, Wayne B. Giampietro, Stitt, Klein, Daday & Aretos, Arlington Heights, IL, E. Leonard Rubin, John L. Hines, Jr., Sachnoff & Weaver, Ltd., Chicago, IL, Paul M. Faker, William F. Patry, Baker, Botts LLP, New York, NY, for Defendant.

*MEMORANDUM OPINION AND ORDER*

ZAGEL, J.

**\*1** This is a copyright and trademark infringement suit brought by Ty, Inc. ("Ty") against Publications International, Ltd ("PIL"), in connection with PIL's publication and sale of books featuring Ty's Beanie Babies plush toys. Before me are PIL's Motion for Reconsideration, or, in the Alternative, to Strike and its Motion to Strike Plaintiff's Motion for Leave to Take Discovery Against Counsel for PIL.

*Motion for Reconsideration*

On October 22, 1999, Ty served its first discovery requests on PIL, including Interrogatory 8: "Identify each person, including but not limited to expert witnesses, having knowledge of discoverable

matters who may be called by you to testify as a witness at trial, and for each such person ... please state what you anticipate to be the substance of said person's testimony at trial." Ty also served Interrogatory No. 9 in which it asked PIL to "[s]pecify the facts and witnesses with knowledge of the facts supporting the affirmative defense to the Complaint in this action." In response to both interrogatories, PIL named six individuals.

At the request of both parties, an expedited eight-week discovery period was scheduled with a cutoff date of May 2, 2000. Neither party requested a discovery extension, and discovery did indeed close on May 2. Two months thereafter, Ty moved for summary judgment in connection with its copyright and trademark related claims, which I granted as to the copyright claims but denied as to the trademark claims. Ty then moved for summary judgment for monetary relief as to its copyright claim, which I granted and subsequently entered final judgment on the claim under Federal Rule of Civil Procedure 54(b).

PIL appealed both summary judgment rulings, and the Seventh Circuit reversed. *Ty, Inc. v. Publications Int'l, Ltd.,* 292 F.3d 512 (7th Cir.2002), *cert. den.,* 537 U.S. 1110, 123 S.Ct. 892, 154 L.Ed.2d 783 (2003). Rehearing and rehearing *en banc* were denied by the Court on July 11, 2002, and Ty's Petition for Certiorari before the U.S. Supreme Court was denied on January 13, 2003. *Ty, Inc. v. Publications Int'l, Ltd.,* 537 U.S. 1110, 123 S.Ct. 892, 154 L.Ed.2d 783 (2003). On February 3, 2003, PIL served supplemental interrogatory responses, identifying 14 new persons with information relevant to PIL's defenses and who may be called upon at trial, none of which were included in its responses to Interrogatories No. 8 and 9 while discovery was open. [FN1] On June 5, 2003, I struck the 14 additional witnesses from PIL's supplementary interrogatory responses—and its ability to call these witnesses at trial—on the ground

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 2

Not Reported in F.Supp.2d, 2004 WL 421984 (N.D.Ill.), 2004 Copr.L.Dec. P 28,768

**(Cite as: 2004 WL 421984 (N.D.Ill.))**

that PIL had failed to supplement its interrogatory response as required by Rule 26 and that Rule 37 sanctions were therefore justified. *Ty, Inc v Publications Int'l, Ltd.*, No. 99 C 5565, 2003 WL 21294667, at *7 (N.D.Ill June 4, 2003) PIL now moves for reconsideration of that decision.

> FN1. The supplemental response itself named 15 additional trial witnesses, but one of them, Scott Rogers, was identified and deposed during discovery, so Ty has no objection to PIL's naming him as a potential trial witness.

