UNITED STATES DISTRICT COURT
for the
DISTRICT OF CONNECTICUT

| | |
|---|---|
| LISA K. BLUMENSCHINE, | : CIVIL ACTION NO. 302CV2244 DJS |
| Plaintiff, | : |
| vs. | : |
| PROFESSIONAL MEDIA GROUP LLC, | : APRIL 17, 2006 |
| Defendant. | : |

**DEFENDANT'S MOTION IN LIMINE TO PRECLUDE PURPORTED EXPERT TESTIMONY BY SHELDON WISHNICK**

Plaintiff offers Sheldon Wishnick, an actuary who spends his full time testifying in various litigations, as a proposed expert witness with respect to Lisa Blumenschine's damages.

It is respectfully submitted that Mr. Wishnick's particular claim to expertise as an actuary provides an inadequate basis for him to be allowed to testify in this matter on behalf of plaintiff, as follows:

1. This is not a personal injury case where an actuary can take a set group of facts (permanent or partial disability, life expectancy, etc.) and testify meaningfully

to the jury about the plaintiff's expected losses. The Federal Rules of Evidence, Rule 703, require the expert to make reasonable assumptions of fact upon which his testimony or opinion are based. See, Boucher v. U.S. Suzuki Motor Corp., 73 F.3d 18, 21-22 (2d Cir. 1996) (among other assumptions by expert in calculating lost earnings, court would not permit inference that sporadically employed plaintiff was "on the verge of a twenty-four year career of clock-punching").

In this type of an employment matter, a proper scientific witness would be an economist, not an actuary, who would have made studies of the particular market in which defendant is involved (the market for start-up magazines); the particular type of employee (a commissioned salesperson) and, using statistical studies of each, arrive at an opinion based on the facts of the actual case as to whether Ms. Blumenschine was likely to have any future losses from her position, and the employer's position in the market, and what those losses would be.

Here, Mr. Wishnick does not purport to be an economist and admitted at his deposition he made no analysis of the central factors an economist would consider in fitting a real expert opinion to the facts at bar.

At his deposition, Mr. Wishnick admitted that all he

did was make a mechanical calculation here. Deposition Transcript of Sheldon Wishnick, August 13, 2003, p. 45:22) (hereinafter, "<u>Wishnick Depo.</u>, p. "_.") He took the difference between what Lisa Blumenschine made in the one or two years before she was terminated by ProMedia; subtracted her current earnings; made the totally unfounded assumption that that loss would remain the same every year going forward until the end of her work-life expectancy; increased the figure by an interest component based on the general rise in wages in the United States; backed it out to present value based on a present value table; and added a component for increased taxes if the amount was to be paid in a lump sum. He admitted that this mathematical calculation, based on general interest and inflation rates, had nothing to do with the magazine publishing industry; or with a start-up magazine; or with the type of business in which she was employed; or with the particularities of her employer; or with any expected rise or decline in compensation for commission salespersons. <u>Wishnick depo.</u>, pp. 45:17-48:1; 60:5-10; 62:2-17. Moreover, Mr. Wishnick admitted that he never interviewed plaintiff (<u>Wishnick depo.</u>, p. 32:17) and had no idea that she was a commissioned salesperson. <u>Wishnick depo.</u>, pp. 50:8-51:2. He also testified that had he known she was a commissioned

salesperson from the beginning, it may have changed his findings. <u>Wishnick depo.</u>, p. 60:21-62:1.

3. The proposed expert testimony of Mr. Wishnick should not be allowed since, by his own admission at deposition, he has not and cannot satisfy the requirements of the Federal Rules of Evidence, whereby an expert may testify only where his "specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue" and "the testimony is based upon sufficient facts or data." Fed.R.Evid. 702. The expert's "specialized knowledge" must be "more than subjective belief or unsupported speculation." <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579, 590, 113 S.Ct. 2786, 2795 (1993). Here, Mr. Wishnick admits he did not even considered the facts of this matter, let alone tie or apply his "specialized knowledge" to them. See, <u>id.</u>, 509 U.S. at 591, 113 S.Ct. at 2795-96. Mr. Wishnick's expert testimony is not relevant to the particular facts of this matter, nor is there a sufficient basis for it, and therefore must not be permitted.

4. In fact, Mr. Wishnick did no studies whatever other than a mechanical calculation which is purely the province of the jury. See, <u>Monessen Southwestern Railway Co. v. Morgan</u>, 486 U.S. 330. 108 S.Ct. 1837 (1988) (under

4

Federal Employers' Liability Act, it is for jury to determine appropriate discount rate and make calculation to reduce future earnings to present value); 25A C.J.S. Damages §345 (2005)(past and future lost earnings determinations are ordinarily for the jury). In this regard, Mr. Wishnick testified as follows:

> "Q   Okay. And that figure about the average wage increases, is that specific to any particular type of sector?
>
> A   No.
>
> Q   That's everybody's annual wage increase?
>
> A   Yes.
>
> Q   Okay. The second column, Offset Earnings, starts, if I'm not wrong, from the current salary at Penton Media?
>
> A   That's correct.
>
> Q   Okay. And those are also simply mathematically increased every year?
>
> A   That's correct.
>
> Q   By 3.5 percent?
>
> A   Yes.
>
> Q   For that same reason?
>
> A   Yes.
>
> Q   Okay. Are there any assumptions in this report having to do with the magazine industry?
>
> A   No.

