UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| LISA K. BLUMENSCHINE, | : CIVIL ACTION NO. |
| | : 302 CV 2244 (HBF) |
| Plaintiff, | : |
| | : |
| V. | : |
| | : |
| PROFESSIONAL MEDIA GROUP, | : |
| LLC, | : APRIL 17, 2006 |
| | : |
| Defendant. | : |

## JOINT PRETRIAL MEMORANDUM

*1.*   *TRIAL COUNSEL.*

    *Counsel for Plaintiff:*    Scott R. Lucas, Esq.
                                         Keith A. McBride, Esq.
                                         Martin, Lucas & Chioffi LLP
                                         177 Broad Street
                                         Stamford, CT 06901
                                         Phone: (203) 973-5200
                                         Fax: (203) 973-5250
                                         slucas@mlc-law.com

    *Counsel for Defendants:*    George P. Birnbaum, Esq.
                                         Michael L. Ferch, Esq.
                                         Minogue Birnbaum LLP
                                         237 Elm Street
                                         New Canaan, CT 06840
                                         Phone: (203) 966-6916
                                         Fax: (203) 966-6917
                                         minoguellp@sbcglobal.net
                                         mlferchesq@aol.com
                                         gpbscout@aol.com

*2.*   *JURISDICTION.*   Plaintiff alleges that jurisdiction over the subject matter of this litigation exists under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e, *et seq.*, the Civil Rights Act of 1991, 42 U.S.C. §1981a, and the Age Discrimination in

Employment Act of 1967 (ADEA), as amended, 29 U.S.C. §621, *et seq.*, pursuant to 28 U.S.C. §1343. As to those claims not arising under federal law but clearly so related to the claims in this action within the original jurisdiction of this Court, jurisdiction exists under the doctrine of supplemental jurisdiction as codified in 28 U.S.C. §1367.

3. ***JURY/NONJURY.*** Jury.

4. ***TRIAL LENGTH.*** Five (5) to seven (7) days.

5. ***NATURE OF THE CASE.***

    A. ***PLAINTIFF'S CLAIMS:***

        1. Sex discrimination in violation of Title VII;
        2. Retaliation in violation of Title VII;
        3. Age discrimination in violation of the ADEA;
        4. Retaliation in violation of the ADEA;
        5. Sex and age discrimination in violation of CFEPA;
        6. Retaliation in violation of CFEPA;
        7. Promissory estoppel;
        8. Negligent misrepresentation; and
        9. Violation of Connecticut's wage statute, C.G.S. §31-72.

All of the above claims will be pursued at trial. None of the claims have been dismissed or withdrawn.

    B. ***DAMAGES:*** Possible damages under the asserted claims are as follows[1]:

***Title VII and CFEPA***

| | |
|---|---|
| Back pay | $287,591 |
| Front pay | $314,567 |
| Punitive & compensatory damages | $ 50,000 (capped by Title VII) ($100,000 – estimated – if CFEPA) |
| Attorneys' fees | $150,000 |
| *Total* | *$802,158* |

---

[1] Defendant does not concede any of these damages, nor the manner in which they are computed.

*ADEA*
| | |
|---|---|
| Back pay | $287,591 |
| Front pay | $314,567 |
| Punitive damages | $602,158 |
| Attorneys' fees | $150,000 |
| Total | *$1,354,316* |

***Promissory Estoppel, Negligent Misrepresentation***
| | |
|---|---|
| Wages | $40,000 |
| Total | *$ 40,000* |

***Wage Statute***
| | |
|---|---|
| Wages (2x) | $ 80,000 |
| Attorneys' fees | $150,000 |
| Total | *$230,000* |

***Total Claims (with duplication)***
| | |
|---|---|
| Wages | $602,158 |
| Compensatory damages | $100,000 |
| Punitive damages (ADEA) | $602,158 |
| Punitive damages (wages) | $ 40,000 |
| Attorneys' fees | $150,000 |
| Total | *$1,494,316* |

**C.    DEFENDANT'S AFFIRMATIVE DEFENSES:**

1. Plaintiff fails to state a claim on which relief can be granted.

2. Plaintiff lacks jurisdiction with respect to the 7th, 8th and 9th Counts.

3. With respect to the 8th Count, any recovery is barred or must be proportionately reduced by plaintiff's contributory negligence.

