## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **LISA K. BLUMENSCHINE,** | : | **CIVIL ACTION NO.** |
| | : | **302 CV 2244 (HBF)** |
| **Plaintiff,** | : | |
| | : | |
| **V.** | : | |
| | : | |
| **PROFESSIONAL MEDIA GROUP,** | : | |
| **LLC,** | : | **APRIL 26, 2006** |
| | : | |
| **Defendant.** | : | |

## PLAINTIFF'S OPPOSITION TO
## DEFENDANT'S MOTION IN LIMINE TO EXCLUDE TESTIMONY
## AND ARGUMENT CONCERNING LOST DOCUMENTS

In this case involving, *inter alia*, discrimination and retaliation, defendant Professional Media Group, LLC has asserted that plaintiff Lisa Blumenschine was terminated exclusively for "lack of sales." Discovery unearthed that documents relative to plaintiff's sales cannot be located and, presumably, either no longer exist or never existed in the first place. This includes (1) sales commission reconciliations, (2) sales quotas, (3) monthly sales figures, and (4) sales forecasts. Each of these items are available for every other salesperson. As for each of these items, at least one employee of defendant has testified that they have seen them in the past, although since this litigation, none can be located other than a "sales summary." (See deposition excerpts attached as Exhibit 1).

Incredibly, defendant now moves to preclude "any discussions of the absence of those documents" ***other than*** the one document that the defendant has been able to provide, the "sales summary." According to defendant, only if plaintiff can show that the missing records were

"intentionally destroyed" and "that they would have shown anything different than the sales summary" should testimony about the missing sales records for plaintiff be allowed.

Defendant cites only to <u>Pace v. National RR Passenger Corp.</u>, 291 F.Supp.2d 93 (D.Conn. 2003), in which a party sought an adverse inference instruction where the defendant had destroyed records relevant to the case pursuant to its own practice of destroying documents after keeping them for two calendar years. <u>Id.</u> at 97. In that case, the court rejected the argument that an adverse inference instruction is improper merely upon a showing of negligence. <u>Id.</u> at 99. The court quoted the Second Circuit's opinion in <u>Residential Funding Corp. v. De George Financial Corp.</u>, 306 F.2d 99, 108 (2d Cir. 2002), saying "the culpable state of mind factor is satisfied by a showing that the evidence was destroyed knowingly, even if without an intent [to breach a duty to preserve it] or *negligently*" (citations omitted, emphasis in original). The decision in <u>Residential Funding</u> also states "each party should bear the risk of its own negligence." <u>Id.</u> at 108. Thus, according to defendant's own cited Second Circuit authority, intentional destruction is not required.

In this case, it is contrary to common sense and fairness to punish plaintiff by precluding her from mentioning that such documents existed and are no longer available where there is evidence that defendant has lost or destroyed this relevant evidence. It matters not whether that destruction was negligent or intentional.

2

## *CONCLUSION*

For the forgoing reasons, plaintiff respectfully requests that the defendant's Motion in Limine to Exclude Testimony and Argument Concerning Lost Documents be denied.

By
Scott R. Lucas (ct00517)
Keith A. McBride (ct26929)
*Attorneys for Plaintiff,*
*Lisa K Blumenschine*
MARTIN, LUCAS & CHIOFFI, LLP
177 Broad Street
Stamford, CT 06901
Phone: (203) 973-5200
Fax: (203) 973-5250
slucas@mlc-law.com
kmcbride@mlc-law.com

## *CERTIFICATE OF SERVICE*

This is to certify that on this 26th day of April, 2006, a copy of the foregoing was mailed, first class, postage prepaid, to:


George P. Birnbaum, Esq.
Thomas P. Minogue, Esq.
Michael L. Ferch, Esq.
Minogue Birnbaum LLP
237 Elm Street
New Canaan, CT 06840
Phone: (203) 966-6916
Fax: (203) 966-6917


Scott R. Lucas

4

# **EXHIBIT 1**

1

1        UNITED STATES DISTRICT COURT

2          DISTRICT OF CONNECTICUT

3    * * * * * * * * * * * * * * * *

4    LISA K. BLUMENSCHINE,              *

5             Plaintiff,               *

6        vs.                           *      Civil Action No.
                                                302 CV 2244(DJS)
7    PROFESSIONAL MEDIA GROUP, LLC,    *

8             Defendant.               *

9    * * * * * * * * * * * * * * * *

10                                    Stamford, CT

11                                    September 16, 2003

12                                    10:03 a.m.

