# EXHIBIT A

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1326552 (N.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 1

**C**
Only the Westlaw citation is currently available.
United States District Court, N.D.Texas, Wichita
Falls Division.
Paul D. MILLER and his wife, Caprice Miller
v.
BURLINGTON NORTHERN SANTA FE
RAILWAY COMPANY, a Delaware corporation,
Gary and Judy McGarvey, David D. Waldner, John
Does One Through Five
**No. 7:99-CV-0149-R.**

Oct. 16, 2001

MEMORANDUM AND ORDER ON MCGARVEY
DAUBERT MOTION

ROACH, Magistrate J.
*1 This is a personal injury case brought under FELA
by a railroad engineer injured in two collisions
separated by sixteen months. The first collision
occurred between his train and a vehicle driven by an
employee of two of the individual defendants and the
second collision occurred between the commercial
transportation vehicle engaged by the railroad
employer to transport plaintiff as a crew member and
another vehicle on the highway. The railroad
employer, the driver of the first vehicle, and his
employers, the operators of the second colliding
vehicle and several unknown John Does are the
named defendants.

> FN1. Federal Employers' Liability Act, 45
> U.S.C. § § 51-60

> FN2. His wife is also a plaintiff seeking
> damages for loss of consortium.

Among the damages alleged to have been sustained
by the Plaintiff are his loss of earnings in the past, the
loss of earnings in the future, and loss of earning
capacity. Pursuant to the Amended Scheduling
Order, Plaintiffs designated Jeffrey B. Opp as
"Plaintiff's economic expert."

> FN3. Plaintiff has alleged the earnings loss
> as an element of damage asserted against
> each and every of the defendants. See
> Paragraphs 11, 22, 32 and 55 of the Original
> Complaint.

Defendants Gary and Carolyn McGarvey
("McGarveys"), the owners of the vehicle that
collided with the train, as the employers of the
operator of the vehicle, have filed a *Daubert* motion
challenging the projected testimony of Opp as
Plaintiff's economic expert. Their *Daubert* motion
has been referred to me for hearing and determination
by the Court's general Order of Reference as a non-
dispositive motion.

> FN4. *Daubert    v.    Merrell    Dow*
> *Pharmaceuticals, Inc.,* 509 U.S. 579, 113
> S.Ct. 2786, 125 L.Ed.2d 469 (1993)

Having reviewed McGarvey's Motion and the
accompanying Appendix and Brief, Plaintiffs'
Response and McGarvey's Reply as the "gatekeeper,"
I do not find sufficient support on *Daubert* grounds
for shutting the gate on Opp's testimony. The first
prong of the two prong *Daubert* analysis is a
reliability assessment by which the gatekeeper is to
evaluate the methodology used by the expert in his
analysis. The second prong is the "fit" analysis, to-
wit: whether the proffered expert testimony will
assist the trier of fact in understanding or determining
a fact in issue.

Opp's report dated January 22, 2001 and the
accompanying spreadsheets and schedules reflect that
Opp's anticipated role in the trial of this case is to
summarize and coalesce extensive statistical data
related to Plaintiff's past net earnings and his future
net earnings extrapolated therefrom and to compare
that data to similar data derived from a selected set of
other employees and applied in the same manner to
Plaintiff's anticipated future earnings events. The
"science" or "methodology" used by Opp in
preparing the data spreadsheets and schedules was
basic mathematics, the same learned in grade school
but with a smattering of simple algebraic formulae
(functions) learned in high school thrown in. The
spreadsheets and schedules attached to and
supporting the report are reproducible using any
common spreadsheet programs such as *Excel, Quatro
Pro* or *DataPro.* The formulae used to calculate the
various entries for addition, subtraction and
multiplication and recording the various subtotals and
totals are likewise available in the same spreadsheet
programs.

> FN5. Copyrights of Microsoft, Corel, and
> Data Pro, respectively.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1326552 (N.D.Tex.)
(Cite as: Not Reported in F.Supp.2d)

**\*2** The essence of Opp's anticipated testimony as reflected in his report of January 22 and his deposition excerpts is the mathematical differential between the amount of earnings Plaintiff experienced in the past and reasonably could have anticipated in the future had he not been injured and those same past and future earnings he experienced and reasonably could anticipate earning in the future in his injured state. To arrive at the differential, Opp took known data (Plaintiff's own wage history for four years prior to the first collision), added in the calculated value of the fringe benefits, deducted therefrom the federal income taxes reported and/or paid, backed out certain expenses and certain "tier" retirement payments, to arrive at the "net" historical railroad earnings. The mathematical functions used to arrive at such historical figures were addition, subtraction, and multiplication, all grade school skills. From the baseline of that "historical" data, Opp projected the figures into the future using a commonly recognized mathematical principal known as "extrapolation." This function does presume or assume a straight line ("linear") relationship between past occurrences and future events, an assumption that may be challenged on cross-examination, but is fair to assume and is not "junk science."

FN6. Appendix pp. 130-151.

Opp did use "set theory" (another mathematical tool) to project Plaintiff's earnings into the future. Opp assumed that Plaintiff was a member of a class of similarly situated railroad employees ( the "set") and projected that Plaintiff's future earnings would be affected by the same factors that did affect the set members in the past and would affect the members in the future. The McGarveys challenge the composition of the "set" selected by Opp (those furnished by the railroad employer) as not being representative of Plaintiff. The use of a set (of which Plaintiff is assumed to be a member) to project the effects of certain assumed events is recognized methodology for predicting effects on individual members of the set. But the composition of the set should be defined so as to include the Plaintiff. I cannot find, as a matter of law, that the Plaintiff is not a member of the set chosen by Opp for his computational and analytical purposes. But the use of an inappropriate set or a set factually unrelated to Plaintiff certainly makes Opp's projected testimony an easy target for cross-examination.

FN7. Appendix 90-91.

Using certain disclosed different assumptions as to what future events might affect Plaintiff's earning experience (i.e., working 5 or 10 more years or retiring at age 62) for his written report purposes, Opp chose three different time periods as to which he calculated the gross (total) effect of his injuries on the Plaintiff's earnings differentials. The McGarveys challenge the arbitrariness of the selection of these three periods. Since his data covered a 22-year range, Opp could have selected any annual or other period for analytical and reporting purposes, but the choice of these three periods for reporting and presentation purposes is based on certain fair assumptions concerning Plaintiff's future working options.

**\*3** The McGarveys complain about Opp's extensive use of annualizations in his calculations of earnings differentials. Annualizations of fiscal data are common and are as accurate as using averages or calculating means. Again, fodder for cross-examination, but not exclusion.

It is inherent in projecting future earnings that certain assumptions need be made. These assumptions were disclosed by Opp in his report. The assumptions he made are not clearly mistaken, unsupportable, or fanciful. They appear to be fairly made. But if mistaken, they are certainly fodder for cross-examination, not exclusion.

> FN8. It is not the trial court's role to determine the truth or falsity of the expert's opinion but merely to focus on the underlying principals and the methodology. *E.I. du Pont de Nemours and Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex.1995).

Finally, Opp's written report summarized in the language of the written word what the mathematical language in the compilations of data and mathematical functions disclosed.

The knowledge and skills used by Opp in assembling and compiling the data, performing the mathematical calculations, selecting the formulae (functions) to be applied to the data, charting the results, and then summarizing the end figures in mathematical and written language do not require special college degrees or post-graduate education. The methodology is not proper subject of peer review. The bachelor's degree in economics which Opp holds reflects the degree of mastery of basic mathematical, statistical and language skills necessary to perform the

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2001 WL 1326552 (N.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d)**

compilations, calculations and formulae selections
used by Opp in his analysis and in making his report.
Brain surgery, it ain't. And Einstein did not have a
degree in nuclear physics either. Opp's proffered
testimony meets the reliability assessment prong of
*Daubert*

As previously indicated, loss of earnings is one of the
major damage issues plead by the Plaintiffs I could
not conceive of a more difficult challenge to a trial
attorney than presenting lost wage data without an
expert to summarize the voluminous data and
calculations Opps' analysis and opinions based
thereon are relevant to the issues in controversy
formed by the pleadings. Opps' proffered testimony
needs the "fit" prong of *Daubert*.

Mathematics is not junk science. Defendants'
*Daubert* motion is overruled. Opp can testify.

IT IS SO ORDERED.

N.D.Tex.,2001
Miller v. Burlington Northern Santa Fe Ry. Co
Not Reported in F.Supp.2d, 2001 WL 1326552
(N.D.Tex.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## **EXHIBIT B**

Westlaw.

--- F.3d ----
--- F.3d ----, 2006 WL 932354 (C.A.7 (Ill.))
**(Cite as: --- F.3d ----)**

Page 1

**H**
Briefs and Other Related Documents
Only the Westlaw citation is currently available
United States Court of Appeals,Seventh Circuit.
Sally NAEEM, Plaintiff-Appellee,
v.
MCKESSON DRUG COMPANY and Dan
Montreuil, Defendants-Appellants.
**No. 04-3816.**

ARGUED Sept. 15, 2005.
DECIDED April 12, 2006.

**Background:** Terminated employee sued employer
and manager, asserting Illinois law claim for
intentional infliction of emotional distress. Following
jury trial, the United States District Court for the
Northern District of Illinois, Joan B. Gottschall, J.,
2002 WL 975315, entered judgment for employee.
Employer and manager appealed.

**Holdings:** The Court of Appeals, Ripple, Circuit
Judge, held that:

4(1) emotional distress claim was not preempted by
Illinois Human Rights Act (IHRA);

11(2) jury's determination that employer's conduct
was extreme and outrageous was supported by
sufficient evidence;

12(3) jury's determination that employer intended to
cause employee emotional distress was supported by
sufficient evidence;

13(4) jury's determination that employee suffered
emotional distress was supported by sufficient
evidence;

21(5) erroneous admission of professor's purported
expert testimony was not reversible error;

26(6) admission of expert testimony regarding
Department of Transportation (DOT) regulations was
not plain error; and

30(7) District Court's error of comparing employee's
award of damages with awards in federal courts was
harmless

Affirmed.

**[1] Civil Rights 78 €══1704**

78 Civil Rights
    78V State and Local Remedies
        78k1704 k. Existence of Other Remedies;
Exclusivity. Most Cited Cases

**Torts 379 €══443**

379 Torts
    379V Other Miscellaneous Torts
        379k443 k. Nature and Form of Remedy. Most
Cited Cases
The Illinois Human Rights Act (IHRA) does not
preclude courts from exercising jurisdiction over all
tort claims factually related to incidents of sexual
harassment. 775 ILCS 5/8-111(C).

The Illinois Human Rights Act (IHRA) does not
preclude courts from exercising jurisdiction over all
tort claims factually related to incidents of sexual
harassment. 775 ILCS 5/8-111(C).

