# EXHIBIT C

Westlaw.

99 Fed.Appx. 616                                                                    Page 1
99 Fed.Appx. 616, 2004 WL 1166546 (C.A.6 (Mich.))
**(Cite as: 99 Fed.Appx. 616)**

# H

Briefs and Other Related Documents
This case was not selected for publication in the Federal Reporter.NOT RECOMMENDED FOR FULL--TEXT PUBLICATION Sixth Circuit Rule 28(g) limits citation to specific situations Please see Rule 28(g) before citing in a proceeding in a court in the Sixth Circuit If cited, a copy must be served on other parties and the Court. Please use FIND to look at the applicable circuit court rule before citing this opinion Sixth Circuit Rule 28(g) (FIND CTA6 Rule 28.)

United States Court of Appeals,Sixth Circuit.
Fenton McKENZIE, Plaintiff-Appellant,
v.
Kurt BERGGREN and Kurt Berggren, P.C.,
Defendants-Appellees
**No. 02-2108.**

May 18, 2004.

**Background:** Client sued attorney who represented him in an employment discrimination suit, asserting claims of legal malpractice, breach of contract, breach of fiduciary duty, and intentional infliction of emotional distress. The United States District Court for the Eastern District of Michigan, Feikens, J., granted summary judgment for the attorney, and the client appealed

**Holdings:** The Court of Appeals, Gilman, Circuit Judge, held that:

1(1) legal malpractice claim was not barred by limitations;

2(2) client was collaterally estopped from basing a legal malpractice action upon allegations of coercion to settle the underlying litigation;

3(3) client could not prevail on a claim for breach of contract where the alleged facts supported a claim for legal malpractice; and

4(4) client failed to allege "extreme and outrageous" conduct, as required to support a claim of intentional infliction of emotional distress

Affirmed.

See also, 212 F.R.D. 512.

West Headnotes

**[1] Limitation of Actions 241 ⌐⌐⌐55(3)**

241 Limitation of Actions
    241II Computation of Period of Limitation
        241II(A) Accrual of Right of Action or Defense
            241k55 Torts
                241k55(3) k Negligence in Performance of Professional Services. Most Cited Cases
Absent any affirmative action by attorney or client to sever their relationship following a settlement of underlying litigation, the Michigan statute of limitations for a legal malpractice claim did not begin to run. M.C.L.A. § 600.5805(6).

**[2] Compromise and Settlement 89 ⌐⌐⌐17(1)**

89 Compromise and Settlement
    89I In General
        89k14 Operation and Effect
            89k17 Conclusiveness
                89k17(1) k. In General. Most Cited Cases

**Judgment 228 ⌐⌐⌐828.9(2)**

228 Judgment
    228XVII Foreign Judgments
        228k828 Effect of Judgments of State Courts in United States Courts
            228k828.9 Nature of Judgment
                228k828.9(2) k. Consent or Default Most Cited Cases
Under Michigan law, settlement of underlying action in which attorney represented client collaterally estopped the client from basing a legal malpractice action upon allegations of coercion to settle where a state-court judge had refused to set aside the settlement agreement after finding that it was knowingly and voluntarily entered into by the client.

**[3] Attorney and Client 45 ⌐⌐⌐105**

99 Fed.Appx. 616
99 Fed.Appx. 616, 2004 WL 1166546 (C.A.6 (Mich.))
(Cite as: 99 Fed.Appx. 616)

45 Attorney and Client
   45III Duties and Liabilities of Attorney to Client
      45k105 k. In General. Most Cited Cases
Under Michigan law, a plaintiff cannot prevail on a claim for breach of contract where the alleged facts support a claim for legal malpractice.

[4] Damages 115 ☜57.25(1)

115 Damages
   115III Grounds and Subjects of Compensatory Damages
      115III(A) Direct or Remote, Contingent, or Prospective Consequences or Losses
         115III(A)2 Mental Suffering and Emotional Distress
            115k57.19 Intentional or Reckless Infliction of Emotional Distress; Outrage
               115k57.25 Particular Cases
                  115k57.25(1) k. In General. Most Cited Cases
Attorney's alleged actions in yelling at a client and calling him crazy, and strong-arming him into a settlement by referencing his skin color, did not rise to the level of "extreme and outrageous" under Michigan law, as required to support a claim of intentional infliction of emotional distress.

*616 On Appeal from the United States District Court for the Eastern District of Michigan.

Laurie S. Longo, Laurie S. Longo, P.C., Ann Arbor, MI, for Plaintiff-Appellant.
*617 Michael L. Updike,Secrest, Wardle, Lynch, Hampton, Truex & Morley, Farmington Hills, MI, for Defendants-Appellees.

Before GUY and GILMAN, Circuit Judges; and BARZILAY, Judge.

FN* The Honorable Judith M. Barzilay, Judge, United States Court of International Trade, sitting by designation.

OPINION

GILMAN, Circuit Judge.
**1 Fenton McKenzie was represented by Kurt Berggren in an employment discrimination action against Ford Motor Company. McKenzie settled his suit against Ford and, after unsuccessfully attempting to renounce his settlement agreement soon thereafter, brought suit against Berggren for legal malpractice,

breach of contract, breach of fiduciary duty, and intentional infliction of emotional distress. The district court granted summary judgment in favor of Berggren. For the reasons set forth below, we AFFIRM the judgment of the district court.

I. BACKGROUND

McKenzie hired Berggren to represent him in an employment discrimination suit against Ford that was brought in a Michigan state court. At the time, McKenzie had claims pending with both the Michigan Department of Civil Rights and the Equal Employment Opportunity Commission (EEOC), but did not employ Berggren to represent him in those matters. He had also received a favorable arbitration decision under Ford's internal grievance procedure prior to retaining Berggren as counsel.

McKenzie's complaint in the Ford lawsuit set forth the following counts: (1) race discrimination, (2) breach of contract, (3) workers' compensation and retaliatory discrimination relating to the compensation claim, (4) retaliatory discrimination for the complaints filed with the Michigan Department of Civil Rights and the EEOC, and (5) disability discrimination. He settled his suit against Ford on May 12, 1999 for $260,000. Of that sum, $130,000 was assigned to his workers' compensation claim, $70,000 was in the form of a taxable payment, and $60,000 was designated for attorney fees. McKenzie soon had a change of heart and attempted to renounce the settlement agreement in a letter to the court on July 6, 1999. A hearing before the state-court judge was held on July 28, 1999. The judge refused to set aside the agreement after finding that it was knowingly and voluntarily entered into by McKenzie.

After his appeal of the state-court decision was dismissed for being untimely, McKenzie brought suit against Berggren in federal court based on diversity of citizenship. 28 U.S.C. § 1332(a)(1). His brief summarizes the claims as follows:
(1) legal malpractice relating to Defendant's lack of preparation at trial and compromise of the Umpire's decision previously awarded Plaintiff;
(2) breach of contract relating to Defendant having misappropriated a larger percentage of attorney's fees than provided for by the parties' agreement and having settled claims expressly outside the scope of his authority;
(3) breach of fiduciary duty relating to Defendant having improperly obtained power of attorney to sign a self-serving settlement which included terms

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

beyond the scope of those to which Plaintiff had **\*618** agreed and expressly beyond the scope of Defendant's authority; and

(4) intentional infliction of emotional distress

McKenzie's brief also summarizes the specific instances of negligence that allegedly support his claims:

**\*\*2** (1) Berggren failed to adequately prepare Plaintiff for trial and conducted very little preparation in terms of interviewing the witnesses or deposing them in advance of trial to find out what the opposition witnesses were going to say. Although he listed over 60 witnesses for Plaintiff, including several doctors as well as actuarial experts who were to give testimony on economic damages, Berggren arranged to have only three witnesses present for trial, only one of which he called to testify. Two were late and the trial court penalized Plaintiff by refusing to allow their testimony:

(2) Berggren failed to file motions in limine relative to Plaintiff's background, specifically involving some criminal events which were outside the ten-year window and would not have risen to the level of a felony, which became the subject of opening remarks by opposing counsel;

(3) Berggren had subpoenaed records during discovery but either had not gotten them and had not followed up on it, or had not marked or even reviewed them before trial; and

(4) Berggren failed to introduce evidence on proximate cause, for example, opinion testimony that the situation in the workplace caused Plaintiff's psychiatric suffering.

Both parties moved for summary judgment. The district court granted Berggren's motion and denied McKenzie's. It held that McKenzie was collaterally estopped from arguing that his attorney coerced him into settling his case with Ford, and that McKenzie's claims regarding Berggren's trial preparation concerned tactical decisions that are protected under *Simko v. Blake*, 448 Mich. 648, 532 N.W.2d 842 (1995) This appeal followed.

## II. ANALYSIS

### A. Standard of review

A grant of summary judgment is reviewed de novo. *Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 629 (6th Cir.2002). Summary judgment is proper where there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the district court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)

### B Statute of limitations

[1] McKenzie filed suit against Berggren on June 11, 2001. Under Michigan law, the statute of limitations for a legal malpractice claim is two years from the "last date of service" or six months from the date of discovery of the action, whichever is later. M.C.L. § 600.5805(6). Berggren correctly points out on his brief that, under Michigan law, "an attorney-client relationship ends, and the last date of service occurs for the purposes of the malpractice statute of limitations, when a client acts in such a way that the essence **\*619** of the attorney-client relationship is destroyed."

**\*\*3** Although McKenzie stated in his deposition that he considered the attorney-client relationship to have been terminated within a "couple of days" of May 12, 1990, neither he nor Berggren took any affirmative action to sever the relationship. Such an affirmative step is required under Michigan law. *Compare Genrow v. Flynn*, 166 Mich. 564, 131 N.W. 1115, 1116 (1911) (holding that the client's letter to his attorney accusing him of deceit constituted a discharge of service); *and Berry v. Zisman*, 70 Mich.App. 376, 245 N.W.2d 758, 760 (1976) (holding that the attorney-client relationship is terminated by a legal malpractice action); *with Rochlen v. Landau*, No. 232151, 2002 WL 31953824, at \*2 (Mich.App. Dec.13, 2002) (unpublished) (rejecting the defendant's argument that the "act of retrieving a file, for purposes of photocopying, was an 'unequivocal termination' of the attorney-client relationship that can be likened to the filing of a legal malpractice action"). The district court therefore properly rejected Berggren's statute-of-limitations defense.

© 2006 Thomson/West No Claim to Orig U S Govt Works.

