## EXHIBIT F

Westlaw.

Not Reported in A.2d                                                                 Page 1
Not Reported in A.2d, 2004 WL 574880 (Conn.Super.)
**(Cite as: Not Reported in A.2d)**

# H

Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Superior Court of Connecticut, Judicial District of
New Britain.
CENDANT CORPORATION
v.
COMMISSIONER, State of Connecticut, Department
of Labor et al.
**No. CV030520241S.**

March 9, 2004.

Jackson Lewis LLP, Hartford, for Cendant
Corporation.
AAG Thomas Clifford III, AG-Workers
Comp/Labor, Hartford, for CT Dept. of Labor/Shaun
B Cashman/Com.
Joseph Garrison, New Haven, Jeffrey Bagnell,
Norwalk, for Kim Persky PINKUS, J.

I

## PROCEDURAL HISTORY

*1 This action is an administrative appeal from a
final decision rendered by Shaun Cashman,
commissioner of the state of Connecticut department
of labor (commissioner). The appeal in this appeal
are the plaintiff, Cendant Corporation (Cendant), and
the defendants, the commissioner and Kim Persky
(Persky). This appeal is brought pursuant to the
Uniform Administrative Procedures Act (UAPA) §
4-166 et seq. and General Statutes § 31-51kk et seq.

On November 11, 1999, Persky, a former employee
of Cendant, filed a complaint with the Connecticut
department of labor (department) alleging that
Cendant violated the Connecticut Family and
Medical Leave Act (CFMLA), General Statutes §
31-55kk et seq. at the conclusion of her maternity
leave by failing to restore her to her previous
position. Cendant responded to Persky's complaint
and on May 4, 2001, the department, through its
division of wage and workplace standards, issued an
administrative complaint in which it alleged that
Cendant violated General Statutes § 31-51nn and §
31-51pp. A contested case hearing was conducted

by the department's designated hearing officer, Lee
Ellen Terry, on September 10, 11 and 24, October 4
and 23 and November 5, 2001. The parties submitted
posthearing briefs and hearing officer Terry issued a
proposed decision on September 18, 2002, in which
she concluded that Cendant violated the provisions of
the CFMLA and that Persky was entitled to damages.

> FN1. "Any eligible employee who takes
> leave under section 31-51ll for the intended
> purpose of the leave shall be entitled on
> return from such leave (1) to be restored by
> the employer to the position of employment
> held by the employee when the leave
> commenced; (2) if the original position of
> employment is not available, to be restored
> to an equivalent position with equivalent
> employment benefits, pay and other terms
> and conditions of employment; or (3) in the
> case of a medical leave, if the employee is
> medically unable to perform the employee's
> original job upon the expiration of such
> leave, to be transferred to work suitable to
> such employee's physical condition if such
> work is available." General Statutes § 31-
> 51nn(a).

> FN2. "It shall be a violation of sections 5-
> 248a and 31-51kk to 31-51qq, inclusive, for
> any employer to discharge or cause to be
> discharged, or in any other manner
> discriminate, against any individual for
> opposing any practice made unlawful by
> said sections or because such employee has
> exercised the rights afforded to such
> employee under said sections." General
> Statutes § 31-51pp(a)(2)

In accordance with General Statutes § 4-179 and
Regs., Conn. State Agencies § 31-1-7, on September
24, 2002, Cendant timely served notice of its intent to
file objections and exceptions to the proposed
decision. On November 15, 2002, Cendant timely
filed its objections and exceptions to the proposed
decision. On December 18, 2002, the commissioner
heard oral arguments on Cendant's objections and
exceptions. On February 5, 2003, the commissioner
issued his final decision, affirming and adopting the
hearing officer's proposed decision in its entirety.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

Not Reported in A.2d
Not Reported in A.2d, 2004 WL 574880 (Conn.Super.)
(Cite as: Not Reported in A.2d)

Cendant filed this appeal on March 21, 2003, in the Superior Court for the Judicial District of New Britain. The department and Persky filed a joint answer to the complaint on June 2, 2003 and asserted a special defense of judicial estoppel. Both sides filed briefs and the parties were heard at oral argument on November 14, 2003.

## II

### SCOPE OF REVIEW

The scope of the court's review of an agency's decision is very limited. "Judicial review of [an administrative agency's] action is governed by the Uniform Administrative Procedure Act (General Statutes ... § § 4-166 through 4-189), and the scope of that review is very restricted." (Internal quotations marks omitted.) *Board of Education v. Freedom of Information Commission,* 208 Conn. 442, 452, 545 A.2d 1064 (1988). General Statutes § 4-183(j) provides in relevant part that: "[t]he court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court shall affirm the decision of the agency unless the court finds that substantial rights of the person appealing have been prejudiced because the administrative findings, inferences, conclusions, or decisions are (5) clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record." In order to obtain reversal of an agency's decision, the plaintiff must demonstrate that he suffered "material prejudice as a result of this alleged procedural deficiency." *Jutkowitz v. Dept of Health Services,* 220 Conn. 86, 94, 596 A.2d 374 (1991).

*2 In addition, "[j]udicial review of conclusions of law reached administratively is also limited. The court's ultimate duty is only to decide whether, in light of the evidence, the agency has acted unreasonably, arbitrarily, illegally, or in abuse of its discretion." (Internal quotation marks omitted.) *Beizer v. Dept. of Labor,* 56 Conn.App. 347, 360, 742 A.2d 821, cert. denied, 252 Conn. 937, 747 A.2d 1 (2000). "The question is not whether the trial court would have reached the same conclusion but whether the record before the commission supports the action taken." *Hospital of St. Raphael v. Commission on Hospitals & Health Care,* 182 Conn. 314, 318, 438 A.2d 103 (1980).

"Where the issue is one of law, the court has the

broader responsibility of determining whether the administrative action resulted from an incorrect application of the law to the facts found or could not reasonably or logically have followed from such facts. Although the court may not substitute its own conclusions for those of the administrative board, it retains the ultimate obligation to determine whether the administrative action was unreasonable, arbitrary, illegal or an abuse of discretion." (Internal quotation marks omitted.) *Beizer v. Dept. of Labor, supra,* 56 Conn.App. at 360.

### A Substantial Evidence Rule

"The substantial evidence rule governs judicial review of administrative fact-finding under General Statutes ... § 4-183 ... An administrative finding is supported by substantial evidence if the record affords a substantial basis of fact from which the fact in issue can be reasonably inferred. Such a standard of review allows less room for judicial scrutiny than does the 'weight of the evidence' rule or the 'clearly erroneous' rule ... In determining whether an administrative finding is supported by 'substantial evidence,' a court must defer to the agency's right to believe or disbelieve the evidence presented by any witness, even an expert, in whole or in part." (Citations omitted; internal quotation marks omitted.) *Briggs v. State Employees Retirement Commission,* 210 Conn. 214, 217, 554 A.2d 292 (1989). "[I]f the administrative record provides substantial evidence upon which the hearing officer could reasonably have based his finding ... the decision must be upheld." *Connecticut Building Wrecking Co. v. Carothers,* 218 Conn. 580, 601, 590 A.2d 447 (1991).

