Page 166

1  as you say, put a line in the sand, tell her what was
2  expected of her. But no, I never said I wanted to
3  terminate Terry Nelson. I never said that.
4      Q.   I want to be clear about what you
5  recommended. You recommended that she be given notice of
6  certain restrictions?
7      A.   Well, I wanted to recommend that she would
8  be given a structure in which she was to operate, so sort
9  of like a listing of her responsibilities, so she knew
10 what was expected of her.
11     Q.   Did you do that?
12     A.   Dan Kinnaman I believe did that. I wouldn't
13 know exactly how or what he said, because I wasn't there.
14 But I know that it was made very clear earlier on that she
15 was accountable and she would have to be accountable for
16 things that she did.
17     Q.   And that was based on your recommendation?
18     A.   It was based -- it wasn't based on my
19 recommendation, it was based on circumstances. It was
20 based on what had happened with Terry, where she was and
21 what she was doing.
22     Q.   All I'm trying to find out is, what part, if
23 any, did you play in notifying her of her restrictions?
24     A.   I wouldn't say she had restrictions, I was
25 given -- I gave her responsibilities, sort of like a list

Page 167

1  of what was expected of her.
2      Q.   You gave her responsibilities?
3      A.   Dan gave her responsibilities. I reinforced
4  it.
5      Q.   How did you do that?
6      A.   By discussing them with her.
7      Q.   Did you give her any list of
8  responsibilities yourself?
9      A.   I may have. I don't have a copy of it, but
10 I may have given her what was expected of her, list of
11 what was expected of her.
12     Q.   And did she continue to perform badly?
13     A.   No, she improved, actually.
14     Q.   Did you recommend she be kept on in that
15 basis?
16     A.   I was never asked, so there was no
17 recommendation.
18     Q.   You made no recommendation?
19     A.   None asked for.
20     Q.   Did Mr. Kinnaman ask you to assess her
21 performance as a salesperson after you made your
22 recommendations known to her?
23     A.   He did, he did ask how things were going,
24 and I said better.
25     Q.   And were they your only discussions with

Page 168

1  Mr. Kinnaman that you had about --
2      A.   I'm sorry, it's hard to hear.
3      Q.   We'll wait a second.
4           Did you put your suggestions as to what you
5  thought should be done regarding Ms. Nelson, did you put
6  those suggestions in writing to Mr. Kinnaman?
7      A.   I don't recall.
8      Q.   When did this occur?
9      A.   I would say prior to my being promoted in
10 the spring, probably of 2000 -- I have my years mixed up,
11 2001. I don't know exactly, but prior to my being
12 promoted. Hard to remember. It could have been spring
13 2001.
14     Q.   It's true that you don't precisely remember,
15 is that fair to say?
16     A.   Um-hum.
17     Q.   You don't remember whether you made these
18 suggestions to Mr. Kinnaman in your capacity as --
19     A.   I'm sorry, I thought I was clear that I did
20 make different suggestions, but I don't know that I put
21 them in writing.
22     Q.   And you're not clear when you made them?
23     A.   That's correct.
24     Q.   And you don't know the nature of the
25 communication that occurred, if any, between Mr. Kinnaman

Page 169

1  and Ms. Nelson?
2      A.   I only now that Dan Kinnaman did tell me
3  that he had spoken to her.
4      Q.   You are clear you never recommended that she
5  be terminated?
6      A.   I am clear.
7      Q.   Did you recommend that anybody be terminated
8  in your capacity as a manager, anybody in the sales force
9  that you supervised?
10     A.   I don't believe I did.
11     Q.   You told us earlier this morning that you
12 did not recommend that Mr. Saroyan be terminated?
13     A.   I was very wishy-washy about that, I didn't
14 have a feeling either way.
15     Q.   You did not recommend he be terminated?
16     A.   I told Dan I could see his points, but I
17 didn't necessarily recommend that he should be terminated.
18     Q.   And you didn't protest the fact that he was?
19     A.   I didn't know that he was being terminated.
20     Q.   So you didn't protest the fact that he was?
21     A.   Not knowing, I could not have protested.
22     Q.   Now, you're familiar with a company called
23 Universal Business?
24     A.   Universal Business?
25     Q.   Yeah.

