UNITED STATES DISTRICT COURT
for the
DISTRICT OF CONNECTICUT

```
LISA K. BLUMENSCHINE,            : CIVIL ACTION NO. 302CV2244 HBF
                                 :
            Plaintiff,           :
                                 :
      vs.                        :
                                 :
PROFESSIONAL MEDIA GROUP LLC,    : JUNE 2, 2006
                                 :
            Defendant.           :
```

**MEMORANDUM OF DEFENDANT PROFESSIONAL
MEDIA GROUP, LLC IN OPPOSITION TO DOUBLE
WAGE DAMAGES AND ANY AWARD OF ATTORNEY'S
FEES UNDER THE CONNECTICUT WAGE STATUTE**

Defendant Professional Media Group, LLC ("ProMedia") respectfully submits this memorandum in support of its position that the $40,000 in wages awarded by the jury in its verdict in favor of plaintiff Lisa Blumenschine ("Blumenschine") on Count Nine of her Complaint should not be doubled, nor should attorney's fees be awarded, pursuant to Connecticut General Statute, § 31-72 (the "Connecticut Wage Statute").[1]

As set forth below, ProMedia's position is supported by the following:

---

[1] ProMedia reserves its rights on its motion to dismiss Count Nine in its entirety as unsupported in the record, but that motion will not be addressed herein.

1. The amount of damages awarded by the jury verdict demonstrate that the jury did not intend for plaintiff to receive any additional compensation in this matter;

2. It is the Court, not the jury, which must make the determination as to whether doubling and any award of attorney's fees are warranted under the Connecticut Wage Statute;

3. The trial record of this matter is barren of evidence sufficient under the relevant case law to support any finding of "bad faith, arbitrariness or unreasonableness" in the "withholding" of wages by ProMedia; and

4. The total absence of "bad faith" on the part of ProMedia is conclusively demonstrated by the following: the trial record does not contain any indication that Blumenschine ever said to ProMedia, while she was working at ProMedia from April through December 2001, or at any time prior to the filing of her Federal complaint herein, that she was owed _any_ unpaid compensation.

I.

**THE LOGIC OF THE JURY'S VERDICT
ON DAMAGES DEMONSTRATES THAT THE
JURY DID NOT INTEND THAT PLAINTIFF
RECEIVE ANYTHING IN EXCESS OF
$50,000 IT EXPLICITLY AWARDED.**

The jury verdict in this matter can be understood logically in only one way: that the jury believed that plaintiff was owed $40,000 in wages as unpaid compensation for the year 2001, as well as an additional $10,000, which is the equivalent of the severance ProMedia had indicated a willingness to pay when Blumenschine was terminated.

From the form of the verdict, in which the jury awarded a total of $50,000 on the negligent misrepresentation claim (Count Eight) but made it clear that said $50,000 was inclusive of, not in addition to, the $40,000 it awarded on the wage claim (Count Nine), it is evident that the jury intended plaintiff to receive no more than a total of $50,000, comprised of two components: unpaid 2001 wages, plus something for severance. The jury further explicitly found no further economic damage and zero non-economic damage.

In being asked to opine on whether the withholding of wages was "in bad faith, arbitrary or unreasonable" (see question 4 of the second jury verdict form regarding

3

damages), the jury was not told that such a finding would or could have further economic consequences for ProMedia. Taken in the abstract, without any indication that the answer to this question had any economic consequences, the jury was perfectly willing to give plaintiff the emotional satisfaction of a "free" slap on defendant's wrist. What the jury plainly was not willing to give plaintiff were additional damages, much less a determination that plaintiff was entitled to any portion of her attorney's fees.

Thus, it would violate the logical consistency of the jury's verdict to use its advisory opinion to award plaintiff greater damages than the jury was willing to give her.

## II.

**THE COURT, NOT THE JURY, IS THE ULTIMATE JUDGE OF THE APPROPRIATENESS OF DOUBLING WAGE DAMAGES AND AWARDING ATTORNEY'S FEES PURSUANT TO THE CONNECTICUT WAGE STATUTE.**

The Connecticut Wage Statute makes clear that Blumenschine may recover "twice the full amount of such wages, with costs and such reasonable attorney's fees <u>as may be allowed by the court</u>, . . . " C.G.S. § 31-72 (emphasis added). It is for the Court then to determine

4

whether, as an issue of fact, ProMedia's behavior was sufficiently "in bad faith, arbitrary, or unreasonable" (see, Schoonmaker v. Lawrence Brunoli, Inc., 265 Conn. 210, 269, 828 A.2d 64, 103 (2003); Sansone v. Clifford, 219 Conn. 217, 229, 592 A.2d 931 (1991)). Connecticut law is also clear that where the record before the Court does not support such a factual finding, see, Point III, infra, such as where there was a "bona fide disputed issue whether plaintiff was entitled to the wages . . . awarded," (Hardy v. Saliva Diagnostic Sys., Inc., 52 F.Supp.2d 333, 341 (D.Conn. 1999)), double damages and attorney's fees cannot be awarded.

