**EXHIBIT E**

Westlaw.

Not Reported in A.2d  
Not Reported in A.2d, 2000 WL 992171 (Conn.Super.), 27 Conn. L. Rptr. 448  
**(Cite as: Not Reported in A.2d)**

Page 1

H

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.
Superior Court of Connecticut.
Lillian MACK,
v.
Bernard LaVALLEY
No. CV 9455707S.

June 28, 2000

MEMORANDUM OF DECISION ON MOTION FOR PAYMENT OF POST-JUDGMENT INTEREST

SULLIVAN

*1 The plaintiff, Lillian Mack, was awarded judgment by jury trial in the amount of $78,400 on March 2, 1998, from which the defendant appealed. The defendant appealed the judgment. The Appellate Court denied the defendant's appeal by its decision of October 5, 1999, thereby affirming the judgment Mack v. Lavalley, 55 Conn.App. 150, 165 (1999). The defendant's petition for certification to the Supreme Court was denied on December 1, 1999. The face value of the judgment was paid on February 4, 2000, without prejudice of course to the plaintiff's right to seek post-judgment interest from date of judgment to date of payment.

I

The statute upon which the plaintiff relies to establish her claim for post-judgment interest is General Statutes § 37-3b, first enacted in 1981 as part of Public Act 81-315 Section 2 thereof provided as follows:

Sec. 2. For a cause of action arising on or after the effective date of this act, interest at the rate of ten percent a year, and no more, may be recovered and allowed in any action to recover damages for injury to the person, or to real or personal property, caused by negligence, computed from the date of judgment

This statute remained in effect until Public Act 97-58, Section 2, which, for the purposes of this motion, changed the wording "may be recovered" to the words "shall be recovered." The statute was effective May 27, 1998 and provided that it affected "a cause of action arising on or after May 27, 1997."

The cause of action in the instant case arose on May 29, 1992, as articulated by the complaint of June 2, 1994. Hence the applicable statute is that of 1981, providing for "may" rather than the later statute which provided for "shall."

A review of the history of the statute is appropriate, although not necessarily enlighting. This statute, § 31-3b did not come into existence until 1981, by enactment of Public Act 81-315, Section 2. The proposition of recovering interest in negligence actions was part of the general subject of recovery of interest "in civil actions" which historically was the only statute which dealt with the recovery of interest in civil actions "for the detention of money after it becomes payable."

Section 37-3a has preserved the discretionary language "may be recovered," pertaining to other civil actions, despite the fact that the legislature in 1997 changed § 37-3b to read in mandatory fashion "shall be recovered" for negligence actions.

The root of these two statutes goes back to at least 1902, first appearing as Section 4600 of the Revision of 1902. There is some indication that the statute may be of more ancient origin, dating back to the early 1700 era.

As indicated the statute § 37-3a and its predecessors remained constant through today's date. It was determined early on that interest was not to be awarded on unliquidated demands, such as assault, battery, slander. Regan v. New York & New England R.R. Co., 60 Conn. 142, 143 (1891). This proposition is re-affirmed by the case of New York N.H. & H.R. Co. v. Ansonia L. & W.P. Co., 72 Conn. 703, 750 (1900), which states "There is no right to interest on a disputed demand ..." Although the case does state that where it is clear that the obligation and the amount is clearly discernable from the start, (probably applicable only to property damage) there might be a valid claim for interest.

*2 In 1981, by P.A. 81-315 the legislature divided the statute into § 37-3a, previously providing for interest in civil actions, and § 37-3b, allowing interest in negligence actions from the date of judgment, both

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

Not Reported in A.2d                                                                                                                                       Page 2
Not Reported in A.2d, 2000 WL 992171 (Conn.Super.), 27 Conn. L. Rptr. 448
(Cite as: Not Reported in A.2d)

statutes provided for a discretionary "may" basis.

A review of the legislative history of the splitting of Section 37-3 into Section 37-3a and Section 37-3b is of no significant assistance. No reason is given for doing this, either on the floor of the respective houses or in the judiciary committee. It appears, from the comments of Mr. Biedier in the committee, that it was part of an initial bill to assess interest from the day of injury, to compel settlements during an era of high interest. As enacted § 37-3b allowed interest, discretionary, from the date of judgment. Noteworthy, the legislative history of the 1981 Act does not deal with the prospect of delays caused by appeals.

In 1997, by Public Act 97-58, Section 2 the legislature changed the wording of § 37-3b from the discretionary "may" to the mandatory "shall." Nothing in the legislative history indicates that the legislature was attempting to clarify what the legislature perceived to be an improper interpretation by the judiciary of the word "may" in the 1981 legislation. In testimony before the house committee the Chamber of Commerce stated: "The Chamber is opposed to Raised House Bill No. 6597 because mandating rather than allowing courts to post judgment interest from the date of verdict or judgment, whichever is sooner, penalizes employers that are exercising their right to ask the court to consider certain motions. Raised House Bill No. 6597 would have a chilling effect on employers who lose in court but who still wish to pursue legal avenues statutorily open to them."

