Not Reported in A.2d
Not Reported in A.2d, 1996 WL 218689 (Conn.Super.)
(Cite as: Not Reported in A.2d)

Page 4

different amounts of money damages.

As previously stated, the complaint was in eleven counts. Only the eleventh count claims a violation of CUTPA (Conn. Gen.Stat. § 42-110a et seq.)

Count eleven sets out twelve paragraphs by incorporating paragraphs 1 through 8 of count one, 9 through 11 of count nine and adding a paragraph 12.

Plaintiff's counsel seek attorneys fees pursuant to Conn. Gen.Stat. § 42-110 et seq; the trial court, Austin, J., found that: The plaintiffs have sustained and proved *some* of their allegations against the defendants Blue Spruce Developers, Inc., Tradewind Developer's, Inc., J.S. Builders, Inc. John Slezak, Louisette Slezak and Susan Moreau by a preponderance of the evidence and by virtue of the default and the affects of the order of preclusion.

The court further found that the conduct of the defendant John Slezak clearly was contrary to public policy and was deceptive re: using an unlicensed plumber and that CUTPA has been violated. (Memorandum of Decision, p. 85.)

This court has reviewed the memorandum of decision of Austin, J. to determine what part the CUTPA violation and related damages played in the trial and preparation of the subject case. As this court has previously stated, two cases were consolidated and Judge Austin's decision, as set forth in his memorandum dated February 24, 1994, addresses both of those cases as consolidated. A subcontractor or employee of J.S. Builders, Inc., Eugene Rourke, applied for a plumbing permit to install the plumbing systems at the subject premises. His application showed a license number which was not a valid number (Memorandum of Decision, p. 24, 25).

*5 The rough plumbing was installed and the builder did not subsequently call the building inspector to inspect the rough plumbing as installed (Memorandum of Decision, p. 26). The plaintiffs had agreed that they would buy the house before the plumbing was complete and finish it themselves in order to save money. (Memorandum of Decision, p. 27).

Before the builder had completed the work on the house to the Steigers' satisfaction, the builder and the Steigers had a dispute over continued work by Eugene Rourke, the unlicensed plumber, and as a result the builder did not complete the work he and the Steigers had agreed to. The Steigers then notified the builder that they were going to hire their own plumber to finish the work. The Steigers hired a heating contractor to correct or complete the work on the heating system. That contractor corrected some of the work required by the heating system but not all of it, and left certain code violations. The Steigers did not hire any plumbers other than Economy Oil to complete the house and did not hire any contractors to do other work on the house. The only work that the Steigers had done themselves to complete or correct the work in the house was to change the drain outlet for the washing machine in their basement. Mr. Steiger installed an outlet fitting that did not have a trap and which was the wrong kind of material, both of which were code violations. The plaintiffs complained of an improper ground in their electrical system. That work could have been corrected for roughly $3 to $5 and could have been corrected by the Steigers themselves. The Steigers lived in the house for six years without correcting the improper ground in their electrical system.

The Steigers complained of septic gases in their house, which escaped through unplugged drain openings in the basement and the second floor main bath and through the empty main bath toilet and bathtub. The Steigers could have cured all of the known causes of septic gases in the basement by putting an expandable plug cap in the original washer outlet fitting instead of the improper one installed by Mr. Steiger.

The Steigers could have corrected all of the known causes of septic gas in the second floor main bath by putting an expandable plug in the drain pipe under the sink and by putting water or vegetable oil in the traps in the toilet and bathtub.

The measures necessary to block these sources of septic gas entailed minimal expense and could have been performed by the Steigers themselves.

The Steigers were aware of the importance of sealing off the septic gases and correcting the electrical ground because they had been told that by their own expert witness, Mr. Alves. (Memorandum of Decision, p. 30, 32.)

The plumbing system at the Steiger's house is the part of the house which had the most building code violations-all of the work necessary to correct the building code violations in the Steiger's house could have been performed without requiring that they move out of the house. (Memorandum of Decision, p. 37.)

