|                              |   |                            |
|------------------------------|---|----------------------------|
| LISA K. BLUMENSCHINE         | : |                            |
|                              | : |                            |
| v.                           | : | CIV. NO. 3:02CV2244 (HBF)  |
|                              | : |                            |
| PROFESSIONAL MEDIA GROUP, LLC| : |                            |
|                              | : |                            |
|                              | : |                            |
|                              | : |                            |

## RULING ON POST TRIAL MOTIONS

On May 17-19 and 22-24, 2006, a jury trial was held on Lisa Blumenschine's claims against her former employer, Professional Media Group, LLC. Ms. Blumenschine brought a nine count complaint, alleging that her employment was unlawfully terminated on the basis of her sex and age.[1] Plaintiff also brought state law claims to recover unpaid compensation.

At the end of plaintiff's case, defendant moved for judgment as a matter of law pursuant to Rule 50(a) of the Federal Rules of Civil Procedure. The Court reserved decision pending completion of the evidence. The Court continued to reserve on defendant's motion after the evidence was completed and the case was sent to the jury.

---

[1] In Count One, Ms. Blumenschine alleges discrimination on the basis of sex pursuant to Title VII, 29 U.S.C. §2000, et seq. In Court Two, plaintiff alleges age discrimination under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §623(d). Count Three is a claim for sex and/or age discrimination pursuant to the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. §46a-60(a). In Counts Four, Five and Six, she claims retaliation under Title VII, ADEA and CFEPA respectively. Finally, plaintiff brought the following state law claims in Counts Seven, Eight and Nine for Promissory Estoppel, Negligent Misrepresentation; and violation of the Connecticut Wage Statute, Conn. Gen. Stat. §31-72.

On May 24, 2006, the jury returned its verdict in favor of plaintiff on two counts: negligent misrepresentation (Count Eight) and violation of the Connecticut Wage Statute (Count Nine). Defendant renewed its oral motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(a) as to Counts Eight and Nine after the verdict was returned.

On June 2, 2006, defendant filed a memorandum in opposition to doubling statutory damages and any award of attorney's fees under the Connecticut Wage Statute. [Doc. #93]. On the same date, plaintiff filed a post-trial motion for court-awarded statutory double damages, reasonable attorney's fees, costs and prejudgment and post-judgment interest. [Doc. #95]. On June 23, 2006, defendant filed its opposition to plaintiff's post-trial motion. [Doc. #96]. On July 7, 2006, plaintiff filed a reply brief. [Doc. #97]. Oral argument was held on October 5, 2006. The defendant filed a post-argument letter brief on October 13, 2006, [doc. #101], which was followed by plaintiff's response on October 20, 2006. [Doc. #102].

BACKGROUND

The Court sets forth only those facts deemed necessary to an understanding of the issues before the Court. The following facts are essentially undisputed.

On January 31, 2000, Professional Media Group hired Ms. Blumenschine as a National Sales Manager of its new magazine Matrix. Matrix was launched in 2000 and directed to the higher

education management such as college presidents, regents, deans, technology services and department heads. Matrix's revenue was derived solely through advertising sales. In her offer letter, Blumenschine was promised compensation at the rate of $140,000 per year. This compensation was divided into her salary of $80,000 and a $60,000 nonrecoverable draw against commission. In April 2001, plaintiff was told by defendant that the commission portion of her compensation would be altered and replaced with a different but similar compensation package. At this time, plaintiff's nonrecoverable draw against commissions was withheld. Plaintiff made numerous inquiries about the new compensation system and its implementation. In September 2001, plaintiff was promoted to the position of Associate Publisher. Plaintiff's employment was terminated on January 2, 2002. Plaintiff was never paid her full nonrecoverable draw against commission for 2001.

In all other respects, the parties disagree on the sufficiency of the evidence that Ms. Blumenschine was owed a nonrecoverable draw against commission in 2001.

<u>The Verdict</u>

On May 24, 2006, the jury returned its verdict, finding in favor of the plaintiff on her negligent misrepresentation claim (Count Eight), that her former employer made a misrepresentation of fact regarding her compensation that it knew or should have known was false. The jury awarded plaintiff $50,000 on the negligent misrepresentation claim, indicating on the verdict form

that $40,000 was for owed wages and $10,000 was a severance
payment. [Doc. #87]. The jury also found in plaintiff's favor on
the Connecticut Wage Statute claim, Conn. Gen. Stat. § 31-71
(Count Nine), that defendant failed to pay wages in the amount of
$40,000, as defined by the statute, that were due to her at the
time of her termination. [Doc. #85]. The jury found in a special
interrogatory that defendant's violation of the Connecticut Wage
Statute was done in "bad faith, arbitrarily, or unreasonably."
[Doc. #87]. Defendant renewed its oral motion for judgment as a
matter of law, pursuant to Fed. R. Civ. P. 50(a), as to Counts
Eight and Nine after the verdict was returned.


**MOTION FOR JUDGMENT AS A MATTER OF LAW**

Standard of Law

The standards for granting a Rule 50 motion are well
established. Judgment as a matter of law is only appropriate
where "there is no legally sufficient evidentiary basis for a
reasonable jury to find for that party on that issue." Fed. R.
Civ. P. 50(a)(1). The Court, in ruling on a Rule 50 motion, is
"required to consider the evidence in the light most favorable to
the party against whom the motion is made and to give that party
the benefit of all reasonable inference that the jury might have
drawn in his favor from the evidence. The court "cannot assess
the weight of conflicting evidence, pass on the credibility of
the witnesses, or substitute its judgment for that of the jury."
Smith v. Lightning Bolt Productions, Inc., 861 F.2d 363, 367 (2d

Cir. 1988); Galdieri-Ambrosini v. National Realty & Development Corp., 136 F.3d 276, 289 (2d Cir. 1998); Binder v. Long Island Lighting Co., 57 F.3d 193, 198-99 (2d Cir. 1995).  In other words, a motion for judgment as a matter of law may be granted only when:

> (1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against [it].

Eagleston v. Guido, 41 F.3d 865, 875 (2d Cir. 1994) (citation omitted), cert. denied,  516 U.S. 808 (1995).

"The standard for granting a renewed motion for judgment as a matter of law under Rule 50(b) is precisely the same as the standard for granting the pre-submission motion."  9A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure §2537, p. 335-57 (1995). When an initial motion for judgment as a matter of law under Rule 50(a) is not granted, "the court is deemed to have submitted the action to the jury subject to a later determination of the legal questions raised by the motion." Id. at §2522, p. 244-46.


Evidence Viewed In A Light Most Favorable to Plaintiff

Viewed in a light most favorable to plaintiff, the evidence at trial supports the jury's verdict as follows.

Lisa Blumenschine's Testimony

Lisa Blumenschine testified that she left her position at

Target in January 2000 to take a position as National Sales Manager with Professional Media. She was making $150,000 to $200,000 a year as National Sales Manager at Target. Plaintiff stated she was recruited by Bill Ziperman to work for Joe Hanson at Professional Media on a new magazine with a new readership. She testified she was nervous about joining a startup company. At her first meeting to discuss the possibility of joining Professional Media, Blumenschine testified that she discussed potential compensation and disclosed what she was making at Target. She was told that the company would meet her salary or come close, and assured there was potential to exceed her current salary. They also discussed management opportunities and responsibilities. Blumenschine testified that she wanted to be an Associate Publisher. She was told that her position could develop into an Associate Publisher position but the magazine needed time to get off the ground and then they would see what her position would be.

On January 7, 2000, at a meeting with Bill Ziperman, she was presented an offer letter to join the company as National Sales Manager at the new higher education magazine Matrix. [Pl. Ex. 1]. Regarding compensation, the letter states, "[y]our salary will be $6,666.66 a month for the year 2000. The commission/bonus plan will be as previously discussed and informally documented. (I will write it up in detail and send it to you next week). You are eligible for full time employee benefits as described in our benefits documentation (previously provided)." [Pl. Ex. 1].

Plaintiff testified that she was willing to accept the job title because Ziperman said that if the magazine was successful she would become an Associate Publisher. She testified that they discussed her base salary of $80,000, set forth in the offer letter, and the nonrecoverable draw of $60,000 to get her compensation into the $140,000-$150,000 range. She stated she was willing to forgo the $10,000 necessary to match her Target compensation because of the income potential of the new magazine. She explained that the nonrecoverable draw was necessary as this was a new venture and no revenues were being generated. Ziperman did not follow up the offer letter with the promised further documentation regarding the nonrecoverable draw.

In April 2001, Ziperman initiated a discussion with Blumenschine regarding her nonrecoverable draw. She testified that he told her the magazine was not generating the revenues that he hoped, and that he would be withdrawing her nonrecoverable draw until he could develop another plan. Plaintiff stopped receiving her nonrecoverable draw in May 2001. She testified that she did not agree to take less than $140,000 in total compensation. She estimated that she asked Ziperman about the plan going forward once or twice a week and was told he was working on it.

In September 2001, Ziperman promoted Blumenschine to the position of Associate Publisher for Matrix.[2] [Pl. Ex. 11]. She

---

[2]On September 26, 2001, Bill Ziperman sent an e-mail to all of the employees at Professional Media Group announcing Blumenschine's promotion. The e-mail states in relevant part,

stated that, as Associate Publisher, she became more involved in putting the magazine together, playing an editorial role, establishing a rate card and profit and loss statement.