PIL first argues that it should be permitted to amend its witness list because a party is not required to identify trial witnesses until the pretrial conference. *See Hottenstein v. Burlington N. R.R Co.*, No 96 C 8616, 1998 WL 378429 (N.D.Ill July 1, 1998) (denying motion to preclude witnesses disclosed after close of discovery because "a party is not required to identify trial witnesses until the pretrial order."); *Kedzior v Talman Home Fed. Sav & Loan Ass'n of Illinois*, No 89 C 4188, 1990 WL 70855, at *7 (N.D.Ill May 10, 1990) ("the better and more widely adopted rule is that it is inappropriate to expect counsel to provide this information until the pretrial conference."). While this is so, the problem with PIL's amendments is that the individuals it seeks to add were never identified during discovery as persons having relevant knowledge to the issues in this case, despite Ty's interrogatories seeking this information. Federal Rule of Civil Procedure 26 requires a party to provide other parties with "the names and, if known, the addresses and telephone number of each individual likely to have discoverable information that the disclosing party may use to support its claims or defenses ...., identifying the subjects of the information." Fed.R.Civ.P. 26(a)(1)(A). Rule 26 also requires a party to supplement or amend its disclosures and discovery responses if it learns that the information disclosed or the response is "incomplete or incorrect and if the additional corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed R.Civ.P. 26(e)(1). The purpose of

supplementary discovery "is to prevent trial by ambush." *Heidelberg Harris, Inc v Mitsubishi Heavy Indus., Ltd.*, No. 95 C 0673, 1996 WL 680243, at *8 (N.D. Ill. Nov 21, 1996) "If a party is allowed to withhold the supplementation of its discovery responses until after fact discovery is closed, the purpose of [Rule 26] is effectively frustrated because the opposing party is denied the opportunity to conduct discovery on the supplemental responses." *Id.* Therefore, it is not PIL's belated identification of trial witnesses, but rather its belated identification of people with knowledge relevant to the issues in this case, in violation of Rule 26, to which Ty objects

*2 PIL further argues that even if it did violate Rule 26, I failed to engage in the requisite analysis in determining to impose exclusion under Rule 37 The rule provides that "[a] party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1) .. is, not, unless such failure is harmless, permitted to use as evidence at a trial .. any witness or information not so disclosed." Fed R.Civ.P. 37(c)(1) "The fundamental purpose of Rule 37 is to ensure that the merits of the case can be addressed at trial without any party suffering prejudice as a result of nonfeasance or malfeasance during discovery." *Weiland v. Linear Constr., Ltd.*, No. 00 C 6172, 2002 WL 31307622, at *2 (N.D. Ill. Oct 15, 2002). The Seventh Circuit has stated that "the sanction of exclusion is automatic and mandatory unless the sanctioned party can show that its violation of Rule 26(a) was either justified or harmless." *Salgado v Gen. Motors Corp.*, 150 F.3d 735, 742 (7th Cir.1998). However, the Court has also stated that "[t]he determination of whether a Rule 26(a) violation is justified or harmless is entrusted to the broad discretion of the district court." *Mid-America Tablewares, Inc. v. Mogi Trading Co., Ltd.*, 100 F.3d 1353, 1363 (7th Cir.1996); *see also Salgado*, 150 F.3d at 739 "A district court need not make explicit findings concerning the existence of a substantial justification or the harmlessness of a failure to disclose." *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir 2003). However, "the following factors should guide the district court's discretion: (1) the prejudice or surprise to the party

© 2006 Thomson/West. No Claim to Orig. U S. Govt. Works

**(Cite as: 2004 WL 421984 (N.D.Ill.))**

against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date." *Id.* at 857.

In connection with my earlier ruling, I found that PIL's failure to supplement its interrogatory response as required by Rule 26 was unjustified:

> PIL's proffered justification for supplementing its witness list at this late stage is the alleged "relatively late production" of key documents relating to Ty's misuse, the same justification offered above for additional merits discovery. Although parties may supplement relevant discovery responses with documents and information that has become available since the close of discovery, it has been clearly established, as discussed above, that PIL had access to the documents from which it derived these fourteen proposed witnesses for three weeks prior to the close of discovery. However, PIL did not name these additional witnesses before the May 2, 2000 cutoff. Furthermore, PIL made no attempt to supplement their responses by naming these witnesses during the two months between the close of discovery and the filing of Ty's summary judgment motion. As with its request for additional merits discovery, PIL chose not to name these fourteen witnesses when discovery was open or shortly thereafter. Because PIL has offered no explanation, let alone a reasonable one, as to why it did not do so, I am striking the fourteen new witnesses from its responses.