Q    Okay. Did you ever work in the magazine industry?

A    No.

Q    Do you know what the rate of success is for startup magazines?

A    No.

Q    Do you know the difference between the rate of success for startup magazines and magazines that have been established for five years?

A    No.

Q    Okay. Do any of your calculations have any assumptions regarding the type of company that Professional Media is?

A    No.

Q    Okay. Do your calculations take into account any studies or any information regarding the type of company that Penton Media is?

A    No.

Q    Okay. Do you know anything about Professional Media, other than the fact that it's the defendant in this lawsuit?

A    No.

Q    Okay. Is the same true for Penton Media?

A    That's correct.

Wishnick Depo., pp. 46:8-48:1.

\* \* \*

Q    Okay. And is that what you reference on the previous page under Salary Loss, "actual gross income received for that year adjusted

6

for $40,000.00 due in unpaid commissions?"

A   Yes.

Q   And you were told that by the attorney?

A   Yes.

Q   You don't know whether or not those are really unpaid.

    That's the claim in the lawsuit, right?

A   Yes.

Q   Okay. And you have no independent knowledge of that?

A   That's correct.

Q   Or the facts of her employment?

A   I know nothing about that.

Q   All right. You know nothing about the reasons for her termination, just you're just doing this calculation?

A   That's right.

<u>Wishnick depo.</u>, pp. 50:8-51-2.

                    * * *

Q   I just got a few more questions.

    You made reference, Mr. Wishnick, to a 3.5 percent figure that you used to represent an annual increase in at least two of the columns on this.

    Can you tell me where that comes from?

A   There is a study put out in February of every year called, "Economic Report of the President." And what I do is check that each year. Typically I'll look at about a

7

ten-year period. And it shows the average payrolls and the progress from year to year. And generally for college graduates they are between four and four-and-a-half percent a year on the average.

Q   Okay. Give me, as closely as you can, the name of that study?

A   Well, the name of the publication is "Economic Report of the President." And there are a lot of tables in there. I can't recall the exact table. There aren't a lot that deal with wages, so it's clear.

Q   And do those tables make any difference between people who are commission salespeople and --

A   No.

Q   -- other types of --

A   No.

Q   So this four or four-and-a-half percent is a generalized figure that would apply to executives.

    Would it apply to industrial workers?

A   Well, again, I don't have that kind of breakdown.

Q   Okay. You just took a figure in terms of college graduate, average rise in their wages?

A   Yeah. And that's why I cut it back.

Q   Okay. Do you know of any studies that have to do with the comparative rise or fall of the income of commission salespeople?

A   No. I'm not aware of any. I mean, there may be.

8

Q    Okay. You didn't use any in terms of this?

A    No.

Wishnick depo., pp. 58:21-60:10.

\* \* \*

Q    You don't know whether part of that 132,854 is a draw against commissions?

A    No, I don't. No.

Q    And that doesn't make any difference to your assumptions and your findings?

A    Well, it was not presented to me as a draw against commissions. It was presented to me, through my questionnaire, as -- I knew how much she actually earned in the year from the tax records. And it was represented to me that she was owed 40,000 in earned commissions at that point in time. So from that information -- I didn't see anything about a draw against commissions.

Q    How do you know they were earned commissions?

A    (Referring.) Well, it says, "owed additional 40,000 in commissions not paid." My interpretation of that is that they were owed commissions. I don't know any more than that, than what I'm given.

Q    Okay. You don't know whether they were earned, or whether they were supposed to be a draw?

A    I assumed that they were earned, from that information.

Q    You don't know, though?

A    I don't know.

Q    Okay. And if you understood that part of

>       this $ 132,854.00 figure was a draw against
>       commissions, as opposed to base salary,
>       would it change your findings?
>
> A     I would want some more information.  It
>       might.

Wishnick depo., pp. 60:21-62:1.

\* \* \*

> Q     Okay.  In this instance did you ask anything
>       about the company involved here, or the
>       business involved here?
>
> A     No."

Wishnick depo., p. 62:14-17.

5.   Based on the foregoing, it is respectfully submitted that Mr. Wishnick's "science" is the wrong type for this matter.  What is needed here is the testimony of an economist, which Mr. Wishnick does not purport to be.

6.   In addition, since Mr. Wishnick is merely making a mathematical calculation, based on certain general assumptions having no specific relation to this case, his testimony would deprive the jury of making those calculations for themselves or otherwise confuse or prejudice the jury that his underlying assumptions are to

10

be considered facts already in evidence in this case.

Fed.R.Evid. 703. All Mr. Wishnick does is add his false

patina of "expertise" to a mechanical calculation.

                                Respectfully submitted,

                                DEFENDANT PROFESSIONAL MEDIA
                                GROUP LLC

                                By: _____
                                George P. Birnbaum (CT04937)
                                MINOGUE BIRNBAUM LLP
                                Attorneys for Defendant
                                237 Elm Street
                                New Canaan, CT 06840
                                (203) 966-6916

## CERTIFICATION

    This is to certify that a copy of the foregoing was delivered by hand to the following counsel of record on this 17th day of April, 2006:

    Scott R. Lucas, Esq.
    Martin, Lucas & Chioffi, LLP
    177 Broad Street
    Stamford, CT  06901

_____
GEORGE P. BIRNBAUM