3

### 6. *PLAINTIFF'S CONTENTIONS.*

#### *Overview*

Plaintiff, a 51-year-old female, brings this action alleging she was the victim sex and age discrimination while employed by defendant Professional Media Group, LLC, and that once she complained of this discrimination, she was terminated. In addition, upon her termination, defendant failed to pay all wages due her, in violation of Connecticut's wage statute, in further retaliation for her complaints. This failure to pay also supports her claims of promissory estoppel and negligent misrepresentation.

#### *Factual Background*

Defendant is a company located in Norwalk, Connecticut engaged in the publication industry. Its products consist of two trade magazines in the educational field, one entitled "District Administration," which primarily addresses district administrators of high schools, and the other entitled "University Business" (formerly "Matrix"), which addresses college and university administrators. For a brief time, defendant published a magazine called "eMarketing Magazine" directed to technology in the education industry, but this magazine folded in September 2001, just after 9/11.

The members of the executive and management team of defendant during plaintiff's employment were: (1) Joseph J. Hanson, the 50% managing owner of defendant[2]; (2) William Ziperman, defendant's General Manager; (3) Daniel Kinnaman, Vice President and Publisher; and (4) Daniel Shannon, Vice President and Publisher. This management team had the authority to make all major decisions, including all decisions concerning employees' salaries, terminations

---

[2] Mr. William Pattis, a non-managing owner of defendant, owns the remaining 50% of defendant.

4

and promotions. Historically, and throughout plaintiff's tenure, all of the members of defendant's senior management team have been men. Together and individually, these managers guarded this male inner circle to the strict exclusion of women, including plaintiff.

Plaintiff, prior to being recruited by defendant, was a successful saleswoman in the publishing industry. She was gainfully employed with another publisher, Primedia, as a sales manager at the time she was first approached by defendant in November 1999. Plaintiff was recruited by defendant for the position of sales manager of its Matrix magazine effort. Plaintiff made it clear she was looking to earn $150,000 and obtain a position of senior management, namely Associate Publisher. It was known at the time of plaintiff's hire that plaintiff was historically a top producer, highly competent and sought-after in the publishing industry. In fact, her competency and goodwill had earned her promotions from salesperson to National Sales Manager in other organizations, long before being recruited by defendant. As sales manager for a major publishing house, plaintiff was not only in charge of overseeing staff, but was also responsible for strategic planning and directing the sales effort.

Toward the end of December 1999, Mr. Ziperman, knowing plaintiff's desires, history and position with Primedia approached plaintiff requesting that they meet. In order for one to be given a position within defendant's management team, they must interview with and be approved by other members of management, including Mr. Hanson, defendant's 50% owner. Therefore, after a series of meetings with Mr. Ziperman, Mr. Hanson and defendant's managerial inner circle, plaintiff was not offered the title of Associate Publisher, but instead offered a lateral move with the title of National Sales Manager, the same position she held with Primedia. Plaintiff nevertheless was led to believe she would take on significant managerial duties.

In addition, plaintiff was promised that she would be paid at the rate of $140,000 per year, divided between a base salary of $80,000 and a non-recoverable draw of $60,000. Relying on these promises, plaintiff terminated her employment with Primedia and accepted defendant's offer. Plaintiff hit the ground running and immediately attempted to undertake the tasks she was told she was hired to do. In reliance on the assurances made to her by defendant and her desire to continue in her role in management, plaintiff declined an offer from another employer as a salesperson, despite being offered almost $35,000 more than her salary with defendant.