13

14                         - - -

15            DEPOSITION OF WILLIAM ZIPERMAN
                           - - -

16   APPEARANCES:

17       FOR THE PLAINTIFF:

18               MARTIN, LUCAS & CHIOFFI
                 BY:   SCOTT LUCAS, ESQ.
19                     MICHAEL BAYONNE, ESQ.
                       177 Broad Street, 16th Floor
20                     Stamford, CT 06904

21       FOR THE DEFENDANT:

22               MINOGUE BIRNBAUM, LLP
                 BY:   THOMAS E. MINOGUE, JR., ESQ.
23                     237 Elm Street
                       New Canaan, CT 06840
24

25

CAMPANO & ASSOCIATES
COURT REPORTING SERVICES

1        Q      Do you know whether you handed it to her or

2     mailed it to her?

3        A      I believe I handed it to her, but I'm not

4     positive.

5        Q      Do you recall where you were when you handed

6     it to her?

7        A      I do not.

8        Q      Was it at that Dunkin' Donuts meeting?

9        A      No, I don't believe so.

10               There was an attachment to this, I believe.

11     But that's the part that's lost.

12       Q      The attachment to this is lost?

13       A      Yes.

14       Q      When did you first realize it was lost?

15       A      When there was the action in front of that

16     government commission.

17       Q      So you looked for it and couldn't find it at

18     that point?

19       A      Yes.

20       Q      I noticed in production there are other

21     salespeople that have folders, commission folders, if

22     you will.

23       A      Um-hum.

24       Q      I don't know what the term is.  But folders

25     with the commission calculations and reconciliations in

1    them; is that correct?

2        A     Yes.

3        Q     Is it the practice of Professional Media to

4    maintain that type of folder for salespeople?

5        A     Yes.

6        Q     Did you maintain that type of folder for

7    Ms. Blumenschine?

8        A     Yes, I thought.

9        Q     No one can find it?

10       A     We had a change of financial people and so

11   the -- somewhere in that change -- I also kept copies

12   on my computer, but I must have overwritten it because

13   I don't have a copy.

14       Q     You've done a computer search and can't find

15   any documents?

16       A     Right.

17       Q     And you've done a physical search and you

18   can't find the folder that may or may not have been

19   kept of Ms. Blumenschine's commissions?

20       A     Right.

21       Q     Do you recall ever seeing a folder with

22   Ms. Blumenschine's name on it containing commission

23   calculations for her?

24       A     No.  But I don't see them for other --

25   unless there are commission payments, I don't see them.

1    Q    Can you explain that for me?

2    A    I review commission payments, so -- it's not

3    that I see the folders.  I see the contents in terms of

4    proving commissions.

5    Q    She received a check every month, correct?

6    A    That was a draw against commission.

7    Q    Was there ever a reconciliation performed, a

8    draw against actual commission?

9    A    There was, but there were no commissions.

10    Q    Did you perform that reconciliation?

11    A    No.

12    Q    Did you see that reconciliation?

13    A    No.  It was just obvious.

14    Q    Do you know whether an actual physical

15    reconciliation was ever drafted up?

16    A    In writing?

17    Q    Yes.

18    A    I don't believe so.

19    Q    What would be in this folder that you think

20    existed?

21            MR. MINOGUE:  Object to form.

22            You can answer if you recall.

23    A    Repeat the question, please.

24    Q    What do you recall being in this folder that

25    you can't locate, if anything?

1          MR. MINOGUE:  Object to the form.

2      A     Again, I never saw these commission folders

3  until this lawsuit occurred.  I mean, it was something

4  that our financial person used as a way of keeping

5  track of things.  I simply saw documents that pertained

6  to commission payments and reviewed them quarterly,

7  before the payments were made.

8      Q     You never saw any of those types of

9  documents for Ms. Blumenschine, correct?

10     A     No.  And the reason, as I said before, is in

11 the year 2000 the performance did not exceed or come

12 close to meeting the commission plan.  And I never got

13 to put together a commission plan for the year 2001

14 because the sales of the magazine just didn't justify

15 commissions.