**[2] Civil Rights 78 €══1704**

78 Civil Rights
    78V State and Local Remedies
        78k1704 k. Existence of Other Remedies;
Exclusivity. Most Cited Cases

**Torts 379 €══443**

379 Torts
    379V Other Miscellaneous Torts
        379k443 k. Nature and Form of Remedy. Most
Cited Cases
When the sexual harassment aspect of an employee's
case is merely incidental to what are otherwise
ordinary common law tort claims, the employee's tort
claims are not preempted by the Illinois Human
Rights Act (IHRA). 775 ILCS 5/8-111(C).

When the sexual harassment aspect of an employee's
case is merely incidental to what are otherwise
ordinary common law tort claims, the employee's tort
claims are not preempted by the Illinois Human
Rights Act (IHRA). 775 ILCS 5/8-111(C).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

--- F.3d ----
--- F.3d ----, 2006 WL 932354 (C.A.7 (Ill.))
(Cite as: --- F.3d ----)

**[3] Civil Rights 78 ☞1704**

78 Civil Rights
   78V State and Local Remedies
      78k1704 k. Existence of Other Remedies; Exclusivity. Most Cited Cases

**Torts 379 ☞443**

379 Torts
   379V Other Miscellaneous Torts
      379k443 k. Nature and Form of Remedy Most Cited Cases

The distinction between claims that are preempted by the Illinois Human Rights Act (IHRA) and claims that are not preempted turns on the legal duty that the defendant allegedly breached; that is, if the conduct would be actionable even aside from its character as a civil rights violation because the IHRA did not furnish the legal duty that the defendant was alleged to have breached, the IHRA does not preempt a state law claim seeking recovery for it. 775 ILCS 5/8-111(C)

The distinction between claims that are preempted by the Illinois Human Rights Act (IHRA) and claims that are not preempted turns on the legal duty that the defendant allegedly breached; that is, if the conduct would be actionable even aside from its character as a civil rights violation because the IHRA did not furnish the legal duty that the defendant was alleged to have breached, the IHRA does not preempt a state law claim seeking recovery for it. 775 ILCS 5/8-111(C)

**[4] Civil Rights 78 ☞1704**

78 Civil Rights
   78V State and Local Remedies
      78k1704 k. Existence of Other Remedies; Exclusivity Most Cited Cases

**Damages 115 ☞57.5**

115 Damages
   115III Grounds and Subjects of Compensatory Damages
      115III(A) Direct or Remote, Contingent, or Prospective Consequences or Losses
         115III(A)2 Mental Suffering and Emotional Distress
            115k57.4 Preemption
               115k57.5 k. In General Most Cited Cases

Employee's claim against employer for intentional infliction of emotional distress, consisting of pattern of behavior creating impossible deadlines, setting up obstacles to employee's performance of her job, and sabotaging her work, was not preempted by Illinois Human Rights Act (IHRA), inasmuch as employer's alleged actions constituted tort independent of any duties not to discriminate against employee, and would constitute tort no matter what its motives were. 775 ILCS 5/8-111(C)

Employee's claim against employer for intentional infliction of emotional distress, consisting of pattern of behavior creating impossible deadlines, setting up obstacles to employee's performance of her job, and sabotaging her work, was not preempted by Illinois Human Rights Act (IHRA), inasmuch as employer's alleged actions constituted tort independent of any duties not to discriminate against employee, and would constitute tort no matter what its motives were. 775 ILCS 5/8-111(C)

**[5] Civil Rights 78 ☞1704**

78 Civil Rights
   78V State and Local Remedies
      78k1704 k. Existence of Other Remedies; Exclusivity. Most Cited Cases

**Damages 115 ☞57.5**

115 Damages
   115III Grounds and Subjects of Compensatory Damages
      115III(A) Direct or Remote, Contingent, or Prospective Consequences or Losses
         115III(A)2 Mental Suffering and Emotional Distress
            115k57.4 Preemption
               115k57.5 k. In General Most Cited Cases

Proper inquiry into whether employee's claim against employer for intentional infliction of emotional distress was preempted by Illinois Human Rights Act (IHRA) was not whether facts supporting emotional distress claim could also have supported discrimination claim, but whether employee could prove elements of intentional infliction of emotional distress independent of legal duties furnished by IHRA. 775 ILCS 5/8-111(C).

Proper inquiry into whether employee's claim against employer for intentional infliction of emotional

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----
--- F.3d ----, 2006 WL 932354 (C.A.7 (Ill.))
**(Cite as: --- F.3d ----)**

distress was preempted by Illinois Human Rights Act (IHRA) was not whether facts supporting emotional distress claim could also have supported discrimination claim, but whether employee could prove elements of intentional infliction of emotional distress independent of legal duties furnished by IHRA. 775 ILCS 5/8-111(C).

**[6] Damages 115 ⬅➔57.21**

115 Damages
   115III Grounds and Subjects of Compensatory Damages
     115III(A) Direct or Remote, Contingent, or Prospective Consequences or Losses
      115III(A)2 Mental Suffering and Emotional Distress
       115k57.19 Intentional or Reckless Infliction of Emotional Distress; Outrage
        115k57.21 k. Elements in General. Most Cited Cases
Under Illinois law, a plaintiff may recover damages for intentional infliction of emotional distress only if she establishes that: (1) the defendant's conduct was extreme and outrageous; (2) the defendant intended to inflict severe emotional distress or knew that there was at least a high probability that his conduct would inflict severe emotional distress; and (3) the defendant's conduct did cause severe emotional distress.

**[7] Federal Courts 170B ⬅➔776**

170B Federal Courts
   170BVIII Courts of Appeals
     170BVIII(K) Scope, Standards, and Extent
      170BVIII(K)1 In General
       170Bk776 k. Trial De Novo. Most Cited Cases
The Court of Appeals reviews a district court's order denying a motion for judgment as a matter of law de novo.

**[8] Federal Courts 170B ⬅➔765**

170B Federal Courts
   170BVIII Courts of Appeals
     170BVIII(K) Scope, Standards, and Extent
      170BVIII(K)1 In General
       170Bk765 Extent of Review Dependent on Nature of Decision Appealed from
        170Bk765 k. Judgment Notwithstanding Verdict Most Cited Cases

**Federal Courts 170B ⬅➔801**

170B Federal Courts
   170BVIII Courts of Appeals
     170BVIII(K) Scope, Standards, and Extent
      170BVIII(K)3 Presumptions
       170Bk801 k. Judgment N.O.v. Most Cited Cases
On a defendant's motion for judgment as a matter of law, the Court of Appeals will not reverse unless no reasonable juror could have found that the plaintiff established all of the elements of her claim, and the Court must view all evidence in the light most favorable to the plaintiff and draw all reasonable inferences in her favor.

**[9] Federal Courts 170B ⬅➔825.1**

170B Federal Courts
   170BVIII Courts of Appeals
     170BVIII(K) Scope, Standards, and Extent
      170BVIII(K)4 Discretion of Lower Court
       170Bk825 New Trial or Rehearing
        170Bk825.1 k. In General. Most Cited Cases
The Court of Appeals reviews a district court's order denying a new trial for abuse of discretion.

**[10] Federal Courts 170B ⬅➔415**

170B Federal Courts
   170BVI State Laws as Rules of Decision
     170BVI(C) Application to Particular Matters
      170Bk415 k. Damages, Interest, Costs and Fees Most Cited Cases

**Federal Courts 170B ⬅➔420**

170B Federal Courts
   170BVI State Laws as Rules of Decision
     170BVI(C) Application to Particular Matters
      170Bk420 k. Judgments. Most Cited Cases
Because employer's liability for intentional infliction of emotional distress (IIED) was based on an Illinois tort, role of district court, on motion for judgment as matter of law or for new trial, was to determine whether jury's verdict was based on sufficient proof to satisfy claim for damages under Illinois law.

**[11] Damages 115 ⬅➔57.55**

115 Damages
   115III Grounds and Subjects of Compensatory Damages

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

--- F.3d ----
--- F.3d ----, 2006 WL 932354 (C.A.7 (Ill.))
**(Cite as: --- F.3d ----)**

Page 4

115III(A) Direct or Remote, Contingent, or Prospective Consequences or Losses
115III(A)2 Mental Suffering and Emotional Distress
115k57.50 Labor and Employment
115k57.55 k. Sex and Gender. Most Cited Cases

Jury's determination, that employer's conduct was extreme and outrageous, as required for employee to recover under Illinois law for intentional infliction of emotional distress, was supported by sufficient evidence, including evidence that employee was forced to climb unstable metal stairway during her pregnancy, that her computer was sabotaged, that manager publicly criticized her work during meetings, that her office and files were moved so that she was unable to locate necessary paperwork, and that employer increased amount of work due under performance improvement plan (PIP) while knowing employee would not be able to meet deadlines.

**[12] Damages 115 ☜57.55**

115 Damages
115III Grounds and Subjects of Compensatory Damages
115III(A) Direct or Remote, Contingent, or Prospective Consequences or Losses
115III(A)2 Mental Suffering and Emotional Distress
115k57.50 Labor and Employment
115k57.55 k. Sex and Gender. Most Cited Cases

Jury's determination, that employer intended to cause employee emotional distress, as required for employee to recover under Illinois law for intentional infliction of emotional distress, was supported by sufficient evidence, including human resources manager's admission that management, in implementing performance improvement plan (PIP) was trying to "send [employee] a message," "affect [her] mental processes," and "get [her] attention."

**[13] Damages 115 ☜57.55**

115 Damages
115III Grounds and Subjects of Compensatory Damages
115III(A) Direct or Remote, Contingent, or Prospective Consequences or Losses
115III(A)2 Mental Suffering and Emotional Distress
115k57.50 Labor and Employment
115k57.55 k. Sex and Gender. Most

Cited Cases
Jury's determination, that employee suffered emotional distress, as required for employee to recover from employer under Illinois law for intentional infliction of emotional distress, was supported by sufficient evidence, even though employee did not seek psychiatric help until years after her employment terminated, where employee testified that initially she was too ashamed to seek psychiatric help and could not afford to do so, and psychiatrist testified that employee suffered from post-traumatic stress disorder (PTSD), which could be traced to her experiences with employer.

**[14] Evidence 157 ☜508**

157 Evidence
157XII Opinion Evidence
157XII(B) Subjects of Expert Testimony
157k508 k. Matters Involving Scientific or Other Special Knowledge in General. Most Cited Cases

**Evidence 157 ☜555.2**

157 Evidence
157XII Opinion Evidence
157XII(D) Examination of Experts
157k555 Basis of Opinion
157k555.2 k. Necessity and Sufficiency.
Most Cited Cases
*Daubert*, as extended to all expert testimony including non-scientific expert testimony, requires the district court to perform the role of gatekeeper and to ensure the reliability and relevancy of expert testimony. Fed. R. Evid. 702.