99 Fed.Appx. 616
99 Fed.Appx. 616, 2004 WL 1166546 (C.A.6 (Mich.))
**(Cite as: 99 Fed.Appx. 616)**

Page 4

### C. McKenzie's legal malpractice claim

[2] Under Michigan Law, a legal malpractice claim has the following four elements: "(1) the existence of an attorney-client relationship; (2) negligence in the legal representation of the plaintiff; (3) that the negligence was a proximate cause of an injury; and (4) the fact and extent of the injury alleged." *Coleman v. Gurwin,* 443 Mich. 59, 503 N.W.2d 435, 436-37 (1993) (citations omitted). The district court concluded that McKenzie had failed to show any negligence on the part of Berrgren, which is the second element of McKenzie's prima facie case. It therefore granted summary judgment on behalf of Berggren.

McKenzie argues that his malpractice claim is not barred by his settlement of the underlying action because Berggren coerced him to settle, both by verbally admonishing him to settle and by leaving him no reasonable alternative in light of Berggren's allegedly negligent representation before and during trial. He relies on *Lowman v. Karp,* 190 Mich.App. 448, 476 N.W.2d 428 (1991), for the proposition that a settlement of the underlying action is not an absolute bar to a subsequent legal malpractice claim. The court in *Lowman* held that the legal malpractice claim there at issue was not barred by a prior settlement where the defendant left the plaintiff with no alternative other than to settle her case on unfavorable terms:

Plaintiff claims that after she informed defendant that she did not want to settle, defendant flatly refused to try the case. The matter arose so close to the trial date that it would have been very difficult, if not impossible, for plaintiff to obtain another attorney. Thus, plaintiff was put in a position where settlement was her only reasonable choice despite her own reservations about the settlement and despite the advice of others.

*Id.* at 431.

McKenzie's case is distinguishable, however, because in *Lowman* the question of whether the settlement agreement was knowingly and voluntarily entered into by the plaintiff had never been litigated. Here that question has been previously litigated in state court, so that McKenzie is collaterally estopped from subsequently claiming that Berggren coerced him to settle. In this respect, the present case is similar to that of *Alterman v. Provizer, Eisenberg, Lichtenstein & Pearlman, P.C.,* 195 Mich.App. 422, 491 N.W.2d 868 (1992). The Michigan Court of Appeals in

*Alterman* held that the plaintiff was collaterally estopped from arguing that his attorney \*620 had negligently allowed him to settle a claim while mentally incompetent because a motion to set aside the settlement on the basis of his alleged mental incompetence had previously been rejected by another court. *Id.* 870-71.

\*\*4 McKenzie, although not entirely barred from bringing a legal malpractice action, is collaterally estopped from basing such an action upon allegations of coercion to settle. The district court therefore did not err in granting summary judgment to Berggren on the ground that the alleged negligent representation was essentially based on the settlement.

In addition to dismissing McKenzie's complaint on the basis of collateral estoppel, the district court found that this case was controlled by *Simko v. Blake,* 448 Mich. 648, 532 N.W.2d 842 (1995), in which the Michigan Supreme Court held that "tactical decisions do not constitute grounds for a legal malpractice action." *Id.* at 848; *see also Woods v. Gursten,* No. 194523, 1998 WL 1988581, at \* 3 (Mich.App. Dec.15, 1998) (holding that "legitimate areas of attorney judgment . . . may not be second-guessed"). The plaintiff in Simko alleged

that [his attorney] did not produce any witnesses in his defense besides Mr. Simko himself, failed to produce plaintiff's personal physician who had been treating him for a pinched nerve and who prescribed medication that would have offered an explanation of his medication condition at the time of his arrest, and failed to provide Mr. Simko with the name and location of the hotel where Mr. Simko had spent the day before he was arrested that may have protected him from impeachment.

*Simko,* 532 N.W.2d at 845. Summary disposition in favor of Simko's attorney was upheld by the Michigan Supreme Court on the ground that the attorney was "not answerable for mere errors in judgment." *Id.* at 847.

McKenzie argues that the presence of a factual record distinguishes his case from Simko's. But the Michigan Supreme Court in *Simko* rejected the notion that the presence of a factual record would have affected its decision. *Id.* at 844 (stating that "no amount of factual development could reveal a case of malpractice."). In fact, the dissent in *Simko* criticizes the majority opinion for finding as a matter of fact or law that the defendant's " 'alleged acts and omissions were trial tactics based on good faith and reasonable professional judgment' " even though "the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

99 Fed.Appx. 616
99 Fed.Appx. 616, 2004 WL 1166546 (C.A.6 (Mich.))
**(Cite as: 99 Fed.Appx. 616)**

Simkos [had] filed an affidavit of a lawyer stating that in his opinion Blake had erred." *Id.* at 851 (quoting the majority opinion).    Although the dissenting opinion may be correct in its assessment that the majority inadvisably rejected the contention that a question of fact can arise as to whether a " 'mere' error of judgment [ ] constitutes negligence." *Id.* at 850 (Levin, J., dissenting), the Michigan Supreme Court's holding is nevertheless binding on this court.

### D. Breach of contract and fiduciary duty claims

[3] The district court found that McKenzie's breach of contract and fiduciary duty claims were duplicative of his legal malpractice claim.  Michigan law is clear that a plaintiff cannot prevail on a claim for breach of contract where the alleged facts support a claim for legal malpractice. *Aldred v. O'Hara-Bruce,* 184 Mich.App. 488, 458 N.W.2d 671, 673 (1990) (holding that claims against attorneys for inadequate representation sound in legal malpractice and not breach of contract).  The *Aldred* case has also been interpreted by the Michigan courts as holding that the only claim that may be brought against one's attorney for inadequate legal services*621 is a claim for legal malpractice. *Melody Farms, Inc. v. Carson Fischer, PLC,* No. 215883, 2001 WL 740575, at *5 (Mich.App. Feb.16, 2001) (unpublished) (holding that, in light of *Aldred,* a claim for breach of fiduciary duty is redundant with a claim for legal malpractice).

### E. Intentional infliction of emotional distress

**\*\*5** [4] Under Michigan law, a prima facie claim for intentional infliction of emotional distress has the following four elements:  "(1) extreme and outrageous conduct;  (2) intent or recklessness;  (3) causation;  and (4) severe emotional distress." *Ruffin-Steinback v. dePasse,* 267 F.3d 457, 464 (6th Cir.2001) (quotation marks omitted).  Michigan law requires that the plaintiff show more than "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Roberts v. Auto-Owners Ins. Co.,* 422 Mich. 594, 374 N.W.2d 905, 909 (1985) (citation and quotation marks omitted). In this case, McKenzie alleges that Berggren "yelled at him and called him crazy, and strong-armed [him] into a settlement by referencing his skin color!" Although this alleged language would indeed be rude and unprofessional, we agree with the district court that McKenzie has failed to allege any conduct that

rises to the level of "extreme and outrageous" under Michigan law.

### III. CONCLUSION

For all of the reasons set forth above, we AFFIRM the judgment of the district court.

C.A.6 (Mich.),2004.
McKenzie v. Berggren
99 Fed.Appx. 616, 2004 WL 1166546 (C.A.6 (Mich.))

Briefs and Other Related Documents (Back to top)

• 02-2108 (Docket) (Sep. 13, 2002)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT D

Westlaw.

Not Reported in F.Supp.2d                                                         Page 1
Not Reported in F.Supp.2d, 2004 WL 2290898 (S.D.N.Y.), 59 Fed.R.Serv.3d 1123
(Cite as: Not Reported in F.Supp.2d)

**H**
Briefs and Other Related Documents

United States District Court,S.D. New York.
James E. MCGRORY, Plaintiff,
v.
THE CITY OF NEW YORK, New York City
Department of Correction, and Cynthia Owens,
Defendants
**No. 99 Civ.4062 FM.**

Oct. 8, 2004.

Stephen M. Jackel, Chester & Jackel, LLC, New
York, New York, Co-Counsel for Plaintiff.
Robert A. Burstein, Rand Rosenzweig Smith Radley
Gordon & Burstein LLP, New York, New York, Co-
Counsel for Plaintiff.
James M. Lemonedes, Edward Shin, Office of
Corporation Counsel, New York, New York, for
Defendants.

*MEMORANDUM DECISION*
MAAS, Magistrate J.

### I. Introduction

*1 This employment discrimination action was filed
by plaintiff James F. McGrory ("McGrory"), a former
correction officer ("CO") at Rikers Island. McGrory
alleged that his employer, the New York City
Department of Correction ("DOC"), subjected him to
a hostile work environment because he was white.
McGrory further contended that the DOC retaliated
against him by terminating his probationary
appointment after he filed a complaint with, and
requested a right-to-sue letter from, the Equal
Employment Opportunity Commission ("EEOC").

One unusual aspect of the case was that McGrory
brought suit not only against his former employer,
but also against Cynthia Owens ("Owens"), a black
female CO. McGrory contended that Owens was at
least partially responsible for the racially hostile
environment that he encountered. Owens, in turn,
brought counterclaims against McGrory and cross
claims against the City of New York ("City"). In her
cross claims, Owens alleged that she was the victim
of racial discrimination, that she was subjected to a
hostile work environment based on her race and

gender, and that the DOC retaliated against her
because she had exercised her First Amendment right
to speak out about corruption and race and gender
discrimination at the DOC.

The case was tried in May 2003. Prior to trial,
McGrory and Owens settled their claims against one
another. Consequently, the case was presented to the
jury as a suit involving two plaintiffs and one
defendant, the City. At the conclusion of its
deliberations, the jury rejected both of Owens' claims
against the DOC. The jury also determined that
McGrory had not been subjected to a racially hostile
work environment. Nevertheless, the jury found that
DOC had retaliated against McGrory for taking
action protected by Title VII and its state and local
counterparts. McGrory was awarded damages in the
amount of $1 million, consisting of $181,303 in back
pay, $285,307 in front pay, and $533,390 in
compensatory damages for mental pain and suffering.

The City has now moved for judgment as a matter of
law ("JMOL") pursuant to Rule 50(b) and a new trial
pursuant to Rule 59 of the Federal Rules of Civil
Procedure. McGrory's attorneys, in turn, have cross-
moved for prejudgment interest on the jury's back
pay award.

For the reasons set forth below, the City's motions
both are denied, conditioned upon McGrory's written
acceptance of an order of remittitur reducing the
jury's damages award as specified below; McGrory's
cross-motion is granted in part and denied in part.