In "challenging an administrative agency action, the plaintiff has the burden of proof ... The plaintiff must do more than simply show that another decision maker, such as the trial court, might have reached a different conclusion. Rather than asking the reviewing court to retry the case de novo ... the plaintiff must establish that substantial evidence does not exist in the record as a whole to support the agency's decision ... In reviewing [an agency] decision made pursuant to the [Uniform Administrative Procedure Act], the reviewing court must sustain the [agency's] determination if an examination of the record discloses evidence that supports any one of the reasons given ... The evidence, however, to support any such reason must be substantial; [t]he credibility of witnesses and the determination of factual issues are matters within the province of the administrative agency ... This ...

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

Case 3:02-cv-02244-HBF    Document 68-5    Filed 04/27/2006    Page 4 of 15

Not Reported in A.2d                                                                          Page 3
Not Reported in A.2d, 2004 WL 574880 (Conn.Super.)
(Cite as: Not Reported in A.2d)

substantial evidence rule is similar to the sufficiency of the evidence standard applied in judicial review of jury verdicts, and the evidence is sufficient to sustain an agency finding if it affords a substantial basis of fact from which the fact in issue can be reasonably inferred ... [I]t imposes an important limitation on the power of the courts to overturn a decision of an administrative agency ... and to provide a more restrictive standard of review than standards embodying review of weight of the evidence or clearly erroneous action ... The United States Supreme Court, in defining substantial evidence in the directed verdict formulation, has said that it is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence ... The reviewing court must take into account [that there is] contradictory evidence in the record ... but the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence ..." (Internal quotation marks omitted.) *Newtown v. Keeney,* 234 Conn. 312, 319-20, 661 A.2d 589 (1995)

B. Deference to Agency's Interpretation

*3 "Ordinarily, the construction and interpretation of a statute is a question of law for the courts where the administrative decision is not entitled to special deference, particularly where ... the statute has not previously been subjected to judicial scrutiny or time-tested agency interpretations." *Southington v. State Board of Labor Relations,* 210 Conn. 549, 559, 556 A.2d 166 (1989) However, "[i]t is [a] well established practice ... to accord due deference to the construction given [a] statute by the agency charged with its administration ... This principle applies with even greater force to an agency's interpretation of its own duly adopted regulations ... That traditional deference, however, is unwarranted when the construction of a statute ... has not previously been subjected to judicial scrutiny [or to] ... a governmental agency's time-tested interpretation ..." (Citations omitted; internal quotation marks omitted.) *Evans v. Dept. of Social Services,* 81 Conn.App. 37, 40, 838 A.2d 250 (2004)

It is undisputed that the state of Connecticut department of labor is responsible for enforcing the statutes in question. As more fully set forth later in this opinion, the commission's interpretation has been

the subject of judicial scrutiny by several federal circuits. This court is required, therefore, to accord great deference to the interpretation of those statutes given by the department. This does not mean that the court must abdicate its adjudicative function in interpreting the law, but it does mean that where there are different but equally plausible interpretations of a statute, the court must give due deference to the interpretation followed by the administrative agency concerned. See *Evans v. Dept. of Social Services, supra,* 81 Conn.App. at 40 Where, on the other hand, the court determines that an agency's interpretation of a statute is not plausible or reasonable, the court should not defer to such interpretation *Bridgeport Hospital v. Commission on Human Rights & Opportunities,* 232 Conn. 91, 109-10, 653 A.2d 782 (1995).

### III

### DISCUSSION

The department's designated hearing officer, Lee Ellen Terry made the following findings of fact: in May of 1998, Persky was promoted to the position of vice president and general manager of sales of Cendant's "Sidewalk" business unit, which consisted of about 300 employees. Persky oversaw the profit and loss responsibility and managed the operations of the unit, including sales, advertising, collections, billing, budgeting and other functions supporting the unit. By June of 1998, a newer agreement was negotiated between Cendant and Microsoft involving a "cost-plus" arrangement. Persky had the responsibility for a $30 million budget, which represented Microsoft's ultimate cost exposure required to finance Cendant's services. Also, in the June 1998 agreement, Cendant had granted to Microsoft the irrevocable right to purchase Sidewalk's sales force, including all personal property owned, leased, rented or licensed by Sidewalk and used primarily by the sales force.

> FN3. Sidewalk was a joint venture created by the president of the CUC/Cendant Entertainment Division, Bob Sarkie, and a counterpart at Microsoft. Sidewalk was a web site where an individual could look for entertainment, merchants, services, and other items of interest in certain cities. Microsoft created the Sidewalk web site, and created the editorial content, such as

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

Not Reported in A.2d
Not Reported in A.2d, 2004 WL 574880 (Conn.Super.)
(Cite as: Not Reported in A.2d)

Page 4

reviews of restaurants and the theater. Cendant's role was to provide a sales force to generate advertising revenue to support the web site. Cendant sold space to local merchants, produced the ads, and provided a web site for the customers with informational pages to describe the merchants.

FN4. Cendant agreed to provide a dedicated advertising sales force to act as Microsoft's sales agent for certain merchant relationships relating to Sidewalk's on-line shopping service titled "netMarket," within certain Microsoft web sites, and for certain preferred placement of links from the Microsoft web sites to netMarket.

*4 In October of 1998, Persky informed her managers at Cendant that she was pregnant and would be requiring a maternity leave starting in January of 1999. In November 1998, Persky began officially reporting to Mike Wargotz, president and CEO of the Life-Styles Division and she had indicated to him that she would be needing a maternity leave in January. In December of 1998, Wargotz started to identify candidates to be brought in as a "placeholder" for Persky while she was on maternity leave. Eventually, Wargotz selected Jonathan Yee to perform Persky's job when she left in January. Persky took Yee to meetings and met with him on a daily basis, until she left in January, giving him all the necessary documents needed to learn the job. Also in December of 1998 and January of 1999, Cendant began discussions with Microsoft about selling the sales component of Sidewalk to Microsoft. Persky was directly involved in these negotiations.

FN5. Persky familiarized Wargotz with the complexities and difficulties she had encountered with the contract with Microsoft.

On January 25, 1999, Persky began her maternity leave. A letter dated February 15, 1999 indicated that Persky's CFMLA leave was approved and that she could take up to sixteen weeks of unpaid leave to run concurrently with any paid leave through March 16, 1999 until May 24, 1999. During her maternity leave, Persky continued to e-mail and telephone Wargotz to discuss Sidewalk matters, but he did not answer or return phone calls or respond to her e-mails.

By February 25, 1999, Microsoft and Cendant

reached a transition agreement. Peter Atkins, a general manager at Microsoft at the time, did not request that Persky stay on during the transition because he felt that their relationship in trying to enforce the 1998 agreement had been too acrimonious. Atkins kept Yee on to help with the transition. On March 1, 1999, Wargotz told Persky that Sidewalk's sales division had been purchased by Microsoft, that he was no longer her manager, that Yee would be fulfilling Cendant's obligations at Sidewalk until December of 1999 and that Vere Spandow would also be remaining with Sidewalk until December of 1999.

FN6. The agreement stated that the parties desired to terminate the prior agreement and that Microsoft would have the opportunity to employ certain Cendant employees who currently provided sales services for Sidewalk and to provide for the provision by Cendant of certain transitional services with respect to the operations of Sidewalk. Also, the transition agreement did not contain any provision specifically eliminating Persky's position or preventing her from being retained.