43 (Pages 166 to 169)

Page 202

1   Q. But you acknowledged to him that your sales
2 were awful?
3   A. I didn't say that I said that. You asked me
4 if I said that, and I said I don't recall saying that.
5   Q. You don't recall. Did you acknowledge to
6 him that your sales were below your expectations?
7   A. Yes, everybody's were, but yes.
8   Q. But you did, and he talked to you about your
9 sales, correct?
10   A. He --
11   Q. Was he disrespectful when he did that?
12   A. He was glib.
13   Q. What does that mean?
14   A. What does glib mean?
15   Q. Yes.
16   A. A short answer, not supportive, not really
17 contributing anything.
18   Q. Well, what did you need to know in addition
19 to the fact that your sales were inadequate in his view?
20   A. I didn't really know that my sales were
21 inadequate, that's putting another spin on it.
22   Q. Okay.
23   A. I knew that my sales were not where I wanted
24 them to be, so all of this was based on a very individual
25 assessment, but it wasn't based on a Professional Media

Page 203

1 assessment because I was never given one, I was never
2 given a barometer or any measure to work from.
3   Q. So you had no sales goals?
4   A. That's correct. I don't recall being given
5 sales goals. I explained that earlier, that we weren't
6 really given, I was calling it a bogey, we could say goals
7 to work against. We didn't say for this issue we want to
8 achieve $150,000 or something like that.
9   Q. Did you give Mr. Saroyan sales goals as a
10 manager?
11   A. I was -- no.
12   Q. Did you give Terry Nelson sales goals?
13   A. No.
14   Q. Did you give anybody else sales goals?
15   A. No, no one was given sales goals.
16   Q. And you didn't give any to others that
17 reported to you?
18   A. No, they wouldn't have come from me. They
19 would have come from the publisher as part of the business
20 plan.
21   Q. In other words, you had no management
22 responsibility with respect to sales goals and people who
23 reported to you?
24   A. I wasn't saying I had no responsibility for
25 it. I had responsibility for the sales effort. What we

Page 204

1 were talking about is a budget. I wasn't given a sales
2 budget. I wasn't given a page count that we projected to
3 achieve, because basically from the beginning what had
4 been projected went out the window, because from day one,
5 from issue one, which was the June of, I believe 2000, we
6 hadn't met what we wanted to meet.
7   Q. Let's take Mr. Saroyan, for example, were
8 his sales goals, in your opinion, his sales volume, in
9 your opinion, meeting your expectations of what they
10 should be as a manager?
11      MR. LUCAS: I'm going to object to
12 that.
13   A. I didn't know enough about what the company
14 expected from him to assess whether he was meeting what
15 was expected of him or not. My problem with George lay in
16 the fact that I couldn't get straight answers from him in
17 terms of best bets or prospects, how he was going about
18 selling these prospects, where he spent his time. Those
19 were the issues that I had with him.
20   Q. You knew that he wasn't selling enough
21 advertising space, didn't you?
22      MR. LUCAS: Objection.
23   A. I didn't know what, if you want to quantify
24 that, I don't know what enough was, I was never given a
25 budget or a bogey. I was never given an expectation or

Page 205

1 list of accounts that would be best bets or best
2 prospects. I was given a list of accounts, but you may
3 have 1500 accounts on a database, that doesn't mean that
4 they're all potential advertisers or current advertisers
5 or have ever advertised or have an advertising budget.
6   Q. How would you find out?
7   A. From calling on them.
8   Q. Right.
9   A. And qualifying them.
10   Q. And did you keep track of his efforts in
11 that regard, Mr. Saroyan's?
12   A. Yes, I did to some extent.
13   Q. Did you find them adequate or inadequate?
14   A. I found them inadequate.
15   Q. What did you do about it?
16   A. I went out to California and made sales
17 calls with him, and I worked with him.
18   Q. Anything else?
19   A. I believe that covers it.
20   Q. And with respect to your own sales volume,
21 did you keep track of the efforts that you made to sell
22 product?
23   A. Sell pages, is that?
24   Q. Sell pages.
25   A. It was all -- we worked through a sales