As discussed in Point III below, the record of evidence before this Court is devoid of facts supporting even an inference, much less a strong inference, let alone hard evidence, of the requisite "bad faith" of ProMedia.

### III.

**THE RECORD IS DEVOID OF EVIDENCE SUFFICIENT TO INVOKE DOUBLING WAGE DAMAGES AND AWARDING AN ATTORNEY'S FEES UNDER THE RELEVANT CASE LAW.**

Based on the record before the Court, an award of double damages and an attorney's fees is inappropriate: the record is barren of any evidentiary showing that ProMedia, in explicitly terminating Blumenschine's nonrecoverable

5

draw against commissions, acted with the requisite "bad faith, arbitrariness, or unreasonableness."

Not only does the record of this matter show, at the least, a "bona fide" dispute between the parties (see, Hardy, supra),[2] but the evidence also shows that ProMedia had no understanding or belief that it owed "wages" -- within the meaning of the Connecticut Wage Statute or otherwise -- to Blumenschine at the time of her termination, and that it acted reasonably with respect to Blumenschine's compensation package and at no time in "bad faith." The deposition testimony of William Ziperman, portions of which were read into the record at trial, supports this result.

Mr. Ziperman testified that when Blumenschine first approached ProMedia, she was "looking for the opportunity to earn 150,000. You know, a combination of salary and commission." (Deposition Transcript of William Ziperman, dated September 16, 2003, at p.17, lines 15-16; page 22, lines 8-9)(hereinafter, "Ziperman depo. at [page:line(s)].") Blumenschine was hired, and compensated in 2000 by way of an $80,000 base salary, with a $60,000

---

[2] ProMedia submits that the record before the Court supports the inference that it was only after retaining counsel and filing her Federal complaint that Blumenschine ever considered the terminated draw as "guaranteed" compensation, the replacement of which she then averred was "promised" by ProMedia.

6

nonrecoverable draw against commissions. To elucidate why the nonrecoverable draw was implemented in the first place, Mr. Ziperman testified as follows:

> "The commission was <u>variable</u>. . . . [Because of the new magazine launch, advertisers could enter a contract but cancel after the first issue, without paying. The nonrecoverable draw was implemented because] <u>we were looking to protect our salespeople</u> for a protracted period of time where there would be no actual sales revenue coming in. So that's why there was a draw against commission <u>in that first year</u>."

Ziperman depo. 20:18-21:4; <u>accord</u> 22:5(emphasis added).

When the nonrecoverable draw was stopped, Mr. Ziperman recalled the following conversation with Blumenschine:

> "A.  Well, what I explained to her was that, you know, that sales on Matrix were very, very disappointing and not improving, and I was having difficulty getting together a commission plan for her with the sales so poor. . . . I told her that we were discontinuing the draw against commission because I did not see how she could earn commission in excess of the draw without improved performance of the magazine. And I did tell her I was trying to put together a commission plan, but I was struggling with it."

<u>Id.</u>, pp. 49:20-50:8.

　　　* * *

> "Q. And was it your intent to make this commission, when you came up with it, retroactive to that April date?
>
> A. Retroactive to the beginning of the year.
>
> Q. Okay. And did you ever come up with such a commission plan?
>
> A. I did not. The sales of the magazine kept declining.

Id., p. 51:7-14.

After the draw was stopped, Blumenschine never brought in sufficient advertising sales revenue to warrant a commission check to her beyond her base salary:

> "Q. Was there ever a reconciliation performed, a draw against actual commission?
>
> A. There was, but there were no commissions.
>
> Q. Did you perform that reconciliation.
>
> A. No.
>
> Q. Did you see that reconciliation.
>
> A. No. It was just obvious."

Id., 27:7-13.

> "Q. You never saw any [commission tracking/payment documents] for Ms. Blumenschine, correct?
>
> A. No. And the reason, as I said before, is in the year 2000 the performance did not exceed or come close to meeting the commission plan. And I never got to put together a commission plan for the year 2001 because the sales of

>     the magazine just didn't justify
>     commissions."

Id., 28:8-15.[3]

There was never any understanding by the parties that any amounts from stoppage of the nonrecoverable draw were guaranteed to be paid by ProMedia:

> "Q. But as far as you understood, Lisa came away from your meeting in April with an understanding that you were discontinuing the nonrecoverable draw, but she would wait to hear from you as to the basis her compensation would be going forward?
>
> A. Yes. Commission going forward.

Id., 53:3-8.

Contrary to showing "bad faith," the evidence reveals that ProMedia's financial officer, William Ziperman, needed something to "hang his hat on" to justify providing Blumenschine with, beyond her base salary, additional commission-based compensation for 2001, yet Blumenschine's sales did not improve. The fact that she was not fired immediately in April 2001, or while her sales performance remained poor and declined throughout the summer and fall of 2001, supports a finding that ProMedia acted reasonably and

---

[3] Any commission plan that Mr. Ziperman believed was attached to Blumenschine's offer letter was for the year 2000 only. Ziperman depo., p. 31:1-7. Moreover, Mr. Ziperman openly volunteered and repeatedly stated he could not find the attachment to Blumenschine's offer letter, despite conducting a good-faith search for it. Ziperman