Nowhere in the legislative history is it suggested that Public Act 97-58, changing "may" to "shall" was intended to clarify existing law. It is clear that the legislature intended to change from discretionary to mandatory, despite the protest of the chamber that the change would thereafter, have a chilling effect on post judgment remedies.

The criteria for determination of post judgment interest is quite clear. "A decision to deny or grant postjudgment interest is a matter lying within the discretion of the trial court." Brewer v. D'Onfro, 45 Conn.App. 543, 550 (1997). "The court's determination of regarding the award of interest should be made in view of the demands of justice rather than through an application of any arbitrary role . . Whether interest may be awarded depends on whether the money involved is payable ... and whether the detention of the money is or is not wrongful under the circumstances ..." Bower v. D'Onfro, supra, p. 551.

The Bower court cites, with approval, the case of Maluszewski v. Allstate Ins. Co., 34 Conn.App. 27, 38 (cert denied) 1991. In that case the money was awarded by arbitrators, but was delayed by the fact of the defendant's appeal to the Supreme Court. Judge Jackaway denied the appeal but further concluded that the defendant "had made its arguments in good faith," and hence he denied interest on the appeal of final judgment, as provided by statute as a matter of right. See General Statutes § 52-263. It is without doubt that the appeals process is time consuming and involves substantial expense to both the appellant and the appellee. However, bearing in mind the discretionary nature of the pre 1997 Section 37-3b under which this motion is made, the court cannot conclude that the mere taking of an appeal by a defendant is such conduct as to automatically call for the payment of interest. The court further takes into consideration that the filing and prosecution of an appeal frequently results in the reversal of a plaintiff's judgment and the extinguishing of the judgment. Any statute or rule which has the prospect of a chilling effect upon a party's right to appeal must be viewed with extreme caution.

*3 This court determines that the mere taking and prosecuting of the appeal in this case is not in itself sufficient to cause the interest of justice to call for post judgment interest.

The question before the court is whether the taking and prosecution of the appeal was bona fide and in good faith, or conversely was in bad faith, frivolous and/or for the mere purpose of delay.

The Appellate Court decision is reported as Mack v. Lavalley, 55 Conn.App. 150, October 1999. Thereafter petition for certification was denied. The judgment was paid promptly thereafter on February 4, 2000. The appeal involved a series of issues each of which posed significant questions which had not previously been specifically decided by our appeals courts. First, what is the degree of evidence sufficient to show that a deposed witness is unavailable (Practice Book Section 13-31). Second, where the absent witness was noticed as an expert, but his qualifications do not appear in the deposition, are his non-expert physical observations that the threshold was "slippery" and "sloped toward the street" admissible, bearing in mind that any deposition testimony stating an expert opinion that the condition was not reasonably safe would be prohibited by the court. Third, was the defendant prejudiced because

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d  Page 3
Not Reported in A.2d, 2000 WL 992171 (Conn Super ), 27 Conn. L. Rptr. 448
**(Cite as: Not Reported in A.2d)**

this deposition witness had been described to the jury panel as a professional engineer

As to the premises, factual and legal questions of possession and control and proximate cause were issues which clearly lent themselves to appellate review.

Finally, there being a deduction for comparative negligence, the issue before the court on the collateral source hearing was how to apply the collateral source payment to the reduced economic damages Differences of opinion existed between various superior court decisions, applying different formulas to deal with collateral source reduction Without doubt this was an issue which specifically lent itself to appeals court review, resulting in a specific formula for the guidance of all litigants and the trial courts

*Conclusion*

This court concludes that the taking and prosecution of the appeal was unquestionably bona fide and in good faith. The defendant diligently prosecuted the appeal. The court determines that it is not in the interest of justice that postjudgment interest be awarded, concluding that the detention of the money was not wrongful. The mere fact that the taking of an appeal causes a stay of the judgment to be effectuated under Practice Book Section 61-11(a) of course does not lead to a conclusion that the taking of an appeal is for the sole purpose of causing unwarranted delay.

For the reasons set forth herein the plaintiff's motion for post judgment interest under this controlling statute, § 31-3b, Public Act 81-315, is denied

Conn Super ,2000
Mack v. LaValley
Not Reported in A.2d, 2000 WL 992171 (Conn Super ), 27 Conn. L. Rptr. 448

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U S Govt. Works

# **EXHIBIT F**

Westlaw.

Not Reported in A.2d                                                                                                          Page 1
Not Reported in A.2d, 2005 WL 527749 (Conn.Super.)
**(Cite as: Not Reported in A.2d)**

C

Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Superior Court of Connecticut,Judicial District of
Waterbury.
BANK OF NEW YORK, Trustee
v.
NATIONAL FUNDING et al.
No. X01CV000171525S.

Jan. 21, 2005.

Hunt Leibert Chester & Jacobson PC, Hartford, for Bank of New York.
Martin Steinmetz, Stamford, for National Funding Mortgage Banker, Mostafa Reyad and Co., and Federal Mortgage of Conn.
Mostafa Reyad, Stamford, pro se.
Halloran & Sage, Westport, for Vincent Liberti.
Wofsey Rosen Kweskin & Kuriansky LL, Stamford, for Joseph Grassi.
Douglas Milan, Greenwich, pro se.