*6 The court found that the plaintiff's claim for emotional distress apparently arose because:
They had lived in a house that had ambient septic gases for six years. Yet notwithstanding the availability of the escrow funds, the many thousands of dollars that they have spent on attorneys and experts in this litigation and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:02-cv-02244-HBF    Document 96-13    Filed 06/23/2006    Page 2 of 3

Not Reported in A.2d
Not Reported in A.2d, 1996 WL 218689 (Conn.Super.)
(Cite as: Not Reported in A.2d)

Page 5

the $35,000 home equity loan which they obtained they have not taken any steps to improve conditions in their house. Their witness, Mr. Alves, said that their failure to correct the septic gas leak and the electrical ground was reckless. (Memorandum of Decision, p. 61, 62.)

The trial court in the company of counsel viewed and inspected the Steiger residence spending some one and a half hours at that premise. At that time the court made certain observations regarding certain plumbing defects. One of the second floor bathrooms had a bad odor. The bathroom was all closed up and portions of the plumbing were not connected. The master bathroom on the second floor had a hole in the floor behind the toilet installation. This had apparently caused the hole in the ceiling in the area of the first floor entry way ... The overall impression of the court was that of a basically sound structure with defects that are capable of reasonable resolution. The trial court noted:
The court has carefully reviewed the estimate of the witness Grillo which totals $121,183.11. Grillo's approach was to gut the entire residence and start anew. The court cannot accept this approach nor is it justified, particularly after having had the opportunity to inspect and view the property. In addition, in many respects, Grillo was not qualified nor did he possess the requisite expertise or hold the proper licenses or permits. Furthermore, Grillo's approach was to please the plaintiffs in all and every respect and wish. (Memorandum of Decision, p. 80.)

There were other various and sundry claims for damages inside, outside and about the subject premises which the court rejected. The court found code violations in the plumbing system and found that the most economical way to bring the plumbing system up to code would be to remove it and replace it. (Memorandum of Decision, p. 76, 77.) The court further found that the cost of doing that would be $6,850 plus $1,010 for repairing the heating system. Some of the drywall and sheetrock would have to be removed at a cost of $2,040. Outside clapboard would have to be removed to get access to the kitchen vent at the cost of $840. In addition, repainting the affected area ceilings and walls would be $2,160. Additional work regarding heat pipes, including sheetrock, painting and carpeting is $650. Miscellaneous costs in protecting the contents of the house, cleanup, dumpsters and permits was found to be $1,750. The trial court found fit to add 10 percent for profit and 6 percent for Connecticut sales tax. (Memorandum of Decision, p. 76, 78.) The total out of pocket damages as set out above is $18,838.00.

*7 This court is presented with several different claims for Attorneys fees and costs by the plaintiff.

Plaintiffs' "Exhibit 6" in the present case claims the sum of $33,106.95.

Plaintiff claims in his post trial memorandum in support of Attorneys fees filed with the court on March 6, 1996, as follows: The total amount claimed is $25,103.07 plus costs of $4,185.90, an appellate transcript fee of $284.48 and a flat fee for the appeal of $3,534.00 inclusive of costs. Credit was already given in the legal fees for the time billed to this file (38 hours) which should have been billed to the file in the companion case. A credit of $375.00 must be given for double entry on November 23, 1993. And a further credit of $345.00 is to be given for legal fees associated with the Middletown suit.

Total Legal fees are $27,217.07 plus costs of $4,470.38 which includes the costs at the time of trial and the fees for the transcript for the appeal.

In any event, the claim for attorneys fees and costs is $30,000 plus.

The trial court addressed the issue of attorneys fees as follows.