No one ever indicated that her job was in jeopardy. She testified that she asked whether her job was in jeopardy when her nonrecoverable draw was withdrawn and no new commission structure was provided. She understood that start up ventures are uncertain and need a lot of money to get them off the ground and obtain the advertising to support the business. She stated that she asked Ziperman whether they wanted another person for the job. She needed to know that Joe Hanson was committed to see the start up through and was assured not to worry. She told Ziperman what she needed to earn. Blumenschine testified she went on job interviews and was offered a job in cable news, selling publications at $175,000 a year. She stated that Ziperman assured her that he

---

I'm pleased to announce that Lisa Blumenschine has been promoted to Associate Publisher for Matrix.

This is good news for Matrix. Lisa has been with Matrix since its launch and has done a terrific job helping the book get established in the higher education market. She has contributed greatly to Matrix' steady growth and this new position will allow her to use more of her skills as we move the magazine to the next level. Lisa will, in addition to continue growing her own territory, support and manage the sales effort. She will also continue to play a key role in positioning the magazine and developing collateral sales material.

[Pl. Ex. 11].

had a lot of faith in her and that Matrix would make it.

At that time, a restructuring took place at Matrix with Dan Shannon joining as Vice-President and Publisher.  Shannon's responsibilities included supervision of plaintiff.  She stated that, because her title changed, some of her accounts were redistributed and she was thwarted in her sales efforts.  She found Shannon unreceptive to discussion and dismissive and unsupportive.  Blumenschine testified that, after Shannon took over, she was excluded from management meetings.  She believed Shannon treated her with distrust, disrespect and tremendous resistance.

On January 2, 2002, plaintiff's employment with Professional Media Group was terminated at a meeting with Dan Shannon and Bill Ziperman. [Pl. Ex. 27].  Plaintiff was provided with a severance letter. Regarding a severance payment, the Company stated in its letter that,

> We also are offering you an additional six (6) weeks of salary in light of your severance from the Company. However, because this severance pay is offered as a matter of goodwill rather than legal obligation, we do not want to make this payment only to find that you believe you have some claim against PMG.
>
> Accordingly, the aforementioned severance payment is dependent upon your written agreement to the terms of the attached letter. You should consider that letter carefully and consult with an attorney before signing it if you have any questions. If it is satisfactory, sign and return it to us, whereupon the severance payment will be made to you at the conclusion of the 7-day period referred therein.

[Pl. Ex. 27].  Six weeks' salary is approximately $10,000.[3]

Defendant provided a letter to plaintiff to sign.  The letter states in relevant part,

> I understand that Professional Media Group, LLC ("PMG") has offered the severance agreement arrangement outlined in your letter to me dated January 2, 2002, a copy of which is attached hereto.  I further understand that my employment, which was at the will of PMG, has been terminated, effective immediately, and I acknowledge that the offer made to me in your January 2, 2002 letter represents full compensation for anything I believe is owed to me by PMG.  Accordingly, I have decided to accept this severance offer by signing this letter and returning it to you.
>
> In consideration of the offer made to me by the attached letter dated January 2, 2002, I hereby release and discharge PMG, and any subsidiary or affiliate thereof, as well as its directors, officers, predecessors, successors, assigns, trustees, fiduciaries, managers, members, administrators, representatives and agents from all and all claims, of any type and description, I may have (or believe I have) against it or them, including but not limited to claims arising from my employment or from its termination, as well as from any purported discrimination or wrongful discharge.
>
> I understand that by accepting the offer outlined to me in the attached January 2, 2002 letter and signing this release, I am forever giving up my right to sue on any such claim, and I promise not to do so.  This release is made by me knowingly and voluntarily.

[Pl. Ex. 27].

Plaintiff testified that when she asked for the paperwork to

---

[3]Plaintiff was paid a monthly salary of $6,666.66; six weeks' salary is $9,999.99.

apply for unemployment benefits, Ziperman told her she needed to sign the severance letter to get unemployment benefits and a severance payment.  Plaintiff recalled that she got upset and excused herself.  When she returned and asked for the papers for unemployment benefits, she was told she must sign the severance letter.  Dan Shannon then told her he was confused and provided her with the unemployment benefits paperwork.  Plaintiff did not sign the severance letter.

William Ziperman

William Ziperman was employed as General Manager at Professional Media Group beginning in 1998.  Ziperman testified that he recruited plaintiff to work at Professional Media as National Sales Manager.  He recalled that Blumenschine was looking for an opportunity to earn $150,000 and wanted to know whether there was potential to become Associate Publisher.  He told plaintiff that the company had salespeople earning in excess of $150,000 and the company looked to promote from within whenever possible. Ziperman testified that he discussed the duties of National Sales Manager but did not provide a written list of responsibilities to plaintiff. Ziperman consulted with Joe Hanson and Dan Kinneman in hiring plaintiff.

He testified that, regarding compensation, "we were looking to protect our salespeople for a protracted period of time where there would be no actual sales revenue coming in. So that is why there was a draw against commission in that first year." Ziperman Tr. 20-21.  Blumenschine received a nonrecoverable draw.

"But it was against certain conditions.  Unfortunately, the letter of agreement was lost so I don't have the details.  But part of it was to pay her for [advertising] pages that were being given away, and then part was to - was a draw against commissions on a magazine that hadn't been launched.  So it was a way of protecting her, you know, in that launch phase."  Ziperman Tr. 21.

Ziperman agreed that, in her role as National Sales Manager, plaintiff had duties that other salespeople did not have.  "Supervisory rather than managerial, I would say.  We offered her . . . I mean she was helpful in supervising the sales process, developing materials, and looking at territories trying to evaluate the market.  But her primary responsibility was selling."  Ziperman Tr. 22-23.

Ziperman testified that Professional Media could produce no documents tracking Blumenschine's sales and commission calculations during her employment.  Ziperman Tr. 26-28.  "And the reason, as I said before is in the year 2000 the performance did not exceed or come close to meeting the commission plan.  And I never got to put together a commission plan for the year 2001 because the sales of the magazine just didn't justify commissions."  Ziperman Tr. 28.  He stated that he could not recall seeing any commission reconciliation reports for Blumenschine.  Ziperman Tr. 39-40.

At his deposition, Ziperman was asked to consider an exhibit listing the duties for the National Sales Manager's position.

The document stated, in part, "[t]he commission/bonus plan will be as previously discussed and informally documented." Ziperman Tr. 28. Ziperman testified that he was unable to locate any documentation in which the commission/bonus plan was informally documented." Ziperman Tr. 29-30. When asked, "[t]his document doesn't say anything about time period, does it?," he responded, "no." Ziperman Tr. 30. Ziperman was unable to recall any of the terms regarding the commission/bonus plan. Ziperman Tr. 36. He stated that he last saw the commission/bonus plan in January 2000. Ziperman Tr. 38.

In April 2001, Ziperman had a conversation with plaintiff about discontinuing her nonrecoverable draw. "What I explained to her was that, . . . sales on Matrix were very, very disappointing and not improving, and I was having difficulty getting together a commission plan for her with the sales so poor." Ziperman Tr. 49. "I told her that we were discontinuing the draw against commission because I did not see how she could earn commission in excess of the draw without improved performance of the magazine. And I did tell her I was trying to put together a commission plan, but I was struggling with it." Ziperman Tr. 50. Ziperman testified,

> Q    And was it your intent to make this
>      commission, when you came up with it
>      retroactive to that April date?
>
> A    Retroactive to the beginning of the year.
>
> Q    Okay. And did you ever come up with such a commission
>      plan?
>
> A    I did not.  The sales of the magazine kept

declining.

. . .

        Q    Did she make inquiry of you from time to time
             as to whether the commission plan you were
             working on was completed?

        A    Yes.

. . .

        Q    But it wasn't your intent to drop Ms.
             Blumenschine's total compensation package
             down to 80,000, was it?

        A    She had already gotten the additional
             [$20,000].

        Q    Down to a hundred?

        A    Right.

        Q    It wasn't your intent for the year to drop it
             down to a hundred, was it?

        A    No, if sales had increased and given me
             something to hang my hat on.  In retrospect
             I'm sorry I hadn't come up with a commission
             plan like I had for eMarketing.  I had given
             them a two-year plan because of different
             timing.  None of them made commission, but
             they had plans.  We wouldn't be having this
             conversation if I had estimated it earlier.
             I was chasing a second target.

Ziperman Tr. 52-53.

        Ziperman testified that he made the decision to promote

plaintiff in September 2001 with Joe Hanson and Dan Shannon.

Ziperman Tr. 53.  He considered the promotion a "change in

title." Ziperman Tr. 60.  As Associate Publisher, Blumenschine's

job was really a sales job, sales responsibility."  Ziperman Tr.

60.  "Did you tell her that, . . . 'We're going to change your

title but your duties aren't changing, so don't get excited?'