*3 *Ty, Inc.,* 2003 WL 21294667, at *7. I explained PIL's failure to take discovery as follows:

> The fact of the matter is that PIL chose not to explore these issues when discovery was open. It is inexplicable why PIL did not take whatever discovery it needed in this regard when it had the chance. Any alleged shortcoming is the result of its own calculated decision not to pursue the defense in discovery.... I can infer--and I do infer--that in all likelihood, counsel for PIL made a strategic decision, just as any lawyer makes strategic decisions, to explore other issues at the expense of leaving the misuse defense undeveloped. I suspect that the value of the

defense may not have been fully apparent to PIL until Judge Posner hinted that a misleading statement in Ty's standard copyright licenses "might constitute copyright misuse, endangering Ty's copyrights." *Ty, Inc.,* 292 F.3d at 520. Alternatively, it may well have been that PIL intended to raise this defense, as it now asserts, but that it did not need discovery in order to do so. In any event, PIL has made their bed, and Ty is entitled to have them lie in it.

*Id.* at 7, 7 n. 6. Accordingly, I rejected PIL's claim that its late disclosure was justified because of Ty's allegedly late production of the documents. The best explanation for PIL's failure comes from its own brief:

> In a perfect world PIL would have been able to review the documents, develop a strategy, identify the witnesses and amend the answers within the three weeks left in discovery or the two months thereafter before the parties became locked in the summary judgment proceedings. Unfortunately, PIL was at the time represented by two small-firm practitioners, dwarfed by Ty's large-firm team, and was unable to do so.

While this may be true, it unequivocally reveals that PIL's failure was its own doing.

Along with the lack of justification, allowing the new trial witnesses to testify--with discovery now closed--would prejudice Ty. Two of the named witnesses are Ty's trial attorneys and have been from the onset of this case. Compelling them to testify against their own client would prejudice Ty at this late stage. Even accepting PIL's offer to not seek disqualification of the attorneys, forcing them to testify against their own client is against public policy, as explained by the Seventh Circuit:

> The roles of attorney and witness are usually incompatible. A witness is supposed to present the facts without a slant, while an attorney's job is to advocate a partisan view of the significance of the facts. One person trying to do both is apt to be a poor witness, a poor advocate, or both.

*Gusman v. Unisys Corp.,* 986 F.2d 1146, 1148 (7th Cir.1993); *see also United States v. McCorkle,* No. 93 C 6528, 1994 WL 317702, at *3 (N.D.Ill June 23, 1994) ("There is a strong policy against allowing lawyers to also act as witnesses.") While

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 421984 (N.D.Ill.), 2004 Copr.L.Dec. P 28,768

**(Cite as: 2004 WL 421984 (N.D.Ill.))**

it may be true that documents involving the attorneys may be offered into evidence by PIL at trial, that is very different from forcing them to take the witness stand against their own client.

*4 Regarding the remaining witnesses, Ty has not had the opportunity to depose them or otherwise develop evidence to contest their anticipated testimony. *See Scranton Gillette Communications, Inc. v. Dannhausen,* No. 96 C 8353, 1998 WL 566668 (N.D.Ill. Aug. 26, 1998) (precluding plaintiff from presenting trial witnesses not disclosed until the filing of the pretrial order because allowing them to testify would be unfair to defendants); *Boynton v. Monarch,* No. 92 C 140, 1994 WL 463905 (N.D.Ill. Aug.25, 1994) (it would constitute unfair surprise to the defendant to admit the testimony of a witness plaintiff disclosed only in the pretrial order--and not in supplemental answers to interrogatories--because defendant had no opportunity to depose the witness). Ty should not be put in the position of having to scramble to track down these individuals to see what they may say if called to testify, and then prepare rebuttal evidence or testimony, when it should be focusing its resources on preparing for trial. PIL claims that Ty can "hardly be prejudiced or surprised" because the identity of the witnesses was obtained from Ty's own document production [FN2] However, merely because the names of these witnesses appeared, among hundreds of other names, somewhere in the thousands of pages of documents produced by Ty, does not mean that Ty should have anticipated that PIL would call these individuals as trial witnesses and deposed them accordingly. *See Boynton,* 1994 WL 463905 (plaintiff could not name trial witnesses who were not disclosed during discovery even if the witnesses' names appeared on documents produced by defense because the mere appearance of the names on documents produced did not give defendant sufficient knowledge of the witnesses' relevance to the case prior to the close of discovery, and allowing the witness to testify would constitute "unfair surprise" to the plaintiff); *United States v.2016 N. 77th Court,* No. 91 C 7755, 1993 U.S. Dist. LEXIS 2523, at *14 (N.D.Ill. March 3, 1993) (recommending that court reject government's claim that it should be permitted to call certain witnesses

at trial notwithstanding that it had not identified these witnesses in response to an interrogatory, because the government produced documents that revealed the "existence and knowledge of these persons; the mere production of documents did not satisfy the government's discovery obligations).