Nevertheless, after over a year of faithful service under Dan Kinnaman, defendant was viewed primarily as a "salesperson" and not a manager. Then, in May 2001, defendant unilaterally withheld the non-recoverable portion of plaintiff's compensation. Defendant asserts this was because her sales figures did not warrant this "commission," despite the fact that defendant readily admits that at the time that plaintiff's non-recoverable draw was suspended, no "commission plan" existed for plaintiff and the pay withheld was admitted to have been "nonrecoverable." Mr. Ziperman also admitted under oath that no commission plan existed for plaintiff.

Plaintiff did not agree to have her pay reduced. She protested the unilateral reduction of her compensation. In response, she was repeatedly assured that her total compensation would be reinstated retroactively in some fashion. This never occurred despite continuous inquiries from May 2001 to the date of her termination a few months later.

A lull in the publishing industry followed the terrorist attacks of September 11, 2001. Around this time, Dan Kinnaman relinquished his position as publisher of Matrix magazine and became a part-time publisher for defendant. This led to a restructuring of defendant's

management team. Mr. Kinnaman was no longer the supervisor of plaintiff. Defendant decided to shut down eMarketing Magazine, which was headed by Mr. Shannon, due to a lack of sales under his direction.[3] Despite eMarketing Magazine's failure under Mr. Shannon's direction and control, Mr. Shannon was transferred to replace Mr. Kinnaman as the new head of Matrix magazine and placed directly over plaintiff. In addition, at this time, without any input from Mr. Kinnaman or Mr. Shannon, plaintiff was given the position of Associate Publisher by Mr. Ziperman in what he testified was an effort to appease her.

Plaintiff was not informed of the view now espoused by defendant that her promotion was simply a change in title, a view directly contrary to what she and others within the organization were told. In fact, plaintiff was told by Mr. Ziperman that she was highly valued and not "just a salesperson." Even more importantly, on September 26, 2001, incident to plaintiff's promotion to Assistant Publisher, an e-mail was circulated to the entire company stating:

> I'm please to announce that Lisa Blumenschine has been promoted to Associate Publisher for Matrix.
>
> This is good news for Matrix. Lisa has been with Matrix since its launch and has done a terrific job helping the book get established in the higher education market. She has contributed greatly to Matrix's steady growth and this new position will allow her to use more of her skills as we move the magazine to the next level. Lisa will, in addition to continue growing her own territory, support and manage the sales effort. She will also continue to play a key role in positioning the magazine and developing collateral sales material.
>
> Lisa has enjoyed great success in the past working for a number of magazines including, Operations & Fulfillment, DM New, Catalog Age and Direct. I look forward to her leveraging this experience for a more successful Matrix.

---

[3] Plaintiff had no role in the sales or management of E Magazine.

At the outset, Mr. Shannon, plaintiff's new supervisor, made clear his sexist and ageist views. Mr. Shannon did not want any input from plaintiff on the magazine nor would he answer questions regarding the direction of the magazine when posed by plaintiff in an attempt to perform her duties as an Associate Publisher. It became painfully obvious to plaintiff that although she was promoted to Associate Publisher, she was being excluded from participating as a manager.

Plaintiff's protests over being shut out from management and its meetings fell on deaf ears. Defendant readily admits that plaintiff "scoffingly" told Mr. Shannon that "the small management group of the company was a boys' club." While defendant admits that it registered plaintiff's protests as complaints of discrimination, Mr. Shannon decided to give them "no weight." Moreover, Mr. Shannon created a hostile environment with his sexual laden jokes and comments. In fact, despite the known complaints of discrimination, Mr. Shannon proceeded with a plan implemented just weeks after her promotion, and shortly after her first complaint, to hire two young men, Darren Sikorsky (age 27) and Tom Terry (age 31) to replace plaintiff. At the time Ms. Blumenschine was advised of the potential of hiring these two young male salespeople, plaintiff had been Associate Publisher for only two months.