16     Q     You have on this Exhibit A several bullet

17 points with duties listed after them.  Do you see that?

18     A     Yes.

19     Q     Were those the duties you anticipated the

20 national sales manager to perform?

21     A     Yes.

22     Q     Then in the paragraph following those bullet

23 points, you indicate "The commission [slash] bonus plan

24 will be as previously discussed and informally

25 documented."

1      A     Um-hum, yes.

2      Q     The document you said you can't locate that

3  was attached to this, was that the informal

4  documentation you're referring to here?

5      A     That had been previously informally

6  documented.  I had -- I think I had written up, you

7  know, some basic ideas and I had then formalized them

8  in a document.  That's the document I can't find.

9      Q     The basic -- are you referring to the formal

10  documents or the basic ideas that you wrote up in this

11  sentence here?

12      A     Well, I have neither.

13      Q     You have neither.  But what are you

14  referring to in the sentence?

15      A     The formal document -- in this sentence?

16      Q     Right.

17      A     Which sentence?

18      Q     "The commission [slash] bonus plan will be

19  as previously discussed and informally documented."

20      A     Had previously informally discussed.

21      Q     It says "previously discussed and informally

22  documented."

23      A     The "previously" refers to both "discussed

24  and informally documented."

25      Q     My question to you is:  What format was that

```
 1    informal documentation?  Was it on a cocktail napkin --
 2        A    Kind of, or on a pad or something, roughing
 3    out ideas.
 4        Q    You've already testified you can't locate
 5    that document, correct?
 6        A    Well, that was just scrap.  It was formally
 7    documented later, and that's the document I can't find.
 8        Q    You took that scrap and then made a formal
 9    document?
10        A    Yes.
11        Q    Which you indicate in the next sentence, in
12    parentheses, that in fact is what you intended to do?
13        A    Right.
14        Q    "I will write it up in detail and send it to
15    you next week"?
16        A    Yes.
17        Q    Did you in fact do that?
18        A    Yes.
19        Q    And you can't find that document?
20        A    No.
21        Q    This document doesn't say anything about
22    time period, does it?
23        A    This document?
24        Q    Right.
25        A    No.
```

1      Q      Did it contain, for example, the 30-day

2    notice of termination provision?

3      A      I don't remember.

4      Q      That would have been attached to Exhibit A

5    that you can't locate, the document of terms you just

6    referred to?

7      A      Yes.

8      Q      Do you recall any of the terms on the

9    document of terms?

10     A      Not in any detail, no.  I know that she had

11   some free page and some paid page objectives, but they

12   were primarily page objectives as opposed to revenue

13   objectives.

14     Q      Looking at Terry Nelson's documents that

15   I've given you as Exhibit C --

16     A      Yes.

17     Q      -- Terry Nelson sold for what magazine?

18     A      For *Matrix*.

19     Q      Do you see halfway through Exhibit C,

20   starting with Bates number 260 --

21     A      Yes.

22     Q      -- this page, a very similar document to the

23   one we just saw with Melanie Jenkins?  Do you see that?

24            So at least as of 2002 you did set some sort

25   of goals for *Matrix*; is that correct?

1    of her sales for those two issues, which is --

2         Q    "She" being Lynn Keeler?

3         A    Yes.

4         Q    Who was Lynn Keeler?

5         A    She was our financial manager.

6         Q    She would copy you on these reports?

7         A    Yes.

8         Q    How often would you get these reports?

9         A    Quarterly.

10        Q    Would you get them on all salespeople?

11        A    Typically, yes.

12        Q    You didn't get any on Ms. Blumenschine?

13        A    Now that I see all these, I have my doubts,

14   but I don't remember.

15        Q    You did not see them for Ms. Blumenschine?

16        A    I don't really remember.

17        Q    When you said you had your doubts, what were

18   you referring to?

19        A    If you had asked me before looking at these

20   if I had seen them for Terry Nelson, I would have said

21   no as well.

22        Q    Well, you've searched your records for these

23   types of documents for Ms. Blumenschine, right?