**[15] Federal Courts 170B ☜823**

170B Federal Courts
170BVIII Courts of Appeals
170BVIII(K) Scope, Standards, and Extent
170BVIII(K)4 Discretion of Lower Court
170Bk823 k. Reception of Evidence.
Most Cited Cases
So long as a district court adheres to *Daubert's* requirements regarding expert testimony, the Court of Appeals shall not disturb the district court's findings unless they are manifestly erroneous. Fed. R. Evid. 702

**[16] Evidence 157 ☜555.2**

157 Evidence

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

--- F.3d ----
--- F.3d ----, 2006 WL 932354 (C.A.7 (Ill.))                                                   Page 5
**(Cite as: --- F.3d ----)**

157XII Opinion Evidence
  157XII(D) Examination of Experts
    157k555 Basis of Opinion
      157k555.2 k. Necessity and Sufficiency.
Most Cited Cases
While a district court does not have to recite the
*Daubert* standard for expert testimony mechanically,
it is nonetheless crucial that a *Daubert* analysis of
some form in fact be performed. Fed. R. Evid. 702.

**[17] Federal Courts 170B ☞823**

170B Federal Courts
  170BVIII Courts of Appeals
    170BVIII(K) Scope, Standards, and Extent
      170BVIII(K)4 Discretion of Lower Court
        170Bk823 k. Reception of Evidence.
Most Cited Cases
Admission of expert testimony would not be given
deference normally afforded to district court under
"manifestly erroneous" standard, where district court
explained admission in only one sentence, stating that
purported expert had sufficient expertise. Fed. R.
Evid. 702.

**[18] Evidence 157 ☞555.2**

157 Evidence
  157XII Opinion Evidence
    157XII(D) Examination of Experts
      157k555 Basis of Opinion
        157k555.2 k. Necessity and Sufficiency.
Most Cited Cases
When a district court fails to consider an essential
*Daubert* factor for admitting expert testimony, such
as reliability, it has abused its discretion. Fed. R.
Evid. 702.

**[19] Evidence 157 ☞555.9**

157 Evidence
  157XII Opinion Evidence
    157XII(D) Examination of Experts
      157k555 Basis of Opinion
        157k555.9 k. Damages. Most Cited
Cases
Testimony by professor of management, in
employee's action against employer for intentional
infliction of emotional distress, was not sufficiently
reliable to constitute expert testimony, in that his
opinions were not tied to specific portions of policy
manual, and appeared to be general observations
regarding what is normal or usual business practice.
Fed. R. Evid. 702.

**[20] Federal Civil Procedure 170A ☞2334**

170A Federal Civil Procedure
  170AXVI New Trial
    170AXVI(B) Grounds
      170Ak2333 Trial Errors
        170Ak2334 k. Evidence. Most Cited
Cases

**Federal Courts 170B ☞900**

170B Federal Courts
  170BVIII Courts of Appeals
    170BVIII(K) Scope, Standards, and Extent
      170BVIII(K)6 Harmless Error
        170Bk896 Admission of Evidence
          170Bk900 k. Expert and Opinion
Testimony Most Cited Cases
Even if the admission of a plaintiff's purported expert
testimony is in error, the defendants must show that
the introduction of such evidence violated their
substantial rights in order to be entitled to a new trial
or setting aside of the verdict. Fed. R. Evid. 702; Fed.
R. Civ. P. 61.

Even if the admission of a plaintiff's purported expert
testimony is in error, the defendants must show that
the introduction of such evidence violated their
substantial rights in order to be entitled to a new trial
or setting aside of the verdict. Fed. R. Evid. 702; Fed.
R. Civ. P. 61.

**[21] Federal Courts 170B ☞900**

170B Federal Courts
  170BVIII Courts of Appeals
    170BVIII(K) Scope, Standards, and Extent
      170BVIII(K)6 Harmless Error
        170Bk896 Admission of Evidence
          170Bk900 k. Expert and Opinion
Testimony Most Cited Cases
Erroneous admission of professor's purported expert
testimony in support of employee's claim against
employer for intentional infliction of emotional
distress was not reversible error, in that the
objectionable testimony was corroborated by other
witnesses, elicited on cross-examination, or otherwise
discredited on cross-examination. Fed. R. Evid. 702;
Fed. R. Civ. P. 61.

**[22] Federal Courts 170B ☞773.1**

170B Federal Courts

--- F.3d ----
--- F.3d ----, 2006 WL 932354 (C.A.7 (Ill.))
**(Cite as: --- F.3d ----)**

Page 6

170BVIII Courts of Appeals
   170BVIII(K) Scope, Standards, and Extent
     170BVIII(K)1 In General
      170Bk773 Estoppel to Allege Error;
Invited Error
       170Bk773.1 k. In General  Most
Cited Cases
When error is invited, not even plain error permits
reversal

**[23] Federal Courts 170B 🔑621**

170B Federal Courts
   170BVIII Courts of Appeals
    170BVIII(D) Presentation and Reservation in
Lower Court of Grounds of Review
     170BVIII(D)2 Objections and Exceptions
      170Bk621 k. Necessity of Objections or
Exceptions in General. Most Cited Cases
To preserve an issue for appellate review, a party
must make a proper objection at trial that alerts the
court and opposing party to the specific grounds for
the objection

**[24] Federal Courts 170B 🔑628**

170B Federal Courts
   170BVIII Courts of Appeals
    170BVIII(D) Presentation and Reservation in
Lower Court of Grounds of Review
     170BVIII(D)2 Objections and Exceptions
      170Bk627 Evidence and Witnesses
       170Bk628 k. Admission or Exclusion
of Evidence  Most Cited Cases
When a defendant does not object to the admission of
evidence during the trial, the objection is waived and
cannot be raised for the first time in a motion for new
trial or on appeal.

**[25] Federal Courts 170B 🔑627.1**

170B Federal Courts
   170BVIII Courts of Appeals
    170BVIII(D) Presentation and Reservation in
Lower Court of Grounds of Review
     170BVIII(D)2 Objections and Exceptions
      170Bk627 Evidence and Witnesses
       170Bk627.1 k. In General  Most
Cited Cases
Defendant waived its objection that expert's
testimony impermissibly provided conclusions of law
when defendant failed to raise such objection in its
motion in limine or during testimony itself.

**[26] Federal Courts 170B 🔑628**

170B Federal Courts
   170BVIII Courts of Appeals
    170BVIII(D) Presentation and Reservation in
Lower Court of Grounds of Review
     170BVIII(D)2 Objections and Exceptions
      170Bk627 Evidence and Witnesses
       170Bk628 k. Admission or Exclusion
of Evidence  Most Cited Cases
Even if expert provided impermissible testimony in
employee's action against employer for intentional
infliction of emotional distress, in saying that
employee's failure to have worker tested for drugs
was not violation of Department of Transportation
(DOT) regulations, admission of such testimony was
not plain error, where manager admitted at trial that
he knew that worker was not covered by DOT
regulations. Fed. R. Evid. 702.

**[27] Federal Courts 170B 🔑415**

170B Federal Courts
   170BVI State Laws as Rules of Decision
    170BVI(C) Application to Particular Matters
     170Bk415 k. Damages, Interest, Costs and
Fees  Most Cited Cases
Because employee was awarded damages against
employer solely on her state-law intentional infliction
of emotional distress claim, Illinois law governed
review of that award

**[28] Damages 115 🔑184**

115 Damages
   115IX Evidence
    115k183 Weight and Sufficiency
     115k184 k. In General. Most Cited Cases
Under Illinois law, the evidence need only tend to
show a basis for the computation of damages with a
fair degree of probability.

**[29] New Trial 275 🔑162(1)**

275 New Trial
   275III Proceedings to Procure New Trial
    275k162 Remission or Reduction of Excess of
Recovery
     275k162(1) k. In General. Most Cited Cases
Under Illinois law, a damages award will not be
subject to remittitur if it falls within the flexible range
of conclusions which can be reasonably supported by
facts because the assessment of damages is primarily
an issue of fact for jury determination.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----
--- F.3d ----, 2006 WL 932354 (C.A.7 (Ill.))
**(Cite as: --- F.3d ----)**

Page 7

**[30] Federal Courts 170B ⌖634**

170B Federal Courts
   170BVIII Courts of Appeals
     170BVIII(D) Presentation and Reservation in Lower Court of Grounds of Review
      170BVIII(D)2 Objections and Exceptions
       170Bk634 k. Amount or Extent of Relief; Costs; Judgment. Most Cited Cases
District court's error of comparing employee's award of $240,000 in damages on her Illinois claim for intentional infliction of emotional distress with awards in Seventh Circuit and other federal courts, rather than making that determination under Illinois law, was harmless, given employee's presentation of evidence of pain and suffering, including testimony from family members about her emotional state and diminished capabilities, testimony from her psychiatrist, and her own testimony regarding her emotional state.

**[31] Appeal and Error 30 ⌖1004(1)**

30 Appeal and Error
   30XVI Review
     30XVI(I) Questions of Fact, Verdicts, and Findings
      30XVI(I)2 Verdicts
       30k1004 Amount of Recovery
        30k1004(1) k. In General. Most Cited Cases
In reviewing damage awards, Illinois courts give great deference to the jury.

**[32] Damages 115 ⌖208(1)**

115 Damages
   115X Proceedings for Assessment
     115k208 Questions for Jury
      115k208(1) k. In General. Most Cited Cases
Under Illinois law, it is the jury's function to consider the credibility of witnesses and to determine an appropriate award of damages.

**[33] Federal Courts 170B ⌖776**

170B Federal Courts
   170BVIII Courts of Appeals
     170BVIII(K) Scope, Standards, and Extent
      170BVIII(K)1 In General
       170Bk776 k. Trial De Novo. Most Cited Cases

**Federal Courts 170B ⌖829**

170B Federal Courts
   170BVIII Courts of Appeals
     170BVIII(K) Scope, Standards, and Extent
      170BVIII(K)4 Discretion of Lower Court
       170Bk829 k. Amendment, Vacation, or Relief from Judgment. Most Cited Cases
A district court's decision to deny a motion to vacate a jury's award based on a manifest error of law will be reviewed for abuse of discretion, and its interpretation of the law will be reviewed de novo. Fed. R. Civ. P. 59.

**[34] Damages 115 ⌖20**

115 Damages
   115III Grounds and Subjects of Compensatory Damages
     115III(A) Direct or Remote, Contingent, or Prospective Consequences or Losses
      115III(A)1 In General
       115k20 k. Natural and Probable Consequences of Torts. Most Cited Cases
The general rule of damages in a tort action in Illinois is that the wrongdoer is liable for all injuries resulting directly from the wrongful acts, whether they could or should not have been foreseen by him, provided the particular damages are the legal and natural consequences of the wrongful act imputed to the defendant, and are such as might reasonably have been anticipated.