### II. Facts

Viewed in the light most favorable to McGrory, the
evidence at trial established as follows:

In April 1997, the DOC offered McGrory a position
as a probationary CO. In July 1997, after he had
completed a twelve-week training course, McGrory
was assigned to work at the George R. Vierno Center
at Rikers Island ("GRVC"). (Tr. 47-50; Defs.' Ex. G).

On October 29, 1997, McGrory was assigned to a
"split shift" to provide meal relief to other COs
working the regular 7 a.m. to 3 and 3 to 11 p.m.
shifts. (Tr. 58). At approximately 4:30 p.m.,
McGrory's supervisor assigned him to provide meal

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                              Page 2
Not Reported in F.Supp.2d, 2004 WL 2290898 (S.D.N.Y.), 59 Fed.R.Serv.3d 1123
(Cite as: Not Reported in F.Supp.2d)

relief for the COs at a series of posts. He went to the first post but discovered that the CO he was to relieve was not there. (*Id.* at 61-62) He then went to Owens' post, scooting through a security gate as it started to close. As he did so, he heard Owens yell, "[G]et your new jack[ ] ass off my post. I ain't going to a fucking meal yet." (*Id.* at 62) When McGrory explained that the person whom he was scheduled to relieve first was not at his post, and that he had to provide four meal reliefs before the end of his own shift, Owens responded, "that sounds like your fucking problem. Take your new jack ass off my post now and come back at 6:00 when I eat my dinner." (*Id.* at 63) After some further words, McGrory attempted to sign the log book at Owens' post, but she prevented him from doing so, evidently fearing that he would not return at the time that she wanted to take her meal. (*Id.* at 64) Owens also cautioned McGrory, "you don't know who you are dealing with." (*Id.* at 64-65)

> FN1. "New jack" is a pejorative term used by more senior officials to describe new correction officer. (*See id.* at 371).

*2 Eventually, Owens called a supervisor, Captain Edward Watkins, who responded to her post in a matter of minutes. (*Id.* at 65-66, 578-79). After hearing from both COs, Watkins directed McGrory to move to a meal relief at another location and not to return to Owens' post during his shift. (*Id.* at 67-71) Later that evening, when McGrory ran across Owens and attempted to discuss their dispute, she at first refused to look at him and eventually told him, "Go fuck yourself. I am going to get you." (*Id.* at 75)

The following day, McGrory was assigned to the gym corridor "bubble," a post from which he controlled several gates that provided access to the gymnasium and central administrative areas of the GRVC. (*Id.* at 82-83) At approximately 3 p.m., as officers were assembling for the roll call at the start of their shift, McGrory heard a black CO call the group to attention, stating that there was an "officer [that ha]s something to say." (*Id.* at 84) At that point, Owens identified herself as a delegate of the Guardians Association, an organization of African-American COs. She further explained that she wished to discuss McGrory, a white male probationary CO who had been disrespectful and had made sexual and racial comments to her the previous day while trying to perform a meal relief. (*Id.* at 73, 84-85) During a ten-minute diatribe, Owens indicated to the assembled COs that she intended to pursue written complaints to the GRVC warden and the DOC

commissioner, among others, "to get this man," that she had a petition that any other COs who were aggrieved by McGrory's conduct on other occasions could sign, and that "anybody who gets [McGrory's back] [was] going to have to deal with [her]." (*Id.* at 85-86). DOC supervisors were present as Owens was making these statements to the assembled officers, but they failed to intercede (*Id.* at 87).

McGrory reported the incident to an Assistant Deputy Warden within a matter of minutes (*Id.* at 862-64) Nevertheless, soon thereafter, COs began to make adverse comments about McGrory in his presence, and he began to receive anonymous threatening telephone calls at his assigned control post. (*Id.* at 87-92) McGrory also received anonymous "hang up" calls at home. (*Id.* at 765).

While at his post on October 30, McGrory received a telephone call from a supervisor, Captain Gravioli, who instructed him to prepare a written report about the meal relief incident the previous day. (*Id.* at 93-95; McGrory Ex. 9). In response to McGrory's inquiry, Gravioli also indicated that McGrory could submit a report regarding the roll call incident. (Tr. 96) Following Gravioli's instructions, McGrory submitted a report regarding the October 29 incident before the end of his tour; he did not submit a report regarding Owens' statements at roll call until November 4, the day after his next scheduled work day. (*Id.* at 118, 120, 427-28).

On November 10, 1997, McGrory prepared a report to Warden Schoenfeld of the GRVC in which he complained about various acts of harassment to which he had been subjected as a result of the events of October 29 and 30. (*Id.* at 127-30; McGrory Ex. 16) Shortly thereafter, McGrory was summoned to a meeting with the GRVC warden and a deputy warden at which he was encouraged to transfer to another facility at Rikers Island. When McGrory refused, fearing that the acceptance of a transfer would be treated as an admission of misconduct, the warden changed McGrory's tour so that he would not be working the same shift as Owens. (Tr. 134-36)

*3 On or about November 14, 1997, someone defaced a photograph of Owens and Reverend Al Sharpton at a parade which had been displayed on a Guardians Association bulletin board at the GRVC. (*Id.* at 138) McGrory later learned that the damage to the photograph was the subject of a *Village Voice* article which also reported that Officer Owens had filed an EEO complaint against a white probationary CO. (*Id.* at 141-43). The article was circulated within

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 3
Not Reported in F.Supp.2d, 2004 WL 2290898 (S.D.N.Y.), 59 Fed.R.Serv.3d 1123
(Cite as: Not Reported in F.Supp.2d)

the GRVC to COs and inmates. (*Id.* at 143-44).

After McGrory learned of the *Village Voice* article, he sent a memorandum to the GRVC warden on January 22, 1998. (McGrory Ex. 23) McGrory's memorandum indicated that Owens' leaks to the press had "created an unsafe and hostile work environment" for McGrory and forced him to "endure unnecessary stress and anxiety." (*Id.*, Tr. 146) McGrory also noted in the memorandum that he had filed a Federal E.E.O.C. complaint "to defend [his] interests." (McGrory Ex. 23 at 2) The EEOC complaint to which McGrory referred was filed on or about January 6, 1998. (*See* McGrory Ex. 21; Tr. 149, 446).

McGrory subsequently was summoned to the DOC headquarters, where he met with Dana Shehee, a DOC investigator who was assigned to investigate his EEO complaint, on February 20, 1998. (Tr. 151-54). During that meeting, McGrory gave Shehee the names and badge numbers of officers who were present during Owens' statements to the roll call on October 30 and other witnesses to Owens' alleged harassment of him. (*Id.* at 155). Over the next eighteen months, McGrory continued to contact Shehee while the DOC's internal EEO investigation was underway to report new acts of harassment and to determine when Shehee would issue his report. (*See id.* at 156, 165-66) Prior to his termination, McGrory never learned the results of the DOC investigation of his complaints. (*See id.* at 155, 163) McGrory was informed, however, that the DOC EEO office had closed its file concerning a separate complaint brought by Owens, finding that there was no probable cause to believe that she was the victim of race or gender discrimination or retaliation. (*Id.* at 159-60; McGrory Ex. 35).

On November 9, 1998, five months after the DOC closed its file regarding Owens' complaint, Luis R. Burgos, Jr. ("Burgos"), the DOC Deputy Commissioner for Equal Employment Opportunity, advised McGrory, in writing, that "it would be in the best interest of [DOC] that you and [CO] Owens attend Sensitivity and/or Interpersonal Communication Skills Training at the [DOC] Training Academy." (McGrory Ex. 41) McGrory complied with this request. (Tr. 162)

On December 30, 1998, McGrory and another CO were assigned to take an inmate who had been stabbed to Elmhurst Hospital for treatment. After they waited in the emergency room with the inmate for approximately four hours, McGrory went to a delicatessen across the street to get some food and coffee, an act that he later learned was a "serious" violation of DOC rules. (*Id.* at 177-78; McGrory Ex. 46). As a result of McGrory's failure to stay with the inmate, the DOC supervisor at the hospital, Captain Catapano, commenced a disciplinary proceeding that resulted in McGrory receiving a "command discipline." McGrory did not contest the alleged violation and agreed to forfeit four days of vacation pay as a sanction. (Tr. 180-85; McGrory Ex. 50).

**\*4** A few days later, the GRVC warden recommended that McGrory's two-year probationary period be extended six months based upon the command discipline and the fact that McGrory had been out on sick leave on five occasions for a total of nine days. (McGrory Ex. 54). The form that McGrory signed to acknowledge the extension of his probation warned him that a continued pattern of excessive absences or a further disciplinary record could result in "termination of employment." (Defs.' Ex. G) (block capitalization deleted)

With the continued passage of time, McGrory concluded that Shehee was not adequately pursuing the investigation of his complaint regarding Owens. (Tr. 170). Accordingly, on January 14, 1999, he sent a letter to the EEOC. In that letter, McGrory complained about additional alleged acts of retaliation. He also requested that the EEOC issue him a right-to-sue letter because he believed that his case had been "mishandled." (McGrory Ex. 51). The DOC was not sent a copy of McGrory's letter, but it was copied on a February 5, 1999, letter from the EEOC to McGrory which advised him that the Department of Justice would issue the requested right-to-sue letter. (McGrory Ex. 57).