Persky contacted Anne Collins, Cendant's new director of human resources at that time, concerning her employment. When Persky and Collins met in mid-March, Collins informed Persky that her job had been eliminated and asked Persky about her interest in equivalent jobs at Cendant. By the end of March, Collins once again informed Persky that her job with Sidewalk was eliminated and that her options were to accept a lesser position than what she had before, or to pursue a severance package. Persky spoke with Collins about the severance package over a span of several weeks.

Shortly after speaking with Collins, Persky contacted Cendant's employment lawyer, Kirsten Hotchkiss, about the severance package. Hotchkiss told Perksy that there would be no discussion of a severance package at that time. At this point, Persky communicated to Hotchkiss that she was going to retain representation with regard to her rights because her position was eliminated, yet Cendant was unwilling to discuss a severance package.

*5 Finally, on November 11, 1999, after some correspondence between Hotchkiss and Persky's attorney, Jane Hanson, about severance packages and possible alternative job opportunities, Persky filed a

Not Reported in A.2d                                                                                    Page 5
Not Reported in A.2d, 2004 WL 574880 (Conn.Super.)
**(Cite as: Not Reported in A.2d)**

complaint with the state of Connecticut, department of labor, wage and workplace standards division (division), alleging that her former employer violated the provisions of the CFMLA.

On May 4, 2001, the division issued an administrative complaint notifying Cendant of its right to appear at a contested case hearing, for which the commissioner had designated Attorney Lee Ellen Terry as the hearing officer, to show cause why an order should not enter directing the employer to restore any right, benefits, entitlements or protection offered to Persky under the CFMLA, and/or reinstate Persky and/or pay monetary damages for any loss which was the direct result of the employer's violations of the CFMLA. On February 5, 2003 the commissioner issued the final decision

The commissioner recognized that "[c]ourts construing the FMLA have noted that an employee may bring two types of claims under the FMLA First, an employee can bring a claim that her employer refused to provide her with an FMLA benefit to which she was entitled, such as reinstatement to her former position or an equivalent position upon her return from FMLA leave. The employee can also bring a claim that her employer discriminated against her because she took FMLA leave under the FMLA's anti-discrimination provision." (Final Decision, Record at 78, pp. 22-23.) The commissioner concluded that Persky's claim was one of interference, not discrimination, and also found that the strict liability standard applied to claims under the CFMLA which involve an employer's interference with an employee's right to reinstatement under the Act. (Final Decision, Record at 78, p. 22.) The commissioner also concluded that Cendant was judicially estopped from arguing that Persky was not entitled to reinstatement because her leave lasted more than sixteen weeks, because Cendant informed Persky in a letter "that her sixteen-week leave would run concurrently with any paid leave and would end on May 24, 1999." (Final Decision, Record at 78, p. 21 & n. 1.)

According to the commissioner's findings of fact, the commissioner concluded, that it was more probable that if Persky had not taken a leave, she would have remained in her position as vice president and general manager of Sidewalk and would have continued to be an active participant in the transition process. (Final Decision, Record at 78, p. 26.) The commissioner determined that Persky established a causal connection between her leave and Cendant's failure to reinstate her to her original position, based on the

lack of evidence in the record to show that Cendant intended to permanently replace Persky with Yee before her leave began. (Final Decision, Record at 78, pp. 25-26.) The commissioner concluded that Persky's position existed at the end of her CFMLA leave; (Final Decision, Record at 78, pp. 26-28); and that Cendant did not offer Persky any equivalent positions. (Final Decision, Record at 78, pp. 33-34.) Finally the commissioner found that Persky adequately mitigated her damages and that she was entitled to damages "prorated as to her salary and any bonuses, discretionary or nondiscretionary, and benefits she would have received had she been restored to the position of general manager and compensated on a par with Jonathan Yee, upon her return from her leave of absence under the CFMLA." (Final Decision, Record at 78, p 36; see generally Final Decision, Record at 78, pp. 35-37.)

**\*6** Cendant appeals on the following grounds: count one alleges that the commissioner violated statutory provisions; and count two alleges that the commissioner acted in excess of statutory authority; the third count claims that the agency decision was affected by an error of law and the fourth count asserts that the agency decision was clearly erroneous; and finally count five asserts that the agency decision was arbitrary and capricious.

Cendant asserts that the commissioner's application of a strict liability standard to Persky's claim disregards the plain language of the CFMLA and the final decision erroneously applies judicial estoppel to the question of whether Persky was entitled to reinstatement. Cendant argues that the decision was clearly erroneous in view of the reliable, probative and substantial evidence on the record Cendant further argues that there is no testimony to support the conclusion that Persky would have remained on the transition team, no evidence that Persky was denied reinstatement for any reason connected to her FMLA leave, that Persky's position existed at the end of her leave and failing to offer Persky an equivalent position is clearly erroneous and that the findings on damages are inconsistent with the commissioner's legal conclusions.

A.

Strict Liability Standard

The first issue is whether the commissioner's application of a strict liability standard to Persky's

claim disregarded the plain language of the CFMLA, the regulations adopted by the Connecticut department, and the caselaw interpreting the FMLA in violation of General Statutes § 4-183(j)(1), (2), (4) and (6). In the decision, the commissioner noted that courts have imposed a strict liability standard in cases where employers interfere with an employee's FMLA rights, as distinguished from cases where an eligible employee contends the employer has discriminated against an employee for exercising his or her rights under the FMLA. (Final Decision, Record at 78, p. 22.) Cendant contends that the commissioner incorrectly applied this strict liability standard (Plaintiff's Brief, p. 12.)

> FN7. General Statutes § 4-183(j)(1), (2), (4) and (6) states that: "The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court shall affirm the decision of the agency unless the court finds that substantial rights of the person appealing have been prejudiced because the administrative findings, inferences, conclusions, or decisions are: (1) In violation of constitutional or statutory provisions; (2) in excess of the statutory authority of the agency ... (4) affected by other error of law ... or (6) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion. If the court finds such prejudice, it shall sustain the appeal and, if appropriate, may render a judgment under subsection (k) of this section or remand the case for further proceedings. For purposes of this section, a remand is a final judgment."

"The FMLA creates two interrelated substantive rights for employees. . First, an employee has the right to take up to twelve weeks of leave for the reasons described above. 29 U.S.C. § 2612(a). Second, an employee who takes FMLA leave has the right to be restored to his other original position or to a position equivalent in benefits, pay, and conditions of employment upon return from leave. 29 U.S.C. § 2614(a). The FMLA does not entitle the employee to any rights, benefits, or positions they would not have been entitled to had they not taken leave. 29 U.S.C. § 2614(a)(3)(B). It simply guarantees that an employee's taking leave will not result in a loss of job security or in other adverse employment actions. To protect the employee, FMLA prohibits interference with the exercise of the employee's right to take

leave. 29 U.S.C. § 2615(a). The relevant provision states '[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this title [and subchapter].' 29 U.S.C. § 2615(a)(1). Congress has authorized the Department of Labor ("DOL") to issue implementing regulations for the FMLA. 29 U.S.C. § 2654. These regulations are entitled to deference under *Chevron USA, Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843-44 (1984). DOL regulations state that '[t]he FMLA prohibits interference with an employee's rights under the law.' 29 C.F.R. § 825.220(a). Any violation of the FMLA itself or of the DOL regulations constitute interference with an employee's rights under the FMLA. 29 C.F.R. § 825.220(b)." (Citations omitted.) *Liu v. Amway Corp.,* 347 F.3d 1125, 1132-33 (9th Cir.2003).