Page 226

1  Q. What other damages are you claiming in this
2  case?
3  A. Legal fees, emotional distress.
4  Q. Okay. And we talked earlier this morning
5  about emotional distress, correct?
6  A. Could you refresh my memory?
7  Q. Well, let me ask you, how would you describe
8  the aspects of emotional distress from which you are
9  suffering? I thought we talked about that, but feel free
10 to expand on it if you wish.
11 A. We did go through this, I didn't know
12 exactly what you meant.
13 Q. Okay.
14 A. As I explained it this morning.
15 Q. Yet your explanation isn't any different
16 now? I'm not implying that it should be.
17 A. Not from where it was this morning.
18 Q. I just want to make sure I understand what
19 it is, it's all you said this morning?
20 A. You want to read it back it to me?
21 Q. You'll have a chance when you get your
22 deposition when it's concluded.
23 A. All seven hours I sit here and read?
24 Q. That's up to you.
25    In terms of any other damages, emotional

Page 227

1  distress and these out-of-pockets and these lost benefits
2  you're talking about, are you claiming any other damages?
3  A. The lawsuit claims state what I'm claiming.
4  Q. But in terms of your own personal losses,
5  you're claiming the damages that you've articulated here
6  in the lawsuit?
7  A. In the lawsuit, yes.
8  Q. In terms of your legal fees, have you
9  received fees for the services that have been provided to
10 you?
11 A. Yes, I have.
12 Q. And as of this date, what do the legal fees
13 amount to?
14 A. 5,000, 6,000 dollars.
15 Q. Do you know whether you have a contingent
16 fee agreement?
17 A. I know what kind of agreement I have.
18 Q. What kind of agreement do you have?
19 A. Contingent.
20 Q. And was there a retainer paid?
21 A. Yes.
22 Q. How much?
23 A. I don't remember.
24    MR. MINOGUE: How are we doing on
25    time?

Page 228

1     THE REPORTER: It's 4:10.
2  Q. When you got promoted to associate
3  publisher, did you get a bigger sales territory then than
4  you had as --
5  A. No.
6  Q. Same sales territory or smaller?
7  A. I think it was smaller because I had more
8  managerial responsibilities.
9  Q. Are you sure it was smaller?
10 A. I don't recall specifically.
11 Q. Do you know if it was bigger?
12 A. I know it wasn't bigger.
13 Q. Okay. During the entire period that you
14 were employed, was Matrix making money or losing money, if
15 you know?
16 A. I was not privy to the financials. I asked
17 Dan Kinnaman once, and he told me I wasn't privy to that
18 information.
19    MR. MINOGUE: I don't have another
20    copy of this, but I'm going to put this as
21    an exhibit which I'm going to ask the Court
22    Reporter to mark.
23    (Marked Defendant's 4 for I.D.)
24 Q. That's a list of names that you supplied us
25 as potential witnesses in this case, and I'm reading it

Page 229

1  upside down from where I'm sitting, but could you just
2  start with the first name and tell me the name of the
3  person, the address of that person, if you know it, and
4  what you expect that person to testify about in this case?
5  A. Lynn Keeler lives in Vermont, and I would
6  expect her -- she was the accounts person or the
7  accountant for Professional Media Group when I was there.
8  William Ziperman was the general manager of Professional
9  Media. Daniel Shannon we've discussed, Terry Nelson we've
10 discussed. Peter Bernhard is my partner.
11 Q. Going back to Terry Nelson for one second.
12 Did you ever, at any time after you were terminated, seek
13 to contact or contact Terry Nelson?
14 A. Um-hum.
15 Q. You did?
16 A. She called me, and I called her back.
17 Q. And what, could you describe for us that
18 conversation, please, if you spoke?
19 A. She was shocked that I had been terminated.
20 Q. Did she say that to you?
21 A. Um-hum.
22 Q. Do you remember her exact words?
23 A. No, she was in Mexico when everything
24 happened, she came home to find out that I was no longer
25 working for the company.