B.J. SHEEDY, J.
*1 This is one of several actions concerning the same transaction transferred to this complex litigation docket for management and trial. Plaintiff, Bank of New York as Trustee, here sued and sought damages as against Mostafa Reyad, a mortgage lender licensed in this state, and several mortgage lending companies of which he is sole proprietor and by which he does business under the trade names of National Funding, National Funding Mortgage Broker, and Mostafa Reyad & Companies (here, "Defendants"). The plaintiff did not proceed against the Mortgage People LLC, withdrew against Federal Mortgage of Connecticut, on February 27, 2004, and withdrew as against Douglas Milan, Esq., at trial. Actions brought against Joseph Grassi, Jr., Vice-President of the various Defendants, and Vincent Liberti, Esq., were dismissed by this court on July 29, 2004. The case was tried as against these Defendants as a hearing in damages on October 26, 2004, the court having entered a default against them on April 27, 2004, for their failure to comply with discovery.[FN1] The Defendants proceeded pro se, their prior counsel having in the interim resigned from the practice of law.

FN1. Discovery responses from the Defendants had been due January 5, 2004. This court permitted the Defendants additional time to February 6, 2004, for compliance and advised the Defendants a default would enter against them failing such compliance. The Defendants filed no compliance and default entered. In fact, no compliance had yet been made when on or about March 11, 2004, the Defendants filed a Motion to Re-Open. The court, after a hearing held on July 12, 2004, found no good cause shown as required by Practice Book Section 17-42 and denied that motion.

In a decision rendered after trial in a related matter captioned *Bank of New York v. Eugene Chimblo, et al* (Docket # X01-CV99-0163131), Hodgson, J., entered a judgment of strict foreclosure as against Chimblo and one Gerhard Hutter in favor of the plaintiff with regard to the subject property at 993 Lake Avenue in Greenwich, Connecticut. This court took judicial notice of that Memorandum of Decision dated May 14, 2001 (Exh 4 here). Chimblo there stipulated to entry of judgment and further stipulated the amount due on two notes securing two mortgages as of April 2, 2001, was, as regards the first note, the principal amount of $1,507,317.40 with interest of $279,063.26 and, with regard to the second note, the principal amount of $137,127.74 with interest of $29,522.95.[FN2]

FN2. The court also awarded attorney fees in the amount of $5,771.73 and statutory costs.

Thereafter, on June 16, 2003, after hearing in a Motion for Deficiency Judgment, the court, Hodgson, J., found the value of the property on February 1, 2002 (the date plaintiff acquired title as a result of the May 14, 2001, judgment), to be $1,650,000, the value appraised by Dwight Hughes, a licensed appraiser, who testified before Judge Hodgson on June 16, 2003, and before this court in the instant matter on October 26, 2004. Finding the judgment debt to be $1,840,482.39, interest of $109,486.00 on that debt pre-foreclosure and $38,245.06 post-foreclosure, legal fees and costs of $59,369.00, and an appraiser's fee of $850.00, Judge Hodgson found the deficiency

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:02-cv-02244-HBF    Document 95-7    Filed 06/02/2006    Page 7 of 13

Not Reported in A.2d                                                                Page 2
Not Reported in A.2d, 2005 WL 527749 (Conn.Super.)
(Cite as: Not Reported in A.2d)

to be $448,726.50 and entered judgment in that amount.[FN3] Finally, in another related action brought in the Judicial District of Fairfield at Bridgeport, captioned *Bank of New York v. Gary Olcha*,[FN4] Docket No. # CV00-0375788, the court, Stevens J., after a hearing in damages, took judicial notice of Judge Hodgson's entry of strict foreclosure and entry of deficiency judgment,[FN5] and found damages as against the appraiser were properly measured, under *Advanced Financial Services, Inc. v. Associated Appraisal Services,* 79 Conn.App. 22, 34 (2003), to be the amount of the debt owed the plaintiff minus the fair market value of the property on the date title vested in the plaintiff (2/1/02) or $476,580-to which he added interest (to the date of the plaintiff's submission) of $50,295.00 for a total award of $526,875.00 plus costs.[FN6]

> FN3. The parties stipulated on the record the plaintiff would not seek to enforce the deficiency judgment against Chimblo or his heirs.
>
> FN4. Olcha was an appraiser-more about whom will later here be said.
>
> FN5. Exhibit 9 here, pp. 16-17.
>
> FN6. *Id.,* at p. 21.