Plaintiff's claim damages under CUTPA, Conn. Gen.Stat. § 42-110b et seq. CUTPA allows for both punitive damages and attorneys fees. A violation of CUTPA occurs when the conduct has a tendency or capacity to deceive and results in ascertainable loss. *Aurigemma v. Arco Petroleum Products Co.*, 734 F.Supp. 102 (D.Conn.). There need not be proven an actual intent to deceive, just that the conduct have a tendency to do so. *Covenant Radio Corp. v. Ten Eighty Corp.*, 35 Conn.Supp. 1 (1977). A single act is sufficient to support an action for CUTPA. *Koehm v. Kuhn*, 41 Conn.Supp. 130. The purpose of the act is to foster honesty and full disclosure in the conduct of business. *Bailey Employment Systems, Inc. v. Hahn*, 545 F.Supp. 62. (Memorandum of Decision, p. 81.)

The trial court went on to state that one of the criteria to awarding a fee is "the amount involved in the results obtained." The trial court did not stop there, however, but went on to find the following.
The results could have been obtained years ago if the plaintiffs had allowed their suit against the corporations and Slezak, et ux and Moreau to proceed to trial in Middletown instead of withdrawing it on the eve of trial there.
The plaintiffs claim and offered testimony as to attorneys fees as against Hart, Kneen and Old Lyme of $46,906 plus costs of $4,023.02, and as against the corporations

Case 3:02-cv-02244-HBF   Document 96-13   Filed 06/23/2006   Page 3 of 3

Not Reported in A.2d                                                                 Page 6
Not Reported in A.2d, 1996 WL 218689 (Conn.Super.)
(Cite as: Not Reported in A.2d)

and Slezak, et ux and Moreau of $22,267.50 plus costs of $2,845.57.

The court has carefully considered and reflected upon the credibility of all the testimony presented during this lengthy proceeding. The court has considered the demeanor of the witnesses, their candor or lack thereof, their opportunity to observe and interpret those observations, their interest, if any, bias or prejudice, expertise and/or training.

One of the most distressing aspects of the proceedings has been the almost total lack of any conduct on the part of the plaintiffs to mitigate damages. (Memorandum of Decision, p. 82.)

*8 The amount of time and effort expended in this matter has been great. It is unfortunate that the original action against the builder in Middlesex Judicial District was not pressed to a conclusion several years ago. (Memorandum of Decision, p. 85.)

The total cost to repair the plumbing and to put the premises back in proper condition thereafter as determined by Judge Austin is $18,838.00. The overall impression of the trial court was that the premises was basically a sound structure with defects that were capable of reasonable resolution.

The court, while exercising its discretion in considering attorneys fees, should, in addition to those criteria set forth by the appellate court decision, also consider the plaintiff's behavior in dealing with the defendant. The trial court, Judge Austin, made such observations and findings as this court has set out in the aforesaid. The trial court found that the plaintiff's conduct played a part in perpetuating and protracting this case. It would be unfair for this court to award attorneys fees that were unreasonably or unnecessarily generated. It would also be contrary to the remedial nature of the statute under which it is claimed. Certainly it is implicit in the remedial statutory scheme of CUTPA that those who claim such a violation should not themselves act inappropriately in prosecuting the claim.

This court cannot and will not ignore the observation and finding of the trial court, Austin, J. It would be totally inappropriate under the circumstances to merely rubber stamp as approved submitted time sheets and claimed fees.

The CUTPA violation was a claim that formed a part of a very extensive legal proceeding. The CUTPA violation was related to the plumbing and related damage. This court also recognizes that in order to hold the individual defendants liable for the CUTPA violation, counsel was required to produce evidence that pierced the corporate veil which involved time and expense. This court has taken that fact into consideration.

A finding of a CUTPA violation should not be considered as a vehicle for the collection for all the fees and costs of the case. The claim against these defendants exceeded $125,000. The court rejected much of what the plaintiff claimed. The appellate court affirmed the court in that regard. Whatever attorneys fees and costs that are awarded are awarded pursuant to a successful CUTPA claim against the corporation and the individual defendant.

This court awards the attorneys fees and costs in the total sum of $10,000.

Conn.Super.,1996.
Steiger v. J.S. Builders
Not Reported in A.2d, 1996 WL 218689 (Conn.Super.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.