No." Ziperman Tr. 86. "Did anyone tell her that?  Nobody told her

about any additional responsibilities."  Ziperman Tr. 87-88.  "We

                              14

conveyed to her that she was getting the title she wanted."
Ziperman Tr. 87.  Ziperman testified that he did not conduct a
performance review of plaintiff's performance, stating, "[i]f an
employee were to request it, we would certainly try to
accommodate." Ziperman Tr. 64.  Ziperman could not recall any
employee who requested a performance review.  Ziperman Tr. 64.

In the fall 2001, Dan Kinneman left Matrix and plaintiff
began reporting to Dan Shannon.  Ziperman Tr. 54-55.  Ziperman
testified that a new editor was hired for Matrix and Professional
Media acquired University Business sometime at the end or 2001 or
the beginning of 2002. Ziperman Tr. 56, 66-67, Ziperman said that
Dan Shannon recommended terminating Blumenschine's employment and
that Joe Hanson and he were also involved in the decision.
Ziperman Tr. 75, 90.  Ziperman did not speak to plaintiff about
her performance because she reported directly to Dan Shannon.
Ziperman Tr. 75. Ziperman testified that he did not provide
Blumenschine with a written or verbal warning regarding her job
performance.  Ziperman Tr. 93.

Joe Hanson's Testimony

Joe Hanson testified that he first met Lisa Blumenschine at
an interview to recruit her for a sales position at Matrix. He
stated that Ziperman told him that plaintiff was a top notch
sales person at Prime Media. He recalled that Blumenschine was
clear that she wanted a future in management.  He did not recall
having a conversation with her about compensation. Rather, he
spoke with Bill Ziperman about the content of the offer letter.

15

Hanson believed they could not get Blumenschine for less than $140,000 a year. He stated that the base salary was $80,000 with an advance against commission of $60,000. He said it was a one year agreement. There was little revenue opportunity. Matrix was going to publish three issues in later 2000 and three issues in early 2001. He acknowledged that there was no way to compensate Blumenschine close to what she was earning before she joined Matrix, so they contrived a compensation structure so that in the following year she would receive $80,000 plus commissions. He stated that the nonrecoverable draw was so that plaintiff could receive something and it was designed to persuade her to leave her job to work at Matrix. He testified that he was unaware what plaintiff was earning with her former employer, Target.

Hanson testified that Blumenschine received all of the compensation promised in 2000. Thereafter, he decided that her compensation structure needed to be altered. He stated that it was clear early in 2001 that he could not justify a total compensation of $140,000 to plaintiff. He said it made no sense economically, as there was not nearly enough revenue to come close to justifying her compensation into 2001. Hanson spoke to Ziperman and told him to talk to Blumenschine and to tell her it just wasn't working and that her compensation was being reduced to $80,000. Hanson testified that plaintiff did not complain to Hansen that she was not getting what was promised to her in 2001.

Hanson testified that Matrix did not create documents

setting forth sales goals. The only document Hanson recalled seeing was plaintiff's offer letter.

He testified that he was not there when plaintiff was promoted, but understood that the title of Associate Publisher effected no change in her responsibilities or activities and no change in her compensation. Hanson stated that he did not consider her change in title a promotion as he has never promoted an employee without a raise.

Hanson did not recall seeing plaintiff around the office because she was out making sales calls. He recalled asking her about sales and invariably was told it was a tough market. She did not tell him about any problems with Shannon.

Blumenschine's title change was announced in September 2001 and the decision to terminate her employment was made in November 2001. He testified that the only documents he reviewed in discussing termination of plaintiff's employment was the severance letter and release. He did not look at sales figures, as they did not exist at the time. He testified that Blumenschine's termination was for inadequate sales performance.

Daniel Kinneman's Testimony

Daniel Kinneman was hired by Professional Media Group in 1998 as Group Publisher for both Curriculum Administrator and Matrix. Kinneman left his position in September 2001. Kinneman testified that he met Lisa Blumenschine during the hiring process. He stated he was not responsible for administering compensation packages but was involved in discussions about

general ranges of salary and structure. He testified that he was aware that plaintiff's compensation would include an advance against anticipated sales, paid as nonrecoverable. He explained that this was done to protect sales people working for a startup magazine.

Kinneman was responsible for supervising plaintiff day to day. He did not remember seeing specific commission reconciliations. He reviewed quarterly reports for all the people at the magazine. He did not recall a specific commission report for Blumenschine. Kinneman testified that Ziperman was responsible for administering plaintiff's compensation and he was unaware that her nonrecoverable draw was discontinued.

Kinneman recalled having several conversations with Blumenschine regarding the survival of Matrix. It was clear they did not have enough sales to be self-sustaining. He stated that he told plaintiff to concentrate on sales. Kinneman was not aware of Blumenschine's promotion and was not consulted about the promotion or the decision to terminate her employment.

Dan Shannon's Testimony

Dan Shannon testified that when he joined Matrix, the decision to promote Lisa Blumenschine was already made. He stated he had no input into Blumenschine's compensation and had not monitored her sales to that date. He testified that he viewed plaintiff's promotion as a title change only and believed that no responsibilities were taken away from her. He stated

that Blumenschine didn't ask for anything that was not given.

Shannon recalled that his first conversations with Hanson and Ziperman regarding firings at Matrix was at the time he was hired. He was asked if he was prepared to make changes to fix the problem, which he understood to mean firing employees, although he could not recall if plaintiff was specifically mentioned. Shannon testified that plaintiff's sales performance was going down and that he had daily conversations with her during the fall 2001. He stated that he never documented his conversations with plaintiff regarding declining sales. He stated that plaintiff was never put on a thirty day written notice regarding her performance. He stated that the severance offered covered the notice period, as it was rare to give thirty days notice to a sales person because it was best to end the employment.

Shannon testified that he recommended terminating Blumenschine's employment, adding that he was not the first to mention it. Shannon could not recall saying that plaintiff had to sign the agreement not to sue in order to receive unemployment benefits.

DISCUSSION

Defendant seeks judgment as a matter of law on plaintiff's claims of negligent misrepresentation (Count Eight) and violation of the Connecticut Wage Statute (Count Nine). For the reasons that follow, defendant's motion is **DENIED**.

<u>Negligent Misrepresentation</u>

Defendant argues that there was no evidence that Bill Ziperman was going to provide another commission plan and thus plaintiff could not reasonably rely on any representation or promise of a commission plan.

> Under Connecticut law, one who, in the course of his business, profession or employment . . . supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.  Even an innocent misrepresentation of fact may be actionable if the declarant has the means of knowing, ought to know, or has the duty of knowing the truth.

<u>Adair v. Pfizer</u>, 245 F. Supp. 2d 437, 445 (D. Conn. 2003) (quoting <u>Craine v. Trinity College</u>, 259 Conn. 625, 661 (2002)).

Defendant challenges the jury's finding that there was any promise made by Ziperman to provide a future commission plan and asserts there was no evidence showing that plaintiff was entitled to the nonrecoverable commission after 2000. According to defendant, Blumenschine's sales did not support her salary and she remained in her job only on the subjective belief of a future commission structure even though she had no commission structure after April 2001. The evidence considered in the light most favorable to plaintiff supports the jury's verdict on this claim.

It is not disputed that the offer letter contains no date restriction for receiving the nonrecoverable draw of $60,000. Although the offer letter, signed by Bill Ziperman, stated, "The

commission/bonus plan will be as previously discussed and informally documented. (I will write it up in detail and send it to you next week.)" Pl. Ex. 1, defendant provided no evidence that any commission/bonus plan was ever documented. Ziperman testified he was unable to locate any documentation regarding the commission/bonus plan, and was unable to recall any of the terms set forth in the plan. Ziperman Tr. 29-30. Ziperman stated the last time he saw the commission/bonus plan was in January 2000. Ziperman Tr. 38.

Moreover, defendant provided no evidence that an alternative commission plan for 2001 was created. There was no evidence provided of plaintiff's 2001 sales and no commission reports to support the defendant's view that plaintiff's performance could not support continuing the nonrecoverable draw. Ziperman admitted that it was not his intention to drop Blumenschine's commission down to $100,000 from $140,000 a year. Ziperman at 52-53. He was asked, "But as far as you understood, Lisa came away from your meeting in April with an understanding that you were discontinuing the nonrecoverable draw, but she would wait to hear from you as to the basis her compensation would be going forward?." He answered, "Yes. Commission going forward." Ziperman Tr. 53.

The Court concludes that, viewing all the evidence in a light most favorable to plaintiff, defendant's offer letter did not restrict the nonrecoverable draw to one year. The evidence demonstrates that plaintiff left her former job, which paid

$150,000, on the promise that she would make $140,000 at Matrix. Plaintiff also testified that she declined a $175,000 job opportunity to remain at Matrix and move into a management position. The jury was entitled to believe plaintiff's testimony that she remained in her position at Matrix on Ziperman's promise that an alternative commission plan would be developed for 2001 and that the new plan would be retroactive to April 2001. Ziperman Tr. 52. Plaintiff was promoted to Associate Publisher in September 2001. Plaintiff testified, and the record reflects, that defendant did not support its claim that her nonrecoverable draw was based on lagging sales, and Ziperman could not recall seeing any commission reconciliation reports for Blumenschine. Ziperman Tr. 39-40. Ziperman never informed plaintiff that there would be no new 2001 commission plan. Without more, the jury was entitled to award plaintiff her nonrecoverable draw for 2001. See Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 135 (2000) ("[T]he court must review all of the evidence in the record, drawing all reasonable inferences in favor of the nonmoving party, but making no credibility determinations or weighing any evidence.").