> FN2. PIL additionally claims that with respect to new witness Ty Warner, it had specifically identified Warner as someone who it wanted to depose during discovery. While this may be true, the fact remains that the aforementioned deposition was never taken. More importantly, Ty Warner-- just like the other new witnesses--was never identified, either initially or as a supplement before the close of discovery, in PIL's Interrogatory No. 8 or 9.

PIL also asserts that if there is any prejudice to Ty, it can be cured by Ty "pick[ing] up the phone" to see how these witnesses will testify because each of the new witnesses has some type of relationship with Ty. Apart from being pure speculation, such a remedy might well be of no value to Ty for purposes of impeachment at trial. More importantly, the assertion that each witness is somehow in Ty's control is simply not true. Although some of the named individuals may have, at one time, been employees of Ty's former licensees, the licenses between Ty and these licensees have since expired or been terminated, so there is no "relationship" between Ty and any of the non-trial counsel individuals. As a final assertion, PIL claims that any prejudice could also be cured by reopening discovery to allow Ty to depose the new witnesses. However, we are well past the discovery cutoff in this case, and I will not permit PIL to use the new witness designations as a backdoor method for reopening discovery. *See Great-West Life & Annuity Ins. Co. v. Weisz Michling Hofman, P.C.,* No. 01 C 2470, 2002 WL 1067707 (N.D.Ill. March 25, 2002) (denying defendants' motion to reopen discovery because defendants did not see fit to conduct requested discovery before close of discovery). Accordingly, I find that any prejudice to Ty cannot be cured or that if it can be cured, it can

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d                                                                          Page 5

Not Reported in F.Supp.2d, 2004 WL 421984 (N.D.Ill.), 2004 Copr.L.Dec. P 28,768

**(Cite as: 2004 WL 421984 (N.D.Ill.))**

be done so only at great expense to Ty. Therefore, I deny PIL's motion seeking reconsideration of my decision to preclude it from naming the aforementioned fourteen witnesses.

*Alternative Motion to Strike*

**\*5** In the event that I uphold my prior ruling striking PIL's amendments-- which I do--PIL asks that I also strike the amended interrogatory responses recently served by Ty identifying its trial witnesses. As background, on March 7, 2000, PIL served its second interrogatories on Ty, including Interrogatory 15: "State the name, address and telephone number of each person Plaintiff intends to call as a witness at the trial of this case, and the subject matter of the testimony to be given by that individual." On March 17, 2000, when discovery was still ongoing, Ty responded that it "has not yet identified the witnesses it intends to call at trial." On September 16, 2003, Ty filed its Supplemental Response to PIL's Interrogatory No. 15 identifying six individuals whom it expected to call as trial witnesses. Ty claims that it did not disclose the identity of these witnesses until this date because it did not determine who it would call as trial witnesses until then.

PIL argues that for the same reasons for which I have struck its supplemental responses, I should also strike Ty's supplemental responses. However, there is a material difference between the six witnesses disclosed by Ty and the fourteen witnesses disclosed by PIL. All of Ty's witnesses were identified as persons with relevant knowledge, either by PIL or by Ty, and were deposed by the parties during discovery. In other words, there was no Rule 26 violation. PIL cannot reasonably claim that it did not know about the potential for these six individuals to be designated as witnesses. Therefore, PIL will suffer no harm or surprise as a result of Ty's supplementation. Rather, PIL's only viable claim is one of timing--that Ty has somehow acted in bad faith by never attempting to answer during discovery PIL's Interrogatory No. 15 seeking the identity of Ty's trial witnesses and by waiting seven months after the return of jurisdiction to this Court before doing so. However, although there is

no absolute prohibition on interrogatories seeking identification of trial witnesses, such information "is not typically divulged during the discovery stage of a trial." *Kedzior,* 1990 WL 70855, at \*7. Instead, "the better and more widely adopted rule is that it is inappropriate to expect counsel to provide this information until the pretrial conference." *Id.* at \*7. Accordingly, the timing of this disclosure is not an appropriate basis, by itself, to strike these witnesses.