To add insult to injury, faced with plaintiff's complaints, Mr. Shannon in a sexist fashion states he had issues with plaintiff due to his perception that she was sexually attracted to him, and that "on four or five occasions during the period from September, 2001 through December, 2001, [plaintiff] told me that she had 'had a crush on' me or wanted 'to go out with' me when we worked for the same company a number of years ago. On each occasion, I ignored the flirtatious

8

comments and changed the subject or simply failed to respond." He testified in his deposition that in his opinion plaintiff repeatedly made advances and inappropriate flirtatious gestures.

Plaintiff adamantly denies all of Mr. Shannon's sexist allegations. Moreover, despite Mr. Shannon's purported problems with plaintiff's alleged sexuality, defendant contends the sole and exclusive reason for plaintiff's termination was her "poor sales." The irony of Mr. Shannon's termination of plaintiff for "poor sales" given his failed effort with the sales of eMarketing Magazine which folded incident to his assuming control of Matrix magazine just weeks earlier is readily apparent. Moreover, Mr. Shannon's references to the future employment of the two young males he referred to as "the boys," and his creation of a hostile workplace, demonstrate his sexist as well as ageist views.

On January 2, 2002,[4] after two months of complaints of sex discrimination and being shut out from management, Mr. Shannon informed plaintiff of his decision to terminate her. At no time during her employment had plaintiff been told that her position was in jeopardy, in fact she was assured that her position was safe.

### *Pretext*

Defendant's purported reason for plaintiff's termination (i.e., "poor sales") is demonstrably false. Documents produced by defendant alleged to exhibit plaintiff's "Poor Sales." Defendant cannot and has not produced any evidence that plaintiff's sales were so poor relative to defendant's other salespeople that they placed her job in jeopardy. Moreover, plaintiff had just been promoted to Associate Publisher on September 26, 2001 based upon her sales

---

[4] This termination decision, although made shortly after plaintiff's complaints in November 2001, was not communicated to plaintiff until January 2002, after the employment of "the boys" was secured to replace plaintiff.

9

performance through the month of November (in the industry sales are known for coming months in advance). Specifically, defendant states that it fired plaintiff due to her "poor sales" for the *three months* spanning September, October and November of 2001. However, defendant was and readily admits that it was well aware of plaintiff's so-called sales for at least two of those three months prior to her promotion and yet still promoted her on September 26, 2001. In addition, Mr. Shannon states that he made his decision to terminate plaintiff around "possibly late November," which is the third month of the three-month time span.

Therefore, within 60 days after her promotion to Associate Publisher and within weeks of her first complaint of discrimination, plaintiff was selected by Mr. Shannon for termination for alleged "poor sales" based upon sales figures it knew at the time of her promotion.

To highlight defendant's pretextual reason for plaintiff's termination, defendant admits that the sole document it relied upon to terminate plaintiff does not even contain the data of the type it claimed it used in forming its conclusion of "poor sales." Stated otherwise, when defendant was confronted with the fact the sales figures on which it claims to have relied were already known, defendant shifted to a claim that plaintiff's alleged lack of sales included "projections which [are] as important as actuals." Incredibly, however, the document defendant admits it solely and exclusively relied upon in making its determination to terminate plaintiff does not even contain "projections" within it. No documents containing any such "projections" have been produced in this litigation.

Moreover, implicit within defendant's pretextual reason for plaintiff's termination is its disingenuous indication that it was its poor financial condition arising out of alleged poor sales revenues which necessitated plaintiff's termination. Incredibly, however, in the same time frame

as plaintiff's termination, defendant proceeded to acquire: (1) assets of University Business, a competing magazine which was brought in to merge with Matrix for a price of $350,000, (2) Darren Sikorsky, a sales manager paid approximately $60,000 per year plus additional commission, (3) Tom Terry, a sales manager paid $60,000 per year plus additional commission; and (4) Dan Boucher, a Publisher who was compensated well over $120,000 in base salary and guaranteed commissions.