24        A    Right.

25        Q    None have turned up, right?

```
 1        A     If you don't have any, none have turned up.

 2        Q     But yet you have these for all other

 3   salespeople, correct?

 4        A     Correct.

 5              She did have a different type of sales plan

 6   than these people.

 7                   MR. MINOGUE:   There's no question

 8   pending.

 9        Q     How was it different?

10        A     She had an overall quota which included

11   her -- an overall magazine quota for the year 2000,

12   which included her territory.

13        Q     Her quota was a magazine-wide quota?

14        A     Right.

15        Q     Okay.

16              (Whereupon, the Multipage document headed

17   "Sales by Issue" was marked as Plaintiff's Exhibit F

18   for identification.)

19        Q     I show you what I've marked as Exhibit F, a

20   document produced by your company, by your employer,

21   bearing Bates numbers 1036 through 1050. And I'll ask

22   whether you can identify this packet of documents for

23   me.

24        A     How so?

25        Q     Do you know what they are?
```

```
 1              UNITED STATES DISTRICT COURT

 2            FOR THE DISTRICT OF CONNECTICUT

 3

 4       * * * * * * * * * * * *

 5   LISA K. BLUMENSCHINE,        *       COPY

         Plaintiff              *

 6       VS.                      *    3:02 CV 2244 (DJS)

 7
     PROFESSIONAL MEDIA           *
 8   GROUP, LLC,
                                  *
 9            Defendant
         * * * * * * * * * * * *

10
                                Stamford, CT
11
                                September 30, 2003
12
                                10:00 A.M.
13

14                        - - -
                  DEPOSITION OF JOSEPH HANSON
15                        - - -

16

     APPEARANCES:
17
          FOR THE PLAINTIFF:
18
               MARTIN, LUCAS & CHIOFFI
19             BY:  SCOTT LUCAS, ESQ.
                    177 Broad Street
20                  Stamford, CT  06904

21        FOR THE DEFENDANT:

22             MINOGUE BIRNBAUM LLP
               BY:  THOMAS E. MINOGUE, JR., ESQ.
23                  237 Elm Street
                    New Canaan, CT  06840

24

25
```

1    Q.    You have in your Exhibit R 1-8-2000 date

2    of hiring LB letter.  Where did you get that

3    information from?

4    A.    Bill Zipperman.

5    Q.    If you look at the letter, it is

6    actually dated January 7.  Is this a reference to

7    the date of the letter, 1-8-00?

8    A.    I guess so.

9    Q.    Do you know if there's another letter

10    other than the one that's marked Exhibit A?

11    A.    I would be surprised.

12    Q.    Do you know why there's a date

13    discrepancy?

14    A.    I was trying to get an overall picture

15    of what was going on.  I didn't ask anybody to dig

16    up documents.

17    Q.    This is information you got from

18    Mr. Kinnaman?

19    A.    Or Mr. Zipperman.  I'm not sure.  I just

20    didn't want to mention the wrong year.

21    Q.    And do you know whether Ms. Blumenschine

22    was given commission sales goals?  Sales goals

23    upon her commission would be based?

24    A.    I would certainly think so.

25    Q.    Have you ever seen a document that sets

1    forth sales goals for Ms. Blumenschine?

2        A.    Not that I recall.

3        Q.    Have you ever seen a document that sets

4    forth the amount of commission she will earn

5    vis-a-vis certain sales attainments?

6        A.    No.

7        Q.    Ms. Blumenschine was the only one being

8    given the title national sales manager; isn't that

9    correct?

10        A.    Not in our company, no.  We have another

11    national sales manager in the company.

12        Q.    At that time?

13        A.    Yes.

14        Q.    For a different magazine?

15        A.    Yes.

16        Q.    She was the only one on this particular

17    magazine?

18        A.    Yes.

19        Q.    Were there other salespeople working on

20    the magazine at the time Ms. Blumenschine was

21    hired?

22        A.    I don't think so.

23        Q.    Eventually two more were hired, correct?

24        A.    Yes.

25        Q.    Was she responsible for them as sales

1

1          UNITED STATES DISTRICT COURT

2            DISTRICT OF CONNECTICUT

3     * * * * * * * * * * * * * * * *         COPY

4    LISA K. BLUMENSCHINE,              *

5              Plaintiff,               *

6         vs.                           *     Civil Action No.
                                              302 CV 2244(DJS)
7    PROFESSIONAL MEDIA GROUP, LLC,     *

8              Defendant.               *

9     * * * * * * * * * * * * * * * *

10                              Stamford, CT

11                              September 24, 2003

12                              11:37 a.m.