**[35] Damages 115 ⌖37**

115 Damages
   115III Grounds and Subjects of Compensatory Damages
     115III(A) Direct or Remote, Contingent, or Prospective Consequences or Losses
      115III(A)1 In General
       115k35 Pecuniary Losses
        115k37 k. Loss of Earnings or Services. Most Cited Cases

**Damages 115 ⌖38**

115 Damages
   115III Grounds and Subjects of Compensatory Damages
     115III(A) Direct or Remote, Contingent, or Prospective Consequences or Losses
      115III(A)1 In General
       115k35 Pecuniary Losses

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F 3d ----
--- F 3d ----, 2006 WL 932354 (C A 7 (Ill ))
**(Cite as: --- F.3d ----)**

115k38 k Impairment of Earning Capacity. Most Cited Cases
Under Illinois law, employee could be awarded past and future lost earnings and benefits in her Illinois law action against employer for intentional infliction of emotional distress, where employer's actions, including hiding her files and failing to change deadlines in her performance improvement plan (PIP), caused her loss of wages.

[36] Damages 115 ⚎140.7

115 Damages
115VII Amount Awarded
115VII(E) Mental Suffering and Emotional Distress
115k140.7 k. Particular Cases. Most Cited Cases
Under Illinois law, jury's award of $150,000 for lost earnings and benefits to date, and $75,000 for future lost earnings and benefits, to employee on her claim of intentional infliction of emotional distress, was not against weight of the evidence, where actuary calculated present value of employee's lost earnings and benefits to be between $337,570 and $510,382.

[37] Damages 115 ⚎186

115 Damages
115IX Evidence
115k183 Weight and Sufficiency
115k186 k. Loss of Earnings, Services, or Consortium Most Cited Cases
Under Illinois law, in order to recover lost earnings, all the law requires is that the plaintiff present evidence which will establish, with a fair degree of probability, a basis for the assessment of damages.

Appeal from the United States District Court for the Northern District of Illinois, Eastern Division No. 95 C 5425-Joan B. Gottschall, Judge

Constantine J. Gekas, Gekas & Associates, Chicago, IL, for Plaintiff-Appellee.
Thomas J. Piskorski, Seyfarth & Shaw, Chicago, IL, for Defendants-Appellants.

Before FLAUM, Chief Judge, and RIPPLE and KANNE, Circuit Judges.
RIPPLE, Circuit Judge
*1 Sally Naeem filed this action against McKesson Drug Company ("McKesson") and McKesson employees Hank Weinmaster and Dan Montreuil,

after McKesson terminated her employment on February 2, 1996. In her second amended complaint, Ms Naeem alleged three counts: (1) sexual discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., (2) retaliatory sexual discrimination in violation of Title VII, and (3) a state-law claim for intentional infliction of emotional distress Counts 1 and 3 were tried to a jury in August 2001 The jury reached a verdict in favor of McKesson on Count 1, and a verdict in favor of Ms. Naeem against McKesson and Dan Montreuil on Count 3. Count 2 is not at issue in this appeal and was ultimately dismissed with prejudice on September 27, 2004. After this dismissal, the defendants renewed their motion for judgment as a matter of law, or alternatively, for a new trial on Counts 1 and 3. The district court denied the defendants' motion on all grounds. For the reasons set forth in the following opinion, we affirm the judgment of the district court

I

BACKGROUND

A. Facts

McKesson is a wholesale distributor of pharmaceuticals, over-the-counter drugs and other products. In 1978, Ms Naeem began her career at McKesson as a keypunch operator. She worked her way up to the post of operations manager at McKesson's Houston, Texas, Distribution Center. In March, 1992, she was transferred to McKesson's distribution center in Romeoville, Illinois, and worked there as the computer room supervisor. Ms. Naeem aspired to be the operations manager at the Romeoville distribution center, and, in 1993, she agreed to assume the role of transportation coordinator, a full-time job, while continuing to serve as computer room supervisor. As a practical matter, therefore, she was working two full-time jobs. There was no job description that established a priority between the two positions. Although McKesson employees testified at trial that they had observed various problems with her performance, Ms Naeem nevertheless received a 4 0% merit-based pay increase in 1993 with an explanation that she exceeded most objectives. She also received a 3 7% merit-based increase in 1994.

In March 1994, Ms. Naeem's manager, Jerry Moultry,

--- F 3d ----
--- F 3d ----, 2006 WL 932354 (C.A.7 (Ill.))
**(Cite as: --- F.3d ----)**

made a sexual proposition to her that she rebuffed Moultry later was given a written warning for inappropriate behavior based on this incident. Jeanette Maggio, the human resources director, testified at trial that Moultry was very upset when he was disciplined, and he worried that the incident would hinder his career The warning letter was not placed in Mr Moultry's personnel file; instead it was kept in a separate file to which few employees had access

In July 1994, Ms. Naeem applied for the position of operations manager. Her bid for this position was unsuccessful; the position was awarded ultimately to Hank Weinmaster, who was then serving as the operations manager at a McKesson warehouse in Omaha Ms Naeem then filed a discrimination charge with the Equal Employment Opportunity Commission ("EEOC") in October 1994. She alleged that she had not been promoted to operations manager due to sex discrimination and retaliation, attributing her lack of success in obtaining the position largely to Mr Moultry's negative input. In its defense, McKesson explained to the EEOC that Ms. Naeem had not been promoted because she was having difficulty meeting performance standards in her position as transportation coordinator/computer room supervisor.

*2 In early 1995, Ms. Naeem became pregnant with her fourth child She experienced a difficult pregnancy, suffering from gestational diabetes, hypertension and other complications In May 1995, Moultry was replaced by Dan Montreuil. Ms. Naeem claims that, after Mr Montreuil became manager of the distribution center, her workload increased significantly: she was to be available to take calls from drivers at all times of the day and night, and was given many responsibilities for a pending warehouse reconfiguration. As part of the reconfiguration project, she was put in charge of setting up computers. This project involved climbing up a metal stairway onto a raised mezzanine level and crawling under furniture to set up the machines. She performed this task herself although, given her pregnancy, it was difficult for her

Ms. Naeem testified that she spoke with Maggio, the human resources director, and advised her that she was not feeling well and that her work was becoming overwhelming. She also spoke with Mr. Weinmaster who, according to Ms Naeem, did not offer any help

On July 17, 1995, Ms Naeem placed her concerns in a grievance memo Several days later, she met with

Mr. Montreuil, Weinmaster and Jan Hartley, a human resources manager Ms Naeem testified that Mr. Montreuil was very angry at the meeting and yelled that she would receive no additional help, stated that she would have to continue working the two full-time jobs, and demanded a doctor's note. Mr Montreuil presented another version of the meeting; he claimed that he had informed Ms. Naeem that he would help her and had asked that she prepare a specific list of items on which she needed assistance. He further testified that she never prepared such a list. Ms. Naeem saw her physician the following Monday. He recommended that she go on short-term medical disability. She followed that advice and took leave from July 25, 1995 until October 30, 1995.

Upon her return to work, Ms Naeem was given a disciplinary warning for having failed to complete assignments before beginning her leave. Consequently, she was placed on a "Performance Improvement Plan" ("PIP"). The PIP detailed a number of projects that Ms. Naeem was to complete, in addition to her normal job duties, as well as due dates for the various projects Ms. Naeem testified that the PIP was very onerous and that she had to work long hours to try to meet plan deadlines. Ms. Hartley, the human resources manager, admitted at trial that the PIP was implemented to "get Sally's attention," to "send Sally a message" and to "affect [her] mental processes." Tr XV at 2591.

Additionally, while Ms Naeem was absent, her transportation office was relocated during the warehouse reconfiguration. Ms. Naeem claims that many of the transportation records were lost in the process She testified that it was difficult to finish some of the tasks in the PIP because the transportation records needed to complete projects were missing after the office relocation.

*3 Ms. Naeem received a second written disciplinary warning on December 7, 1995, for failing to complete truck inspections properly. Ms. Naeem attributed the errors in the inspection to her inability to find the necessary files. Ms. Naeem also testified that, during this time period, after she returned from leave, Mr Montreuil reprimanded and humiliated her at management staff meetings.

Ms Naeem completed her first PIP and was given a second PIP on December 27, 1999 Ms. Naeem thought it would be extremely difficult to accomplish this PIP, which was more burdensome than the previous PIP, but she tried to work longer hours to complete the tasks In addition to her normal job

--- F 3d ----
--- F 3d ----, 2006 WL 932354 (C.A.7 (Ill.))
**(Cite as: --- F.3d ----)**

responsibilities, the tasks she was to complete for the PIP included driving to Indiana to train truck drivers about drug testing requirements and drafting reports for the upcoming inventory. Ms. Naeem also testified that, during this period, Mr. Montreuil tampered with information in her computer and changed the password so she would be unable to access her computer to meet pending deadlines.

On January 8, 1996, Ms. Naeem's two-year-old son became ill, and she took a week off from work, consistent with the Family and Medical Leave Act, to care for him. According to Ms. Naeem, Mr. Montreuil called her about five times during her leave to insist that she come back into work; Ms. Naeem refused each time. When she returned to work, Mr. Montreuil did not extend or excuse the PIP deadlines due to her son's illness.

On Tuesday, January 23, 1996, Mr. Montreuil and Hartley suspended Ms. Naeem for three days after she failed to order post-accident drug testing of a driver, Dave Barden, who was involved in a truck accident on December 29, 1995 ("the Barden incident"). The suspension stated that the failure to order a drug test was in violation of United States Department of Transportation ("DOT") regulations. Ms. Naeem claims that the DOT regulations did not apply because the truck involved was too small and that it was Mr. Montreuil who failed to order the testing.

When Ms. Naeem returned to work on the following Monday, January 29, she was given until noon on that Friday, February 2, to complete the listed tasks on the PIP. Ms. Naeem testified that she was "working round the clock to get all this done," but that it was "an impossible task." Tr.IX at 1272-73. Mr. Montreuil testified, however, that she had sufficient time to complete the tasks in both PIPs and that he had offered to help her with her other duties, so that she could focus on PIP tasks. She did not complete the tasks, and was fired on Friday, February 2, 1996.

At trial, Ms. Naeem presented evidence of the emotional distress that she suffered during this time period. She testified that, before she was fired, she was working almost around the clock, that she was getting into arguments with her family and that she was suffering physical symptoms of anxiety including headaches and a recurring upset stomach. Her husband and son offered testimony that she became unable to eat, got into arguments, cried for hours, was unable to breast-feed her new infant son

and refused sexual relations with her husband. She also suffered hair loss. Her behavior drove one of her older sons from the home. She testified that she did not seek psychiatric help after she was fired because she was ashamed and because it was too expensive. She began to contemplate suicide and, finally, saw a psychiatrist who diagnosed her with major depressive disorder and post-traumatic stress disorder. After her discharge, she was unable to find a job, and instead ran a convenience store with her family, where she was robbed at gun point. Ms. Naeem later obtained a job as an entry-level computer operator.

### B. District Court Proceedings

**\*4** On May 27, 1997, Ms. Naeem filed her second amended complaint, alleging three counts against McKesson: (1) sexual discrimination in violation of Title VII, (2) retaliatory sexual discrimination in violation of Title VII and (3) intentional infliction of emotional distress, an Illinois tort claim. Ms. Naeem also brought Count 3 against Montreuil and Weinmaster. As noted earlier, Count 2 has a long procedural history; it was ultimately dismissed with prejudice on September 27, 2004, and is not at issue in this case.