> FN2. Right-to-sue letters ordinarily are issued by the EEOC. *See* 42 U.S.C. § 2000e-5(f)(1). When the respondent is a governmental agency or political subdivision and the EEOC has been unable to secure a conciliation agreement within thirty days, the matter must be referred to the Attorney General and the EEOC may take no further action. *Id.* Thereafter, the Attorney General must provide the complainant with notice of the right to sue if the Department of Justice has not filed a civil action within 180 days of the charge being filed. *Id.*

> FN3. Although McGrory was not aware of it

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2290898 (S.D.N.Y.), 59 Fed.R.Serv.3d 1123
**(Cite as: Not Reported in F.Supp.2d)**

at the time that he requested the right-to-sue letter, Shehee had concluded the EEO investigation of McGrory's discrimination complaint against Owens by January 5, 1999. In a memorandum to Burgos bearing that date, Shehee recommended that the case be closed as "unsubstantiated." (*See* McGrory Ex. 48). Shehee did not reveal this recommendation to McGrory when he met with him on December 28, 1998. (Tr. 217)

On January 30, 1999, McGrory was assigned to the "MOPS" unit of the GRVC, where violent inmates are housed for observation and punitive segregation. (Tr. 188). Such inmates are confined to their cells for 23 hours each day, but are permitted to make telephone calls from telephones brought to their cells. While McGrory was retrieving the telephone from a particularly dangerous inmate, the inmate reached through a feeding slot in his cell door and grabbed a metal window crank from McGrory, which he used to break the window of his cell (*Id.* at 191-93). McGrory then summoned his supervisors, who helped restore order (*Id.* at 193-94). Although McGrory was instructed to prepare an infraction report for the inmate, there was no discussion at the time about McGrory being disciplined. (*Id.* at 198-99)

On February 9, 1999, McGrory attempted to break up a fight between a male inmate and a black female CO. (*Id.* at 200-02). Before other officers responded, McGrory sustained a number of injuries, including a bite wound, a torn anterior cruciate ligament, and a broken finger. (*Id.* at 202-03, 207, 218). While he was recuperating from these injuries at home, McGrory was required to visit DOC doctors in Queens. In addition, after about two weeks, DOC captains began to visit his house to make sure he was there, and he needed prior permission to leave for visits to his physicians. (*Id.* at 214). For one full year after the altercation, McGrory also was subjected to periodic testing for communicable diseases, including HIV. (*Id.* at 218).

On February 18, 1999, Captain John Bennett, Jr., prepared a command discipline report charging that McGrory violated DOC rules because he "failed to be vigilant and alert by not safeguarding [DOC] property," *i.e.,* the window crank. (Tr. 691-94; McGrory Ex. 62). One box on the form report indicates that the filing date was February 18, 1999, but that date appears to have been written over a different earlier entry. (McGrory Ex. 62). McGrory was not given notice of this second command

discipline because it was "referred downtown" to DOC's headquarters. (Tr. 724, 728).

> FN4. Captain Bennett also prepared a cover memo to the GRVC Warden concerning the window crank incident which is dated February 16, 1999. (McGrory Ex. 61). Bennett testified that at the time he prepared the memo he was unaware that McGrory had filed any EEO complaint. (Tr. 708).

**\*5** On February 19, 1999, based on the Elmhurst Hospital and window crank incidents, the warden of the GRVC, Richard Badillo, sent a memorandum to the DOC Committee on Uniformed Personnel ("COUP") requesting that McGrory be terminated prior to the expiration of his extended probationary period (*Id.* at 744-46; Defs' Ex. M). COUP reviews the records of probationary officers at the end of their probationary period to determine whether they should be retained. (Tr. 746-47, 818). Badillo testified that at the time he made his request to COUP, he was unaware that McGrory had a pending EEO claim. (*Id.* at 745).

COUP considered McGrory in early March 1999, (*id.* at 837), at which time its members voted unanimously to recommend that he be terminated. (City Ex. N). The members of COUP who considered McGrory's case were unaware that he had been injured coming to the aid of a fellow CO and was out on sick leave. (*See* Tr. 835).

One of the DOC units represented at the March COUP meeting was its EEO office, which knew that McGrory had filed an EEOC complaint (*Id.* at 837-38; City Ex. N at 2). At the time, it was not unusual for a representative of that office to note during COUP's consideration of a probationary employee that the employee had an open EEO case. (*Id.* at 839). Luis R. Burgos, Jr., the DOC Deputy Commissioner for Equal Opportunity, testified, however, that it was not DOC's practice to circulate right-to-sue letters to the members of COUP. (*Id.* at 1250, 1288). According to Burgos, COUP members were advised of a pending EEO case only if it related to the reason the person was being considered by COUP for termination (*Id* at 1288-89).

On March 22, 1999, after learning of the COUP vote, Bernard Kerik, then the DOC commissioner, directed that McGrory be terminated. (*Id.*).

On March 24, 1999, McGrory was directed to appear

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2290898 (S.D.N.Y.), 59 Fed.R.Serv.3d 1123
(Cite as: Not Reported in F.Supp.2d)

at the DOC Health Maintenance Division. When he arrived, he was escorted into a captain's office, where he was directed to surrender his firearm and was terminated. (*Id.* at 219-20). The officers who effected his dismissal advised McGrory that he had no recourse because he was a probationary employee. (*Id.* at 220). Such terminations of DOC officers who are out on leave as a result of a work-related injury are extremely rare. (*Id.* at 734).

Between the date of his termination and the commencement of his trial, McGrory did not work. (*Id.* at 221). In addition, his emotional state deteriorated to such an extent that he became eligible for Social Security permanent partial disability payments in the amount of approximately $940 per month. (*Id.* at 225, 514). Because he was injured on the job, McGrory also received Worker's Compensation payments in the amount of $650 every two weeks. (*Id.* at 225, 243-44).

In April 2000, McGrory began seeing a psychiatrist, Dr. Martin Hurwitz, who was willing to accept Worker's Compensation payments for his treatment. (*Id.* at 223-24, 1183). Dr. Hurwitz diagnosed McGrory as suffering from major depressive disorder and posttraumatic stress disorder ("PTSD"). (*Id.* at 1183). Over time, Dr. Hurwitz prescribed a series of drugs to treat McGrory's mental illness, including Celexa, Paxil and Wellbutrin (antidepressants), Desyrel (an antidepressant and sleep-inducing drug), Neurontin (an anti-epileptic drug used to treat mood swings), Zyprexa (an anti-psychotic prescribed for his paranoia); many of which remained part of McGrory's extensive daily medication. (*Id.* at 1192-1204). During his testimony at trial, Dr. Hurwitz opined that McGrory developed the major depressive disorder following the October 1997 incident involving Owens and that he developed PTSD following his injuries during the February 1999 assault. (*Id.* at 1185, 1189). According to Dr. Hurwitz, the pre-existing depression disorder exacerbated McGrory's PTSD. (*Id.* at 1191-92). Dr. Hurwitz further opined that McGrory was suicidal, that his prognosis was extremely poor, and that he was unlikely ever to be able to function in a work environment. (*Id.* at 1204-05). Mrs. McGrory also testified that her husband's sleep was disturbed and that he was "having a difficult time with sexual relations," conditions which began in late October 1997. (*Id.* at 765-66).

FN5. According to the American Psychiatric Association, episodes of major depressive

disorder often follow a severe stressor, such as the death of a loved one or a divorce. The condition is associated with a high suicide rate. When an individual has manic, "mixed" or hypomanic episodes during the course of a major depressive disorder, the diagnosis is changed to bipolar disorder. *See Diagnostic and Statistical Manual of Mental Disorders* 369-73 (4th ed. Text Rev.2000) ("DSM-IV-IR")

FN6. Posttraumatic stress disorder is a condition that arises following exposure to an extreme stressor involving the personal experiencing of an event that involves actual or threatened death or serious injury or another threat to one's physical integrity. The individual's reaction to the event must involve intense fear, helplessness or horror for a period of more than one month. Such stressors can include a violent assault. (DSM-IV-TR at 463)

*6 McGrory's direct economic damages were established through the testimony of the City's former chief actuary, Jonathan Schwartz, who calculated the present value of McGrory's lost earnings and benefits on the assumption that he would never again work. (*Id.* at 791-802, 813). Schwartz testified that if McGrory had worked as a CO for twenty years, he would have earned (after discounting to present value) approximately $752,000 in salary, $126,000 in pension payments, and $30,000 in payments from a variable supplements fund. (*Id.* at 799). Schwartz further testified that McGrory's total economic loss would be greater if he worked for twenty-five years before retiring or was promoted to the rank of captain during the course of his DOC career. In his calculations, Schwartz failed to account for the Social Security disability and Worker's Compensation payments that McGrory was receiving. (*Id.* at 807).

### III *Verdict*

On May 15, 2003, after an eight-day trial, the jury returned its verdict. Among its other findings, the jury concluded that McGrory was not subjected to a racially hostile work environment, but that he was terminated in retaliation for engaging in a protected activity-namely, his request that the EEOC issue a right-to-sue letter to him. (*Id.* at 1521-22, 1525). The jury awarded McGrory $181,303 in back pay, $385,307 in front pay, and $533,390 in other compensatory damages, for a total of $1 million. (*Id.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                         Page 6
Not Reported in F.Supp.2d, 2004 WL 2290898 (S.D.N.Y.), 59 Fed.R.Serv.3d 1123
(Cite as: Not Reported in F.Supp.2d)

at 1522).

### IV. Discussion

#### A. City's Motions

##### 1. Rule 50(b)

The City's Rule 50(b) motion contains two branches. First, the City argues that McGrory failed to establish a causal connection between any protected activity under Title VII and his termination. Second, the City contends that he lacked a good faith reasonable belief that he was the victim of a racially hostile work environment.

Rule 50(b) of the Federal Rules of Civil Procedure provides that a party may renew a JMOL motion after trial provided that it also was made pursuant to Rule 50(a) before the case was submitted to the jury. Fed.R.Civ.P. 50(b). Rule 50(a), in turn, requires that such a motion specify the judgment sought and the law and the facts on which the moving party is entitled to the judgment. Fed.R.Civ.P. 50(a).

Trial and appellate courts apply the same standard in reviewing a post-trial JMOL motion. *DiSanto v. McGraw-Hill, Inc./Platt's Div.,* 220 F.3d 61, 64 (2d Cir.2000). Pursuant to that standard, a movant seeking to set aside a jury verdict faces a "high bar." *Lavin McEleney v. Marist College,* 239 F.3d 476, 479 (2d Cir.2001). As the Second Circuit has cautioned:
In deciding such a motion, the court must give deference to all credibility determinations and reasonable inferences of the jury, and it may not itself weigh the credibility of witnesses or consider the weight of the evidence. Thus, judgment as a matter of law should not be granted unless (1) there is such a complete absence of evidence supporting the verdict that the jury's verdict could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against [it].

\*7 *DiSanto,* 220 F.3d at 64 (quoting *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.,* 136 F.3d 276, 289 (2d Cir.1998)); *accord Yurman Design, Inc. v. PAJ, Inc.,* 262 F.3d 101, 108 (2d Cir.2001).

To prevail on his retaliatory discharge claim under Title VII, the State Human Rights Law (N.Y. Exec.