> FN8. General Statutes § 31-51ll (Family and medical leave: Length of leave Eligibility) states that: "(a) Subject to section 31-51mm, an eligible employee shall be entitled to a total of sixteen workweeks of leave during any twenty-four-month period, such twenty-four-month period to begin with the first day of leave taken, for one or more of the following: (1) Upon the birth of a son or daughter of the employee; . " (Emphasis added.)

*7 "As the Supreme Court recently recognized, the FMLA was enacted to respond to the 'serious problem with the discretionary nature of family leave' that occurs 'when the authority to grant leave and to arrange the length of that leave rests with individual supervisors.' *Nevada Dept. of Human Resources v. Hibbs,* 538 U.S. 721, 123 S.Ct. 1972, 1980 (2003). DOL regulations clearly state that an employer interferes with an employee's rights under FMLA by 'refusing to authorize FMLA leave' and 'discouraging an employee from using such leave.' 29 C.F.R. § 825.220. It follows that an employer has discouraged an employee from taking FMLA leave when his or her supervisor interferes with the length and dates of leave, including an outright denial of leave. See, e.g., *Williams v. Shenango, Inc.,* 986 F.Sup. 309, 320-21 (W.D.Pa.1997) (holding that periodic denials of FMLA leave requests and limitations on which week the employee was allowed to take it presented a genuine issue of fact as to whether the employee's rights under FMLA were denied). The statute and the accompanying regulations protect an employee from any employer

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

Case 3:02-cv-02244-HBF    Document 68-5    Filed 04/27/2006    Page 8 of 15

Not Reported in A.2d                                                      Page 7
Not Reported in A.2d, 2004 WL 574880 (Conn.Super.)
(Cite as: Not Reported in A.2d)

actions that discourage or interfere with the right to take FMLA leave 29 C.F.R. § 825.220(1)." *Liu v. Amway Corp., supra,* 347 F.3d at 1134.

"Under DOL regulations, the mischaracterization of ... FMLA leave as personal leave qualifies as "interference" with [an employee's] leave." *Id.,* at 1135. In *Liu v. Amway Corp.,* the 9th Circuit held that "the designation of Liu's leave as personal leave deprived her of rights under FMLA. By designating Liu's leave as 'personal,' she was subject to the control and discretion of her supervisor in taking leave she had a statutory right to take. [The supervisor] clearly believed that it was within his discretion to deny leave because the leave was 'personal.' Had Liu's leave been appropriately designated FMLA leave, [the supervisor] would not have had such discretion. See generally *Nevada Dept. of Human Resources v. Hibbs,* 123 S.Ct. at 1980 (discussing one of the aims of FMLA as eliminating the discretion individual supervisors had in granting family leave). FMLA leave for baby bonding time is not contingent upon an employer's needs. E.g., *Blohm v. Dillard's, Inc.,* 95 F.Sup.2d 473, 478-79 (E.D.N.C.2000) (rejecting an argument by employer that the employee should have scheduled their FMLA leave around the needs of the corporation)." *Liu v. Amway Corp., supra,* 347 F.3d at 1135. The court concluded that "Liu presented a triable issue of fact as to whether her rights under FMLA were violated by the misidentification of her FMLA leave as personal leave. FMLA enforcement mechanisms protect employees against having to plead and negotiate with their supervisors to be granted leave they are entitled to receive under ... FMLA and CFRA." *Id.*

"Where an employee alleges that his or her FMLA leave is impermissibly considered in the decision to terminate him or her, this Circuit applies the standard set forth by the DOL in 29 C.F.R. § 825.220(c) ... Thus, at trial, an employee may prevail on a claim that an employer interfered with her rights by terminating her in violation of FMLA by showing, by a preponderance of the evidence, that her taking of FMLA-protected leave constituted a negative factor in the decision to terminate her ... We held that the statutory and regulatory language of FLMA makes clear that where an employee is subjected to 'negative consequences ... simply because he has used FMLA leave,' the employer has interfered with the employee's FMLA rights under 29 C.F.R. § 825.220(a)(1). In contrast, where an employee is punished for opposing unlawful practices by the employer, the issue then becomes one of discrimination and retaliation. In a similar determination made by the Seventh Circuit in *Diaz v. Fort Wayne Corp.,* 131 F.3d 711 (7th Cir.1997), the court explained that FMLA claims 'do not depend on discrimination' since the issue is not that 'the employer treated one employee worse than another' but that every employee has substantive rights under FMLA that the employer must respect." (Citations omitted.) *Liu v. Amway Corp., supra,* 347 F.3d at 1135-36.

*8 Accordingly, courts in several federal circuits have held that: "Section 2615(a)(1) claims ... do not require that an employee prove that the employer acted with any particular intent-a mere showing that the employee was entitled to the benefit and the employer refused to provide it suffices to establish liability under the FMLA." *Cross v. Southwest Recreational Industries, Inc.,* 17 F.Sup.2d 1362, 1368 (N.D.Ga.1998); see also *Cavin v. Honda of Am. Mfg., Inc.,* 346 F.3d 713, 719 (6th Cir.2003) ("To prevail on an interference claim, a plaintiff must establish that (1) he is an eligible employee, 29 U.S.C. § 2611(2); (2) the defendant is an employer, 29 U.S.C. § 2611(4); (3) the employee was entitled to leave under the FMLA, 29 U.S.C. § 2612(a)(1); (4) the employee gave the employer notice of his intention to take leave, 29 U.S.C. § 2612(e)(1); and (5) the employer denied the employee FMLA benefits to which he was entitled"); *King v. Preferred Technical Group,* 166 F.3d 887, 891 (7th Cir.1999) ("If an employer interferes with the FMLA-created right to medical leave or to reinstatement following the leave, a deprivation of this right is a violation regardless of the employer's intent.") "Congress used the words 'shall be unlawful for an employer to [deny an employee's rights under the FMLA]' rather than the words 'may be unlawful to [deny an employee's rights under the FMLA],' which indicates that Congress intended to hold employers strictly liable for denying FMLA provided rights to employees." *Cross v. Southwest Recreational Industries, Inc., supra,* 17 F.Sup.2d at 1368. "The FMLA thus imposes strict liability upon employers who deny a FMLA entitlement to a qualified employee." *Liu v. Amway Corp., supra,* 347 F.3d at 1135-36.