58 (Pages 226 to 229)

Goldfarb & Ajello
203-972-8320

Page 230

1 . Q. And you recollect her being shocked?
2 A. That's what she said.
3 Q. What did you say?
4 A. Nothing.
5 Q. Just hung up the phone?
6 A. No, I said, "What's done is done. It is
7 what it is." And then I think I started to cry, so, okay.
8 And then she said do I have any prospects, and she tried
9 to give me -- she gave me some referrals, people who might
10 be looking, and we talked about my job search.
11 Q. Is that the only time you have spoken with
12 her?
13 A. No. I then went out for drinks with her one
14 night, and that's the last time I heard from her.
15 Q. When was that?
16 A. February of 2002, I believe it was February,
17 I'm not exactly sure when. I remember it was cold and
18 rainy, and it was soon after I got terminated, so --
19 Q. Where did you go?
20 A. We went to a place in, I think it was
21 Hamden, that her daughter's husband owned.
22 Q. Don't remember the name?
23 A. Mr. Kay's I think was the name.
24 Q. What did you talk about?
25 A. We were talking about, she was joking about

Page 231

1 how everybody who was in management had been fired or
2 left.
3 Q. And?
4 A. What did I say, I said, "Let's play darts."
5 I mean I didn't want to discuss it. I didn't want to
6 implicate her in anything, I didn't want to put her job in
7 jeopardy, and I certainly wouldn't want to discuss my
8 case.
9 Q. You didn't record that conversation by any
10 chance, did you?
11 A. No.
12 Q. You didn't make any notes with respect to
13 it?
14 A. We were in a bar, no.
15 Q. Didn't go home and make some notes about it?
16 A. No.
17 Q. Correct?
18 A. That's correct.
19 Q. And is that your best recollection of what
20 you discussed with Terry Nelson that evening at Mr. Kay's
21 or the restaurant in Hamden?
22 A. She was nervous, she was telling me about
23 things that were going on, it was an update of where the
24 book stood, what was going on, who was working there,
25 changes. I really -- it was very hurtful to me and I

Page 232

1 didn't really want to be party to it. It made me very
2 uncomfortable.
3 Q. How long did that evening last, with her?
4 A. With her, we were out for a couple of hours,
5 but the major part of it was not spent discussing
6 Professional Media.
7 Q. Did she supply you with any documents
8 relating to this case?
9 A. No.
10 Q. Professional Media?
11 A. Nothing.
12 Q. Did you ask her?
13 A. I would not.
14 Q. Who's the next person on the list, please?
15 A. Peter Bernhard, Dr. Marvin Den, Beverly
16 Silverman, Ron Sickler, Jamie Tomasic, Nancy Swyitkes,
17 Sarah Sikes, S-I-K-E-S, Nancy Newman, Susan Cunnard
18 Bernhard, O. Bernhard.
19 Q. Who is?
20 A. Oygin (phonetic).
21 Q. Well, I think I know who Oygin is, who is
22 Ms. Sikes?
23 A. A friend.
24 Q. And what do you expect her to testify about
25 in this case?

Page 233

1 A. She worked for Professional Media for a
2 short time.
3 Q. What period of time, if you know?
4 A. Trying to remember. The beginning, I
5 believe it was the beginning part of the year of 2001.
6 Q. Have you talked to her about her employment
7 there?
8 A. She talked to me about her employment there.
9 Q. What did she say?
10 A. In a nutshell.
11 Q. As best you can remember it, not in a
12 nutshell?
13 A. As best I can recall and relay and
14 summarize, that she was not happy there and did not -- was
15 not there a very long time.
16 Q. What was her job there as you understood it?
17 A. Her job was to sell listings in the back of
18 the book, as I understood it.
19 Q. Listings in what?
20 A. In the back of -- I don't recall whether it
21 was Matrix -- couldn't have been Matrix, it would have
22 been Curriculum Administrator, she was district
23 administration or something like that.
24 Q. She had a sales job?
25 A. Different type of sales job with a very