*2 In her decision of May 14, 2001, Hodgson, J., found the following facts which are material to this court's determination and of which this court has taken judicial notice. In 1997, Gerhard Hutter and his wife Nance owned the four-bedroom house on more than four acres in Greenwich. Nance Hutter had filed for bankruptcy and the bankruptcy creditor argued to the bankruptcy court the value of the house was $875,000. The house was put up for auction and that amount was bid. Gerhard Hutter, as joint owner, had the opportunity to purchase the property by matching the bid amount but he had not the funds to do that. The Hutters told Douglas Milan, Esq. of their interest in the property and their financial problems and Milan, knowing the Hutters had obtained an appraisal indicating the property was valued at an amount significantly in excess of the bid amount, put the Hutters in touch with Milan's elderly neighbor and client, Eugene Chimblo. Chimblo and Hutter agreed to a complicated arrangement by which Chimblo would loan Hutter the $875,000 necessary to clear the house from the bankruptcy proceedings, at which point Hutter could either pay off the loan from Chimblo (which Hutter could not do) or Chimblo and Hutter could enter into a further agreement to renovate and sell the home with the two dividing the net proceeds. They agreed Chimblo would borrow $1.65 million which would clear Hutter's indebtedness to Chimblo for $875,000, permit Chimblo to pay $550,000 of the anticipated sale proceeds in advance to Hutter, and finance the renovations and mortgage payments until the house was sold. Hutter believed the property was worth $2.75 million based upon an appraisal completed by Gary Olcha at that amount. Hutter and Chimblo's agreement provided the purchase price of the property was $2.75 million and that the house would be listed at and sold for at least that amount. Exh. 4, p. 6. Judge Hodgson specifically found the "parties were well aware that by structuring the transaction as the purchase by Chimblo of a property for $2.75 million, Chimblo was more likely to obtain financing in the amount of $1.65 million, which would appear to be only sixty percent of value." *Id.* Milan, as Chimblo's attorney, was referred to National Funding as a source for the $1.65 million loan. National Funding, a trade name of Mostafa Reyad, licensed in this state in August of 1998 as a mortgage lender, did not loan its own funds but obtained money from other sources to write loans which National Funding then assigned to the provider of the funds. The agreement between Chimblo and the Hutters was executed at Mostafa Reyad's place of business in Stamford on August 31, 1998, the date and location set for the closing of the $1.65 million loan from National Funding to Chimblo.[FN7] Hutter signed a warranty deed conveying title in fee simple to Eugene Chimblo. Olcha's $2.75 million appraisal, originally completed for Hutter was, "re-certified" to National Funding at the request of Grassi who had indicated the appraisal could be used for the mortgage loan transaction if the appraisal were recertified to National Funding. Exh. 1, Para 6. Grassi has admitted he was employed by National Funding at the time (Exh. 3, response to interrogatory # 3). The defendants admitted, in response to Paragraph 8 of the First Count of the Revised Complaint of July 23, 2002, that Grassi was at all relevant times an employee of the Defendants and was acting within the course and scope of his employment. See Answer dated August 16, 2002, filed by the Defendants' former attorney when he represented all of these Defendants. Reyad never later amended that response. Chimblo executed the two notes for $1,512,500 and $137,500 secured by the two mortgages in favor of National Funding and he defaulted on them having made only minimal payments. Hodgson, J., found he also signed a consent to assignment and an acknowledgment a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:02-cv-02244-HBF    Document 95-7    Filed 06/02/2006    Page 8 of 13

Not Reported in A.2d                                                                 Page 3
Not Reported in A.2d, 2005 WL 527749 (Conn.Super.)
(Cite as: Not Reported in A.2d)

servicer might be utilized with regard to the loans. Exh. 4, p. 7 The plaintiff held the notes and mortgages pursuant to a securitization agreement [FN8] with Indy Mac Bank, the servicer of the two mortgages

> FN7. Vincent Liberti, Esq., represented National Funding at the closing of the two loans to Chimblo
>
> FN8. Pooling and Servicing Agreement Series 1999 D on August 31, 1998

*3 Following this hearing in damages, the parties submitted post-trial memoranda of law.[FN9] The court has examined the exhibits, reviewed the trial testimony, carefully read the trial briefs and has closely read all of the transcripts of hearings earlier held-to include a transcript of the trial before Hodgson, J (more about which will later here be said) and the memoranda of decisions of which she has taken judicial notice

> FN9. The Defendants' Reply brief was submitted after the time agreed to by the parties.

### NEGLIGENCE

The plaintiff relies on Paragraphs 18(g) and (h) of the Revised Complaint of July 23, 2002. Paragraph 18(g) asserts, "The National Funding Defendants, acting by and through Joseph Grassi, Jr. and/or Mostafa Reyad, acted negligently and/or carelessly in the preparation and closing of the Notes I and II and Mortgages I and II in that the true loan to value ratio of the transactions ... violated lending criteria of the National Funding Defendants, Mostafa Reyad, the provider of the funds, Federal Home Loan Mortgage Corporation and Federal National Mortgage Association." The negligence asserted in Paragraph 18(h) is that "the defendants failed to provide accurate and correct information for the closing and sale of the loans, (sic) when it was reasonably forseeable (sic) that Notes I and II and Mortgages I and II would be sold."