Finally, the jury's award of the $10,000 severance payment is also supported by the evidence. Dan Shannon testified that plaintiff was not put on notice that, if her sales did not improve, her employment would be terminated. He stated that the offered severance payment covered the notice period as it was rare to give sales people thirty (30) days notice, because in his

view it was best to end the employment. Based on this record, defendant has not met the standard for granting a Rule 50 motion. See <u>Eagleston</u>, 41 F.3d at 875.

### Connecticut Wage Statute

Similarly, defendant argues that the record does not contain a promise to pay additional wages. Plaintiff argued she was owed her wages at the time of her termination, that is, the balance of the $140,000 due her. As set forth above, the jury was entitled to find that plaintiff was promised wages of $140,000, that she was entitled to the nonrecoverable draw of $40,000 for 2001 and that upon her termination, defendant failed to pay her the wages due her.

Based on the evidence, defendant's Rule 50 motion on the Connecticut Wage Statute is also **DENIED.**


### PLAINTIFF'S POST-TRIAL MOTION FOR COURT AWARDED STATUTORY DAMAGES, REASONABLE ATTORNEY'S FEES, COSTS AND PREJUDGMENT AND POST-JUDGMENT INTEREST **[Doc. #95]**

Plaintiff moves for an award of statutory damages, reasonable attorney's fees, costs and prejudgment and post-judgment interest under Connecticut General Statutes §§31-72, 37-3a and 37-3b.

As set forth above, on May 24, 2006, the jury returned its verdict in favor of plaintiff on two counts: negligent misrepresentation (Count Eight) and violation of the Connecticut Wage Statute (Count Nine). The jury awarded plaintiff $50,000 on the negligent misrepresentation claim, indicating on the verdict

form that $40,000 was for owed wages and $10,000 was a severance payment. [Doc. #87].  The jury also ruled in plaintiff's favor on the Connecticut Wage Statute claim, Conn. Gen. Stat. § 31-71 (Count Nine), that defendant failed to pay wages in the amount of $40,000, as defined by the statute, that were due to her at the time of her termination. [Doc. #85]. The jury found in a special interrogatory that defendant's violation of the Connecticut Wage Statute was done in "bad faith, arbitrarily, or unreasonably." [Doc. #87].

Plaintiff moves for an award of statutory double damages together with reasonable attorneys' fees and costs under the Connecticut Wage Statute, Conn. Gen. Stat. §31-72.  Plaintiff also seeks prejudgment interest pursuant to Conn. Gen. Stat. §37-3a and post-judgment interest pursuant to Conn. Gen. Stat. §37-3a and §37-3b.

A.  Connecticut Wage Statute: Award of Double Damages

Plaintiff asks the Court to double the damages award of $40,000 pursuant to Conn. Gen. Stat. 31-72,[4] based on the jury's finding that the defendant's failure to pay plaintiff her wages at the time of the termination of her employment was "unreasonable, arbitrary or in bad faith."  Defendant argues that the record does not support the advisory finding by the jury that the withholding of her wages was "unreasonable, arbitrary or in

_____

[4]The Connecticut Wage Statute states that a party may recover "twice the full amount of such wages, with costs and such reasonable attorney's fees as may be allowed by the court. . . ." Conn. Gen. Stat. §31-72.

bad faith." Conn. Gen. Stat. § 31-72. The Court disagrees and makes the following findings based on the trial record.

> Section 31-72 provides for a discretionary award of double damages to employees who are successful in actions against their employers who are successful in actions against their employers for wages due. Although the statutory language does not require evidence of bad faith, arbitrariness or unreasonableness, cases interpreting and applying this statute have required such evidence. See <u>Sansone v. Clifford</u>, 219 Conn. 217. 229 (1991) ("[i]n am action for wages brought pursuant to General Statutes §31-72, awards for double damages and attorney's fees are inappropriate in the absence of the trial court's finding of bad faith, arbitrariness or unreasonableness").

<u>Butler v. Hartford Technical Institute, Inc.</u>, 243 Conn. 454, 470 (Conn. 1997).

There is no dispute that defendant failed to pay plaintiff wages that were due to her after April 2007. The jury found that outstanding wages of $40,000 were withheld in violation of the Connecticut Wage Statute. Bill Ziperman testified that he was developing a new compensation plan after he discontinued plaintiff's nonrecoverable draw. Yet, no commission plan was ever developed. Plaintiff testified that she continued to ask Ziperman for the new commission plan and was assured he was working on it. Significantly, Ziperman never told plaintiff that there would be no commission plan for 2001 nor did he indicate that her compensation going forward was solely based on her $80,000 salary.[5] Notwithstanding defendant's argument that

---

[5] At his deposition, Ziperman was asked,
Q    But it wasn't your intent to drop Ms. Blumenschine's

25

plaintiff's sales did not justify any commissions in 2001, the
company did not produce any commission reports to back this up.
Plaintiff was promoted in September, yet she did not receive a
performance review regarding poor sales performance.  Defendant
discontinued plaintiff's nonrecoverable draw in May 2001 with the
promise to develop a commission plan going forward. In effect,
defendant stopped paying plaintiff any commission for the
remainder of 2001, never responded to plaintiff's inquiries to be
paid commissions, terminated her employment and then never paid
her any commission for sales from May through December 2001.  On
this record, the Court finds that withholding the nonrecoverable
draw, in the absence of a new commission plan, was arbitrary and
unreasonable and supports an award of double damages.  See
Cabrera v. G.T. Construction, 3:05CV812, 2006 WL 1272618, at *1
(D. Conn. Mar. 27, 2006) (finding that the defendant acted in
"bad faith based upon his pattern and practice of not paying
wages that were due and owing, and based upon his repeated
promises to Plaintiff's that they would be paid their back wages

---

```
            total compensation package down to $80,000, was it?
A           She has already gotten the additional $20,000.
Q           Down to a hundred?
A           Right.
Q           It wasn't your intent fo the year to drop it down to a
            hundred, was it?
A           No, if sales had increased and given me something to
            hang my hat on.  In retrospect I'm sorry I hadn't come
            up with a commission plan like I had for eMarketing.  I
            had given them a two-year plan because of different
            timing.  None of them made commission, but they had
            plans.  We wouldn't be having this conversation if I
            had estimated it earlier. I am chasing a second target.
```

Ziperman Tr. 52-53.

as an inducement for them to continue to work for him.");
Commissioner of Labor v. Wall, 69 Conn. App. 450, 462 (Conn. App.
2002) (finding that "the defendants' withholding in fact had been
motivated not by a good faith belief that they were acting in
accordance with the terms of the employment agreement, but rather
by mere whim and caprice."); Petronella ex rel. Maiorano v.
Venture Partners, Ltd., 60 Conn. App. 205, 215 (Conn. App. 2000)
(finding double damages were properly awarded, the lower Court
found "[t]he claimants were promised by said defendants that they
would be paid their back wages as an inducement to keep them
working. Yet, they were fired two months later and not given
those back wages. After being fired, they were further told they
would be paid if they would sign certain releases. However, to
this day they have not been paid."), cert. granted in part, 255
Conn. 909 (2000), appeal dismissed as improvidently granted, 258
Conn. 453 (2001); Anderson v. Shcieffer, 35 Conn. App. 31, 42-43
(Conn. App. 1994) (unjustified failure to pay commissions
demonstrated "bad faith, arbitrariness, and unreasonableness.");
Crowther v. Gerber Garment Tech. Inc., 8 Conn. App. 254, 265-66
(Conn. App. 1986) (The Court of Appeals found persuasive, the
lower court's finding that defendant "had unfettered discretion
to adjust retroactively the plaintiff's commission rate as
untenable" it "unilaterally" modified plaintiff's commission
rate'. . . "these finding show that the defendant was jaundiced
by the financial success of the plaintiff under the existing
employment contract, unilaterally undertook to reduce the

commission rate, in effect taking the law into its own hands.")
(emphasis in original).[6] Here an award of double damages "is in
keeping with the remedial purposes of the wage laws." Cabrera,
2006 WL 1272618 at *1.

Accordingly, the Court awards plaintiff double damages
pursuant to Conn. Gen. Stat. §31-72.


B.    Prejudgment and Post Judgment Interest

Additionally, the Court finds that an award of prejudgment
and post judgment interest at the statutory rate of ten percent
(10%) is warranted.  The allowance of prejudgment and post
judgment interest under Conn. Gen. Stat. §37-3a "as an element of
damages is primarily an equitable determination and a matter
within the sound discretion of the trial court." Metcalfe v.
Talarski, 213 Conn. 145, 160 (1989) (prejudgment interest); .TDS
Painting & Restoration, Inc. v. Copper Beech Farm Inc., 73 Conn.