*Motion to Strike Plaintiff's Motion for Leave to Take Discovery Against Counsel for PIL*

In the fall of 2003, Ty discovered that in approximately August of 2003, Judge Richard A. Posner--the author on appeal in this case concerning the issue of copyright fair use--wrote an unpublished article entitled "Fair Use and Statutory Reform in the Wake of Eldred," which was written with William F. Patry, counsel for PIL. Accordingly, Ty moved to take limited discovery against Patry concerning the drafting of the foregoing article and his dealings with Judge Posner. At the November 20, 2003 status hearing, I suggested that there were two areas appropriate for inquiry: (1) whether Patry made representations to others about the article or about the work he was doing with Judge Posner, except any representations he made to his own client; and (2) whether the article in any way, even in its draft forms, touched upon the precise issue which was raised in the appeal in this case. On December 2, Ty wrote to Patry requesting the aforementioned discovery along with additional information beyond the scope of what I found to be reasonable. Patry responded on December 16 by providing answers to the two areas suggested at the November 20 status and to some areas beyond the scope of those suggestions and by simultaneously moving to strike Ty's motion seeking discovery against Patry. As it prepared its opposition to PIL's motion to strike, Ty submitted another request seeking more information beyond the scope of my November 20 suggestions. Patry responded on January 8, 2004 by noting his continued objection to this line of discovery but nonetheless providing some more information. In its January 16 opposition to the motion to strike, Ty requested that I require Party to disclose two more

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                                        Page 6

Not Reported in F.Supp.2d, 2004 WL 421984 (N.D.Ill.), 2004 Copr.L.Dec. P 28,768
(Cite as: 2004 WL 421984 (N.D.Ill.))

categories of information: (1) whether he and Judge Posner are still collaborating on the Article and whether there is any plan for future collaboration between the two; and (2) correspondence between the two, whether in electronic or other form.

**\*6** In response to the motion at hand, I find that Patry has now given more information than I said was reasonable on November 20. This is certainly enough information for Ty, if it should so choose, to file either a motion to recuse Judge Posner in the Seventh Circuit or a complaint under the Rules of the Judicial Council of the Seventh Circuit Governing Complaints of Judicial Misconduct or Disability. Accordingly, I see no reason for further inquiry. [FN3]

> FN3. This case demonstrates that lack of civility does not always occur from lawyers who fear they will come up short on the law. White moved for limited discovery relating to Patry's relationship with Judge Posner on the ground that "[s]uch information is relevant and may be essential in the event Ty later deems it necessary to file a motion in the Court of Appeals concerning Judge Posner's continued involvement in this case." Patry had the better argument on this issue but he ought to reconsider his rhetoric. In response, he wrote in part:
> ... The Court should summarily dismiss Plaintiff's frivolous, *ethically challenged motion* ..
> ... Ty, although raising the gravest type of allegations that can be made against a judge, *cowardly does so* only by implication ... Like *Senator McCarthy's lists,* Ty will not say what they think the impropriety is ... [Ty] *lacks the courage and the ethical compass* to do so. Instead they are *misusing this Court in an unseemly effort to besmirch blameless reputations*
> .. Since Ty *lacks the courage* to state what the alleged misconduct is, we are, of course, left to conjecture
> ... I am *deeply disgusted* by the nature and

manner of the accusations. Ty's counsel infer (since they *lack the courage* of stating them). *It is a new low even for them.* Ty chose to file a *sneak attack* ... inferring the gravest violations of ethical canons. Such behavior simply cannot be countenanced
> ... The motion should be denied summarily and PIL should be awarded all attorney's fees and costs in having to reply to *such a regrettable breach of procedure and common decency,* unsupported by any valid legal or factual basis
> (emphasis added). The passages I have emphasized have no place in legal discourse. Patry should learn to hold his thunder until he is actually accused of some form of wrongdoing and, even then, ought to be far more careful. Insofar as he thought he was defending an excellent judge, it does no service to Judge Posner (who needed no defenders) to have a simple, neutral question in this court's record characterized as an accusation of the "gravest type."

For the reasons above, PIL's Motion for Reconsideration or, in the Alternative, to Strike and its Motion to Strike Plaintiff's Motion for Leave to Take Discovery Against Counsel for PIL are DENIED.

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.