Finally, upon the filing of plaintiff's complaint with the CHRO, documents which defendant allegedly maintained plaintiff was merely a salesperson like all other salespersons in defendant's employment, setting forth sales data and commissions analysis were supposedly "lost." Defendant claims under oath it realized it had "lost" the documents detailing the structure of plaintiff's compensation and what it now characterizes as a "commission plan" at the time plaintiff filed her CHRO complaint. Even more incredible is defendant's admission that despite claiming these documents are now "lost," defendant claims it never even saw such documents at any time, prior to or subsequent to this litigation. Yet, all other true "salespersons" within its employment had folders containing these quarterly commission reports analyzing sales numbers, goals, and commission payments.

By the time plaintiff was told on January 2, 2002 that her position was terminated, defendant had already made offers to the two young men who Mr. Shannon repeatedly referred to as "the boys." As noted, these two young men had been in discussions with defendant as early as November. When plaintiff insisted that she be included in management meetings, including hiring decision meetings, Mr. Shannon adamantly precluded her from such inclusion. Moreover, management's awareness of plaintiff's complaint of sex discrimination did not even merit any

form of inquiry or investigation by defendant. Rather, in reaction to plaintiff's complaints of discrimination, defendant hired a total of three young men and terminated plaintiff. Upon her termination, plaintiff was never paid the compensation due her (i.e., $40,000)[5], representing the balance of her compensation from the date it was unilaterally reduced with promise to pay, until the date of her termination.

7. ***DEFENDANT'S CONTENTIONS.***

I. Sex Discrimination

1. Defendant ("ProMedia" or the "Company") did not discriminate against plaintiff Lisa Blumenschine ("Blumenschine") on account of her sex, or in any way violate Title VII or the Connecticut statute, either willfully or even unintentionally.

2. Blumenschine's evidence does not constitute a *prima facie* case of sex discrimination.

3. Blumenschine was terminated on performance-related grounds (i.e., her poor sales record and performance, including her projections).

4. The decision by Joseph J. Hanson ("Hanson"), managing member and 50% owner of the Company, to terminate Blumenschine was not motivated by sex discrimination.

5. The work atmosphere at ProMedia was neither discriminatory nor disrespectful of women.

6. Blumenschine's overriding obligation, whatever her title, always was to produce sales in her territory, and she did not fulfill that obligation to Hanson's satisfaction.

---

[5] This amount equals her non-recoverable draw of $60,000, less the monies paid to her for 4 of the 12 months, from January 2001 through April 2001 (i.e., 1/3 of $60,000), leaving $40,000 due through the remainder of the year.

12

7. The Company had many women employees, two of whom were among the five most highly compensated employees.

8. The Company also terminated men on performance-related grounds.

9. The expressed reason for Blumenschine's termination was not a pretext.

10. The disclosed foundation for Blumenschine's proposed damage claim is inadequate.

11. ProMedia acted in good faith throughout.

II. Age Discrimination

1. Defendant ("ProMedia" or the "Company") did not discriminate against plaintiff Lisa Blumenschine ("Blumenschine") on account of her age, or in any way violate ADEA or the Connecticut statute, either willfully or even unintentionally.

2. Blumenschine's evidence does not constitute a *prima facie* case of age discrimination.

3. Blumenschine was terminated on performance-related grounds (i.e., her poor sales record and performance, including her projections).

4. The decision by Joseph J. Hanson ("Hanson"), managing member and 50% owner of the Company, to terminate Blumenschine was not motivated by age discrimination.

5. The work atmosphere at ProMedia was neither discriminatory nor disrespectful of older people.

6. Blumenschine's overriding obligation, whatever her title, always was to produce sales in her territory, and she did not fulfill that obligation to Hanson's satisfaction.

7. The Company had many older employees, some of whom were among the five most highly compensated employees.

8. The Company also terminated younger people on performance-related grounds.

9. The expressed reason for Blumenschine's termination was not a pretext.

10. The disclosed foundation for Blumenschine's proposed damage claim is inadequate.

11. ProMedia acted in good faith throughout.

III. Retaliatory Discharge

1. Blumenschine was not discharged in retaliation for any complaint of discrimination by her or because she engaged in any "protected activity."