13                          - - -

14          **DEPOSITION OF DANIEL SHANNON**
                            - - -

15

16   APPEARANCES:

17        FOR THE PLAINTIFF:

18            MARTIN, LUCAS & CHIOFFI
              BY:  SCOTT LUCAS, ESQ.
19                 MICHAEL BAYONNE, ESQ.
                   177 Broad Street, 16th Floor
20                 Stamford, CT 06904

21        FOR THE DEFENDANT:

22            MINOGUE BIRNBAUM, LLP
              BY:  THOMAS E. MINOGUE, JR.
23                 237 Elm Street
                   New Canaan, CT 06840

24

25

1        Q        Yes.

2        A        That's news to me.

3        Q        Okay.   Just so I'm clear -- I don't want to

4    belabor the point but --

5        A        That's okay.

6        Q        -- while you were publisher of *eMarketing*

7    and these reports were circulated, you would only see

8    the detailed reports for the salespeople on your

9    magazine?

10        A        That's correct.

11        Q        Yet you have personal knowledge that similar

12    reports were generated for the salespeople on the other

13    magazines?

14        A        I have personal belief.   I don't know that.

15    I don't know that.

16        Q        So you haven't actually seen such reports

17    for other magazines?

18        A        Not to my memory.

19        Q        But you did see them for *Matrix* [slash]

20    *University Business* in late 2001 when Ms. Blumenschine

21    reported to you?

22        A        Yes.

23        Q        Now, as publisher and editor-in-chief of

24    *eMarketing*, did you work with Ms. Blumenschine?

25        A        No.

| | | |
|---|---|---|
| 1 | Q | I take it you were not aware in 2001 that |
| 2 | | that had been taken away from her? |
| 3 | A | I was not aware of any aspect of her |
| 4 | | compensation, nor am I to this day. |
| 5 | Q | Okay. Let me show you what was marked |
| 6 | | earlier as Exhibit F. Is that a document that you |
| 7 | | referred to in making your decision to terminate |
| 8 | | Ms. Blumenschine? |
| 9 | A | This is the weekly report that you indicated |
| 10 | | you did not have. This is the one I was referring to. |
| 11 | Q | That's a monthly summary. |
| 12 | A | The weekly report resembles it. |
| 13 | Q | Resembles it? |
| 14 | A | Yes. I thought it was the same thing. |
| 15 | Q | That's a month-by-month summary? |
| 16 | A | It comes out on a weekly basis and it's |
| 17 | | subtotaled as you go. So this is the weekly. |
| 18 | Q | That's the document you relied upon? |
| 19 | A | This one per se, l assume. I don't -- |
| 20 | Q | That data is what you relied on? |
| 21 | A | Yeah, right. As I say, this is the weekly |
| 22 | | report. You may have one that is a comprehensive |
| 23 | | month, cumulative. |
| 24 | Q | That's all I have. |
| 25 | A | This is what I was referring to. What you |

CAMPANO & ASSOCIATES
COURT REPORTING SERVICES

 1   said you did not have, what I was referring to, you do

 2   have.

 3        Q    I apologize.

 4        A    I just want you to know for your

 5   information.

 6             Yes, this is the -- if this is not the exact

 7   month or whatnot -- but this is exactly the kind of

 8   information that I would rely upon.

 9        Q    Look through the whole document and tell me

10   if there's anything missing that you did rely upon that

11   you recall.

12        A    No, there's nothing missing that would jump

13   out at me at all.

14             I'm trying to read -- acquaint myself with

15   this, trying to see whose territories is whose.

16        Q    You're aware, are you not, that

17   Ms. Blumenschine filed a claim with the Commission on

18   Human Rights and Opportunities against the company and

19   you?

20        A    I'm aware that she filed a Complaint, but I

21   wasn't aware it was against me. I thought it was just

22   a corporate complaint. Is there a distinction there?

23   You tell me.

24        Q    In any event, the federal suit is not

25   against you per se. I thought you were named -- yes,