Counts 1 and 3 were tried to a jury in August 2001. After the close of Ms. Naeem's case, the defendants moved for judgment as a matter of law on the intentional infliction of emotional distress claim. They argued that Ms. Naeem did not present sufficient evidence that the defendants' conduct rose to the level of extreme or outrageous. The district court orally denied the motion on the ground that sufficient evidence had been presented. The jury found in favor of McKesson on Count 1, but found McKesson and Dan Montreuil liable on Count 3. Damages for the intentional infliction of emotional distress claim, to be paid to Ms. Naeem by McKesson, were awarded in the amounts of: $235,000 for pain and suffering, $35,000 for past and future medical care, $150,000 for lost earnings and benefits to date and $75,000 for future lost earnings and benefits. R.160 at 4-6. The jury also awarded Ms. Naeem $5,000 for pain and suffering to be paid by Mr. Montreuil. *Id.*

After trial, the defendants renewed their motion for judgment as a matter of law, or alternatively, for a new trial. The defendants argued there was insufficient evidence to support an intentional infliction of emotional distress claim. They further contended: (1) that the jury's award of front and back

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

--- F.3d ----
--- F.3d ----, 2006 WL 932354 (C.A.7 (Ill.))
**(Cite as: --- F.3d ----)**

pay had to be vacated because such damages are not available in an intentional infliction of emotional distress case; (2) that an award of $240,000 for pain and suffering was excessive, and (3) that the $35,000 award for medical expenses was speculative. The district court denied the motion. It noted that Ms. Naeem had "produced adequate evidence to support the jury's verdict on her [intentional infliction of emotional distress] claim." R.208 at 1. The district court next ruled that, with respect to the loss of front and back pay, the damages are not "front and back pay," as contemplated by Title VII, but rather are compensation for the value of earnings and benefits lost as a result of the defendants' tortious actions. *Id.* at 1. With regard to the award for pain and suffering, the district court held that the award was not "monstrously excessive" based on the evidence presented to the jury:

[p]laintiff's evidence revealed a course of conduct which threatened her physical health and the health of her fetus, seriously affected the emotional well-being of her family, and caused severe and possibly permanent emotional damage, for which she ultimately sought and has been found to need continuing professional therapy.

*5 *Id.* at 2. The district court compared the award with other cases from this and other federal circuits and concluded that the award was not "out of line with the awards in cases involving similar evidence of emotional damage." *Id.* at 3.

The defendants again moved for judgment as a matter of law, and submitted that the intentional infliction of emotional distress claim was preempted by the Illinois Human Rights Act ("IHRA"), 775 ILCS 5/1-101 et seq. The district court denied this motion, ruling that the

plaintiff presented abundant evidence at trial of defendants' intentionally extreme and outrageous behavior, such as their incessant public criticism of her work performance, their deliberate sabotaging of her computer files, and their piling on of extra work that they knew one person could not accomplish without great difficulty or error.

R.256 at 2. The district court further noted that the "defendants' behavior toward plaintiff is actionable in tort apart from defendants' duty as an employer not to discriminate in the workplace." *Id.*

## II

## DISCUSSION

## A. Preemption by the Illinois Human Rights Act

The IHRA gives the Illinois Human Rights Commission ("IHRC") exclusive jurisdiction over civil rights violations. 775 ILCS 5/8-111(C) (stating that "[e]xcept as otherwise provided by law, no court of this state shall have jurisdiction over the subject of an alleged civil rights violation other than as set forth in this Act"). A violation of the IHRA includes employment discrimination based on sex or handicap. *Id.* 5/1-103(I), (O), (Q); *Id.* 5/1-102(A). Employment discrimination, in turn, is defined as incidents in which an employer acts with respect to "promotion, renewal of employment ... discharge, discipline, tenure or terms, privileges or conditions of employment on the basis of unlawful discrimination or citizenship status." *Id.* 5/2-102(A).

The defendants contend that Ms. Naeem's intentional infliction of emotional distress claim is preempted by the IHRA because she bases her claim on the same course of behavior that gave rise to her Title VII retaliation claim. The district court determined that the relevant inquiry was whether Ms. Naeem can establish the necessary elements of her intentional infliction of emotional distress claim "independent of any legal duties furnished by the IHRA, not whether the two claims happen to arise from the same course of conduct." R.258 at 2. The district court then concluded that there was "abundant evidence" at trial of extreme and outrageous behavior on the part of the defendants that could be the basis of an intentional infliction of emotional distress claim, including "their incessant public criticism of her work performance, their deliberate sabotaging of her computer files, and their piling on of extra work that they knew one person could not accomplish without great difficulty or error." *Id.* Therefore, the district court held that Ms. Naeem's intentional infliction of emotional distress claim was not preempted by the IHRA.

*6 [1][2] The Supreme Court of Illinois twice has addressed IHRA preemption. In *Geise v. Phoenix Co. of Chicago, Inc.,* 159 Ill.2d 507, 203 Ill.Dec. 454, 639 N.E.2d 1273, 1277 (Ill.1994), the Supreme Court of Illinois ruled that claims of negligent hiring and retention that are "inextricably linked" to the concept of sexual harassment are preempted by the IHRA. The court also held that framing a claim in terms of a tort does not "alter the fundamental nature of [a] cause of action." *Id.* The court revisited the issue of IHRA preemption in *Maksimovic v. Tsogalis,* 177

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----
--- F.3d ----, 2006 WL 932354 (C.A.7 (Ill.))
**(Cite as: --- F.3d ----)**

Ill.2d 511, 227 Ill.Dec. 98, 687 N.E.2d 21 (Ill.1997). It held that a plaintiff's claims of assault, battery and false imprisonment were not "inextricably linked" with claims of sexual harassment because the plaintiff could establish "the necessary elements of each tort independent of any legal duties created by the Act." *Id.* at 22. *Maksimovic* clarified the court's earlier reasoning in *Geise*, stating:

The rule from *Geise* is not that the Act precludes the circuit court from exercising jurisdiction over *all* tort claims related to sexual harassment. Rather, whether the circuit court may exercise jurisdiction over a tort claim depends upon whether the tort claim is inextricably linked to a civil rights violation such that there is no independent basis for the action apart from the Act itself.

*Id.* at 23 (emphasis in original). Therefore, the IHRA does not preclude courts from exercising jurisdiction over all tort claims factually related to incidents of sexual harassment. *Id.* According to the court in *Maksimovic*, if a plaintiff can allege facts sufficient to establish elements of a tort, that tort is not preempted by the IHRA. *Id.* at 23-24 (observing that there is nothing in the legislative history of the IHRA that intended to abolish common law torts). When, as in *Maksimovic,* the sexual harassment aspect of the case is "merely incidental to what are otherwise ordinary common law tort claims," *id.* at 23, the claim is not preempted.

Appellate courts of Illinois twice have examined the scope of the *Maksimovic* holding in the context of an employment-related tort claim. In *Benitez v. KFC National Management Co.,* 305 Ill.App.3d 1027, 239 Ill.Dec. 705, 714 N.E.2d 1002 (Ill.App.Ct.1999), restaurant employees sued their employer after their supervisor and fellow employees poked holes in the ceiling of the restroom and used those holes to watch and photograph the plaintiff-employees undressing. The appellate court found that their claim of intentional infliction of emotional distress was not preempted because "the elements of intentional infliction of emotional distress are quite different from those necessary to establish a civil rights violation under the [IHRA]," and the plaintiffs had alleged sufficient facts to support the elements of intentional infliction of emotional distress. *Id.* at 1009 (citations omitted). In *Veazey v. LaSalle Telecommunications, Inc.,* the appellate court found that an employee who raised claims against his employer for terminating him "because he was Black" had no tort basis independent of the IHRA for imposing liability upon his employer, and thus the claim was preempted. 334 Ill.App.3d 926, 268

Ill.Dec. 750, 779 N.E.2d 364, 371 (Ill.App.Ct.2002).

\*7 There are also pre-*Maksimovic* cases in Illinois that support the view that claims of intentional infliction of emotional distress are not categorically preempted by the IHRA. In *Sutton v. Overcash,* the Illinois Appellate Court found that an intentional infliction of emotional distress claim based on sexual harassment was not preempted by the IHRA because the tort claim required more proof than is necessary to state a claim under the IHRA. 251 Ill.App.3d 737, 191 Ill.Dec. 230, 623 N.E.2d 820, 833 (Ill.App.Ct.1993); *see also Pavilion v. Kaferly,* 204 Ill.App.3d 235, 149 Ill.Dec. 549, 561 N.E.2d 1245, 1250-51 (Ill.App.Ct.1990) (same).

[3] We similarly have held that "discrimination and intentional infliction of emotional distress are different wrongs," and so torts that do not depend on a civil rights violation are not preempted. *See Sanglap v. LaSalle Bank FSB,* 345 F.3d 515, 519 (7th Cir.2003). However, we also have held that a claim of intentional infliction of emotional distress was preempted by the IHRA when "the core of [the plaintiff's] theory" was that the plaintiff was a victim of racial harassment. *Smith v. Chicago Sch. Reform Bd.,* 165 F.3d 1142, 1151 (7th Cir.1999). Similarly, in the context of sexual harassment, we have found an intentional infliction of emotional distress claim to be preempted when it "depend[ed] on allegations of sexual harassment," where the plaintiff's claim centered on the conduct of her superior, who propositioned her, grabbed her breasts and forcibly kissed her. *Quantock v. Shared Mktg. Servs. et al.,* 312 F.3d 899, 902, 905 (7th Cir.2002) (per curiam). The distinction between claims that are preempted and claims that are not preempted turns on the legal duty that the defendant allegedly breached; "that is, if the conduct would be actionable even aside from its character as a civil rights violation because the IHRA did not 'furnish[ ] the legal duty that the defendant was alleged to have breached,' the IHRA does not preempt a state law claim seeking recovery for it." *Krocka v. City of Chicago,* 203 F.3d 507, 516-17 (7th Cir.2000) (citing *Maksimovic,* 227 Ill.Dec. 98, 687 N.E.2d at 23).

[4][5] In Ms. Naeem's case, the district court ruled correctly when it determined that her claim for intentional infliction of emotional distress was not preempted. Following the *Maksimovic* test, the proper inquiry was not whether the facts that support Ms. Naeem's intentional infliction of emotional distress claim could also have supported a discrimination claim, but instead whether Ms. Naeem

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

can prove the elements of intentional infliction of emotional distress independent of legal duties furnished by the IHRA. *See also Sanglap*, 345 F.3d at 519-20.