L. § 290, *et seq.*), or the City Human Rights Law (N.Y.C. Admin. Code § 8-101, *et seq.*) (collectively, the "Employment Laws"), McGrory was required to establish that: (1) he was participating in an activity protected under the Employment Laws; (2) the DOC was aware of that activity; (3) he suffered an adverse employment action; and (4) "there was a causal connection between the protected activity and the adverse action." *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 79 (2d Cir.2001) (quoting *Galdieri-Ambrosini,* 136 F.3d at 292)). *See also Tomka v. Seiler Corp.,* 66 F.3d 1295, 1305 n. 4 (2d Cir.1995) (standard of proof for claims under the state Human Rights Law is the same as for those brought under Title VII); *Pace Univ. v. Comm'n on Human Rights,* 200 A.D.2d 173, 182-83 (1st Dep't 1994), *rev'd on other grounds,* 85 N.Y.2d 125 (1995) (setting forth elements of retaliation claim under City Administrative Code and noting that the requirements of Title VII are "virtually identical").

In its JMOL motion, the City concedes that a request for a right-to-sue letter constitutes protected activity under the Employment Laws and that the DOC was aware of that request prior to McGrory's termination (*See* City Defs.' Mem. of L. at 4). The City further concedes, as it must, that McGrory's termination was an adverse employment action. (*Id.*) The City nevertheless argues that McGrory failed to make out a prima facie retaliatory discharge case because he did not establish a causal connection between his request for a right-to-sue letter and his termination.

Causation in a retaliation case need not be established through direct proof. Instead, it is sufficient for a former employee to show that there was a close temporal nexus between the protected activity and his termination. *See Cifra v. Gen. Elec. Co.,* 252 F.3d 205, 217 (2d Cir.2001); *DeCintio v. Westchester County Med. Ctr.,* 821 F.2d 111, 115 (2d Cir.1987). While the Second Circuit has not drawn a bright line as to the amount of time that suffices to satisfy the causation element of a retaliation claim, *Gorman-Bakos v. Cornell Co-op Extension of Schenectady County,* 252 F.3d 80, 85 (2d Cir.1990), a gap of only one or two months between the two events is clearly sufficient. *See, e.g., Treglia v. Town of Manlius,* 313 F.3d 713, 721 (2d Cir.2002) ("The temporal proximity between protected activity in February 1998 and the allegedly adverse employment actions in March 1998 is sufficient to establish the required causal link for a prima facie case."); *Cifra,* 252 F.3d at 216-17 (summary judgment should not have been granted where employee was fired "just 20 days after GE learned that she had hired an attorney to pursue

Not Reported in F.Supp.2d                                                    Page 7
Not Reported in F.Supp.2d, 2004 WL 2290898 (S.D.N.Y.), 59 Fed.R.Serv.3d 1123
(Cite as: Not Reported in F.Supp.2d)

her claim of gender discrimination"); *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 769 (2d Cir.1998) (error to grant summary judgment where plaintiff's "discharge came less than two months after she filed a complaint with [defendant's] management and just ten days after she filed a complaint with the [State Division of Human Rights]")

**\*8** Here, Warden Badillo testified that he did not know of McGrory's pending "EEO matter" at the time that he requested COUP's approval of his recommendation that McGrory be terminated. (Tr. 745). Moreover, there was testimony by Deputy Commissioner Burgos that it was not DOC practice to advise COUP members of pending EEO matters unless they related to the reason that a probationary CO was being recommended for termination (*Id* at 1250, 1288-89). The jury was entitled, however, to make credibility determinations, and therefore was free to reject these assertions. Indeed, during his testimony, Warden Badillo conceded that it was extremely rare for a CO to be terminated while he was on sick leave as a result of a work-related injury. On the basis of that admission, and its assessment of witness credibility, the jury could well have concluded that the rush to terminate McGrory, only two months after his probationary period was extended, and less than two months after the DOC learned of McGrory's request for a right-to-sue letter, was the result of retaliatory animus, rather than a desire to rid the DOC of a marginal performer before he gained the additional protections to which nonprobationary City employees are entitled.

> FN7. The City also notes that there is no evidence that Commissioner Kerik knew of McGrory's EEOC complaint when he approved McGrory's termination. (*See* City Defs.' Mem. of L. at 5). There is no indication, however, that Commissioner Kerik's role in the process of terminating McGrory went beyond rubber stamping the recommendation that COUP had made in response to Warden Badillo's request.

This, of course, was hardly the only conclusion that the jury could have reached on the basis of the evidence. In fact, given the window crank incident, which was reported to Warden Badillo only a few days before he made his recommendation to the COUP, it seems far more likely that McGrory was fired simply because he was a probationary employee who had been the subject of two disciplinary reports within a matter of weeks. That the Court or others

may disagree with the verdict, however, does not entitle the City to judgment as a matter of law.

Partially backing away from its earlier concession, the City also suggests that McGrory's request for a right-to-sue letter could not constitute "protected activity" because the DOC was aware of McGrory's EEOC complaint for more than one year before it was issued. (City Defs.' Mem. of L. at 9). In support of this proposition, the City cites *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (per curiam). In that case, the defendant school district was aware of the plaintiff's EEOC filing for nearly two years before it took any action against her. Although the plaintiff argued on appeal that the EEOC's issuance of a right-to-sue letter sufficed to establish the required causal nexus between her protected activity and the adverse employment action, the plaintiff played no role in the decision to issue the letter. Accordingly, because the plaintiff's EEOC complaint had been pending for a long time and because she had not engaged in any protected activity shortly before her employer took the adverse employment action, the Supreme Court held that the employer was entitled to summary judgment.

In this case, as in *Breeden*, the plaintiff's employer was aware of his EEOC complaint for a considerable period of time. Therefore, if the EEOC had completed its investigation and sent McGrory a right-to-sue letter of its own volition, it would be difficult for him to argue that its issuance, which is a relatively routine step in cases that are thought to lack merit, set in motion the steps leading to his termination. Here, however, McGrory took the additional affirmative step of requesting a right-to-sue letter so that he could prosecute his claims in federal court. Since the EEOC had not yet completed its investigation, this indication that McGrory wished to proceed in federal court, rather than administratively, clearly meets the relatively low threshold required to establish that he engaged in "protected activity." *See, e.g., Treglia*, 313 F.3d at 721 (plaintiff engaged in protected activity by notifying several co-workers that they might be contacted after he was asked to provide a list of witnesses to the New York State Division of Human Rights); *Richardson v. N.Y.S. Dep't of Corr. Servs.*, 180 F.3d 426, 446-47 (2d Cir.1999) (harassment of plaintiff "shortly after deposition notices were served" suffices to make out a Title VII claim).

**\*9** The City also argues that McGrory lacked a good faith reasonable belief that the actions challenged in his EEOC complaint in fact violated the law (*See*

Not Reported in F.Supp.2d                                                                                       Page 8
Not Reported in F.Supp.2d, 2004 WL 2290898 (S.D.N.Y.), 59 Fed.R.Serv.3d 1123
**(Cite as: Not Reported in F.Supp.2d)**

City Defs.' Mem. of L. at 12-15). To prevail on a Title VII retaliation claim, a plaintiff is not required to establish the correctness of his underlying complaint *Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons,* 842 F.2d 590, 593 (2d Cir.1988). "However, the plaintiff must demonstrate a good faith, reasonable belief that the underlying challenged actions of the employer violated the law." *Id.* (citing *Abel v. Bonfanti,* 625 F.Supp. 263, 267 (S.D.N.Y.1985); *Francoeur v. Corroon & Black Co.,* 552 F.Supp. 403, 412 (S.D.N.Y.1982) (internal quotation marks deleted)

The City contends that no such good faith reasonable belief is possible in this case because the events of October 29th did not involve any racial hostility. While it is undisputed, at trial McGrory introduced evidence of a series of acts over time which he reasonably (but mistakenly) could have believed sufficed to make out a hostile work environment claim For example, McGrory testified that DOC supervisors were present and took no action on October 30th when Owens was permitted to address the roll call to announce her accusation that McGrory had made racist and sexist remarks to her during their argument the day before. McGrory also testified that Owens was permitted to post her version of the October 29th events on a Guardians Association bulletin board at the GRVC There also was no evidence that DOC supervisors took any action when copies of the *Village Voice* article, which impliedly accused McGrory of racist conduct, were distributed to both inmates and COs at the GRVC. Finally, as time went on, McGrory came to believe that Shehee had botched the investigation of his EEO complaint against Owens, which had been pending for more than one year While the jury correctly concluded that there was insufficient evidence of a racially hostile work environment, the City has not shown that there was a reason for a layman such as McGrory to have known that such isolated acts were insufficient to establish his entitlement to relief.

For these reasons, the City is not entitled to judgment as a matter of law with respect to McGrory's retaliation claim.

### 2. *Rule 59*

The City also has moved for a new trial pursuant to Rule 59 of the Federal Rules of Civil Procedure Insofar as pertinent, Rule 59(a)(1) provides that a new trial may be granted in an action tried before a jury "for any of the reasons for which new trials have

heretofore been granted in actions at law in the courts of the United States." Fed.R.Civ.P. 59(a)(1) Rule 59 imposes a lower threshold for the grant of a new trial than Rule 50 does for the grant of judgment as a matter of law because the trial judge may reassess the trial evidence and need not view it in the light most favorable to the nonmovant. *United States v. Landau,* 155 F.3d 93, 104 (2d Cir.1998) Accordingly, "a motion for a new trial may be granted even if there is substantial evidence to support the jury's verdict." *Caruolo v. John Crane, Inc.,* 226 F.3d 46, 54 (2d Cir.2000) (quoting *id.*). Although the trial court has considerable discretion in granting a new trial pursuant to Rule 59(a)(1), *Metromedia Co. v. Fugazy,* 983 F.2d 350, 363 (2d Cir.1992); *Caruolo,* 226 F.3d at 54, it "ordinarily should not grant a new trial unless it is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." *Hygh v. Jacobs,* 961 F.2d 359, 365 (2d Cir.1992) (quoting *Smith v. Lightning Bolt Prods., Inc.,* 861 F.2d 363, 370 (2d Cir.1988)).

**\*10** The City advances two arguments in support of its Rule 59 motion. First, the City contends that the evidence was insufficient to support the jury's front and back pay awards. (City Defs.' Mem of L. at 16-19) Second, the City asserts that McGrory was compensated McGrory for emotional damages arising out of incidents for which they are not liable. (*Id* at 23). Neither of these arguments has merit. However, for the reasons set forth below, the City is entitled to certain reductions in the amounts that the jury awarded.