Some other courts have applied the standard that Cendant favors; see *Kohls v. Beverly Enter., Wisconsin,* 259 F.3d 799, 804 (7th Cir.2001) ("The employer may ... present evidence to show that the employee would not have been entitled to her position even if she had not taken leave"); *O'Connor v. PCA Family Health Plan, Inc.,* 200 F.3d 1349, 1354 (11th Cir.2000) (affirming summary judgment

Case 3:02-cv-02244-HBF    Document 68-5    Filed 04/27/2006    Page 9 of 15

Not Reported in A 2d                                              Page 8
Not Reported in A 2d, 2004 WL 574880 (Conn.Super.)
(Cite as: Not Reported in A.2d)

for employer on the basis that "when an 'eligible employee' who was on FMLA leave alleges her employer denied her FMLA right to reinstatement, the employer has an opportunity to demonstrate it would have discharged the employee even had she not been on FMLA leave"); *Vargas v. Globetrotters Eng. Corp.*, 4 F.Sup.2d 780, 783 (N.D.Ill.1998) (secretary had no right to reinstatement in position because it had been eliminated before her return from leave). This is not sufficient to show that the commissioner's application of the strict liability standard was unreasonable, arbitrary, illegal or an abuse of discretion. In each of these three cases, the claimants were discharged either because of their performance; see *Kohls v. Beverly Enter. Wisconsin, supra*, 259 F.3d at 804; or because their jobs were being eliminated. See *O'Connor v. PCA Family Health Plan, Inc., supra*, 200 F.3d at 1354; *Vargas v. Globetrotters Eng. Corp., supra*, 4 F.Sup.2d at 783 In the present case, based upon the record evidence, it was clear that neither Persky's job performance nor her job status had anything to do with her dismissal Shortly before Persky went on leave, she received a positive review and a 7.9 percent raise (Record at 10, Joint Ex. 10; Record at 81, pp. 49-50.) Further, Jonathan Yee was still performing tasks that Persky had been performing prior to beginning her leave. Therefore, her job was still available

*9 Additionally, the commissioner found that the CFMLA mirrored the FMLA's use of the word "shall," rather than "may," regarding the employer's legal obligations to the complainant, therefore, the strict liability standard used by the federal courts was applicable. (Final Decision, Record at 78, p. 22.) The commissioner found that Persky's claim was one of interference, not discrimination and also found that the strict liability standard applied to claims under the CFMLA which involve an employer's interference with an employee's right to reinstatement under the Act (Final Decision, Record at 78, p. 22.) The commissioner then concluded that Cendant assumes strict liability for any interference with Persky's rights under the CFMLA. (Final Decision, Record at 78, p. 23.) Accordingly, Cendant's appeal will not be sustained on the basis that the commissioner applied the wrong standard

B.

Judicial Estoppel

The next issue is whether the final decision

erroneously applied judicial estoppel to the question of whether Persky was entitled to reinstatement. In his decision, the commissioner concluded that Cendant was judicially estopped from arguing that Persky was not entitled to reinstatement because her leave lasted more than sixteen weeks, because Cendant informed Persky in a letter "that her sixteen-week leave would run concurrently with any paid leave and would end on May 24, 1999." (Final Decision, Record at 78, p. 21 & n. 1) Cendant argues that under Connecticut law, employees are only entitled to sixteen weeks of leave every twenty-four months, Persky's leave lasted seventeen weeks, therefore, Persky should not be entitled to reinstatement (Plaintiff's Brief, p. 18.) Cendant submits that neither Persky nor the commissioner has cited to any previous proceeding in which Cendant has taken an inconsistent position on this issue (Plaintiff's Brief, p. 18.)

"Judicial estoppel, sometimes called the doctrine against the assertion of inconsistent positions, is a judge-made doctrine that seeks to prevent a litigant from asserting a position inconsistent with one that she has previously asserted in the same or in a previous proceeding It is not intended to eliminate all inconsistencies, however slight or inadvertent; rather, it is designed to prevent litigants from playing fast and loose with the courts." *In re Chambers Development Company, Inc.*, 148 F.3d 214, 229 (3rd Cir.1998). "The basic principle ... is that absent any good explanation, a party should not be allowed to gain an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory." 18 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure Section(s) 4477 (1981), p. 782

In the present case, as the commissioner noted, Cendant stated in a letter and made representations in the statement of undisputed facts filed in federal court that Persky's FMLA leave was ending on May 24, 1999. (Record at 35, Letter to Kim Persky; Record at 74, Post-Trial Reply Brief of Persky, p. 3, n. 3) Further, Cendant never denied that it made these representations. Therefore, the court finds that there is evidence in the record to support the commissioner's decision that Cendant took inconsistent positions on the issue.

C.

Final Decision In View of the Whole Record

Not Reported in A.2d
Not Reported in A.2d, 2004 WL 574880 (Conn.Super.)
(Cite as: Not Reported in A.2d)

1. Whether Persky would have been employed if she had not taken leave

*10 The third issue is whether the record is devoid of any testimony to support the conclusion that Persky would have remained on the transition team had she not taken the leave of absence. In the decision, the commissioner concluded, that it was more probable that if Persky had not taken leave, she would have remained in her position as vice president and general manager of Sidewalk and would have continued to be an active participant in the transition process. (Final Decision, Record at 78, p. 26.) Cendant argues that when an employer presents evidence to show that an employee would not have remained employed, even if she had not taken leave, the employee must show, by a preponderance of the evidence, that the employment action would not have taken place if she had not taken FMLA leave. (Plaintiff's Brief, pp. 19-20.) Cendant submits that Persky failed to put forth any evidence to meet this burden. (Plaintiff's Brief, p. 20.) Cendant argues that the only evidence on this point clearly shows that Persky would not have remained at Sidewalk because Microsoft did not want to include her as a part of the transition team. (Plaintiff's Brief, p. 22.) Therefore, she was not entitled to be reinstated.

On this issue, the commissioner again relied on the testimony of Yee and Spandow. Yee, as Persky's temporary replacement, admitted that the general manager position continued to exist after the transition agreement was executed in February 1999, and that many of the position's pre-transition duties continued during the transition. (Record at 83, pp. 195-96.) Yee retained Persky's title, vice president and general manager of Sidewalk, and performed substantially similar duties to those that she had performed working with Spandow and Microsoft. (Record at 83, p. 196.) Spandow, who was one of Persky's VP-level subordinates, confirmed this fact as well. (Record at 79, p. 82.) Additionally, the controlling agreement between Cendant and Microsoft for the provision of transition services, which provided that the services during the transition were to be "substantially similar" to those provided under the prior agreement, provided evidence of the availability of Persky's position. (Record at 1, Joint Ex. 1, Appendix D.) Finally, Spandow's testimony showed that he believed that both his and Persky's positions continued to exist after the transition and sale of Sidewalk was announced in February 1999; (Record at 79, p. 82); and that Yee was filling

Persky's position. (Record at 70, p. 98.) Based upon the foregoing, the court finds there is substantial evidence in the record to support the commissioner's conclusions.

2. There is evidence that Persky was denied reinstatement for reasons connected to her FMLA leave.

The fourth issue is whether there is any evidence in the record to support the conclusion that Persky was denied reinstatement for any reason connected to her FMLA leave. The commissioner determined that Persky established a causal connection between her leave and Cendant's failure to reinstate her to her original position based on the lack of evidence in the record to show that Cendant intended to permanently replace Persky with Yee before her leave began. (Final Decision, Record at 78, pp. 25-26.) Cendant argues that the record is devoid of any evidence to show that Persky was not reinstated for some reason connected with her CFMLA leave and, therefore, the commissioner's finding that there is a causal connection between Persky's leave and Cendant's failure to reinstate her is clearly erroneous in light of the evidence on the whole record. (Plaintiff's Brief, pp. 22-25.) Cendant contends that when Persky was absent on leave, it could not have predicted that it would subsequently sell the Sidewalk unit to Microsoft and that Microsoft would not select Persky for the transition team. (Plaintiff's Brief, p. 23.)