Page 246

```
 1         MR. LUCAS: Okay.
 2     Q.  In terms of these so-called sexist jokes
 3  that you referred to in the Complaint, you told us that
 4  they occurred when he was with clients and fellow
 5  salespeople? By "he," I mean Mr. Shannon.
 6     A.  Oh, not salespeople. It could have been
 7  editorial people as well.
 8     Q.  Employees?
 9     A.  Yes.
10     Q.  How often did that occur?
11     A.  When we were out at conferences or
12  conventions.
13     Q.  How often would you be out at conferences
14  and conventions? I'm trying to get a number.
15     A.  I really don't --
16     Q.  Could you approximate a number for me?
17     A.  Well, it would depend on the number of
18  conferences or conventions. The end of the year was quite
19  busy, the fall was quite busy with conferences, so at
20  those conferences, people -- he tended to let his hair
21  down and say things that were inappropriate.
22     Q.  In your view?
23     A.  Excuse me?
24     Q.  In your view?
25     A.  To me, yes.
```

Page 247

```
 1     Q.  Okay. Were they directed at you?
 2     A.  They were said while he was standing next to
 3  me in my presence.
 4     Q.  Were they directed to you?
 5     A.  I don't know who they were directed to. I
 6  was there within earshot.
 7     Q.  Were there other people present?
 8     A.  Yes, there were.
 9     Q.  Can you name for me a cross-section of those
10  people that you remember being present during these
11  inappropriate jokes?
12     A.  Terry Nelson, actually she took offense to
13  them too; Wayne D'Orio, I believe; Gil, I can't remember
14  his last name, he was a writer. I can't remember who was
15  there. It would have been on -- I think I ended up paying
16  for dinner that night on a credit card, so it would be on
17  my expense report, but I don't remember all the people
18  that were there.
19     Q.  Do you remember any of the place or places
20  it occurred?
21     A.  Indianapolis I remember, and then we were
22  also in Minneapolis, when we were at conferences and
23  conventions.
24     Q.  And always in a group or not?
25     A.  More than likely in a group.
```

Page 248

```
 1     Q.  Okay. Over how long a period of time, in
 2  terms of -- well, withdrawn.
 3         You say the majority of these occasions
 4  where he told sexist jokes or inappropriate jokes occurred
 5  when you were away on conferences or in some other
 6  setting, I forget what you said?
 7     A.  Conventions or conferences.
 8     Q.  Over what period of time did that comprise,
 9  starting and ending?
10     A.  October/November.
11     Q.  Of?
12     A.  The year 2001.
13     Q.  Not before that?
14     A.  I didn't work with him before that.
15     Q.  Okay. That's what I'm trying to get at.
16     A.  Right.
17     Q.  You started to work with him when?
18     A.  Beginning of October, I would guess.
19     Q.  Okay. So it was from October roughly of
20  2001 until the end of your relationship at Pro Media,
21  correct, which was in January of --
22     A.  Right.
23     Q.  Correct?
24     A.  Correct.
25     Q.  Same months your sales figures were
```

Page 249

```
 1  declining?
 2         MR. LUCAS: Objection.
 3     A.  The issue, we didn't have a December issue.
 4  We had a November issue.
 5         MR. MINOGUE: I have nothing further,
 6      thank you.
 7         THE WITNESS: I need to --
 8         MR. LUCAS: I'll do it.
 9         CROSS-EXAMINATION
10  BY MR. LUCAS:
11     Q.  You were asked several questions throughout
12  the day regarding why you didn't try to contact
13  Mr. Ziperman about the way Mr. Shannon was treating you,
14  do you recall those questions?
15     A.  Yes.
16     Q.  And before the last break there was some
17  questions about some time you spent in Vermont, do you
18  recall that?
19     A.  Yes.
20     Q.  Did that testimony in Vermont trigger any
21  change in your testimony regarding Mr. Ziperman?
22     A.  Yes, actually it did.
23     Q.  And what is that?
24     A.  I was asked why I included Susan and Woody
25  on my list, on my Exhibit A list.
```