A finding of negligence is predicated on the existence of a duty See e.g., Catz v. Rubenstein, 201 Conn. 39, 44 (1986) "The existence of the duty is a question of law ." Murillo v. Seymour Ambulance Assn., Inc., 264 Conn. 474, 479 (2003). In Murillo, supra, our Supreme Court enunciated a test for the existence of a legal duty. That test entails:
(1) a determination of whether an ordinary person "in the defendant's position, knowing what the defendant knew or should have known, would anticipate that harm of the general nature of that suffered was likely to result, and (2) a determination, on the basis of a public policy analysis, of whether the defendant's responsibility for its negligent conduct should extend to the particular consequences or particular plaintiff in the case ... The first part of the test invokes the question of foreseeability, and the second part invokes the question of policy." (Citation and internal quotation marks omitted.) 264 Conn., at 479

The Defendants' commitment letter of August 18, 1998 (Exh. 7), indicates "60% CLTV"-or loan to value ratio for loan transaction. It was issued by National Funding, is on National Funding stationery, and is signed by Joseph R. Grassi, Jr., as Vice President of National Funding. Exh. 3 confirms that employment and Mostafa Reyad, the sole proprietor of the business, has testified to Grassi's employment by him at an earlier hearing and has admitted to his employment of Grassi in his former lawyer's response to the governing complaint. There is therefore sufficient evidence to warrant the finding of an agency relationship between Reyad and National Funding and Grassi The "value" of the property was said by Gary Olcha, Hutter's appraiser, to be $2.75 million Exh. 1, paragraph 6, provides Attorney Milan, Chimblo's lawyer, was advised by Grassi of the need for an appraisal and that Olcha's report could be used for the loan transaction if that appraisal were re-certified to National Funding and that was in fact accomplished Similarly, Exh. 8, the Uniform Underwriting Transmittal Summary, shows a loan to value ratio of 60% ("LTV-55.000%; Total LTV-60.000%"), lists the appraised value at $2,750,000 (same as the sale price) based on Olcha's appraisal, identifies Grassi as both the "underwriter" and "contact person" and National Funding as the "seller," and was signed by Grassi as National Funding's agent on July 28, 1998. The flaws in the Olcha appraisal were attested to by the plaintiff's expert, Dwight Hughes, a certified real estate appraiser who appraised the subject property four times and reviewed Olcha's appraisal. Hughes was aware the property was listed for sale in 1997 for $2.1 million but did not sell but that Olcha never stated that in his appraisal and he testified that omission violated the Uniform Standards of Property Appraisal Practices which required real estate appraisers to refer to multiple listings of a subject property in arriving at an opinion of value Tr., 10/26/04, pp. 23-4. In fact, there was a place on the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

appraisal form for such listings. *Id.*, at p. 24. Thus, the 1998 Olcha appraisal for $2.75 million was a value $650,000 above the price for which it was listed in 1997, a price at which it did not sell. Hughes' appraisal of the property's value-$1.250 million-was based on data provided him from the multiple listing service and his comparing of the subject property to three other Greenwich properties which sold during the period 1/98-6/25/98 and were of similar size and amenities and on similar acreage (sales comparison approach).[FN10] Exh. 5. He did another drive-by appraisal to determine the property value on 2/1/02 (when title vested in the plaintiff) and found its value was $1.650 million. Exh. 6. He also then walked the property, spoke to the listing agent, and researched comparable sales. Hughes also testified Olcha's appraisal deviated from the standard of care employed by real estate appraisers in that Olcha chose dissimilar properties as comparables-specifically, properties with close to 7,000 sq. ft. of living space when the subject property was 3,934 sq. ft. of gross living area, properties that had six and one-half bathrooms when the subject property had two and one-half bathrooms, etc. Hughes' testimony was that, based upon his appraisal of the property in June of 1998, the loan to Chimblo actually had a loan to value ratio of 120%, that that ratio was a deviation from the standards applicable to loan transactions, and that, though he had appraised over two hundred fifty properties, he was aware of no loans in which the loan to value ratio was in excess of 100%. Tr., p. 41. Finally, Hughes testified an appraiser's opinion of the value of real property was critical in arriving at a loan to value ratio for the purpose of loan appraisals and that an appraiser in such situations serves as the "eyes of the banks or the lender." Tr., p. 36.[FN11]

FN10. Reyad's cross-examination of Hughes focused on the fact Hughes did a retroactive drive-by appraisal-that is, he viewed the property from the exterior in 2000 and, using data researched and above described, determined the value of the property on 6/25/98. Hughes testified credibly that such approaches were frequently employed in the industry and his approach was based on comparable sales. Cross-examination was not effective.

FN11. The defendants never disclosed a liability expert. Even had this matter proceeded as a fully contested trial on the merits, Hughes' testimony would have remained unrefuted.