_____

[6]Defendant's reliance on Ravetto v. Triton Thalassic
Technologies, Inc., No. FSTCV020189897, 2005 WL 3507963, at *4
(Conn. Super. Nov. 4, 2005), and the cases cited therein, are
distinguishable on the facts.  First, in Ravetto defendant's
employees were furloughed because the company was unable to pay
their salary.  Second, some employees, such as plaintiff,
voluntarily remained at work under a "deferred salary plan."
Finally, when repaying wages to plaintiff, defendant subtracted
monies "on the basis that the commissions on which the draw or
advances in the amount were paid, were never earned."  In this
case, defendant did not furlough its employees.  Blumenschine had
a nonrecoverable draw, an agreement with defendant that the
commission would be paid.  Defendant discontinued the
nonrecoverable draw in May 2001 with a promise to provide a new
plan going forward.  Ziperman testified he did not intend to
limit Blumenschine's compensation to be at $100,000 for 2001. The
jury found that the nonrecoverable draw was due to plaintiff in
the absence of a new commission plan for 2001 and based on the
testimony at trial.

App. 492, 510-11 (Conn. App.) (post judgment interest), <u>cert.
denied</u>, 262 Conn. 925 (2002).  Whether to award prejudgment
and/or post judgment interest turns on whether the detention of
the money was wrongful under the circumstances.  See <u>Spearhead
Construction Corp. v. Bianco</u>, 39 Conn. App. 122, 134-35 (Conn.
App.), <u>cert. denied</u>, 235 Conn. 928 (1995); <u>T.D. Painting &
Restoration, Inc.,</u> 73 Conn. App. at 511-12 (post judgment
interest); <u>Lawrence v. New Hampshire Ins. Co.,</u> 29 Conn. App. 484,
498, <u>cert. denied</u>, 224 Conn. 923 (1992).  Here, defendant
wrongfully withheld commissions due and owing to plaintiff and
therefore an award of prejudgment interest running from the date
that the wages were withheld is appropriate.[7]  Prejudgment
interest, awarded pursuant to §37-3a, runs from the date that the
wages were withheld until the date of judgment enters.  <u>Cabrera v.
G.T. Construction</u>, 3:05CV812, 2006 WL 1272618, *1 (D. Conn. Mar.
27, 2006).

"It follows, therefore, that post judgment interest, also
awarded pursuant to §37-3a, begins to run from the date of
judgment."  <u>T.D. Painting & Restoration, Inc.,</u> 73 Conn. App. at
511 (Post judgment interest "shall be calculated from the date of
the final judgment to the date of payment.") (citing <u>O'Leary v.
Industrial Park Corp.,</u> 211 Conn 648, 653-54 (1989)).

Accordingly, plaintiff's motion for prejudgment and post
judgment interest is **GRANTED**.

---

[7]Prejudgment and post-judgment interest is awarded only on
the unpaid wages, not the additional double damages awarded
pursuant to Conn. Gen. Stat. §31-72

C.  Reasonable Attorneys' Fees and Costs

Last, plaintiff seeks an award of attorneys' fees and costs. In support of this request, her attorneys have submitted an affidavit of Attorney Scott Lucas [Doc. #95]; contingency fee agreement dated February 8, 2002 [Doc. #95 Ex. 1]; contingency fee agreement dated May 23, 2002 [Doc. #95 Ex. 2]; billing invoice from January 7, 2002 through April 23, 2002 [Doc. #95 Ex. 3]; billing invoice from May 20, 2002 through May 31, 2006 [Doc. #95 Ex. 4]; a list of costs [Doc. #95 Ex. 5]; an invoice from State Marshal Anthony D. Verrico [Doc. #95 Ex. 6]; invoices from court reporters [Doc. #95 Ex. 6]; and Martindale.com lawyer profiles for attorneys Scott Lucas, Keith McBride, Mary Alice Canaday, Claire Ryan, and Michael Bayonne [Doc. #95 Ex. C]. Based on the affidavit and records, plaintiff seeks an award of attorneys' fees in the amount of $252,917.75 or, in the alternative, $122,915.75, plus costs of $9,625.97.[8]

---

[8]Plaintiff offers the following explanation for the alternative request of $122,915.75:

> After April 30, 2002, this matter was handled on a 20% contingency, and, given the jury award of $50,000 plus doubling under the wage statute ($40,000) for a total of $90,000, an additional $18,000 is due from plaintiff. Thus, the total fees incurred by Ms. Blumenschine through May 31, 2006 are $122,915.75 (i.e. $2,560 (under the first retainer agreement) + $102,355.75 (reduced-hourly-rate fees under the second retainer agreement) + $18,000 (contingency fee under second retainer agreement)).

[Doc. #97 at 5].

1.   The Standard for Awarding Fees

Section 31-72, provides for recovery of "reasonable attorney's fees to prevailing parties; 'it is well established, however, that it is appropriate for a plaintiff to recover attorney's fees, and double damages under that statute, only when the trial court has found that the defendant acted with 'bad faith, arbitrariness or unreasonableness.'" Schoomaker v. Lawrence Brunoli, Inc., 265 Conn. 210, 269 (2003) (citing Sansone v. Clifford, 219 Conn. 217, 229 (1991)).  The jury, by an advisory finding, and the Court have made the requisite finding of bad faith, arbitrariness or unreasonableness and plaintiff may recover a "reasonable attorney's fee."

Defendant objects to any fee award. However, defendant argues that if the Court is inclined to consider some award of attorney's fees, over objection, that the amount plaintiff sought should be reduced to one ninth (1/9)[9] to reflect her limited success at trial.  Alternatively, defendant argues that plaintiff's fee request should be reduced by eighty percent (80%).

The district court is afforded broad discretion in determining a reasonable fee award based on the circumstances of the case.  Hensley v. Eckerhart, 461 U.S. 424, 437 (1983).  The "normal starting point for calculating reasonable attorneys'

_____

[9]As defendant points out, plaintiff lost on seven of nine counts at trial, including her request for punitive damages and non-economic damages.  Significantly, the Connecticut Wage Statute claim is the sole statutory authority for an award of attorney's fees. [Doc. #96 at 4].

fees, to be awarded to a prevailing [] plaintiff is the calculation of a so-called 'lodestar' figure, which is arrived at by multiplying 'the number of hours reasonably expended in the litigation . . . by a reasonable hourly rate.'" Kirsch v. Fleet Street, Ltd., 148 F.3d 149, 172 (2d Cir. 1998) (quoting Hensley, 461 U.S. at 433). The rates to be used in calculating the lodestar are the market rates "prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." Blum v. Stenson, 465 U.S. 886, 896 & n. 11 (1984); see also Gierlinger v. Gleason, 160 F.3d 858, 882 (2d Cir. 1998). There is a strong presumption that the lodestar figure represents a reasonable rate. Quaratino v. Tiffany & Co., 166 F.3d 422, 425 (2d Cir. 1997).

"[T]he fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates." Hensley, 461 U.S. at 437. "Applications for fee awards should generally be documented by contemporaneously created time records that specify, for each attorney, the date, the hours expended, and the nature of the work done." Kirsch, 148 F.3d at 173. The Court should exclude from the fee calculation hours that were not reasonably expended. Hensley, 461 U.S. at 434. Hours that are "excessive, redundant, or otherwise unnecessary should be excluded and in dealing with such surplusage, the court has discretion simply to deduct a reasonable percentage of the number of hours claimed as a practical means of trimming fat from a fee application, from the lodestar calculation." Kirsch, 148 F.3d at 173 (internal

citations and quotation marks omitted).  The task of determining

a fair fee requires a conscientious and detailed inquiry into the

validity of the representations that a certain number of hours

were usefully and reasonably expended.  Lunday v. City of Albany,

42 F.3d 131, 134 (2d Cir. 1994) (remanding award of attorneys'

fees and directing the magistrate judge to review critically

counsel's time records).  The trial court must

> examine the hours expended by counsel and the
> value of the work product of the particular
> expenditures to the client's case . . . . In
> making this examination, the district court
> does not play the role of an uninformed
> arbiter but may look to its own familiarity
> with the case and its experience generally as
> well as to the evidentiary submissions and
> arguments of the parties.

Gierlinger, 160 F.3d at 876 (quoting DiFilippo v. Morizio, 759

F.2d 231, 235-36 (2d Cir. 1985)).  The Second Circuit has further

directed that if the Court determines that certain hours are not

deserving of compensation, it must state the reasons for

excluding those hours "as specifically as possible."  LeBlanc-

Sternberg v. Fletcher, 143 F.3d 748, 764 (2d Cir. 1998) (internal

quotations omitted) (citing Orchano v. Advanced Recovery, Inc.,

107 F.3d 94, 99 (2d Cir. 1997)).

"The product of reasonable hours times a reasonable rate

does not end the inquiry."  Hensley, 461 U.S. at 434.  There are

other considerations that may lead a court to adjust the fee

upward or downward.  Id.  The lodestar figure may be adjusted on

the basis of the "results obtained."  Id.  "Indeed 'the most

critical factor' in determining the reasonableness of a fee award

'is the degree of success obtained.'" <u>Farrar v. Hobby</u>, 506 U.S. 103, 114 (1992) (quoting <u>Hensley</u>, 461 U.S. at 436). "This factor is particularly crucial where a plaintiff is deemed 'prevailing' even though he succeeded on only some of his claims for relief." <u>Hensley</u>, 461 U.S. at 434. A plaintiff who prevails on some but not all of his claims is not entitled to a fee award for unsuccessful claims that were based on different facts and different legal theories. <u>Id.</u> However, "[a] plaintiff's lack of success on some of his claims does not require the court to reduce the lodestar amount where the successful and unsuccessful claims were interrelated and required essentially the same proof." <u>Murphy v. Lynn</u>, 118 F.3d 938, 952 (2d Cir. 1997), <u>cert. denied</u>, 522 U.S. 1115 (1998) (citation omitted); <u>DeLeon v. Little</u>, No. 3:94CV902, 2000 WL 435494, at *4 (D. Conn. Mar. 2, 2000). The following factors may also be considered: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. <u>Hensley</u>, 461 U.S. at 430 n. 3.