2. Blumenschine was terminated on performance-related grounds (i.e., her poor sales record and performance, including her projections).

3. Blumenschine never made any complaint of sex or age discrimination, nor could her casual conversation legitimately or reasonably be understood as a complaint requiring investigation or remediation.

4. In ProMedia's sole experience of a cognizable complaint of sex discrimination, ProMedia took immediate remedial action, which eventually led to the termination of the employee involved (Dan Boucher).

5. There was no retaliatory discharge since no complaint of discrimination by Blumenschine was ever made known to Hanson, who made the decision to discharge Blumenschine.

6. ProMedia did not violate any of Blumenschine's protected rights, willfully or even unintentionally.

7. ProMedia acted in good faith throughout.

IV. <u>Promissory Estoppel</u>

1. At no time did ProMedia make a sufficiently definite promise to pay Blumenschine, regardless of her level of sales, anything other than her base salary after May, 2001.

2. Blumenschine knew or should have known that after May, 2001, any compensation over her base salary of $80,000 would be dependent on achieving a higher level of sales than anything she subsequently achieved.

V. <u>Negligent Misrepresentation</u>

1. ProMedia never misrepresented the amount of Blumenschine's compensation, even negligently.

2. From and after May, 2001, Blumenschine knew that any non-recoverable commission against draw had been eliminated from her compensation.

3. From May, 2001, Blumenschine, an experienced salesperson, understood that unless she produced a higher level of sales than that which she subsequently achieved, her on-going salary would be limited to her base pay of $80,000 per year; she nevertheless continued to work for ProMedia.

4. Even if (which is not conceded) ProMedia was negligent in making any representation which led Blumenschine to believe that she would earn more than $80,000 without producing more meaningful commissionable sales, her own contributory negligence must deny her recovery.

VI. <u>State Law Wage Claim</u>

1. All wages owed to Blumenschine by ProMedia have been paid to her.

2. ProMedia has not knowingly or willfully withheld any wages from Blumenschine.

15

## 8. *LEGAL ISSUES.*

A. Whether defendant discriminated against plaintiff in violation of 29 U.S.C. §2000 (Title VII);

B. Whether defendant discriminated against plaintiff in violation of 29 U.S.C. §623(d) (ADEA);

C. Whether defendant discriminated against plaintiff in violation of Conn. Gen. Stat. §46a-60(a);

D. Whether defendant retaliated against plaintiff in violation of 42 U.S.C. §2000e-3 (Title VII);

E. Whether defendant retaliated against plaintiff in violation of (29 U.S.C. § 623(d)(ADEA);

F. Whether defendant retaliated against plaintiff in violation of Conn. Gen. Stat. §46a-60(4);

G. Whether defendant is estopped from contesting, and is bound by, the representations set forth in paragraphs 10 and 11 of the Complaint;

H. Whether defendant committed the tort of negligent misrepresentation;

I. Whether defendant violated Conn. Gen. Stat. §31-72 (wage statute); and

J. Defendant's defenses to the foregoing.

### 9.    STIPULATED FACTS/CONTESTED ISSUES.

#### Stipulated Facts.

1. Plaintiff Lisa K. Blumenschine is a resident of the state of Connecticut.

2. Defendant Professional Media Group, LLC (PMG) is a Connecticut limited liability company with its principal place of business in Norwalk, Connecticut.

3. Defendant is engaged in the publication industry. Its products consist of two trade magazines in the educational field, one entitled "District Administration," which primarily addresses district administrators of high schools, and the other entitled "University Business" (formerly "Matrix"), which addresses college and university administrators.