[6] Under Illinois law, a plaintiff may recover damages for intentional infliction of emotional distress only if she establishes that: "(1) the defendant's conduct was extreme and outrageous, (2) the defendant intended to inflict severe emotional distress or knew that there was at least a high probability that his conduct would inflict severe emotional distress, and (3) the defendant's conduct did cause severe emotional distress." *Van Stan v. Fancy Colours & Co.,* 125 F.3d 563, 567 (7th Cir.1997). Given the extreme behavior outlined by the district court, and presented to the jury, we must conclude the defendants committed a tort independent of any duties not to discriminate against Ms. Naeem. The conduct that she alleges is not just sexually harassing conduct; instead, she alleges a pattern of behavior by the defendants that created impossible deadlines, set up obstacles to her performing her job, and sabotaged her work. The defendants' conduct will be discussed in more detail below; however, it is clear that her claim rests not just on behavior that is sexually harassing, but rather behavior that would be a tort no matter what the motives of the defendant. Therefore, her claim is not preempted by the IHRA.

### B Sufficiency of the Evidence

*8 The defendants also claim that Ms. Naeem presented insufficient evidence to establish a claim of intentional infliction of emotional distress and, consequently, that they are entitled to judgment as a matter of law or, alternatively, a new trial. As we have noted earlier, under Illinois law, a plaintiff establishes intentional infliction of emotional distress by showing that: "(1) the defendant's conduct was extreme and outrageous, (2) the defendant intended to inflict severe emotional distress or knew that there was at least a high probability that his conduct would inflict severe emotional distress, and (3) the defendant's conduct did cause severe emotional distress." *Van Stan,* 125 F.3d at 567.

[7][8] We shall review the district court's order denying a motion for judgment as a matter of law de novo. *Id.* However, we shall not reverse unless "no reasonable juror" could have found that Ms. Naeem established all of the elements of her claim, and "we must view all evidence in the light most favorable" to

Ms. Naeem and "draw all reasonable inferences" in her favor. *Id.*

[9][10] We shall review the district court's order denying a new trial for abuse of discretion. *Scaggs v. Consol. Rail Corp.,* 6 F.3d 1290, 1293 (7th Cir.1993). Because liability is based on an Illinois tort, the role of the district court was to determine whether the jury's verdict was based on sufficient proof to satisfy the claim for damages under Illinois law. *McClain v. Owens-Corning Fiberglas Corp.,* 139 F.3d 1124, 1125 (7th Cir.1998).

[11] First, the defendants claim that their conduct was not "extreme and outrageous." As they point out, Illinois courts have been hesitant to find intentional infliction of emotional distress in the workplace because, "if everyday job stresses resulting from discipline, personality conflicts, job transfers or even terminations could give rise to a cause of action for intentional infliction of emotional distress, nearly every employee would have a cause of action." *Graham v. Commonwealth Edison Co.,* 318 Ill.App.3d 736, 252 Ill.Dec. 320, 742 N.E.2d 858, 867 (Ill.App.Ct.2000). Yet, Illinois courts have found extreme and outrageous behavior to exist in the employer/employee context when the employer "clearly abuses the power it holds over an employee in a manner far more severe than the typical disagreements or job-related stress caused by the average work environment." *Honaker v. Smith,* 256 F.3d 477, 491 (7th Cir.2001). In this case, viewing the evidence in a light most favorable to Ms. Naeem, the actions taken against Ms. Naeem clearly go far beyond typical on-the-job disagreements, including the following: forcing Ms. Naeem to climb up an unstable metal stairway to hook up computer equipment during her pregnancy; sabotaging Ms. Naeem's computer to deny her access and alter her files; publicly criticizing Ms. Naeem's work during meetings with other supervisors; moving her office and her transportation files, causing her to be unable to locate necessary paperwork; and increasing the amount of work due under the PIPs, knowing that Ms. Naeem would not be able to meet the deadlines

*9 The jury also was entitled to consider that the defendants knew that Ms. Naeem was pregnant at the time, and, consequently, was particularly susceptible to emotional distress. *See Patterson v. Xerox Corp.,* 901 F.Supp. 274, 279 (N.D.Ill.1995) (holding that an employer who chastised a pregnant employee at work and berated that employee over the phone at home had acted in an "extreme and outrageous" manner); *see also Wall v. Pecaro,* 204 Ill.App.3d 362, 149

Ill.Dec. 388, 561 N.E.2d 1084, 1088 (Ill.App.Ct.1990) (holding that "by reason of her pregnancy, [the plaintiff] was peculiarly susceptible to emotional distress").

[12] There was also sufficient evidence presented to the jury on the second element, intent to cause emotional distress. Hartley admitted at trial that McKesson management was trying to "send Sally a message," "affect [her] mental processes" and "get [her] attention." Tr.XV at 2591. Viewing this evidence in the light most favorable to Ms. Naeem, the jury could have found that the McKesson employees intended to cause emotional distress.

[13] Finally, there was sufficient evidence of the third element, that Ms. Naeem actually suffered emotional distress. The defendants argue that, because Ms. Naeem did not seek psychiatric help until years after her employment with McKesson terminated, she did not suffer severe emotional distress. However, we previously have held that seeking psychiatric help is not a necessary condition to a finding that a defendant actually suffered from severe emotional distress. See Bristow v. Drake Street, Inc., 41 F.3d 345, 350 (7th Cir.1994) (holding that the only effect of such a necessity "would be to increase psychiatrists' incomes"). Ms. Naeem's own testimony establishes that, after she was fired, her "self-esteem and self-confidence were zero," she was "so angry and depressed [she] didn't want to talk or deal with anybody," she and her husband "didn't have a relationship" and she considered committing suicide. Tr.IX at 1289-90, 1297. While preparing for depositions in this case, she was "having nightmares" of Mr. Montreuil "yelling at [her] and embarrassing [her] in front of every-body." Id. at 1295. Also, Ms. Naeem testified at trial that she was too ashamed to seek psychiatric help after her employment with McKesson was terminated, nor could she afford to go to a psychiatrist. Her family members also testified about their observations of her mental state; her husband testified that, by late 1995, she was losing her hair, that they did not have any marital relations, that she was unable to breast-feed her newborn son, and that she would "cry[ ] for hours." Tr.VII at 854-56. Ms. Naeem's distress was similar to the distress found actionable in Bristow, where a woman who faced sexual discrimination at work sued for intentional infliction of emotional distress. 41 F.3d at 349-50. We found her emotional distress to be severe when she suffered stomach pains and vomiting, stopped eating, cried all the time, appeared frightened, was not a happy person, and was not functioning well, even though she did not seek

psychiatric help. Id.

*10 Additionally, Ms. Naeem's psychiatrist, Dr. Lahmeyer, testified that Ms. Naeem suffered from post-traumatic stress disorder and major depressive disorder, which can be traced to her experiences at McKesson. Dr. Lahmeyer testified that he still meets regularly with Ms. Naeem, and that she is being treated with antidepressant, anti-anxiety medication. Ms. Naeem presented sufficient evidence from her psychiatrist, and from her own testimony, to support her claim that she suffered severe emotional distress. See Pavilon v. Kaferly, 204 Ill.App.3d 235, 149 Ill.Dec. 549, 561 N.E.2d 1245, 1252 (Ill.App.Ct.1990) (jury had sufficient evidence to find severe emotional distress when plaintiff needed continuing psychotherapy, and when her psychotherapist testified that she was "scared, angry, unable to cope with her child, her work, and her relationship with men").

Viewing all of the evidence in the light most favorable to Ms. Naeem, a reasonable juror certainly could find that she had established all the elements of her claim. The district court did not abuse its discretion in denying defendants' motion for a new trial.

C. Objections to Expert Witness Testimony

The defendants next claim that the district court erred in allowing the testimony of two of Ms. Naeem's expert witnesses. We shall discuss the testimony of each witness below separately.

1. Professor William Anthony

At trial, William Anthony, a professor of management at Florida State University, testified for Ms. Naeem as a human resources expert and gave his opinion as to whether McKesson followed its own human resources policies in dealing with Ms. Naeem. Prior to trial, the defendants filed a motion in limine seeking to exclude Prof. Anthony's testimony on the ground that it was inadmissible under Federal Rules of Evidence 402, 403 and 702. The district court granted the motion in part, excluding Prof. Anthony's testimony regarding whether McKesson followed accepted human resource policies, but allowing testimony regarding whether McKesson followed its own policies.

[14][15] The admissibility of expert testimony is

governed by Federal Rule of Evidence 702, as well as *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) "We first undertake a *de novo* review of whether or not the district court properly followed the framework set forth in *Daubert* " *Fuesting v. Zimmer, Inc.,* 421 F.3d 528, 534 (7th Cir.2005) (citation omitted). *Daubert,* as extended to all expert testimony including non-scientific expert testimony, requires the district court to perform the role of gatekeeper and to "ensure the reliability and relevancy of expert testimony." *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) So long as the district court adhered to *Daubert's* requirements, we shall not "disturb the district court's findings unless they are manifestly erroneous." *Fuesting,* 421 F.3d at 534

[16][17][18] In ruling on the defendants' motion in limine, the district court simply stated that "[Prof.] Anthony has sufficient expertise to be able to assist the jury in understanding the meaning of a company's employment policies." R.150 at 5. We have said that judges merely need to follow *Daubert* in making a Rule 702 determination. While the *Daubert* standard does not have to be recited mechanically, "it is nonetheless crucial that a *Daubert* analysis of some form in fact be performed." *Fuesting,* 421 F.3d at 535. In *Fuesting,* we held that conclusory statements by the district court were not sufficient to show that a *Daubert* analysis was performed adequately. *Id.* (holding that a district court's statements finding an expert's credentials to be sufficient was not enough; the district court also needed to assess the reliability of the methodology used by the expert). Similarly, in this case, the district court's one sentence, stating that Prof. Anthony has sufficient expertise, is not enough to show that the district court applied the *Daubert* standard; the court provided no analysis of Prof. Anthony's methodology. Therefore, the admission of Prof. Anthony's testimony should not be given the deference normally afforded to a district court under the "manifestly erroneous" standard. When a district court fails to consider an essential *Daubert* factor, such as reliability, it has abused its discretion. *See Smith v. Ford Motor Co.,* 215 F.3d 713, 717 (7th Cir.2000)

*11 [19] The defendants contend that Prof. Anthony's testimony gave opinions that were not founded in scientific, technical or specialized knowledge. Defendants' Br. at 30. We have stated that "experts' work is admissible only to the extent that it is reasoned, uses the methods of the discipline, and is founded on data. Talking off the cuff-deploying

neither data nor analysis-is not an acceptable methodology." *Lang v. Kohl's Food Stores, Inc.,* 217 F.3d 919, 924 (7th Cir.2000)

Prof. Anthony did testify that he examined a number of depositions from McKesson employees, as well as the McKesson personnel policy manual, when formulating his opinions. However, his opinions in court were not tied to specific portions of the policy manual, and appeared to be general observations regarding what is normal or usual business practice. As such, his testimony did not meet the requisite level of reliability *See Kumho Tire Co.,* 526 U.S. at 152 (holding that the objective of *Daubert* is to ensure that "an expert, whether basing testimony on professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field")