### a. *Front and Back Pay*

The City maintains that the jury's front and back pay awards are unjustified because McGrory's inability to work arose out of the February 9, 1999, inmate assault, rather than retaliatory conduct on the part of the DOC The City further contends that, even if McGrory sustained an economic loss, the jury failed to make a proper adjustment for the Social Security disability and Worker's Compensation payments that he was receiving.

Turning to the first of these arguments, the City points to testimony by both McGrory and Dr Hurwitz suggesting that the injuries McGrory sustained as a result of the inmate assault are the real reason he has been unable to work since his termination. For example, the City notes McGrory's concession during his testimony that the decision awarding him Worker's Compensation benefits said

Not Reported in F.Supp.2d                                                                                    Page 9
Not Reported in F.Supp.2d, 2004 WL 2290898 (S.D.N.Y.), 59 Fed.R.Serv.3d 1123
(Cite as: Not Reported in F.Supp.2d)

"nothing about discrimination or retaliation." (Defs.' Mem. of L. at 17 (quoting Tr. at 249)). The City also correctly observes that Dr. Hurwitz diagnosed McGrory as suffering from both major depressive disorder (resulting from his dispute with Owens) and PTSD (resulting from the inmate assault). (Defs.' Reply Mem. of L. at 13) Reasoning that the jury's verdict belied the existence of a hostile work environment arising out of the October 29th and 30th incidents and that the assault occurred months before McGrory's termination, the City contends that there is no evidence that the psychological impairments giving rise to McGrory's inability to work are attributable to his termination on March 24, 1999. (Id. at 14; Defs.' Mem. of L. at 17)

To put it mildly, the evidence that McGrory's psychological disability was a product of his retaliatory termination was extraordinarily thin. In his papers opposing the City's motion, McGrory points to a portion of his direct testimony in which he suggested that his present psychological state is attributable to numerous factors and mentioned his termination (Pl.'s Opp. Mem. of L. at 19). Thus, in the course of a lengthy answer about his emotional state following his termination, McGrory testified:

... I had a good job, a good career, the future. My wife and I had gotten married in that time period. I was looking forward to a nice future, and I went through 18 months of insanity, and then it culminated with me getting beaten up by an inmate, and the inmate was never charged, *and I was fired*

(Id. (quoting Tr. 222)).

*11    Additionally,    although    no    detailed documentation concerning McGrory's Worker's Compensation case was introduced into evidence, McGrory testified that his initial award was amended "by the workmen's compensation law judge to include the depression that [he had] been suffering since the harassment and assault *and the retaliatory treatment afterwards.*" (Id. at 20 (quoting Tr. 225) (emphasis added)).

The last item of proof that McGrory marshals to support his claim that his psychological disability is the product of DOCS' retaliatory termination of him is a summary notation that Dr. Hurwitz made when he first met with McGrory. Dr. Hurwitz testified with respect to that notation as follows:
Q What do you note in your notes [of] the very first visit? Would you look at your note for the very first visit by the way?
A Yes.

Q You note that this is an unjust termination case. That's what you write down, isn't it?
A Yes.
Q It's the very first thing you write on your very first note concerning Mr. McGrory, right?
A Yes.

(Id. at 21 (quoting Tr. 1219)).

Dr. Hurwitz also gave testimony that McGrory developed a major depressive disorder "subsequent to the October 1997 incident" and "the subsequent events at his workplace, which included other officers' comments." (Tr. 1185, 1188) The doctor further testified that by March 2001, McGrory was "four plus" depressed, a degree so severe that "you cannot function." (Id. at 1197). When asked for his prognosis, Dr. Hurwitz testified that McGrory's condition is extremely poor. He's a strong suicidal risk. He has great feelings of hopelessness, feelings of worthlessness. His life has essentially been destroyed. He feels that there is no way that he can ever recover.

(Id. at 1205).

On the basis of the foregoing testimony, the jury reasonably could find that McGrory's termination was one of the factors leading to his "four plus" depression. There consequently is no basis for the City's claim that the record is devoid of *any* evidence that McGrory's depression was caused, at least in part, by his retaliatory termination. Accordingly, I am unable to say that the jury reached a seriously erroneous result by awarding McGrory damages arising out of his termination.

The City also argues that the jury failed to make appropriate adjustments in its back and front pay awards to account for the fact that McGrory is receiving Worker's Compensation and Social Security disability payments (Def.'s Mem. of L. at 17-18). In that regard, the jury was instructed, without any objection on the part of the City, that no offset should be made against any back or front pay award for Worker's Compensation payments. As the Court explained in its charge:
Now, you have heard testimony that Mr. McGrory has been receiving payments from the New York State Worker's Compensation Board since February 10th, 1999, as a result of certain injuries that he sustained during a physical assault while he was working as a[CO]. Pursuant to the New York State Workers' Compensation law, the carrier that is providing the Workers' Compensation payments to

Not Reported in F.Supp.2d                                                                                                         Page 10
Not Reported in F.Supp.2d, 2004 WL 2290898 (S.D.N.Y.), 59 Fed.R.Serv.3d 1123
**(Cite as: Not Reported in F.Supp.2d)**

the plaintiff is given a lien on all such payments received by the plaintiff and that lien must be paid by the plaintiff from any settlement or any recovery in this case. Accordingly, you should not make any deduction against either back pay or front pay for such payments.

**\*12** (Tr. 1501; *see also id.* at 1356.) There consequently is no basis for the City's motion insofar as it is based upon the Worker's Compensation payments made to McGrory.

The jury awarded McGrory front pay in the amount of $285,307. According to Schwartz's calculations, the net present value of McGrory's future earnings, assuming that he retired after twenty years without a promotion, exceeded $500,000. Schwartz's calculations also indicated that if McGrory had worked as a CO for twenty-five years, the net present value of his anticipated earnings as a CO would have exceeded $600,000. (*See* McGrory Ex. 75-A.) It seems clear that, rather than accepting either

scenario, the jury concluded that McGrory's disability would last for only six years since the damages that it awarded for front pay corresponded exactly to the net present value of the earnings that Schwartz calculated McGrory would have earned during the period from "2003-04" through "2008-09." (*Id.*). As Schwartz testified, however, his calculations contained no offset for the $67,680 ($940 x 72 months) in Social Security disability payments that McGrory reasonably could be anticipated to receive during this same period. Additionally, McGrory's counsel conceded in his summation that such a deduction for Social Security payments was appropriate. (Tr. 1468). For this reason, the jury's front pay award should be reduced by $67,680, resulting in an award in the amount of $217,627 ($285,307-$67,680).

FN8. The net present value figures that Schwartz calculated for this period are as follows:

| | | | |
|---|---|---|---|
| 2003-04 | $53,316 | 2006-07 | $46,064 |
| 2004-05 | 50,777 | 2007-08 | 44,456 |
| 2005-06 | 48,363 | 2008-09 | 42,331 |

Turning to back pay, in his summation, McGrory's counsel attempted to walk the jury through the applicable math, stating as follows:

For back [ ] pay, we [c]al[cu]lated that from March 25, 1999, to May of this year, the back [ ] pay loss-we're taking present day value-amount is $213,703. The Social Security that he [has] received-that should be deducted from the amount of April of 2000, when he began to receive Social Security totals $32,400. And that is the amount that should be deducted from any award. The net back [ ] pay that Mr. McGrory should receive up to today should be $181,303.

(Tr. 1467-68). The jury evidently adopted this calculation in its entirety since it awarded McGrory the precise sum that counsel requested.

There are two problems with the jury's back pay award. First, to the extent that it reflects a portion of the period reflected in Schwartz's calculations as "2003-04,"

McGrory is being unjustly enriched because the jury previously had included those wages in its front pay award. Accordingly, the City is entitled to a setoff in the amount of $23,273 (*See* Pl's Mem. of L. at 22). Second, McGrory's counsel indicated that he had calculated the $32,400 deduction for Social Security based on McGrory's testimony that he had received "900 per month" from the Social Security Administration for a period of thirty-six months. (*See* Tr. 1467). In fact, McGrory testified that he was receiving $940 per month. (*Id.* at 225). Assuming that counsel correctly stated to the jury that McGrory's Social Security payments began in April 2000 (the City does not appear to contest this representation), the City is entitled to an additional setoff of $1440 ($40 x 36 months). For this reason, the jury's back pay award must be reduced to $156,590 ($181,303-$23,273-$1440).

FN9. In his memorandum of law, McGrory suggests that the net present value of the back pay he is entitled to recover is as follows:

| PERIOD | NPV |
|---|---|
| Through 4/30/99 | $ 4,500.00 |

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 11
Not Reported in F.Supp.2d, 2004 WL 2290898 (S.D.N.Y.), 59 Fed.R.Serv.3d 1123
(Cite as: Not Reported in F.Supp.2d)

| | |
|---|---|
| 5/1/99 through 9/30/00 | 44,031.00 |
| 2000-01 | 43,769.00 |
| 2001-02 | 43,302.00 |
| 2002-03 | 55,986.00 |
| Through 5/15/03 | 23,272.79 |

The period through May 15, 2003 obviously overlaps the 2003-04 period for which the jury awarded him front pay.

### b. *Compensatory Damages*

**\*13** The final component of the jury's award was compensatory damages in the amount of $533,390, which, together with its award of back and front pay, brought McGrory's damages to a total of $1 million, a sum that the City characterizes as a "convenient round figure that is unsupported by any of the record evidence " (Defs.' Mem of L. at 19). The City challenges this aspect of the jury's damages award on the basis that it necessarily relies on the testimony of Dr. Hurwitz. In the City's view, Dr. Hurwitz's testimony does not justify an award of more than one-half million dollars for emotional distress because he attributed McGrory's major depressive disorder to the events of October 1997 (which the jury concluded did not give rise a hostile work environment) and McGrory's PTSD to an assault by an inmate (for which the City cannot be held liable under the Employment Laws) (*Id* at 22).

To determine whether the jury's award is excessive, a court should consider the awards in similar cases, "bearing in mind that any given judgment depends on a unique set of facts and circumstances " *Scala v. Moore McCormack Lines, Inc.*, 985 F.2d 680, 684 (2d Cir.1993) (quoting *Nairn v. Nat'l R.R. Passenger Corp.*, 837 F.2d 565, 568 (2d Cir.1988)) The standard by which a federal court should conduct that review depends on whether state or federal rights are being vindicated. Under New York State law, a verdict may be set aside if it "deviates materially from what would be reasonable compensation." N.Y. Civ. Prac. L. & Rules § 5501(c). In federal question cases, however, district courts are required to apply a considerably more deferential standard. *See Consorti v. Armstrong Indus., Inc.*, 72 F.3d 1003, 1011 (2d Cir.1995), *judgment vacated on other grounds*, 518 U.S. 1031 (1996). In such cases, the jury's verdict may not be overturned unless it is so excessive that it shocks the conscience of the court. *See Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 422-23 (1996). Whichever rubric applies, the court must consider the reasonableness of the sums awarded by comparing the facts presented to the jury with the facts that led to the awards in other cases. *Bick v. City of New York*, No. 95

Civ. 8781(KMW)(MHD), 1998 WL 190283, at *22 (S.D.N.Y. Apr. 21, 1998).