*11 The commissioner relied on *Smith v. Diffee Ford-Lincoln-Mercury, Inc.,* 298 F.3d 955, 961 (10th Cir.2002), wherein the court decided that "an employee may be dismissed, preventing her from exercising her statutory right to FMLA leave-but only if the dismissal would have occurred regardless of the employee's request for or taking of FMLA leave." The court held that the employer interfered with the employee's FMLA rights when it discharged her during her FMLA leave for failing to fully train a subordinate. *Id.* In upholding the jury's verdict, in favor of Smith, the court found that Smith had offered sufficient evidence that she would not have been discharged had she not taken FMLA leave. *Id.* Such evidence included Smith's long-term employment history, the employer's failure to subject her to serious discipline before her FMLA leave, the lack of monitoring or reporting of training progress and, most significantly, the timing of her termination (during her FMLA leave). *Id.* The court held that "[f]rom this testimony the jury could reasonably infer that, had Smith been healthy, Diffee would have

permitted her to continue indefinitely at her job without training anyone." *Id*

In the present case, the record reveals that Persky was active in planning for the sale of Sidewalk to Microsoft up until she started her leave. (Record at 2, Joint Ex. 2; Record at 80, pp. 24-26, 142; Record at 81, pp. 6-7 ) Only after she commenced her leave, did Michael Wargotz (Persky's former supervisor and senior management at Cendant) begin to ignore Persky's attempts to keep herself current on the progress of the transition agreement. (Record at 81, pp. 52-53.) Further, up until the time she took her leave in 1999, Persky's supervisors complimented her on her willingness to play the role of "bad cop," and noted she had been constructive and forthright in her dealings with Microsoft. (Record at 2, Joint Ex. 2; Record at 84, p. 77 ) Shortly before Persky went on leave, she received a very positive review and a 7.9% raise. (Record at 10, Joint Ex. 10; Record at 81, pp. 49-50 ) In addition, both Spandow and Yee testified that Persky was professional, and neither of them indicated having problems working with her. (Record at 83, Yee Testimony, p 177;    Record at 79, Spandow Testimony, p. 131 )

> FN9. "I always found Kim to be very professional."

> FN10. "I never heard Kim raise her voice at anybody."

No one informed her that she would not be returning to her position as vice president and general manager of Sidewalk after her leave ended (Final Decision, Record at 78, p 26; see generally Persky Testimony, Record at 81 ) As per the findings of fact, Wargotz told Persky to contact Mark Metcalfe, president of Cendant Membership Services, about what her new job was going to be Upon contacting Metcalfe, he indicated to her that he had no idea he was her manager, that he did not know the status of Sidewalk, and that he did not know anything about a job opening for her As in *Smith v. Diffee Ford-Lincoln-Mercury, Inc , supra,* the timing of Persky's discharge also indicates a causal relation between her FMLA leave and her dismissal. Therefore, the commissioner found it more probable that if Persky had not taken the CFMLA leave, she would have remained in her position as vice president and general manager of Sidewalk and would have continued to be an active participant in the transition process (Final Decision, Record at 78, p 26 )

**\*12** Based upon the foregoing, the court finds there is substantial evidence in the record to support the commissioner's conclusions that Persky established a causal connection with respect to her leave and Cendant's failure to reinstate her to her original position

3. Persky's position existed at the end of her leave.

The fifth issue is whether Persky's position, or a substantially similar position, existed at the end of her CFMLA leave, therefore, entitling her to reinstatement The commissioner concluded that Persky's position existed at the end of her CFMLA leave (Final Decision, Record at 78, pp. 26-28 ) Cendant argues that the commissioner inexplicably came to the broad and erroneous conclusion that Persky's job and Yee's job were the same and, therefore, Persky deserved to be reinstated. Cendant contends that Persky's position was not available to her because, as of February 25, 1999, it no longer existed, and that it would have been eliminated even if Persky had not taken her CFMLA leave at that time. Cendant cites *Sauer v . McGraw Hill Companies, Inc., Case No. 99 N. 1898, 2001 U.S Dist. LEXIS 15936 (D.Colo. June 12, 2001),* in support of its argument. In *Sauer v McGraw Hill Companies, Inc.,* the plaintiff never introduced evidence to suggest that, after defendant distributed her duties, a single distinct position existed that was substantially similar to her original position. *Id.* The defendant, conversely, showed that other employees who had not been on leave and who had performed similar duties to that of the plaintiff lost those responsibilities as a result of the employer's reorganization. *Id* The court found that there was no evidence that the defendant eliminated the plaintiff's pre-FMLA leave position because of her FMLA leave, and also found no evidence of discrimination based on the same facts *Id*

The commissioner concluded, however, that the present case was distinguishable from *Sauer* because, in the present case, Cendant did not redistribute Persky's duties (Final Decision, Record at 78, p. 27; see Yee Testimony, Record at 83.) Yee's position of general manager and vice president of Sidewalk included Persky's former duties and were only modified due to the demands of transitioning Sidewalk to Microsoft (Final Decision, Record at 78, p 27; Record at 83, p. 112.) Yee was expected to perform the same functions Persky had performed so Sidewalk could remain an on-going concern. (Final Decision, Record at 78, p. 27; see Record at 83, pp.

Not Reported in A.2d                                                                                      Page 11
Not Reported in A.2d, 2004 WL 574880 (Conn.Super.)
**(Cite as: Not Reported in A.2d)**

122-23.) Yee retained Persky's titles of vice president and general manager of Sidewalk and performed substantially similar duties that Persky had performed (Final Decision, Record at 78, p. 27; see Yee Testimony, Record at 83.) Yee's duties throughout the transition were typical management duties, i.e., he had to oversee the termination of leases and the handling of real estate matters associated with the move of Sidewalk's operations to Microsoft (Final Decision, Record At 78, p. 27; see Yee Testimony, Record at 83, pp. 165-67.) Persky was more familiar than Yee with Sidewalk's business operations, and there is no reason why she would not be as capable, if not more capable, in transitioning the various units to Microsoft. (Final Decision, Record at 78, p. 27; see Persky Testimony, Record at 81.) The commissioner found that Yee's broad-based duties as general manager and vice president of Sidewalk did not substantially change after the transition agreement. (Final Decision, Record at 78, p. 28.) Persky's excellent track record with CUC and Cendant, including her rapid rise in status, her experience with handling a variety of different high level positions, and her excellent educational qualifications are sufficient to conclude that Persky was well qualified to handle the transition period (Final Decision, Record at 78, p. 28.)

*13 The court adopts the commissioner's finding that it would render the CFMLA meaningless if an employer had the latitude to refuse to reinstate an employee on leave as long as it could point to some differences in the position that developed the leave period. (Final Decision, Record at 78, p. 28.) Therefore, this court agrees with the commission's conclusion that Yee's position as general manager and vice president of Sidewalk during the term of the transition agreement was not substantially different from the position Persky originally held (Final Decision, Record at 78, p. 28.) Based upon the foregoing, there is sufficient evidence in the record that Persky's position continued to exist at the end of her leave.