*4 Grassi was made aware the subject property sold at auction shortly prior to these loan transactions for $875,000. Exh. 1. While evidence of sale price at auction is not determinative of a property's true value, such knowledge should at least have made Grassi wary of Olcha's appraised value of $2.75 million-more than three times the auction price. Grassi's response, however, was to suggest to Attorney Milan that Olcha's June of 1998 appraisal could be used to obtain approval of Chimblo's loan if that appraisal were re-certified to National Funding. Grassi was Reyad's and National Funding's agent and employee vis-a-vis these loan transactions. As a licensed mortgage lender, Reyad knew or should have known of the need to accurately represent the property's appraised value and the loan to value ratio. He knew the loans were to be assigned to this plaintiff. Despite repeated references to this court that this plaintiff was a "stranger" to him, the evidence before Judge Hodgson "was undisputed that Mostafa Reyad authorized his employee, Ayeshah Iliah, to sign the assignment of the mortgage on his behalf, doing business as National Funding adopting her act as his own." Exh. 4, p. 11. That finding is confirmed on examination of Reyad's trial testimony before Judge Hodgson on April 11, 2001. With reference to Ms. Iliah's authorization to assign the mortgages to Bank of New York, Reyad testified, "I issued an instruction for her to do that." Tr., p. 24. Later, he testified her authority to make the assignment was "in the normal course of business." Tr., p. 59. Thus, the three elements required to show the existence of an agency were established-specifically (1) a manifestation by the principal the agent will act for him; (2) acceptance by the agent of the undertaking; and (3) an understanding between the parties the principal will be in control of the undertaking. *Gateway v. DiNoia*, 232 Conn. 223, 239-40 (1995). A principal is generally liable for the authorized acts of his agent. 1 Restatement (Second), Agency § 140, p. 349 (1958). The existence of agency is a question of fact to be determined by the trier of fact. *Newtown Associates v. Northeast Structures, Inc.*, 15 Conn.App. 633, 637 (1988). Iliah's acts were undertaken with the express authority of Reyad as principal of National Funding. Grassi's acts were performed, if not with Reyad's express authority, with apparent authority. "[A]n agent who has apparent authority can bind his principal, especially as to parties who act in good faith." *Hall-Brooke Foundation, Inc. v. City of Norwalk*, 58 Conn.App. 340, 344 (2000). "Apparent authority is that semblance of authority which a principal, through his own acts *or inadvertences* causes or allows third persons to believe his agent

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:02-cv-02244-HBF   Document 95-7   Filed 06/02/2006   Page 10 of 13

Not Reported in A.2d                                                                                          Page 5
Not Reported in A.2d, 2005 WL 527749 (Conn.Super.)
(Cite as: Not Reported in A.2d)

possesses.  Consequently, apparent authority is to be determined, not by the agent's own acts, but by the acts of the agent's principal." (Citations omitted; internal quotation marks omitted; emphasis added.) *Tomlinson v. Board of Education,* 226 Conn. 704, 734 (1993). Acting with authority conferred upon them by these Defendants, Grassi's and Iliah's acts became the acts of Reyad and these Defendants for which acts they are answerable. Grassi's misrepresentations, whether intentional or negligent, became these Defendants' misrepresentations. It was clearly foreseeable this plaintiff would suffer the harm it did. (The loan was sold for $1.4 million.) because the collateral for the loans was substantially less than the amount of the debt. Public policy favors the imposition of tort liability on mortgage brokers who do not act with honesty and who make these kinds of misrepresentations in the mortgage loan origination process because brokers have reason to anticipate an undersecured loan will cause loss to a lender who acquires that loan. Mortgage brokers ought not be encouraged to close such loans without respect for the truth seeking process in order that they might be paid. Public policy requires the disclosure of all relevant facts, the exchange of accurate appraisals, and true representations of the value of collateral for loans obtained. Grassi and Olcha were joint participants in the obtaining of the appraisal upon which the loan was approved in the sense that they are both liable to the plaintiff for the harm to it. *Restatement (Second) Torts,* § 886A, p. 338, Comment B. That Olcha has already been adjudged liable in another forum is no impediment to the imposition of liability upon these Defendants for their negligent misconduct in creating the same harm.

*5 Contrary to the plaintiff's urging re the measure of damages to be awarded, this court believes the appropriate measure is the amount of the deficiency judgment-which Hodgson, J., found to be $448,726.50.[FN12] This court awards compensatory damages in that amount. The plaintiff has also requested the court to award interest under Connecticut General Statutes § 37-3a. The applicable statute is Connecticut General Statutes § 37-3b which makes the recovery of interest mandatory rather than discretionary and at the rate of ten percent a year "computed from the date that is twenty days after the date of judgment ..." Our Appellate Court has concluded that a party seeking an award of post-judgment interest must file a post-trial motion because the award can be determined only after judgment has been rendered." *Bower v. D'Onfro,* 45 Conn.App. 543, 549 (1997). It will, therefore, be necessary for the plaintiff to file a motion for post-judgment interest and provide the court the appropriate calculation as per § § 37-3b(a) and (b).

> FN12. Ruling on Plaintiff's Motion for Deficiency Judgment, June 16, 2003, p. 2; see also *First Federal Savings & Loan Association of Rochester v. Charter Appraisal Co.,* 247 Conn. 597, 610 (1999).