2.  Plaintiff's Fee Request

    a.  Reasonableness of the Hours Claimed

Plaintiff bases her fee request on 994.8 hours of time billed by attorneys Scott Lucas, Mary Alix Canaday, Michael Bayonne, Claire Ryan, Keith McBride and paralegal Bonnie Ford.

There are two applicable fee agreements between Ms. Blumenschine and the firm of Martin, Lucas & Chioffi, LLP.   The firm was initially retained by plaintiff on an hourly basis, with the option to convert to a split-fee agreement, providing both substantially reduced hourly rates and a twenty percent (20%) contingency fee. [Doc. #95 Ex. 1].  The first agreement covers the period of January 7 through April 23, 2002.  Plaintiff seeks 10.6 hours of time totaling $2,560 in attorneys' fees under the terms of the first agreement. [Doc. #95 Ex.3].

On or about May 23, 2002, the terms of the engagement were changed to the split fee arrangement, retroactive to May 20, 2002. [Doc. #95 Ex. 2].  The second agreement covers the period from May 23, 2002 through May 31, 2006.  Plaintiff seeks 984.20 hours of time totaling $102,355.75, plus $18,000 due under the contingency fee portion of the second agreement (twenty percent (20%) of the $90,000 damages award). In addition, plaintiff seeks $9,625.97 in costs for a total of $132,541.72 in attorneys' fees and costs.  [Doc. #95 Ex. 5].

Defendant argues that "the causes of action Blumenschine prevailed on (and the only one on which she can be awarded attorney's fees) have no overlapping legal elements or theories with her federal discrimination-based claims and are not

factually 'inextricably intertwined' with the discrimination-based counts, as evidenced by the underlying factual predicate for the different claims." [Doc. #96 at 8].

Defendant proposes an across the board award reduction to one-ninth (1/9) of the total fees and costs sought, since the sole source of the Court's discretionary authority to award fees is the Connecticut Wage statute §31-72. One-ninth (1/9) of the total requested fees and costs is $14,726.85.

The Court has carefully considered defendant's requests to disallow specific time entries, and rules as follows:

1.  In considering the first invoice, the time entries totaling 7 hours referencing work performed preparing for and representing plaintiff at the CHRO proceeding are disallowed.[10]  [Doc. #95 Ex. 1].

2.  In considering the second invoice, the time entries from May 2, 2002 through December 2, 2002, totaling 13.65 hours that reference work performed preparing for and representing plaintiff at the CHRO proceeding are disallowed. [Doc. #95 Ex.4].

3.  Time entries totaling 56.8 hours referencing work performed relating to trial experts Wishnick and Silverman are disallowed. [Doc. #95 Ex.4].

4.  The time entry of .7 hour on May 6, 2004, to discuss a job offer with plaintiff is disallowed. [Doc. #95

---

[10]The Court will permit 3.7 hours for the time expended meeting with plaintiff at the start of the case and in preparing plaintiff's demand letter and responding to defendant's opposition in the amount of $1,170.

36

Ex.4].

5.   Time entries totaling 81.8 hours referencing work
     performed on the motions in limine are disallowed.
     [Doc. #95 Ex.4].

6.   Time entries totaling 13.9 hours referencing work
     performed preparing witnesses Nancy Switkes and Sara
     Sikes are disallowed. [Doc. #95 Ex.4].

7.   Time entries totaling 27.25 hours referencing work
     performed relating to research on federal
     discrimination claims and/or damages are disallowed.
     [Doc. #95 Ex.4].

8.   Time entries totaling 136.2 hours referencing work
     performed researching and drafting plaintiff's summary
     judgment motion are disallowed.  Plaintiff's Motion for
     Summary Judgment was denied on all grounds. [Doc. #95
     Ex.4].

9.   Time entries totaling 83.74 hours referencing work
     performed researching and drafting plaintiff's
     opposition to defendant's motion for summary judgment
     are disallowed.  Plaintiff prevailed on her Connecticut
     Wage Statute claim. Accordingly, the Court permitted an
     award of one-ninth (1/9) or 10.46 hours of the total
     94.2 hours performed in opposing the motion.

10.  Time entries totaling 24.35 hours referencing work
     performed researching and drafting a reply to
     defendant's opposition to plaintiff's motion for
     summary judgment and two (2) entries for reviewing the

court's rulings on summary judgment are disallowed.

11. Time entries totaling 10.25 hours referencing work
performed in preparation for and in deposing Dan
Boucher are disallowed.

Based on the review a above, the Court disallows 455.64
hours.

Finally, the Court makes a further reduction in the time
entries for excessive, unnecessary or vague entries. The Second
Circuit has held that an application for attorneys' fees must be
supported by detailed, contemporaneous time records indicating
the attorney who performed the work, the date, the hours
expended, and the nature of the work done." New York Ass'n for
Retarded Children v. Carey,711 F.2d 1136, 1148 (2d Cir. 1983).
While the fee applicant's records need not be extraordinarily
detailed, they must identify the general subject matter of the
claimed time expenditures. Hensley, 461 U.S. at 437.  A review of
the submitted records reveals that a number of the entries in the
records submitted by counsel indicate merely that a phone call,
or a conference was held without describing the nature of the
discussions.   "A court may ... refuse to award fees based on
time entries that provide a vague description of the work
performed."  Smart SMR of New York, Inc., 9 F. Supp. 2d at 150.
"Entries stating such vague references as 'review of file',
'review of correspondence', 'research', 'conference with client',
and 'preparation of brief' do not provide an adequate basis upon
which to evaluate the reasonableness of the services and hours
expended on a given matter."  Rabin, 425 F. Supp. 2d at 273

(quoting Mr. & Mrs. B. v. Weston Bd. of Educ., 34 F. Supp. 2d 777, 781 (D. Conn. 1999)).

A court may attempt to clarify vague entries by looking at the context of adjacent entries. Conn. Hosp. Ass'n v. O'Neill, 891 F. Supp. 687, 691 (1994). However, courts have stated that it is "neither practical nor desirable" to review each entry in a massive case. Copeland, 641 F.2d at 903 ("a district court [should not], in setting an attorney's fee, become enmeshed in a meticulous analysis of every detailed facet of the professional representation.").

An award of attorney fees is not "to serve as full employment or continuing education programs for lawyers and paralegals." Lipsett v. Blanco, 975 F.2d 934, 938 (1st Cir. 1992). Thus, a "trial court should ordinarily greet a claim that several lawyers were required to perform a single set of tasks with healthy skepticism." Id. at 938-39 (citing United Nuclear Corp. v. Cannon, 564 F. Supp. 581, 590 (D.R.I. 1983)). "It is well recognized that when more lawyers than are necessary are assigned to a case, the level of duplication of effort increases ...." Farmington Sav. Bank v. Patriot Mech. Servs., LLC, CV0308273578, 2004 WL 422954, at *9 (Conn. Super. Ct. Jan. 26, 2004) (quoting Gatti v. Community Action Agency of Greene County, Inc., 263 F. Supp. 2d 496, 518 (N.D.N.Y. 2003)).

"[I]n many cases in which prevailing parties seek an award of attorneys fees, it is unrealistic to expect a trial judge to evaluate and rule on every entry in an application ... For that reason, many courts have endorsed percentage cuts as a practical

means of trimming ... a fee application." <u>Farmington Sav. Bank</u>,
2004 WL 422954, at *9 (internal quotations and citations
omitted).

Defendant correctly points out that a number of billing
entries are vague. The Court spent a considerable amount of time
reviewing the billing records, affidavit and exhibits submitted
by counsel in order to evaluate the services performed. In some
instances, vague entries can be clarified by reviewing adjacent
time entries, in which case a deduction has not been taken.
However, multiple entries for "review file" or "attention to
file" "attention to status" "conference with. . ." or "misc." are
noted.[11] Other entries are purely duplicative or excessive. The
billing records contain multiple entries of attorneys billing for
conferences with each other and/or with their client present.[12]
Understandably, it is impossible to determine whether these hours
and others like them were duplicative or were justifiably billed.
Accordingly, the Court finds an across the board 4% reduction for
these specific entries is justified. This reduction totals twenty
(20) hours.

---

[11]For example, February 8, December 9, 10, 16, 2002,
February 4, March 5, 11, 17, May 2, 15, 21, 2003. This is not an
exhaustive list but an example of the entries disallowed.