4. Plaintiff's date of birth is June 27, 1951.

5. Joseph J. Hanson owns a one-half interest in the Company and serves as its managing owner.

6. Plaintiff was recruited by defendant for the position of National Sales Manager of its Matrix magazine effort.

7. Lisa Blumenschine was hired by the Company in or around January 2000.

8. At the time plaintiff was hired, "Matrix" was a start-up publication aimed at college and university administrators.

9. Plaintiff began her employment with defendant on January 31, 2000 when she was hired as defendant's National Sales Manager.

10. Advertisement space in the inaugural issue of "Matrix" was offered for free as an enticement for continued ad sales from initial customers.

11. Despite the fact that the Company discontinued her "nonrecoverable draw against commissions" in May 2001, Blumenschine continued to work for the Company.

12. In or around September of 2001, Daniel Shannon replaced Daniel Kinnaman as Publisher of "Matrix" magazine, and consequently became Blumenschine's supervisor.

13. The Company informed Blumenschine of its decision to terminate her on or about January 2, 2002.

14. Defendant at all relevant times hereto employed more than 20 employees.

15. The Company hired Messrs. Terry and Sikorsky in early 2002, when they left the failing "University Business."

## *CONTESTED ISSUES.*

### *Plaintiff's Contested Issues.*

1. Plaintiff was selected by Mr. Shannon for termination after receiving complaints of discrimination.

2. Mr. Shannon was the driving force in the ultimate decision to terminate plaintiff.

3. Mr. Shannon, as supervisor of plaintiff, abused the power of his position to further the harassment of plaintiff, leaving defendant liable despite any claim that it did not have knowledge of Mr. Shannon's unlawful conduct.

4. No action was taken to provide, prevent and promptly correct Mr. Shannon's discriminatory behavior.

5. Defendant, through Mr. Shannon, discriminated against plaintiff on the basis of her age and sex.

6. No affirmative defense is available to defendant because Mr. Shannon's harassment culminated in a tangible negative employment action.

7. There is an all-male executive team at defendant that carries with it the power to hire, fire, promote and set salaries.

8. Plaintiff's responsibility as a National Sales Manager carried with it the authority to recommend termination as well as the over seeing of salespersons.

9. Plaintiff's compensation was not directly related to her amount of sales.

10. Sales figures with defined goals and or objectives did not exist for plaintiff as they did for defendant's salespeoples.

11. Plaintiff was reassured that her position was secure.

12. Plaintiff was never told that her job was in jeopardy due to her sales performance.

13. Plaintiff's promotion was not one in title only.

14. Plaintiff never stated that she expected to be terminated because of her sales performance.

15. Plaintiff did not acquiesce to the nonrecoverable portion of her compensation being withheld.

16. Plaintiff's promotion was merit based.

17. Plaintiff's management responsibility for George Saroyan consisted of overseeing his sales effort.

18. Defendant did not have "projections" of plaintiff's sales figures upon which to base her termination.

19

19. Defendant's registered plaintiff's "boys club" comment as a complaint, referring to her exclusion from its all-male management team.

20. Plaintiff's sex and gender played key roles in defendant's decision to terminate her.

21. Plaintiff, unlike George Saroyan, a true salesperson, was not given notice that her sales figures were having any negative influence on her position when, in fact, she was promoted into a position of management.

22. Plaintiff had problems with Mr. Shannon's discrimination at the time he became her direct supervisor.

23. Mr. Shannon made sexist and ageist jokes and comments.

24. Mr. Shannon viewed plaintiff as a threat and viewed her in a stereotypical, sexual manner.

25. Plaintiff's complaint of sex discrimination triggered, at least in part, defendant's decision to terminate her.

26. Plaintiff was excluded from managerial meetings.

27. Male employees replaced plaintiff.

28. Defendant had hired two young men incident to its decision to terminate plaintiff.

29. Defendant terminated plaintiff only after being in contact with two male salespeople.

30. Defendant intentionally discriminated against plaintiff due to her age, gender and complaints of discrimination.

31. Defendant discriminated against plaintiff by firing her.