[20][21][22] Even though the admission of Prof. Anthony's testimony was in error, the defendants must show that the introduction of such evidence violated their "substantial rights" in order to be entitled to relief under Federal Rule of Civil Procedure 61 The defendants objected to specific statements made by Prof. Anthony: (1) noting that there was no written job description for Ms. Naeem's position and opining that the absence of one is abnormal; (2) concluding that there was no consistency from one supervisor to another; (3) stating that Ms. Naeem's job duties as computer room supervisor and transportation coordinator seemed to be incompatible; and (4) stating that some of Ms. Naeem's job duties were extremely unusual Defendants' Br. at 30. However, Ms. Hartley corroborated statements (1) and (2) while testifying when she admitted that there was no written job description for Ms. Naeem's position and that there were no written documents that set forth changes in the job responsibilities and duties expected of Ms. Naeem by her current supervisor as compared to her previous supervisors. Tr.V at 386-87, 391-92 Moreover, Prof. Anthony's opinion that some of Ms. Naeem's job duties were "extremely unusual" was elicited by the defendants on cross-examination, Tr.VI at 517-18, and, when error is invited, not even plain error permits reversal. *See United States v. Fulford,* 980 F.2d 1110, 1116 (7th Cir.1992) (holding that a party who introduces testimony cannot later claim that such testimony is irrelevant and prejudicial) Finally, the defendants cross-examined Prof. Anthony regarding his statement that Ms. Naeem's duties as computer room supervisor and transportation coordinator were incompatible, and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----
--- F.3d ----, 2006 WL 932354 (C.A.7 (Ill.))
**(Cite as: --- F.3d ----)**

Page 16

Prof. Anthony admitted that he did not perform a job analysis nor did he know the full extent of what she was expected to do in her position. Tr VI at 513-14. Given that the objectionable testimony by Prof. Anthony was corroborated by other witnesses, elicited on cross-examination or otherwise discredited on cross-examination, there was no reversible error in the admission of Prof. Anthony's testimony.

### 2. David LaPorte.

*12 At trial, David LaPorte testified for Ms. Naeem as an expert on DOT regulations governing post-accident drug testing. He testified that Ms. Naeem's failure to have Barden tested for drugs after his December 29, 1995, accident was not a violation of DOT regulations. The defendants offered no objection during Mr. LaPorte's direct examination when he was asked to give an opinion regarding whether the failure to test for drugs was a DOT violation. Tr V at 307-08.

Before trial, however, the defendants filed a motion in limine to exclude the testimony of LaPorte. The defendants contended that his testimony about the applicable DOT regulations was irrelevant to the questions to be decided by the jury. They stressed that what was at issue was Mr. Montreuil's state of mind in suspending Ms. Naeem, not whether he was actually correct in believing that DOT regulations required drug testing after the Barden incident. The defendants further argued that LaPorte's testimony regarding McKesson's drug and alcohol testing policies was not needed to help the jury understand the evidence, and that such an opinion would usurp the jury's fact-finding role in their determination as to whether Mr. Montreuil acted reasonably under the McKesson policies. No additional argument was made at trial during LaPorte's testimony. The defendants did not raise their current argument, that LaPorte impermissibly provided conclusions of law, until their renewed motion for judgment as a matter of law or, alternatively, for a new trial. See R.288 at 12. In that motion, they argued that the testimony of David LaPorte was admitted in error because it allowed an expert witness to provide "a legal interpretation and application of a federal regulation." See id. In their view, the court should instruct the jury on the applicable law, not witnesses.

[23][24][25] To preserve an issue for appellate review, a party "must make a proper objection at trial that alerts the court and opposing party to the specific

grounds for the objection." *United States v. Wynn*, 845 F.2d 1439, 1442 (7th Cir.1988). An objection is proper when "a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context...." Fed.R.Evid. 103(a)(1). "Neither a general objection to the evidence nor a specific objection on other grounds will preserve the issue for review." *Wynn*, 845 F.2d at 1442; *see also United States v. Laughlin*, 772 F.2d 1382, 1392 (7th Cir.1985) (holding that defendant's objection to the admission of photographs on the ground of irrelevancy did not preserve objection under Federal Rule of Evidence 404(b)). When a defendant does not object to the admission of evidence during the trial, the objection is waived and cannot be raised for the first time in a motion for new trial or on appeal. *United States v. Hack*, 205 F.2d 723, 727 (7th Cir.1953). In this case, the defendants did not raise their current objection to LaPorte's testimony in either their motion in limine or during the testimony itself. The defendants therefore waived their current objection to LaPorte's testimony.

*13 In any event, we previously have stated that allowing a witness to testify as to a legal conclusion may cause the jury to accord too much weight to that testimony, and may infer that the jury should look to that witness for legal guidance. *See Bammerlin v. Navistar Int'l Transp. Co.*, 30 F.3d 898, 900 (7th Cir.1994); *Harbor Ins. Co. v. Cont'l Bank Co.*, 922 F.2d 357, 366 (7th Cir.1991). In *Bammerlin* and *Harbor Insurance*, the expert witnesses were offering "opinions about legal issues that ... determine[d] the outcome of a case." *United States v. Sinclair*, 74 F.3d 753, 757-58 n. 1 (7th Cir.1996) (citing cases). However, in the present case, the DOT regulations at issue do not determine the outcome of Ms. Naeem's claims; rather, they are only a piece of evidence regarding whether one of the disciplinary actions against Ms. Naeem was justified.

[26] Moreover, even if LaPorte did provide impermissible testimony, it would not be grounds for reversal. Mr. Montreuil admitted at trial that he knew that the truck driven by Barden was not covered by the DOT regulations at the time he disciplined Ms. Naeem for failing to order post-accident drug testing. Therefore, his testimony was consistent with the testimony of Mr. LaPorte, and, consequently, there was no plain error. *See also United States v. Duvall*, 272 F.3d 825, 829 (7th Cir.2001) (holding that, even if expert testimony opining that drugs were packaged for distribution was admitted in error, the error was harmless because the defendant admitted he intended

--- F.3d ----
--- F.3d ----, 2006 WL 932354 (C.A.7 (Ill.))
(Cite as: --- F.3d ----)

Page 17

to distribute the drugs in question).

### D. Jury Award for Pain and Suffering

The defendants submit that the jury's award of $240,000 for pain and suffering is excessive and not in line with comparable cases. The district court denied the defendants' renewed motion for judgment as a matter of law or, alternatively, for a new trial on this ground. The court applied the federal standard for review of compensatory damages, asking "whether the award is monstrously excessive; whether there is no rational connection between the award and the evidence, indicating that it is merely a product of the jury's fevered imaginings or personal vendettas; and whether the award is roughly comparable to awards made in similar cases." *EEOC v. AIC Sec. Investigations, Ltd.,* 55 F.3d 1276, 1285 (7th Cir.1995) (citations omitted). The court held that the award was not "monstrously excessive" and that the defendants had failed to establish that such an award was out of line with comparable cases. R.208 at 3-4.

[27] Because Ms. Naeem was awarded damages solely on her state-law intentional infliction of emotional distress claim, Illinois law governs review of that award. *Medcom Holding Co. v. Baxter Travenol Labs., Inc.,* 106 F.3d 1388, 1397 (7th Cir.1997). That conclusion is mandated by *Gasperini v. Center for Humanities, Inc.,* 518 U.S. 415, 431, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996), in which the Supreme Court held that a federal district court must defer to state standards of review of damages for state law claims because *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), "precludes a recovery in federal court significantly larger than the recovery that would have been tolerated in state court." A federal appellate court must review the district court's determination only for abuse of discretion. *Id.* at 438.

*14 [28][29] Under Illinois law, "the evidence need only tend to show a basis for the computation of damages with a fair degree of probability." *Medcom Holding Co.,* 106 F.3d at 1398 (citation omitted). A damages award will not be subject to remittitur if it "falls within the flexible range of conclusions which can be reasonably supported by facts because the assessment of damages is primarily an issue of fact for jury determination." *Id.* (citations omitted). Illinois courts, in applying this standard, have "traditionally declined to make ... comparisons [with amounts awarded in other cases] in determining

whether a particular award is excessive." *Richardson v. Chapman,* 175 Ill.2d 98, 221 Ill.Dec. 818, 676 N.E.2d 621, 628 (Ill.1997) (citing cases); *see also Tierney v. Cmty. Mem'l Gen. Hosp.,* 268 Ill.App.3d 1050, 206 Ill.Dec. 279, 645 N.E.2d 284, 294 (Ill.App.Ct.1994) (holding that "[w]ith regard to defendants' arguments that the jury's verdict should be compared to other similar awards and thereby found to be excessive, this is simply not the law in Illinois") (citing cases).

[30] In this case, the district court failed to apply the Illinois standard for review of damages. It compared the award to Ms. Naeem with awards to other plaintiffs in other cases in the Seventh Circuit and other federal courts around the nation. Although making such comparisons is the federal standard for review of compensatory damages, it is not the established methodology employed by Illinois courts. By using such a standard, a district court may allow a larger recovery than would be allowable under Illinois law, or, conversely, it may preclude an award that would be allowable under Illinois law. *Gasperini* prohibits such a result. 518 U.S. at 431. Indeed, *Gasperini* stresses that substantial differences between federal and state court damage awards may result if the federal court does not apply state standards. *See id.* at 430-31. The possibility of such differences is even more pronounced in this case because the district court compared the damage awards to cases outside the state of Illinois and even outside the Seventh Circuit. Therefore, we must conclude that, in employing this methodology, the district court committed error. However, after a review under the correct Illinois standards, we must conclude that the district court's error was harmless.

[31][32] In reviewing damage awards, Illinois courts give great deference to the jury. Illinois law makes clear that it is "the jury's function to consider the credibility of witnesses and to determine an appropriate award of damages." *Richardson,* 221 Ill.Dec. 818, 676 N.E.2d at 628. Indeed, the Supreme Court of Illinois has stated that an award of damages "will be deemed excessive if it falls outside the range of fair and reasonable compensation or results from passion or prejudice, or if it is so large that it shocks the judicial conscience." *Best v. Taylor Mach. Works, et al.,* 179 Ill.2d 367, 228 Ill.Dec. 636, 689 N.E.2d 1057, 1079 (Ill.1997) (citations omitted). In this case, Ms. Naeem presented evidence of her pain and suffering, including: testimony from family members about her emotional state and diminished capabilities, testimony from her psychiatrist and her own testimony regarding her emotional state while

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

employed at McKesson and after her termination. The jury had ample evidence to form the basis of their award of $240,000, and we cannot say that such an award "shocks the conscience." *See id.*

### E. Jury Award of Front and Back Pay

\*15 [33] The jury awarded $150,000 for lost earnings and benefits to date, and $75,000 for future lost earnings and benefits. R.160 at 5. After judgment was entered, the defendants moved for the district court to vacate these damages. They contended that vacation was possible under Federal Rule of Civil Procedure 59, which allows for a judgment to be altered or amended when there has been a "manifest error of law." *See Russell v. Delco Remy Div. of Gen. Motors Corp.*, 51 F.3d 746, 749 (7th Cir.1995). The defendants contend that it was a manifest error of law to award what it classifies as "front and back pay" to Ms. Naeem, because an award for an intentional infliction of emotional distress claim is intended to compensate the victim for the emotional distress suffered as a result of the tortious conduct; awards for past and future loss of income and benefits, according to the defendants, are not "logical" for an intentional infliction of emotional distress claim. Defendants' Br. at 34-35. The district court denied defendants' motion; we review the district court's decision for abuse of discretion, and review its interpretation of the law de novo. *See Boyd v. Illinois State Police,* 384 F.3d 888, 897 (7th Cir.2004).