Compensatory damages under Title VII are subject to certain limitations which vary depending upon the size of the employer. Insofar as relevant here, 42 U.S.C. § 1981a limits compensatory damages "in the case of a respondent who has more than 500 employees in each of 20 or more calendar weeks in the current or preceding calendar year [to a maximum of] $300,000." 42 U.S.C. § 1981a(b)(3)(D). This is the highest cap provided by Title VII. *Id.* In this action, McGrory has sued both the City and the DOC. Although DOC is not a suable entity, *see, e.g., Echevarria v. Dep't of Corr. Servs.*, 48 F.Supp.2d 388, 391 (S.D.N.Y.1999) (dismissing claims against DOC); *Adams v. Galletta*, 966 F.Supp. 210, 212 (S.D.N.Y.1997) (same; collecting cases), this is of little consequence since it is beyond dispute that both the City and the DOC had substantially more than 500 employees in 2003. *See Mayor's Mgm't Rep. for 2003* at 159 (available at http://www.nyc.gov/html/ops/downloads/pdf/2003_mmr/0903_mmr.pdf) (last visited October 1, 2004) (reflecting 9,533 uniformed and 1443 civilian DOC employees in the City's January 2003 Financial Plan). Accordingly, McGrory's compensatory damages under Title VII would have to be limited to $300,000.

**\*14** The limitations on compensatory damages under Title VII are inapplicable here for at least two reasons. First, the jury did not return its verdict solely under federal law. Instead, because counsel agreed that there was no need to detail the statutory bases for McGrory's retaliation claims, the issue was presented to the jury generically, without reference to any statute. As Judge Lynch has observed, more detailed instructions "would have served no purpose, but to have wrapped [an] otherwise sound charge in confusing and irrelevant cotton" because "lay jurors have no particular interest as to ... the statutory source of a municipal defendant's liability ... and nothing about their function requires them to know." *Katt v. City of New York*, 151 F.Supp.2d 313, 367 (S.D.N.Y.2001).

In such circumstances, it is appropriate that the jury's compensatory damages award be evaluated under state law, which does not set any statutory cap on the amount that the plaintiff can recover. *See Gasperini*, 518 U.S. at 437 ("when New York substantive law governs a claim for relief, New York law and decisions guide the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 12
Not Reported in F.Supp.2d, 2004 WL 2290898 (S.D.N.Y.), 59 Fed.R.Serv.3d 1123
(Cite as: Not Reported in F.Supp.2d)

allowable damages") As Judge Dolinger has noted, this treatment is consistent with Title VII's admonition that "nothing in this Chapter shall be deemed to exempt or relieve any person from any liability, ... provided by any present or future law of any state" and Second Circuit case law "permitting a successful plaintiff to recover under the 'theory of liability that provides the most complete recovery.' " *Bick,* 1998 WL 190283, at *22 (citing 42 U.S.C. § 2000e-7 and quoting *Magee v. United States Lines, Inc.,* 976 F.2d 821, 822 (1992)). *See also Luciano v. Olsten Corp.,* 912 F.Supp. 663, 675 (E.D.N.Y.1996), *aff'd,* 110 F.3d 210 (2d Cir.1997) (noting that "a decision to permit [the plaintiff] to benefit from the remedy provided by state law does not conflict with the congressional purpose of making employment discrimination awards reasonable"); *Ginsberg v. Valhalla Assocs., P.C.,* No. 96 Civ. 6462, 1997 WL 669870, at *2 (S.D.N.Y. Oct. 28, 1997) (allocating compensatory damages award to plaintiff's state law claim) It follows that the excessiveness of the compensatory damages awarded to McGrory must be assessed under the "deviates materially" standard applicable under New York law. Nonetheless, the facts of both federal and state law cases can appropriately inform that determination.

There are many cases in which a plaintiff seeking compensatory damages under state and federal antidiscrimination laws asserts only a "garden variety" emotional distress claim "In those cases, the evidence of mental suffering is generally limited to the testimony of the plaintiff, who describes his or her injury in vague or conclusory terms, without relating either the severity or consequences of the injury." *Bick,* 1998 WL 190283, at *25. Faced with such a limited factual presentation, both state and federal courts typically reduce the award to $30,000 or less. *See, e.g., Tyler v. Bethlehem Steel Corp.,* 958 F.2d 1176, 1190 (2d Cir.1992) (reviewing Human Rights Law claim under both federal and state standard of review and affirming district court's refusal to set aside $18,000 jury award for emotional distress where plaintiff testified that the loss of his job was "like a divorce, your wife died or [a] state of shock"); *Reiter v. MTA,* 01 Civ 2762(JGK), 2003 WL 22271223, at *9 (S.D.N.Y. Sept. 30, 2003) (reducing compensatory damages under Title VII from $140,000 to $10,000 amount at "low end of spectrum" where plaintiff testified to "feeling 'stressed,' 'nervous,' 'on edge,'' and 'clammy,' but ... had [no] trouble eating or sleeping" because the award was "plainly based on sympathy or speculation rather than dispassionate common sense"); *Tanzini v. Marine Midland Bank, N.A.,* 978 F.Supp. 70, 77-78 (N.D.N.Y.1997) (court conditions denial of new trial motion on remittitur reducing emotional distress component of award under the Human Rights Law from $200,000 to $30,000 where the evidence of injury

consisted solely of testimony from the plaintiff and his wife that he was "in a state of shock" and "did not leave the house for one week following his termination"); *Funk v. F & K Supply, Inc .,* 43 F.Supp.2d 205, 226-28 (N.D.N.Y.1999) (finding that awards of $850,000 and $450,000 for garden variety emotional distress deviated materially from what would be reasonable and granting remittitur reducing each amount to $30,000); *McIntosh v. Irving Trust Co.,* 887 F.Supp. 662, 669 (S.D.N.Y.1995) (granting remittitur reducing compensatory damages on state law retaliation claim from $219,428 to $20,000 under the "shocks the conscience" standard where plaintiff testified that he was devastated, angry, depressed and embarrassed following his termination, but did not give any indication of the magnitude or duration of these feelings and did not seek any "medical or other professional help" and there was no evidence that he curtailed any of his life activities); *MABSTOA v. N.Y.S. Exec. Dep't,* 632 N.Y.S.2d 642, 644 (2d Dep't 1995) (reducing $30,000 award by State Division of Human Rights to $7,500 where complainant testified that he was devastated by the petitioner's actions, and that his emotional distress disturbed his sleep and caused him to gain weight, but he did not seek medical or psychiatric assistance and there was "no indication of the duration of his distress or evidence that his weight gain and the resultant worsening of his high blood pressure was related to the rejection of his application for [a new job]"); *Quality Care v. Rosa,* 599 N.Y.S.2d 65, 66 (2d Dep't 1993) (finding that "in the absence of any evidence of the duration of [complainant's] condition, its severity or consequences, and in the absence of evidence of any medical treatment[,]" complainant's claim that she was " 'shock[ed] and 'devastated' by her termination, that she was 'in a real pickle,' and that she felt bad" required reduction of emotional damages award from $10,000 to $5,000); *but see Epstein-Miller v. Kalvin-Miller Int'l, Inc.,* 139 F.Supp.2d 469, 480 (S.D.N.Y.2001) (noting that "some courts have remitted emotional distress awards to between $30,000 and $75,000 where the only evidence of emotional distress has been the plaintiff's testimony that he was distressed, even when no physical manifestations have been claimed").

**\*15** In other cases where the plaintiff's testimony has provided greater detail concerning the severity and duration of the emotional distress or the plaintiff has adduced expert testimony larger awards have been approved. For example, in *Bick,* a case which was decided under state law, the jury rejected the plaintiff's retaliation claim, but awarded her $750,000 in damages for pain and suffering as a result of the gender discrimination to which she was subjected. The plaintiff proved her compensatory damages claim through her own testimony and that of her therapist, which established that she had suffered from

Not Reported in F.Supp.2d                                                                    Page 13
Not Reported in F.Supp.2d, 2004 WL 2290898 (S.D.N.Y.), 59 Fed.R.Serv.3d 1123
(Cite as: Not Reported in F.Supp.2d)

"fairly severe emotional anguish for an extended period," although she was largely functional and had improved by the time of trial. *Bick,* 1998 WL 190283, at *24-25. On this record, after comparing the jury's award to other cases, the court granted the defendants a new trial unless the plaintiff agreed to a reduction of her compensatory damages to $100,000.

Similarly, in *Shea v. Icelandair,* 925 F.Supp. 1014, 1025-26 (S.D.N.Y.1996), the jury awarded the plaintiff $250,000 in emotional distress damages under the state Human Rights Law following his demotion to a less prestigious position. The plaintiff did not seek any psychiatric help, but he suffered from Parkinson's disease and angina, conditions that his doctors testified were worsened by the stress that his demotion caused. Applying the "deviates materially" standard of review, the court concluded that the case was not a garden variety emotional distress case, but that there was some question as to how rapidly the plaintiff's condition would have deteriorated had the defendant not discriminated against him. The court also noted that the plaintiff had not sought psychiatric care. Based upon a review of the awards in other employment discrimination cases, the judge granted a remittitur reducing the jury's award to $175,000. Other large awards for emotional distress have been sustained by the state and federal courts where the discriminatory conduct was egregious or persisted for an extended period. *See Katt,* 151 F.Supp.2d at 369-70 (collecting cases).

This case does not fit easily into either end of the damages continuum. To be sure, McGrory has established far more than "garden variety" emotional distress, and he has done so through the testimony of several witnesses, including his psychiatrist. Nonetheless, the Court cannot ignore the fact that both Dr. Hurwitz and Mrs. McGrory attributed most, if not all, of McGrory's extensive psychological problems to events for which the City cannot be held liable. Indeed, even McGrory mentioned his termination only in passing in describing the significant decline in the quality of his life. Although Dr. Hurwitz's notes regarding McGrory contain a reference to an "unjust termination case," it seems clear that this notation, which evidently preceded the taking of any history, reflected something that Dr. Hurwitz was told by McGrory or someone else, rather than a clinical diagnosis that he made.