#### 4. Cendant violated CFMLA by failing to offer Persky any equivalent positions.

The sixth issue is whether Cendant violated the CFMLA when it failed to offer Persky an equivalent position after her leave had terminated pursuant to General Statutes § 31-51nn(a)(2). In the decision, the commissioner concluded that Cendant did not offer Persky any equivalent positions. (Final Decision, Record at 78, pp. 33-34.) Cendant first

argues that, pursuant to § 31-51nn(a), an employee's restoration rights are qualified by the CFMLA regulations, which provide that "[i]f an employee is laid off during the course of taking FMLA leave and employment is terminated, the employer's responsibility to continue FMLA leave and restore the employee ceases at the time the employee is laid off ..." Regs., Conn. State Agencies § 31-51qq-24(a)(1); see also *Ilhardt v. Sara Lee Corp.*, 118 F.3d 1151 (7th Cir.1997). (Plaintiff's Brief, p. 30.) Cendant submits that because Persky's position no longer existed when her leave ended, she was not entitled to be reinstated. (Plaintiff's Brief, p. 30.) Further, Cendant argues that pursuant to § 31-51nn(c), it is not required to restore Persky to an equivalent position if doing so would put her in a better position than if she had not taken leave (Record at 83, pp. 160, 193-94; Record at 79, p. 83.)

> FN11. General Statutes § 31-51nn(a)(2) provides: "Any eligible employee who takes leave under section 31-51ll for the intended purpose of the leave shall be entitled on return from such leave ... (2) if the original position of employment is not available, to be restored to an equivalent position with equivalent employment benefits, pay and other terms and conditions of employment."

> FN12. General Statutes § 31-51nn(c) provides: "Nothing in this section shall be construed to entitle any restored employee to (1) the accrual of any seniority or employment benefits during any period of leave; or (2) any right, benefit or position of employment other than any right, benefit or position to which the employee would have been entitled had the employee not taken the leave."

> FN13. Cendant contends that restoring Persky to an equivalent position would have put her in a better position than Kirk Nagamine, who was her subordinate and was not on leave and was terminated because he was not being selected for the transition team (Plaintiff's Brief, p. 31.)

The commissioner cites *Brown v. J.C. Penney Corp.*, for the proposition that "an employee on FMLA leave is entitled to reinstatement 'even if the employee has been replaced.' " *Brown v. J.C. Penney Corp.*, 924 F.Sup. 1158, 1163 (S.D.Ha.1996), citing 29 U.S.C. § 2614(a)(1) and 29 C.F.R. §

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

…

825.214(a). Moreover, as the commissioner also notes, § 31-51qq-21(a) of the Regulations of Connecticut State Agencies provides: "Except as provided in subsection (b) of this section, upon return from FMLA leave, an employee is entitled to be returned to the original position the employee held when leave commenced, or if the original position is not available, to an equivalent position with equivalent benefits, pay and other terms and conditions of employment. An employee is entitled to such reinstatement even if the employee has been replaced or his or her position has been restructured to accommodate the employee's absence." The commissioner found that Cendant was required to reinstate Persky to an equivalent position if her position no longer existed or was no longer available to her (Final Decision, Record at 78, p. 32.) According to the record, Kirsten Hotchkiss, Cendant's attorney, informed Persky in a letter of four different vice president positions for which Persky could apply. (Record at 3; Final Decision, Record at 78, p. 15.) According to the evidence before the commission, the letter did not constitute a bona fide offer of work for the positions because when Persky contacted the senior vice presidents responsible for the positions, she discovered that three out of the four positions did not actually exist. (Final Decision, Record at 78, p. 33; Persky Testimony, Record at 81, pp. 79-120.) In fact, at the time of the letter, only the position of vice president of telemarketing existed and that position was already filled. (Final Decision, Record at 78, p. 33; Persky Testimony, Record at 81, pp. 79-120.) This evidence supports the commissioner's conclusion that Persky did not decline the opportunity to discuss the offer of vice president positions and indeed, thoroughly investigated the positions listed in the Hotchkiss letter by calling each senior vice president. (Final Decision, Record at 78, pp. 16-17; Record at 81, pp. 78-81.)

*14 In addition, the commissioner concluded that the telemarketing position was not equivalent to Persky's previous position. In her previous position of vice president and general manager, Persky originally reported to the CEO, and later to a senior vice president. The other vice presidents reported to her and she had profit and loss responsibilities, as well as budgeting authority. (Final Decision, Record at 78, p. 33; see Persky Testimony, Record at 81.) The commissioner found that the position of vice president of telemarketing, although equivalent in pay, was not virtually or substantially equivalent to the high level of duties, responsibilities and authority Persky previously performed (Final Decision,

Record at 78, pp. 33-34; Record at 81, pp. 78-81); see also Regs., Conn. State Agencies § 31-51qq. Further, the evidence does not establish that there were no other equivalent positions in existence following the reorganization. (Record at 83, pp. 87-88.) Based upon the evidence in the record, the commissioner's decision on this issue was not clearly erroneous. Therefore, this court agrees with the commissioner's position that Cendant violated the CFMLA when it failed to offer Persky an equivalent position after her leave had terminated.

### 5. Findings on damages are consistent with the Commissioner's legal conclusions and the weight of legal authority.

The seventh and final issue in this appeal is whether the commissioner's findings on damages are consistent with the evidence in the record. In the decision, the commissioner found that Persky adequately mitigated her damages and that she was entitled to stay and performance bonuses (Final Decision, Record at 78, pp. 35-37.) First, Cendant argues that the commissioner's finding that Persky adequately mitigated her damages in view of the evidence in the record was clearly erroneous. Cendant argues that the commissioner's finding ignores the reorganization that occurred during Persky's leave and affected all vice presidents in the organization. Second, Cendant argues that the damages awarded by the commissioner were inconsistent with his legal conclusions. Specifically, Cendant argues that the commissioner's award of a stay bonus and performance bonuses is speculative and, thus, clearly erroneous; and his award of severance pay and stock options is inconsistent and, therefore, clearly erroneous in light of the evidence.

To satisfy the duty to mitigate "the unemployed . . . claimant need not go into another line of work, accept a demotion, or take a demeaning position; he forfeits his right to back pay if he refuses a job substantially equivalent to the one he was denied." *Ford Motor Co. v. EEOC,* 458 U.S. 219, 231-32 (1982). "[The] claimant's burden is not onerous, and does not require [the claimant] to be successful in mitigation." *Dailey v. Societe Generale,* 108 F.3d 451, 456 (2d Cir.1997). The commissioner found that Persky adequately mitigated her damages by initiating contact with all the individuals listed in the letter Hotchkiss sent to her. (Final Decision, Final Decision, Record at 78, p. 35; Record at 81, pp. 83-116, 118-19.) Persky also expressed that she would consider other suitable positions. (Final Decision,

Record at 78, p. 35; Record at 81, pp. 119-26.) The commissioner found that three of these positions did not exist, and one was not equivalent to her position as general manager and, therefore, Persky "had good cause to refuse the one actual position offered to her because it was not substantially equivalent in terms of status and responsibility." (Final Decision, Record at 78, pp. 33-35.) Therefore, based upon the evidence in the record, the commissioner's determination that Persky acted adequately mitigating her damages was not clearly erroneous.