### CUTPA

The plaintiff relies upon the same two allegations earlier asserted to here state a claim under the Connecticut Unfair Trade Practices Act (CUTPA)-specifically that the inclusion of incorrect information regarding loan to value ratio and appraisal value as stated in Exhibits 7 and 8 violate Connecticut General Statutes § 42-110a et seq. The Act is aimed at eliminating or discouraging "unfair or deceptive acts or practices" in the conduct of any trade or commerce. Connecticut General Statutes § 42-110b(a). The standard for determining whether an act or practice constitutes a CUTPA violation is known as the "cigarette rule." Under that test, the criteria for determining when a practice is unfair are: "(1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise-in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, [competitors or other business persons]

All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." *Willow Springs Condominium Assn., Inc. v. Seventh BRT Development Corp.,* 245 Conn. 1, 43, citing to *Cheshire Mortgage Service, Inc. v. Montes,* 223 Conn. 80, 105-06 (1992). To justify a finding of unfairness, the injury must be a) substantial; b) outweighed by any countervailing benefits to consumers or competitors that the practice produces; and c) an injury that consumers themselves could not reasonably have avoided. *Williams Ford, Inc. v. Hartford Courant Co.,* 232 Conn. 559, 592 (1995). An act or practice is deceptive if three conditions are met. First, there must be a representation, omission, or other practice likely to mislead consumers. Second, consumers must interpret the message reasonably under the circumstances. Third, the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d          Page 6
Not Reported in A.2d, 2005 WL 527749 (Conn.Super.)
**(Cite as: Not Reported in A.2d)**

misleading representation, omission, or practice must be material-that is, likely to affect consumer decisions or conduct. *Southington Savings Bank v. Rodgers,* 40 Conn.App. 23, 28 (1995). A violation of CUTPA may be established "by showing a practice amounting to violation of public policy. Furthermore, a party need not prove an intent to deceive to prevail under CUTPA." (Citations omitted; internal quotation marks omitted.) *Normand Josef Enterprises, Inc. v. Conn. National Bank,* 230 Conn. 486, 522-23 (1994). The standard under CUTPA is lower than for fraud. *Id., at 523.* Whether a practice is unfair and thus violated CUTPA is an issue of fact. *DeMotses v. Leonard Schwartz Nissan, Inc.,* 22 Conn.App. 464, 466 (1990). A single act is sufficient to establish a CUTPA violation. *Johnson Electric Co. v. Salce Contracting Assoc., Inc.,* 72 Conn.App. 342, 353 (2002). The statute is a remedial statute and is to be interpreted in favor of recovery. *Id.*

*6 The Connecticut Supreme Court has addressed the scope of CUTPA liability for misrepresentation in *Hinchliffe v. American Motors Corp.,* 184 Conn. 607 (1981). "The CUTPA plaintiff need not prove reliance or that the representation became part of the basis of the bargain." *Id., at 617.* Furthermore, CUTPA imposes no requirement of a consumer relationship. *Larsen Chelsey Realty Co. v. Larsen,* 232 Conn. 480, 495-96 (1995). In *McLaughlin Ford, Inc. v. Ford Motor Co.,* 192 Conn. 550, 567 (1984), the Court concluded a competitor or other business person could maintain a CUTPA cause of action without showing consumer injury.

Considering the totality of the circumstances, this court concludes the Defendants' misrepresentations were material and deceptive. Exhibits 7 and 8 establish deceit. Representing the loan to value ratio to be sixty percent when in fact it was, as Hughes' testified, one hundred twenty percent is clearly material to a lender whose need is to ensure a given transaction is appropriately secured. The lender had a right to rely upon the representations made by these Defendants. For reasons earlier stated, the conduct at issue here violates public policy. Mortgage brokers ought not be encouraged to engage in deceptive acts and practices which cause foreseeable harm of the type suffered by this plaintiff in order that the broker close a transaction so as to be paid. It undermines banking principles and mortgage industry standards to permit the level of dishonesty here demonstrated and the cost to society-whether measured by the potential for bank losses (perhaps even failures), increased consumer costs, or loss of consumer confidence in mortgage lenders/brokers requires the statutory scheme be broadly construed so as to discourage these unscrupulously deceptive practices and to encourage accuracy and honesty in order that the national problem of mortgage fraud be addressed.

Both to establish the significant misconduct of these defendants and to underscore the need to punish those like they who sacrifice truth for personal gain, punitive damages are awarded under Connecticut General Statutes § 42-110(a) in an amount equal to actual damages.

To the damages awarded for negligent misconduct ($448,726.50) is added an additional $448,726.50 for a total award of $897,453.00 plus whatever interest may later be awarded under the negligence claim and statutory costs.

DEFENDANTS' CLAIMS

The Defendants submitted a timely trial memorandum dated 11/12/04 and an untimely Reply to the plaintiff's post-hearing memorandum on November 18, 2004. Nevertheless, the court here briefly addresses the arguments raised by those pleadings.

As earlier stated, the Defendants have claimed they are not liable to the plaintiff because a "stranger" to the plaintiff-which this court presumes means only that Reyad had no personal dealings with Bank of New York. That is of no significance since the trade name companies-of which Reyad is sole proprietor-clearly did. He authorized the loan assignments to the plaintiff and he is legally liable to the plaintiff by application of agency principles with regard to Iliah's and Grassi's conduct. Thus, Reyad's statement that he "never has any power of decision making" (11/12/04 memorandum, p. 8) is unpersuasive as is his statement that he-a mortgage lender/broker-was not involved in a "trade" (and thus he argues he is not liable under CUTPA). *Id.,* at p. 10.