[12]For example, on December 9, 11, 2002, May 23, 2003, July
21, 22, both Attorneys Lucas and an associate billed for
conferences with each other and/or their client. This is not an
exhaustive list but an example of the entries disallowed.

b.  Reasonable Hourly Rate

The traditional lodestar method for determining reasonable attorneys fees calculates a figure "based upon the number of hours reasonably expended by counsel on the litigation multiplied by a reasonable hourly rate." Luciano v. Olsten Corp., 109 F.3d 111, 115 (2d Cir. 1997) (citing Blanchard v. Bergeron, 489 U.S. 87, 94 (1989)). "The 'lodestar' figure should be in line with those [rates] prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." Id. (citation and internal quotation marks omitted). The "prevailing community" used to determine the lodestar figure is typically, with few exceptions, "the district in which the court sits," in this case, the District of Connecticut. See id. (citation and internal quotation marks omitted). "[T]here is . . . a strong presumption that the lodestar figure represents a reasonable fee." A.R. ex rel. R.V. v. N.Y. City Dep't of Educ., 407 F.3d 65, 79 (2d Cir. 2005) (citations and internal quotation marks omitted).

Under the first fee agreement, plaintiff agreed to pay her attorneys on an hourly basis. Remaining under the first fee agreement is 3.6 hours for the time expended by Attorney Scott Lucas meeting with plaintiff at the start of the case, preparing plaintiff's demand letter and responding to defendant's opposition to the demand in the amount of $1,080. [Doc. #95 Ex. 1].  Plaintiff has requested a fee award for Attorney Lucas at a billable rate of $385 per hour based on his over twenty (20) years as an AV-rated litigator whose practice focuses in large

41

part on employment law matters. [Doc. #95 at 8]. In the fee agreement Attorney Lucas states, "I will have primary responsibility for this matter, and my current hourly rate is $300." [Doc. #95 Ex. 1]. As Attorney Lucas agreed to be paid $300 per hour for his work, he cannot now seek reimbursement at the higher rate of $385.00.  Additionally, the Court finds that a rate of $300 is a reasonable rate for an attorney of Mr. Lucas' experience in Stamford, Connecticut. See Galazo v. Pieksza, No. 4:01-CV-01589(TPS), 2006 WL 141652, *3 (D. Conn. Jan. 19, 2006) (allowing $350 per hour for attorney with over 35 years experience in civil rights litigation); Shorter v. Hartford Financial Services Group, 3:03CV0149(WIG), 2005 WL 2234507, *10 (D. Conn. May 31, 2005) (awarding $300 per hour for attorney with 13 years experience in employment law); Cabrera v. G.T. Construction, 3:05-CV-812(MRK)(WIG), 2006 WL 1328767, at *1 (D. Conn. May 8, 2006) (finding $300 per hour is a reasonable rate for an attorney with 40 years experience). The Court finds that 3.6 hours at a rate of $300 per hour is reasonable.

After April 30, 2002, plaintiff entered into a second fee arrangement, agreeing to pay her lawyers a reduced hourly rate with a twenty (20%) contingency [Doc. #95 Ex.2]. Remaining under the second fee agreement are 510 hours. The bulk of the billing records in this case is based on this fee arrangement and represents billing entries from May 20, 2002 through May 31, 2006.  Plaintiff argues that the amount billed under this fee agreement is "significantly lower than the lodestar amount of $252,917.25, and [the Court "should"] add to it until a

reasonable fee amount is reached." [Doc. #95 at 9-10].[13]

Notwithstanding the split fee agreement for work performed after May 1, 2002, the Court will review the billing under the second agreement by the "number of hours reasonably expended by counsel on the litigation multiplied by the reasonable hourly rate." Luciano, 109 F.3d at 115.

This Court recently reviewed the prevailing rate for paralegals, associates and partners practicing in the District of Connecticut.

From 1996 through 2005, courts in Connecticut have recognized reasonable attorney rates in varying amounts. See Evans v. State of Connecticut, 967 F. Supp. 673 (D. Conn. 1997) (in Title VII action, rates of $200 for attorney and $50 for law students/paralegals were reasonable); Wallace v. Fox, 7 F. Supp. 2d 132 (D. Conn. 1998) (in class action shareholder derivative suit, average rate of $300 to $375 was reasonable); Jacques All Trades Corp. v. Laverne Brown, et al, CV 900381618S, 1998 WL 161228 (Conn. Super. Mar. 17, 1998) (in CUTPA action, $150 for partners, $100 for associates, and $55 for paralegals was reasonable); Hardy v. Saliva Diagnostic Sys., Inc., 52 F. Supp. 2d 333 (D. Conn. 1999) (in breach of employment contract case, rates of $185 to $200 were reasonable); St. George v. Mak, No. 5:92CV587, 2000 WL 305249 (D. Conn. Feb. 15, 2000) (in § 1983 action, rates of $250 and $175 were not challenged as unreasonable); Kaplan, 2000 WL 767679, at * 7 (in CUTPA case, reduced reasonable rate for NY attorney was $350); Evanauskas v. Strumpf, No. 3:00CV1106, 2001 WL 777477, at *23 (D. Conn. June 27, 2001) (in a Fair Debt Collections Act case, an

---

[13]Attorney Lucas explained that, "[t]he lodestar method is provided by way of guidance. As noted in the moving papers, it is appropriate to award Ms. Blumenschine at least her actual fees and expenses under the retainer agreement provided the agreement is found to be reasonable. Deviation upward is at this Court's discretion." Lucas Aff. n. 1.

attorney with "extensive experience" was entitled to $275 per hour); Tsombanidis, 208 F. Supp. 2d at 275-77 (in motion for attorney's fees under § 1988, partner rate of $275, associate rate of $165, and paralegal rate of $50 were reasonable); Petronella v. Acas, No. 3:02cv1047, 2004 WL 1688525 (D. Conn. Jan. 23, 2004) (in an interpleader action $225 was a reasonable rate which could be reduced to $113 after a deduction for travel time was made); Stanley Shenker & Assoc., Inc. v. World Wrestling Fed'n. Entm't., No. X05CV000180933S, 2005 WL 758135 (Conn. Super. Mar. 1, 2005) (in a complex secured transactions case, $285 for a partner and $195 for an associate was reasonable); Sony Electronics, Inc. v. Soundview Tech., 389 F. Supp. 2d 443, (D. Conn. 2005) (in complex trademark litigation, $400 is the highest rate Connecticut has allowed for an attorney with vast experience); Galazo v. Pieksza, No. 4:01-CV-01589, 2006 WL 141652 (D. Conn. Jan. 19, 2006) (in § 1983 case, $350 for partner and $250 for associate were reasonable rates).

See Rand-Whitney Containerboard v. Town of Montville, 3:96CV413(HBF), 2006 WL 2839236, *10 (D. Conn. Sept. 5. 2006). Accordingly, the Court finds the following rates are reasonable based on the Court's years of practice and knowledge of rates charged generally within the District Court.[14]

| | |
|---|---|
| Scott R. Lucas, Partner | $300 |
| Mary Alice S. Canaday, Associate | $250 |
| Claire E. Ryan, Associate | $225 |
| Michel Bayonee, Associate | $175 |
| Keith A. McBride, Associate | $150 |
| Bonnie K. Ford, Paralegal | $ 75 |

[14]In 2006, the associates had the following years of experience: Attorney Canaday-twelve (12) years, Attorney Ryan-seven (7) years, Attorney Bayonnee-five (5) years, and Attorney McBride-three (3) years.

The Court will address whether the lodestar calculation represents a reasonable fee below.

c.    Adjustment for Limited Success

"Although there is a 'strong presumption' that the lodestar figure represents the 'reasonable' fee, other considerations may lead to an upward or downward departure from the lodestar.  Grant v. Martinez, 973 F.2d 96, 101 (2d Cir. 1992) (internal quotation marks and citation omitted).  It is undisputed that the lodestar figure may be adjusted on the basis of the results obtained. Hensley, 461 U.S. at 434.  "The party advocating such a departure, however, bears the burden of establishing that an adjustment is necessary to the calculation of a reasonable fee." Id. (citing United States Football League v. National Football League, 887 F.2d 408, 413 (2d Cir. 1989), cert. denied, 493 U.S. 1071 (1990)). "A prevailing party who is entitled to a fee award for his successful prosecution of successful claims is not entitled to a fee award for unsuccessful claims that were 'based on different facts and different legal theories.'" Kirsch, 148 F.3d at 173 (citing Hensley, 461 U.S. at 434); see also Hyde v. Small, 123 F.3d 583, 585 (7th Cir. 1997) (district court must determine whether "the plaintiff was aiming high and fell far short, in the process inflicting heavy costs on his opponent and wasting the time of the court, or whether ... the case was simply a small claim and was tried accordingly.").

Defendant seeks an eighty (80%) downward reduction based on plaintiff's limited success at trial or one-ninth (1/9) of the

45

total fees and costs sought.