[34][35] The general rule of damages in a tort action in Illinois is that:
the wrongdoer is liable for all injuries resulting directly from the wrongful acts, whether they could or should not have been foreseen by him, provided the particular damages are the legal and natural consequences of the wrongful act imputed to the defendant, and are such as might reasonably have been anticipated.

*Sutton v. Overcash,* 251 Ill.App.3d 737, 191 Ill.Dec. 230, 623 N.E.2d 820, 838 (Ill.App.Ct.1993) (citing *Siemieniec v. Lutheran Gen. Hosp.,* 117 Ill.2d 230, 111 Ill.Dec. 302, 512 N.E.2d 691 (Ill.1987)) In *Sutton,* the court allowed a jury instruction on lost wages for the plaintiff's intentional infliction of emotional distress claim against her employer after the plaintiff presented evidence that the defendant's actions caused the plaintiff to leave her job, and initially to take a job that paid her less. *Id.* at 838-39. Although the defendants attempt to distinguish *Sutton* on the ground that the plaintiff voluntarily left her

job, while Ms. Naeem was discharged, we do not believe this is a meaningful distinction. Just as in *Sutton,* the defendants' actions caused Ms. Naeem's loss of wages. These actions, as previously described, included hiding necessary files and failing to change deadlines in her PIP. These actions all contributed to her discharge. As the district court stated when allowing Ms. Naeem to present evidence of lost earnings, "if you were to believe the plaintiff's testimony, you could find that . . . the plaintiff's failure to do the things she had to do to keep her job was caused by the defendants' tortious conduct." Tr.X at 1484. Ms. Naeem also testified that she was unable to find a job after a job search, and that her depression caused her difficulties in making good decisions Tr.IX at 1288-94.

\*16 [36][37] The defendants also argue that the award for lost earnings and benefits is against the weight of the evidence. Under Illinois law, "[i]n order to recover lost earnings, all the law requires is that the plaintiff present evidence which will establish, with a fair degree of probability, a basis for the assessment of damages." *Sutton,* 191 Ill.Dec. 230, 623 N.E.2d at 838. As noted above, Ms. Naeem presented testimony with respect to how the defendants caused her to lose her job and how she had difficulty finding another job after her termination. Ms. Naeem also presented the testimony of Sandor Goldstein, an actuary, who calculated the present value of Ms. Naeem's lost earnings and benefits to be between $337,570 and $510,382 Tr.XI at 1594-96. Therefore, there was an evidentiary basis for the jury's conclusion that defendants' actions caused a loss of past and future earnings, as well as relevant evidence for the jury to consider in calculating those losses It was not an abuse of discretion for the district court to find the evidence provided the proof of damages. *See McClain v. Owens-Corning Fiberglas Corp.,* 139 F.3d 1124, 1126 (7th Cir.1998) (holding that "[g]enerally, an abuse of discretion only occurs where no reasonable person could take the view adopted by the trial court" (citing *Harrington v. DeVito,* 656 F.2d 264, 269 (7th Cir.1981))).

### Conclusion

For the reasons set forth in this opinion, the judgment of the district court is affirmed.

AFFIRMED

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

FN1. Ms. Naeem's duties in her role as computer room supervisor included overseeing the computer room employees, who coordinated the processing of product orders on the computer. Her duties as transportation coordinator included the supervision of drivers: setting work schedules, coordinating routes, and handling truck delivery issues

FN2. McKesson argues that the robbery is the reason that Ms. Naeem sought psychiatric help

FN3. The jury also found in favor of Hank Weinmaster on Count 3

FN4. The application of *Maksimovic v. Tsogalis,* 177 Ill.2d 511, 227 Ill.Dec. 98, 687 N.E.2d 21 (Ill.1997) by federal district courts has led to sometimes inconsistent results *Compare Spahn v. Int'l Quality & Productivity,* 211 F.Supp.2d 1072, 1075 n. 2 (N.D.Ill.2002) (noting that "claims for [intentional infliction of emotional distress] are generally not preempted by the IHRA when there is an underlying sexual harassment claim" (citations omitted)), *with Simon v. City of Naperville,* 71 F.Supp.2d 882, 884 (N.D.Ill.1999) (holding that an intentional infliction of emotional distress claim that is based on facts which also constitute sexual harassment is "surely preempted" under the IHRA). Several district courts have determined that an intentional infliction of emotional distress claim is not preempted by the IHRA, even when the plaintiff also claims discrimination or retaliation based on sex. *See, e.g., Temores v. SG Cowen,* 289 F.Supp.2d 996, 1006-07 (N.D.Ill.2003); *Spahn,* 211 F.Supp.2d at 1076; *Warnell et al. v. Ford Motor Co. et al.,* 48 F.Supp.2d 1095, 1097 (N.D.Ill.1999) However, in others, the court has determined that a plaintiff who claims sexual or other discrimination does face preemption of their intentional infliction of emotional distress claim by the IHRA. *See, e.g., Beard v. City of Chicago,* 299 F.Supp.2d 872, 874-75 (N.D.Ill.2004); *Thomas v. Habitat Co.,* 213 F.Supp.2d 887, 899 (N.D.Ill.2002); *Haswell v. Marshall Field & Co.,* 16 F.Supp.2d 952, 965 (N.D.Ill.1998).
Despite *Maksimovic's* holding that

preemption should rest on an examination of legal duties, not on the factual basis of claims, district courts have found IHRA preemption of an intentional infliction of emotional distress claim when a plaintiff alleged the same conduct to support intentional infliction of emotional distress as was alleged to support a claim of disability, racial or sexual harassment. *See Stansberry v. Uhlich Children's Home,* 264 F.Supp.2d 681, 690 (N.D.Ill.2003) (noting these claims are "inextricably linked"); *see also Thomas,* 213 F.Supp.2d. at 899; *Haywood v. Lucent Techs.,* 169 F.Supp.2d 890, 914 (N.D.Ill.2001) (stating that an intentional infliction of emotional distress claim was preempted when the same conduct alleged to support intentional infliction of emotional distress claim also was alleged to support discrimination claim); *Simon,* 71 F.Supp.2d at 884 (same); *Haswell,* 16 F.Supp.2d at 965 (holding that an intentional infliction of emotional distress claim was preempted because the "same allegations surface in [the plaintiff's] disability discrimination claim" under the Americans with Disabilities Act). However, in other district court cases, the district court has correctly looked to the source of the legal duty in determining preemption. In *Roberts v. County of Cook,* the plaintiff alleged sexual harassment by her employer who engaged "in a pattern of verbal and physical sexual discrimination." 213 F.2d 882, 884 (N.D.Ill.2002). Nevertheless, the district court found that an intentional infliction of emotional distress action was not preempted by IHRA, even though it involved sexual elements, because it did "not depend on the prohibitions against sex discrimination for its survival." *Id.* at 887 (citation omitted); *see also Arnold v. Janssen Pharmaceutica, Inc.,* 215 F.Supp.2d 951, 955 (N.D.Ill.2002) ("That extreme and offensive conduct might also constitute sexual harassment does not affect the viability of a tort claim for [intentional infliction of emotional distress] "); *Spahn,* 211 F.Supp.2d at 1076 (holding that it is "perfectly clear that the critical analysis focuses on legal duties, not facts"). Another district court noted that if an employer acts in an extreme and outrageous manner, and thus commits intentional infliction of emotional distress, it is "irrelevant whether the motive for this

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

--- F 3d ----
--- F 3d ----, 2006 WL 932354 (C.A.7 (Ill.))
**(Cite as: --- F 3d ----)**

Page 20

harassment" was based on a discriminatory intent. *Jimenez v. Thompson Steel Co., Inc.*, 264 F.Supp.2d 693, 696 (N.D.Ill.2003).

FN5. Federal Rule of Evidence 702 states: If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case

FN6. An example of such an opinion, cited by defendants, is the testimony that: "I concluded that in Sally's case they didn't lay out the duties and responsibilities clearly enough, since there was no written job description. And that's normally how you do that." Tr VI at 501

FN7. Another example of such an opinion is Prof. Anthony's testimony that "some of the things that [Ms. Naeem] was asked to do in the performance plan were extremely unusual for any job. Like managing three shifts, for example." Tr.VI at 517-18.

FN8. Federal Rule of Civil Procedure 61 states, in relevant part: "No error in either the admission or exclusion of evidence . . is ground for granting a new trial or for setting aside a verdict or for vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice."

FN9. No defense witness testified that the absence of a written job description for Ms. Naeem's position was "abnormal." Ms. Hartley was asked about the McKesson personnel policy manual, which stated that "Every employee should have a job description [and] specific position guide." Tr V at 362-63. Ms. Hartley testified that the personnel policy that mandated a written job description was not the policy that was used at the time of Ms. Naeem's employment in Romeoville. *Id.* at 366. Her testimony was

later impeached by the interrogatory answered by Ms. Miller, vice president of McKesson, who stated that the policy regarding written job descriptions in question was in place during Ms. Naeem's employment at Romeoville. Tr VI at 481-83

FN10. The district court noted in its ruling on the defendants' renewed motion for judgment as a matter of law, or, alternatively for new trial that the jury's award was not technically for "front and back pay" because those terms connote Title VII damages. R 208 at 2. Instead, the jury was instructed that it could award damages for "[t]he value of earnings and benefits lost" and "[t]he present cash value of the earnings and benefits reasonably certain to be lost in the future." *See id.*, Illinois Pattern Instruction-Civil, No. 30 07.

FN11. Ms Naeem testified that her attempts to find another job included: getting addresses of other drug companies from the library and sending them resumes, calling human resources directors for drug companies to inquire about available positions, and looking through the newspaper to find job listings. Tr.IX at 1288-90.

FN12. Goldstein made these calculations based on an assumption that Ms. Naeem would stay employed at McKesson, and took into account the difference between her McKesson salary and her current salary. Tr.XI at 1593-94

C.A.7 (Ill.),2006.
Naeem v. McKesson Drug Co.
--- F 3d ----, 2006 WL 932354 (C.A.7 (Ill.))

Briefs and Other Related Documents (Back to top)

• 04-3816 (Docket) (Nov. 1, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.