**\*16** While the defendants cannot disclaim liability for McGrory's emotional pain and suffering on the theory that he was substantially impaired before the alleged retaliation occurred, it is equally true that they are only liable for any exacerbation of his preexisting conditions caused by his termination. *See Shea,* 925 F.Supp. at 1025-

26 (citing *Maurer v. United States,* 668 F.2d 98, 99-100 (2d Cir.1981), and *Milos v. Sea-Land Serv., Inc.,* 478 F.Supp. 1019, 1023 (S.D.N.Y.1979), aff'd, 622 F.2d 574 (2d Cir.1980)). Moreover, the jury's award of future pay-which amounts to only six years' wages-suggests that the jury found that McGrory's emotional injuries would not be permanently disabling. The decision to award McGrory more than $530,000 for pain and suffering therefore seems motivated by sympathy-perhaps based upon the fact that DOC fired McGrory while he was recovering from a line of duty injury-rather than a dispassionate review of the relevant facts. *Cf. Price v. City of Charlotte, N.C.,* 93 F.3d 1241, 1250 (4th Cir.1996) (holding in a Section 1983 case that emotional distress is compensable only if it "find[s] its genesis in the actual violation, not in any procedural deficiencies that accompanied the violation").

In these circumstances, it is appropriate that McGrory's compensatory damages is reduced to an amount which does not materially deviate from the sum that would be reasonable compensation for his emotional injuries. After reviewing the cases set forth above, and other similar cases, I believe that an award in the amount of $100,000 is the maximum amount that could be considered reasonable. *See Ismail v. Cohen,* 899 F.2d 183, 186 (2d Cir.1990) (reviewing jury's damages award to determine if "the quantum was *clearly* within the maximum limit of a reasonable range" based on jury awards in other cases and facts and circumstances of the case) (emphasis in original); *Ruhlman v. Smith,* 323 F.Supp.2d 356, 368 (N.D.N.Y.2004) (reducing compensatory damages award to "the maximum amount within the realm of reasonableness" (citing *Ismail,* 899 F.2d at 187)); *Perdue v. City Univ. of New York,* 13 F.Supp.2d 326, 337 (E.D.N.Y.1998) (same (citing *Ismail,* 899 F.2d at 187)); *Kim v. Dial Service Intern., Inc.,* No. 96 Civ. 3327(DLC), 1997 WL 458783, at *6 (S.D.N.Y. Aug. 11, 1997) (same).

### c. Scope of Relief Under Rule 59

A district court cannot unilaterally reduce a jury award to the amount it considers proper. *Tingley,* 49 F.3d at 96. Instead, if the "court finds that the verdict is excessive, it may order a new trial, a new trial limited to damages, or, under the practice of remittitur, may condition a denial of a motion for a new trial on the plaintiff's accepting damages in a reduced amount." *Id.* In this case, the Court opts for the third alternative. Accordingly, the City's Rule 59 motion for a new trial will be granted with respect to McGrory's damages unless, on or before October 18, 2004, McGrory serves and files a written notice accepting an order of remittitur containing the following terms:

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2290898 (S.D.N.Y.), 59 Fed.R.Serv.3d 1123
**(Cite as: Not Reported in F.Supp.2d)**

\*17 i. reducing front pay from $285,307 to $217,627;

ii. reducing back pay from $181,303 to $156,590; and

iii reducing damages for emotional distress from $533,390 to $100,000.

### B Plaintiff's Motion

In his cross-motion, McGrory seeks interest on his back pay award. The parties agree that it "ordinarily is an abuse of discretion not to include pre-judgment interest" in an award of back pay. _Saulpaugh v. Monroe Cmty. Hosp., 4 F.3d 134, 145 (2d Cir.1993)_ (quoting _Clarke v. Frank, 960 F.2d 1146, 1154 (2d Cir.1992)_). The City argues, however, that a different result should obtain here because (1) the jury heard information about interest during the testimony of the Plaintiff's economist, Schwartz, and (2) the size of the award is so much greater than the back wages to which McGrory is entitled that "the only reasonable explanation for this discrepancy is that the jury sought on its own to include prejudgment interest in its back pay award." (City Mem. of L. in Opp. to Pl.'s Prejudgment Interest Mot. ("City Int Mem.") at 3).

In _Gierlinger v. Gleason, 160 F.3d 858, 874 (2d Cir.1998)_, the district court declined to award a plaintiff prejudgment interest on his back wages, reasoning that the jury had already incorporated that as an element of its award because it had been given instructions concerning the concept of present value (in the context of future wages) and directed to award "all 'financial damages' suffered in connection with any loss of past and/or future income." The Second Circuit reversed and remanded that aspect of the judgment below, finding that an instruction that the jury had to reduce any award of future wages to present value did not suggest that it necessarily included interest in its calculation of back wages. _Id_ The _Gierlinger_ court noted further that "the concept of prejudgment interest was at no point mentioned to the jury." _Id._

Seizing on the word "interest," the City essentially argues that _Gierlinger_ mandates the denial of McGrory's request because Schwartz mentioned the term twice during the course of his testimony. (_See_ City Int Mem. at 2-4). However, neither the jury nor the Court ever discussed the concept of _prejudgment_ interest with the jury. Moreover, Schwartz's testimony plainly does not suggest-much less compel the conclusion that-the jury's verdict necessarily included an award of prejudgment interest with respect to McGrory's back wages.

Schwartz's first reference to interest occurred when he was explaining the concept of present value to the jury. It would, of course, be impossible to explain the principles applicable to discounting to present value without making reference to interest. Since the discussion of present value focused on _future_ wages, there simply is no reason to believe that the jury would have extended the analysis to McGrory's back pay claim. The suggestion is particularly ludicrous in light of Schwartz's actual testimony about present value, which consumed only about a page of the trial transcript. (_See_ Tr. 790).

\*18 The only other reference to interest arose after the City's counsel pointed out during a sidebar conference that Schwartz had failed to account for the Social Security and Worker's Compensation that Schwartz had received. When the testimony resumed, McGrory's counsel asked Schwartz what the effect on his calculations would be if McGrory had actually received payments "in the amount of approximately $2,000 per month." (_Id._ at 807). Schwartz responded, in part, that he would have to deduct not only the payments but interest on those payments to be accurate. (_Id_ at 808). In the next breath, however, he testified that simply making a dollar-for-dollar adjustment would not do "terrible violence to the accuracy" of his calculations since they dealt with only a handful of recent years. (_Id._). Thus, Schwartz's testimony suggested that, insofar as back wages are concerned, the inclusion of interest would not have made a material difference (_Id_ at 808-809). There consequently is no reason to believe that the jury decided to make such a mathematical adjustment for prejudgment interest on its own.

Turning to the alleged excessiveness of the award, the City argues that, after adjusting for Social Security disability and Worker's Compensation payments that McGrory actually received, his unpaid back wages amount to only $57,000 (City Interest Mem at 3). Using that figure as a "barometer," the City attacks the jury's award of $181,303 as plainly excessive, contending that the discrepancy can only be explained by the jury's inclusion of prejudgment interest in its award. (_Id_.).

Trial of this action took place in mid-May, 2003 The earnings chart received in evidence indicates that from 1999 through the period identified as "2003-04" McGrory would have earned wages with a net present value of $191,588. In his summation, McGrory's counsel suggested that the net present value of McGrory's back wages was actually $213,703 before making any setoff for Social Security disability payments. (Tr. 1467). While the number suggested by counsel appears to be somewhat higher than the correct amount, even after the Social Security is deducted, it is clear that McGrory's back wage claim, discounted to present value, involved more than $100,000. There consequently is no basis for the Court to conclude that the jury necessarily included prejudgment

Not Reported in F Supp 2d                                     Page 15
Not Reported in F Supp 2d, 2004 WL 2290898 (S.D.N.Y.), 59 Fed R Serv 3d 1123
(Cite as: Not Reported in F.Supp.2d)

interest in its back pay award because the only proper
award would have been $57,000.

Turning to the issue of the appropriate interest rate,
McGrory has not suggested the rate that should be applied
to the back pay award. The rate at which prejudgment
interest is to be calculated is within the Court's discretion.
*See Endico Potatoes, Inc. v. CIT Group/Factoring, Inc.,
67 F.3d 1063, 1071 (1995)*. Numerous courts have
applied the 52-week treasury bill rate to ensure that a
plaintiff receives adequate, but not excessive,
compensation. *See Luciano,* 912 F.Supp.2d at 676-77
(collecting cases). The instrument underlying that index,
however, has been discontinued. *See http://
www.federalreserve.gov/releases/h15/data.htm* (last
visited Sept. 30, 2004). A review of the prevailing interest
rates for conservative financial investments during the
same period nevertheless indicates that a five percent
interest rate, compounded annually, is more than
sufficient to make McGrory whole. *See, e.g., Saulpaugh,
4 F.3d at 145* (holding in a Title VII case that the trial
court's "failure to apply a compound rate of interest to its
calculation of damages constituted an abuse of
discretion").

*19 Finally, in an effort to bump up the accrued interest,
McGrory contends that the cut off date for interest should
be the date that the amended judgment in this case was
entered. The amended judgment did not alter any of the
relief that McGrory was awarded. Indeed, the only change
was to add language noting that the jury had returned a
verdict in favor of the City on Owens' claim. Accordingly,
interest will only be awarded for the period from
McGrory's dismissal through the date the original
judgment was entered. The parties are further directed to
calculate that interest on the amount of back pay that was
due and owing at the end of each calendar year.

### V. Conclusion

For the foregoing reasons, the City's motions pursuant to
Rules 50(b) and 59 of the Federal Rules of Civil
Procedure both are denied, conditioned upon McGrory's
written acceptance of an order of remittitur reducing the
jury's damages award in the manner specified above.
McGrory's cross-motion for interest on the jury's back pay
award is granted in part and denied in part.

S.D.N.Y.,2004.
McGrory v. City of New York
Not Reported in F Supp 2d, 2004 WL 2290898
(S.D.N.Y.), 59 Fed R Serv 3d 1123

Briefs and Other Related Documents (Back to top)

• 1:99cv04062 (Docket) (Jun 04, 1999)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.