> FN14. See, e.g., *NLRB v. Madison Courier, Inc.*, 153 U.S.App.D.C. 232, 245-46, 472 F.2d 1307, 1320-21 (1972) (employee need not "seek employment which is not consonant with his particular skills, background, and experience" or "which involves conditions that are substantially more onerous than his previous position"); *Wonder Markets, Inc.*, 236 N.L.R.B. 787, 787 (1978) (offer of reinstatement ineffective when discharged employee offered a different job, though former position still existed), enf'd, 598 F.2d 666, 676 (CA1 1979), supplemental decision, 249 N.L.R.B. 294 (1980); *Good Foods Manufacturing & Processing Corp.*, 195 N.L.R.B. 418, 419 (1972) (offer of reinstatement ineffective because job offered had different conditions of employment and benefits), supplemental decision, 200 N.L.R.B. 623 (1972), enf'd, 492 F.2d 1302 (CA7 1974); *Harvey Carlton*, 143 N.L.R.B. 295, 304 (1963) (offer of reinstatement ineffective because employees would return on probation). Some lower courts have indicated, however, that after an extended period of time searching for work without success, a claimant must consider taking a lower-paying position. See, e.g., *NLRB v. Madison Courier, Inc.*, supra, at 245-46, 472 F.2d, at 1320-21; *NLRB v. Southern Silk Mills, Inc.*, 242 F.2d 697, 700 (CA6), cert. denied, 355 U.S. 821 (1957). If the claimant decides to go into a dissimilar line of work, or to accept a demotion, his earnings must be deducted from any eventual back pay award. See § 706(g); *Merriweather v. Hercules, Inc.*, 631 F.2d 1161, 1168; *Taylor v. Philips Industries, Inc.*, 593 F.2d 783, 787 (CA7 1979) (per curiam).

**\*15** Section 31-51qq-47 of the Regulations of Connecticut State Agencies outlines the types of relief the commissioner may grant. It provides: "Where, in his final decision, the commissioner concludes that an employer has: (1) interfered with, restrained or denied the exercise of, or the attempt to exercise, any rights provided under the Act ... the commissioner may order the employer to comply with the applicable requirements of the Act and to provide such relief as the commissioner determines will remedy the harm incurred by the complainant as a result of the employer's violation, discharge or discrimination. Such relief may include but is not limited to restoration of any rights, benefits, entitlements or protections afforded to the employee by the Act, reinstatement to employment, back pay and any other monetary compensation for any loss which was the direct result of the employer's violation, discharge or discrimination." Regs., Conn. State Agencies § 31-51qq-47. The commissioner found that because of Cendant's violation of the CFMLA, Persky was deprived of the opportunity to receive "the same or an equivalent opportunity for bonuses, profit-sharing, and other similar discretionary and non-discretionary payments." Regs., Conn. State Agencies § 31-51qq-23(e)(2).

The record indicates that Yee was subject to a best effort requirement to receive his bonuses. Yee had authorized his own bonuses without an objection from Microsoft. It is undisputed that Yee and other Sidewalk employees received performance bonuses whether or not they met Microsoft's standards (Record at 83, Testimony of Yee, October 23, 2001, p. 205; Testimony of Spandow, September 10, 2001, p. 92.) Sidewalk, under Yee's leadership, failed to meet the post-sale performance metrics "every month." Yet Cendant continued to pay Yee monthly performance bonuses. Nothing in the record indicates that Persky ever failed to use her best efforts to meet her contractual responsibilities to Sidewalk and Microsoft. Further, all the law requires is that Persky establish her damages with "reasonable certainty," not absolute certainty or "mathematical precision." See *Simone Corp. v. Connecticut Light & Power Co.*, 187 Conn. 487, 495, 446 A.2d 1071 (1982) ("Damages are an essential element of a plaintiff's proof and must be proved with reasonable certainty"); *Warton v. Richard T. Johnson General Contractor, Inc.*, Superior Court, judicial district of Danbury, Docket No. CV 293607 (September 8, 1994, Flynn, J.) ("Damages need not be proved with mathematical precision").

Cendant cites to the following Connecticut Agencies Regulations § 31-51qq-23(c)(2), "[a] monthly

Not Reported in A.2d
Not Reported in A.2d, 2004 WL 574880 (Conn.Super.)
(Cite as: Not Reported in A.2d)

production bonus, on the other hand does require performance by the employee," and claims that this regulation prevents the commissioner from awarding Persky damages for bonuses paid during the transition of Sidewalk to Microsoft because she did not "actually perform" during that period. (Plaintiff's brief, p. 39.) This court does not agree with Cendant's interpretation of the regulation. Rather, the court agrees with Persky's contention that "[t]o interpret [this regulation] in the manner Cendant suggests would lead [to] an absurd and circular conclusion, i.e., an employee who is not allowed to return to work and to perform her job duties cannot claim damages unless she can show that she actually performed her job duties. Of course, no damages could ever be awarded under this analysis, and the regulations would in effect be subsidizing the employer's violation of the FMLA by placing impossible limits on an aggrieved employee's ability to obtain damages for losses attributable to the employer's unlawful conduct." (Defendants' brief, pp. 40-41.)

*16 The relevant portion of the regulation, which pertains to equivalent pay, provides: "Many employers pay bonuses in different forms to employees for job-related performance such as for perfect attendance, safety (absence of injuries or accidents on the job) and exceeding production goals. Bonuses for perfect attendance and safety do not require performance by the employee but rather contemplate the absence of occurrences. To the extent an employee who takes FMLA leave has met all the requirements for either, or both, of these bonuses before FMLA leave began, the employee is entitled to continue this entitlement upon return from FMLA leave, that is, the employee may not be disqualified for the bonus(es) for the taking of FMLA leave. See Sections 31-51qq-24(b) and (c) of the Regulations of Connecticut State Agencies. A monthly production bonus, on the other hand does require performance by the employee. If the employee is on FMLA leave during any part of the period for which the bonus is computed, the employee is entitled to the same consideration for the bonus as other employees on paid or unpaid leave (as appropriate)." Regs., Conn. State Agencies § 31-51qq-23(c)(2). Thus, the regulation only precludes the commissioner from awarding Persky the monthly production bonus for the time she was absent on leave if Cendant did not pay such bonus to other employees who were on leave. Moreover, the commissioner noted that Persky "pro-rated her damages to account for the time she was out on her CFMLA leave and reduced her damages

accordingly." (Final Decision, Record at 78, p. 35.)

In addition, Cendant claims that Persky is not entitled to any severance pay after ten years of employment because she did not sign a release of claims. There was no evidence in the record that Cendant ever provided Persky with a release to sign. Pursuant to the CFMLA regulations, Persky is entitled to be awarded all amounts, discretionary and non-discretionary, that were paid to her replacement during the transition. Regs., Conn. State Agencies § 31-51qq-23(e)(3). The court agrees that the amounts include severance, which is a discretionary payment. Because Persky presented evidence that Yee was paid severance pay, in addition to the other bonus compensation he received, had Persky been allowed to return to work, she would have been entitled to severance at the time her employment would have ended. Finally, the court notes that Persky presented evidence, through testimony and an expert report, of Sheldon Wishnick, a Fellow of the Society of Actuaries, relating to the losses she suffered as a result of Cendant's refusal to reinstate her. (Record at 19.) Wishnick's report and supplementary analysis of the interest loss attributable to the bonuses and severance compensation not received calculated her total losses, including wages, bonuses, stock options and severance through October 15, 2001, to be $496,344. Cendant failed to present expert testimony or any other evidence which rebutted this analysis. Therefore, the court finds that none of the damages were speculative. There is substantial evidence in the record to support the commissioner's findings.

## IV.

## CONCLUSION

*17 For the foregoing reasons, the court dismisses Cendant's appeal.

Conn.Super.,2004.
Cendant Corp. v. Commissioner
Not Reported in A.2d, 2004 WL 574880
(Conn.Super.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.