*7 The Defendants' frequent turnabout positions are confusing and frustrate the court's comprehension of the arguments. Though the defendants have earlier inundated the court with memoranda urging dismissal of this matter based upon a federal court action entitled *IndyMac Holdings, Inc., et al v. Mostafa Reyad, et al.,* U.S. Dist. Ct., Distr. of Conn., Civil Action No. 3:00CV835 (CFD), [FN13] here he describes that federal action as "not related to this action in any respect." Reply memorandum, p. 1. Yet, on p. 18 of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

his 11/12/04 memorandum, he states, "This action is a duplicate of exact part (sic) of the Federal action." Reyad also argues the federal action is res judicata and this action should be dismissed as a matter of law. *Id.*, at p. 4. For reasons this court has articulated in earlier Rulings, there is no res judicata effect and this court has jurisdiction.

> FN13. Reyad has inaccurately and repeatedly represented Droney, J., dismissed the case before him. Reyad's motion to dismiss for lack of subject matter jurisdiction was denied. 8/10/01 Ruling, p. 35. All that was granted was Reyad's motion to dismiss based upon a forum selection clause in the parties' contract-which the court treated as a 12(b)(6) motion. *Id.* No forum selection clause is here at issue.

Defendants argue they are not liable because "Plaintiff presented to this Court a forged assignment of mortgage without recourse." 11/24/04 memorandum, p. 13. Not only was there not a scintilla of evidence regarding a "forgery" but Reyad's argument ignores his testimony before Hodgson, J., admitting he authorized Iliah to assign the mortgages and notes *to this plaintiff*. Inconsistently, he argues he endorsed the mortgage assignment and note "without recourse" and therefore he cannot be held liable to any holder of the mortgage or note. *Id.*, at p. 12. At the conclusion of the hearing in damages before this court, Reyad made the same argument. Trial transcript of 10/26/04, p. 104. Defendant offered Exh. A-which the court permitted-as evidence of the same. Exh. A was not the assignment but rather a Notice of Underwriting Review from IndyMac to Reyad. More to the point, it evidences no endorsement by Reyad and, not surprisingly given the character of the document, does not anywhere contain the language "without recourse." The court is without any evidence to prompt consideration of the Defendant's argument.

Reyad attacked the appraisal(s) of Hughes because they were retroactive drive-by appraisals. Hughes established such appraisals were common in the industry and that his appraisals were also based upon comparable sales, the property's listing history, conversations with prior listing agents, review of MLS documents, and inspections of photographs of the property.

The Defendants argue this court wrongly deprived them of the right to file special defenses and wrongly deprived them of the right to present evidence. P.B. § 17-34(a) provides:
In any hearing in damages upon default, the defendant shall not be permitted to offer evidence to contradict any allegations in the plaintiff's complaint, except such as relate to the amount of damages, unless notice has been given to the plaintiff of the intention to contradict such allegations and of the subject matter which the defendant intends to contradict, nor shall the defendant be permitted to deny the right of the plaintiff to maintain such action, nor shall the defendant be permitted to prove any matter of defense, unless written notice has been given to the plaintiff of the intention to deny such right or to prove such matter of defense.

*8 Under sub-section (b), the notice requirement is made applicable to all "other claims for affirmative relief." P.B. § 17-35(a) provides the notices called for in § 17-34(a) "shall be given in the manner provided in Sections 10-12 through 10-14, the original with proof of service being filed with the clerk." § 17-35(b) provides, "In all actions in which there may be a hearing in damages, notice of defenses must be filed within ten days after notice from the clerk that a default has been entered." Under P.B. § 17-37, the notice shall specify the allegations of the complaint to be controverted and only those allegations should be specified which are intended to be controverted by proof. Thus, § 17-34, calls for the providing of *two* notices-one to the plaintiff of the intention to contradict specific allegations of the complaint and the second being written notice to the plaintiff of the intention to deny plaintiff's right to maintain the action and to prove any matters of defense. That two notices are required by § 17-34 is made clear by the use of the word "notices" in § 17-35(a).

Examination of the chronology of pleadings reveals the inaccuracy of Reyad's representation the court defaulted the Defendants on July 12, 2004. In fact, the default was granted on May 6, 2004 (# 171). Defendants filed a Motion to Re-Open the default (# 183.25), which motion, while dated 3/11/04, was not filed with the court until 5/13/04. The motion was denied at the conclusion of argument on July 12, 2004, and it was that denial-not the granting of the default-that entered on July 12, 2004. It was not until July 21, 2004, that the Defendants filed a "Notice of Defenses" (# 186.05). Even had the two Notices required by P.B. § 17-34 been filed, the Notice of Defenses was untimely filed.

Finally, the Defendants argue that, with regard to the

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 527749 (Conn.Super.)
**(Cite as: Not Reported in A.2d)**

Page 8

CUTPA claim, the applicable statute of limitations bars the claim. C.G.S. § 42-110g(f) provides for a three-year statute of limitations. The misconduct occurred in 1998; this suit having been brought in the year 2000, the statute had not yet expired.

The Defendants' claims are both untimely and unpersuasive.

Judgment enters in favor of the plaintiff in the gross amount of $897,453.00 plus costs and whatever interest may be awarded.

Conn.Super.,2005.
Bank of New York v. National Funding
Not Reported in A.2d, 2005 WL 527749 (Conn.Super.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.