> In <u>Hensley</u>, 461 U.S. at 434-37, the Supreme
> Court set forth an analytic framework for
> determining whether a plaintiff's partial
> success requires a reduction in the lodestar.
> At step one of this analysis, the district
> court examines whether the plaintiff failed
> to succeed on any claims wholly unrelated to
> the claims on which the plaintiff succeeded.
> The hours spent on such unsuccessful claims
> should be excluded from the calculation.  <u>Id.</u>
> at 434-35; 2 Martin A. Schwartz & John E.
> Kirklin, Section 1983 Litigation 276-77 (2d
> ed. 1991). At step two, the district court
> determines whether there are any unsuccessful
> claims interrelated with the successful
> claims. If such unsuccessful claims exist,
> the court must determine whether the
> plaintiff's level of success warrants a
> reduction in the fee award. <u>Hensley</u>,  461
> U.S. at 436; 2 Schwartz & Kirklin, supra, at
> 278. If a plaintiff has obtained excellent
> results, however, the attorneys should be
> fully compensated. <u>Hensley</u>, 461 U.S. at 435.

<u>Grant</u>, 973 F.2d at 101.

Here, under step one of the analysis, plaintiff failed to
succeed on all of her federal and state employment discrimination
claims.  These claims were wholly unrelated to the state law
claims of negligent misrepresentation and violation of the
Connecticut Wage Statute. However, it is difficult to further
exclude the hours spent on the unsuccessful claims where the
entries do not specifically state which claims the work was
attributed to.  To the extent there were specific entries, the
Court has excluded the fees.  At step two of the analysis, the
Court finds that some of the discovery and witnesses was
necessary for all of the claims.  As demonstrated in this ruling,
the testimony of Lisa Blumenschine, Bill Ziperman, Joe Hanson,
Dan Kinneman and, to a lesser extent, Dan Shannon was necessary

to consider the disputed issues raised in plaintiff's two successful claims. There is no question, however, that the discovery and trial would have been significantly streamlined if plaintiff's case were solely based on the claims of negligent misrepresentation and violation of the Connecticut Wage Statute. It is true that plaintiff's demand for $1,354,316 in damages on the federal and state employment discrimination claims undoubtedly precluded settlement of the case. Accordingly, the Court finds that plaintiff's level of success warrants a further reduction of the fee award.  That determination lies largely with the discretion of the trial court.  Grant, 973 F.2d at 101; Hyde, 123 F.3d at 585 ("the judgment of reasonableness is confined to the discretion of the district court.").

|  | Lodestar Rate | Hours | Total |
|---|---|---|---|
| Scott R. Lucas, Partner | $300 | 219.3 | $65,790.00 |
| Mary Alice S. Canaday, Assoc. | $250 | .2 | $    50.00 |
| Claire E. Ryan, Associate | $225 | 2.2 | $   495.00 |
| Michel Bayonee, Associate | $175 | 77.15 | $13,501.25 |
| Keith A. McBride, Associate | $150 | 135.85 | $20,377.50 |
| Bonnie K. Ford, Paralegal | $ 75 | 75.30 | $ 5,647.50 |
|  | TOTAL | 510.00 | $105,861.25 |

The Court finds an across the board reduction based on the results obtained of seventy percent (70%) is warranted. Therefore the Court awards plaintiff **$31,758.37.**

The Court awards attorneys' fees associated with the preparation and filing of the post-verdict motion and reply brief

without reduction in the number of hours in the amount of
**$4,455.00**

    d.   <u>Costs</u>

Plaintiff seeks $9,625.97 in costs associated with this litigation. [Doc. 95 Ex.5]. The normal procedure is to submit a verified bill of costs directly to the clerk of the court. D. Conn. L. Civ. R. 54(a).

Consistent with this ruling that fees and costs attributable to the violation of the Connecticut Wage statute may be awarded, the Court disallows the following costs:

June 11, 2003-Actuarial Litigation Service (expert retainer fee) for $900.00 is disallowed.

September 8, 2003-Deposition transcripts for Beverly Silverman and Sheldon Wishnick for $394.32 is disallowed.

September 8, 2003-Subpoena witness fee (Boucher) for $58.25 is disallowed.

September 10, 2003-Service of subpoena fee (Boucher) for $60.00 is disallowed.

October 31, 2003-Transcript costs (Boucher) for $217.00 is disallowed. [Doc. #95 Ex. 6].

April 24, 2006-Actuarial Litigation Service-Expert file review/update for $250.00 is disallowed.

May 16, 2006-Retainer for trial testimony for $1,000.00 is disallowed.

The Court reviews the following costs using the Local Rule 54 standard.

<u>Westlaw Research</u>

All computer legal research fees are disallowed pursuant to D. Conn. L. Civ. R. 54(c)(7)(xi).

<u>Postage and Federal Express</u>

All general postage expenses of counsel, Federal Express or other express mail service costs are disallowed pursuant to D. Conn. L. Civ. R. 54(c)(7)(xvi). Similarly, fees incurred for messenger service are disallowed.

<u>Travel Expenses</u>

All counsel fees and expenses in arranging for and traveling to a deposition or trial are disallowed pursuant to D. Conn. L. Civ. R. 54(c)(7)(v). All attorneys' fees incurred in attending depositions, conferences or trial, including expenses for investigations are disallowed pursuant to D. Conn. L. Civ. R. 54(c)(7)(ix).

<u>Items Taxable as Costs</u>

1. <u>Complaint</u>

The Complaint filing fee of $150.00 and service fee of $75.00 is allowed pursuant to D. Conn. L. Civ. R. 54(c)(1).

2. <u>Fees for Court Reporter</u>

The costs of an original and one copy of deposition transcripts are recoverable if they are used for cross examination or impeachment, or if they are necessarily obtained for the preparation of the case and for the convenience of counsel. D. Conn. L. Civ. R. 54(c)(2)(ii). Court reporter fees are taxed at the prevailing page rate pursuant to D. Conn. L. Civ. R. 80. Maximum transcript rates for an original and one

copy are $4.13 per page (incurred after April 1, 2003).

The Court finds that the costs for transcripts for plaintiff Lisa Blumenschine in the amount of $512.00, and tax in the amount of $32.50 are allowable in the amount of $544.50. Defendant's request for fees for multi-page condensing in the amount $30.00 is disallowed.

The Court finds that the costs for transcripts for William Ziperman in the amount of $343.00, appearance fee of the court reporter of $85.00, and tax in the amount of $27.15 are allowable in the amount of $455.15. Defendant's request for fees for key word index in the amount of $15.00 and for shipping and handling in the amount of $9.48 are disallowed.

The Court finds that the costs for transcripts for Daniel Kinneman are allowable, subject to submission of supporting documentation of the number of pages and the page rate charged. Plaintiff will provide the documentation within ten (10) days. The appearance fee of the court reporter of $85.00, and tax in the amount of $19.33, are allowable in the amount of $104.33. Defendant's request for fees for key word indexing in the amount $15.00 and for shipping and handling in the amount of $8.70 are disallowed.

The Court finds that the costs for transcripts for Joseph Hanson are allowable, subject to submission of supporting documentation of the number of pages and the page rate charged. Plaintiff will provide the documentation within ten (10) days. The appearance fee of the court reporter of $85.00, and tax in the amount of $21.43, are allowable in the amount of $106.43.

Defendant's request for fees for key word indexing in the amount $15.00 and for shipping and handling in the amount of $8.70 are disallowed.

The Court finds that the costs for transcripts for Daniel Shannon are allowable subject to submission of supporting documentation of the number of pages and the page rate charged. Plaintiff will provide the documentation within ten (10) days. The appearance fee of the court reporter of $85.00, and tax in the amount of $21.95,[15] are allowable in the amount of $106.95. Defendant's request for fees for key word indexing in the amount $15.00 and for shipping and handling in the amount of $14.60 are disallowed.

<u>Photocopies</u>

Plaintiff's request for photocopy fees in the amount of $379.35 incurred during May 2006, the month the case was tried, are allowed pursuant to D. Conn. L. Civ. R. 54(c)(3)(I).  All other photocopy fees are disallowed pursuant to D. Conn. L. Civ. R. 54(c)(3)(iii) and (c)(7)(xv).

Accordingly, plaintiff's request for costs is **GRANTED** in the amount of **$1,921.71.**

---

[15]The court reporter's invoice includes taxes for the deposition of Daniel Shannon and David Boucher in the amount of $43.90.  As the Court has already disallowed expenses associated with David Boucher, one-half of the taxes on the invoice were attributed to Daniel Shannon in the amount $21.95.

<u>CONCLUSION</u>

For the reasons stated, plaintiff's Motion Post Trial Motion for Court Awarded Statutory Damages, Reasonable Attorney's Fees, Costs, and Pre-Judgment and Post-Judgment Interest **[Doc. #95]** is **GRANTED** in accordance with this ruling. Plaintiff's motion for prejudgment and post judgment interest is **GRANTED**. Attorneys' fees are awarded in the amount of $**36,213.37**[16] and costs in the amount of $**1,921.71**.

Defendant's oral Motion for Judgment as a Matter of Law **[undocketed]** is **DENIED**.

This is not a recommended ruling. The parties consented to proceed before a United States Magistrate Judge [Doc. #48] on February 9, 2006, with appeal to the Court of Appeals.

SO ORDERED at Bridgeport this 30th day of March 2007.

___/s/_____
HOLLY B. FITZSIMMONS
UNITED STATES MAGISTRATE JUDGE

---

[16]This figure represents the total of $31,758.37 in reduced fees plus fees associated with the preparation and filing of the post-verdict motion and reply brief in the amount of $4,455.00